**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

|  |  |  |
|---|---|---|
| CBRE REALTY FINANCE TRS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 08-cv-1964 |
| BRIAN A. MCCORMICK | ) ) ) | |
| and | ) ) | |
| CHARLES W. MOORE, | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' ANSWER, COUNTERCLAIM AND JURY DEMAND

Defendants, Brian A. McCormick ("McCormick") and Charles W. Moore ("Moore") (hereinafter collectively the "Defendants"), answer the Plaintiff, CBRE Realty Finance TRS, LLC's, (hereinafter the "Plaintiff") Complaint as follows:

1. To the extent that paragraph 1 is an attempt to describe the claims brought by the Plaintiff, the allegations do not require a response. To the extent they constitute allegations of fact, the allegations are denied.

2. The Defendants lack information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 and the same are therefore denied.

3. It is admitted that Defendant Moore is an adult individual residing in New York. The remaining allegations are denied.

4. Admitted.

1

5. The Defendants admit that the amount in controversy is in excess of $75,000.00. The Defendants lack information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 5 and the same are therefore denied.

6. The allegations contained in paragraph 6 call for a legal conclusion and therefore no response is required.

7. The allegations contained in paragraph 7 call for a legal conclusion to which no response is required.

8. It is admitted that CBF Holdings and Triton RF are parties to a Loan Agreement dated as of October 31, 2005 and that Triton RF issued a promissory note to CBF Holdings. Further answering, the Original Rodgers Forge Loan and any promissory note speak for themselves and any attempt to summarize or re-characterize the terms of such documents is denied.

9. Admitted.

10. Admitted.

11. Admitted.

12. It is admitted that Defendants executed a guaranty in favor of CBF Holdings. Further answering, the guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

13. Defendants are without sufficient information to admit or deny the allegations contained in paragraph 13 and therefore such allegations are denied.

14. It is admitted that CBF and Triton RF are parties to a certain Loan Agreement dated as of April 14, 2006 and that Triton RF executed an amended and restated promissory note in favor of CBF. Further answering, the Rodgers Forge Loan

2

and Rodgers Forge Note speak for themselves and any attempt to summarize or re-characterize the same is denied.

15. Denied.

16. The first sentence of paragraph 16 is admitted. It is denied that Rodgers Forge Apartments Realty Company Limited Partnership is or was a subsidiary of Triton RF. The terms of Rodgers Forge Note and any Indemnity Deed of Trust speak for themselves and any attempt to summarize or re-characterize the same is denied.

17. It is admitted that the Defendants executed an amended and restated guaranty relative to the Rodgers Forge Loan. Further answering, the Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

18. To the extent the allegations contained in paragraph 18 call for a legal conclusion they are denied. Further answering, the Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

19. The Rodgers Forge Guaranty and Rodgers Forge Loan Agreement speak for themselves and any attempt to summarize or re-characterize the same is denied.

20. The Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

21. It is admitted only that CBF declared a default and accelerated the indebtedness it claimed under the Rodgers Forge Note. It is further denied that any failure to make payments to Ohio Savings Bank constituted a reason for CBF to declare a default. The remaining allegations contained in paragraph 21 are denied.

22. Admitted.

23. It is admitted that on or about April 27, 2007 CBF sent a certain notice to the Defendants. Such notice speaks for itself and any attempt to summarize or re-characterize such notice is denied.

24. It is admitted only that the CBF has made certain demands on the Defendants and that the Defendants have not made payments to CBF in response to that demand. It is denied that the Defendants are liable to CBF or otherwise required to make payments to CBF.

25. The Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

26. Denied. By way of further answer, any failure to complete any portion of the project on time or on budget was either waived by Plaintiff or was the result of Plaintiff's conduct.

27. It is admitted that certain taxes associated with the Project were not paid prior to the foreclosure. However, the failure to pay the said taxes resulted from the failure of CBF to honor its promises to provide continued funding of the interest reserve or to waive current interest payments, the result of which was that the Borrower was required to use money that otherwise would have gone into project development, including the payment of ongoing taxes, to the payment to CBF of ongoing interest payments. The balance of the allegations contained in paragraph 27 are denied. By way of further answer, the Rodgers Forge Loan speaks for itself and any attempt to summarize or re-characterize the same is denied.

