**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

| | |
|---|---|
| CBRE REALTY FINANCE TRS, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BRIAN A. MCCORMICK ) <br> ) <br> and ) <br> ) <br> CHARLES W. MOORE, ) <br> ) <br> Defendants. ) | Case No. 08-cv-1964 |

**DEFENDANTS' AMENDED COUNTERCLAIM**

1. Plaintiff in counterclaim, Brian A McCormick ("McCormick") is an adult individual who at all times relevant hereto had a business address at 410 Severn Avenue, Annapolis, Maryland.

2. Plaintiff in counterclaim, Charles W. Moore ("Moore") is an adult individual who at all times relevant hereto had a business address at 410 Severn Avenue, Annapolis, Maryland.

3. Defendant in counterclaim, CBRE Realty Finance TRS, LLC ("CBF") is, upon information and belief, a limited liability company with offices at 185 Asylum Street, Hartford, Connecticut.

4. On or about November 8, 2005, CBF and Montrose Investment Holding, LLC ("Montrose") entered into a Loan Agreement and related documents whereby CBF

1

agreed to provide mezzanine financing to permit Montrose to develop the Monterey Condominiums project, and to market and sell those condominium units.

5. McCormick and Moore formed Montrose at or about the time of the loan to satisfy CBF's requirements that the borrower be "a single purpose bankruptcy-remote limited liability company." Again to satisfy CBF's requirements, McCormick and Moore caused Montrose to form Triton Pavilion, LLC also as "a single purpose bankruptcy-remote limited liability company." Triton Pavilion, LLC, in turn, acquired Pavilion LLC, which owned the apartment complex that was to be converted to condominiums.

6. McCormick and Moore were the sole members of Montrose. The Loan Agreement provided for McCormick and Moore to grant to CBF a "first priority limited recourse pledge of and security interest" in Montrose. Pursuant to the terms of the Loan Agreement, McCormick and Moore executed a Membership Interests Pledge and Security Agreement, pursuant to which they purportedly pledged their membership interests in Montrose to CBF.

7. Until approximately one month before the closing of the mezzanine financing, McCormick and Moore believed that, as is typical of loans of this type, interest would not be required to be paid currently but would accrue and be paid upon completion of the project. Indeed, with interest accruing at more than $750,000 per month on the senior loan, the project could not afford an additional $220,000 per month in interest payments to the mezzanine lender.

8. CBF also knew or should have known that the project could not afford current interest payments and that anything other than the usual practice of deferring interest payments could not be borne by the project.

9. During October 2005, approximately a month before McCormick and Moore, through the single purpose bankruptcy-remote entities required by CBF, were scheduled to close on the acquisition of Pavilion LLC, CBF advised McCormick and Moore for the first time that, in connection with its anticipated public offering of its stock, CBF needed to be able to report to prospective investors that there would be ongoing cash flow from the mezzanine financing in the form of interest payments in an amount of not less than eight (8%) percent per annum. CBF further advised McCormick and Moore that its current business plan was in jeopardy, that the CBF board was pressuring CBF management to do what was necessary in order to meet the CBF business plan and that the current payment of interest by Montrose was absolutely critical to CBF so that it could buy time with its investors in order to implement its failing business plan.

10. In order to accomplish its goal of demonstrating to potential investors that there would be ongoing interest payments while at the same time addressing the fact that the project could not afford to make interest payments, CBF proposed that it lend an amount of money to Montrose to establish an interest reserve account sufficient for Montrose to make ongoing interest payments in the amount of eight (8%) percent per annum of the principal balance of the loan. Additional interest was to be accrued and added to the principal balance of the loan.

11. In short, under the proposal, CBF would lend money to Montrose solely for the purpose of permitting Montrose to make payments to CBF in order for CBF to, in turn, show its investors that it was receiving current payments on its loan when, in fact, all it was doing was cycling its own money through Montrose.

12. Absent CBF's funding of the interest reserve, Montrose did not have the ability to make the current interest payments, which at eight (8%) percent per annum amounted to more than $220,000 per month.

13. Indeed, in connection with the mezzanine financing, Montrose provided CBF with projections showing the sources and uses of cash.  CBF knew from those projections and from conversations with Montrose that the project could not afford to make ongoing interest payments.

