**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | |
|---|---|
| _____ ) | |
| CBRE REALTY FINANCE TRS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-cv-1964 |
| ) | |
| BRIAN A. MCCORMICK ) | |
| ) | |
| and ) | |
| ) | |
| CHARLES W. MOORE, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Howard H. Stahl (D. Md. Bar No. 24741)
Jennifer Quinn-Barabanov (D. Md. Bar No. 1649)
George R. Calhoun, V (D. Md. Bar No. 25018)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902

*Attorneys for Plaintiff* RFC TRS, LLC

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

I.      STANDARD ON A MOTION FOR SUMMARY JUDGMENT .......................................2

II.     BACKGROUND ........................................................................................3

III.    RFC IS ENTITLED TO JUDGMENT ON ITS CLAIMS UNDER THE
        RODGERS FORGE GUARANTY ...................................................................4

        A.      The Rodgers Forge Loan Documents ..................................................4

        B.      The Rodgers Forge Defaults ...........................................................5

        C.      There Are No Material Disputed Facts and Summary Judgment Should Be
                Entered In Favor of Plaintiff on the Rodgers Forge Guaranty............................6

IV.     RFC IS ENTITLED TO JUDGMENT ON ITS CLAIMS UNDER THE
        MONTROSE GUARANTY .............................................................................8

        A.      The Montrose Loan Documents and Negotiations ....................................8

        B.      The Montrose Defaults ................................................................12

        C.      The Material Facts Are Undisputed and RFC Has Established Its
                Entitlement to Judgment ...............................................................14

V.      MOORE AND MCCORMICK'S DEFENSES ARE UNAVAILING .............................16

        A.      The Documentary Evidence Undermines Defendants' Allegations of Oral
                Promises to Waive Current Interest or Increase the Interest Reserve.................16

        B.      The Alleged Oral Representations Are Not Material as a Matter of Law
                Under Any Contractual Theories ......................................................17

                1.      The Loan Documents Do Not Allow Collateral Oral Promises ...............18

                2.      Maryland Law Does Not Allow Oral Modification of Written
                        Contract Terms.............................................................19

                3.      The Statute of Frauds Bars the Alleged Oral Promise............................20

        C.      Defendants Cannot Properly Rely Upon the Alleged Oral Promises as
                Affirmative Defenses .................................................................21

                1.      Maryland Law Precludes Defendants' Claim that the Loan
                        Documents Were Fraudulently Induced ....................................21

                2.      Defendants Cannot Establish a Defense of Duress...................................24

                3.      Defendants Cannot Establish a Defense of Illegality .............................25

CONCLUSION................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................2

*Bartlett v. Frederick County*,
   246 Fed.Appx. 201 (4th Cir. 2007)........................................................................2

*Blumenthal v. Heron*,
   261 Md. 234, 274 A.2d 636 (Md. 1971) ...............................................................25

*Call Carl, Inc. v. BP Oil Corp.*,
   554 F.2d 623 (4th Cir. 1977) .................................................................................22

*Collection & Investigation Bureau of Maryland, Inc. v. Linsley*,
   37 Md. App. 66, 375 A.2d 47 (Md. App. 1977) ...................................................20

*Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*,
   164 F. Supp. 2d 520 (D. Md. 2001) ......................................................................19

*Cooper v. Berkshire Life Ins. Co.*,
   148 Md. App. 41, 810 A.2d 1045 (Md. Ct. Spec. App. 2002)...............................22

*First Union Nat. Bank v. Steele Software Systems Corp.*,
   154 Md. App. 97, 838 A.2d 404 (Md. Ct. Spec. App. 2003)................................22

*Floyd v. Mayor and City Council of Baltimore*,
   179 Md. App. 394, 946 A.2d 15 (Md. Ct. Spec. App. 2008)................................19

*Food Fair Stores, Inc. v. Teresa Carol Joy*,
   283 Md. 205, 389 A.2d 874 (Md. 1977) ..............................................................24

*Foreman v. Melrod*,
   257 Md. 435, 263 A.2d 559 (1970) ................................................................19, 20

*Friedman & Fuller, P.C. v. Funkhouser*,
   107 Md. App. 91, 666 A.2d 1298 (Md. App. 1995) .............................................21

*Gresham v. Lumbermen's Mut. Cas. Co.*,
   404 F.3d 253 (4th Cir. 2005) ...................................................................................2

*Higgins v. Barnes*,
   310 Md. 532, 530 A.2d 724 (Md. 1987) ..............................................................19

*In re Peanut Crop Ins. Litigation*,
   524 F.3d 458 (4th Cir. 2008) ...................................................................................2

*James v. Goldberg*,
    256 Md. 520, 261 A.2d 753 (Md. 1970)..............................................................22

*Kermisch v. Savings Bank of Baltimore*,
    266 Md. 557, 295 A.2d 776 (Md. 1972)..............................................................19

*Learning Works, Inc. v. The Learning Annex, Inc.*,
    830 F.2d 541 (4th Cir. 1987) .............................................................................20

*Markoff v. Kreiner*,
    180 Md. 150, 23 A.2d 19 (1941) .......................................................................19

*Martens Chevrolet, Inc. v. Seney*,
    292 Md. 328, 439 A.2d 534 (Md. 1982)..............................................................21

*Maslow v. Vanguri*,
    168 Md. App. 298, 896 A.2d 408 (Md. Ct. Spec. App. 2006)...............................19

*McDonald v. Friedman*,
    2004 WL 3397805 (D. Md. 2004) .......................................................................22

*Md. Environmental Trust v. Gaynor*,
    370 Md. 89, 803 A.2d 512 (Md. 2002) ...............................................................22

*Mellon Bank Corp. v. First Union Real Estate Equity & Mort., Inv.*,
    951 F.2d 1399 (3d Cir. 1991)..............................................................................22

*Motor City Bagels, L.L.C. v. American Bagel Co.*,
    50 F. Supp. 2d 460 (D. Md. 1999) ......................................................................22

*Phoenix Services Ltd. Partnership v. Johns Hopkins Hosp.*,
    167 Md. App. 327, 892 A.2d 1185 (Md. Ct. Spec. App. 2006)...............................20

*Sass v. Andrew*,
    152 Md. App. 406, 832 A.2d 247 (Md. Ct. Spec. App. 2003).................................21

*Scott v. Harris*,
    550 U.S. 372 (2007)...........................................................................................2

*Shillman v. Hobstetter*,
    249 Md. 678, 241 A.2d 570 (Md. 1968) ...........................................................25

*Volcjak v. Washington County Hosp. Ass'n*,
    124 Md. App. 481, 723 A.2d 463 (Md. Ct. Spec. App. 1999).................................2

*Wootton Enterprises, Inc. v. Subaru of America, Inc.*,
    134 F.Supp.2d 698 (D. Md. 2001), *aff'd*, 34 Fed. Appx. 57 (4th Cir. 2002).........22

**STATUTES**

Md. Code, Courts and Judicial Proceedings § 5-901 ....................................................................20

**RULES**

Fed. R. Civ. P. 56(c) ........................................................................................................................2

**INTRODUCTION**

As Judge Davis recognized, this case is a "routine collection action."  Mar. 3, 2009

Motions Hearing Tr. ("MTD Tr.") at 15:8-9.[1]  Defendants Charles Moore and Brian McCormick

signed unconditional guaranties of performance in connection with two commercial real estate

developments, Montrose and Rodgers Forge.  Both projects faltered and Defendants failed to

honor their guaranties.  Defendants do not dispute that certain guaranteed obligations were not

performed.  For example, it is undisputed that the borrowers did not pay certain taxes and

contractors and that the guarantors did not make good on those defaults as promised.

