# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore Division

| | |
|---|---|
| CBRE REALTY FINANCE TRS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-cv-1964 |
| ) | |
| BRIAN A. MCCORMICK ) | |
| ) | |
| and ) | |
| ) | |
| CHARLES W. MOORE, ) | |
| ) | |
| Defendants. ) | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Howard H. Stahl (D. Md. Bar No. 24741)
Jennifer Quinn-Barabanov (D. Md. Bar No. 1649)
George R. Calhoun, V (D. Md. Bar No. 25018)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902

*Attorneys for Plaintiff* RFC TRS, LLC

Pursuant to Federal Rule 56, Plaintiff, RFC TRS, LLC, submit this statement of

undisputed facts and supporting declarations:

1.  Defendants Charles Moore ("Moore") and Brian McCormick ("McCormick") co-founded Triton Real Estate Partners, LLC.  Transcript of Brian McCormick's July 7, 2009 Deposition ("McCormick Tr."; excerpts attached as Exhibit A to this Statement) at 15:2-16:18; Rodgers Forge Sponsor Overview, attached as Exhibit 18 to the Declaration of Daniel Farr ("Farr Decl.").

2.  Both Triton Rodgers Forge, LLC ("Rodgers Forge") and Montrose Investment Holdings, LLC ("Montrose") (together the "Borrowers") were under the control of Defendants Moore and McCormick through their membership stakes in the holding companies that owned the Borrowers.  McCormick Tr. at 27:16-29:22

3.  Moore and McCormick have participated in complex real estate and other investments.  McCormick Tr. at 21:1-26:7; Transcript of Charles Moore's June 19, 2009 Deposition ("Moore Tr."; excerpts attached as Exhibit B to this Statement) at 12:25-17:12.

4.  At Triton, Moore and McCormick financed and developed a $50 million residential project known as The Landing at Spa Creek.  McCormick Tr. at 24:8-20.

5.  Moore and McCormick acquired and sold a $70 million commercial building in downtown Atlanta known as 56 Marietta.  McCormick Tr. at 25:21, Rodgers Forge Sponsor Overview, Farr Decl. Exh. 18 at M01263.

6.  McCormick was responsible for the financing and development of over 1,700 housing units with a value in excess of $150 million as Founder, Chairman, and CEO of Evergreen Holding Company.  McCormick Tr. at 21:19-23:8.

7.  McCormick and Moore have executed transactions involving the acquisition of over $500 million of datacenter assets including Spring eSolutions and Palo Alto Internet Exchange.  McCormick Tr. at 25:21, Rodgers Forge Sponsor Overview, Farr Decl. Exh. 18 at M01263.

8.  McCormick is a lawyer and a certified public accountant.  McCormick Tr. at 9:18-21.

9.  McCormick has substantial experience in negotiating loan documents and real estate transactions.  McCormick Tr. at 25:21

10.     McCormick was primarily responsible for the negotiation of the loans at issue. Moore's Response to Pl's. First Set of Interrogatories, Farr Decl. Exh. 3 at RFCCM00032; Moore Tr. at 22:14-22.

11.     Moore holds an MBA from the University of Chicago.

12.     Moore put together private equity deals with an aggregate value between $750 million and $1 billion over the decade prior to the events at issue in this litigation. Moore Tr. at 15:17-25.

13.     Moore has participated in the negotiation or review of complicated transactional and loan documents on multiple occasions.  Moore Tr. at 16:7-19.

14.     Moore's role in Triton Real Estate Partners was as an investor and to assist in financial modeling of potential projects.  Moore Tr. at 24:7-8, 31:17-19.

15.     Moore's knowledge of the negotiations between Triton Real Estate Partners and its subsidiaries and RFC was entirely derivative of McCormick's.  Moore's Response to Pl's. First Set of Interrogatories, Farr Decl. Exh. 3 at RFCCM00032; Moore Tr. at 22:14-22, 25:9-24, 26:7-15.

16.     Moore and McCormick represented their experience and expertise to potential investors in Rodgers Forge and Montrose, including RFC.  McCormick Tr. at 17:11-13; Rodgers Forge Sponsor Overview, Farr Decl. Exh. 18.

17.     Moore and McCormick negotiated financing for Rodgers Forge and Montrose with the assistance of professional investment bankers at CBRE L.J. Melody, including Maury Zanoff.  McCormick Tr. at 15:5-16:3, 19:1-20:11; 108:10-13, 109:17-19; March 28, 2005 Letter from L.J. Melody & Co. to Brian McCormick, Farr Decl. Exh. 19.

18.     CBRE L.J. Melody is an independent company from RFC.  McCormick Tr. at 15:20-16:3.

19.     CBRE Realty Finance Holdings, LLC ("RFC Holdings") entered into a loan agreement with Triton Rodgers Forge, LLC on or about October 31, 2005.  Farr Decl. ¶ 69.

