# EXHIBIT A

reporter.

A. I can do that.

Q. If for any reason you don't hear me, you can ask me to repeat the question so that you can hear it.

A. I will.

Q. If you have any problem understanding my question, you will ask for clarification if needed?

A. Sure.

Q. Is there any reason why you can't provide full and truthful testimony today?

A. No.

Q. You are not on any medication of any sort that would impair your memory in any way?

A. I am not.

(Recess.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, would you describe your educational background for me?

A. Sure. I -- I am a lawyer, and I am also a CPA.

Q. When did you receive your law degree?

BY MS. QUINN-BARABANOV:

Q. Going back to this document, Exhibit Number 1, what is this document?

MR. BODOFF: Objection. You can answer.

THE WITNESS: This is a document that was prepared by Maury Zanoff and Joe Donato from CBRE - Melody, our investment bankers, in order to take the Rodgers Forge project to market.

BY MS. QUINN-BARABANOV:

Q. So you recognize this document that has been marked as Exhibit 1?

A. I do.

Q. CBRE Melody, their name is listed in the bottom right corner; correct?

A. Correct.

Q. You mentioned someone named Maury Zanoff, who is he?

A. Maury Zanoff is I believe director at CBRE L.J. Melody.

Q. And CBRE L.J. Melody is a different company than CBRE Realty Finance, which is under the two projects we are going to discuss today?

A. Correct.
Q. That was your understanding?
A. Absolutely.
Q. You said this document was prepared for the purpose of obtaining mortgage loan financing, is that correct?
A. Correct.
Q. And did you review this document?
A. I did.
Q. And were the representations in this document accurate, to the best of your knowledge, when it was prepared?
A. Yes.
Q. And approximately when do you think this document was prepared, as best can you tell based on the document?
A. I would say sometime in the summer months of 2005.
Q. So looking at the second paragraph, the last sentence, do you see that?
A. Yes.
Q. Could you read that last sentence for me?

A. Early indications suggest that these conversions are going to be highly successful.

Q. And these conversions is a reference to what?

A. The Landing at Spa Creek and the Pavilion Project.

Q. As of December '05, your expectation was that the Rodgers Forge project was going to be highly successful; is that right?

A. Yes.

Q. Was this document submitted to any potential mortgage lenders?

A. Yes, I believe it was.

Q. Do you know which ones it was submitted to?

A. Other than -- actually I don't know. Specifically I don't recall but I mean I'm sure there was a fairly significant list. I don't know.

Q. Do you believe it was submitted to CBRE?

A. I believe so.

MS. QUINN-BARABANOV: I am asking Miss Reporter to mark Exhibit 2.

Q. We will come back to that later. Did Mr. Zanoff provide services in connection with the Pavilion project?

A. He did.

Q. What were the services that he provided?

A. He sourced senior and mezzanine debt.

Q. And who did Mr. Zanoff represent in the Montrose transaction?

A. He represented Montrose Investment Holdings.

Q. Did he also represent Triton?

A. Triton -- Jennifer, Triton was a -- it was really a cost center where we had administration work, CEO, General Counsel, CFO, those types of people. And Triton Real Estate Partners itself did not own anything.

Q. Other than Montrose, did Mr. Zanoff represent any other party to the Montrose transaction?

A. I don't --

MR. BODOFF: Objection.

THE WITNESS: I don't think so, Jennifer.

It obviously was signed by Triton Real Estate Partners, the engagement agreement but it was for work to be done on behalf of Montrose.

BY MS. QUINN-BARABANOV:

Q. So to the best of your knowledge, there is no other retainer agreement related to the Montrose transaction involving Mr. Zanoff?

A. I don't believe so.

Q. And did Mr. Zanoff represent Triton in connection with the Rogers Sports transaction?

A. Yes, he did.

Q. Was that memorialized in the retention agreement?

A. It likely was.

Q. Are you -- I don't believe that has been produced to us. Would you undertake -- did you look for that document?

A. We looked for every document.

Q. Would you just go back and look for that, if you would?

A. Sure.

Q. Because that has not been produced to us.

Okay. Let's go back to Exhibit 1 for a moment. I want to go back to the biographical information. You mentioned you were the CEO of Evergreen -- well, let's actually go back to the first page. In the third paragraph there is a sentence there that says Mr. McCormick brings a wealth of operating experience to Triton, having created, managed and sold two substantial operating companies, including a real estate development business. Do you see that?

A. I do.

Q. What are the two companies you are referring to there?

A. It would be Evergreen and U.S. Mobile Service.

Q. Evergreen was the real estate development group?

A. Correct.

Q. Going to the next page. You describe Evergreen as one of the nation's largest developers of affordable housing. What was the basis of that statement?

A. We were during that point in time a large -- very large developer, under what was then the FMHA 502 housing program.

Q. Were you largest in terms of value or number of units? What was the metric you were using?

A. Number of units.

Q. And in the chart laid out in the middle of the page, you provide the price range for the units developed under various projects. And the number of units. Are those all -- described as a partial list in the document. About what percentage of the developments handled by Evergreen during your time there are identified in this chart?

A. You know, Jennifer, I don't recall. I think the reason it is a partial list is because in 2005, I couldn't recall back to the late '80s or early '90s.

Q. Okay. But based on this list that you provided, what was the approximate value of the housing you developed while at Evergreen? Do you have a sense on order of magnitude?

MR. BODOFF: If you know.

THE WITNESS: I could do the math, but I don't recall.

BY MS. QUINN-BARABANOV:

Q. I did the math and I will represent to you that using the low end of the range times the number of units and adding it up, it's about more than $150 million. Does that sound about right?

A. Sure.

Q. And you were also involved, in the time frame of this litigation you were involved in the Rodgers Forge project, correct?

A. Correct.

Q. And what was the value of that project?

A. The sell-out value of the project?

Q. No, at the time it was financed?

A. There were several values, so I think that you have to be more specific in terms of which value.

Q. I'm talking about at the beginning when you got that transaction financed. The amount of capital that was paid in and the amount of financing that you received; how much was that?

A. I don't remember off the top of my head.

Q. Would it be somewhere in the neighborhood of $60 million; is that right?
A. It could be yes.
Q. What about Pavilion using the same criteria? What was the approximate value of that project?
A. I think it was about 140 million.
Q. You were also involved in a project called The Landing at Spa Creek, correct?
A. Correct.
Q. What was the value of that project?
A. I think it was somewhere in the neighborhood of 50 million.
Q. In connection with all of those transactions, you obtained some sort of financing; is that right?
A. Correct.
Q. And that financing was documented in the loan documents?
A. It was.
Q. In the next paragraph you mentioned that you sold U.S. Mobile for a substantial profit to

                                                                             investors. What was the value of U.S. Mobile at the time of the sale?

A. I think that the value was approximately $30 million.

Q. And that transaction, that sale was also memorialized in some sort of contract document?

A. Yes.

Q. You also in the next paragraph mention a sale -- the acquisition, I'm sorry. You mention the acquisition of 300 million in data center assets from Sprint; do you see that?

A. Yes.

Q. That transaction was also memorialized in some sort of contract?

A. Yes.

Q. And the same would be true for the $200 million data center assets required from Palo Alto Internet Exchange?

A. Correct.

Q. And the acquisition and sale of the Marietta building referenced in the last sentence?

A. Correct.

Q. And in connection with those data center assets did you obtain some sort of financing for those acquisitions?

A. Yes.

Q. And that financing was memorialized in loan documents?

A. It was.

(McCormick Exhibit No. 3 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you a document, an e-mail from Francis McCormick to you and John Moore and someone named David Walden on June 13th. It has two attachments. One relates to the Pavilion project and the second relates to the Rodgers Forge project. Do you recognize this document, Exhibit 3?

A. I do.

Q. What is it?

A. This is a document that we would have provided to a financial institution that was potentially interested in financing, in this case the Pavilion and Rodgers Forge projects.

Q. Was this document provided to CBRE?
A. I don't know.
Q. Who prepared this document?
A. This would have been a document that was prepared by the people in my office, me included.
Q. So you would have reviewed this document?
A. I probably would have written quite a bit of it.
Q. And to the best of your knowledge it would have been accurate as of the time it was sent on May 13, 2005?
A. Yes.
Q. And going back to the document number 1 -- the L.J. Melody document. Did you review that document before it was circulated?
A. I don't recall but I'm sure that I did.
Q. I want to go back to the issue of the corporate structures that were involved. I want to start with the Rodgers Forge transaction and I just want to ask you about the structure of the different entities that were involved in the transaction. So you mentioned Triton Real Estate Partners, correct?

A. Correct.
Q. What was the business of that entity?
A. Triton Real Estate Partners?
Q. Correct.
A. I thought we already discussed that.
Q. You said it was a management company?
A. Correct.
Q. And it provided services?
A. Correct.
Q. And who did it provide services to?
A. To either Bellona Holdings, Primrose Holdings or to Montrose Holdings.
Q. Those were all companies that you were involved with in some way?
A. Yes.
Q. Were there other entities, for example, Pavilion, Triton Pavilion?
A. Sure. The holding entities as well as the -- as well as the sub-entities underneath the holding entities.
Q. And what were the entities underneath, I just want to know, what the list was.

A. I haven't looked recently, but there was -- you know, always a hold co. There was an intermediate holding company which is typically what we would refer to as the developer, and then there was the fee owner, which is the owner -- the owner typically of, obviously of the property.

Q. And what was your involvement at the various levels of those -- of that structure?

A. Well, the hold co. would own 100 percent of the developer, and then the developer would typically own 100 percent of the entity that was the owner of the fee.

Q. Were you a member of each of those entities?

A. No, I was a member of hold co. You then have the holding company that was the -- I believe -- the sole member of the development entity. Then you would have the development entity as the sole member of the entity that was holding the fee.

Q. So Triton Real Estate Partners just to make sure I am clear, did not hold any assets.

A. Correct.

back and forth at that time. Okay.

Q. You can read back the question.

THE REPORTER: "Question: So is it your understanding that the loan agreement reads in April 2006, Rodgers Forge required current payment of some portion of the interest?"