28. It is admitted that CBF and Montrose are parties to a Loan Agreement dated as of November 8, 2005 and that Montrose issued a promissory note to CBF.

4

Further answering, the Montrose Loan Agreement and any promissory note speak for themselves and any attempt to summarize or re-characterize the terms of such documents is denied.

29. Admitted.

30. Admitted.

31. Denied.

32. Denied.

33. It is denied that Montrose acquired Triton Pavilion, LLC. The remaining allegations are admitted.

34. Admitted.

35. It is admitted that Exhibit B is a true and correct copy of the Montrose Guaranty, which was executed by the Defendants. The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

36. The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

37. The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

38. The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

39. It is admitted that CBF took ownership of Montrose. The remaining allegations are denied.

40. It is admitted only that on or about April 27, 2007, CBF provided a certain notice to the Defendants. The notice provided speaks for itself and any attempt to summarize or re-characterize such notice is denied.

41. It is admitted only that the CBF has made certain demands on the Defendants and that Defendants have not made any payments to CBF in response. It is denied that the Defendants are liable to CBF or were obligated to make any payments pursuant to that demand.

42. It is admitted only that certain tax obligation on the Montrose Property were not satisfied and that CBF advanced funds to satisfy the same. However, the failure to pay the said taxes resulted from the failure of CBF to honor its promises to provide continued funding of the interest reserve or to waive current interest payments, the result of which was that the Borrower was required to use money that otherwise would have gone into project development, including the payment of ongoing taxes, to the payment to CBF of ongoing interest payments. The balance of the allegations contained in paragraph 42 are denied.

43. Denied.

44. Denied.

45. Denied.

46. It is admitted only that CBF wrote to the Defendants on or about August 9, 2007 and made certain demands. The August 9, 2007 letters speak for themselves and any attempt to summarize or re-characterize the same is denied.

47. The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

48. Denied.

## COUNT I
## BREACH OF CONTRACT (Rodgers Forge)

49. Defendants incorporate the foregoing responses herein by reference.

50. Denied.

51. Denied.

52. Denied.

## COUNT II
## BREACH OF CONTRACT (Montrose)

53. Defendants incorporate the foregoing responses herein by reference.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's action is barred by the doctrine of laches.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's action is barred by its own unclean hands.

## FOURTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by its failure to mitigate its damages.

## FIFTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by the doctrine of duress.

### SIXTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by the doctrine of illegality.

### SEVENTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by the doctrines of waiver and estoppel.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred by the doctrine of setoff.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred because it violated its covenant of good faith and fair dealing.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's action is barred as a result of its own failure to perform in accordance with the agreements that are at issue in this case.

### COUNTERCLAIM

1.     Plaintiff in counterclaim, Brian A McCormick ("McCormick") is an adult individual who at all times relevant hereto had a business address at 410 Severn Avenue, Annapolis, Maryland.

2.     Plaintiff in counterclaim, Charles W. Moore ("Moore") is an adult individual who at all times relevant hereto had a business address at 410 Severn Avenue, Annapolis, Maryland.

3.     At all relevant times, McCormick and Moore were the sole owners of Bellona Holdings, LLC ("Bellona") and Montrose Investment Holdings, LLC ("Montrose").  Bellona owned 100% of Triton Rodgers Forge, LLC ("Triton"), which in turn owned indirectly 100% of the condominium conversion project located in Baltimore,

Maryland known as Rodgers Forge Condominiums. Montrose owned indirectly 100% of the condominium conversion project located in Rockville, Maryland known as Monterey Condominiums. As a result of these ownership interests, McCormick and Moore were entitled to all of the profits derived from the development and sale of the condominiums at Rodgers Forge and Monterey.

4.      Defendant in counterclaim, CBRE Realty Finance TRS, LLC ("CBF") is, upon information and belief, a limited liability company with offices at 185 Asylum Street, Hartford, Connecticut.

### The Monterey Transaction

5.      On or about November 8, 2005, CBF and Montrose entered into a Loan Agreement and related documents whereby CBF agreed to provide mezzanine financing to permit Montrose to develop the Monterey Condominiums project, and to market and sell those condominium units.