14. Knowing that Montrose did not have the ability to make the current interest payments and was not projected to be able to do so, CBF assured McCormick and Moore that should the interest reserve become depleted it would either provide additional financing sufficient to replenish the reserve, to the end that the required interest payments could be made despite the fact that Montrose's projections did not allow for them, or it would allow current interest payments to accrue and be paid upon completion of the project.

15. The written agreement between the parties documented the interest reserve.  CBF advised McCormick and Moore that it could not state publicly that it would provide further funding for the interest payments and that as a result, it could not include in the agreement a commitment on its part to do so.  Nevertheless, it assured Montrose, McCormick and Moore that should the time come when the interest reserve was depleted, it would provide the additional funds to allow Montrose to make the interest payments. McCormick and Moore relied on those assurances.  This assurance was repeated after the loan closed.

16. As predicted, the interest reserve on the loan to Montrose became fully depleted.

17. Despite the promises of CBF made prior to the execution of the loan agreements and thereafter, CBF refused the requests of Montrose, Moore and McCormick either to further fund the interest reserve or to allow current interest payments to accrue and be paid upon completion of the project.

18. As a result of the failure of CBF to honor the aforesaid promises, Montrose was required to utilize funds that were allocated to the development of the condominium projects to pay CBF the current interest amount. The total amount of payments allocated to project development but diverted to interest amounted to $402,951.59.

19. As a result of the diversion of funds from project development to interest payments, the project fell behind on its payments to contractors and materialmen and the project became out of balance.

20. Despite Montrose's requests that CBF honor its promises, made both before and after the loan closing, to either further fund the interest reserve or to allow current interest payments to accrue and be paid upon completion of the project, CBF steadfastly refused.

21. Montrose was able to raise a sufficient amount of equity investment to satisfy creditors and to bring the project back into balance, but that equity investment was contingent upon CBF deferring interest payments until the end of the loan. CBF refused to do so.

22. CBF took other actions in order to coerce McCormick and Moore to cause Montrose to make current interest payments, including:

a. CBF held a second mortgage on property known as the Rodgers Forge Condominiums, which was owned indirectly by McCormick and Moore through an entity known as Triton Rodgers Forge LLC ("Triton"). Although Triton was not delinquent with regard to its payments under the Rodgers Forge loan, CBF threatened foreclosure against Triton allegedly because the senior loan with Ohio Savings Bank was out of balance. On May 4, 2007, it sold that property at foreclosure sale subject to the first mortgage of Ohio Savings Bank. Upon information and belief, CBF threatened foreclosure on the Rodgers Forge Condominium project in order to strong-arm McCormick and Moore into causing Montrose to provide additional interest payments to it on the Monterey Condominiums project.

b. In its desperate attempt to show its investors the cash flow it promised from the Monterey Condominiums project, CBF threatened to, and in fact did, withhold other financing for a project owned by McCormick and Moore known as The Landing at Spa Creek in Annapolis, Maryland unless it first received assurances that McCormick and Moore would cause Montrose to make current interest payments to CBF. CBF's withholding of this financing contributed to the financial failure of The Landing at Spa Creek.

23. On or about May 9, 2007, CBF, purportedly acting under the authority of McCormick and Moore's pledge of their ownership in Montrose, took ownership of the membership interests and control over Montrose.

24. As a result of CBF's failure to honor its promises and its subsequent actions to take over Montrose, McCormick and Moore were wrongly deprived of the substantial values that existed and would exist in Montrose had CBF honored its promises.

## COUNT I
## BREACH OF CONTRACT

25. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 24 hereof.

26. CBF promised McCormick and Moore that in the event that the interest reserve ran out, it would either further fund the interest reserve or allow current interest payments to accrue and be paid upon completion of the project.

27. In consideration of that promise, McCormick and Moore executed the Guaranty and the Membership Interests Pledge and Security Agreement (the "Pledge Agreement").

28. CBF breached its promise to McCormick and Moore.

29. McCormick and Moore have been harmed thereby.

## COUNT II
## BREACH OF CONTRACT – PLEDGE AGREEMENT

30. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 29 hereof.

31. CBF, McCormick and Moore are parties to the Pledge Agreement.

32. CBF's rights under the Pledge Agreement are dependent upon there existing a valid default by Montrose under the Loan Agreement.

7

33. Montrose did not default under the Loan Agreement or its defaults were otherwise excused by CBF's own breach of promises and/or its conduct.