In an attempt to evade liability, Defendants have pleaded defenses that are without

support in the governing law or undisputed facts.  Defendants have argued, in various shifting

forms, that their nonperformance was excused or was the result of fraudulent conduct on the part

of RFC.  They primarily argue that RFC promised Defendant McCormick that RFC would

forego current interest payments on the Montrose loan if the borrower became unable to make

such payments.  Although the precise articulation of this argument has changed, in each of its

iterations it is directly contradicted by the express language of the applicable contracts.  Indeed,

Judge Davis stated early in this case that "the law is four square against the arguments that are

being offered on behalf of the defendants,"  MTD Tr. at 63:18-19, and that Defendants are

"running up against, it seems to me, about three or 400 years of really black letter contract law."

MTD Tr. at 20:2-3.  After dismissing Defendants' counterclaims, Judge Davis warned

Defendants that they could not avoid liability by alleging oral representations that are

inconsistent with the terms of the executed loan documents.  He stated:

---

[1] Attached as Exh. A to the Declaration of George Calhoun ("Calhoun Decl.") submitted
in support of this Opposition.

But I certainly credit the plaintiff's argument that you don't undermine Contract A by reliance on some clearly unenforceable oral contract insofar as one seeks to vary the terms of the documents in this case. So the defendants will not be permitted to vary the terms of the executed agreements in this case.

It really becomes a question of whether the plaintiff is entitled on equitable grounds to enforce the terms of those agreements, meaning, among other things, that the burden is entirely on the defendants to show duress, to show fraud, to show illegality. And I think they're going to have a very, very significant burden in doing that.

MTD Tr. at 64:7-65:2. Having completed discovery, including the depositions of McCormick and Moore, it is now clear that Defendants cannot meet this burden. Accordingly, Plaintiff is entitled to summary judgment.

## I.    STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue as to any material fact so that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A question of fact is genuine only where it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Thus, a nonmovant must produce substantial evidence to defeat summary judgment, and mere assertions by a party will not suffice where hard evidence is against him. *See id.* at 252; *Scott v. Harris*, 550 U.S. 372, 378-80 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Conversely, disputed facts that are not essential to a legal decision are not material to summary judgment. *Liberty Lobby*, 477 U.S. at 248. Contract interpretation is a matter of law, not fact. *See In re Peanut Crop Ins. Litigation*, 524 F.3d 458, 470 (4th Cir. 2008); *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005); *Bartlett v. Frederick County*, 246 Fed.Appx. 201, 205 (4th Cir. 2007); *Volcjak v.*

*Washington County Hosp. Ass'n*, 124 Md. App. 481, 509, 723 A.2d 463, 477 (Md. Ct. Spec. App. 1999).

## II.    BACKGROUND

Since the defenses asserted by Brian McCormick and Charles Moore rest primarily upon allegations of fraud, it is important to recognize that these Defendants are both extremely sophisticated businessmen.  Between them they have participated in complex real estate and other investments with an aggregate value well in excess of a billion dollars.  Statement of Material Facts Not In Dispute ("SUMF") at ¶ 1-7.   Mr. McCormick was a co-founder of Triton Real Estate Partners and was primarily responsible for the negotiation of the loans at issue. SUMF at ¶ 1, 10.  Mr. McCormick has substantial real estate development experience and was responsible for the financing and development of over 1,700 housing units with a value in excess of $150 million as Founder, Chairman, and CEO of Evergreen Holding Company.  SUMF at ¶ 6. While at Triton, McCormick (along with Moore) financed and developed a residential project known as The Landing at Spa Creek worth $50 million.  SUMF at ¶ 4.  And also in combination with Moore, McCormick acquired and sold a $70 million commercial building in downtown Atlanta.  SUMF at ¶ 5.  McCormick has also been responsible for over $500 million worth of non-real estate transactions in conjunction with Moore.  SUMF at ¶ 7.  In addition, Mr. McCormick is a lawyer and a certified public account, and has substantial experience in negotiating loan documents and real estate transactions.  SUMF at ¶ 8-9.

Mr. Moore, who co-founded Triton with Mr. McCormick, holds an MBA from the University of Chicago and has an extensive background in finance and private equity investment. SUMF at ¶ 11.  In the ten years prior to the transactions at issue in this case, Mr. Moore put together private equity deals with an aggregate value ranging from $750 million to $1 billion. SUMF at ¶ 12.  During this time, Mr. Moore participated in the negotiation or review of

complicated transactional and loan documents on multiple occasions.  SUMF at ¶ 13.  Mr. Moore's primary role at Triton was to assist in financial analysis and modeling and as an investor.  SUMF at ¶ 14.

Defendants touted their experience, resources and expertise to potential investors including Plaintiff to encourage them to invest in Montrose and Rodgers Forge**.**  SUMF at ¶ 16. With the assistance of other professionals at Triton Real Estate and outside investment bankers, in mid-2005, Defendants approached RFC concerning two separate condominium conversion projects seeking an equity investment or mezzanine financing.  SUMF at ¶ 16-17.  Because this case involves two separate real estate transactions and associated guaranties, the particular facts and arguments applicable to each are discussed separately below.

## III.    RFC IS ENTITLED TO JUDGMENT ON ITS CLAIMS UNDER THE RODGERS FORGE GUARANTY

There is no legitimate dispute that summary judgment in favor of Plaintiff is appropriate in connection with the claim on the "Rodgers Forge" guaranties.  Defendant McCormick acknowledged that RFC was entitled to foreclose on the Rogers Forge Project, but argues that RFC "didn't need to foreclose."  McCormick Tr. at 69:2.; SUMF at ¶ 46.  This is not a defense, but a confession of liability.