20.     On April 14, 2006 RFC entered into an amended Loan Agreement with Rodgers Forge for a loan with a principal amount of $22,073,200.00 (the "Rodgers Forge Loan").  Rodgers Forge Loan Agreement, Farr Decl. Exh. 6.

21.     RFC Holdings was an affiliate of CBRE Realty Finance TRS, LLC ("RFC") and subsequently assigned the October 31, 2005 Rodgers Forge Loan to RFC.  Farr Decl. ¶ 69.

22.     CBRE Realty Finance TRS, LLC is the predecessor by name change to RFC TRS, LLC (also "RFC"), the Plaintiff in this action.  Farr Decl. ¶ 70.

23.     The October 31, 2005 Rodgers Forge Loan was to be used by Rodgers Forge to redevelop an existing apartment complex in the Rodgers Forge subdivision in Baltimore, Maryland by converting the units into residential condominiums for subsequent sale.  Rodgers Forge Loan Agreement §§ 1.1, 1.3, Farr Decl. Exh. 6.

24.     The Rodgers Forge Loan was secured by an indemnity deed of trust granting RFC a lien against the real property under development.  First Amendment to Indemnity Deed of Trust and Security Agreement, Farr Decl. Exh. 10.

25.     Moore and McCormick issued personal guaranties pursuant to a Guaranty Agreement (the "Rodgers Forge Guaranty").  Amended and Restated Guaranty ("Rodgers Forge Guaranty"), Farr Decl. Exh. 9.

26.     Moore and McCormick agreed to indemnify RFC against any loss, damage or liability suffered by RFC to the extent such loss arises out of Rodgers Forge's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Rodgers Forge Property.  Rodgers Forge Guaranty § 1(A)(i).

27.     Moore and McCormick guaranteed that substantial completion of each portion of the construction of the Project (as defined in the Rodgers Forge Loan Agreement) would be attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget.  Rodgers Forge Guaranty § 1(C)(i).

28.     Moore and McCormick agreed to indemnify and hold RFC harmless for any and all claims, demands, suits, losses, damages or expenses in connection with the existence of any "Hazardous Substance" or "Environmental Condition" associated with the Rodgers Forge Property.  Rodgers Forge Guaranty § 1(D).

29.     The Rodgers Forge Loan was mezzanine financing, meaning that RFC's liens, security, and right to repayment were subordinate to those of the senior lender on the Rodgers Forge Project.  Farr Decl. ¶ 71; McCormick Tr. at 68:8-17.

30.     Ohio Savings Bank was the senior lender on the Rodgers Forge Project. McCormick Tr. at 48:22-49:2.

31.     Ohio Savings Bank had extended a $34 million acquisition loan and a senior $6 million construction loan.  January 17, 2007 Letter from David R. Naka to RFC, Farr Decl. Exh. 20.

32.     In the event of a default by Rodgers Forge, Ohio Savings Bank had the right to foreclose on its security interest, which would eliminate RFC's rights, liens, and security interest.  McCormick Tr. at 68:8-17; January 17, 2007 Letter from David R. Naka to RFC, Farr Decl. Exh. 20.

33.    RFC had the right to prevent foreclosure by the senior lender by curing Rodgers Forge's default.  January 17, 2007 Letter from David R. Naka to RFC, Farr Decl. Exh. 20 at RFCCM00184; McCormick Tr. at 59:6-60:8.

34.    Rodgers Forge failed to make interest payments in November and December 2006 and January 2007 on the senior loans totaling over $1 million.  January 17, 2007 Letter from David R. Naka to Rodgers Forge, Moore, and McCormick, cc RFC, Farr Decl. Exh. 21, atRFCCM00176.

35.    The failure to make interest payments constituted a default under the senior loan. January 17, 2007 Letter from David R. Naka to Rodgers Forge, Moore, and McCormick, cc RFC, Farr Decl. Exh. 21, atRFCCM00176.

36.    Rodgers Forge never cured this default.  McCormick Tr. at 58:19-59:5, 61:19-63:15, 66:20-68:3.

37.    On January 17, 2007, Ohio Savings Bank issued two notices of default to Rodgers Forge.  January 17, 2007 Letter from David R. Naka to Rodgers Forge, Moore, and McCormick, cc RFC, Farr Decl. Exh. 21, atRFCCM00176; January 17, 2007 Letter from David R. Naka to Rodgers Forge, Moore, and McCormick, cc RFC, Farr Decl. Exh. 22, atRFCCM00177.

38.    A default under the senior loan constituted a default under the Rodgers Forge Loan.  Rodgers Forge Loan Agreement § 9.19, Farr Decl. Exh. 6; McCormick Tr. at 48:18-49:17.

39.    On February 1, 2007, RFC issued a Notice of Acceleration to Rodgers Forge declaring a default and accelerating the remaining balance of the Rodgers Forge Loan.  Am. Answer ¶ 21, Farr Decl. Exh. 2; February 1, 2007 Letter from RFC to Rodgers Forge, Farr Decl. Exh. 23, at RFCCM00178.