THE WITNESS:

A. Correct.

BY MS. QUINN-BARABANOV:

Q. Let's go to page 22.

A. Jennifer, maybe I can clarify? I don't know if I should or not, but you asked me to read language from a promissory note dated October 31, and then just had me read information or verbiage from the loan agreement dated April 14.

Q. I think that's on the record.

A. Okay.

Q. Let's go to page 22. I want to direct your attention to section 9.19. And that refers to senior loan documents. Do you see that?

A. Yes.

Q. Who was the senior lender on the Rodgers

Forge project?

A. Ohio Savings Bank.

Q. And under the terms of the Rodgers Forge loan from CBRE, Triton was obligated not to itself or allow Rodgers Forge apartments to breach the senior loan; is that right?

MR. BODOFF: Objection. Your understanding. Only answer as to your understanding.

THE WITNESS: I believe that a -- I believed, and do believe that a default under the senior loan could affect -- trigger a default under the mezzanine loan.

BY MS. QUINN-BARABANOV:

Q. So it was your understanding that a default on the senior loan would trigger a default under the CBRE loan, correct?

A. Correct.

(McCormick Exhibit No. 11 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. All right. I am showing you Exhibit 11, it's a January 17 letter from Naka, Huttar &

A. Yes, I do.

Q. And attached to this document are the two January 17th default notices that we just discussed, is that correct?

A. That is correct.

Q. Let me direct your attention to the last paragraph of this letter. The last sentence of the last paragraph on the first page, do you see that? The junior lender has five days from the effective date of this notice to cure the defaults? Do you see that?

A. Yes, I see that.

Q. What was your understanding of how CBRE could cure the defaults identified by Ohio Savings Bank?

MR. BODOFF: Objection. His first stated that he wasn't sure that there were defaults.

BY MS. QUINN-BARABANOV:

Q. Let me ask this question, was it your understanding that as of January 17, 2007, there had been any defaults of any kind under the Ohio Savings Bank loan?

A. Yes.

Q. So which specific defaults had occurred by that date?

A. We had at least certainly paid interest, not on a timely basis.

Q. Okay. So going back again to this last paragraph on Exhibit 13, what was your understanding of how CBRE could cure the defaults that had been identified by Ohio Savings Bank?

MR. BODOFF: Objection, he said the defaults were he did not pay on a timely basis, so that assumes that there were still payments outstanding.

BY MS. QUINN-BARABANOV:

Q. You can answer the question?

A. CBRE had the right to step in and make protective advances to Ohio Savings Bank.

Q. What do you mean by protective advances?

A. Pay money to Ohio Savings Bank in order to protect its security position.

Q. And that's the money that would have otherwise been owed by Triton, correct?

A. To the extent it wasn't paid, yes.

Q. And to your knowledge did CBRE make the payments identified in this January 17th letter?

A. I believe that they did.

Q. Before CBRE made those payments, did Triton contest in any way that those payments in fact were not owed?

A. I don't believe so.

Q. And the delinquencies identified in this January 17th letter totaled more than a million dollar, right?

MR. BODOFF: Objection.

THE WITNESS: Jennifer, does it say that some place? I don't recall the amounts.

BY MS. QUINN-BARABANOV:

Q. If you go back to the two previous exhibits, 11 and 12, 12 references a $1,500 and 11 references $1,046,000 and change. So is that more than a million dollars Ohio Savings Bank believed was due as of January 17, 2007?

A. Correct.

Q. And it's your understanding that those

amounts were paid by CBRE?

A. Correct. Or at least a portion of those amounts were paid.

MR. BODOFF: Only if you know.

THE WITNESS: I don't know what portion.

MS. QUINN-BARABANOV: I asked for his understanding, Joe.

MR. BODOFF: But I don't want him to guess.

MS. QUINN-BARABANOV: You can't coach your witness, okay?

MR. BODOFF: I understand.

MS. QUINN-BARABANOV: That was the question and you can't coach your witness, and I'm going to put a stop to this, okay?

(McCormick Exhibit No. 14 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 14. It appears to be a February 1, 2007 from CBRE to Triton Rodgers Forge. Do you recognize this document?

A. I do.

Q. And it's a notice of acceleration, correct?

A. That is correct.

Q. Related to the CBRE loan from Rodgers Forge, right?

A. That is correct.

Q. And the reason that CBRE or you provided for accelerating the amount under the loan were defaults under the senior loan from Ohio Savings Bank, right?

MR. BODOFF: Objection. You asked him to restate or repeat what the letter says.

BY MS. QUINN-BARABANOV:

Q. Your understanding was that CBRE accelerated the amounts due under its loan because of a default to Ohio Savings Bank, right?

MR. BODOFF: Objection.

THE WITNESS: Correct.

BY MS. QUINN-BARABANOV:

Q. As of February 1, 2007, were you aware of any defaults of any kind under the Ohio Savings Bank

loan?

A. I believe the answer to that is yes, although I can't specifically tell you what they were.

Q. Did Triton ever have any communications with CBRE about the factual representations made by Ohio Savings Bank in its notices of default?

A. I'm sure that we did. We had many conversations with CBRE. I was in Hartford on several different occasions, but I don't recall specific conversations about that.

Q. So you don't recall any conversations where you told -- you or anyone else acting on behalf of Triton told CBRE that Ohio Savings Bank's reasons in its notices of default were incorrect?

A. I don't believe so.

(McCormick Exhibit No. 15 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 15. Do you recognize this document?

CBRE improperly declared a default under the Rodgers Forge loan documents due to a perceived technical default by Triton Rodgers Forge LLC with its senior lender, Ohio Savings Bank. Do you see that?

A. I do.

Q. Could you explain to me what you mean by a perceived technical default?

MR. BODOFF: To the extent of your understanding.

MS. QUINN-BARABANOV: These are his responses, Joe.

MR. BODOFF: The responses to interrogatories may have been in part based on advice and statements of counsel. So to the extent that they reflect conversations that he and I had, he should not answer those.

MS. QUINN-BARABANOV: Could you read the question back?

THE REPORTER: "Question: Could you explain to me what you mean by a perceived technical default?"

THE WITNESS: I guess as I view this, this would be -- perceived technical default is probably a bad choice of words.

BY MS. QUINN-BARABANOV:

Q. Why?

A. I think that the more appropriate wording would have been an unnecessary default.

Q. An unnecessary default to whom, to CBRE or to Ohio Savings Bank?

A. CBRE defaulting Triton.

Q. What do you mean by unnecessary?

A. CBRE had its interest being paid via its interest reserve. We were in advanced discussions with a new investor, and we had a good relationship with Ohio Savings Bank.

Q. Let me ask you this. So you are not disputing that there was a default under the terms of the Ohio Savings Bank loan; is that right?

A. I would say that, yeah, to some extent.

Q. And you are also not disputing that there was a default then under the terms of the CBRE loan?

MR. BODOFF: Objection.

BY MS. QUINN-BARABANOV:
Q. Right?
A. That is right.
Q. What is your understanding of what the consequences would have been if -- the consequences of a default to Ohio Savings Bank for CBRE?
A. One more time, Jennifer.
Q. What would the consequences have been for CBRE if you had defaulted on the Ohio Savings Bank loan?
A. CBRE could make protective advances, and to the extent that they didn't, Ohio Savings Bank could foreclose out our interest in the property.
Q. And what was your understanding of what the impact would have been on CBRE's interest?
A. They would have likely lost their investment.
Q. Are you standing by the statement in this interrogatory then when it says in the fifth line down, CBRE improperly closed on the Rodgers Forge project premised on false pretenses?
A. CBRE -- CBRE foreclosed in my opinion in

order to hold our feet to the fire with respect to Monterey. They didn't need to foreclose.

Q. All right. I want to go back to the loan agreement for a second, which was number 4. And I want to go to section 3.2 which is on page 6.

There is a definition of a loan document there. Do you see in section 3.2? It's on page 6.

A. I do.

Q. So for the purposes of this discussion, I want to use that, when I say loan documents, that's what I mean and I'm referring to Rodgers Forge. So you are not alleging that CBRE failed to perform any of its obligations under the loan documents; is that correct?

MR. BODOFF: Objection.

BY MS. QUINN-BARABANOV:

Q. For Rodgers Forge?

A. I agree with that.

Q. And you are not contending that CBRE entered into any oral agreements that were not honored in connection with Rodgers Forge; is that correct?

MR. BODOFF: Objection.

THE WITNESS: I believe so.

BY MS. QUINN-BARABANOV:

Q. You ARE not contending that CBRE made any misrepresentation that induced any party to enter into any of the loan documents for Rodgers Forge; is that right?

MR. BODOFF: Objection.

THE WITNESS: That's correct.

BY MS. QUINN-BARABANOV:

Q. And you are not claiming that any of the Rodgers Forge loans documents were entered into under duress; is that correct?

MR. BODOFF: Objection.

THE WITNESS: They were entered into at a time when we absolutely had to get a deal done.

BY MS. QUINN-BARABANOV:

Q. And by "had to get a deal done," what do you mean by that?

A. We would have lost substantial deposits had we not closed on the transaction.

Q. Deposits to who?

A. It was not.

Q. I want to go back for one second to the original promissory note, which is, I think, number 5 -- 6.

(McCormick Exhibit No. 17 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Do you recall our prior discussion about paragraph 2, the interest?

A. Yes.

Q. And our discussion of a red line document that appears to relate to that promissory note?

A. Yes.

Q. I am showing you now what has been marked as Exhibit 17. It appears to be a copy of an October 31, 2005, e-mail from Maury Zanoff to Lou Tyminski and you. Do you see this document?

A. Yes.

Q. It is an e-mail string that appears to be complete, except for the attachment that is referenced in the bottom e-mail on page 2.

A. Yes.

Q. And other than the attachment this appears to be complete, correct?

A. It is, yes.

Q. In the bottom e-mail on page 2, there is a reference to a red line version. Do you see that? Based on the information provided by Andrew, attached is a red line version of the note incorporating the new economic terms which Andrew discussed with Brian this weekend, do you see that?