6.      Until approximately one month before the closing of the mezzanine financing, Triton was led to believe that, as is typical of loans of this type, interest would not be required to be paid currently but would accrue and be paid upon completion of the project. Indeed, with interest accruing at more than $750,000 per month on the senior loan, the project could not afford an additional $220,000 per month in interest payments to the mezzanine lender.

7.      During October 2005, approximately a month before Montrose's scheduled acquisition of the property that was the subject of the condominium conversion, CBF advised Montrose that, in connection with its anticipated public offering of its stock, it needed to be able to report to prospective investors that there would be

ongoing cash flow from the mezzanine financing in the form of interest payments in an amount of not less than eight (8%) percent per annum.  CBF further advised Montrose that its current business plan was in jeopardy, that the CBF board was pressuring CBF management to do what was necessary in order to meet the CBF business plan and that the current payment of interest by Montrose was absolutely critical to CBF so that it could buy time with its investors in order to implement its failing business plan.

8. In order to accomplish its goal of demonstrating to potential investors that there would be ongoing interest payments while at the same time addressing the fact that the project could not afford to make interest payments, CBF proposed that it lend a sufficient amount of money to Montrose to establish an interest reserve account sufficient for Montrose to make ongoing interest payments in the amount of eight (8%) percent per annum of the principal balance of the loan.  Additional interest was to be accrued and added to the principal balance of the loan.

9. In short, under the proposal, CBF would lend money to Montrose solely for the purpose of permitting Montrose to make payments to CBF in order for CBF to, in turn, show its investors that it was receiving current payments on its loan when, in fact, all it was doing was cycling its own money through Montrose.

10. Absent CBF's funding of the interest reserve, Montrose did not have the ability to make the current interest payments, which at eight (8%) percent per annum amounted to more than $220,000 per month.

11. Indeed, in connection with the mezzanine financing, Montrose provided CBF with projections showing the sources and uses of cash.  CBF knew from those

projections and from conversations with Montrose that the project could not afford to make ongoing interest payments.

12. Knowing that Montrose did not have the ability to make the current interest payments and was not projected to be able to do so, CBF assured Montrose that should the interest reserve become depleted it would either provide additional financing sufficient to replenish the reserve, to the end that the required interest payments could be made despite the fact that Montrose's projections did not allow for them, or it would waive current interest payments.

13. The written agreement between the parties documented the interest reserve. CBF advised Montrose that it could not state publicly that it would provide further funding for the interest payments and that as a result, it could not include in the agreement a commitment on its part to do that. Nevertheless, it assured Montrose that should the time come when the interest reserve was depleted, it would provide the additional funds to allow Montrose to make the interest payments. Montrose, McCormick and Moore relied on those assurances.

### The Rodgers Forge Transaction

14. On or about October 31, 2005, CBRE Realty Finance Holdings LLC ("CBF Holdings"), an affiliate of CBF, and Triton entered into a Loan Agreement whereby CBF Holdings agreed to provide mezzanine financing to permit Triton to develop the Rodgers Forge Condominiums project, and to market and sell those condominium units. Pursuant to the Loan Agreement, interest in the amount of twelve (12%) percent accrued monthly and was added to the outstanding balance of the loan. Significantly, there was no requirement of monthly interest payments.

11

15.     The Loan Agreement was later amended by an Amended Loan Agreement between CBF and Triton dated April 14, 2006.  In the Amended Loan Agreement, interest accrued at twenty (20%) percent rather than twelve (12%) percent.

16.     Prior to closing the Amended Loan Agreement, CBF advised Triton that, in connection with its public offering of its stock, it needed to be able to report to prospective investors that there would be ongoing cash flow from the mezzanine financing in the form of interest payments in an amount of not less than eight (8%) percent per annum.  CBF further advised Triton that its current business plan was in jeopardy, that the CBF board was pressuring CBF management to do what was necessary in order to meet the CBF business plan and that the current payment of interest by Triton was absolutely critical to CBF so that it could buy time with its investors in order to implement its failing business plan.