34. CBF breached its obligations to McCormick and Moore, including its implied covenant of good faith and fair dealing, when it exercised its rights under the Pledge Agreement.

35. McCormick and Moore have been harmed thereby.

## COUNT III
## BREACH OF CONTRACT – THIRD PARTY BENEFICIARY

36. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 35 hereof.

37. The mezzanine financing was structured by CBF in order to convey to CBF McCormick and Moore's ownership of Montrose in the event of a default.

38. Any defaults by Montrose on its obligations to CBF were the direct result of CBF's breach of its promises to continue to fund the interest reserve or to allow current interest payments to accrue and be paid upon completion of the project.

39. Using the alleged default by Montrose, caused by CBF's own breach of promise, CBF in fact did take from McCormick and Moore their ownership interests in Montrose.

40. McCormick and Moore are intended beneficiaries of CBF's promises to honor its agreements relating to the mezzanine financing, including its agreements to further fund the interest reserve or allow current interest payments to accrue and be paid upon completion of the project.

41. CBF breached its obligations to McCormick and Moore, including but not limited to its obligations of good faith and fair dealing.

## COUNT IV
## FRAUD – DAMAGES

42. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 41 hereof.

43. CBF represented to McCormick and Moore that it would either further fund the interest reserve should it become depleted or that it would allow current interest payments to accrue and be paid upon completion of the project.

44. Upon information and belief, CBF made the foregoing representations with the intent of inducing McCormick and Moore to enter into the aforesaid loan transaction, including the execution of the Pledge Agreement.

45. McCormick and Moore did, in fact, rely on the representations made by CBF.

46. Upon information and belief, CBF knew that the foregoing representations were false when they were made or they made them with reckless disregard of their truthfulness.

47. McCormick and Moore have been damaged thereby.

## COUNT V
## FRAUD – RECISSION

48. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 47 hereof.

49. McCormick and Moore are entitled to rescind their agreements with CBF.

## COUNT VI
## CONVERSION

50. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 49 hereof.

51. CBF knowingly and wrongfully took possession of McCormick and Moore's membership interests in Montrose in violation of the Pledge Agreement.

52. McCormick and Moore have a right to possess their membership interests in Montrose.

53. McCormick and Moore have a right to the return of their membership interests and all proceeds derived by CBF therefrom.

### COUNT VII
### REPLEVIN

54. McCormick and Moore incorporate herein the allegations contained in paragraphs 1 through 53 hereof.

55. At all times relevant to this action, McCormick and Moore were the rightful owners of their respective membership interests in Montrose.

56. As a result of CBF's wrongful seizure of McCormick and Moore's membership interests, McCormick and Moore have been deprived of the benefits of such membership interests, and the value of such membership interests have been adversely harmed, causing them damages.

57. McCormick and Moore are entitled to damages as result of CBF's wrongful seizure and detainer of their membership interests in Montrose.

WHEREFORE, the Defendants Brian A. McCormick and Charles W. Moore pray that this Honorable Court:

1. Dismiss the Complaint;

2. Enter judgment in their favor and against Plaintiff on the Complaint;

3. Under Counts I, II, III, IV and VI of the Counterclaim, enter judgment in their favor and against Plaintiff in an amount to be determined at trial;

4. Under Count V of the Counterclaim, rescind the agreements between McCormick and Moore and Plaintiff;

5. Under Count VII of the Counterclaim, enter judgment requiring CBF to turn over the membership interests in Montrose to McCormick and Moore; and

6. Grant such further relief as the Court deems just.

                BRIAN A. McCORMICK
                and CHARLES W. MOORE,

                By their attorneys,

                */s/ Joseph S.U. Bodoff*
                Joseph S.U. Bodoff (D. Md. Bar No. 92160)
                Ryan D. Sullivan (D. Md. Bar No. 16382)
                Bodoff & Associates, P.C.
                120 Water Street
                Boston, MA  02109-4210
                (617) 742-7300

Dated: January 15, 2009

## **CERTIFICATE OF SERVICE**

      I, Ryan D. Sullivan hereby certify that on this 15th day of January, 2008, I caused a true and accurate copy of the Defendants' Amended Counterclaim to be served upon counsel for the Defendant via the Electronic Case Filing System at the following electronic addresses:

George C. Calhoun V- gcalhoun@steptoe.com

                                         */s/ Ryan D. Sullivan*