### A.    The Rodgers Forge Loan Documents

CBRE Realty Finance Holdings, LLC ("RFC Holdings") entered into a loan agreement with Rodgers Forge on or about October 31, 2005.[2]  SUMF at ¶ 19.  The Rodgers Forge Loan was to be used by Rodgers Forge in connection with the re-development of an existing apartment

---

[2] RFC Holdings was an affiliate of Plaintiff and subsequently assigned the Rodgers Forge Loan to what is now RFC.  SUMF at ¶ 21, 22.  For the purposes of convenience, the entity that became RFC, CBRE Realty Finance TRS, LLC is referred to as RFC throughout this brief.

complex in the Rodgers Forge subdivision in Baltimore, Maryland (the "Rodgers Forge Property").  SUMF at ¶ 23.  Rodgers Forge planned to use the proceeds from the Original Rodgers Forge Loan to convert the Rodgers Forge Property into residential condominiums for subsequent sale.  *Id.*  This October 31, 2005 loan was intended to be, and was, a short term bridge loan subsequently replaced by a later RFC loan, the Rodgers Forge Loan, described below.

On April 14, 2006 RFC entered into an amended Loan Agreement with Rodgers Forge for a loan with a principal amount of $22,073,200.00 (the "Rodgers Forge Loan").  SUMF at ¶ 20.  The Rodgers Forge Loan was secured by an indemnity deed of trust granting RFC a lien against the real property under development.  SUMF at ¶ 24.  In addition, Moore and McCormick issued personal guaranties pursuant to a Guaranty Agreement (the "Rodgers Forge Guaranty").  SUMF at ¶ 25.  As set forth in the Rodgers Forge Guaranty, Moore and McCormick agreed, unconditionally and irrevocably, to indemnify RFC against any "loss, damage or liability suffered by [RFC]" to the extent such loss arises out of Rodgers Forge's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Rodgers Forge Property (collectively, the "Rodgers Forge Specific Obligations").  SUMF at ¶ 26.

Moore and McCormick also guaranteed that substantial completion of each portion of the construction of the Project (as defined in the Rodgers Forge Loan Agreement) would be attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget (the "Rodgers Forge Construction Obligations").  SUMF at ¶ 27.

### B.    The Rodgers Forge Defaults

On January 17, 2007, the senior lender on the Rodgers Forge Project, Ohio Savings Bank, issued two notices of default to Rodgers Forge due to its failure to make interest payments in November and December 2006 and January 2007 on the senior $34 million acquisition loan and

the senior $6 million construction loan.  SUMF at ¶ 37.  The missed payments totaled over $1
million.  SUMF at ¶ 34.  At the same time, Ohio Savings Bank looked to RFC to advance the
missed interest payments or risk being foreclosed out of its junior position.  SUMF at ¶ 32, 33.
As McCormick now admits, a default under the senior loan by Ohio Savings Bank constituted a
default under the Rodgers Forge Loan.  SUMF at ¶ 38.

     As a result, on February 1, 2007, RFC issued a Notice of Acceleration to Rodgers Forge
declaring a default and accelerating the remaining balance of the Rodgers Forge Loan.  SUMF at
¶ 39.  At or about the same time, RFC learned that Rodgers Forge could not (or would not) make
its real estate tax payment in connection with the Rodgers Forge Property unless it received a
new capital infusion.  SUMF at ¶ 41.  As a result, RFC ultimately paid the real estate taxes due,
which also constituted a default under the Rodgers Forge Loan.  SUMF at ¶ 42, 43, 51, 53.

     As a result of these defaults, RFC noticed a foreclosure of the Rodgers Forge Property in
April 2007.  SUMF at ¶ 44.  In May 2007, RFC completed the foreclosure sale of its collateral
and that sale was approved by the Circuit Court for Baltimore County.  SUMF at ¶ 49.  Although
the Borrower and the Defendants were notified, none objected to the sale.  SUMF at ¶ 50.

    **C.**    **There Are No Material Disputed Facts and Summary Judgment Should Be
Entered In Favor of Plaintiff on the Rodgers Forge Guaranty**

     Defendants have effectively conceded liability on the Rodgers Forge Guaranty by
expressly repudiating the sole substantive defense that they raised with respect to this claim.  No
material facts are in dispute and summary judgment should be granted to RFC.

     Originally, Defendants argued that they were not liable on the guaranty because RFC had
allegedly improperly declared default due to a "perceived technical default" on the senior loan.
SUMF at ¶ 46.  However, McCormick has since admitted that this was a "bad choice of words"
and that there were defaults on Rodgers Forge that entitled RFC to foreclose.  *Id.*  And he has

admitted that RFC did not fail to perform its own obligations under the loan documents.  SUMF at ¶ 47.  Moore indicated that his knowledge of the project was entirely dependent on McCormick's and that in any event he could not remember anything.   He conceded, however, that he did not consider a payment default to be "non-material."  Moore Tr. 50:12-21.

There is no dispute that: (1) the Rodgers Forge borrower was delinquent on its payments to Ohio Savings Bank at the time of foreclosure, (2) that Ohio Savings Bank had declared a default due to the borrower's failure to make over $1 million in payments, (3) that RFC declared a default only after Ohio Savings Bank had already done so and (4) that RFC advanced tax payments and protective interest payments to Ohio Savings Bank when the borrower and Defendants failed to make those payments.   SUMF at ¶ 30-40, 53-54.

With respect to the Rodgers Forge Guaranty, RFC has been damaged as follows:

- Legal Fees & Costs:                                        $ 62,509.36[3]

- Property Taxes advanced:                          $ 352,612.03

- Interest Payments Paid to Senior Lender:    $ 3,963,582.54
    Pre-Foreclosure: $1,602,283.71
    Post-Foreclosure $2,361,298.83

**RODGERS FORGE TOTAL:**         **$ 4,378,703.93**

SUMF at 53-56.  Accordingly, the Court should enter judgment in favor of RFC and against Defendants in the amount of $4,378,703.93, plus pre and post-judgment interests, attorneys' fees and costs.[4]

---

[3] These costs and fees were incurred in connection with handling contractor lien issues, the tax issues and the negotiations with the senior lender necessitated by the defaults on the Rodgers Forge Loan.  In addition, RFC is entitled to an award of fees in connection with this action in an amount to be determined.

**IV.   RFC IS ENTITLED TO JUDGMENT ON ITS CLAIMS UNDER THE MONTROSE GUARANTY**

Just as with the Rodgers Forge Guaranty claim, the essential facts surrounding the Montrose transaction are undisputed.  The Montrose Project fell behind schedule and then into default on its payments of interest, to contractors, and of taxes.  Though Defendants guaranteed those payments, they failed to make good on their guaranties.  Instead, Defendants have asserted several defenses that fly in the face of established law and the decisions by Judge Davis in this case.  Specifically, they allege that RFC orally promised to waive current interest payments if the interest reserve contained in the loan became depleted but then failed to do so.  All of the evidence regarding the negotiations, and in particular the emails sent throughout, indicates that no such promise was made.  And any such promise is flatly contradicted by the terms of the Montrose Loan Documents.