40.    RFC advanced protective interest payments to Ohio Savings Bank to prevent the latter from foreclosing on the Rodgers Forge Property and wiping out its security. Farr Decl. ¶ 72; McCormick Tr. at 59:6-60:8; May 3, 2007 Email from Brian McCormick to Paul Martin, Farr Decl. Exh. 24.

41.    On or about February 6, 2007, RFC learned that Rodgers Forge could not or would not make its real estate tax payment in connection with the Rodgers Forge Property unless it received a new capital infusion.  February 6, 2007 Email from Angela Nagel to Matthew Alix, Farr Decl. Exh. 25.

42.    Rodgers Forge did not pay real estate taxes in connection with the Rodgers Forge Property during the first half of 2007.  Am. Answer ¶ 27; June 25, 2007 Letter from Brian McCormick to RFC, Farr Decl. Exh. 26.

43.    Failure to pay real estate taxes constituted a default under the Loan Agreement. Rodgers Forge Loan Agreement § 9.3, Farr Decl. Exh. 6.

44.     In April 2007, RFC noticed a foreclosure on the Rodgers Forge Property.  April 23, 2007 Letter from Anne-Therese-Bechamps, Farr Decl. Exh. 27.

45.     As of April 2007, Rodgers Forge was delinquent on its payments to Ohio Savings Bank and in default on that loan.  McCormick Tr. at 58:19-59:5, 61:19-63:15, 66:20-68:3.

46.     RFC had the right to foreclose on the Rodgers Forge Property.  McCormick has admitted that his interrogatory response that RFC had improperly declared a default due to a "perceived technical default" on the senior loan was a "bad choice of words."  McCormick Tr. at 58:19-59:5, 61:19-63:15, 66:20-68:3.

47.     RFC did not fail to perform its own obligations under the Rodgers Forge Loan Documents.  McCormick Tr. at 69:9-18.

48.     RFC declared a default only after Ohio Savings Bank had already done so.  February 1, 2007 Letter from RFC to Rodgers Forge enclosing January 17, 2007 Letter from David R. Naka to Rodgers Forge, Moore, and McCormick, cc RFC and January 17, 2007 Letter from David R. Naka to RFC, Farr Decl. Exh. 23, at RFCCM00178-183.

49.     In May 2007, RFC completed the foreclosure sale of the Rodgers Forge Property and that sale was approved by the Circuit Court for Baltimore County.  Rodgers Forge Judicial Sale Ratification, Farr Decl. Exh. 28.

50.     Rodgers Forge, Moore, and McCormick were notified of the foreclosure sale and none objected.  McCormick Tr. at 60:5-8, 62:21-63:16, 81:9-12; April 23, 2007 Letter from Anne-Therese-Bechamps, Farr Decl. Exh. 27.

51.     McCormick acknowledged that that RFC had been forced to pay real estate taxes owed by the project and to make interest payments to Ohio Savings Bank in 2006 and 2007.  May 3, 2007 Email from Brian McCormick to Paul Martin, Farr Decl. Exh. 24.

52.     RFC was the only bidder on the Rodgers Forge Property.  Farr Decl. ¶ 73.

53.     RFC advanced $352,612.03 of property taxes owed and not paid by Rodgers Forge.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; June 25, 2007 Letter from Brian McCormick to RFC, Farr Decl. Exh. 26; RFC Accounting of Rodgers Forge Foreclosure Costs, Farr Decl. Exh. 60; Rodgers Forge 2007 Property Tax Bill and Disbursement Authorization, Farr Decl. Exh. 62; Farr Decl. ¶ 74.

54.     RFC made $1,602,283.71 in protective interest payments to Ohio Savings Bank prior to the foreclosure as a result of Rodgers Forge's failure to pay.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; June 25, 2007 Letter from Brian McCormick to RFC, Farr Decl. Exh. 26, RFC Accounting of Rodgers Forge Foreclosure Costs, Farr Decl. Exh. 60; Farr Decl. ¶ 75.

55.     RFC made $2,361,298.83 in protective interest payments to Ohio Savings Bank subsequent to the foreclosure as a result of Rodgers Forge's failure to pay. RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; June 25, 2007 Letter from Brian McCormick to RFC, Farr Decl. Exh. 26; RFC Accounting of Rodgers Forge Post-Foreclosure Expenses, Farr Decl. Exh. 61; Farr Decl. ¶ 76.

56.     RFC expended $62,509.36 in legal fees and costs in connection with handling contractor lien issues, the tax issues and the negotiations with the senior lender necessitated by the defaults on the Rodgers Forge Loan. RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; Farr Decl. ¶ 77.

57.     RFC demanded payment from Moore and McCormick for the obligations that they had guaranteed regarding Rodgers Forge. Am. Answer ¶¶ 23, 24; April 27, 2007 Letter from RFC to Moore and McCormick, Farr Decl. Exh. 29.