A. I do.

Q. So you did have discussions with Andrew Manley concerning the terms of the note; is that right?

A. I must have.

Q. Sitting here today you have no reason to doubt that you had conversations with him about that?

A. No reason to doubt.

Q. And the next e-mail in the chain is from Steve Tyminski to you? And Steve asks you in the second sentence, "Please confirm that the new note terms are accurate. (Change from an accrual to a current pay on interest for the portion of the loan

being allocated to an interest reserve.) "

Do you see that?

A. I do.

Q. Is that your understanding of the status of the drafting of the promissory note as of October 31, 2005?

A. I think that is obviated by what Maury wrote in his e-mail to Steve, myself, and others, you know, 90 minutes later. So again, I believe that that note, what's being said there is that Steve was trying to confirm that the note terms are accurate, that it's not going to be PIKed, it's going to be paid on a current basis with an interest reserve being set up and a portion of the loan being allocated and a portion of that interest being allocated, the interest reserve.

Q. And the issue of paying current interest was specifically negotiated, correct?

MR. BODOFF: Objection.

THE WITNESS: Yes.

BY MS. QUINN-BARABANOV:

Q. Okay. Let's turn --

represented by counsel in the April 2007 time frame?

MR. BODOFF: Let me say -- when you say "you" who are you referring to, him personally?

BY MS. QUINN-BARABANOV:

Q. Was Triton represented by counsel in the April 2007 time frame?

A. I believe that Eddie started prior to that time.

Q. Did you lodge any form of objection to this judicial sale, in response to this notice of judicial sale?

A. I don't believe so.

Q. You were aware, however, that it was possible to contest the sale through various legal processes?

A. Yes.

Q. Did you personally ever take any action to contest this sale?

A. Jennifer, I don't believe so.

Q. And that judicial sale eventually went through and was approved by the court, is that your understanding?

provide 2.1 roughly million dollars to CBRE as a deposit?

A. Yes.

Q. Where was that $2.1 million coming from?

A. From Unicorn.

Q. And Triton would fund, under section B, it says that Triton would fund the OSB out of balance in the amount of $1.3 million. And by out of balance, what did you mean?

A. I'm not sure if that was -- there are many different out of balance references. I'm not sure which one that referred to.

Q. What does the expression out of balance mean?

A. That the construction typically, that the construction was -- we were either spending more on the construction or less on the construction. To be in balance you would be on budget.

Q. And the issue with respect to Rodgers Forge was that you were spending more on construction, correct?

A. That was one of the issues, yeah.

Q. Are term sheets in your understanding binding?

A. No.

Q. As of August 8, 2005, it looks like you were in the process of exchanging comments on a term sheet with CBRE; is that correct?

A. I believe that this was sent to CBRE for its review. I don't know that we received any comments back from CBRE.

Q. But you provided -- Mr. Zanoff, acting on your behalf, provided this proposed term sheet to CBRE; is that right?

A. Correct.

Q. And it reflected the state of your discussions as of August 9, 2005?

MR. BODOFF: Objection.

THE WITNESS: It -- it -- provided the starting line, if you will, for our discussions with CBRE.

BY MS. QUINN-BARABANOV:

Q. Are you aware of any term sheets that were exchanged by the parties before August 9, 2005?

A. I'm not certain.
Q. As you sit here today, do you recall any term sheets being exchanged before August 9, 2005?
A. I just don't know.
Q. Do you recall when discussions between CBRE and Montrose, Triton -- I use them interchangeably -- began, concerning an investment in the Pavilion project?
A. Likely during the summer of 2005.
Q. Do you believe it was substantially before this August 9, 2005, e-mail?
A. I don't know.
Q. So, as you sit here today, you have no specific recollection of conversations about CBRE investing in Pavilion prior to August 2005?
A. Not specifically.
Q. Let's go to the terms -- and so Mr. Zanoff was acting as your agent in connection with this proposed loan, correct?
A. Correct.
Q. And was it his practice to forward these term sheets to you as they were sent to him by CBRE?

A. He would have done so.

Q. But it's your understand that this term sheet was generated by Montrose or Triton?

A. And/or Mr. Zanoff.

Q. And/or Mr. Zanoff. All right.

Let's go to the third page, the second page of the actual term sheet.

The second page of the term sheet.

A. I'm sorry.

Q. There is a secured interest section. In the second paragraph, the second sentence, it says the CBRE commitment shall include an estimated 1.35 million in funds necessary to establish an interest reserve for the purpose of maintaining current payments of CBRE's base rate of interest. Do you see that?

A. I do.

Q. So under the terms of this August 8 proposal, some of the interest on the CBRE loan would be paid current, correct?

MR. BODOFF: Objection.

THE WITNESS: That is correct.

BY MS. QUINN-BARABANOV:

Q. The interest -- if you look down at the two sections down on the chart, CBRE return and minimum return, the second sentence refers to a 12 percent base rate of interest. So the 12 percent interest was -- would be due on a monthly basis, correct?

MR. BODOFF: Objection.

THE WITNESS: Can you please ask the question one more time?

BY MS. QUINN-BARABANOV:

Q. Under the terms of this proposal, interest accruing at 1 percent would be due currently, correct?

MR. BODOFF: Objection.

THE WITNESS: Correct.

BY MS. QUINN-BARABANOV:

Q. And the remaining 8 percent interest would accrue, right?

MR. BODOFF: Objection.

MR. ORTEGO: It's 6.

BY MS. QUINN-BARABANOV:

Q. I'm sorry the remaining 6 percent would accrue, correct?

MR. BODOFF: Objection.

THE WITNESS: Under this proposal, correct.

BY MS. QUINN-BARABANOV:

Q. And so under this proposal the plan was that Triton or some affiliated entity would fund the interest reserve; is that right?

MR. BODOFF: Objection.

THE WITNESS: The interest reserve was to be funded by --

BY MS. QUINN-BARABANOV:

Q. Look at the second sentence.

A. -- CBRE.

Q. Look at second sentence of your e-mail. It says please find out when CBRE expects us to fund the 1.3 million. And 1.3 million is the amount of the interest reserve, right?

A. That's correct.

Q. So under this August 9th proposal, the plan was for Triton or some affiliated entity to fund

the interest reserve, correct?

A. Or a portion, yes.

Q. Well, based on this e-mail there is no reference to any fund -- portion being funded by CBRE, is there?

A. Part of CB's loan was to establish an interest reserve. And a portion of the moneys that we were to contribute to the project, which was about 6.1 million, a portion of those funds would go into an interest reserve as well.

Q. Okay. Let's go to the last page of the term sheet. The first paragraph. The first sentence says this letter is non-binding and does not constitute commitment to extend funds to the above referenced project. So was it your understanding that this August 8 term sheet was not a binding commitment by CBRE?

MR. BODOFF: I assume it was signed by CBRE?

MS. QUINN-BARABANOV: That's irrelevant to my question.

MR. BODOFF: The thing is you said. I

Q. Could you read that sentence for me?

A. "Any potential investment or loan made by CBRE Realty Finance shall be evidenced only by formal, written, fully-executed loan and/or other agreements and other appropriate documents setting forth these and other pertinent terms and conditions between Sponsor and CBRE Realty Finance."

Q. Keep going.

A. "In the absence of formal executed documentation neither CBRE nor Sponsor is intended to or shall be bound by the terms and conditions hereof."

Q. It was your understanding that the parties intended that any final agreement reached would be evidenced by a formal written agreement; is that right?

MR. BODOFF: Objection.

THE WITNESS: That is correct.

BY MS. QUINN-BARABANOV:

Q. We talked about your discussions with CBRE, I want to be sure I am clear. Are you aware of any discussions by anyone else on behalf of Triton or

(McCormick Exhibit No. 29 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 29. It's an August 19, 2005, term sheet related to Pavilion. Do you recognize this document?

A. I do.

Q. Does it appear to be a true and complete copy of the August 19th, 2005, term sheet?

A. It does.

Q. This one was actually signed by both parties, correct?

A. That's correct.

Q. Let me direct your attention to the second page in the section of the chart entitled CBRE Investment Structure, the second paragraph. Do you see the CBRE commitment shall include an estimated $1,480,000 in funds necessary to establish an interest reserve for the purpose of maintaining current payments on CBRE's Base Rate of interest. Do you see that?

A. Yes.

Q. So under this August 19, 2005, proposal, some of the interest on the loan would be due currently, correct?

MR. BODOFF: Objection.

BY MS. QUINN-BARABANOV:

Q. As referenced to current payment, correct?

A. Correct.

Q. And you understood it would require some of the interest to be paid on a current basis?

A. Correct.

Q. If you look down at the section CBRE Return and Minimum Return, it looks like 12 percent is due on a current basis, right?

A. That is correct.

Q. And then an additional 8 percent would accrue; is that correct?

A. That's correct.

Q. If you go back up to the prior column we were looking at, CBRE Investment Structure, the third paragraph. Could you read the second sentence for me? "The funds necessary"?

A. The funds necessary to maintain current payment of CBRE Base Rate of interest shall be provided in equal amounts, i.e., 50 percent each by Sponsor to scheduled cash payments and CBRE through its interest reserve.

Q. So under the August 19th proposal the plan was for CBRE and Triton to split the current interest that was due; is that right?

A. That is correct.

Q. And CBRE's portion would be funded from the interest reserve, correct?

A. Through its interest reserve, correct.

Q. Where was Triton's portion going to come from?

A. Under this proposal, it would have come through -- or come from Triton.

Q. Would that have been your personal funds through Triton that would have paid the current interest?

A. If that's the way that the deal had closed, then, yes.

Q. But that was not the way the deal closed,

Q. Does it appear to be a true and complete copy of Mr. Zanoff's e-mail to you?

MR. BODOFF: The first page or the entire string?

BY MS. QUINN-BARABANOV:

Q. The entire string.

A. The string does. Jennifer, I don't recall the insert here, but the string does.

Q. Okay. Let's start about half way through, on the second page there is an e-mail that carries over from page 2 to page 3. It's from someone named Jodi Gallivan. Do you see that?