17.     In order to accomplish its goal of demonstrating to potential investors that there would be ongoing interest payments while at the same time addressing the fact that the project could not afford to make interest payments, CBF proposed that it lend a sufficient amount of money to Triton to establish an interest reserve account sufficient for Triton to make ongoing interest payments in the amount of eight (8%) percent per annum of the principal balance of the loan.  Additional interest in the amount of twelve (12%) percent per annum was to be accrued and added to the principal balance of the loan.

18.     In short, under the proposal, CBF would lend money to Triton solely for the purpose of permitting Triton to make payments to CBF in order for CBF to, in turn, show its investors that it was receiving current payments on its loan when, in fact, all it was doing was cycling its own money through Triton.

19. Absent CBF's funding of the interest reserve, Triton did not have the ability to make the current interest payments, which at eight (8%) percent per annum amounted to more than $120,000 per month.

20. Indeed, in connection with the mezzanine financing, Triton provided CBF with projections showing the sources and uses of cash. CBF knew from those projections and from conversations with Triton that the project could not afford to make ongoing interest payments.

21. Knowing that Triton did not have the ability to make the current interest payments and was not projected to be able to do so, CBF assured Triton that should the interest reserve become depleted it would either provide additional financing sufficient to replenish the reserve, to the end that the required interest payments could be made despite the fact that Triton's projections did not allow for them, or it would waive current interest payments.

22. The written agreement between the parties documented the interest reserve. CBF advised Triton that it could not state publicly that it would provide further funding for the interest payments and that as a result, it could not include in the agreement a commitment on its part to do that. Nevertheless, it assured Triton that should the time come when the interest reserve was depleted, it would provide the additional funds to allow Triton to make the interest payments. Triton, McCormick and Moore relied on those assurances.

## CBF's Breach of Promises

23.     At the time the mezzanine loans closed, CBF knew that the interest reserves that is established would not be sufficient to cover the interest that Triton and Montrose were required to pay under their respective loans.

24.     As predicted, the interest reserve on the loan to Montrose became fully depleted and the interest reserve on the loan to Triton was rapidly depleting.

25.     Despite the promises of CBF made to Triton and Montrose prior to the execution of the loan agreements, CBF refused the requests of Triton and Montrose either to further fund the interest reserve or to waive the requirement that they pay interest currently.

26.     As a result of the failure of CBF to honor the aforesaid promises, Montrose was required to utilize for interest payments to CBF funds that were allocated to the development of the condominium projects. The total amount of payments allocated to project development but diverted to interest amounted to $402,951.59.

27.     As a result of the diversion of funds from project development to interest payments, both projects fell behind on their payments to contractors and materialmen and the projects became out of balance.

28.     Triton and Montrose were able to raise a sufficient amount of equity investment to satisfy creditors and to bring the projects back into balance, but that equity investment was contingent upon CBF deferring interest payments until the end of the loans. CBF refused to do so.

29.     In order to secure Triton's obligations to it, CBF held a second mortgage on the Rodgers Forge Condominiums. Although Triton was not delinquent with regard to

its interest payments under the Rodgers Forge loan, CBF threatened foreclosure against Triton allegedly because the senior loan with Ohio Savings Bank was out of balance. On May 4, 2007, it sold that property at foreclosure sale subject to the first mortgage of Ohio Savings Bank.

30.     Upon information and belief, CBF threatened foreclosure on the Rodgers Forge Condominium project in order to strong-arm McCormick and Moore into causing Montrose to provide additional interest payments to it on the Monterey Condominiums project.

31.     In its desperate attempt to show its investors the cash flow it promised from the Monterey Condominiums project, CBF threatened to, and in fact did, withhold other financing for a project owned by McCormick and Moore known as The Landing at Spa Creek in Annapolis, Maryland unless it first received assurances that McCormick and Moore would cause Montrose to make current interest payments to CBF. CBF's withholding of this financing contributed to the financial failure of The Landing at Spa Creek.

32.     In order to secure Montrose's obligations to it, McCormick and Moore pledged to CBF their membership interests in Montrose. On or about May 9, 2007, CBF enforced that pledge by taking control over Montrose.

33.     As a result of CBF's failure to honor its promises and its subsequent actions to take over both projects, Triton and Montrose – and through their ownership of those entities, McCormick and Moore – were deprived of substantial profits.