Even had Plaintiff made the alleged representations, they would be immaterial as a matter of law.  Defendants were sophisticated businessmen who knew that the loan documents were the final, integrated agreement between the parties.  And because the terms of the loan documents contradicted the alleged oral representations, Defendants could not reasonably have relied on them.  As a result, Defendants' oral representation theory also fails to support a fraudulent inducement defense.

**A.      The Montrose Loan Documents and Negotiations**

On or about November 8, 2005, RFC entered into a loan agreement (the "Montrose Loan Agreement") with Montrose pursuant to which RFC agreed to lend Montrose the principal sum

---

[4] The terms of the Rodgers Forge Guaranty, which is attached to the Farr Decl. at Exh. 9, that authorize these payments are substantively identical to the terms discussed below with respect to the Montrose claim.

of $31,946,650.00 (the "Montrose Loan").[5]   SUMF at ¶ 59.   On the same date, Montrose

executed a promissory note in favor of RFC for that sum (the "Montrose Note").   SUMF at ¶ 61.

The proceeds of the Montrose Note were used as mezzanine financing for the conversion of a

432-unit rental project in Rockville, Maryland into condominiums by subsidiaries of Montrose

(the "Montrose Property").   SUMF at ¶ 63.   The Montrose Note was secured by, among other

things, a pledge of Defendants' membership interests in Montrose as sole member of Triton

Pavilion, which in turn owned Pavilion, the fee owner of the Montrose Property.   SUMF at ¶ 60,

91.   Because RFC's loan was mezzanine financing, its security interest in Montrose and right to

repayment were subordinate to those of the senior lender, Fremont Investment & Loan

("Fremont").   SUMF at ¶ 98.

    Defendants first approached RFC concerning the Montrose loan in approximately August

2005.   SUMF at ¶ 64.   At that time, the parties began negotiations concerning a term sheet for the

proposed loan.   The earliest draft term sheet, prepared by Defendants or their representatives,

confirmed that "[a]ny potential investment or loan made by CBRE Realty Finance shall be

evidenced only by a formal, written, fully-executed loan and/or other agreements and other

appropriate documents setting for these and other pertinent terms and conditions . . . ."   SUMF at

¶ 65-66.   Mr. McCormick testified that he fully understood that this language evidenced the

parties' intent that any deal be recorded in a formal, written document.   SUMF at ¶ 67.   This

language was repeated in every term sheet exchanged between the parties over the next two

months.   SUMF at ¶ 68.

    Each term sheet exchanged by the parties, including the initial August term sheet drafted

by Defendants, included the requirement that Montrose pay current interest and provided for an

_____

    [5] Although the loan documents are dated November 8, 2005, McCormick testified that
closing did not actually occur until November 9 or November 10, 2005.   SUMF at ¶ 62.

interest reserve.  SUMF at ¶ 69.  Thus, Defendants' interrogatory response, which alleged that RFC's demand for current payment of interest was sprung on Defendants at the last moment, is contradicted by the evidence.  Current interest payments and the interest reserve continued to be discussed extensively among Defendants, Fremont, and RFC throughout October.  SUMF at ¶ 70.

The interest reserve and requirement of current interest were based on Defendants' own project models and projections and belie their claim that the project was destined to fail because the interest reserve was inadequately funded.  Defendants expected Montrose to sell approximately 40 condominiums per month beginning seven months after construction commenced and that condominium sales would generate sufficient cash flow to begin repaying debt – including any current interest obligation.  SUMF at ¶ 71-72.  Although the interest reserve was not large enough to last the life of the loan, Defendants were satisfied with it because it contained enough funds to cover eleven months of interest payments.  SUMF at ¶ 73.  By then, the project would be generating sufficient income to more than adequately cover any current interest obligations.  SUMF at ¶ 74; s*ee, also e.g.*, Farr Decl. Exh.38, Oct. 19, 2005 Email from M. Zanoff to B. McCormick ("I've also added a 2nd equity distribution worksheet to show what the deal will look like with CBRE funding its own interest reserve so that it can receive current interest through the point where we can begin paying them from sales proceeds.").  Indeed, in a model prepared by Defendants <u>after</u> the loan closed, Defendants were showing excess cash of at least $1.4 million per month beginning in August 2006 – before the reserve would have expired if fully drawn each month.  SUMF at ¶ 75.  Based on similar modeling, Defendants expressly did not seek a larger reserve.  SUMF at ¶ 76.

Throughout negotiations, RFC made clear that it would require current payment of interest even if the reserve were exhausted.  Consistent with every term sheet and draft loan document, the email correspondence summarizing the deal made clear that 8% of RFC's interest was to be paid on a current basis.  SUMF at ¶ 77.  Any confusion McCormick may have had on this question was explicitly corrected by a set of emails on November 7, 2005 making clear that current interest would be required and that the interest reserve was smaller than necessary to cover the full life of the loan.  SUMF at ¶ 78.  Indeed, McCormick specifically asked his attorney, "what happens if we exhaust the [interest] reserve?  Do we have a continuing obligation to fund current interest to CBRE?"  SUMF at ¶ 79.  An email later the same day to that attorney, McCormick, Moore, and their investment banker Maury Zanoff makes clear that "I just spoke with Andrew [Manley at CBRE] and the interest is not being waived in the event that the interest reserve is extinguished."  *Id*.  After Zanoff went "back to Andrew" on that point, he further advised that "Andrew is standing his ground on this issue."  SUMF at ¶ 80.  And at his deposition, McCormick admitted that RFC "refused to change the written loan documents to provide for a waiver or replenishment of the interest reserve if it became depleted."  SUMF at ¶ 83.

The executed Loan Agreement reflects these negotiations and its terms explicitly foreclose the possibility that current interest might be waived or the size of the interest reserve increased.  It provides, "in the event there exist insufficient funds in the Interest Reserve from which to pay accrued and unpaid interest at the Pay Rate, Borrower shall be and remain obligated for the payment of such Pay Rate of interest in accordance with the terms hereof . . . ."  SUMF at ¶ 84; Montrose Loan Agreement § 6.3.  As to further funding for the interest reserve, the interest reserve is a budgeted portion of the entire loan amount and the Loan Agreement

states clearly that no further funds shall be forthcoming other than the initial loan amount:
Section 2.1 provides that "in no event shall the amount of the Loan exceed" an amount that is
equal to the initial size of the Loan.  *Id.*; Loan Agreement §§ 1.4, 2.1, Exh. E.