58.     RFC made no oral representations inconsistent with the Rodgers Forge Loan Documents regarding current interest payments and the interest reserve. McCormick Tr. at 69:18-70:9, 72:8-74:20.

59.     On or about November 8, 2005, RFC entered into a loan agreement with Montrose Investment Holdings, LLC ("Montrose") pursuant to which RFC agreed to lend Montrose the principal sum of $31,946,650.00. Montrose Loan Agreement, Farr Decl. Exh. 11.

60.     Montrose owned Triton Pavilion, LLC, which in turn owned Pavilion LLC, which in turn owned the real property itself. Montrose Loan Agreement § 1.3, Farr Decl. Exh. 11.

61.     On or about November 8, 2005, Montrose executed a promissory note in favor of RFC for $31,946,650.00. Montrose Promissory Note, Farr Decl. Exh. 12.

62.     Although the loan documents are dated November 8, 2005, McCormick testified that closing did not actually occur until November 9 or November 10, 2005. McCormick Tr. at 171:17-19.

63.     The proceeds of the Montrose Loan were to be used to convert a 432-unit multi-family rental project in Rockville, Maryland into condominiums for sale. Montrose Loan Agreement §§ 1.3, 1.4, Farr Decl. Exh. 11.

64.     Defendants first approached RFC concerning the Montrose loan in approximately August 2005. McCormick Tr. at 108:21-109:16.

65.     The earliest draft term sheet was prepared by Defendants or their representatives. August 9, 2005 Email from Maury Zanoff to Andrew Manley attaching draft term sheet, Farr Decl. Exh. 30.

66.     That term sheet confirmed that "[a]ny potential investment or loan made by CBRE Realty Finance shall be evidenced only by a formal, written, fully-

executed loan and/or other agreements and other appropriate documents setting
for these and other pertinent terms and conditions . . . ." August 8, 2005 Draft
Term Sheet, Farr Decl. Exh. 30, at RFCCM00653.

67.     Mr. McCormick testified that he fully understood that this language evidenced the
        parties' intent that any deal be recorded in a formal, written document.
        McCormick Tr. at 115:1-18.

68.     The same language was repeated in the other term sheets exchanged between the
        parties over the next two months.  August 19, 2005 Draft Term Sheet, Farr Decl.
        Exh. 31, at RFCCM00498; October 28, 2005 Draft Term Sheet, Farr Decl. Exh.
        32, at RFCCM00643; November 1, 2005 Draft Term Sheet, Farr Decl. Exh. 33, at
        RFCCM00511; November 2, 2005 Draft Term Sheet, Farr Decl. Exh. 34, at
        MC11413;

69.     Each term sheet exchanged by the parties, including the initial August term sheet
        drafted by Defendants, included the requirement that Montrose pay current
        interest and provided for an interest reserve.  McCormick Tr. at 110:10-113:11,
        119:4-121:21, 126:8-20, 126:21-136:20, 138:12-140:13; August 8, 2005 Draft
        Term Sheet, Farr Decl. Exh. 30, at RFCCM00649; August 19, 2005 Draft Term
        Sheet, Farr Decl. Exh. 31, at RFCCM00494; October 28, 2005 Draft Term Sheet,
        Farr Decl. Exh. 32, at RFCCM00639; November 1, 2005 Draft Term Sheet, Farr
        Decl. Exh. 33, at RFCCM00507; November 2, 2005 Draft Term Sheet, Farr Decl.
        Exh. 34, at MC11409

70.     Current interest payments and the interest reserve continued to be discussed
        extensively among Defendants, Fremont, and RFC during negotiations over the
        loan throughout October.  McCormick Interrogatory Responses at 7, Farr Decl.
        Exh. 4; October 12, 2005 Email chain between Maury Zanoff and Brian
        McCormick, Farr Decl. Exh. 35; October 12, 2005 Email chains between
        McCormick, Zanoff, and Fremont Investment, Farr Decl. Exh. 36.

71.     Defendants expected Montrose to sell approximately 40 condominiums per month
        beginning seven months after construction commenced.  November 2, 2005
        Montrose Sources & Uses Spreadsheet, Farr Decl. Exh. 34, at MC11422,
        MC11430, MC11439; January 26, 2006 Sources & Uses Spreadsheet, Farr Decl.
        Exh. 40, at M03409, M03417, M03428.

72.     Defendants expected that condominium sales would generate sufficient cash flow
        to begin repaying debt – including any current interest obligation – seven months
        after construction began.  November 2, 2005 Sources & Uses Spreadsheet, Farr
        Decl. Exh. 34, at MC11418; January 26, 2006 Sources & Uses Spreadsheet, Farr
        Decl. Exh. 40, at M03397.