A. Yes.

Q. Who is Jodi Gallivan?

A. Jodi was a loan officer at Fremont.

Q. And who is Fremont?

A. Fremont was a senior lender at the Monterey project.

Q. And below her e-mail attaches a term sheet from the proposed senior loan from Fremont, correct?

MR. BODOFF: Is that attached or included?

BY MS. QUINN-BARABANOV:

Maybe if you go to the top of the e-mail on that page, does that refresh your recollection as to what the expectation was? The top e-mail on the page?

A. Which page?

Q. The second page of this e-mail, the second sentence?

A. Yes.

Q. There is an e-mail from you to Mr. Zanoff that says "the term sheet -- three-month term sheet does not include the CBRE interest reserve -- how will we fund the current portion of the CBRE interest?"

What was your plan as of October 12, 2005, for funding the current portion of the CBRE interest?

A. We had no plan.

Q. Was it your hope that some of the Fremont proceeds could be used to fund Triton's portion of the CBRE interest?

A. To the extent that there would be current CBRE interest, yes.

Q. Did you engage in any conversations with Fremont as to whether they would allow the proceeds

of the loan -- let's go back --

The first e-mail on the page suggests that Mr. Zanoff went back to Fremont to talk to them about whether they would permit some of the loan proceeds to be used to fund current interest payments to CBRE; is that your understanding?

A. That's what it says here.

Q. Is it your understanding that he had those conversations?

A. I believe he did.

Q. Did you have any conversations with Fremont about that issue?

A. Not that I can recall.

Q. What was your understanding of the outcome of Mr. Zanoff's discussions with Fremont about whether loan proceeds could be used to pay current interest to CBRE?

A. That they could not.

Q. But you asked?

A. Mr. Zanoff did.

(McCormick Exhibit No. 31 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 31. It appears to be an e-mail from Mr. Zanoff to you dated October 12th. Do you recognize this document?

A. Yes.

Q. Does it appear to be a true and correct copy of the October 12th e-mail?

MR. BODOFF: I just have a question here. Maybe I'm looking at this wrong. It looks like two different e-mails here dated October 12, with the second e-mail starting at MC 13558. I may have it wrong; I'm just looking at it now.

MS. QUINN-BARABANOV: All right. This is the way it was produced to us, that it would seem to be correct that you can't have a 152 e-mail attached to a 136 e -- ail. So I agree with you about that.

MR. BODOFF: I am okay with it. I want to clarify.

MS. QUINN-BARABANOV: Okay. So there are two separate documents collectively marked as exhibit -- treat it that way? Collectively marked as 30?

MR. BODOFF: 31.

MS. QUINN-BARABANOV: 31.

MR. BODOFF: 31, yeah. As long as you address them separately, I'm okay.

BY MS. QUINN-BARABANOV:

Q. Let's start with the first document which appears to go from Bates stamp MC 11355 through MC 11357. Does that appear to be a true and complete copy of an e-mail from Mr. Zanoff to you?

A. Yes.

Q. Looking at the e-mail at the top of the second page, is that Fremont rejecting the idea of using the proceeds of their loan to fund CBRE interest reserve?

A. One more time, please, Jennifer.

Q. That e-mail at the top of that page, is that -- did you understand that e-mail to be a rejection by Fremont of the proposal to use their loan proceeds to pay current CBRE interest?

A. Yes.

Q. And then Mr. Zanoff responds with an e-mail that uses the term leakage. Can you explain

what that means? Your understanding?

A. That in this case that Fremont would allow 25 percent of their legal repayment to be paid over to CBRE.

Q. Did you make that proposal to Fremont?

A. I didn't, but Maury apparently did.

Q. Do you have an understanding as to what Fremont's response was?

A. I don't.

Q. Maybe we should go to the next document which is the one that begins on 11358, and appears to go through 11363.

That's an e-mail from Mr. Zanoff to you also dated October 12th, but a little bit later. Do you see that?

A. I do.

Q. Does that appear to be a true and complete copy?

A. Yes.

Q. And looking at Mr. Zanoff's response, Mr. Zanoff's e-mail, what does Fremont's response appear to have been? What was your understanding of

Mr. Fremont's response?

A. That they will allow leakage after a certain pre-sale level.

Q. Okay, so can you explain that in plain English?

A. After 30 percent of the project has been pre-sold, they would allow any repayment -- Fremont would have allowed repayments from its loan to 25 percent of those repayments to be paid over to CBRE in order to cover any interest expense accruing on the loan as well as -- as well as principal paydown.

Q. Was it your understanding that under these terms Triton would be able to cover CBRE's current interest over the life of the CBRE loan?

A. I don't know that I can answer that question.

Q. Was that what you were working towards with these different options?

A. This is what we were modeling.

Q. And the purpose of the model was to come to a result where you could cover the CBRE interest through the life of the loan?

A. That would have been the best result, I'm sure.

(McCormick Exhibit No. 32 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 32, an e-mail from Mr. Zanoff to you dated October 12th. Do you recognize it?

A. Yes.

Q. Does this appear to be a true and complete copy of the October 12th e-mail?

A. Yes.

Q. Let's go to the second page, the second e-mail in the string. Mr. Zanoff says let's think about how much we want CBRE to fund of their return versus the leakage. What did you understand him to mean to that?

MR. BODOFF: By the way for the record I think it's the third e-mail in this string.

MS. QUINN-BARABANOV: The second on that page?

MR. BODOFF: Okay.

THE WITNESS: This was a reference to how much we would like CB Realty Finance to fund of the interest reserve versus relying on leakage from the senior loan -- senior lender.

BY MS. QUINN-BARABANOV:

Q. And you asked Mr. Zanoff as to whether he thought CBRE would be content with just leakage; is that right?

A. Yes.

Q. And then Mr. Zanoff responded no, correct?

A. Correct.

Q. Then he goes on to say, maybe reserve it for six or nine months and then get some leakage, right? So is it fair to say that you were considering different options in terms of the length of time that you wanted CBRE's interest reserve to cover the current interest payments that were due?

A. We were modeling different scenarios.

Q. And six to nine months was less than the expected term of the CBRE loan, correct?

A. I believe that that's not correct. The -- I thought the first loan was for a very short stated

period and the second loan was for a longer period.

Q. On Montrose?

A. I'm sorry, I'm thinking Rodgers Forge.

Q. That's what I'm asking, the six to nine months was less than the expected term of the Montrose loan from CBRE, right?

A. Correct.

Q. What was the expected term of the Montrose loan at that point?

A. I don't recall.

Q. Was it something in the neighborhood of 30 or 36 months; does that sound right?

A. Likely, but I don't recall specifically.

Q. Your expectation is that after six to nine months, you might be able to cover the current interest due to CBRE from sales proceeds from the project, is that right?

A. I think that was Maury's comment back to me.

(McCormick Exhibit No. 33 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. I am showing you what has been marked as Exhibit 33. It appears to be an e-mail from Mr. Zanoff to you, Andrew Manley, dated October 19, 2005. And below it, there is e-mail from Mr. Waldman to you apparently dated October 19. Do you recall the second e-mail in the string, the one from Mr. Waldman to you?

A. Yes.

Q. The e-mail references an attachment. Do you have that attachment? A model that was prepared?

A. It would have been one of our financial models.

Q. It was not produced in connection with this e-mail. Do you know if you have it?

MR. BODOFF: I don't think we produced this.

BY MS. QUINN-BARABANOV:

Q. That's correct, okay?

MR. BODOFF: And I would note on here that it's not sent to any of the defendants or any of the borrowers.

MS. QUINN-BARABANOV: I'm only asking him

about the e-mail string in which he is the recipient, the portion of the e-mail.

MR. BODOFF: I understand that, but then you went back to the attachment.

MS. QUINN-BARABANOV: You are correct, it dropped off somehow. Okay.

BY MS. QUINN-BARABANOV:

Q. So there is a reference there in the middle of the paragraph there, the first paragraph of the e-mail says, "added a second equity distribution worksheet to show what the deal would look like with CBRE funding its own interest reserves so that it can receive current interest through the point where we can begin repaying them from sales proceeds." Do you remember what this model showed?

A. Not specifically, no.

Q. Do you recall approximately when you expected that Triton would be able to repay CBRE from sales proceeds?

A. No, I don't specifically recall.

(Recess.)

(Whereupon, at 12:50 p.m., the deposition

AFTERNOON SESSION

(1:46 p.m.)

Whereupon,

BRIAN McCORMICK,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)

(McCormick Exhibit No. 34 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 34. It is an e-mail from Mr. Zanoff to Mr. Manley attaching another term sheet as of October 28, 2005. Is that a fair characterization of this document?

A. Geez, I believe so.

Q. I want to go to the first paragraph on the second page of the term sheet, there is a column that says CBRE investment structure. And the second paragraph says, CBRE commitment shall include an estimated $3,700,000 in funds necessary to establish

an interest reserve for the purpose of maintaining current payments of CBRE's base rate of interest as defined below in CBRE return and minimum return.

So under this October 28th proposal, some of the interest on the CBRE loan would be paid currently, correct?

MR. BODOFF: Objection.

THE WITNESS: I believe that's correct.

BY MS. QUINN-BARABANOV:

Q. And looking at the section below that says CBRE return and minimum return, the portion that would be due on the current basis was the portion that accrued at 8 percent; is that right?

MR. BODOFF: Objection.

THE WITNESS: That's correct.

BY MS. QUINN-BARABANOV:

Q. And going back up to that second paragraph in the first section of the chart at the top of the page, could you read for me starting with, two sentences from the end of the second paragraph "project cash flows," do you see that?

A. Yes.

Q. Can you read from there to the end of the paragraph for me?

A. If project cash flows were insufficient to fund the base return payment of the, base return shall be made by CBRE through its interest reserve. CBRE's base return shall be due and payable on a monthly basis and shall be considered a project cost.

Q. So, as of October 28th, the understanding was that if cash flows were insufficient to cover the current interest, they would be paid from the interest reserve, correct?