## COUNT I
## BREACH OF CONTRACT
## (TRITON)

34.     McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 33 hereof.

35.     CBF breached its promises to Triton, McCormick and Moore by failing to continue to fund the interest reserve or to waive the requirement that Triton make current interest payments.

36.     Triton, McCormick and Moore have been damaged thereby.

## COUNT II
## BREACH OF CONTRACT
## (MONTROSE)

37.     McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 36 hereof.

38.     CBF breached its promises to Montrose, McCormick and Moore by failing to continue to fund the interest reserve or to waive the requirement that Triton make current interest payments.

39.     Montrose, McCormick and Moore have been damaged thereby.

## COUNT III
## BREACH OF COVENANT OF
## GOOD FAITH AND FAIR DEALING
## (TRITON)

40.     McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 39 hereof.

41.     CBF breached its covenant of good faith and fair dealing by failing to continue to fund the interest reserve or to waive the requirement that Triton make current interest payments.

42. Triton, McCormick and Moore have been damaged thereby.

## COUNT IV
## BREACH OF COVENANT OF
## GOOD FAITH AND FAIR DEALING
## (MONTROSE)

43. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 42 hereof.

44. CBF breached its covenant of good faith and fair dealing by failing to continue to fund the interest reserve or to waive the requirement that Montrose make current interest payments.

45. Montrose, McCormick and Moore have been damaged thereby.

## COUNT V
## FRAUD - DAMAGES
## (TRITON)

46. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 45 hereof.

47. CBF represented to Triton, McCormick and Moore that it would either further fund the interest reserve should it become depleted or that it would waive the requirement that current interest payments be made.

48. Upon information and belief, CBF made the foregoing representations with the intent of inducing Triton, McCormick and Moore to enter into the aforesaid loan transactions.

49. Triton, McCormick and Moore did, in fact, rely on the representations made by CBF.

50. Upon information and belief, CBF knew that the foregoing representations were false when they were made or they made them with reckless disregard of their truthfulness.

51. Triton, McCormick and Moore have been damaged thereby.

## COUNT VI
## FRAUD - DAMAGES
## (MONTROSE)

52. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 51 hereof.

53. CBF represented to Montrose, McCormick and Moore that it would either further fund the interest reserve should it become depleted or that it would waive the requirement that current interest payments be made.

54. Upon information and belief, CBF made the foregoing representations with the intent of inducing Montrose, McCormick and Moore to enter into the aforesaid loan transactions.

55. Montrose, McCormick and Moore did, in fact, rely on the representations made by CBF.

56. Upon information and belief, CBF knew that the foregoing representations were false when they were made or they made them with reckless disregard of their truthfulness.

57. Montrose, McCormick and Moore have been damaged thereby.

## COUNT VII
## FRAUD – RECISSION

58. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 57 hereof.

59. McCormick and Moore are entitled to rescind their agreements with CBF.

WHEREFORE, the Defendants Brian A. McCormick and Charles W. Moore pray that this Honorable Court:

1. Dismiss the Complaint;

2. Enter judgment in its favor and against Plaintiff on the Complaint;

3. Under Counts I through VI of the Counterclaim, enter judgment in their favor and against Plaintiff in an amount to be determined at trial;

4. Under Count VII of the Counterclaim, rescind the agreements between McCormick and Moore and Plaintiff; and

5. Grant such further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Brian A. McCormick and Charles W. Moore do hereby demand a jury trial on all matters so triable.

    BRIAN A. MCCORMICK
    and CHARLES W. MOORE,

    By their attorneys,

    */s/ Joseph S.U. Bodoff*
    Joseph S.U. Bodoff (D. Md. Bar No. 92160)
    Ryan D. Sullivan (D. Md. Bar No. 16382)
    Bodoff & Associates, P.C.
    120 Water Street
    Boston, MA  02109
    (617) 742-7300

Dated: December 4, 2008.

## **CERTIFICAT OF SERVICE**

I, Ryan D. Sullivan hereby certify that on this 4th day of December, 2008, I caused a true and accurate copy of the Defendants' Answer and Counterclaim to be served upon counsel for the Defendant via the Electronic Case Filing System at the following electronic addresses:

George C. Calhoun V- gcalhoun@steptoe.com

*/s/ Ryan D. Sullivan*