As required under the Montrose Loan, Defendants executed an unconditional Guaranty of
certain of Montrose's obligations on the same date as the Loan (the "Montrose Guaranty").
SUMF at ¶ 94.  Moore and McCormick agreed, unconditionally and irrevocably, to indemnify
RFC against any "loss, damage or liability suffered by [RFC]" to the extent such loss arises out
of, among other things, Montrose's failure to pay taxes, assessments or other charges which
could result in prior liens against any portion of the Montrose Property.  Moore and McCormick
also guaranteed that substantial completion of each portion of the construction of the Project (as
defined in the Montrose Loan Agreement) would be attained on time, free and clear of all
mechanics' and materialmen's liens and claims, and within the specified budget (the "Montrose
Construction Obligations").  SUMF at ¶ 95.

### B.    The Montrose Defaults

Both the senior and mezzanine loans contained schedules of construction and of sources
and uses of funds.  Those detailed the source and amount of money to be spent on each item in
the budget.  SUMF at ¶ 104.  The senior loan required the Montrose Project to remain in balance
– that is, it required Montrose to use the money in each disbursement for the purpose specified in
the construction schedules.  SUMF at ¶ 105-106.  If the project fell behind or ran over budget,
causing money from one loan draw to be spent on items that should have been paid for from
earlier disbursements, that would leave insufficient funds to complete the remaining construction
items and the project would fall out of balance.  SUMF at ¶ 107.  On April 20, 2006, Fremont
issued a notice to Triton Pavilion, LLC/Pavilion LLC that the senior loan was "out of balance"

by over $5 million due to insufficient holdback for construction and asbestos remediation. SUMF at ¶ 109.  In other words, as a result of delays or cost overruns, Montrose had used funds that were supposed to be available for future items and asbestos remediation.  SUMF at ¶ 111. On August 25, 2006, Fremont issued a second Out of Balance letter.  SUMF at ¶ 112.  By this time the project was beginning to fall seriously behind and Fremont claimed that it was out of balance by over $13 million.  *Id.*

Because the project was behind, Montrose had been unable to complete, sell and deliver the anticipated number of condominium units.  As a result, it had far less than the anticipated amount of sales proceeds available to make debt service payments.  Although the project budgets had forecast excess sales proceeds being available to make debt service payments, by October 2006 the reserve established for the payment of interest to RFC had been exhausted and no sales proceeds were forthcoming.  SUMF at ¶ 116.  The Borrower or McCormick, however, made the November 2006 interest payment out of their own funds.  *Id.*

The Borrower failed to make the December 2006 payment.  SUMF at ¶ 117.  As a result, on December 13, 2006, RFC issued a Notice of Failure to Make Payment demanding that Montrose cure the default.  SUMF at ¶ 118.  The situation, however, continued to deteriorate. Montrose missed its January interest payment and on January 11, 2007, RFC issued a second Notice of Failure to Make Payment to Montrose. SUMF at ¶ 119, 122.

On January 24, 2007, Fremont declared a default on the senior loan because, among other things, the Borrower had failed to make November, December, and January interest payments totaling over $2 million.  SUMF at ¶ 123, 125.  As with Rodgers Forge, the senior lender looked to RFC to advance the missed interest payments so that RFC could avoid foreclosure and preserve the ability to continue construction on the project.  SUMF at ¶ 128-129.

In light of the senior loan defaults and Montrose's failure to cure the missed payments to RFC, on January 31, 2007, RFC issued a Notice of Acceleration to Montrose accelerating the remaining obligations under the Montrose Loan.  SUMF at ¶ 127.

After Fremont sent its notices of default, RFC began making protective interest payments in order to prevent the senior lender foreclosing on the projects and wiping out RFC's security for its mezzanine loan.  SUMF at ¶ 128-129.  Montrose had fallen behind on payments of not only interest but also taxes and to contractors and materialmen.  SUMF at ¶ 133.  Contractors had filed claims and liens against the project that totaled well in excess of $7 million.  SUMF at ¶ 134.  RFC was forced to pay contractors and materialmen in order to clear the liens, restart construction, and eventually sell the property.  SUMF at ¶ 135.  RFC also paid the outstanding real estate taxes on the Montrose property.  130-132, 144.

In April and May 2007, RFC itself foreclosed on its security interests in Defendants' ownership interest in the Montrose ownership entity.  SUMF at ¶ 135.  As the only bidder at the foreclosure sale, RFC became the owner of the Montrose project.  SUMF at ¶ 141.  Because the additional funds required to develop the Montrose project were tens of millions greater than the originally budgeted amount (see, e.g., SUMF at ¶ 149), RFC sold the project in early 2008. SUMF at ¶ 150.

**C.    The Material Facts Are Undisputed and RFC Has Established Its Entitlement to Judgment**

Defendants guaranteed to RFC "any loss, damage, or liability" it suffered arising out of Montrose's failure to cause taxes or assessments to be paid or to cause timely substantial completion of the project free and clear of mechanics' and materialmen's liens and claims. Guaranties § 1(A)(1), (C).

At his deposition, McCormick admitted that Montrose had failed to timely pay its taxes. SUMF at ¶ 131.   It is thus undisputed that RFC paid real estate taxes due on both projects and that it incurred associated legal fees.  McCormick also does not dispute that he failed to pay contractors, which resulted in liens being placed on the projects.  SUMF at ¶ 133.  RFC paid out of pocket $3,374,288.12 to satisfy those claims and liens and incurred substantial legal fees defending those claims.  SUMF at ¶ 147.  In addition, RFC was forced to accept a lower price for the Montrose ownership interest because the purchaser assumed the liability for the remaining trade payable claims as a significant portion of the purchase price.  SUMF at ¶ 151-152; Sale-Purchase Agreement at § 2.4, Exhibit T.  Thus, RFC suffered additional losses in the amount of $4,993,890.

The Borrower and Defendants' failure to pay the senior lender on Montrose placed the project over-budget because the budget did not call for RFC to advance those funds. Nonetheless, to prevent the senior lenders from foreclosing and wiping out the security for over $50 million worth of loans, RFC was forced to advance interest payments to Fremont.  SUMF at ¶ 128-129.  These unbudgeted payments by RFC were necessary to prevent prior liens and to preserve the ability to continue construction of the project, and are thus recoverable under Sections (1)(A) and 1(C) of the Guaranties.

Specifically, Plaintiff is owed the following sums for funds that it was forced to advance on behalf of the borrowers due to guarantors' failures:

| | | |
|---|---|---|
| • | Legal Fees & Costs: | $ 257,608.04 |
| • | Property Taxes advanced: | $ 562,155.86 |
| • | Mechanics Lien Payments: | $ 3,374,288.12 |
| • | Assumption of Trade Payables by Purchaser: | $4,993,890.00 |

- 15 -

| • | Interest Payments Paid to Senior Lender:<br>Pre-Foreclosure: $4,499,607.86<br>Post-Foreclosure: $4,555,160.53 | $ 9,054,768.39 |
| | **MONTROSE TOTAL:** | **$18,242,710.41** |

SUMF at ¶ 144-148.  In addition, RFC is entitled to an award of pre-judgment interest and fees and costs associated with the present suit in an amount to be determined after judgment. Guaranties §17.