73.     The interest reserve contained enough funds to cover eleven months of interest
        payments.  RFC Accounting of Montrose Foreclosure Costs, Farr Decl. Exh. 65.

74.     Defendants' projections indicated that by the time the interest reserve was exhausted, the project would be generating sufficient income to more than adequately cover any current interest obligations.  October 19, 2005 Email from Maury Zanoff to Andrew Manley, Farr Decl. Exh. 38; McCormick Tr. at 134:14-19, November 2, 2005 Sources & Uses Spreadsheet, Farr Decl. Exh. 34, at MC11418; January 26, 2006 Sources & Uses Spreadsheet, Farr Decl. Exh. 40, at M03397.

75.     In a model prepared by Defendants after the loan closed, Defendants were showing excess cash of at least $1.4 million per month beginning in August 2006.  Moore Tr. at 94:21-95:6; January 26, 2006 Sources & Uses Spreadsheet, Farr Decl. Exh. 40, at M03409.

76.     Based on their modeling, Defendants expressly did not seek a larger reserve.  October 12, 2005 Email from Maury Zanoff to Brian McCormick, Farr Decl. Exh. 37.

77.     Email correspondence reveals an understanding during negotiations that 8% of RFC's interest was to be paid on a current basis and would not be waived.  November 6-7, 2005 Email chain between Zanoff and McCormick, Farr Decl. Exh. 41 at MC11492; November 7, 2005 Email chain between Zanoff and Steven Tyminski, ccing Moore and McCormick, Farr Decl. Exh. 42, at MC11517-MC11518

78.     A series of email exchanges on November 7, 2005 established that current interest would be required and that the interest reserve was smaller than necessary to cover the full life of the loan.  McCormick Tr. at 153:20-164:22; November 6-7, 2005 Email chain between Zanoff and McCormick, Farr Decl. Exh. 41 at MC11492; November 7, 2005 Email chain between Zanoff and Steve Tyminski, ccing Moore and McCormick, Farr Decl. Exh. 42, at MC11517-MC11518; November 7, 2005 Email exchange between Brian McCormick and Maury Zanoff, Farr Decl. Exh. 44, at MC11495; November 7, 2005 Email exchange between Maury Zanoff and Andrew Manley, Farr Decl. Exh. 43, at MC11503

79.     On November 7, McCormick asked, "what happens if we exhaust the [interest] reserve?  Do we have a continuing obligation to fund current interest to CBRE?"  November 7, 2005 Email exchange between Maury Zanoff, Brian McCormick, and Steven Tyminski, Farr Decl. Exh. 43, at MC11504.  An email later the same day to Tyminsky, McCormick, Moore, and their investment banker Maury Zanoff replied that "I just spoke with Andrew [Manley at CBRE] and the interest is not being waived in the event that the interest reserve is extinguished."  November 7, 2005 Email chain between Zanoff, Saas, and Tyminski, ccing Moore and McCormick, Farr Decl. Exh. 42, at MC11518.

80.     After Zanoff went "back to Andrew" on that point, he further advised that "Andrew is standing his ground on this issue."  November 7, 2005 Email chain

between Zanoff, Saas, and Tyminski, ccing Moore and McCormick, Farr Decl. Exh. 42, at MC11517.

81.     RFC was also clear that it made no promise to further fund the interest reserve in the event that it became exhausted.  An email from RFC employee Jim Evans to Zanoff on the day of closing explains that he "couldn't guarantee [additional money for the interest reserve] right now."  November 9, 2005 Email from Jim Evans to Maury Zanoff, Farr Decl. Exh. 45, at MC11531.

82.     Jim Evans promised only to "work with" Defendants if additional money was needed.  November 9, 2005 Email from Maury Zanoff to Brian McCormick, Farr Decl. Exh. 46, at MC11528.

83.     At his deposition, McCormick admitted that RFC "refused to change the written loan documents to provide for a waiver or replenishment of the interest reserve if it became depleted."  McCormick Tr. at 187:7-19.

84.     The terms of the Loan Agreement explicitly foreclose the possibility that current interest might be waived or the size of the interest reserve increased.  Loan Agreement §§ 1.4, 2.1, 6.3, 2.3.2, 2.3.7, 2.3.9, Exh. E, Farr Decl. Exh. 11.

85.     McCormick has conceded that it was his understanding "that the written terms of the loan required Montrose to pay current interest even if the interest rate ran out" and that the integration clauses of the Loan Documents superseded prior oral representations and prevented alter oral modification.  McCormick Tr. at 217:4-218:4, 220:1-15.

86.     Moore has disclaimed any individual agreement with RFC concerning the interest reserve.  Moore Tr. at 28:3-10.

87.     The Loan Agreement had a term of three years.  Montrose Loan Agreement at § 2.2, Farr Decl. Exh. 11.

88.     At his deposition, McCormick made clear that the only alleged misrepresentation occurred before closing of the Montrose Loan.  McCormick Tr. at 195:18-196:16; 223:14-225:12.