MR. BODOFF: Objection.

THE WITNESS: That's what this says, yes.

BY MS. QUINN-BARABANOV:

Q. Let's go to the last page. The first full paragraph on that page. Do you see where it says, "any potential investment or loans made by CBRE Realty Finance shall be evidenced only by a formal written fully executed loan and/or other loan agreements or appropriate documents"? Do you see that?

A. I do.

pay, do you see that?

A. Yes.

Q. Which CB is funding, it says?

A. Yes.

Q. Did you understand that as a reference to the interest reserve?

A. I did.

MR. BODOFF: Object.

BY MS. QUINN-BARABANOV:

Q. And the reference to current pay, did you understand that as to a reference to the payment of current interest?

A. I did.

Q. Let's go back to the previous Exhibit, number 38?

Okay. Then looking at Exhibit 38, do you recognize this November 7, 2005, e-mail from Mr. Zanoff to you?

A. Yes.

Q. Okay. And in the middle e-mail on that page, you say that "Andrew specifically told me that there was no interest reserve. Please confirm."

That's what you asked Mr. Zanoff?
A. Yes.
Q. And by Andrew, you are referring to whom?
A. Andrew Manley.
Q. And you are referring to a conversation with Mr. Manley concerning the interest reserve, correct?
A. That's correct.
Q. And what is the conversation that you were referring to in this e-mail? When did it take place?
A. It took place sometime between the evening of November 6th and 11:09 in the morning on Monday, November 7.
Q. Who else participated in that conversation, if anyone?
A. I don't recall. But the conversations that we had been having throughout that entire time period was that we did not want current pay interest and we didn't want an interest reserve. Mr. Manley always said that he would be up against CB Realty Finance to waive the requirement for current interest and interest reserve. And he again told me at this

time that there wouldn't be an interest reserve because there was going to be no requirement for current interest.

Q. Let's look at Mr. Zanoff's response to you. Mr. Zanoff responded by saying, it was a 12 percent split 50/50 funding between you and CBRE, and then he came down to 8 percent current funded by -- all by CBRE. Do you see that?

A. I do.

Q. So did you understand that Mr. Zanoff believed as of November 7 that there was payment of current interest required?

A. I believe that's the case, yeah.

(McCormick Exhibit No. 40 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what appears to be a November 7th e-mail from Mr. Zanoff to you. Do you recognize this document?

A. Yes.

Q. And does it appear to be a true and complete copy of Mr. Zanoff's November 7th e-mail to

you?

A. It does.

Q. Let's go to the third page of that e-mail. At the bottom of the page, the last complete e-mail, do you see that from you to Mr. Tyminski?

A. At the bottom of the third page.

Q. Yes, MC 11505?

A. Yes.

Q. The last e-mail is from you to?

MR. BODOFF: That is the one that goes to 11506?

BY MS. QUINN-BARABANOV:

Q. No, I'm just asking for the one that is dated at 3:11:00 p.m. Do you see that?

A. Yes.

Q. You asked Mr. Zanoff to check on some items relate to the current proposal, correct?

A. That's correct.

Q. And one of them related to the interest reserve, right?

A. Correct.

Q. And you specifically asked if the interest

would be held in escrow, and if so, how, right?

A. That's correct.

Q. And Mr. Tyminski got back to you, right? In the subsequent e-mail in this chain, correct?

A. It just seems odd that his e-mail is timed before the one I sent to him.

Q. I think your computers were maybe not perfectly synchronized.

MR. BODOFF: I object. No one knows why.

BY MS. QUINN-BARABANOV:

Q. The fact is that it is in your in-box and it's from him and it is dated November 7th. Are you suggesting that this document has been altered in any way?

A. I don't think so.

Q. So Mr. Tyminski responds to your question, correct?

MR. BODOFF: Objection. I think especially in light of the fact that the time is off, I think he is entitled to a non-leading question.

BY MS. QUINN-BARABANOV:

Q. You can answer.

A. He answered my question.

Q. He addressed your question, is that a better way to put it?

A. Yes.

Q. And said there was not escrow on interest reserve, correct?

MR. BODOFF: Objection.

THE WITNESS: He says there is no real escrow of the interest reserve. They would advance as necessary.

BY MS. QUINN-BARABANOV:

Q. Okay. So under the terms of the transaction being discussed on November 7th, there were current interest payments required, correct?

MR. BODOFF: Objection.

THE WITNESS: At some point during the course of the day on November 7th, that, I believe, changed.

BY MS. QUINN-BARABANOV:

Q. As of about 3:00, the parties were still discussing a transaction where current interest would be owed, correct?

MR. BODOFF: Objection.

THE WITNESS: That's true.

BY MS. QUINN-BARABANOV:

Q. Then looking, Mr. Zanoff weighs in. And he asks the question, "I assume we have no responsibility for the current return due to delays regardless of reserve depletion," right?

What did you understand his reference to the current return to mean?

A. The recurring interest paid to CBRE under their facility.

Q. What kind of delay did you understand him to be referring to?

A. I don't know. There could be any number of delays. I'm not sure which one he is referring to.

Q. Delays in terms of completion of the project?

A. Possibly.

Q. Meaning fails or construction --

A. I don't know.

Q. You didn't have any understanding of what

he meant in terms of delay?

A. Not that I can recall.

Q. Okay. And going back to the second page, you ask the question, what does happen if we exhaust the reserve, do we have a continuing obligation to fund current interest to CBRE?

You asked Mr. Zanoff that question, right?

A. I asked Steve Tyminski.

Q. Okay. And Mr. Zanoff is copied. Yes, Mr. Tyminski. Why would you ask that question if it was your understanding that no current interest was required?

A. Well, I think as we just said there, obviously the date November 7th was a very fluid day. So I start off in the morning by sending an e-mail that it's my understanding that no current interest is required. And by the time the day comes to a close, it looks like we've essentially agreed that CBRE is going to fund an interest reserve and that current interest will be required.

Q. And looking at Mr. Zanoff's e-mail at the top of the page, as of November 7, the proposal would

have covered the interest reserve for 18 to 20 months worth of interest, is that right?

MR. BODOFF: Objection.

THE WITNESS: Well, I think he's asking the question of Mr. Manley. I wasn't a part of that e-mail string.

BY MS. QUINN-BARABANOV:

Q. Was that your understanding of how much -- let me ask the question a different way.

The e-mail, two e-mails below there is a reference to $3.71 million?

A. 3.75 million, yeah.

Q. Your understanding is that refers to the amount to be placed in the interest reserve as of this point?

A. I believe so, yes.

Q. And what was your understanding of how many months of current interest that was supposed to cover?

A. I believe that they were trying to get to a year and a half's worth of current interest.

Q. But that was less than the expected life

     of the loan, correct?

A. Correct.

Q. Then going to the first page, Mr. Zanoff sends Andrew Manley an e-mail and says, "and if delayed for some reason, you just keep funding or forego current, correct?"

MR. BODOFF: The correct doesn't have a question mark as your reading implies.

BY MS. QUINN-BARABANOV:

Q. Then Mr. Zanoff sends another e-mail to you at 3:36. That says "from Andrew." Did you understand this e-mail to be based on a conversation that Mr. Zanoff had with Mr. Manley?

A. I believe so. At this point, I can't tell you whether the correct is Andrew's response to Maury or not.

Q. Is there any e-mail on this page?

MR. BODOFF: Excuse me. I don't think he finished answering. Did you finish?

THE WITNESS: No, I did not. I think Mr. Zanoff asked the question, and I believe -- I believe that Mr. Manley answered the question with,

correct. And then I'm sorry, you were asking a question with regard to the first e-mail?

BY MS. QUINN-BARABANOV:

Q. I'm asking what is the basis for your belief that the word correct came from Mr. Manley. What is the basis for your belief that it came from Mr. Manley?

A. I had conversations with both Maury Zanoff and Andrew Manley specifically around that issue.

Q. Do you mean the word correct in terms of being typed into this e-mail came from Mr. Manley, is that what you are trying to say?

A. I think it might be, yes.

Q. Do you see any e-mail on this page after the November 7, 2005, 3:30 e-mail where it was from Mr. Manley where he could have inserted that text?

A. I don't see that, but I also don't know -- I don't know the answer to it. My understanding from Maury and from -- I'm just surmising, but my understanding from Maury and certainly from Andrew that if -- as you can see at this 3:30 in the afternoon, that if we ran out of interest reserve

that they would PIK their interest or replenish the reserves -- I'm sorry, or forego current interest.

Q. What is the basis for your belief that those letters that spell the word correct came from -- were written by Mr. Manley?

A. I'm just saying that I am -- I am just questioning whether those were written by Andrew Manley. Maybe they weren't. It was just a point I was making.

Q. But the 3:36 e-mail above, did you understand Mr. Zanoff's e-mail to be based on a conversation that he had with Mr. Manley?

A. I believe so, yes.

Q. Were you part that conversation?

A. No.

Q. And Mr. Zanoff reports from Andrew, "either/or we will cross that bridge if we get there." What did you understand -- based on that, did you understand that Mr. Manley did not commit to waive or replenish the interest reserve if there were delays?

A. No.

Let's go back to your interrogatory response.

MR. ORTEGO: Exhibit 15.

MR. BODOFF: Exhibit 16. 15 was the --

BY MS. QUINN-BARABANOV:

Q. Looking at the second paragraph. The response to interrogatory number 4 is on page 8, the second paragraph. Do you see that? In that second paragraph, you refer to a November 1, 2005 term sheet, right?

A. Yes.

Q. And you claim that that November 1, 2005, term sheet prompted you to make some inquiries concerning replenishment or waiver of the interest reserve; is that right?

A. That is the claim.

Q. And as I understand it, the transaction or the loan closed on November 8th; is that right?

A. I thought it was November 10th.

Q. Let's go back to the document -- it's number 25, it says on the front page November 8, do you have any reason to disagree with that?