## V.   MOORE AND MCCORMICK'S DEFENSES ARE UNAVAILING

Moore and McCormick allege that RFC should not be permitted to collect on the Montrose Guaranty because it made oral promises either to waive current interest or further fund the interest reserve in the event it became depleted.  During the course of this litigation, they have advanced several variants of these allegations under several different legal theories.  None, however, can save them for two reasons.  First, the documentary evidence conclusively establishes that there was no such promise.  Second, even if such a promise were made, it has no legal significance under any of their proffered theories.  Indeed, Judge Davis has already ruled to that effect earlier in this litigation.

### A.   The Documentary Evidence Undermines Defendants' Allegations of Oral Promises to Waive Current Interest or Increase the Interest Reserve

As discussed above, the communications among the parties leading up to execution of the loan documents make clear that RFC repeatedly and unambiguously refused to agree to waive current interest payments or promise to increase the size of the interest reserve.  Moreover, Defendants conduct subsequent to the defaults but prior to RFC's suit also establishes that they understood that they were obligated to continue paying current interest.  For example, Montrose and McCormick made at least one interest payment after the reserve was exhausted.  SUMF at ¶

116.  Moreover, McCormick repeatedly acknowledged that the interest was owed in documents discussing various additional capital infusions sought by Triton.  SUMF at ¶ 154-156.

In any event, whether the RFC current interest should have been deferred was irrelevant to the collapse of the Montrose project.  As set forth above, the Montrose was so far behind (having missed in excess of $2 million in payments to the senior lender in 3 months, being out of balance with the senior lender by more than $13 million, having failed to pay over $500,000 in taxes, and failed to pay over $7 million in contractors' bills), that $200,000 a month of additional money could not have rescued it or prevented the defaults that lead to the present guaranty claim.

**B.      The Alleged Oral Representations Are Not Material as a Matter of Law Under Any Contractual Theories**

There is no dispute that the alleged promise is directly contradicted by the actual loan documents.  SUMF at ¶ 84.  Similarly, there is no dispute that Defendants understood that the loan documents contained integration clauses and that they constituted the final agreement between the parties.  SUMF at ¶ 85.  Thus, Defendants' allegations of an oral promise – even if true – are all rendered immaterial by the Loan Documents' integration clauses, Maryland's rule against oral modification of unambiguous contract terms, and by the statute of frauds.

Indeed, Judge Davis already established this as law of the case.  Defendants brought the arguments they now raise as affirmative defenses in the form of counterclaims.  After extensive briefing, Judge Davis dismissed the counterclaims as insufficient as a matter of law.  In so doing he ruled expressly that "the defendants will not be permitted to vary the terms of the executed agreements in this case."  MTD Tr. at 64:19-21.  Thus, Defendants should not be permitted to advance contractual theories that do not arise out of the terms of the loan documents to avoid their obligations under the Guaranty.

### 1.     The Loan Documents Do Not Allow Collateral Oral Promises

The Loan Agreement unambiguously requires interest payments to continue irrespective of the amounts remaining in the interest reserve, and it provides for no funding of that reserve other than the initial payments.  Indeed, Moore and McCormick have expressly conceded that the text of the Loan Agreement does not support the interpretation on which their defenses are based. SUMF at ¶ 84; Am. Countercl. ¶¶ 15 (RFC "could not include in the agreement a commitment on its part to [fund the interest reserve]"), 9, 10.  In direct contrast to the alleged promise, the Loan Agreement requires payment of interest monthly.  SUMF at ¶ 85; Loan Agreement at §§ 2.3.2, 2.3.7, 2.3.9.  The provision of the Loan Agreement providing for an interest reserve states explicitly that:

> in the event there exist insufficient funds in the Interest Reserve from which to pay accrued and unpaid interest at the Pay Rate, Borrower shall be and remain obligated for the payment of such Pay Rate of interest in accordance with the terms hereof, and nothing in this Section 6.3 is intended or shall be construed to excuse Borrower from making any such payment.

SUMF at ¶ 85; Loan Agreement § 6.3.  Thus, the Loan Agreement plainly requires the Borrower to make monthly interest payments.  Finally, the Agreement explicitly contemplates the possibility that the interest reserve will be depleted:  it requires continuing interest payments in that event.  *Id*.  There is no basis to reconstrue the plain language of the contracts based on alleged oral statements prior to signing.

The merger clause contained in § 16.14 of the Loan Agreement also renders any alleged oral representation or agreement irrelevant.  It provides:

> This Loan Agreement and each of the other Loan Documents is intended by the parties as the final, complete and exclusive statement of the transactions evidenced by this Loan Agreement and the other Loan Documents. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Loan Agreement and each of the Loan Documents, and no party is relying on any promise, agreement or

- 18 -

> understanding not set forth in this Loan Agreement or any of the other Loan Documents. . . . In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealings or the like be effective to amend, terminate, extend or otherwise modify this Loan Agreement or any of the other Loan Documents.

SUMF at ¶ 84; Loan Agreement § 16.14.  McCormick testified that he understood this language.

SUMF at 85.  The Guaranty itself also expressly incorporates the terms of the Loan Agreement

and thus excludes any alleged oral agreement.

## 2.   Maryland Law Does Not Allow Oral Modification of Written Contract Terms

Even if the loan documents did not contain integration clauses, where – as here – a

contract's written terms are unambiguous, Maryland courts do not look to oral agreements to

vary its meaning.  *See Higgins v. Barnes*, 310 Md. 532, 537, 530 A.2d 724, 726 (Md. 1987);

*Floyd v. Mayor and City Council of Baltimore*, 179 Md. App. 394, 436, 946 A.2d 15, 40 (Md.

Ct. Spec. App. 2008).  Here McCormick has conceded that it was his understanding "that the

written terms of the loan required Montrose to pay current interest even if the interest rate ran

out."  McCormick Tr. 217:4-8.  Thus, there is no ambiguity.

> [P]arol evidence of conversations or alleged conversations made before or at the time of the integration of the contract into writing must be excluded from evidence since, as it was put in *Markoff v. Kreiner*, 180 Md. 150, 154-155, 23 A.2d 19 (1941), and repeated in *Foreman v. Melrod*, 257 Md. 435, 441, 263 A.2d 559, 562 (1970), a 'different rule would increase the temptations to commit perjury and often render instruments of little value.  All prior and contemporaneous negotiations are merged in the written instrument, which is treated as the exclusive medium for ascertaining the extent of [the parties'] obligations.'