89.     The term sheets specifically provide that they are "non-binding and do[] not constitute a commitment to extend funds to the [Montrose] project."  August 8, 2005 Draft Term Sheet, Farr Decl. Exh. 30, at RFCCM00653; August 19, 2005 Draft Term Sheet, Farr Decl. Exh. 31, at RFCCM00498; October 28, 2005 Draft Term Sheet, Farr Decl. Exh. 32, at RFCCM00643; November 1, 2005 Draft Term Sheet, Farr Decl. Exh. 33, at RFCCM00511; November 2, 2005 Draft Term Sheet, Farr Decl. Exh. 34, at MC11413.

90.     Defendants swear that they entered into no illegal agreements.  Moore's Response to Pl's. First Set of Interrogatories, Farr Decl. Exh. 3, at RFCCM00036;

McCormick's Response to Pl.'s. First Set of Interrogatories, Farr Decl. Exh. 4, at 12.

91.     The Montrose Note was secured by a pledge of Moore and McCormick's membership interests in Montrose.  Membership Interest Pledge and Security Agreement, Farr Decl. Exh. 14.

92.     Montrose was the sole member and managing member of Triton Pavilion, LLC. Loan Agreement § 1.3, Farr Decl. Exh. 11.

93.     Triton Pavilion, LLC was the sole member and managing member of Pavilion, LLC the fee owner of the Montrose Property.  Loan Agreement § 1.3, Farr Decl. Exh. 11.

94.     Moore and McCormick issued personal guaranties pursuant to a Guaranty Agreement.  Montrose Guaranty, Farr Decl. Exh. 13.

95.     Moore and McCormick agreed to indemnify RFC against any loss, damage or liability suffered by RFC to the extent such loss arises out of Montrose's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Montrose Property.  Montrose Guaranty § 1(A)(i), Farr Decl. Exh. 13.

96.     Moore and McCormick guaranteed that substantial completion of each portion of the construction of the Montrose Project would be attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget.  Montrose Guaranty § 1(C), Farr Decl. Exh. 13.

97.     Moore and McCormick agreed to indemnify and hold RFC harmless for any and all claims, demands, suits, losses, damages or expenses in connection with the existence of any "Hazardous Substance" or "Environmental Condition" associated with the Montrose Property.  Montrose Guaranty § 1(D), Farr Decl. Exh. 13.

98.     The Montrose Loan was mezzanine financing, meaning that RFC's liens, security, and right to repayment were subordinate to those of the senior lender on the Montrose Project.  November 1, 2005 Email from Steven Tyminski to Maury Zanoff, Farr Decl. Exh 39, at RFCCM00502; Intercreditor Agreement between RFC and Fremont, Farr Decl. Exh. 15; Agreement Regarding Mezzanine Lender's Cure Rights, Farr Decl. Exh. 16;

99.     Fremont Investment & Loan was the senior lender on the Montrose Project. McCormick Tr. at 123:16-18.

100.    Fremont had a security interest in Montrose through a deed of trust.  McCormick Tr. at 237:21-238:1.

101.    A default under the senior loan constituted a default under the mezzanine loan. Montrose Loan Agreement § 9.19, Farr Decl. Exh. 11.

102.   In the event of a default by Montrose, Fremont had the right to foreclose on its security interest, which would eliminate RFC's rights, liens, and security interest. McCormick Tr. at 237:21-238:7.

103.   RFC had the right to prevent foreclosure by the senior lender by curing Montrose's default.  Intercreditor Agreement between RFC and Fremont, Farr Decl. Exh. 15; Agreement Regarding Mezzanine Lender's Cure Rights, Farr Decl. Exh. 16.

104.   Both the senior and mezzanine loans contained schedules of construction and sources and uses of funds, detailing the source and amount of money to be spent on each item in the budget and when.  Montrose Loan Agreement Exh. E, Farr Decl. Exh. 11.

105.   Montrose was required to keep money in "holdback" for asbestos remediation. April 20, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 47.

106.   The senior loan required the Montrose Project to remain in balance.  April 20, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 47.

107.   The senior loan would fall out of balance if Montrose failed to use the money in each disbursement for the purpose specified in the construction schedules.  Thus, the senior loan would fall out of balance if cost overruns and/or delays required Montrose to spend more money than budgeted on certain items, with the result that the remaining available loan funds would be insufficient to cover remaining items in the budget.  McCormick Tr. at 86:13-18, 249:3-12.

108.   As of April 20, 2006, the Montrose Project was out of balance.  April 20, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 47.

109.   On April 20, 2006, Fremont issued a notice to Triton Pavilion, LLC/Pavilion LLC that the senior loan was "out of balance" by over $5 million due to insufficient holdback for construction and asbestos remediation.  April 20, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 47.

110.   Construction had gone over budget, forcing Montrose to leave insufficient funds in reserve to cover contractual requirements.  April 20, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 47; McCormick Tr. 249:10-12.