MR. BODOFF: I'm not. The question is misleading. I'm trying to explain to you why. I'm trying to explain to you why I think it's misleading because we don't know what number 2 is and everything else flows from it.

BY MS. QUINN-BARABANOV:

Q. Let's stop right now. So on the first e-mail on that page, Mr. Zanoff reports that Andrew is standing his ground on this issue, correct?

A. That's what it says, yes.

Q. And so it was your understanding that in response to inquiries from Mr. Zanoff, Mr. Manley still refused to change the written loan documents to provide for a waiver or replenishment of the interest reserve if it became depleted, correct?

MR. BODOFF: Objection.

BY MS. QUINN-BARABANOV:

Q. Go ahead.

A. That's correct.

Q. If you had this agreement with Mr. Manley, why wouldn't he agree to change the written loan terms to reflect the agreement?

hook if some delays for your current return." Right, that's what Mr. Zanoff asked Mr. Manley, right?

A. That's what it looks like.

Q. And Mr. Manley's response was "we will consider options." Right?

A. That's what it says.

Q. So it's your understanding that in this conversation, at least CBRE did not consent to a deferral of interest if there were delays?

MR. BODOFF: Objection. He is not even part of the conversation.

BY MS. QUINN-BARABANOV:

Q. Let me rephrase it this way. Did Mr. Zanoff communicate with you -- do you remember having any discussions with Mr. Zanoff about this e-mail exchange with Mr. Manley?

A. Not specifically.

Q. If I understand your position correctly, you are claiming that Mr. Manley's preclosing representation that CBRE would either waive interest or refund the interest reserve if it was depleted was fraudulent; is that right?

A. I believe so.

Q. Are there any other preclosing representations by CBRE that you claim were fraudulent?

A. You know, without refreshing me, no, I don't.

Q. Are there any other allegedly fraudulent representations by CBRE that you relied upon when entering into the loan documents for Pavilion?

A. You know, I think that was the issue that we talked about, that was the focal issue in that regard.

Q. So as you sit here today, you are not aware of any facts related to any fraud prior to the closing?

A. No more that I can recall.

(McCormick Exhibit No. 43 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. So Mr. McCormick, we had a discussion about whether November 8 was the closing day or signing day of the loan agreement, but in any event,

with the terms hereof and nothing in this section 6.3 is intended or shall be construed to excuse borrower from making any such payment."

Q. So it is your understanding that the written terms of the loan required Montrose to pay current interest even if the interest rate ran out, right?

A. That is my understanding, yes.

Q. Go to page 34. Section 16.14, Integration, No Oral Change. Do you see that?

A. Yes, I do.

Q. Would you review that paragraph, please?

A. Okay.

Q. And so it was your understanding that the terms of this loan agreement as written provided that the written terms would supersede all prior oral agreements to the parties, correct?

A. That's my understanding.

MR. BODOFF: Objection.

BY MS. QUINN-BARABANOV:

Q. And it's your understanding that the written terms of this loan document also, as its

written, prohibit any oral modifications of its terms, right?

MR. BODOFF: Objection.

THE WITNESS: That is correct.

BY MS. QUINN-BARABANOV:

Q. Let's go to the guarantee document. What exhibit is that?

MR. BODOFF: Number 9 is the guarantee.

(McCormick Exhibit No. 46 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 46. Do you recognize this document?

A. Yes.

Q. And is it a copy of the membership interest pledge and security agreement in connection with the Pavilion loan, correct?

A. That is correct.

Q. And does it appear to be a true and complete copy of that Pledge and Security Agreement?

A. Yes, it does.

Q. Okay. Let me re-ask the question. That's fair. Is it your understanding that the terms of this pledge agreement as written to -- is it your understanding that under the terms of this pledge agreement as written, the written terms of the agreement supersede any prior oral agreements between the parties regarding the subject matter of the Pavilion loan?

A. I am just reading, it says that, you know, no other agreements will be effective unless executed in writing, and I understood that.

Q. You also understood that this pledge agreement could only be modified in writing; is that right?

A. That is correct.

(McCormick Exhibit No. 47 was marked for identification.)

BY MS. QUINN-BARABANOV:

Q. Mr. McCormick, I'm showing you what has been marked as Exhibit 47. Do you recognize this documented?

A. Yes, I do.

A. Those were agreements that were made between me and someone with authority or apparent authority from CBRE.

Q. Anything else?

A. On a factual basis? I don't understand any more of the question than that.

Q. As you sit here today, you are not aware of any additional facts that would support your position that pre-contractual promises by CBRE concerning the interest reserve are binding?

A. Factually?

Q. Yes.

A. Not that I can think of.

Q. And you also made some representations that CBRE made some post-closing -- well, let me ask you this question. In some of your pleadings, you suggested that CBRE made some post-closing representations to provide additional funding for the interest reserve. Is that your position?

A. I believe so.

Q. What is the factual basis for that position?

A. I think some of the e-mails that we went through, some of the discussions that I have had with or had with CBRE, or Maury had with CBRE.

Q. And those were the discussions on or around November 9, relating to the $1.1 million shortfall?

A. I believe so.

Q. Any other discussions?

A. With respect to --

Q. Refunding the interest reserve if it became depleted after execution of the loan document?

A. You mean, did I have conversations after the execution of the loan documents with them with respect to that funding.

Q. Are you alleging that CBRE made any representations after execution of the loan documents that it would replenish the interest reserve or waive current interest that you claim are binding?

A. I had conversations with Andrew Manley subsequent to the closing. As we were moving through the project, that we would certainly need that -- you know, his promise to be honored. And as we moved

further into the project, we realized that we were going to be delayed.

Q. Were there any additional promises of this kind made after the closing documents were executed?

A. I don't know that there needed to be additional promises. We had -- from my perspective, they were conversations that I had with Andrew during the ensuing months. We had already agreed on what the -- you know, we had already made our agreement, if you will, so we just talked about the necessity for increasing interest reserve if we needed it.

Q. Some of the filings in this case have suggested that you are claiming that CBRE made promises about refunding the interest reserve or waiving interest to you in your individual capacity. And by that I mean you individually as opposed to you as a representative of Triton or some Triton affiliated entity. Is that your position?

A. I don't know that those --

MR. BODOFF: Object to the extent that it is a legal position. To the extent that you wanted to ask him whether --

McCormick. Do you recognize this document?

A. Yes.

Q. And this is a notice of default from Fremont, correct?

A. It appears to be.

Q. Is it a true and complete copy of a January 24, 2007 notice of default?

A. I believe so.

Q. Looking at the third paragraph, the notice references three payments, November 1, 2006, December 1, 2006, and January 1, 2007. Do you see that?

A. I do.

Q. Is it true that as of January 24, 2007, Triton Pavilion and these other entities had failed to make these payments to Fremont?

MR. BODOFF: Objection. I'm sorry.

THE WITNESS: I believe that's correct.

MR. BODOFF: I withdraw that objection.

BY MS. QUINN-BARABANOV:

Q. Did Fremont have a security interest in the Pavilion property?

A. They had a deed of trust.

Q. What was your understanding of what would have happened to CBRE -- CBRE's ability to collect on its loan if Fremont had foreclosed on that deed of trust?

A. Their foreclosure would have foreclosed out CBRE.

Q. So CBRE would not have been able to recover on its loan, correct?

MR. BODOFF: Objection.

BY MS. QUINN-BARABANOV:

Q. Based on the -- let me rephrase that.

So CBRE would not have -- let me switch to another question.

Did Fremont and CBRE, did there come a time when Fremont and CBRE entered into a forbearance agreement of some kind?

A. I don't recall.

Q. So you are not aware of any agreement between Fremont and CBRE to forbear with respect to the overdue amount?

A. With respect to Triton Pavilion or with

Fremont stop funding its loan?

A. Because their interest was in arrears.

Q. Did it also have anything to do with the project being on or overbudget?

A. There was an out of balance that was existing at that time as well.

Q. By out of balance, what do you mean in this context?

A. Over budget, out of budget.

Q. So over budget?

A. It could be under or over, in this case, it was over.

Q. Looking at the second sentence, "lender has further confirmed that despite the prohibition on the mechanics' and materialmen's liens, certain mechanics' and materialmen's liens have been filed with property." Is it true that as of April 27, 2007, there were mechanics' and material liens filed with this property?

A. I believe so.

Q. Do you have any reason to dispute the existence of the ten liens that are listed here?

paragraph.

BY MS. QUINN-BARABANOV:

Q. At the top of the paragraph, the first item there that is listed is a failure to cause taxes against any portion of the property to be timely paid. You don't dispute that Montrose failed to make timely payments of tax obligations, do you?

MR. BODOFF: Objection.

MS. QUINN-BARABANOV: What's the basis?

MR. BODOFF: Well, I mean, I think it's a leading question. I think you could have just easily asked, do you dispute, but it's leading.

THE WITNESS: I don't disagree with that.

BY MS. QUINN-BARABANOV:

Q. You acknowledge that Montrose failed to pay certain taxes on time, correct?

A. That's correct.

Q. The third item, failure to obtain timely completion free and clear of all mechanics' and materialmen's liens. You agree that Montrose failed to complete the project without incurring mechanics' and materialmen's liens at the property, right?

MR. BODOFF: Objection.

THE WITNESS: Do I answer that question?

MR. BODOFF: If you can.

THE WITNESS: I agree.

BY MS. QUINN-BARABANOV:

Q. And another reason listed is failure to abate, clean up, remove or dispose of hazardous substances on the property. Do you see that?

A. I do.

Q. And do you agree that Montrose failed to abate, clean up, remove or dispose of hazardous substances at the property?

A. I do dispute that.

Q. What is the basis for your disagreement with that?

A. That during the course of construction, any asbestos typically which was the environmental condition out there that was found, was mitigated properly. So I really do dispute that.

Q. So your understanding is that the only hazardous substance that you are aware of that was at issue for Pavilion was asbestos, is that right?

# EXHIBIT B

for your MBA?