*Kermisch v. Savings Bank of Baltimore*, 266 Md. 557, 560, 295 A.2d 776, 778 (Md. 1972*); see

also Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F. Supp. 2d 520,

531 (D. Md. 2001); *Higgins*, 310 Md. at 537; *Maslow v. Vanguri*, 168 Md. App. 298, 319, 896

- 19 -

A.2d 408, 421 (Md. Ct. Spec. App. 2006); *Phoenix Services Ltd. Partnership v. Johns Hopkins Hosp.*, 167 Md. App. 327, 892 A.2d 1185 (Md. Ct. Spec. App. 2006).[6]

### 3. The Statute of Frauds Bars the Alleged Oral Promise

Mr. Moore conceded that he had no individual agreement with RFC concerning the interest reserve issue.  SUMF at ¶ 86.  To the extent McCormick – as opposed to Moore – alleges an independent oral agreement to himself, such an agreement is barred not only by the integration clauses but also by the statute of frauds.

Under Maryland law, a contract must be in writing if it (1) purports to charge a defendant on any special promise to answer for the debt, default, or miscarriage of another person; or (2) cannot be performed within 1 year from the date on which it was made.  Md. Code, Courts and Judicial Proceedings § 5-901.  Here, the alleged oral contract fails both tests.

The alleged oral contract was specifically for a deferral or funding of all interest payments due under the Loan Agreement, which had a term of three years.  *See* Loan Agreement § 2.2.  It would therefore be impossible for RFC to discharge its alleged promise to replenish the interest reserve or defer interest payments within anything less than the same three-year period. As a result, the alleged agreement is barred.  *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 544 (4th Cir. 1987) (citations and quotation marks omitted) (statute of frauds applies where the parties "expressly and specifically agreed that their oral contracts were not to be performed within one year" or "when it is impossible by the terms of the contract for it to be performed fully within one year"); *Collection & Investigation Bureau of Maryland, Inc. v.*

---

[6] Despite its name, the parol evidence rule is not one regarding the admission of evidence but is a substantive rule central to Maryland's law of contract interpretation.  *See Foreman v. Melrod*, 257 Md. 435, 442, 263 A.2d 559, 562 (Md. 1970) ("The parol evidence rule is not a rule of evidence but . . . of substantive law.").

*Linsley*, 37 Md. App. 66, 375 A.2d 47 (Md. App. 1977) (oral covenant to refrain from competing

for two years barred by statute of frauds because period of restraint could not be discharged in

under a year); *Friedman & Fuller, P.C. v. Funkhouser*, 107 Md. App. 91, 104, 666 A.2d 1298,

1305 (Md. App. 1995) (same).

 In addition, Moore and McCormick seek to hold RFC to answer for a default by

Montrose Investment Holdings, LLC under the Loan Agreement.  They allege an agreement by

RFC to make good Montrose's failure to pay interest as required.  Because the agreement is

neither "in writing" nor signed by RFC, Moore and McCormick may not bring an action to

enforce it.  For this reason, too, Moore and McCormick cannot assert their alleged oral contract

as a defense to their failure to honor the Montrose Guaranty.

 **C.** **Defendants Cannot Properly Rely Upon the Alleged Oral Promises as Affirmative Defenses**

  **1.** **Maryland Law Precludes Defendants' Claim that the Loan Documents Were Fraudulently Induced**

 Defendants' allegations are also inadequate as a matter of law when characterized as a

defense of fraudulent inducement.  An essential element of fraud is "that [the plaintiff] not only

relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and

that he would not have done the thing from which the injury resulted had not such

misrepresentation been made."  *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 333, 439 A.2d

534, 537 (Md. 1982).  A party has a "right to rely" on the misrepresentations only where reliance

is reasonable.  *See Sass v. Andrew*, 152 Md. App. 406, 441, 832 A.2d 247, 267 (Md. Ct. Spec.

App. 2003).

 Maryland courts have repeatedly held that a contracting party claiming fraudulent

inducement cannot reasonably rely on alleged misrepresentations that are contradicted by the

- 21 -

terms of the contract as signed.  *See Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 631 (4th Cir.

1977) ("[W]e do not think the plaintiffs could reasonably have relied upon the allegedly

fraudulent statements made in the face of plainly contradictory contractual language.");

*McDonald v. Friedman*, 2004 WL 3397805, at *8-*9 (D. Md. 2004) (citing numerous cases to

the effect "that one cannot reasonably rely on allegedly fraudulent misrepresentations when

faced with clear contractual language to the contrary"); *Wootton Enterprises, Inc. v. Subaru of*

*America, Inc.*, 134 F.Supp.2d 698, 714 (D. Md. 2001), *aff'd*, 34 Fed. Appx. 57 (4th Cir. 2002)

(plaintiff could not rely on statements contradicted and superseded by written agreement); *Md.*

*Environmental Trust v. Gaynor*, 370 Md. 89, 98-99, 803 A.2d 512 (Md. 2002) (clear language of

letter to plaintiff precluded reliance on earlier, inconsistent statements); *James v. Goldberg*, 256

Md. 520, 529-30, 261 A.2d 753, 758 (Md. 1970) (where agreement contradicted alleged oral

agreement, plaintiff "had no right to rely upon the alleged false representation and the lower

court properly directed the verdict in favor of the defendant on count two."); *First Union Nat.*

*Bank v. Steele Software Systems Corp.*, 154 Md. App. 97, 160-61, 838 A.2d 404, 441 (Md. Ct.

Spec. App. 2003) (misrepresentations "could not reasonably be relied on by a sophisticated

business entity entering a negotiated contract because they were contradicted by the explicit

terms of the [contract]" and thus there could be no fraud.); *Cooper v. Berkshire Life Ins. Co.*, 148

Md. App. 41, 59-63, 810 A.2d 1045 (Md. Ct. Spec. App. 2002) (fraud plaintiff cannot reasonably

rely on representation of guaranteed premium schedule that contradicts the terms of purchased

insurance policy); *see also Mellon Bank Corp. v. First Union Real Estate Equity & Mort., Inv.*,

951 F.2d 1399, 1412 (3d Cir. 1991) (holding that plaintiff could not show fraud because "it is not

reasonable for [plaintiff] to rely on oral promises that directly contradict the written agreements

between the parties"); *Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F. Supp. 2d 460,

471-72 (D. Md. 1999) ("a party cannot reasonably rely on allegedly fraudulent representations of sales revenues of other franchisees where such representations are directly contradicted by the terms of an applicable offering statement.").