111.   As a result of delays or cost overruns, Montrose had used funds that were supposed to be available for future items and asbestos remediation.  Moore Tr. at 154:2-155:5

112.   On August 25, 2006, Fremont sent notice to Triton Pavilion, LLC/Pavilion LLC that the senior loan was "out of balance" by over $13 million.  August 25, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 48.

113.   By August 25, 2006, construction of the Montrose Project had fallen behind the schedule contained in the senior and mezzanine loan documents.  August 25, 2006 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 48: Moore Tr. at 100:9-101:7.

114.   Montrose had anticipated selling condominium units once construction was complete and using the funds to repay the loans.  Moore Tr. at 98:8-99:6.

115.   Falling behind schedule prevented Montrose from selling the anticipated number of condominium units.  Moore Tr. at 101:19-102:20.

116.   By November 2006, the interest reserve established for payment of interest on RFC's mezzanine loan was exhausted, and either McCormick or Montrose made the November 2006 mezzanine interest payment out of its own funds.  November 9, 2006 Email chain between Angela Nagel and Brian McCormick, Farr Decl. Exh. 49.

117.   Montrose failed to make the December 2006 interest payment.  December 13, 2006 Letter from RFC to Montrose, Farr Decl. Exh. 50.

118.   On December 13, 2006, RFC issued a Notice of Failure to Make Payment demanding that Montrose cure the default.  December 13, 2006 Letter from RFC to Montrose, Farr Decl. Exh. 50.

119.   Montrose failed to make the January 2007 interest payment.  January 31, 2007 letter from RFC to Montrose, Farr Decl. Exh. 51.

120.   Monthly interest payments on the Montrose Loan were between $188,000 and $220,000.  RFC Accounting of Montrose Foreclosure Costs, Farr Decl. Exh. 65.

121.   A failure to make interest payments constituted a default under the Montrose Loan.  Montrose Loan Agreement § 2.3.2, Farr Decl. Exh. 11.

122.   On January 11, 2007, RFC issued a second Notice of Failure to Make Payment. January 11, 2007 Letter from RFC to Montrose, Farr Decl. Exh. 51, at RFCCM00364.

123.   Montrose failed to make November, December, and January interest payments totaling over $2 million to Fremont.  January 24, 2007 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 52.

124.   The failure to make interest payments constitute a default under the senior loan. January 24, 2007 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 52.

125.   On January 24, 2007, Fremont declared a default on the senior loan.  January 24, 2007 Letter from Fremont to Triton Pavilion, Farr Decl. Exh. 52.

126.   Montrose never cured its defaults.  RFC Accounting of Montrose Foreclosure Costs, Farr Decl. Exh. 65.

127.   On January 31, 2007, RFC issued a Notice of Acceleration to Montrose accelerating the remaining obligations under the Montrose Loan.  January 31, 2007 Letter from RFC to Montrose, Farr Decl. Exh. 51.

128.   RFC advanced protective interest payments to Fremont to prevent the latter from foreclosing on Montrose and wiping out its security.  Agreement Regarding Mezzanine Lender's Cure Rights, Recital G, Farr Decl. Exh. 16.

129.   Had RFC not advanced those payments, Fremont would have foreclosed on the project, and thereby foreclosed RFC out of its security interest.  McCormick Tr. at 238:2-7.

130.   Montrose failed to pay taxes on the property.  Am. Answer ¶ 42, Farr Decl. Exh. 2.

131.   At his deposition, McCormick admitted that Montrose had failed to pay its taxes.  McCormick Tr. at 262:3-17.

132.   Montrose's failure to pay real estate taxes constituted a default under the Montrose Loan.  Loan Agreement § 9.3, Farr Decl. Exh. 11.

133.   Montrose failed to pay contractors and materialmen who provided materials or performed work on the Montrose Project, and McCormick has admitted this.  McCormick Tr. at 262:18-263:4.

134.   Those contractors and materialmen filed liens against the Project totaling more than $7 million.  April 27, 2007 Letter from RFC to Moore and McCormick, Farr Decl. Exh. 53.

135.   RFC was forced to negotiate with and in many cases pay contractors and materialmen in order to clear these liens.  Transcript of Robert Cavoto's July 6, 2009 Deposition ("Cavoto Tr."; excerpts attached as Exhibit C to this Statement) at 89:16-90:15, 95:6-96:11.

136.   In April 2007, RFC foreclosed on the membership interests in Montrose.  April 27, 2007 Letter from RFC noticing disposition of collateral, Farr Decl. Exh. 54.

137.   As of April 2007, Montrose was delinquent on its payments to Fremont.  April 25, 2007 Letter from McCormick to Fremont, Farr Decl. Exh. 55, at RFCCM00385-6.

138.   As of April 2007, Montrose was delinquent on its payments to RFC.  April 25, 2007 Letter from McCormick to Fremont, Farr Decl. Exh. 55, at RFCCM00385-6.