A. No.

Q. Did you graduate with honors from either of those schools?

A. I'm pretty sure I graduated with honors from both.

Q. You were never disciplined or expelled from those schools since you graduated with honors.

A. No.

Q. Have you had any formal education since --

A. No.

Q. -- receiving your --

A. No.

Q. Have you had any training of any kind relating to the commercial real estate industry?

A. No.

Q. Have you had any training of any kind relating to evaluation of damages in real estate cases?

A. No.

Q. Have you had any formal training with respect to the valuation of real property?

A. No.

Q. Have you had any formal training with

C.W. MOORE, III

respect to the valuation of business entities?

A. Yes.

Q. Can you describe that for me, please?

A. Well, at the University of Chicago --

Q. I'm sorry. Go ahead.

A. At the University of Chicago, we learned how to value businesses. I also spent several years working for two major investment banks, where enterprise valuation was a central skill requirement.

Q. Let's talk a little bit about your employment. You graduated, you said, in 1993 from business school?

A. Yes.

Q. Can you walk me, briefly, through your employment history since that time?

A. Yes. I worked, in 1993 and 1994, for Morgan Stanley & Company. I worked from 1995, '96, and the first half of '97, for a private equity firm called Greenwich Street Capital Partners. I worked from the latter half of 1997 through 2002 for UBS Capital Americas, the private equity investment arm of UBS AG.

I worked from 2002 through 2005 -- 2004, rather, with Astron Services, which was a boutique

C.W. MOORE, III

investment bank, and, subsequently, I have been working for Jacobson Partners, which is a private equity firm located in New York City, and I have been employed by Jacobson Partners as a general partner since that time.

Very recently, my role is changing to chief financial officer of Formtech Industries, which is a Michigan-based manufacturing company.

Q. I'm sorry. I --

A. F-O-R-M-T-E-C-H, Formtech Industries, chief financial officer.

Q. You said your role is changing to CFO. Is that on outgrowth of your work at Jacobson or is that a new position?

A. It is an outgrowth. Jacobson is winding down. Formtech Industries is a company that is owned by Jacobson Partners, and so it's essentially a portfolio company of the firm.

Q. Describe what that means to me.

A. It's a company that's approximately 60 percent owned by Jacobson Partners Fund IV, which was a special purpose private equity fund that acquired Formtech about three and a half years ago.

Q. It holds various investments?

C.W. MOORE, III

A. Jacobson Partners Fund IV?

Q. Yes.

A. Is that the question? Jacobson Partners Fund IV holds -- It currently holds two investments. Formtech being one.

Q. And what is Formtech's business?

A. Automotive parts.

Q. Prior to working at Formtech, were your job roles similar at each of your earlier jobs?

A. Yes.

Q. All of them were involved in private equity deals of some sort?

A. They were. Back to Morgan Stanley, at Morgan Stanley, it was more of a traditional investment banking job.

Q. Approximately how many projects or how many deals did you put together from '95 to the 2005 time period?

A. Maybe 15. That's an approximation.

Q. What was the value of those deals?

MR. BODOFF: Aggregate?

Q. In the aggregate.

MR. BODOFF: If you know.

A. In the aggregate, 750 to a billion

C.W. MOORE, III

dollars.

Q. As part of your private equity investing experience, did you have occasion to negotiate loan documents?

A. Yes.

Q. And did you have occasion to review loan documents?

A. Yes.

Q. How many times would you say you've negotiated commercial loan documents?

A. Between five and ten times.

Q. Did you have the assistance of counsel in each of those transactions?

A. Yes.

Q. Overall, would you say you have at least general familiarity with how loan documents are put together?

A. I do now.

Q. You say you do now. Is there a point in time when you did not?

A. Yes.

Q. And can you make the differentiation for me?

A. In recent years, I've become much more

familiar with loan documentation as a result of having defaulted under various loan agreements.

Q. What loan agreements are you referring to when you say you defaulted under various loan documents?

A. Principally, Formtech Industries and Tug Manufacturing, both Jacobson Partners' portfolio companies.

Q. Have you defaulted on any personal loan documents?

A. Yes.

Q. When you were describing your employment history, you didn't mention Triton Real Estate. Can you describe your role with Triton Real Estate for me?

MR. BODOFF: Is there a particular Triton Real Estate entity or just generically?

Q. Triton Partners?

A. The holding company?

Q. The holding company.

A. The management company. As you're aware, I was a member of Triton Real Estate partners and, as you may know, not the managing member. Substantially, all of the managerial control was

C.W. MOORE, III

Q. And these are your responses to plaintiff's interrogatories?

A. Yes.

Q. As we sit here today, is there anything that you want to add to those responses?

A. No.

Q. Is there anything that you would like to change?

A. No.

Q. Can you turn to Page 7 of your interrogatory responses, please?

A. Yes.

Q. You state here that Mr. McCormick handled the majority of negotiations and discussions relative to this dispute. Can you explain for me, please, whether you had any direct contact with representatives of plaintiffs in connection with negotiations of either the Montrose or Rodgers Forge notes?

A. I had no direct communication with anybody from CBRE Realty Finance.

Q. Just to make it easy through the course of the deposition, if I refer to CBRE or you refer to CBRE or RFC, we'll be referring to the plaintiff in

C.W. MOORE, III

the negotiations of the Montrose loan in November of 2005.

A. I cannot remember a single material deal point as it relates to that -- that negotiation. I was not involved.

Q. Did you have personal money invested in Triton in November of 2005?

A. Yes.

Q. Do you recall how much of your own assets were invested in Triton in November of 2005?

A. No.

Q. Is it fair to say it was a substantial amount of money?

MR. BODOFF: Let me just object. Answer if you know what "substantial" is. It's a matter of opinion.

A. Look, I don't recall. We had funded a project prior to this project called the Spa Cove project, where I had made an investment, which I considered material.

Q. Is it fair to say that you were relying then, very heavily, on Mr. McCormick, as far as negotiating the Montrose loan?

MR. BODOFF: Objection. You can answer.

C.W. MOORE, III

A. Yes.

MR. CALHOUN: Can you give me the basis of objection, please?

MR. BODOFF: Form of the question.

Q. Who did you rely on in negotiating the Montrose loan?

A. Brian McCormick.

Q. Sorry. I have to ask that again, but I had to have a useable answer.

If you turn to Page 10 of your interrogatory responses, please, with respect to the first full paragraph of that page, that paragraph deals with Rodgers Forge. Correct?

A. Yes.

Q. Are your answers regarding the source of your knowledge with respect to that answer the same as the ones that you gave earlier with respect to the Montrose project?

MR. BODOFF: Objection.

If you understand the question, you can answer it.

A. To the extent I was relying principally on Brian McCormick. Yes.

Q. Did you have personal knowledge that Ohio

C.W. MOORE, III

Savings Bank had not threatened a default under its loan documents at the time Triton defaulted on the mezzanine documents?

MR. BODOFF: Objection. You can answer.

A. Can you ask that question again?

Q. In your interrogatory response, you say, "At the time of the default, Triton was not delinquent on its payments to CBRE and Ohio Savings Bank and had not threatened a default under its loan documents."

Is that statement based on your personal knowledge?

A. No. That is based on information provided to me -- you know, through Brian McCormick.

Q. And, the sentence before that, you claim that, "CBRE improperly declared a default under the Rodgers Forge loan documents due to a perceived technical default by Triton Rodgers Forge, LLC, with a senior lender at Ohio Savings Bank."

Is that statement based on personal knowledge?

A. It falls into the same category.

Q. That it's based on your conversations with Mr. McCormick?

C.W. MOORE, III

MR. CALHOUN: I'll ask it another way.

Q. By you, not your business entities, did you, Charles Moore, have an agreement with CBRE concerning the interest reserve on the Montrose project?

MR. BODOFF: Objection.

You can answer if you understand the question.

A. No.

Q. Did you have any knowledge in November of 2005 of any agreement between Triton or any Triton affiliate and CBRE concerning the interest reserve on the Montrose project?

A. I do not have a recollection of a direct involvement as it relates to that whole issue.

Q. Turn your attention to Interrogatory Number 8, please. It's on Page 11.

Is it fair to say that this answer is also based on your conversations with Mr. McCormick and not based on personal knowledge?

A. Yes.

(Whereupon, Exhibit 4 is marked for identification by the reporter.)

Q. Mr. Moore, I'm handing you a document I've

C.W. MOORE, III

MR. BODOFF: Objection.

A. I would say that, with respect to the amended and restated Rodgers Forge document, I am not sure that I ever reviewed that document.

Q. Are you more certain that you reviewed the loan agreement in connection with the original Rodgers Forge loan?

A. Yes.

Q. Let me back up a little bit.

Are you today, generally, familiar with the structures of the Montrose and Rodgers Forge mezzanine loans?

A. Elaborate on "structure."

Q. The general terms of those agreements.

A. I have a limited knowledge of the terms.

Q. You were involved in the modeling of the Rodgers Forge and Montrose projects. Correct?

A. Yes.

Q. And, when you do your models either by yourself or with the assistance of Mr. Waldman, one of your inputs is -- When you put together your models, you have to use the terms of the loans to structure part of those models. Correct?

A. Correct.

C.W. MOORE, III

earlier model. Correct?

A. Yes.

Q. And this model shows, if I understand it correctly, sales income beginning in May, 2006. Correct?

A. Yes.

Q. And that's income that would be coming in from sales of condominiums and deliveries of those condominiums. Correct?

A. Yes.

Q. If you look down at total cash interest expense, it has a similar pattern of cash interest expense listed for November, 05, to March, '06. Do you see that?

A. Yes.

Q. And then it has no cash interest expense beginning in April, '06, and continuing on from there. Correct?

A. Correct.

Q. Again, you show excess cash becoming a positive number in August, '06. Correct?

A. That's what the model shows.

Q. Without regard to whether mezzanine debt was being paid, interest was being paid on a current

C.W. MOORE, III

basis, this model would show, beginning in August of '06, cash in excess of a million dollars per month that could be used to pay debt or anything else. Correct? Beginning in August, '06.

A. Yes.

Q. You show sales income ending in March, '07. Does that mean that this model contemplates a cleat sellout by March of '07?