These precedents preclude the affirmative defense of fraud here.[7]  The alleged misrepresentation – that should the interest reserve become depleted RFC would either fund the Interest Reserve or waive the requirement of regular interest payments – are contradicted by the express terms of the agreements.  As to further funding for the interest reserve, the Loan Agreement states clearly that no further funds shall be forthcoming other than the initial loan amount:  Section 2.1 provides that "in no event shall the amount of the Loan exceed" an amount that is equal to the initial size of the Loan.  SUMF at ¶ 84; Loan Agreement §§ 1.4, 2.1, Exh. E.  Moreover, Exhibit E to the Loan Agreement allocates the entire amount of money defined in Sections 1.4 and 2.1, including the amount to go to the interest reserve.  *Id.*  Therefore, the Loan Agreement **explicitly prohibits** further funding of the interest reserve.  As to the claim that interest payments would be waived in the event that the interest reserve became depleted, section 6.3 of the Loan Agreement expressly provides that "in the event there exist insufficient funds in the interest reserve from which to pay accrued and unpaid interest at the Pay Rate, Borrower shall be and remain obligated for the payment of such Pay Rate of interest in accordance with the terms hereof . . . ."  SUMF at ¶ 84; Loan Agreement § 6.3.

Even if Maryland law did not render any alleged reliance inappropriate as a matter of law, the facts of this case also demonstrate that reliance could not have been reasonable.  Moore and McCormick were sophisticated businessmen who knew that the loan documents had

---

[7] At his deposition, McCormick made clear that the only alleged misrepresentation occurred before closing of the Montrose Loan and.  SUMF at ¶ 88.  In any event, a post-closing representation could not possibly induce entry into the contracts at issue.

integration clauses and understood them.  SUMF at ¶ 85.  Under their models, they had no need

of a larger interest reserve.  SUMF at ¶ 75-76.  They knew, however, that RFC might not

provide further funding, especially if the project was already in default, and that RFC had

refused to modify loan documents to add a larger interest reserve or to waive the requirement for

the payment of interest.  SUMF at ¶ 64-85.  Under the circumstances, they could not possibly

have reasonably relied on a supposed oral promise to further fund the interest reserve.

### 2.      Defendants Cannot Establish a Defense of Duress

Defendants have also argued that Plaintiff's claims are barred by the doctrine of duress.

Once again, the facts completely undercut their argument.  Defendants imply in their

interrogatories that they were under duress because they had made deposits to the seller of the

Montrose real estate and that RFC changed position after those deposits were made.  *See*

Defendants' Response to Interrogatory No. 4.  As shown by the many draft term sheets, the first

of which prepared by an agent of Defendants, current interest was always a requirement of the

RFC loan.  SUMF at ¶ 65-69.  Thus, it is actually undisputed that the critical fact underlying

Defendants' duress claim – as set forth in their interrogatory responses – is completely false.

Even if Defendants' interrogatory response were accurate, their duress defense fails as a

matter of law.   Duress requires: "(1) a wrongful act or threat by the opposite party to the

transaction or by a third party of which the opposite party is aware and takes advantage, and (2) a

state of mind in which the complaining party was overwhelmed by fear and precluded from

using free will or judgment."  *Food Fair Stores, Inc. v. Teresa Carol Joy*, 283 Md. 205, 216, 389

A.2d 874, 881 (Md. 1977) (internal quotations omitted).  In an economic context, a party must

demonstrate that in order to prevent injury he was compelled to "make a payment of money

which the demanding party has no right to receive," and the payor had "no adequate opportunity

. . . to effectively resist such payment." *See Blumenthal v. Heron*, 261 Md. 234, 244-45, 274

A.2d 636, 641 (Md. 1971).

Moore and McCormick allege no such thing.  Rather, they allege that RFC threatened to

refuse to enter into the Loan Documents if they did not include a requirement of current interest.

That fails both prongs of the test.  RFC had every right not to enter into the transactions at issue.

The term sheets specifically provide that they are "non-binding and do[] not constitute a

commitment to extend funds to the [Montrose] project."  Thus, even if Defendants' allegations

were true, RFC would still have exercised no "unwarrantable authority" nor subjected

Defendants to a "wrongful act or threat."  Nor can Moore and McCormick credibly claim that

their will was overborne.  They were sophisticated businessmen negotiating a complicated loan

transaction during which the parties were at loggerheads over a deal point.  Like every other

participant in every other arms-length business transaction, they were faced with a choice

between agreeing to their counterparty's demands or walking away.  The need to confront that

set of options does not deprive them of free will or judgment.  *See Shillman v. Hobstetter*, 249

Md. 678, 692-93, 241 A.2d 570, 578 (Md. 1968) ("Mere stress of business does not constitute

duress, when the person against whom it is asserted was not responsible for such

circumstances.").

### 3.    Defendants Cannot Establish a Defense of Illegality

Moore and McCormick's illegality defense alleges that they knowingly conspired with

RFC to perpetrate a purported fraud on RFC's investors.  They then ask this Court to enforce

their supposed agreement among thieves.

In their memorandum in support of their amended counterclaim, Defendants alleged that

they had agreed with RFC to waive current interest payments but that the terms of the deal

- 25 -

documents were written to the contrary in an effort to mislead RFC's investors.  As a factual

matter, this fails for the same reason that Defendants' other affirmative defenses fail:  there was

never any "true" agreement to waive payment of current interest.  Throughout the negotiations

RFC made clear that it required the payment of current interest without exceptions and never

promised Defendants anything to the contrary.

Moreover, Defendants insist in sworn interrogatory responses that they entered into no

illegal agreements.  SUMF at ¶ 90.  That applies equally to Plaintiff.  Any agreements were

entered into by both parties, and at the time both had the same information regarding the content

of the negotiations, any oral representations, and the terms of the written contracts.  If

Defendants, though in full possession of the facts and the alleged purposes of the alleged

agreement, did not act illegally, neither did Plaintiff.

As Defendants acknowledge, the agreement RFC seeks to enforce is not illegal – and it is

the one the parties contemplated since August 2005 and have relied on in every instance since it

was executed in November 2005.  RFC has relied on it to govern the loan transaction at issue and

has never taken any action inconsistent with the written loan documents.  Similarly, McCormick

acknowledged Montrose's obligation to make interest payments and in fact made interest

payments after exhaustion of the interest reserve.   Accordingly, Defendants cannot sustain a

defense of illegality.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff RFC summary judgment on

its claims for damages in the amount of $22,621,414.34, plus pre and post-judgment interest,

attorneys' fees and costs.

Dated:  August 6, 2009                     Respectfully submitted

      /s/ George R. Calhoun       
Howard H. Stahl (D. Md. Bar No. 24741)
Jennifer Quinn-Barabanov (D. Md. Bar No. 1649)
George R. Calhoun, V (D. Md. Bar No. 25018)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902

*Attorneys for Plaintiff RFC TRS, LLC*