139.   RFC had the right to foreclose on the Montrose membership interests.  Pledge Agreement § 8, Farr Decl. Exh. 14.

140.   RFC did not fail to perform its own obligations under the Montrose Loan Documents.  Farr Decl. ¶ 78.

141.   RFC conducted a foreclosure sale of Montrose at which it was the high bidder. Farr Decl. ¶ 79.

142.   Montrose, Moore, and McCormick were notified of the foreclosure sale.  April 27, 2007 Letter from RFC noticing disposition of collateral, Farr Decl. Exh. __.

143.   None of Montrose, Moore, and McCormick objected to the foreclosure sale.  May 8, 2007 Email from McCormick to RFC, Farr Decl. Exh. 56.

144.   RFC advanced $562,155.86 of property taxes owed and not paid by Montrose. RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; RFC Wire Authorization Form, Montgomery County Property Tax Bill, and RFC Bank Statement, Farr Decl. Exh. 64; RFC Accounting of Montrose Foreclosure Costs, Farr Decl. Exh. 65; Farr Decl. ¶ 80.

145.   RFC made $4,499,607.86 in protective interest payments to Fremont prior to the foreclosure as a result of Montrose's failure to pay.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; RFC Accounting of Montrose Foreclosure Costs, Farr Decl. Exh. 65; Agreement Regarding Mezzanine Lender's Cure Rights at Recital G, Farr Decl. Exh. 16. Farr Decl. ¶ 81.

146.   RFC made $4,555,160.53 in protective interest payments to Fremont subsequent to the foreclosure as a result of Montrose's failure to pay.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; RFC Accounting of Montrose Post-Foreclosure Expenses, Farr Decl. Exh. 63; Farr Decl. ¶ 82.

147.   RFC paid $3,374,288.12 to unpaid contractors and materialmen to clear mechanics' liens.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; RFC Accounting of Montrose Post-Foreclosure Expenses, Farr Decl. Exh. 63; Farr Decl. ¶ 83.

148.   RFC expended $257,608.04 in legal fees and costs in connection with handling contractor lien issues, the tax issues and the negotiations with the senior lender necessitated by the defaults on the Montrose Loan.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; Farr Decl. ¶ 84.

149.   Even after these payments, the funds required to develop Montrose were over $10 million greater than initially budgeted.  Cavoto Tr. at 169:18-170:11.

150.   In 2008, RFC sold Montrose.  Montrose Sale-Purchase Agreement, Farr Decl. Exh. 17.

151.   RFC was forced to accept a lower sale price for Montrose as a result of obligations to contractors and materialmen that Defendants had failed to pay. Montrose Sale-Purchase Agreement § 2.4 & Exhibit T, Farr Decl. Exh. 17.

152.   The purchaser assumed $4,993,890.00 in trade payables to contractors and materialmen with liens against the project.  RFC Interrogatory Response at 5-6, Farr Decl. Exh. 5; Montrose Sale-Purchase Agreement § 2.4 & Exhibit T, Farr Decl. Exh. 17.

153.   RFC demanded payment from Moore and McCormick for the obligations that they had guaranteed regarding Montrose.  Am. Answer ¶¶ 40, 41, 46, Farr Decl. Exh. 2; April 27, 2007 Letter from RFC to Moore and McCormick, Farr Decl. Exh. 53.

154.   After Montrose defaulted, McCormick sought to negotiate additional funding or capital infusions.  May 8, 2007 Email from McCormick to RFC, Farr Decl. Exh. 56; April 25, 2007 Letter from McCormick to Fremont, Farr Decl. Exh. 55, at RFCCM00385-6; January 31, 2007 Email from McCormick to RFC Employees, Farr Decl. Exh. 57; March 26, 2007 Email from McCormick to RFC Employees, Farr Decl. Exh. 58.

155.   During those discussions, McCormick acknowledged that current interest was due and owing.  December 14, 2006 email from McCormick to Andrew Manley, Farr Decl. Exh. 66.

156.   During those discussions, McCormick acknowledged that RFC had paid monies on behalf of Montrose and Rodgers Forge.  February 28, 2007 Email from McCormick to Paul Martin, Farr Decl. Exh. 59.


Dated:  August 6, 2009                    Respectfully submitted

                                          _____/s/ George R. Calhoun_____
                                          Howard H. Stahl (D. Md. Bar No. 24741)
                                          Jennifer Quinn-Barabanov (D. Md. Bar No. 1649)
                                          George R. Calhoun, V (D. Md. Bar No. 25018)
                                          STEPTOE & JOHNSON LLP
                                          1330 Connecticut Avenue, N.W.
                                          Washington, D.C. 20036
                                          Tel:  (202) 429-3000
                                          Fax:  (202) 429-3902

                                          *Attorneys for Plaintiff RFC TRS, LLC*