A. It does, unless certain units were being held back for some reason.

Q. There might be a lifetime tenancy or something like that?

A. Exactly. An example.

Q. If there was a lifetime tenancy in that sale or construction lapped down the road, it wouldn't be in this model if -- if it is -- it's contemplated it would be sold by the March 7th timeframe.

A. I think that's the case. I don't recall if they were making offers to lifetime tenants to buy them out and get them out of the units and then take their units and resell them.

Q. If you look through the model several pages you get to MO3415, which is, basically, if I

A. No.

MR. BODOFF: Based on what? Scheduled -- I don't think is the right word because it's not like there was a -- I don't know that there's a schedule -- and it's from what timeframe are you talking about?

Q. Assuming that the borrower drew on interest reserve every month for the full amount of the current interest payable on the Montrose project, do you know when that interest reserve would have exhausted?

A. No.

Q. If that date were after May, 2006, would it have been your expectation that sales income would be available to then pay the current interest?

A. It is my understanding that that's the way this project was put together.

Q. So, when you were looking at the models or otherwise contemplating the project, the plan was to have sales income kick in and carry the debt service obligations.

A. To begin paying down the debt and meeting the obligations.

Q. So --

fe500984-6f6f-4f52-9ae7-fdd23339881e

C.W. MOORE, III

A. Although we did have rental income as well.

Q. That's correct; and you can see that in the model. In fact, it's the first line.

A. Yes. Exactly.

Q. That number goes negative beginning in April of '06. Do you know why that happens?

A. I don't. I don't know why that would go negative.

Q. Does that represent empty apartments?

A. Honestly, I don't know. I don't know. Probably a modeling error.

Q. Your counsel, at one point, said that it was entirely incorrect to say that they -- meaning my client, I believe -- could have ever, ever expected that there would be any money coming into this project prior to the date that the interest reserve ran out. It just isn't true.

That statement's not correct. Is it?

MR. BODOFF: Objection.

A. It's hard for me to give an opinion, if Joe made that statement, really, what he was referring to. I can give you an opinion based on this financial model by looking at it -- you know,

I --

Q. I don't want your opinion because you're here as a fact witness, but the fact is, as I think you said earlier, that you anticipated sales would begin, and those proceeds would be used to pay the debt obligations.

A. Correct.

Q. Now, are you familiar with what happened on the Montrose project after the loans closed?

A. I would have a very difficult time recanting for you actually what happened, as it happened in terms of sellout proceeds being applied to loans, to interest escrow availability to -- you know, I would have a difficult time with that.

Q. Do you recall whether or not the project proceeded on the anticipated schedule?

A. I believe there were delays in the project, but that the project did proceed, but, in terms of the details of exactly how it unfolded, I'm not going to be particularly helpful.

Q. Okay. Do you know whether Triton or its subsidiaries made any changes to the construction plans with respect to the Montrose property?

A. Changes from -- I mean, from the

fe500984-6f6f-4f52-9ae7-fdd23339881e

C.W. MOORE, III

originally --

Q. No. From the model at or about the time of closing to how it was actually performed.

A. I believe the changes were made, but I don't know specifically what the changes were, the scope of the dollars involved.

Q. Would it refresh your recollection if I told you that there were changes made to the kitchen layout?

A. It doesn't specifically ring any bells, but it doesn't surprise me either.

Q. Do you recall any discussions concerning asbestos abatement with respect to the Montrose property?

A. I don't recall back when this project got kicked off discussions about asbestos, but I did come to learn that the building had asbestos.

Q. Do you know what, if any, impact the delays had on the models that had been prepared with respect to the project?

A. We'd have to look at those models, but one can imagine that --

MR. BODOFF: Don't speculate. The question was: Do you know?

fe500984-6f6f-4f52-9ae7-fdd23339881e

C.W. MOORE, III

A. Do I know? I don't know, with any specificity, other than project -- that delays in the project would have resulted in -- in delays in construction and then, ultimately, delays in unit sales.

Q. That makes perfect sense. If you don't start as soon, you don't finish as soon.

Do you know whether, in fact, sales volume was as great as anticipated?

A. I don't.

Q. I believe the models anticipated 40 units per month. Correct?

A. In these. Yes.

Q. Do you know whether, in fact, you were able to achieve 40 units per month?

A. I mean, ultimately, I know that we were unable to achieve 40 per month. Initially, I don't know -- you know, the rate of sale, nor the sellout price per unit.

Q. Did you have any discussions with Mr. McCormick or anybody else at Triton about either the delays in construction or the sellout process?

A. I'm sure that I did, but I can't recollect for you any specific discussions.

fe500984-6f6f-4f52-9ae7-fdd23339881e

C.W. MOORE, III

A. As I understand it, funding under a construction loan was meant to stay within a parameter, and so, in the event it got out of balance, that's what created the funding balance. In other words, funding under the construction loan without, ultimately, some disposition of units to pay down the construction loan, that would be one way to create an out-of-balance.

Q. And if an out-of-balance situation were created, what was supposed to happen?

A. I'm not entirely sure what the construction loan said, as it relates to that, but I'm confident the objective was to get it back into balance as quickly as possible or run the risk of having construction funding halt.

Q. Would it be fair to say that the out-of-balance provisions were designed match funds to the pace of progress on a construction?

A. I believe that was the case.

Q. So, if there were delays on the construction, that would be something that might lead to an out-of-balance problem?

A. Yes.

Q. And you understand, in fact, there were

C.W. MOORE, III

some out-of-balance issues on the Montrose project. Correct?

A. That's correct, although I couldn't tell you the timing or the amount.

Q. I can help you with that.

A. I bet you can.

(Whereupon, Exhibit 35 is marked for identification by the reporter.)

Q. I've handed you Exhibit Number 35. It purports to be a letter from Fremont to Triton Pavilion and, in fact, if you turn to the last page, is that your signature there?

A. I'm not sure.

Q. You're not sure if that's your signature?

A. No.

Q. You think someone may have signed it on your behalf?

A. Yes.

Q. Have you authorized anyone to sign it on your behalf?

A. No.

Q. Do you recall having seen this document before?

A. I do not recall.

# EXHIBIT C

some of this stuff is things you do continually throughout a job. So I mean I'm not going say we were done with the cost to complete because the cost to complete we would continually update as we renegotiated with subs, figure out we could use some, couldn't use some, determine what their requirements were to come back. In our eyes we had completed the first scope of work for them, given them product and may or may not do additional work, similar work.

Q. Would it be fair to say that from May 4th when you made your, that formal proposal and the middle of May when you started working on it, that you were essentially in a hiatus?

A. Yes.

Q. What did you do between mid-May when CBF engaged you under that proposal and June 13th?

A. From about mid-May through the first few days of June we were looking at the existing lien suits that had been filed and were in the process of trying to make contact with these contractors

to determine what the components of the lien was so we could start getting some ideas to what the existing liability was to them or what -- what the existing liability was in say the owner's eyes and any other claims for damages or something they may have had.

In early June that scope of work, kind of a little piece of work we kind of got hired under this proposal to perform other additional work associated with the project. At that point in time is when we started to basically get in contact with these subs to bring them in for these meetings to discuss the status of their contract, outstanding liabilities and what it would take to basically remobilize.

Q. Are you saying that when CBF engaged you they engaged you in phases?

MR. CALHOUN: Objection.

Q. If you don't understand the question I can rephrase it.

A. You know, I guess it's...

you were doing some gathering of information relating to the liens?

A. Lien filings that contractors had filed.

Q. How did that change starting in the beginning of June?

A. We went from the position of gathering information for what you might consider a limited scope related to what all the contractor had going on, I mean, you know, every contractor has a different motivation when they file a lien. Some may have filed it with a very conservative claim as to what they were claiming, others may have thrown in the kitchen sink, they were damaged up the kazoo. The preliminary assessment is what is in the claims and what do we need to do to respond to them to minimize any exposure we have.

The one thing we did not want to occur was to have a lien perfected at some inflated amount. So it was preliminarily looking at them and figuring out what's in the claims. As we got hired as you said under the fourth letter

it was now figuring out is this the right contract or what do we owe them legally and what is it going to take to get them back to finish the work. And at some point in time making the assessment as to whether or not from a cost benefit standpoint that would be the right approach.

Typically it's the best approach to keep an existing guy on because the cost of bringing another guy on, but every situation is different. You have to assess it and make a decision accordingly.

Q. Would you say this June 13th e-mail is I guess an early assessment?

A. It's one of our first assessments having gone through a number of meetings with the subs, getting a feel what their postion was, starting to find out as we talked about a little bit earlier the fact that there was a lot of work out there that was on unapproved change orders that needed to be resolved and executed if in fact, you know, was work performed and what needed to be done.

projected totals?

A. I believe it's an accumulation of all the numbers above it but some of those numbers were added to, I believe, because it didn't tie to the original project. I don't know if this schedule totaled down and was totaling individual lines and then the subtotal, or if this original budget really isn't used the same by Triton as the original budget was by the underwriter.

Q. Let's go back to Exhibit 14. Who calculated the revised budget?

A. Basically Delta did, I mean through our meetings with the developer, any meetings we may have had up to that point in time, the analysis of the documents that we had received initially and subsequently. This was the budgeted estimate at that point in time.

Q. And had you estimated, I think if I see here it would cost another 10,207,966 to complete over and above the original budget?

A. Correct.

Q. And that when you say estimate to complete 35,232,744; am I reading that correctly?

A. Is there a question in there?

Q. Am I reading that correctly the funds required to complete were 35,232,744?

A. Yes.

Q. It would be an actual cash outlay?

A. That's the correct way to look at it because the actual work to be performed was less, but there was, as we saw in some of the other schedules, outstanding liabilities.

Q. I see you're showing 7 million 750 in cash liabilities.

(Brief pause in the proceedings.)

BY MR. BODOFF:

Q. Still on Exhibit Number 14 does this $35 million take into account any, estimated cost to complete take into account any revenues that might be received from the project?

A. As offsets, no.

Q. Did you ever undertake that analysis of