# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | |
|---|---|
| CBRE REALTY FINANCE TRS, LLC, ) | |
| CityPlace I, 31st Floor ) | |
| 185 Asylum Street ) | |
| Hartford, CT  06103 ) | |
| ) | |
| Plaintiff, ) | No. 08-cv-1964 |
| ) | |
| v.            ) | |
| ) | |
| BRIAN A. MCCORMICK ) | |
| 410 Severn Avenue ) | |
| Suite B-412 ) | |
| Annapolis, MD 21403 ) | |
| ) | |
| - and - ) | |
| ) | |
| CHARLES W. MOORE ) | |
| 410 Severn Avenue ) | |
| Suite B-412 ) | |
| Annapolis, MD 21403, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

For its Complaint in the above-captioned action, Plaintiff CBRE Realty Finance TRS, LLC ("CBF") alleges as follows:

## NATURE OF ACTION

1.       This is an action for monetary damages against Defendants Charles W. Moore ("Moore") and Brian A. McCormick ("McCormick") based on their guaranty of certain commercial real estate loans made to borrower companies in which Moore and McCormick have or had a significant interest.  The various borrowers defaulted on those loans, and Moore and McCormick have failed to honor their guaranties.

## PARTIES

2.      Plaintiff, CBF, is a Delaware limited liability company with its principal place of business at 185 Asylum Street, CityPlace I, 31st Floor, Hartford, CT  06103.

3.      Defendant, Moore, is an adult individual who resides in New York, and whose principal place of business is at 410 Severn Avenue, Suite B-412, Annapolis, MD 21403.

4.      Defendant, McCormick, is an adult individual who resides in Maryland, and whose principal place of business is at 410 Severn Avenue, Suite B-412, Annapolis, MD 21403.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy, exclusive of interests and costs, exceeds $75,000.00.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendants either reside in or transact significant business in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

7.      Defendants have consented to jurisdiction in any Maryland state or federal court.

## FACTUAL ALLEGATIONS

**A.      The Rodgers Forge Project Loans**

8.      CBRE Realty Finance Holdings, LLC ("CBF Holdings"), an affiliate of CBF, issued a loan in the principal amount of up to $18,280,000 (the "Original Rodgers Forge Loan") to Triton Rodgers Forge, LLC, a Delaware limited liability company, ("Triton RF") pursuant to a Loan Agreement dated as of October 31, 2005.  Simultaneously, Triton RF issued a promissory note to CBF Holdings reflecting this indebtedness.

9.      Defendant McCormick is the managing member of Bellona Holdings, LLC ("Bellona"), which is in turn the managing and sole member of Triton RF.

10.     Defendant Moore is a member of Bellona.

11.     The Rodgers Forge Loan was to be used by Triton RF in connection with the re-development of an existing 508-unit apartment complex in the Rodgers Forge subdivision in Baltimore, Maryland as described in the various loan documents (the "Rodgers Forge Property"). Triton RF planned to use the proceeds from the Original Rodgers Forge Loan to convert the Rodgers Forge Property into residential condominiums for subsequent sale.

12.     Also on or about October 31, 2005, Defendants Moore and McCormick executed that certain Guaranty in favor of CBF Holdings (the "Original Rodgers Forge Guaranty"), pursuant to which Defendants guaranteed certain obligations under the Original Rodgers Forge Loan.

13.     CBF Holdings assigned all of its rights, title and interest in and to the Original Rodgers Forge Loan to CBF.

14.     On or about April 14, 2006, CBF and Triton RF agreed to amend and restate the Original Rodgers Forge Loan pursuant to that certain Loan Agreement dated as of April 14, 2006 (the "Rodgers Forge Loan").  Accordingly, Triton RF executed an Amended and Restated Promissory Note in the principal amount of $22,073,200.00 in favor of CBF (the "Rodgers Forge Note").

15.     CBF has fully performed under the Rodgers Forge Loan and the related loan documents.

16.     To secure the Rodgers Forge Note, Bellona pledged its ownership interest in Triton RF to CBF as security.  In addition, Rodgers Forge Apartments Realty Company Limited

Partnership, which is an ultimate subsidiary of Triton RF and the fee owner of the Rodgers Forge Property, issued an Indemnity Deed of Trust granting CBF a security interest in the Rodgers Forge Property to secure further the Rodgers Forge Loan.

17.     Moore and McCormick similarly executed an Amended and Restated Guaranty (the "Rodgers Forge Guaranty") pursuant to which Defendants guaranteed the performance of certain obligations under the Rodgers Forge Loan.  A copy of the Rodgers Forge Guaranty is attached hereto as Exhibit A.

18.     As set forth in the Rodgers Forge Guaranty, Moore and McCormick agreed, unconditionally and irrevocably, to indemnify CBF against any "loss, damage or liability suffered by [CBF]" to the extent such loss arises out of, among other things, any of the following:

> (a) Triton's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Rodgers Forge Property;
>
> (b) a material misrepresentation or breach of warranty by Triton RF, Moore, or McCormick in connection with the development or operation of the Rodgers Forge Property, the making of the Rodgers Forge Loan, or any certificates or documents provided in connection therewith;
>
> (c) retention by Triton RF, Moore, or McCormick of any income arising with respect to the Rodgers Forge Property.

(collectively, the "Rodgers Forge Specific Obligations").

19.     Moore and McCormick also guaranteed that substantial completion of each portion of the construction of the Project (as defined in the Rodgers Forge Loan Agreement) would be attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget (the "Rodgers Forge Construction Obligations").

20.     In addition, Moore and McCormick agreed to indemnify and hold CBF harmless for any and all claims, demands, suits, losses, damages or expenses in connection with the

existence of any "Hazardous Substance" or "Environmental Condition" associated with the Rodgers Forge Property (the "Rodgers Forge Environmental Obligations").

### B.    The Rodgers Forge Defaults

21.    Triton RF defaulted under the Rodgers Forge Note when it failed to make all payments when and as due on certain senior loans issued by Ohio Savings Bank.  As a result, CBF exercised its rights under the Rodgers Forge Loan Agreement, declared a default and accelerated the indebtedness owed under the Rodgers Forge Note.

22.    CBF has foreclosed on the Rodgers Forge Property, which was purchased at the foreclosure sale by CBF Rodgers Forge, LLC, an affiliate of CBF.

23.    On or about April 27, 2007, CBF notified Defendants of their obligations under the Rodgers Forge Guaranty.  Specifically, CBF indicated that Moore and McCormick were in breach of the Rodgers Forge Specific Obligations and the Rodgers Forge Construction Obligations because, among other things, all work on the Rodgers Forge Property had ceased and at least eight (8) mechanics' liens had been filed against the Rodgers Forge Property.

24.    Despite CBF's demand that Moore and McCormick honor their Rodgers Forge Construction Obligations, neither Defendant has satisfied the outstanding liens and other defaults on the Construction Obligations.

25.    Pursuant to their Rodgers Forge Construction Obligations, Defendants Moore and McCormick were also obligated to cause the on-time, on-budget completion of the renovation of the Rodgers Forge Property.

26.    Defendants Moore and McCormick have failed to cause the on-time, on-budget completion of the renovation of the Rodgers Forge Property, which resulted in a lower value for CBF's collateral.

27.     Triton RF and the Defendants have also failed to honor their commitments under the Rodgers Forge Loan documents to pay all of the taxes associated with the Project.  Prior to the foreclosure, Triton RF and the Defendants have failed to pay approximately $352,612.03 in real estate taxes.  As a result, CBF incurred costs and damages to prevent tax liens from being placed on the Rodgers Forge Property.

### C.     The Montrose Project Loans

28.     On or about November 8, 2005, CBF entered into a loan agreement (the "Montrose Loan Agreement") with Montrose Investment Holdings, LLC ("Montrose") pursuant to which CBF agreed to lend Montrose the principal sum of $31,946,650.00 (the "Montrose Loan").[1]  On the same date, Montrose executed a promissory note in favor of CBF for that sum (the "Montrose Note").

29.     Defendant McCormick is a co-founder and the managing member of Montrose.

30.     Defendant Moore is a co-founder and a member of Montrose.

31.     CBF has fully performed under the Montrose Loan Agreement and the related loan documents.

32.     The  proceeds of the Montrose Note were used to finance, in part, the acquisition of all of the membership interests of Triton Pavilion, LLC, a Delaware limited liability company, which is the sole member of Pavilion, LLC, a Maryland limited liability company ("Pavilion"). Pavilion is the fee owner of certain real property located at 5901 Montrose Road, Rockville, Maryland 20852 (the "Montrose Property").

---

[1] Triton RF and Montrose are hereafter referred to collectively as "Borrowers."  The Montrose Note, the Rodgers Forge Note, and all of the associated loan documents are hereafter referred to collectively as the "Loans."

33.     At the time of the Montrose Loan, the Montrose Property was improved by a 432-unit multi-family rental project.  After acquiring the ownership of Triton Pavilion–and therefore of Pavilion, Montrose planned to convert the Montrose Property to a "residential for sale condominium project" and to sell the resulting condominium units.

34.     The Montrose Note was secured by, among other things, a pledge of Montrose's membership interest in Triton Pavilion as sole member of Pavilion, the fee owner of the Montrose Property.

35.     As part of the transaction contemplated by the Montrose Loan Agreement, Defendants McCormick and Moore guaranteed certain of Montrose's obligations.  Their agreement is set forth in that certain Guaranty dated as of November 8, 2005 (the "Montrose Guaranty") a copy of which is attached hereto as Exhibit B.

36.     As set forth in the Montrose Guaranty, Moore and McCormick agreed, unconditionally and irrevocably, to indemnify CBF against any "loss, damage or liability suffered by [CBF]" to the extent such loss arises out of, among other things, any of the following:

(a) Montrose's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Montrose Property;

(b) a material misrepresentation or breach of warranty by Montrose, Triton Pavilion, Pavilion, Moore, or McCormick in connection with the development or operation of the Montrose Property, the making of the Montrose Loan, or any certificates or documents provided in connection therewith; or

(c) retention by Montrose, Triton Pavilion, Pavilion, Moore, or McCormick of any income arising with respect to the Montrose Property following an event of default under the Montrose Loan.

(collectively, the "Montrose Specific Obligations").

37.     Moore and McCormick also guaranteed that substantial completion of each portion of the construction of the Project (as defined in the Montrose Loan Agreement) would be

attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget (the "Montrose Construction Obligations").

38.     In addition, Moore and McCormick agreed to indemnify and hold CBF (and certain other persons such as CBF affiliates and officers) harmless for any and all claims, demands, suits, losses, damages or expenses in connection with the existence of any "Hazardous Substance" or "Environmental Condition" associated with the Montrose Property (the "Montrose Environmental Obligations").

### D.     The Montrose Defaults

39.     Montrose has defaulted on the Montrose Note by, among other things, failing to make payments when and as due.  As a consequence of such default(s), CBF exercised its rights under the Membership Interests Pledge and Security Agreement that secured the Guaranty and took ownership of Montrose.

40.     On or about April 27, 2007, CBF notified Defendants of their obligations under the Montrose Guaranty.  Specifically, CBF indicated that Moore and McCormick were in breach of the Montrose Specific Obligations and the Montrose Construction Obligations because all work on the Montrose Property had ceased and at least ten (10) mechanics' liens had been filed against the Montrose Property.

41.     Despite CBF's demand that Moore and McCormick honor their Construction Obligations, neither Defendant satisfied the outstanding liens and other defaults on the Construction Obligations.   Indeed, the defaults under the Montrose Loan Agreement and the Montrose Guaranty only accumulated further.

42.    First, Defendants had failed to pay $562,155.76 in taxes owed on the Montrose Property, and CBF was forced to advance these costs to avoid a tax sale of the Montrose Property.

43.    Second, Defendants breached the Montrose Specific Obligations by, among other things, failing to pay over $89,000 to TACC, Inc. for work done in connection with the Montrose Property despite funds having been disbursed by the construction lender for that purpose.

44.    Third, Defendants breached the Montrose Construction Obligations by allowing in excess of $7 million in mechanics' liens to be filed against the Montrose Property.  To date, CBF has been forced to pay in excess of $3.37 million in connection with those mechanics' liens.

45.    Fourth, Defendants breached the Montrose Environmental Obligations by failing to pay for in excess of $1.5 million in unfinished environmental remediation at the Montrose Property.

46.    On or about August 9, 2007, CBF again wrote to Moore and McCormick and demanded performance and payment under the Montrose Guaranty.  Specifically, CBF informed Moore and McCormick that they were in default under the Montrose Guaranty for failing to perform their Montrose Specific Obligations, the Montrose Construction Obligations and the Montrose Environmental Obligations, and demanded payment for $9,882,448.34 plus interest, fees and costs.

47.    Pursuant to their Montrose Construction Obligations, Defendants Moore and McCormick are also obligated to cause the on-time, on-budget completion of the renovation of the Montrose Property.

48.     Defendants Moore and McCormick have failed to cause the on-time, on-budget completion of the renovation of the Montrose Property, which resulted in a lower value for CBF's collateral.

## COUNT I
## BREACH OF CONTRACT (Rodgers Forge)

49.     Plaintiff repeats and incorporates the allegations in Paragraph 1-47 as if set forth fully herein.

50.     Plaintiff has fully performed under all of the Rodgers Forge Loan documents.

51.     Defendants Moore and McCormick have breached their obligations under the Rodgers Forge Guaranty by failing to perform as required.

52.     Plaintiff has been damaged in an amount to be determined at trial but not less than $5 million, plus interest, costs and attorneys' fees.

## COUNT II
## BREACH OF CONTRACT (Montrose)

53.     Plaintiff repeats and incorporates the allegations in Paragraph 1-51 as if set forth fully herein.

54.     Plaintiff has fully performed under all of the Montrose Loan documents.

55.     Defendants Moore and McCormick have breached their obligations under the Montrose Guaranty by failing to perform as required.

56.     Plaintiff has been damaged in an amount to be determined at trial but not less than $10 million, plus interest, costs and attorneys' fees.

WHEREFORE, Plaintiff respectfully demands judgment on Counts I–II against Defendants, McCormick and Moore, jointly and severally, in an amount to be determined at trial, but not less than $15 million, plus costs and attorneys fees as specified in the guaranties, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ George R. Calhoun V

Howard H. Stahl (D. Md. Bar No. 24741)
John F. O'Connor (D. Md. Bar No. 14063)
George R. Calhoun, V (D. Md. Bar No. 25018)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
joconnor@steptoe.com
gcalhoun@steptoe.com

Attorneys for Plaintiff  CBRE Realty Finance TRS, LLC

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | |
|---|---|
| _____ )<br>CBRE REALTY FINANCE TRS, LLC,   )<br>         )<br>     Plaintiff,      )<br>         )<br>v.           )<br>         )<br>BRIAN A. MCCORMICK    )<br>         )<br>and         )<br>         )<br>CHARLES W. MOORE,    )<br>         )<br>     Defendants.     )<br>_____) | Case No. 08-cv-1964 |

**DEFENDANTS' AMENDED ANSWER**

Defendants, Brian A. McCormick ("McCormick") and Charles W. Moore ("Moore") (hereinafter collectively the "Defendants"), answer the Plaintiff, CBRE Realty Finance TRS, LLC's, (hereinafter the "Plaintiff") Complaint as follows:

1.      To the extent that paragraph 1 is an attempt to describe the claims brought by the Plaintiff, the allegations do not require a response.  To the extent they constitute allegations of fact, the allegations are denied.

2.      The Defendants lack information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 and the same are therefore denied.

3.      It is admitted that Defendant Moore is an adult individual residing in New York. The remaining allegations are denied.

4.      Admitted.

5.      The Defendants admit that the amount in controversy is in excess of $75,000.00.

The Defendants lack information sufficient to form a belief as to the truth of the remaining

allegations contained in paragraph 5 and the same are therefore denied.

6.      The allegations contained in paragraph 6 call for a legal conclusion and therefore

no response is required.

7.      The allegations contained in paragraph 7 call for a legal conclusion to which no

response is required.

8.      It is admitted that CBF Holdings and Triton RF are parties to a Loan Agreement

dated as of October 31, 2005 and that Triton RF issued a promissory note to CBF Holdings.

Further answering, the Original Rodgers Forge Loan and any promissory note speak for

themselves and any attempt to summarize or re-characterize the terms of such documents is

denied.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     It is admitted that Defendants executed a guaranty in favor of CBF Holdings.

Further answering, the guaranty speaks for itself and any attempt to summarize or re-characterize

the same is denied.

13.     Defendants are without sufficient information to admit or deny the allegations

contained in paragraph 13 and therefore such allegations are denied.

14.     It is admitted that CBF and Triton RF are parties to a certain Loan Agreement

dated as of April 14, 2006 and that Triton RF executed an amended and restated promissory note

in favor of CBF.  Further answering, the Rodgers Forge Loan and Rodgers Forge Note speak for themselves and any attempt to summarize or re-characterize the same is denied.

15.     Denied.

16.     The first sentence of paragraph 16 is admitted.  It is denied that Rodgers Forge Apartments Realty Company Limited Partnership is or was a subsidiary of Triton RF.  The terms of Rodgers Forge Note and any Indemnity Deed of Trust speak for themselves and any attempt to summarize or re-characterize the same is denied.

17.     It is admitted that the Defendants executed an amended and restated guaranty relative to the Rodgers Forge Loan.  Further answering, the Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

18.     To the extent the allegations contained in paragraph 18 call for a legal conclusion they are denied.  Further answering, the Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

19.     The Rodgers Forge Guaranty and Rodgers Forge Loan Agreement speak for themselves and any attempt to summarize or re-characterize the same is denied.

20.     The Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

21.     It is admitted only that CBF declared a default and accelerated the indebtedness it claimed under the Rodgers Forge Note.  It is further denied that any failure to make payments to Ohio Savings Bank constituted a reason for CBF to declare a default.  The remaining allegations contained in paragraph 21 are denied.

22.     Admitted.

23.     It is admitted that on or about April 27, 2007 CBF sent a certain notice to the Defendants.  Such notice speaks for itself and any attempt to summarize or re-characterize such notice is denied.

24.     It is admitted only that the CBF has made certain demands on the Defendants and that the Defendants have not made payments to CBF in response to that demand.  It is denied that the Defendants are liable to CBF or otherwise required to make payments to CBF.

25.     The Rodgers Forge Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

26.     Denied.  By way of further answer, any failure to complete any portion of the project on time or on budget was either waived by Plaintiff or was the result of Plaintiff's conduct.

27.     It is admitted that certain taxes associated with the Project were not paid prior to the foreclosure.  However, the failure to pay the said taxes resulted from the failure of CBF to honor its promises to provide continued funding of the interest reserve or to waive current interest payments, the result of which was that the Borrower was required to use money that otherwise would have gone into project development, including the payment of ongoing taxes, to the payment to CBF of ongoing interest payments.  The balance of the allegations contained in paragraph 27 are denied.  By way of further answer, the Rodgers Forge Loan speaks for itself and any attempt to summarize or re-characterize the same is denied.

28.     It is admitted that CBF and Montrose are parties to a Loan Agreement dated as of November 8, 2005 and that Montrose issued a promissory note to CBF.  Further answering, the Montrose Loan Agreement and any promissory note speak for themselves and any attempt to summarize or re-characterize the terms of such documents is denied.

29.     Admitted.

30.     Admitted.

31.     Denied.

32.     Denied.

33.     It is denied that Montrose acquired Triton Pavilion, LLC.  The remaining allegations are admitted.

34.     Admitted.

35.     It is admitted that Exhibit B is a true and correct copy of the Montrose Guaranty, which was executed by the Defendants.  The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

36.     The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

37.     The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

38.     The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

39.     It is admitted that CBF took ownership of Montrose.  The remaining allegations are denied.

40.     It is admitted only that on or about April 27, 2007, CBF provided a certain notice to the Defendants.  The notice provided speaks for itself and any attempt to summarize or re-characterize such notice is denied.

41.     It is admitted only that the CBF has made certain demands on the Defendants and that Defendants have not made any payments to CBF in response.  It is denied that the Defendants are liable to CBF or were obligated to make any payments pursuant to that demand.

42.     It is admitted only that certain tax obligation on the Montrose Property were not satisfied and that CBF advanced funds to satisfy the same.  However, the failure to pay the said taxes resulted from the failure of CBF to honor its promises to provide continued funding of the interest reserve or to waive current interest payments, the result of which was that the Borrower was required to use money that otherwise would have gone into project development, including the payment of ongoing taxes, to the payment to CBF of ongoing interest payments.  The balance of the allegations contained in paragraph 42 are denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     It is admitted only that CBF wrote to the Defendants on or about August 9, 2007 and made certain demands.  The August 9, 2007 letters speak for themselves and any attempt to summarize or re-characterize the same is denied.

47.     The Montrose Guaranty speaks for itself and any attempt to summarize or re-characterize the same is denied.

48.     Denied.

## COUNT I
## BREACH OF CONTRACT (Rodgers Forge)

49.     Defendants incorporate the foregoing responses herein by reference.

50.     Denied.

51.     Denied.

52.     Denied.

## COUNT II
## BREACH OF CONTRACT (Montrose)

53.     Defendants incorporate the foregoing responses herein by reference.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's action is barred by the doctrine of laches.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's action is barred by its own unclean hands.

### FOURTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by its failure to mitigate its damages.

### FIFTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by the doctrine of duress.

### SIXTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by the doctrine of illegality.

### SEVENTH AFFIRMATVE DEFENSE

Plaintiff's action is barred by the doctrines of waiver and estoppel.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred by the doctrine of setoff.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred because it violated its covenant of good faith and fair dealing.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's action is barred as a result of its own failure to perform in accordance with the agreements that are at issue in this case.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's action is barred as a result of its fraud in the inducement relative to the agreements upon which its claims rely.

WHEREFORE, the Defendants Brian A. McCormick and Charles W. Moore pray that this Honorable Court:

1.      Dismiss the Complaint;

2.      Enter judgment in its favor and against Plaintiff on the Complaint; and

3.      Grant such further relief as the Court deems just.

BRIAN A. MCCORMICK
and CHARLES W. MOORE,

By their attorneys,


*/s/ Ryan D. Sullivan*_____
Joseph S.U. Bodoff (D. Md. Bar No. 92160)
Ryan D. Sullivan (D. Md. Bar No. 16382)
Bodoff & Associates, P.C.
120 Water Street
Boston, MA  02109
(617) 742-7300

Dated: March 6, 2009.

EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| RFC TRS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN A. MCCORMICK <br><br> and <br><br> CHARLES W. MOORE, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 08-cv-1964

## DEFENDANT CHARLES W. MOORE'S
## RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, the Defendant Charles W. Moore ("Moore")

submits the following responses to the Plaintiff RFC TRS, LLC's First Set of

Interrogatories.

## GENERAL OBJECTIONS

Moore objects to any definition or instruction that seeks to impose obligations

different from, more expansive than, or inconsistent with the applicable rules, or which

change the ordinary and customary meaning of terms and phrases.

## RESPONSES

Interrogatory No.1

Identify all persons who are likely to have knowledge of any fact alleged in the

complaint or in your answer to the complaint, and state the subject matter of the

knowledge possessed by each such person.

{00033128.1}

Exhibit _3_
6 -19 -09    pmc    ID

**RFCCM00026**

<u>Response to Interrogatory No. 1</u>

   The following persons are likely to have knowledge of any of the facts alleged in the complaint or in the Defendants' answer to the complaint.

   1.   Brian A. McCormick, 410 Severn Avenue, Suite B412, Annapolis, MD 21403, 410-295-3180.  Knowledge of Defendants (both Moore and McCormick) dealings with RFC's predecessor CBRE Realty Finance and its employees/agents, dealings with senior lenders on both the Montrose and Rodger's Forge Projects, financing and operation of both projects, and dealings with investors and potential investors in both projects.

   2.   Charles W. Moore, Jacobsen Partners, 595 Madison Avenue, Suite 3100, New York, NY 10022, 212-758-7008.  Knowledge of Defendants (both Moore and McCormick) dealings with RFC's predecessor CBRE and its employees/agents, dealings with senior lenders on both the Montrose and Rodger's Forge Projects, financing and operation of both projects, and dealings with investors and potential investors in both projects.

   3.   Maury Zanoff, CBRE/ L.J. Melody, 555 11th Street, NW, Suite 300, Washington, DC 20004.  Knowledge of the Defendants' negotiations of the mezzanine financing on both the Rodgers Forge and Montrose Projects and CBRE's processes for approval and structuring of such financing.  Knowledge of CBRE's promises and representations to the Defendants that it would either fund or waive current interest payments on both projects.  Knowledge of senior financing on both projects.

RFCCM00027

4.  Andrew Manley, formerly of CBRE Reality Finance.  Knowledge of the
    Defendants' negotiations of the mezzanine financing on both the Rodgers
    Forge and Montrose Projects and CBRE's processes for approval and
    structuring of such financing.  Knowledge of CBRE's promises and
    representations to the Defendants that it would either fund or waive current
    interest payments on both projects.

5.  James Evans, formerly of CBRE Reality Finance.  Knowledge of the
    Defendants' negotiations of the mezzanine financing on both the Rodgers
    Forge and Montrose Projects and CBRE's processes for approval and
    structuring of such financing.  Knowledge of CBRE's promises and
    representations to the Defendants that it would either fund or waive current
    interest payments on both projects.

6.  Tom Podgorski, formerly of CBRE.  Knowledge of the Defendants'
    negotiations of the mezzanine financing on both the Rodgers Forge and
    Montrose Projects and CBRE's processes for approval and structuring of such
    financing.

7.  Sean Myers, Knowledge of the Defendants' negotiations of the mezzanine
    financing on both the Rodgers Forge and Montrose Projects and CBRE's
    processes for approval and structuring of such financing.

8.  Katherine A. Burroughs, Dechert LLP, 90 State House Square, Hartford, CT
    06103, 860-524-3953, counsel for CBRE relative to its foreclosure on
    Rodgers Forge.

3

RFCCM00028

9.   Paul Martin, CBRE Realty Finance, 185 Asylum Street, 37th Floor, Hartford, CT 06103.  Knowledge of CBRE's foreclosure on both the Rodgers Forge and Montrose Projects.

10.  Ray Wirta, CBRE Realty Finance.  Knowledge of post-default events and negotiations to purchase back interest in Rodgers Forge and Montrose.

11.  Jodi Gallivan, Fremont Investment and Loan, 3 Bethesda Metro Center, Suite 1220, Bethesda, MD 20814, 301-280-3451.  Knowledge of financing on Montrose Pavilion Project.

12.  Eron Sodi, Fremont Investment and Loan, 3 Bethesda Metro Center, Suite 1220, Bethesda, MD 20814, 301-280-3451.  Knowledge of financing on Montrose Pavilion Project.

13.  Matthew Williams, CBRE/L.J. Melody, 555 11th Street, NW, Suite 300, Washington, DC 20004.  Knowledge of the Defendants' negotiations of the mezzanine financing on both the Rodgers Forge and Montrose Projects and CBRE's processes for approval and structuring of such financing.  Knowledge of CBRE's promises and representations to the Defendants that it would either fund or waive current interest payments on both projects.  Knowledge of senior financing on both projects.

14.  Steven M. Tyminski, Stevens & Lee, 620 Freedom Business Center, Suite 200, P.O. Box 62330, King of Prussia, PA 19406, 610-205-6032.  Represented Defendants relative to Montrose Pavilion closing and review of loan documents relative to same.

4

RFCCM00029



15. Rick Saas, 4504 Walsh Street, Suite 200, Chevy Chase, MD 20815, 301-961-4966. Represented Plaintiff relative to Montrose Pavilion and Rodgers Forge closings and review of loan documents relative to same.

16. Anne Marie O'Rourke, CBRE Realty Finance, 185 Asylum Street, 37th Floor, Hartford, CT 06103. Knowledge of CBRE's foreclosure on both the Rodgers Forge and Montrose projects.

17. Susan Orr, CBRE Realty Finance, 185 Asylum Street, 37th Floor, Hartford, CT 06103. Knowledge of CBRE's foreclosure on both the Rodgers Forge and Montrose projects.

18. Anne Theres Bechamps, Venable, LLP, 210 Allegheny Avenue, Towson, MD 21204, counsel for CBRE relative to its foreclosure on the Rodgers Forge and Montrose projects.

19. Edward G. Price, 410 Severn Avenue, Suite B412, Annapolis, MD 21403, former in-house counsel for Triton Real Estate Partners, LLC.

20. Kevin Bonk, 410 Severn Avenue, Suite B412, Annapolis, MD 21403, former senior financial analyst for Triton Real Estate Partners, LLC.

21. Jon Waldman, address unknown, former financial analyst for Triton Real Estate Partners, LLC.

22. Jeffrey Greenhalgh, address unknown, former director of construction for Triton Real Estate Partners, LLC.

23. Valentino Tocci, address unknown, former construction project manager for the Monterey project for Triton Real Estate Partners, LLC.

RFCCM00030

24. Eric Mayl, address unknown, former managing director for the Monterey

project for Triton Real Estate Partners, LLC.

25. Dean Fairbend, address unknown, former managing director for the Rodgers

Forge project for Triton Real Estate Partners, LLC.

## Interrogatory No. 2

For each witness you have retained or specially employed to provide expert

testimony in this case, or employed by you whose duties regularly involve giving expert

testimony and whom you expect to testify at trial, provide a complete statement of the

opinions to be expressed and reasons therefor.

## Response to Interrogatory No. 2

Moore has not at this time engaged any expert witness.  Moore will supplement

this answer as required by the applicable Rules of Civil Procedure.

## Interrogatory No. 3

Identify all facts or circumstances concerning the contention in your Second

Affirmative Defense that this "action is barred by the doctrine of laches."

## Response to Interrogatory No. 3

Moore is still exploring all of the facts in support of this affirmative defense, and

will supplement this response as further factual support surfaces during discovery.

## Interrogatory No, 4

Identify all facts or circumstances concerning the contention in your Third

Affirmative Defense that this "action is barred by [Plaintiff's] unclean hands."

RFCCM00031



### Response to Interrogatory No. 4

Moore had very few direct interactions or dealings with CBRE, its agents or employees. Rather Brian McCormick ("McCormick") handled the majority of the negotiations and discussions relative to this dispute. Moore, however, was in regular contact with McCormick. Therefore, the following response is, unless otherwise noted, upon Moore's information and belief, and based on what was reported to Moore by McCormick or gleaned from correspondence to which Moore was copied.

Until approximately one month before the closing of the mezzanine financing on the Montrose Project, McCormick had been repeatedly told by Andrew Manley, then of CBRE, James Evans then of CBRE and Maury Zanoff of CBRE/L.J. Melody that the financing on the project would not require payment of current interest, and that interest would not be payable until the project was completed. In fact, all project budgets and models submitted to CBRE clearly indicated that the project's budget could not afford the payment of current interest to CBRE.

CBRE continued to offer assurances to McCormick that current interest would not be an issue, and that the mezzanine financing on the project would be sufficient to meet the proposed budget. Despite repeated requests by McCormick, CBRE unnecessarily delayed issuing a term sheet for the Montrose Project to McCormick, with the first term sheet having been sent on November 1, 2005, only eleven days prior to the scheduled closing date. The term sheet included a provision for the payment of 8% interest per month with an interest reserve insufficient to cover mezzanine interest expenses for the anticipated construction period. In response to McCormick's inquiries, Andrew Manley, James Evans and Maury Zanoff assured McCormick that CBRE would replenish the

7

RFCCM00032

interest reserve in the event it were depleted, or waive the current payment requirement and allow the interest to accrue. The current pay feature of the term sheet was contradictory to McCormick's prior conversations with Andrew Manley, then of CBRE. In response to the term sheet and the current pay feature in particular, McCormick contacted Andrew Manley for an explanation. McCormick and Manley were joined on a telephone conference by James Evans, also of CBRE, during the week of November 6, 2005. During that conversation, Evans and Manley explained that the current pay feature of financing was necessary so that the projects would show cash flow of 8% per month Evans and Manley requested that McCormick allow for the current pay feature of the loan, and assured McCormick that when the interest reserve was exhausted, CBRE would either replenish the reserve, or waive the current interest requirement going forward. Further, Evans and Manley explained that CBRE's commitment to fund or waive current interest payments could not be reflected in the loan documents themselves. Based on these representations, and fully aware that alternative financing could not be obtained on such a short schedule before the closing, McCormick reluctantly agreed to allow for the current pay feature in the financing. Based on those assurances, Moore executed the Guaranty.

The timing of CBRE's change of position with regard to the requirement that interest be paid currently was made after Triton paid to Home Properties non-refundable deposits amounting to $4.2 million, made on May 5, 2005, June 25, 2005 and November 1, 2005. CBRE knew that Triton had made those payments when, during the week of November 6, 2005 it informed McCormick for the first time that current interest payments would be required.

8

RFCCM00033

In the eleventh hour before the closing of the Guaranty and Montrose loan documents, CBRE continued to alter the financing structure, this time reducing the total principal amount of the loan from the $29.4 million to $28.3 million. The reduction in principal required that funds be taken from the $3,751,440 budgeted for the CBRE interest reserve. Based on the reduction in financing post-closing, McCormick initially informed Maury Zanoff (he in turn informed Andrew Manley and James Evans) that the deal was off, and that McCormick would not allow Montrose to accept the reduced funding. McCormick's reaction was prompted, in part, out of concern that the siphoning of funds from the CBRE interest reserve to bridge the gap in the principal funding would present a risk that the CBRE interest reserve would be insufficient. At the urging of Maury Zanoff, McCormick spoke with James Evans on November 9, 2005 via telephone, and expressed his concern that the reduction in funding will cause an issue with the interest reserve in the future, and put the project at risk. James Evans assured McCormick during this telephone conference that the current pay requirement would not be an issue, and further that he was confident he would be able to get approval to fund the difference between the original $29.4 million principal funding and the reduced funding. Based on this post-closing representation and the representations prior to the execution of the Guaranty, McCormick continued to cause Montrose to accept the funding from CBRE.

Upon information and belief, CBRE never intended to provide further financing of the interest reserve or to waive the current pay requirement. Such representations were material, made both before the loan documents and guaranty were executed, and

RFCCM00034

subsequent thereto with the intent to induce McCormick to cause Montrose to accept the funds from CBRE.

CBRE improperly declared a default under the Rodgers Forge loan documents due to a perceived technical default by Triton Rodgers Forge LLC with its senior lender Ohio Savings Bank. At the time of the default, Triton was not delinquent on its payments to CBRE and Ohio Savings Bank had not threatened a default under its loan documents. CBRE improperly foreclosed on the Rodgers Forge Project premised on false pretenses of a technical default by Triton under its obligations to Ohio Savings Bank, in an effort to exert pressure on Moore and McCormick to cause Montrose to fund current interest payments on the Montrose loan.

<u>Interrogatory No. 5</u>

Identify all facts or circumstances concerning the contention in your Fifth Affirmative Defense that this "action is barred by the doctrine of duress."

<u>Response to Interrogatory No. 5</u>

Moore incorporates his response to Interrogatory No. 4 herein by reference.

<u>Interrogatory No. 6</u>

Identify all facts or circumstances concerning the contention in your Sixth Affirmative Defense that this "action is barred by the doctrine of illegality."

<u>Response to Interrogatory No. 6</u>

Moore incorporates his response to Interrogatory No. 4 herein by reference. Further responding, the Plaintiff is directed to Moore's response relative to McCormick's telephone conversation with Andrew Manley and James Evans during the week of

10

RFCCM00035

November 6, 2005. By way of further response, Moore denies that he acted illegally in connection with any of the transactions that are the subject of this litigation.

**Interrogatory No. 7**

Identify all facts or circumstances concerning the contention in your Seventh Affirmative Defense that this "action is barred by the doctrines of waiver and estoppel."

**Response to Interrogatory No. 7**

Moore incorporates his response to Interrogatory No. 4 herein by reference. Further responding, the Plaintiff is directed to Moore's response to the extent that he describes representations and promises made by CBRE's agents and employees after the closing on certain loan documents relative to the Montrose Project and the Rodgers Forge Project.

**Interrogatory No. 8**

Identify all facts or circumstances concerning the contention in your Tenth Affirmative Defense that this "action is barred as a result of [Plaintiff's] failure to perform in accordance with the agreements that are at issue in this case."

**Response to Interrogatory No. 8**

Moore incorporates his response to Interrogatory No. 4 herein by reference. Further responding, upon information and belief, prior to and subsequent to the closing on the Montrose loan documents, Andrew Manley and James Evans on behalf of CBRE promised McCormick and in turn, Moore, that CBRE would either fund or waive the current payment of interest on the Montrose Project after the funds allocated for the interest reserve were extinguished. In exchange for such promise, McCormick and

11

Moore provided the guaranty and caused Montrose to enter into the Montrose loan documents.  CBRE breached its promise to fund or waive the current interest payments.

**Interrogatory No. 9**

Identify all facts or circumstances concerning the contention in your Eleventh Affirmative Defense that this "action is barred as a result of [Plaintiff's] fraud in the inducement relative to the agreements upon which its claims rely."

**Response to Interrogatory No. 9**

Moore incorporates his response to Interrogatory No. 4 herein by reference.

**Interrogatory No. 10**

Identify all facts or circumstances concerning your admission in paragraph 27 of your answer that "certain taxes associated with the [Rodgers Forge] Project were not paid prior to the foreclosure," including the amounts and subject matters of the taxes not paid and the dates payment was due.

**Response to Interrogatory No. 10**

Moore objects to Interrogatory No. 10 to the extent that it is overly broad and unduly burdensome.  Without waiving the foregoing, Moore states that the statement in paragraph 27 of the answer speaks for itself.

**Interrogatory No. 11**

Identify all facts or circumstances concerning your admission in paragraph 42 of your Answer that "certain tax obligations on the Montrose Property were not satisfied," including the amounts and subject matters of the taxes not paid and the dates payment was due.

12

RFCCM00037

### Response to Interrogatory No. 11

Moore objects to Interrogatory No. 11 to the extent that it is overly broad and unduly burdensome. Without waiving the foregoing, Moore states that the statement in paragraph 42 of the answer speaks for itself.

### Interrogatory No. 12

Identify all facts or circumstances concerning the statement in paragraphs 27 and 42 of your Answer regarding "the failure of CBF to honor its promises to provide continued funding of the [Montrose and Rodgers Forge] interest reserve or to waive current interest payments," including the specific content of those promises and your knowledge of their purpose, truth or falsity, or the reasons they were not contained within the Loan Documents.

### Response to Interrogatory No. 12

Moore incorporates his response to Interrogatory No. 4 herein by reference.

### Interrogatory No. 13

Identify all facts or circumstances concerning Montrose's failure to timely pay contractors or materialmen, including the amount, subject matters, and vendors of the bills not paid and the dates payment was due.

### Response to Interrogatory No. 13

Moore objects to Interrogatory No. 13 to the extent that it is overly broad and unduly burdensome and vague.

13

RFCCM00038

## Interrogatory No. 14

Identify all facts or circumstances concerning Rodgers Forge's failure to timely pay contractors or materialmen, including the amounts, subject matters, and vendors of the bills not paid and the dates payment was due.

## Response to Interrogatory No. 14

Moore objects to Interrogatory No. 14 to the extent that it is overly broad and unduly burdensome and vague.

## Interrogatory No. 15

Identify all facts or circumstances concerning the statement in paragraph 7 of Defendants' Amended Counterclaim that "as is typical of loans of this type, interest would not be required to be paid currently but would accrue and be paid upon completion of the project," including the identity of any expert, witness, consultant, treatise, trade publication or other material relied upon to support the contention that mezzanine loans do not typically require the current payment of interest.

## Response to Interrogatory No. 15

Moore objects to this interrogatory on the ground that, upon the Plaintiff's motion, the Amended Counterclaim has been dismissed. Notwithstanding and without waiving such objection, Mcoore's statement at paragraph 7 of Defendants' Amended Counterclaim that "as is typical of loans of this type, interest would not be required to be paid currently but would accrue and be paid upon completion of the project," is grounded, in part, upon McCormick's 20 plus years of experience as a developer. Additional support for such industry practice may appear in treatises, trade publications or other sources not yet specifically identified by Moore. To the extent further sources

14

RFCCM00039

are discovered, Moore will supplement his responses to this Interrogatory as required by the rules of civil procedure.  Moore may offer the testimony of an outside expert in support of this fact.

As to objections:

Joseph S.U. Bodoff (O n. Bar. Po. 92160)
Ryan D. Sullivan (O. M.d. Bar No. 16582)
Bodoff & Associates, P.C.
120 Water Street
Boston, MA  02109-4210
(617) 742-7300

Dated: April 24, 2009

## Verification

I, Charles W. Moore, state under the penalties of perjury that I have read the foregoing Responses to Plaintiff's First Set of Interrogatories and know the contents thereof; that said responses were prepared with the assistance and advice of counsel; the responses set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, collected and thus far discovered in the course of preparation of these responses; that I reserve the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; that, subject to the limitations set forth herein, these responses are true to the best of my knowledge, information and belief.

Signed under the penalties of perjury on this 24th day of April, 2009.

Charles W. Moore

15

RFCCM00040

# EXHIBIT 4

9.  Paul Martin, CBRE Realty Finance, 185 Asylum Street, 37th Floor, Hartford, CT 06103.  Knowledge of CBRE's foreclosure on both the Rodgers Forge and Montrose Projects.

10. Ray Wirta, CBRE Realty Finance.  Knowledge of post-default events and negotiations to purchase back interest in Rodgers Forge and Montrose.

11. Jodi Gallivan, Fremont Investment and Loan, 3 Bethesda Metro Center, Suite 1220, Bethesda, MD 20814, 301-280-3451.  Knowledge of financing on Montrose Pavilion Project.

12. Eron Sodi, Fremont Investment and Loan, 3 Bethesda Metro Center, Suite 1220, Bethesda, MD 20814, 301-280-3451.  Knowledge of financing on Montrose Pavilion Project.

13. Matthew Williams, CBRE/L.J. Melody, 555 11th Street, NW, Suite 300, Washington, DC 20004.  Knowledge of the Defendants' negotiations of the mezzanine financing on both the Rodgers Forge and Montrose Projects and CBRE's processes for approval and structuring of such financing.  Knowledge of CBRE's promises and representations to the Defendants that it would either fund or waive current interest payments on both projects.  Knowledge of senior financing on both projects.

14. Steven M. Tyminski, Stevens & Lee, 620 Freedom Business Center, Suite 200, P.O. Box 62330, King of Prussia, PA 19406, 610-205-6032.  Represented Defendants relative to Montrose Pavilion closing and review of loan documents relative to same.

15. Rick Saas, 4504 Walsh Street, Suite 200, Chevy Chase, MD 20815, 301-961-4966. Represented Plaintiff relative to Montrose Pavilion and Rodgers Forge closings and review of loan documents relative to same.

16. Anne Marie O'Rourke, CBRE Realty Finance, 185 Asylum Street, 37th Floor, Hartford, CT 06103. Knowledge of CBRE's foreclosure on both the Rodgers Forge and Montrose projects.

17. Susan Orr, CBRE Realty Finance, 185 Asylum Street, 37th Floor, Hartford, CT 06103. Knowledge of CBRE's foreclosure on both the Rodgers Forge and Montrose projects.

18. Anne Theres Bechamps, Venable, LLP, 210 Allegheny Avenue, Towson, MD 21204, counsel for CBRE relative to its foreclosure on the Rodgers Forge and Montrose projects.

19. Edward G. Price, 410 Severn Avenue, Suite B412, Annapolis, MD 21403, former in-house counsel for Triton Real Estate Partners, LLC.

20. Kevin Bonk, 410 Severn Avenue, Suite B412, Annapolis, MD 21403, former senior financial analyst for Triton Real Estate Partners, LLC.

21. Jon Waldman, address unknown, former financial analyst for Triton Real Estate Partners, LLC.

22. Jeffrey Greenhalgh, address unknown, former director of construction for Triton Real Estate Partners, LLC.

23. Valentino Tocci, address unknown, former construction project manager for the Monterey project for Triton Real Estate Partners, LLC.

exert pressure on Moore and McCormick to cause Montrose to fund current interest payments on the Montrose loan.

**Interrogatory No. 5**

Identify all facts or circumstances concerning the contention in your Fifth Affirmative Defense that this "action is barred by the doctrine of duress."

**Response to Interrogatory No. 12**

McCormick incorporates his response to Interrogatory No. 4 herein by reference.

**Interrogatory No. 13**

Identify all facts or circumstances concerning Montrose's failure to timely pay contractors or materialmen, including the amount, subject matters, and vendors of the bills not paid and the dates payment was due.

**Response to Interrogatory No. 13**

McCormick objects to Interrogatory No. 13 to the extent that it is overly broad and unduly burdensome and vague.

**Interrogatory No. 14**

Identify all facts or circumstances concerning Rodgers Forge's failure to timely pay contractors or materialmen, including the amounts, subject matters, and vendors of the bills not paid and the dates payment was due.

**Response to Interrogatory No. 14**

McCormick objects to Interrogatory No. 14 to the extent that it is overly broad and unduly burdensome and vague.

**Interrogatory No. 15**

Identify all facts or circumstances concerning the statement in paragraph 7 of Defendants' Amended Counterclaim that "as is typical of loans of this type, interest would not be required to be paid currently but would accrue and be paid upon completion of the project," including the identity of any expert, witness, consultant, treatise, trade publication or other material relied upon to support the contention that mezzanine loans do not typically require the current payment of interest.

EXHIBIT 5

(24)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

|  |  |  |
|---|---|---|
| CBRE REALTY FINANCE TRS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-1964 |
| | ) | |
| BRIAN A. MCCORMICK | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHARLES W. MOORE, | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSES AND OBJECTIONS OF RFC TRS, LLC TO DEFENDANTS'
FIRST SET OF INTERROGATORIES**

RFC TRS, LLC ("RFC"), by and through its undersigned attorneys, hereby responds and objects to the Defendants' First Set of Interrogatories ("Defendants' Interrogatories") and states as follows:

## GENERAL OBJECTIONS

RFC makes the following General Objections that apply to all of Defendants' Interrogatories. These General Objections may be specifically referred to in the response to certain Interrogatories. However, the failure to refer specifically to a General Objection should not be construed as a waiver of the General Objection. Further, objections to specific Interrogatories are in addition to, and not in lieu of, RFC's General Objections.

1.      These Responses to Interrogatories are made only on behalf of RFC.

2.      RFC objects to Defendants' Interrogatories to the extent that they call for the disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege, protection or rule of confidentiality. By producing any documents in response to the Interrogatories, RFC has not waived the right to assert any privileges.

3.      RFC objects to Defendants' Interrogatories to the extent they are vague, ambiguous, overly broad or that responding to them is burdensome, expensive or oppressive.

4.      RFC objects to Defendants' Interrogatories to the extent that they call for the disclosure of information that is proprietary in nature or which otherwise constitutes confidential business information and/or trade secrets.

5.      RFC objects to Defendants' Interrogatories to the extent that they seek information that is not relevant and/or material to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence. Nothing in RFC's responses shall be construed as an admission respecting the admissibility or relevance of any facts or documents sought by Defendants' Interrogatories.

6.      RFC objects to Defendants' Interrogatories to the extent that they seek to expand the scope of, or impose obligations greater than, those imposed by the applicable Federal Rules.

7.      RFC objects to Defendants' Interrogatories to the extent that Defendants seek information outside of RFC's possession, custody or control, or seeks information already in Defendants' possession or the possession of third parties or is otherwise accessible to Defendants or is a matter of public record.

8.      RFC objects to Defendants' Interrogatories to the extent that they seek information concerning actions other than those that are the subject matter of this litigation.  Any other such actions are not relevant and/or material to the subject matter of this litigation, are not reasonably calculated to lead to the discovery of admissible evidence and are overly broad, unduly burdensome, oppressive and expensive.

9.      RFC objects to Defendants' Interrogatories to the extent that they are not limited in scope to a relevant time period.

10.     RFC objects to Defendants' Interrogatories to the extent they assume any facts not within RFC's knowledge or are otherwise premature in light of on-going discovery in this matter.

11.     RFC objects to Defendants' Interrogatories to the extent they seek information that was generated, obtained or received by RFC in response to this lawsuit or in anticipation of litigation.

12.     RFC reserves its right to challenge the competence, relevance, materiality and admissibility at trial or any subsequent proceeding, of this or any other action, of any information or documents it provides in response to the Interrogatories.  RFC expressly reserves its right to rely on all facts, information and documents developed in discovery or otherwise in support of its contentions or other matters.

13.    RFC objects to the discovery to the extent it seeks disclosure of info which would violate any constitutional, statutory or common law privacy interest of RFC or any of its current or former employees, including but not limited to, the right to lobby.

14.    RFC reserves its right to supplement its responses.


## OBJECTIONS TO DEFENDANTS' DEFINITIONS

RFC hereby objects to the form of each Discovery Request incorporating any of the Definitions set forth in Defendants' Interrogatories. By responding to each such Discovery Request, RFC does not adopt any Instruction or characterization of any term utilized by Defendants.

RFC objects to Defendants' Definitions to the extent such Definitions are overly broad or purport to impose on RFC any obligations greater than those imposed by the applicable Federal Rules governing the proper scope and extent of discovery and any orders entered in the action.

RFC hereby incorporates each objection contained in the Objections to Definitions set forth below to each response to any Discovery Request using an objected to term or phrase, as if fully set forth in each such response.

1.    RFC objects to the definition of "Electronic Information" to the extent that the instructions would require RFC to interview the author of every document responsive to the Interrogatory to ascertain the existence of each and every copy of such document. By way of further objection, such a definition would also require RFC to identify and produce documents that are not in the possession, custody or control of RFC. RFC further objects to the extent that this definition is overly broad, unduly burdensome, oppressive and exceeds the scope of a reasonable search for responsive documents.

- 4 -

## RESPONSES TO INTERROGATORIES

1.   **Standard Interrogatory No. 1. ("Identify all persons who are likely to have personal knowledge of any fact alleged in the complaint, and state the subject matter of the personal knowledge possessed by each such person.")**

**Response** *See* General Objections. Subject to its General Objections, RFC responds that this interrogatory is premature. Notwithstanding this, RFC responds to the best of its present ability as follows:

- Charles Moore, Defendant. Has personal knowledge concerning the execution of the loan documents and the defaults under the loan documents and guaranties.

- Brian McCormick, Defendant. Has personal knowledge concerning the execution of the loan documents and the defaults under the loan documents and guaranties.

- Andrew A. Manley, former CBRE Realty Finance Senior Vice President. Has personal knowledge regarding execution of the loan documents.

- Robert B. Cavoto, CPA, Senior Manager at Delta Consulting Group. Has personal knowledge concerning the mechanic's liens, unperformed construction and related issues in connection with the Montrose and Rodgers Forge projects.

- Ann Marie O'Rourke, Realty Finance Corporation Vice President. Has personal knowledge concerning the defaults and workout efforts concerning the loans.

- Various present and former RFC employees may have knowledge concerning the Montrose and/or Rodgers Forge loans and the Defendants' defaults.

- Various contractors and materialmen. Numerous contractors, materialmen and taxing authorities have first hand knowledge concerning the failure of the borrowers or Defendants to pay contractors or taxes respectively.

For further information, RFC refers Defendants to RFC's document production.

2.   **Standard Interrogatory No.3. ("Itemize and show how you calculate any damages claimed by you in this action, whether economic, non-economic, punitive or other.")**

**Response:** Subject to its General Objections, RFC responds that this interrogatory is premature. Notwithstanding this, RFC responds to the best of its present ability as follows:

a) With respect to the Rodgers Forge Guaranty, RFC has been damaged as follows:

- Legal Fees & Costs: $ 62,509.36

- Property Taxes advanced prior to foreclosure sale: $ 352,612.03
  (Paid to Baltimore County Collector)

- Interest Payments Paid to Senior Lender: $ 3,963,582.54
  Pre-Foreclosure: $1,602,283.71
  Post-Foreclosure $2,361,298.83

  **RODGERS FORGE TOTAL:** **$ 4,378,703.93**

b) With respect to the Montrose Guaranty, RFC has been damaged as follows:

- Legal Fees & Costs: $ 257,608.04

- Property Taxes advanced prior to foreclosure sale: $ 562,155.86
  ($518,913.01, plus penalties, paid to
  Montgomery County Collector)

- Mechanics Lien Payments: $ 3,374,288.12

- Environmental Remediation: $ 1,264,459.00
  (Delta Consulting Group estimate)

- Interest Payments Paid to Senior Lender: $ 9,054,768.39
  Pre-Foreclosure: $4,499,607.86
  Post-Foreclosure: $4,555,160.53

  **MONTROSE TOTAL:** **$14,513,279.41**

  **TOTAL CLAIM:** **$18,891,983.34**

3. **Identify all persons you intend to call as a witness at the trial or hearing of this matter.**

   **Response:** *See* General Objections. RFC objects to this Interrogatory to the extent it seeks information protected by the attorney work-product doctrine, the attorney client privilege, or any other applicable privilege. Subject to and without waiving any of the foregoing objections, RFC states that it has not yet determined who it will call at trial. RFC will disclose its witnesses for its case in chief in accordance with the Court's scheduling order(s).

4. **Identify each person you expect to call as an expert witness at trial, including:**

a) The subject matter(s) on which the expert is expected to testify; and
b) The substance of the facts and opinions on which the expert is expected to testify; and
c) The grounds for each opinion; and
d) The qualifications such expert possesses as to the subject matter(s) listed in response to subparagraph (b) above.

Response: *See* General Objections.  Subject to its General Objections, RFC responds that this interrogatory is premature.  RFC will disclosure any expert witnesses in accordance with the Court's scheduling order(s).

5.     **Identify the person or persons responsible for managing and maintaining the Plaintiff's Electronic Information for the period beginning January 1, 2005 through the present (or any part thereof), including but not limited to desktop computers, servers, personal digital assistants, portable computers, laptop computers and other electronic devices.**

Response: *See* General Objections.  RFC also objects to this Interrogatory to the extent that it seeks information that is not relevant and/or material to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.  RFC objects to this Interrogatory to the extent it seeks information protected by the attorney work-product doctrine, the attorney client privilege, or any other applicable privilege.  Subject to and without waiving any of the foregoing objections, RFC responds that Geri Marchessault is currently responsible for the servers at RFC.

6.     **Identify each person in possession of Electronic Information concerning the subject matter of this litigation.**

Response: *See* General Objections.  RFC also objects to this Interrogatory to the extent that it seeks information that is not relevant and/or material to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.  RFC objects to this Interrogatory to the extent it seeks information protected by the attorney work-product

doctrine, the attorney client privilege, or any other applicable privilege. Subject to and without

waiving any of the foregoing objections, RFC responds that many individual employees may

have e-mail or electronic documents directly or tangentially related to the Rodgers Forge or

Montrose projects, much of which is stored on RFC's central servers. For more information,

RFC refers Defendants to its document production.

7.    **For each category or type of Electronic Information under the control of the
      Plaintiff (e.g., emails, word-processing documents, databases, etc.), state the
      following:**
      **a. A description or identification of the equipment upon which such information is
      stored;**
      **b. The physical location of such equipment;**
      **c. The individual that is responsible for the maintenance of such equipment;**
      **d. Identify any policies of Plaintiff regarding the maintenance of such equipment
      and the information located thereon;**
      **e. Describe any systems or equipment used to back-up such equipment; and**
      **f. Describe the measures taken to preserve the Electronic Information.**

      **Response:** *See* General Objections. RFC also objects to this Interrogatory to the extent

that it seeks information that is not relevant and/or material to the subject matter of this litigation

and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and

without waiving any of the foregoing objections, RFC responds that since December 8, 2007,

      a) All RFC documents and databases are stored on redundant hard drives on a Compaq

ProLiant ML370 G2 server. E-mails are stored on redundant hard drives on a Compaq ProLiant

ML370 G5 server.

      b) All equipment is located in RFC's locked server room.

      c) Beata Szpak, Senior Systems Engineer with Applied Software Technologies, Inc.

      d) The maintenance on the servers is performed every two weeks during the support visit

while the system engineer is on-site. It includes: hardware checks, review of the logs, critical

updates/patches installation, device drivers updates.  RFC maintains copies of, inter alia, e-mail, Word, Excel and other documents on its centralized server.

e) The backups of all the data are performed using a "Revinetix" appliance.  This is a disk-to-disk backup solution.  Backups are performed daily (incremental) and full backup is run weekly.  Monthly backup are performed on the last day of the month.  These are tape backups done using Symantec's "BackupExec" software.

f) The backups of data are archived to the external USB drives and taken off-site.  Tape backups are stored in a fireproof cabinet on-site.

**8.      Identify and describe any policies of Plaintiff relative to the preservation of Electronic Information.**

**Response:**  *See* General Objections.  RFC also objects to this Interrogatory to the extent that it seeks information that is not relevant and/or material to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.  RFC objects to this Interrogatory to the extent it seeks information protected by the attorney work-product doctrine, the attorney client privilege, or any other applicable privilege.  Subject to and without waiving any of the foregoing objections, RFC responds that since December 8, 2007, all RFC documents are stored on the servers indefinitely.  E-mails are stored on a Microsoft Exchange 2003 server.  There is no limit on the mailbox size.  Once a month e-mails are archived to the PST files and kept indefinitely.  Daily and weekly backups are kept for 4 weeks.  Monthly tapes are kept for a few years.  In addition, specific document preservation messages were sent to all employees by counsel.

**9.      State the basis for your contention at Paragraph 51 of the Complaint that the "Defendants Moore and McCormick have breached their obligations under the Rodgers Forge Guaranty by failing to perform as required."**

**Response:** Subject to its General Objections, RFC responds that as set forth in the Rodgers Forge Guaranty, Moore and McCormick were required to indemnify RFC against any "loss, damage or liability suffered by [RFC]" to the extent such loss arises out of, among other things, any of the following:

> (a) Triton's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Rodgers Forge Property;

> (b) a material misrepresentation or breach of warranty by Triton RF, Moore, or McCormick in connection with the development or operation of the Rodgers Forge Property, the making of the Rodgers Forge Loan, or any certificates or documents provided in connection therewith;

> (c) retention by Triton RF, Moore, or McCormick of any income arising with respect to the Rodgers Forge Property.

> (collectively, the "Rodgers Forge Specific Obligations").

Moore and McCormick also guaranteed that substantial completion of each portion of the construction of the Project (as defined in the Rodgers Forge Loan Agreement) would be attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget (the "Rodgers Forge Construction Obligations"). In addition, Moore and McCormick agreed to indemnify and hold RFC harmless for any and all claims, demands, suits, losses, damages or expenses in connection with the existence of any "Hazardous Substance" or "Environmental Condition" associated with the Rodgers Forge Property (the "Rodgers Forge Environmental Obligations").

Triton RF defaulted under the Rodgers Forge Note when it failed to make all payments when and as due on certain senior loans issued by Ohio Savings Bank and became "out of

- 10 -

balance" on those senior loans.  As a result, Ohio Savings Bank refused to make further advances to Triton.

On or about April 27, 2007, RFC notified Defendants of their obligations under the Rodgers Forge Guaranty.  Specifically, RFC indicated that Moore and McCormick were in breach of the Rodgers Forge Specific Obligations and the Rodgers Forge Construction Obligations because, among other things, all work on the Rodgers Forge Property had ceased and at least eight (8) mechanics' liens had been filed against the Rodgers Forge Property.  For further information, RFC refers Defendants to its document production.

Despite RFC's demand that Moore and McCormick honor their Rodgers Forge Construction Obligations, neither Defendant has satisfied the outstanding liens and other defaults on the Construction Obligations.

Pursuant to their Rodgers Forge Construction Obligations, Defendants Moore and McCormick were also obligated to cause the on-time, on-budget completion of the renovation of the Rodgers Forge Property.  Defendants failed to cause the on-time, on-budget completion of the renovation of the Rodgers Forge Property – or indeed to complete it at all.

Defendants have also failed to cause the payment of all of the taxes associated with the Rodgers Forge Project.  Prior to  foreclosure by RFC, Triton RF and the Defendants failed to pay approximately $352,612.03 in real estate taxes.

For additional information, RFC refers Defendants to RFC's document production.

**10.   State the basis for your contention at Paragraph 55 of the Complaint that the "Defendants Moore and McCormick have breached their obligations under the Montrose Guaranty by failing to perform as required."**

**Response:** Subject to its General Objections, RFC responds that as set forth in the Montrose Guaranty, Moore and McCormick  were required to indemnify RFC against any "loss,

- 11 -

damage or liability suffered by [RFC]" to the extent such loss arises out of, among other things, any of the following:

> (a) Montrose's failure to pay taxes, assessments or other charges which could result in prior liens against any portion of the Montrose Property;
>
> (b) a material misrepresentation or breach of warranty by Montrose, Triton Pavilion, Pavilion, Moore, or McCormick in connection with the development or operation of the Montrose Property, the making of the Montrose Loan, or any certificates or documents provided in connection therewith; or
>
> (c) retention by Montrose, Triton Pavilion, Pavilion, Moore, or McCormick of any income arising with respect to the Montrose Property following an event of default under the Montrose Loan.

(collectively, the "Montrose Specific Obligations").  Moore and McCormick also guaranteed that substantial completion of each portion of the construction of the Project (as defined in the Montrose Loan Agreement) would be attained on time, free and clear of all mechanics' and materialmen's liens and claims, and within the specified budget (the "Montrose Construction Obligations").  In addition, Moore and McCormick agreed to indemnify and hold RFC (and certain other persons such as RFC affiliates and officers) harmless for any and all claims, demands, suits, losses, damages or expenses in connection with the existence of any "Hazardous Substance" or "Environmental Condition" associated with the Montrose Property (the "Montrose Environmental Obligations").

Following default by Montrose, on or about April 27, 2007, RFC notified Defendants of their obligations under the Montrose Guaranty.  Specifically, RFC indicated that Moore and McCormick were in breach of the Montrose Specific Obligations and the Montrose Construction

Obligations because all work on the Montrose Property had ceased and at least ten (10) mechanics' liens had been filed against the Montrose Property.  For further information, RFC refers Defendants to its document production.

Despite RFC's demand that Moore and McCormick honor their Construction Obligations, neither Defendant satisfied the outstanding liens and other defaults on the Construction Obligations.   Indeed, the defaults under the Montrose Loan Agreement and the Montrose Guaranty only accumulated further.

Defendants breached the Montrose Construction Obligations by allowing in excess of $7 million in mechanics' liens to be filed against the Montrose Property.  Defendants also failed to cause the payment of $562,155.76 in taxes owed on the Montrose Property.

Defendants breached the Montrose Environmental Obligations by failing to pay for in excess of $1.5 million in unfinished environmental remediation at the Montrose Property.

For additional information, RFC refers Defendants to RFC's document production.


Dated: 7/29/09

Howard H. Stahl (D. Md. Bar No. 24741)
Jennifer Quinn-Barabanov (D. Md. Bar No.
  16499)
George R. Calhoun, V (D. Md. Bar No.
  25018)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902

*Attorneys for Plaintiff* RFC TRS, LLC

- 13 -

## VERIFICATION

The information in the foregoing Responses and Objections of RFC to Defendants' First Set of Interrogatories were prepared with the assistance and advice of counsel and are based on my personal knowledge or on the records, information and knowledge of RFC's employees or its attorneys. I am informed and believe that the matters stated in the responses are true and on that basis, I affirm under the penalties of perjury on the 28th day of April, 2009 that the information contained in the foregoing is true and correct to the best of my knowledge, information and belief.

Daniel Farr
Chief Financial Officer

# EXHIBIT 6

LOAN AGREEMENT

Dated: As of April 14, 2006

Among

**TRITON RODGERS FORGE, LLC,** a Delaware limited liability company

as "Borrower"

and

**CBRE REALTY FINANCE TRS, LLC,** a Delaware limited liability company

as "Lender"

-1-



Exhibit _4_

6-19-09    pmc

**RFCCM00041**

## LOAN AGREEMENT

This Loan Agreement (hereinafter, this "Agreement") is made and entered into as of the 14th day of April, 2006, by and between **TRITON RODGERS FORGE, LLC,** a Delaware limited liability company having an address at c/o Triton Real Estate Partners, LLC, 410 Severn Avenue, Suite B-412, Annapolis, Maryland 21403 (hereinafter, the "Borrower"), and **CBRE REALTY FINANCE TRS, LLC,** a Delaware limited liability company having an address at 185 Asylum Street, 37th Floor, Hartford, Connecticut 06103 (the "Lender).

### WITNESSETH:

1.   BACKGROUND.

1.1   Defined Terms and Existing Loan

Pursuant to a Promissory Note dated October 31, 2005 (the "Original Note") by Borrower in favor of CBRE REALTY FINANCE HOLDINGS, LLC, predecessor in interest to Lender, Lender previously extended to Borrower a loan in the principal amount of up to $18,280,000 (the "Original Loan").

Borrower has requested, and Lender has agreed, to amend the Original Loan to, *inter alia*, increase the principal amount to be advanced under the Original Note and to extend the original Maturity Date as set forth and defined in the Original Note.

As a condition of entering into the modification of the Loan as set forth above, Lender has required that Borrower execute and deliver an Amended and Restated Promissory Note, amending and restating the Original Note in its entirety, and further, Lender has required that Borrower execute and deliver this Agreement.

Capitalized terms used in this Agreement are defined either in Exhibit A, or in specific sections of this Agreement, or in another Loan Document, as referenced in Exhibit A.

1.2   Borrower

Borrower is a limited liability company organized under the laws of the State of Delaware. The managing member of the Borrower is Brian A. McCormick, a Maryland resident (hereinafter, the "Managing Member").

1.3   Land and Improvements; Property

Borrower is the sole member and sole managing member of Rodgers Forge Apartments, GP, LLC, a Maryland limited liability company ("Rodgers Forge Apartments"). Rodgers Forge Apartments is the sole general partner of Rodgers Forge Apartments Realty Company Limited Partnership ("Owner"), a Maryland limited partnership. Borrower is the sole limited partner of Owner. Owner is the fee owner of a certain parcel of land located in Baltimore County, Maryland (hereinafter, the "Land"). The Land is currently improved by a multi-family rental project and each and every appurtenance and other improvement related thereto (the "Improvements"). The Land and Improvements are collectively called the "Property". The

RFCCM00042

Improvements are contemplated to be converted to a residential for sale condominium project, and the Units therein to be sold in accordance with the Budget and the Sales Pricing Plan.

1.4     Use of Loan Proceeds

Lender has previously advanced the sum of $18,280,000 pursuant to the Original Note. Borrower has applied to the Lender for an increase to and amendment of the Original Loan (the Original Loan, as so amended and modified hereby, hereinafter, the "Loan") in the amount of Twenty Two Million Seventy Three Thousand Two Hundred Dollars ($22,073,200.00) (hereinafter, the "Loan Amount"). The Borrower shall (x) use a portion of the proceeds of the Loan to pay for the costs and expenses incident to the closing of the Loan, and (y) advance the remaining proceeds of the Loan set forth in the Budget.

1.5     Guaranties and Indemnities

As an inducement to the Lender to make the Loan, the Managing Member, an individual resident of the State of Maryland, and Mr. Charles W. Moore, an individual resident of the State of New York (hereinafter, singly and collectively, the "Guarantor"), have agreed to furnish certain guaranties and indemnities to the extent provided for in such of the Loan Documents to which each such Guarantor is a party.

1.6     Loan

Subject to all of the terms, conditions and provisions of this Agreement, and of the agreements and instruments referred to herein, Lender agrees to make the Loan to the Borrower.

2.      LOAN PROVISIONS.

2.1     Amount of Loan

In no event shall the amount of the Loan exceed the lesser of: (i) Twenty Two Million Seventy Three Thousand Two Hundred Dollars ($22,073,200.00), or (ii) ninety-seven percent (97%) of the actual Project Costs (when the Loan is aggregated with the original principal amount of the Senior Loan).

2.2     Term of Loan

Unless sooner accelerated pursuant to the terms and conditions hereof, the Loan shall be for a term of thirty six  months (hereinafter, the "Term") commencing on the date hereof and ending on April 1, 2009 (hereinafter, "Maturity Date") subject to extension pursuant to the terms of the Note.

2.3     Interest Rate and Payment Terms

The Loan shall be payable as to interest and principal in accordance with the provisions of this Agreement and the Note. This Agreement also provides for interest at a Default Rate, Late Charges and prepayment rights and fees.

-3-

RFCCM00043

2.3.1 <u>Interest Rate</u>.  The principal amount outstanding under the Loan shall bear interest at the rate of twenty percent (20%) per annum (the "Effective Rate"), compounded on a monthly basis; subject to the conditions and limitations provided for in this Agreement.

2.3.2 <u>Payment, Pay Rate, Accrual, and Calculation of Interest</u>.  That portion of the interest accruing at the Pay Rate shall be: (a) payable in arrears commencing on May 1, 2006 (which shall include all interest accrued from the date hereof to and through such date) and on the last day of each calendar month thereafter (hereinafter, a "Payment Date") until the principal together with all interest and other charges payable with respect to the Loan shall be fully paid; and (b) calculated on the basis of a 360 day year and the actual number of days elapsed.  Interest at the Effective Rate shall be computed from and including the first day of the applicable Interest Period to, but excluding, the last day thereof. All interest accrued at the Effective Rate and not paid on a current basis as a part of the Pay Rate, shall, as of the end of each Interest Period, accrue, and interest thereon at the Effective Rate shall accrue until paid in full in the same manner, with all amounts so accrued, and all interest thereon, to be due and payable in full at Maturity.

2.3.3 <u>Principal</u>.  The entire principal balance of the Loan shall be due and payable in full upon Maturity.

2.3.4 <u>Prepayment</u>

　　　　(a)　　The Borrower may prepay all or any portion of the outstanding balance of the Loan, provided that (x) the Borrower has given the Lender not less than fifteen (15) days prior written notice of its intention to prepay all or any portion of the Loan, and (y) the Borrower pays to the Lender the applicable Prepayment Fee.  Any partial prepayment of principal shall first be applied to any installment of principal then due and then be applied to the principal due in the reverse order of maturity, and no such partial prepayment shall relieve Borrower of the obligation to pay each subsequent installment of principal when due. Notwithstanding such prepayment, the Participation shall continue to remain outstanding until paid in full upon the sale of all residential condominium units comprising the Property have been consummated in third party arms length transactions consistent with the Budget and the Sales Pricing Plan.

2.3.5 <u>Maturity</u>.  At Maturity all accrued unpaid interest, principal and other charges due with respect to the Loan shall be due and payable in full and the principal balance and such other charges, but not unpaid interest, shall continue to bear interest at the Default Rate until so paid.

2.3.6 <u>Method of Payment; Date of Credit</u>.  All payments of interest, principal and fees shall be made in lawful money of the United States in immediately available funds. Payments shall be credited on the Business Day on which immediately available funds are received prior to one o'clock P.M. Eastern Time; payments received after one o'clock P.M. Eastern Time shall be credited to the Loan on the next Business Day.

2.3.7 <u>Billings</u>.  Lender may submit monthly billings reflecting payments due; however, any changes in the interest rate which occur between the date of billing and the due date

-4-

may be reflected in the billing for a subsequent month. Neither the failure of Lender to submit a billing nor any error in any such billing shall excuse Borrower from the obligation to make full payment of all Borrower's payment obligations when due.

2.3.8 Default Rate. Lender shall have the option of imposing, and Borrower shall pay upon billing therefor, an interest rate which is five percent (5%) per annum above the interest rate otherwise payable (hereinafter, the "Default Rate"): (a) following any Event of Default, unless and until the Event of Default is waived by Lender; and (b) after Maturity.

2.3.9 Late Charges. Borrower shall pay, upon billing therefor, a late charge (hereinafter, a "Late Charge") equal to five percent (5%) of the amount of any payment of principal, other than principal due at Maturity, interest, or both, which is not paid within ten (10) days of the due date thereof. Late charges are: (a) payable in addition to, and not in limitation of, the Default Rate, (b) intended to compensate Lender for administrative and processing costs incident to late payments, (c) are not interest, and (d) shall not be subject to refund or rebate or credited against any other amount due.

2.3.10 Participation In addition to the interest to be paid hereunder at the Effective Rate, upon (i) repayment of the Senior Loan, (ii) repayment of the Loan and all interest at the Effective Rate due hereunder, and (iii) repayment to Borrower of Borrower's Required Equity Contribution as set forth in Section 6.2 hereof, plus interest thereon at (and calculated in the same manner as) the Effective Rate, Borrower shall thereafter, upon the consummation of closing by Owner of each Remaining Unit, cause to be paid to Lender an amount equal to twelve and one half percent (12.5%) of the Net Proceeds received by Owner from the sale of each Remaining Unit (the "Participation"), which payment shall be made at the time of and from the proceeds of such closing. The Participation shall remain outstanding and shall be paid by Borrower to Lender notwithstanding the full repayment of the remaining portion of the Loan, and shall continue to be evidenced hereby and by the Loan Documents until each Remaining Unit has been sold by Owner in an arms' length third party sale permitted in accordance with the Sales Pricing Plan or otherwise approved by Lender.

2.4    Loan Fees; Lender's Fees.

2.4.1 Commitment Fee. Borrower has previously paid to Lender a fee in connection with the Original Loan in the amount of $180,280.00. Simultaneously with the execution and delivery hereof Borrower shall pay to Lender an additional fee in the amount of $18,010.00 (hereinafter, collectively, the "Commitment Fee"). The Commitment Fee shall be deemed fully earned as of the date hereof, and shall not be subject to refund or rebate under any circumstances. The Commitment Fee shall not be considered a prepayment towards the Effective Rate of interest hereunder, nor a prepayment of the Principal Amount.

RFCCM00045

2.5    Acceleration

The Loan may be accelerated, at the option of Lender, following an Event of Default, except that upon the occurrence of an Event of Default described in Section 11.1.6 hereof, the Loan shall be accelerated automatically without notice or demand by the Lender. Unless the Lender has already instituted the Default Rate in accordance with the terms and conditions of the Note, upon any such acceleration, all principal, accrued interest and costs and expenses shall be due and payable together with interest on such principal at the Default Rate after acceleration, and any applicable Prepayment Fee.

3.    SECURITY FOR THE LOAN; LOAN AND SECURITY DOCUMENTS.

3.1    Security

The Loan together with interest thereon and all other charges and amounts payable by, and all other obligations of, Borrower and Guarantor to Lender with respect to the Loan, whenever incurred, direct or indirect, absolute or contingent (hereinafter, the "Obligations") shall be secured by the following "Security" which Borrower, and the Guarantor where applicable, agree to provide and maintain:

3.1.1 Pledge of Ownership Interests.  A first priority limited recourse pledge of and security interest in all membership interests in the Borrower by the Guarantor in favor of the Lender (hereinafter, the "Ownership Interest Pledge Agreement").

3.1.2 Guaranty.  A guaranty (hereinafter, collectively, the "Guaranty") from each Guarantor guaranteeing certain obligations of the Borrower to the Lender to the extent provided for in such Guaranty.

3.1.3 IDOT.  A Guaranty (the "IDOT Guaranty") and an Indemnity Deed of Trust and Security Agreement (the "IDOT") from the Owner to and for the benefit of Lender.

3.2    Loan Documents and Security Documents

The Loan shall be made, evidenced, administered, secured and governed by all of the terms, conditions and provisions of the "Loan Documents", each as the same may be hereafter modified or amended, consisting of: (i) this Agreement; (ii) the Note; (iii) the Ownership Interest Pledge Agreement; (iv) the Guaranty; (v) the IDOT Guaranty, (vi) the IDOT; (vii) the UCC financing statements; and (viii) any other documents, instruments, or agreements executed to further evidence or secure the Loan.

The Ownership Interest Pledge Agreement, Guaranty, IDOT Guaranty and IDOT are sometimes collectively referred to as the "Security Documents".

4.    CONTINUING  AUTHORITY  OF  AUTHORIZED  REPRESENTATIVES.
Lender is authorized to rely upon the continuing authority of the persons, officers, signatories or agents hereafter designated (hereinafter, the "Authorized Representatives") to bind Borrower

-6-

RFCCM00046

with respect to all matters pertaining to the Loan and the Loan Documents. Such authorization may be changed only upon written notice to Lender accompanied by evidence, reasonably satisfactory to Lender, of the authority of the person giving such notice and such notice shall be effective not sooner than five (5) Business Days following receipt thereof by Lender. The present Authorized Representatives arc listed on Exhibit C. The Lender shall have a right of approval, not to be unreasonably withheld or delayed, over the identity of the Authorized Representatives so as to assure the Lender that each Authorized Representative is a responsible and senior official of Borrower.

5.    OPERATING BUDGET.

Borrower has submitted to Lender an operating budget (hereinafter, the "Budget") which is annexed hereto as Exhibit E for all costs of acquiring the Property (hereinafter, the "Acquisition Costs"), owning the Property and all other costs, including contingencies and carrying costs, for the Property through the Maturity Date.

6.    LOAN DISBURSEMENT AND BORROWER'S REQUIRED EQUITY CONTRIBUTIONS.

6.1    Procedures and Limits

The Lender shall, subject to compliance with all of the other terms, conditions and provisions of this Agreement, make disbursement of the entirety of the Loan proceeds at closing, with the exception of the Interest Reserve.

6.2    Required Equity Contribution

The Budget contemplates total funding from the combination of the Loan, the Senior Loan and $3,100,000.00 to be contributed by Borrower to Rodgers Forge Apartments prior to the disbursement of the Loan proceeds (hereinafter, the "Required Equity Contribution"). Borrower agrees to make, or to cause Rodgers Forge Apartments to make (as appropriate), Borrower's Required Equity Contribution (to Owner) which shall consist of cash in the amount of $3,100,000 as reflected in the Budget. All of Borrower's Required Equity Contribution shall be made by way of capital contribution and not loan.

6.3    Interest Reserve

Lender shall retain the Interest Reserve and the same shall not be advanced at closing. Provided no Event of Default then exists hereunder, Lender shall advance, on the first day of May, 2006 and on each Payment Date thereafter in payment of the accrued Pay Rate of interest, funds from the Interest Reserve for the payment of such accrued interest, which amount shall be added to the outstanding principal amount and shall thereafter accrue interest at the Effective Rate. In the event of the existence of an Event of Default, or in the event there exist insufficient funds in the Interest Reserve from which to pay accrued and unpaid interest at the Pay Rate, Borrower shall be and remain obligated for the payment of such Pay Rate of interest in accordance with the terms hereof, and nothing in this Section 6.3 is intended or shall be construed to excuse Borrower from making any such payment.

-7-



7.    <u>CONDITIONS PRECEDENT</u>.  It shall be a condition precedent of Lender's obligation to close and fund the Loan that each of the following conditions precedent be satisfied in full, unless specifically waived in writing by Lender at or prior to closing and funding of the Loan:

7.1    <u>Satisfactory Loan Documents</u>

Each of the Loan Documents and Security Documents shall be satisfactory in form, content and manner of execution and delivery to Lender and Lender's counsel.

7.2    <u>Satisfactory Senior Loan Documents</u>

Lender shall have received and approved certified copies of the Senior Loan Documents.

7.3    <u>Intercreditor Agreement</u>

The Lender shall have entered into an acceptable intercreditor or similar agreement with the Senior Lender.

7.4    <u>Required Equity Contribution</u>

The Borrower shall have provided the Lender with evidence of the Borrower's Required Equity Contribution.

7.5    <u>No Material Change</u>

No material adverse change shall have occurred in the financial condition, business, affairs, operations or control of Borrower, Rodgers Forge Apartments, Owner or any Guarantor, since the date of their respective financial statements most recently delivered to Lender.

7.6    <u>Warranties and Representations Accurate</u>

All warranties and representations made by or on behalf of Borrower, Rodgers Forge Apartments, Owner or any Guarantor to Lender shall be true, accurate and complete in all material respects and shall not omit any material fact necessary to make the same not misleading in any material respect.

7.7    <u>Financials and Appraisals</u>

Lender shall have received and approved: (i) financial statements from the Borrower, Rodgers Forge Apartments, Owner and each Guarantor complying with the standards set forth in Section 9.2; and (ii) an appraisal of the Property from an appraiser acceptable to Lender setting forth an appraised Value of the Property which results in a Loan to Project Cost ratio of not in excess of 97%.

7.8    <u>Validity and Sufficiency of Security Documents</u>

RFCCM00048

The Security Documents shall create a valid and perfected lien on the property described therein (hereinafter, the "Collateral") and each of the Security Documents and related UCC filings shall have been duly recorded and filed to the satisfaction of Lender and Lender's counsel.

### 7.9   No Other Liens; Taxes and Municipal Charges Current

The Collateral shall not be subject to any liens or encumbrances, whether inferior or superior to the Loan Documents or the Security Documents, except in respect of personal property taxes not yet due and payable. All real estate taxes, personal property taxes and other municipal charges relating to the Property shall be current.

### 7.10   Compliance With Law

Lender shall have received and approved evidence that:

7.10.1 Present Compliance. All real estate and tangible personal property constituting or intended to constitute Collateral, in all material respects, (to the extent of its present construction or existence), and the Property, each complies with all Legal Requirements including, without limitation, Environmental Legal Requirements, and the provisions of all Licenses and Permits.

7.10.2 No Prohibitions or Violations. There are no Legal Requirements which prohibit or adversely limit the use of the Property for the purposes the same are intended for, nor is there any outstanding and uncured violation of any Legal Requirements including, without limitation, any Environmental Legal Requirements, except as disclosed herein under Section 7.15.

### 7.11   Evidence of Perfection

Lender shall have received such other evidence of the perfection of its security interests as Lender and Lender's counsel may reasonably require.

### 7.12   Condition of Property

There shall have been no material damage or destruction by fire or otherwise to any of the Property.

### 7.13   No Takings

Neither the Property nor any material portion thereof shall have been taken by eminent domain nor shall there be any threat of such a taking.

### 7.14   Insurance

Borrower shall have provided to Lender with respect to the Property evidence of insurance coverages which meet the property, hazard and other insurance requirements set forth on Exhibit D of this Loan Agreement to the satisfaction of Lender and Lender's Consultants.

### 7.15   Hazardous Waste, Hazardous Materials and Toxic Substances

RFCCM00049

Lender shall have received, and in its sole discretion approved, satisfactory reports from acceptable, qualified professionals prepared in accordance with Lender's protocols indicating the acceptability of the environmental risk associated with the Property, addressing the existence of any Hazardous Materials at, or which may affect, the Property and the Property's compliance with Environmental Legal Requirements.

### 7.16   Organizational Documents

Lender shall have received and approved the organizational and authorizing documents of the Borrower, Rodgers Forge Apartments and Owner.

### 7.17   Legal and other Opinions

Lender shall have received and approved legal opinion letters from counsel representing Borrower and Guarantor which meet Lender's legal opinion requirements.

### 8.   WARRANTIES AND REPRESENTATIONS.

Borrower warrants and represents to Lender for the express purpose of inducing the Lender to enter into this Agreement, to make the Loan, and to otherwise complete all of the transactions contemplated hereby that as of the date of this Agreement, upon the date the Loan is funded and at all times thereafter until the Loan has been repaid and all obligations to Lender has been satisfied as follows:

### 8.1   Financial Information

True, accurate and complete financial statements of Borrower, Rodgers Forge Apartments, Owner and each Guarantor have been delivered to Lender and the same fairly present the financial condition of each such Person as of the date thereof and no material and adverse change has occurred in such financial condition since the date thereof. All financial statements of such parties hereafter furnished to Lender shall be true, accurate and complete, in all material respects, and shall fairly present the financial condition of such party as of the date thereof.

### 8.2   No Violations

The consummation of the Loan and the subsequent payment and performance of the Obligations evidenced and secured by the Loan Documents shall not constitute a violation of, or conflict with, any law, order, regulation, contract, agreement or organizational document to which Borrower is a party or by which it or its property is or may be bound.

### 8.3   No Litigation

Except as set forth on Schedule 8.3 attached hereto, there is no material litigation now pending, or to the best of Borrower's knowledge threatened, against Borrower, Rodgers Forge Apartments, Owner or any Guarantor which if adversely decided could materially impair the ability of such party to pay and perform its obligations. There is no litigation, whether or not material, pending, or to the best of Borrower's knowledge threatened, against Borrower, Rodgers Forge Apartments, Owner or any Guarantor which is not covered by insurance.

RFCCM00050

### 8.4   Required Licenses and Permits

All Licenses and Permits which are reasonably required in order to operate the Improvements and to operate the Property as contemplated hereby, have been duly and properly obtained. All such Licenses and Permits once obtained shall remain in full force and effect and shall be complied with in all material respects.

### 8.5   Good Title and No Liens

Owner is the lawful owner of the Land and of areas over, under or on which utility or passage easements are required to make use of the Improvements and parking as contemplated hereby and by the documents referred to herein, and is the lawful owner of the Improvements, free and clear of all liens and encumbrances of any nature whatsoever, except for the matters, if any, which are listed as Permitted Title Exceptions, which Permitted Exceptions includes the lien of two (2) indemnity deeds of trust securing each of the loans defined herein as the Senior Loan. On the date hereof, (i) Rodgers Forge Apartments is the sole general partner of the Owner; (ii) Borrower is the sole owner of 100% of the membership interests in Rodgers Forge Apartments, (iii) Borrower is the sole owner of 100% of the limited partnership interest of the Owner.

### 8.6   Use of Proceeds

The proceeds of the Loan have and shall be used solely and exclusively for the purposes set forth in Section 1.4 hereof. No portion of the proceeds of the Loan shall be used directly or indirectly, and whether immediately, incidentally or ultimately (x) to purchase or carry any margin stock or to extend credit to others for the purpose thereof or to repay or refund indebtedness previously incurred for such purpose, or (y) for any purpose which would violate or in inconsistent with the provisions of regulations of the Board of Governors of the Federal Reserve System including, without limitation, Regulations G, T, U and X thereof.

### 8.7   Entity Matters.

### 8.7.1 Organization.

(i)   Borrower is a single purpose bankruptcy-remote limited liability company which is a duly organized and validly existing limited partnership in good standing under the laws of the State of Delaware, and is duly qualified in each jurisdiction where the nature of its business is such that qualification is required, and has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Loan Agreement and the other Loan Documents to which it is party.

(ii)   Rodgers Forge Apartments is a single purpose bankruptcy-remote limited liability company which is a duly organized and validly existing limited partnership in good standing under the laws of the State of Maryland, and is duly qualified in each jurisdiction where the nature of its business is such that qualification is required, and has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as

-11-

RFCCM00051

contemplated by this Loan Agreement and the other Loan Documents to which it is party.

(iii)   Owner is a single purpose bankruptcy-remote limited partnership which is a duly organized and validly existing limited partnership in good standing under the laws of the State of Maryland, and is duly qualified in each jurisdiction where the nature of its business is such that qualification is required, and has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Loan Agreement and the other Loan Documents to which it is party.

(iv)   The Managing Member is an individual resident in the State of Maryland.

8.7.2 <u>Ownership and Taxpayer Identification Numbers</u>.  All of the members of Borrower, and a description of the interests of Borrower held by the same, are listed in <u>Exhibit B</u> and no additional interests, or rights or instruments convertible into such interests, shall be issued, nor shall any ownership change. The taxpayer identification number(s) of Borrower, Managing Member and each Guarantor are accurately stated in <u>Exhibit B</u>.

8.7.3 <u>Authorization</u>.  All required membership actions and proceedings have been duly taken so as to authorize the execution and delivery by Borrower of the Loan Documents.

8.8   <u>Valid and Binding</u>

Each of the Loan Documents constitute legal, valid and binding obligations of Borrower and, where applicable, Guarantor; subject to bankruptcy, insolvency and similar laws of general application affecting the rights and remedies of creditors and, with respect to the availability of the remedies of specific enforcement, subject to the discretion of the court before which any proceeding therefor may be brought.

8.9   <u>Deferred Compensation and ERISA</u>

8.9.1 Borrower does not have any pension, profit sharing, stock option, insurance or other arrangement or plan for employees covered by Title IV of the Employment Retirement Income Security Act of 1974, as now or hereafter amended (hereinafter, "ERISA") (hereinafter, the "ERISA Plan") and no "Reportable Event" as defined in ERISA has occurred and is now continuing with respect to any such ERISA Plan.  The granting of the Loan, the performance by Borrower of its obligations under the Loan Documents and Borrower's conducting of its operations do not and will not violate any provisions of ERISA.

8.9.2 Neither Borrower, any principal of Borrower, nor any ERISA Affiliate of the foregoing is an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower, any principal of Borrower or any ERISA Affiliate constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3 101. The consummation of the transaction contemplated hereby will not constitute or result in any transaction prohibited by Section 406 of ERISA or Section 4975 of the Code.

-12-

RFCCM00052

### 8.10   No Material Change; No Default

From the date of the Original Loan, there has been no material adverse change in the financial condition, business, affairs or control of Borrower, Rodgers Forge Apartments, Owner or any Guarantor. No Default exists under any of the Loan Documents. There is no Default on the part of Borrower or Guarantor under this Agreement or any of the other Loan Documents and no event has occurred and is continuing which could reasonably be expected to constitute a Default under any Loan Document. Borrower has filed all required federal, state and local tax returns and has paid all taxes due pursuant to such returns or any assessments against Borrower or the Property.

### 8.11   No Broker or Finder

Neither Borrower, nor Guarantor, nor anyone on behalf thereof, has dealt with any broker, finder or other person or entity who or which may be entitled to a broker's or finder's fee, or other compensation, payable by Lender in connection with this Loan, except as otherwise disclosed to Lender and reflected on the closing statement prepared in connection with this transaction.

### 8.12   Background Information and Certificates

All of the factual information contained or referred to in Section 1 of this Agreement and in the Exhibits to this Agreement, and in the certificates and opinions furnished to Lender by or on behalf of Borrower in connection with the Property, is true, accurate and complete in all material respects, and omits no material fact necessary to make the same not misleading in any material respect.

### 8.13   Guarantor's Warranties and Representations

Borrower has no reason to believe that any warranties or representations made in writing by Guarantor to Lender are untrue, incomplete or misleading in any material respect.

### 9.   COVENANTS.

Borrower covenants and agrees that from the date hereof and so long as the Lender has any obligation to make the Loan, or any indebtedness is outstanding hereunder, or any of the Loan or other obligations remains outstanding, as follows:

### 9.1   Notices

Borrower shall, with reasonable promptness, but in all events within ten (10) days after it has actual knowledge thereof, notify Lender in writing of the occurrence of any act, event or condition which (x) constitutes a Default under any of the Loan Documents, or the Senior Loan, and/or (y) has had or may have a material adverse affect on the Property, or the financial condition of the Borrower, Rodgers Forge Apartments, Owner or any Guarantor, as reflected on the most recent financial statements delivered to the Lender in accordance with the terms and conditions of this Agreement. Such notification shall, in the case of clause (x), include a written statement of any remedial or curative actions which Borrower proposes to undertake to cure or remedy such Default.

RFCCM00053

9.2     Financial Statements and Reports

. Borrower shall furnish or cause to be furnished to Lender from time to time, the following financial statements and reports and other information, all in form, manner of presentation and substance acceptable to Lender:

9.2.1 Financial Statements and Reports.

(i)     So long as any portion of the Senior Loan remains outstanding, the Borrower shall furnish or cause to be furnished to the Lender duplicate copies of all of the financial statements, reports and other information delivered by the Borrower, Rodgers Forge Apartments, Owner or any Guarantor to the Senior Lender pursuant to the requirements of the Senior Loan Agreement and the other Senior Loan Documents at such times, and in such form and manner of presentation, as such financial statements, reports and other information are delivered to the Senior Lender pursuant to the terms and conditions of the Senior Loan Agreement and the other Senior Loan Documents.

(ii)     To the extent Rodgers Forge Apartments' and Owner's obligations to the Senior Lender under the Senior Loan Agreement and the other Senior Loan Documents are satisfied in full, the Borrower hereby agrees to continue to provide the Lender with the financial statements, reports and other information referred to in Section 9.2.1(i) above at such times, and in such form and manner of presentation, as referred to in Section 9.2.1(i) above.

(iii)     In addition to the financial statements, reports and . other information referred to in Sections 9.2.1(i) and 9.2.1(ii) above, the Borrower hereby agrees to provide, from time to time during the term hereof, such other information and reports, financial and otherwise, concerning the Borrower, Rodgers Forge Apartments, Owner and the operation of the Property as Lender may reasonably request; including, but not limited to a monthly rent roll and arrearage report, monthly sales activity reports, and copies of each executed sale contract for the sale of any unit(s) (which shall be delivered to Lender within ten days of the execution thereof).

9.2.2 Entity Notices. Concurrently with the issuance thereof, copies of all written notices with respect to defaults or capital contributions given or received by any member of Borrower, of Rodgers Forge Apartments and/or of Owner.

9.3     Payment of Taxes and other Obligations

Subject to the right to contest as set forth in Section 10.1 Borrower shall duly pay and discharge, or cause Rodgers Forge Apartments or Owner to pay and discharge, before the same shall become overdue, all taxes, assessments and other governmental charges payable by it or with respect to the Property, as well as all claims or obligations for labor, materials, supplies or services (involving an amount in excess of $25,000.00 in any instance or $100,000.00 in the aggregate) or for borrowed funds in any amount.

-14-

RFCCM00054

### 9.4   Conduct of Business; Compliance With Law

As an express inducement to the Lender to make and maintain the Loan, the Borrower shall not (and as applicable shall not permit others to):

9.4.1 engage in any business or activity other than the ownership of 100% of the membership interests in Rodgers Forge Apartments; and 100% of the limited partnership interests in Owner, permit Rodgers Forge Apartments to engage in any business or activity other than the ownership of 100% of the general partnership interests in Owner; or permit Owner to engage in any business or activity other than the ownership, operation, improvement, development, sale, marketing, construction and maintenance of the Property;

9.4.2 acquire or own any material assets other than as described in Section 9.4.1 above;

9.4.3 merge into or consolidate, or permit Rodgers Forge Apartments or Owner to merge into or consolidate, with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's prior written consent;

9.4.4 fail, or permit Rodgers Forge Apartments or Owner to fail to observe its respective organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State of Maryland, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its organizational documents;

9.4.5 own, or permit Rodgers Forge Apartments or Owner to own, any subsidiary or make any investment in, any person or entity without the prior written consent of Lender;

9.4.6 incur, or permit Rodgers Forge Apartments or Owner to incur, any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (with respect to Borrower only) the Senior Loan, and, with respect to Owner, suppliers and other trade payables in the ordinary course of its business of owning and operating the Property, provided that such trade payables debt is not evidenced by a note, is unsecured and is paid when due;

9.4.7 become, or permit Rodgers Forge Apartments or Owner to become, insolvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

9.4.8 fail, or permit Rodgers Forge Apartments or Owner to fail, to maintain its records, books of account and bank accounts separate and apart from those of its members, partners, principals and affiliates, the affiliates of its members, partners or principals, and any other person or entity;

9.4.9 enter into or permit Rodgers Forge Apartments or Owner to enter into any contract or agreement with any partner, principal or affiliate, or any member, general partner, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially

-15-

RFCCM00055



similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or affiliate, or any partner, principal or affiliate thereof;

9.4.10 seek or permit the dissolution or winding up in whole, or in part, of Borrower, Rodgers Forge Apartments or Owner;

9.4.11 fail to correct any known misunderstandings regarding its separate identity;

9.4.12 guarantee or become obligated for (or permit Rodgers Forge Apartments or Owner to guarantee or become obligated for) the debts of any other entity or person or hold itself out to be responsible for the debts of another Person other than with respect to the Loan and the Senior Loan, as applicable;

9.4.13 make any loans or advances (or permit Rodgers Forge Apartments or Owner to make any loans or advances) to any third party, including any partner, principal or affiliate, or any member, partner, principal or affiliate thereof, or acquire obligations or securities of any member, partner, principal or affiliate, or any member, general partner, or affiliate thereof, except for the capital contribution from Borrower to Rodgers Forge Apartments contemplated hereby;

9.4.14 fail to file its own tax returns;

9.4.15 fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any member, partner, principal or affiliate of Borrower, or any member, partner, principal or affiliate thereof);

9.4.16 fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

9.4.17 file or consent to the filing, or permit Rodgers Forge Apartments or Owner to file or consent to the filing, of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors;

9.4.18 share any common logo or hold itself out as or be considered as a department or division of (i) any partner, principal, member or affiliate of Borrower, (ii) any affiliate of a partner, principal or member of Borrower, or (iii) any other person or entity;

9.4.19 fail to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

9.4.20 pledge (or permit Rodgers Forge Apartments or Owner to pledge) its assets for the benefit of any other person or entity, other than, with respect to the Loan and (with respect to Borrower and Owner) the Senior Loan;

RFCCM00056

9.4.21 fail to maintain a sufficient number of employees in light of its contemplated business operations;

9.4.22 modify, amend or alter in any way, or permit Rodgers Forge Apartments or Owner to modify, amend or alter in any way, the organizational document of any of Borrower, Rodgers Forge Apartments or Owner;

9.4.23 allow any new member to be admitted into the entity comprising Borrower, Rodgers Forge Apartments or Owner;

9.4.24 permit or allow any Person other than (i) Managing Member to have responsibility for the management of Borrower as manager or managing member, (ii) Borrower to have responsibility for the management of Rodgers Forge Apartments as manager or managing member, or (iii) Rodgers Forge Apartments to have responsibility for the management of Owner as manager or managing member.

9.5     Insurance

Borrower shall at all times maintain or cause to be maintained (or cause Rodgers Forge Apartments or Owner to maintain):   (a) those policies of insurance required pursuant to Exhibit D attached hereto and incorporated herein by reference; and (b) such other policies as reasonably required by Lender and which are customarily obtained for other property and buildings similar to the premises in nature, use, location, height, and type of construction; with all of the foregoing including types of insurance, insureds, named insureds, additional insureds, amounts of coverages and insurance carriers approved by the Lender, in Lender's reasonable discretion.  All policies of insurance shall be in amounts no less than the amounts set forth on Exhibit D and shall be maintained with the companies identified on Exhibit D (if any) or such other companies as shall be approved by Lender, in Lender's reasonable discretion..

9.6     Restrictions on Liens, Transfers and Additional Debt.

9.6.1 Prohibited Transactions.  Except for Permitted Transactions, Borrower shall not, and shall not permit Rodgers Forge Apartments or Owner to:

(i)     create or incur, or suffer to be created or incurred, or to exist, any encumbrance, mortgage, pledge, lien, charge or other security interest of any kind upon any of its assets of any character whether or not related to the Property, or any portion thereof, whether now owned or hereafter acquired or upon the proceeds or products thereof, except the security interests and mortgage liens granted in favor of the Senior Lender pursuant to the Senior Loan Documents;

(ii)    create or incur any indebtedness for borrowed funds with respect to the Property whether secured or unsecured either directly or as a guarantor except for the Loan and the Senior Loan;

(iii)   directly or indirectly permit any sale, transfer, exchange, assignment or pledge of or grant of any security interest in any ownership

-17-

RFCCM00057

interests in Borrower (except pursuant to the Ownership Interest Pledge Agreement), Rodgers Forge Apartments or Owner; or

(iv)   sell, convey, transfer or exchange any of its assets of any character whether or not related to the Property, or any portion thereof, whether now owned or hereafter acquired, other than Owner's sale of individual Units in the ordinary course of business to the extent consistent with the then applicable Sales Pricing Plan and Project Budget, or otherwise as approved by Lender.

9.6.2 <u>Permitted Transactions</u>.  The term "Permitted Transactions" shall mean Permitted Transfers, Permitted Additional Debt and Permitted Title Exceptions.

9.6.3 <u>Permitted Transfers</u>.  The term "Permitted Transfers" shall mean:

(i)   the Security Documents and other agreements in favor of Lender;

(ii)   the Senior Loan Documents in favor of the Senior Lender;

(iii)   the distribution of the Loan proceeds to the Borrower, solely for the purposes set forth in this Agreement;

(iv)   transactions, whether outright or as security, for which Lender's prior written consent has been obtained, which consent may be withheld, granted or granted conditionally, subject to such protective and other conditions as Lender may require in its sole and absolute discretion.

9.6.4 <u>Permitted Additional Debt</u>.  The term "Permitted Additional Debt" shall mean:

(i)   transactions, whether secured or unsecured, for which Lender's prior written consent has been obtained, which consent may be withheld, granted or granted conditionally subject to such protective and other conditions as Lender may require in its sole and absolute discretion;

(ii)   indebtedness incurred by Owner in the ordinary course of business for the purchase of goods or services which are payable, without interest, within thirty (30) days of billing; and

(iii)   indebtedness incurred by Borrower and Owner pursuant to the Senior Loan.

9.6.5 <u>Additional Funds</u>.  All funds required for the Property in excess of those available from the Loan and the Senior Loan shall be provided by Borrower, Rodgers Forge Apartments, Owner and/or Guarantor, as additional equity contributions.

9.6.6 <u>Right To Accelerate Loan</u>.  The Loan shall become due and payable in full, and the Lender shall have the right to accelerate the Loan and declare an Event of Default, at the option of Lender, upon any breach or violation of the provisions of Section 9.6; provided,

-18-

however upon the occurrence of an Event of Default described in Section 11.1.6 below, the Loan shall be accelerated without notice or demand.

9.7     Limits on Guaranties.

Borrower shall not guarantee to anyone other than Lender the obligations of any person or entity.

9.8     Restrictions on Investments

.  Borrower will not make or permit to exist or to remain outstanding any Investment out of proceeds of the Loan, the Property or the Senior Loan.

9.9     Indemnification Against Payment of Brokers' Fees

Borrower agrees to defend, indemnify and save harmless Lender from and against any and all liabilities, damages, penalties, costs, and expenses, relating in any manner to any brokerage or finder's fees in respect of the Loan.

9.10    Limitations On Certain Transactions

Borrower shall not, and shall not permit Rodgers Forge Apartments or Owner to, dissolve or liquidate, nor merge or consolidate with or otherwise acquire all or substantially all of the assets of any other entity.

9.11    Place for Records; Inspection

Borrower shall maintain all of its business records at the address specified at the beginning of this Agreement.  Upon reasonable notice and at reasonable times during normal business hours Lender shall have the right to examine Borrower's business records.  Lender shall use reasonable efforts to not divulge information obtained from such examination to others except in connection with Legal Requirements and in connection with administering the Loan, enforcing its rights and remedies under the Loan Documents and in the conduct, operation and regulation of its banking and lending business (which may include, without limitation, the transfer of the Loan or of participation interests therein).  Any assignee or transferee of the Loan, co-lender, or any holder of a participation interest in the Loan shall be entitled to deal with such information in the same manner and in connection with any subsequent transfer of its interest in the Loan or of further participation interests therein.

9.12    Intentionally Deleted

9.13    Costs and Expenses

Borrower shall pay all costs and expenses reasonably incurred by Lender in connection with the implementation of the Loan, the administration of the Loan, the enforcement of the Lender's rights under the Loan Documents, including, without limitation, legal fees and disbursements, appraisal fees, inspection fees, plan review fees, travel costs, fees and out-of-pocket costs of independent engineers and consultants (hereinafter, collectively, the "Costs").

RFCCM00059

Borrower's obligations to pay such Costs shall include, without limitation, all attorneys' fees and other costs and expenses for preparing and conducting litigation or dispute resolution arising from any breach by Borrower or any Guarantor of any covenant, warranty, representation or agreement under any one or more of the Loan Documents.

### 9.14   Compliance with Legal Requirements

Borrower shall comply, or cause Rodgers Forge Apartments and/or Owner to comply, with all Legal Requirements with respect to the Property.

### 9.15   Indemnification

Borrower shall at all times, both before and after repayment of the Loan, at its sole cost and expense defend, indemnify, exonerate and save harmless Lender and all those claiming by, through or under Lender (hereinafter, each an "Indemnified Party") against and from all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind whatsoever, including, without limitation, attorneys, fees and experts' fees and disbursements, which may at any time be imposed upon, incurred by or asserted or awarded against the Indemnified Party and arising from or out of:

9.15.1 any Hazardous Materials or any violation of, or failure to comply with, any Environmental Legal Requirements all as more particularly provided for in the Environmental Indemnity;

9.15.2 any liability for damage to person or property arising out of any violation of any Legal Requirement, or

9.15.3 any act, omission, negligence or conduct at the Property, or arising or claimed to have arisen, out of any act, omission, negligence or conduct of Borrower, Rodgers Forge Apartments or Owner, or any contractor, sub-contractor, tenant, occupant or invitee thereof which is in any way related to the Property.

Notwithstanding the foregoing, an Indemnified Party shall not be entitled to indemnification in respect of claims arising from acts of its own gross negligence or willful misconduct to the extent that such gross negligence or willful misconduct is determined by the final judgment of a court of competent jurisdiction, not subject to further appeal, in proceedings to which such Indemnified Party is a proper party.

### 9.16   Loan To Cost Covenant.

9.16.1 Loan To Cost.  At all times the ratio (hereinafter, the "Loan To Cost Ratio") obtained by dividing: (i) as of the date of calculation, the aggregate of the outstanding balance of (x) the Loan, and (y) the Senior Loan (plus any unadvanced portion of the Senior Loan), by (ii) the then aggregate Project Budget (both expended and not expended), expressed as a percentage, shall not be greater than 97%.

RFCCM00060

9.16.2 <u>Updated Appraisals</u>. Lender shall have the right at its option, from time to time, to order an update to the Original Appraisal or a new appraisal (hereinafter, collectively, an "Updated Appraisal"). Each Updated Appraisal shall be prepared by the original or more recent appraiser unless Lender makes a good faith determination not to have such appraiser prepare the same in which event the Updated Appraisal shall be prepared at Lender's direction by an appraiser selected by Lender. Any appraiser selected by Lender shall be: (i) an MAI member with not less than ten (10) years experience appraising properties of a similar type to the Property in the general area, (ii) otherwise qualified pursuant to provisions of applicable laws and regulations under and pursuant to which Lender operates, and (iii) each Updated Appraisal shall be in form and substance satisfactory to the Lender, which approval shall not be unreasonably withheld.

9.16.3 <u>Costs of Appraisal</u>. Borrower shall pay for the costs of the Original Appraisal and each Updated Appraisal; provided that Borrower shall not be required to pay for more than one (1) Updated Appraisal in any twelve (12) month period unless a Default has occurred.

9.16.4 <u>Principal Reduction</u>. If at any time the Loan To Cost Ratio is not satisfied, Borrower shall within thirty (30) days following Lender's notice thereof make a principal payment in an amount sufficient to reduce the Loan To Cost Ratio to not more than 97%. It shall be an Event of Default if such payment is not so made.

9.17    <u>Replacement Documentation</u>

Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon surrender and cancellation of such Note or other security document, Borrower will issue, in lieu thereof, a replacement Note or other security document in the same principal amount thereof and otherwise of like tenor.

9.18    <u>ERISA Compliance</u>.

9.18.1 <u>No Prohibited Transaction</u>. Borrower shall not engage in any transaction, nor will it permit or cause any Borrower Affiliate to engage in any transaction, which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

9.18.2 <u>Deliveries</u>. Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as required by Lender in its reasonable discretion, that: (a) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (b) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (c) one or more of the following circumstances is true with respect to Borrower: (i) equity interests in such Person are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101 (b)(2); (ii) less than twenty-five percent (25%) of

RFCCM00061

each outstanding class of equity interests in such Person are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); and (iii) such Person qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (iv) or an investment company registered under The Investment Company Act of 1940.

9.18.3 <u>Operating Company Status</u>.  Until the Loan is paid in full, Borrower will remain at all times an "operating company" as defined in the regulation issued by the U.S. Department of Labor known as the "plan assets regulation," 29 C.F.R. §2510.3-101.

9.19   <u>Senior Loan Documents</u>.

The Borrower shall not permit Owner or Rodgers Forge Apartments to breach the provisions of the Senior Loan Documents, and the Borrower shall not modify or amend, or permit Rodgers Forge Apartments or Owner to modify or amend any of the Senior Loan Documents without the prior written consent of the Lender.

10.   <u>SPECIAL PROVISIONS</u>.

10.1   <u>Right to Contest</u>.

10.1.1 <u>Taxes and Claims by Third Parties</u>.  Notwithstanding the provisions of Section 9.3 which obligate Borrower to pay taxes and other obligations to third parties when due, it is agreed that any tax, assessment, charge, levy, claim or obligation to a third party (expressly excluding an obligation created under the Loan Documents) need not be paid if the validity or amount thereof shall be contested currently, diligently and in good faith by appropriate proceedings and if Borrower shall have adequate unencumbered (except in favor of Lender) cash reserves with respect thereto, and further provided that such contest does not create a default by landlord under any lease assigned to Lender; and provided, further, that Borrower shall pay all taxes, assessments, charges, levies or obligations: (i) immediately upon the commencement of proceedings to enforce any lien which may have attached as security therefor, unless such proceeding is stayed by proper court order pending the outcome of such contest; and (ii) as to claims for labor, materials or supplies, prior to the imposition of any lien on the Property unless the lien is discharged or bonded as set forth in Section 11.1.7.

10.1.2 <u>Legal Requirements</u>.  Borrower may contest in good faith any claim, demand, levy or assessment under any Legal Requirements by any person or entity if: (i) the contest is based upon a material question of law or fact raised by Borrower in good faith; (ii) Borrower properly commences and thereafter diligently pursues the contest; (iii) Borrower demonstrates to Lender's reasonable satisfaction that Borrower has the financial capability to undertake and pay for such contest and any corrective or remedial action then or thereafter reasonably likely to be necessary; (iv) if the likely cost of complying with the Legal Requirement in the event the contest is not successfully resolved, as determined reasonably by Lender, is more than $25,000.00, there is no reason to believe that the contest will not be resolved prior to the Maturity Date; (v) no Event of Default exists; and (vi) if the contest relates to an Environmental Legal

-22-

RFCCM00062

Requirement, the conditions set forth in the Environmental Indemnity relating to such contests shall be satisfied.

10.2    Borrower Fully Liable

The Borrower shall be fully liable for the Loan and the Obligations of the Borrower to the Lender.

10.3    Lender's Consultation Rights

Except with respect to compliance with Environmental Legal Requirements and the handling and disposal of Hazardous Materials, Lender shall have the right from time to time (a) to consult with Borrower regarding the business operation of Rodgers Forge Apartments, Owner and the Property, and the financial and other condition thereof, with Borrower's officers, employees, directors and managers, (b) to discuss with Borrower any significant business issues involved in negotiating a plan of reorganization for Borrower, including Borrower's proposed reorganization plans and operating plans for proceeding following such plan of reorganization coming into effect, and (c) to request from Borrower such forecasts, projections and other financial and business data as Lender may deem reasonably appropriate.

11.    EVENTS OF DEFAULT. The following provisions deal with Default, Events of Default, notice, grace and cure periods, and certain rights of Lender following an Event of Default.

11.1    Default and Events of Default

The term "Default" as used herein or in any of the other Loan Documents shall mean an Event of Default, or any fact or circumstance which constitutes, or upon the lapse of time, or giving of notice, or both, could constitute, an Event of Default. Each of the following events, unless cured within any applicable grace period set forth or referred to below in this Section 11.1., or in Section 11.2., shall constitute an "Event of Default".

11.1.1 Generally. A default by Borrower in the performance of any term, provision or condition of this Agreement to be performed by Borrower, or a breach, or other failure to satisfy, any other term provision, condition, covenant or warranty under this Agreement and such default remains uncured beyond any applicable specific grace period provided for in this Agreement, or as set forth in Section 11.2. below;

11.1.2 Note and Other Loan Documents. A default by Borrower in the performance of any term or provision of the Note, or of any of the other Loan Documents or a breach, or other failure to satisfy, any other term, provision, condition or warranty under the Note, or any other Loan Document, and the specific grace period, if any, allowed for the default in question shall have expired without such default having been cured;

11.1.3 Financial Status and Insolvency.

Any of Borrower, Rodgers Forge Apartments, Owner or any Guarantor shall: (i) admit in writing its inability to pay its debts generally as they become

-23-

RFCCM00063

due; (ii) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (iii) make an assignment for the benefit of creditors; (iv) consent to, or acquiesce in, the appointment of a receiver, liquidator or trustee of itself or of the whole or any substantial part of its properties or assets; (v) file a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law; (vi) have a court of competent jurisdiction enter an order, judgment or decree appointing a receiver, liquidator or trustee, or of the whole or any substantial part of the property or assets of such entity, and such order, judgment or decree shall remain unvacated or not set aside or unstayed for sixty (60) days; (vii) have a petition filed against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law and such petition shall remain undismissed for sixty (60) days; (viii) have, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assume custody or control of such entity or Person or of the whole or any substantial part of its property or assets and such custody or control shall remain unterminated or unstayed for sixty (60) days; (ix) have an attachment or execution levied against any substantial portion of the its property or against any portion of the Collateral which is not discharged or dissolved by a bond within thirty (30) days; or (x) have any material adverse change in its financial condition since the date of this Agreement; or

11.1.4 <u>Liens</u>. A lien for the performance of work, or the supply of materials, or a notice of contract, or an attachment, judgment, execution or levy is filed against the Land or the Improvements and remains unsatisfied or is not discharged or dissolved by a bond (or by cash collateral acceptable to Lender) for a period of thirty (30) days after the Borrower receives written notice of the filing thereof;

11.1.5 <u>Breach of Representation or Warranty</u>. Any material representation or warranty made by Borrower or Guarantor herein or in any other instrument or document relating to the Loan or the Property shall at any time be materially false or misleading, or any warranty shall be materially breached;

11.1.6 <u>Guarantor Default</u>. A default by Guarantor in the performance of any term or provision of any Loan Document to which Guarantor is a party, or the breach, or any other failure to satisfy any other term, provision, condition or warranty imposed upon the Guarantor in any other Loan Document to which it is a party or by which Guarantor is bound which is not cured in accordance with the cure periods under Section 11.2;

11.1.7 <u>Plan Assets</u>. If any of Borrower or any Principal is deemed to hold "plan assets" within the meaning of ERISA or any regulations promulgated thereunder of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Tide I of ERISA or any plan (within the meaning of Section 4975 of the Code);

11.1.8 <u>Judgments</u>. There shall occur any uninsured final judgment in excess of $100,000.00 against Borrower, Rodgers Forge Apartments, Owner or Guarantor and shall

-24-

RFCCM00064

remain in force, undischarged, unsatisfied and unstayed, for more than thirty (30) days, whether or not consecutive, unless such party is diligently pursuing an appeal of such judgment after posting a bond acceptable to the lender, acting reasonably;

11.1.9 Senior Loan.  The occurrence of an event of default under the Senior Loan, as evidenced under the Senior Loan Documents

11.2    Grace Periods and Notice

As to each of the foregoing events the following provisions relating to grace periods and notice shall apply:

11.2.1 No Notice or Grace Period.   There shall be no grace period and no notice provision with respect to the nonpayment of interest and principal at Maturity as and when required by the terms and conditions of this Agreement and no grace period and no notice provision with respect to defaults related to the voluntary filing of bankruptcy or reorganization proceedings or an assignment for the benefit of creditors, or with respect to nonmonetary defaults which are not reasonably capable of being cured, or with respect to a breach of warranty or representation under Sections 8.1. (regarding Financial Information), or with respect to breaches under Sections 9.6 (Restrictions on Liens, Transfers and Additional Debt), and 9.7 (Limits on Guaranties), or with respect to the occurrence of an event of default under the Senior Loan.

11.2.2 Other Monetary Defaults.   All other monetary defaults (including, without limitation, the elimination of any Equity Deficiency) shall have a five (5) day grace period following written notice from Lender, or, if shorter, a grace period without notice until five (5) Business Days before the last day on which payment is required to be made in order to avoid: (i) the cancellation or lapse of required insurance, (ii) a tax sale or the imposition of late charges or penalties in respect of taxes or other municipal charges; and

11.2.3 Nonmonetary Defaults Capable of Cure.  As to non-monetary defaults which are reasonably capable of being cured or remedied, unless there is a specific shorter or longer grace period provided for in this Loan Agreement or in another Loan Document, there shall be a thirty (30) day grace period following written notice from Lender or, if such default would reasonably require more than thirty (30) days to cure or remedy, such longer period of time not to exceed a total of ninety (90) days from Lender's notice as may be reasonably required so long as Borrower shall commence reasonable actions to remedy or cure the default within thirty (30) days following such notice and shall diligently prosecute such curative action to completion within such ninety (90) day period.  However, where there is an emergency situation in which there is danger to person or property such curative action shall be commenced as promptly as possible. As to breaches of warranties and representations (other than those related to financial information or construction documents) there shall be a thirty (30) day grace period following notice from Lender.

11.3    Certain Remedies

If an Event of Default shall occur:

-25-

RFCCM00065

11.3.1 <u>Accelerate Debt</u>. Lender may declare the indebtedness evidenced by the Note and secured by the Security Documents immediately due and payable (provided that in the case of a voluntary petition in bankruptcy filed by Borrower or an involuntary petition in bankruptcy filed against Borrower (after expiration of the grace period, if any, set forth in Section 11.1), such acceleration shall be automatic); and

11.3.2 <u>Pursue Remedies</u>.   Lender may pursue any and all remedies provided for hereunder, or under any one or more of the other Loan Documents.

12.    ADDITIONAL REMEDIES.

12.1    <u>Interest and other Charges</u>

Borrower shall be liable to Lender for all sums paid or incurred to lease, operate, or market and sell the Property whether so paid or incurred pursuant to the provisions of this Section or otherwise, and all payments made or liabilities incurred by Lender hereunder of any kind whatsoever shall be paid by Borrower to Lender upon demand with interest at the Default Rate as provided in this Agreement from the date of payment by Lender to the date of payment to Lender and repayment of such sums with such interest shall be secured by the Security Documents.

12.2    <u>Power of Attorney</u>

For the purpose of exercising the rights granted by this Section 12, as well as any and all other rights and remedies of Lender, Borrower hereby irrevocably constitutes and appoints Lender (or any agent designated by Lender) its true and lawful attorney-in-fact, exercisable upon and following any Event of Default, to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of Borrower.

13.    SECURITY INTEREST AND SET-OFF.

13.1    <u>Security Interest</u>

Borrower and Guarantor hereby grant to the Lender, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender or any affiliate.

13.2    <u>Set-Off</u>

If any payment is not made when due under any of the Loan Documents, after giving regard to applicable grace periods, if any, or if any Event of Default or other event which would entitle Lender to accelerate the Loan occurs, any such deposits, balances or other sums credited by or due from Lender in connection with the Loan, or from any such affiliate of Lender in connection with the Loan, to Borrower may to the fullest extent not prohibited by applicable law at any time or from time to time, without regard to the existence, sufficiency or adequacy of any other collateral, and without notice or compliance with any other condition precedent now or hereafter imposed by statute, rule of law or otherwise, all of which are hereby waived, be set off,

RFCCM00066

appropriated and applied by Lender against any or all of Borrower's Obligations irrespective of whether demand shall have been made and although such obligations may be unmatured, in such manner as Lender in its sole and absolute discretion may determine. Within five (5) Business Days of making any such set off, appropriation or application, Lender agrees to notify Borrower thereof, provided the failure to give such notice shall not affect the validity of such set off or appropriation or application. ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

13.3    Right to Freeze

The Lender shall also have the right, at its option, upon the occurrence of any event which would entitle the Lender to set off or debit as set forth in Section 13.2, to freeze, block or segregate any such deposits, balances and other sums held by Lender in connection with the Loan so that Borrower may not access, control or draw upon the same.

13.4    Additional Rights

The rights of Lender under this Section 13 are in addition to, and not in limitation of, other rights and remedies, including other rights of set off, which Lender may have.

14.    CASUALTY AND TAKING.

14.1    Casualty and Obligation To Repair

In the event of any damage or destruction to the Property or the other Collateral by reason of fire or other hazard or casualty (collectively, a "Casualty"), Borrower shall give immediate written notice thereof to Lender and cause Owner to proceed with reasonable diligence (or, as applicable, cause Rodgers Forge Apartments and/or Owner to proceed), in full compliance with all Legal Requirements and the other requirements of the Loan Documents, to repair, restore, rebuild or replace the affected property (collectively, the "Repair Work").

14.2    Adjustment of Claims

All insurance claims shall be adjusted by Borrower, at Borrower's sole cost and expense, but subject to Lender's prior written approval which approval shall not be unreasonably withheld; provided that if any Default exists under any of the Loan Documents, subject to the rights of the Senior Lender, Lender shall have the right to adjust and compromise such claims without the approval of Borrower.

14.3    Payment and Application of Insurance Proceeds

So long as the Senior Loan remains outstanding, the provisions of the Senior Loan Documents concerning insurance proceeds shall control. Thereafter the following provisions shall control. All proceeds of insurance shall be paid to Lender and, at Lender's option, be

-27-



applied to Borrower's Obligations or released, in whole or in part, to pay for the actual cost of repair, restoration, rebuilding or replacement (collectively, "Cost To Repair"). If the Cost To Repair does not exceed $250,000.00, Lender shall release so much of the insurance proceeds as may be required to pay for the actual Cost to Repair in accordance with the provisions of Section 14.4. Notwithstanding the foregoing, Lender shall also release so much of the insurance proceeds as may be required to pay for the actual Cost To Repair if:

      (i)    in Lender's good faith judgment such proceeds together with any additional funds as may be deposited with and pledged to Lender, on behalf of the Lender, are sufficient to pay for the Cost To Repair;

      (ii)    in Lender's good faith judgment the Repair Work is likely to be completed prior to the Maturity Date; and

      (iii)    no Default exists under the Loan Documents.

14.4    <u>Conditions To Release of Insurance Proceeds</u>

If Lender elects or is required to release insurance proceeds, Lender may impose reasonable conditions on such release which shall include, but not be limited to, the following:

      (i)    Prior written approval by Lender, which approval shall not be unreasonably withheld or delayed of plans, specifications, cost estimates, contracts and bonds for the restoration or repair of the loss or damage;

      (ii)    Waivers of lien, architect's certificates, contractor's sworn statements and other evidence of costs, payments and completion as Lender may reasonably require;

      (iii)    If the Cost To Repair does not exceed $250,000.00, the funds to pay therefor shall be released to Borrower otherwise, funds shall be released upon final completion of the Repair Work, unless Borrower requests earlier funding, in which event partial monthly disbursements equal to 90% of the value of the work completed shall be made prior to final completion of the repair, restoration or replacement and the balance of the disbursements shall be made upon full completion and the receipt by Lender of satisfactory evidence of payment and release of all liens;

      (iv)    Determination by Lender that the undisbursed balance of such proceeds on deposit with Lender, together with additional funds deposited for the purpose, shall be at least sufficient to pay for the remaining Cost To Repair, free and clear of all liens and claims for lien;

      (v)    All work to comply with the standards, quality of construction and Legal Requirements applicable to the construction of the Improvements; and

      (vi)    the absence of any Default under any Loan Documents.

RFCCM00068

14.5    <u>Taking</u>

So long as the Senior Loan remains outstanding, the provisions of the Senior Loan Documents concerning condemnation shall control. Thereafter, the following provisions shall control. If there is any condemnation for public use of the Property or of any Collateral, the awards on account thereof shall be paid to Lender and shall be applied to Borrower's obligations, or at Lender's discretion released to Borrower. If, in the case of a partial taking or a temporary taking, in the sole judgment of Lender the effect of such taking is such that there has not been a material and adverse impairment of the viability of the Property or the value of the Collateral, so long as no Default exists Lender shall release awards on account of such taking to Borrower if such awards are sufficient (or amounts sufficient are otherwise made available) to repair or restore the Property to a condition reasonably satisfactory to Lender and such partial or temporary taking shall not be deemed to violate the provisions of Section 9.6.

15.    <u>ADDITIONAL RIGHTS OF THE LENDER</u>

15.1.1 <u>Participations</u>.    Lender may sell participations to one or more banks or other financial institutions in all or a portion of such Lender's rights and obligations under this Loan Agreement and the other Loan Documents.

15.1.2 <u>Disclosure</u>.    The Borrower agrees that in addition to disclosures made in accordance with standard and customary banking practices Lender may disclose information obtained by pursuant to this Loan Agreement to assignees or participants and potential assignees or participants hereunder. Miscellaneous Assignment Provisions.

16.    <u>GENERAL PROVISIONS.</u>

16.1    <u>Notices</u>

. Any notice or other communication in connection with this Loan Agreement, the Note, or any of the other Loan Documents, shall be in writing, and (i) deposited in the United States Mail, postage prepaid, by registered or certified mail, or (ii) hand delivered by any commercially recognized courier service or overnight delivery service such as Federal Express, addressed:

-29-

RFCCM00069

If to Borrower:

> c/o Triton Real Estate Partners, LLC
> 410 Severn Avenue
> Suite B-412
> Annapolis, Maryland 21403
> Attention: Mr. Brian A. McCormick

With a copy to:

> Steven M. Tyminski, Esq.
> Stevens & Lee
> 620 Freedom Business Center
> Suite 200
> P.O. Box 62330
> King of Prussia, PA 19406

If to Lender:

> CBRE Realty Finance Holdings, LLC
> 185 Asylum Street
> 37th Floor
> Hartford, Connecticut 06103
> Attention: Mr. Andrew Manley

With c copy to:

> J. Richard Saas, Esq.
> Tenenbaum & Saas, P.C.
> 4504 Walsh Street
> Suite 200
> Chevy Chase, Maryland 20815

Any such addressee may change its address for such notices to such other address in the United States as such addressee shall have specified by written notice given as set forth above. All periods of notice shall be measured from the deemed date of delivery.

A notice shall be deemed to have been given, delivered and received for the purposes of all Loan Documents upon the earliest of: (i) if sent by such certified or registered mail, on the third Business Day following the date of postmark, or (ii) if hand delivered at the specified address by such courier or overnight delivery service, when so delivered or tendered for delivery during customary business hours on a Business Day, or (iii) if so mailed, on the date of actual receipt as evidenced by the return receipt, or (iv) if so delivered, upon actual receipt, or (v) if facsimile transmission is a permitted means of giving notice, upon receipt as evidenced by confirmation.

16.2    <u>Limitations on Assignment</u>

RFCCM00070

Borrower may not assign this Agreement or the monies due hereunder or convey or encumber the mortgaged premises or any interest therein without the prior written consent of the Lender in each instance.

16.3   Further Assurances

Borrower shall upon request from Lender from time to time execute, seal, acknowledge and deliver such further instruments or documents which Lender may reasonably require to better perfect and confirm its rights and remedies hereunder, under the Note, and under each of the other Loan Documents.

16.4   Payments

All payments shall be applied first to the payment of all fees, expenses and other amounts due to the Lender (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after an Event of Default, payments will be applied to the Obligations of Borrower to Lender as Lender determines in its sole discretion.

16.5   Parties Bound

The provisions of this Agreement and of each of the other Loan Documents shall be binding upon and inure to the benefit of Borrower and the Lender and its successors and assigns, except as otherwise prohibited by this Agreement or any of the other Loan Documents.

This Agreement is a contract by and among Borrower, the Lender for their mutual benefit, and no third person shall have any right, claim or interest against either Lender, or Borrower by virtue of any provision hereof.

16.6   Governing Law; Consent to Jurisdiction; Mutual Waiver of Jury Trial.

16.6.1 Substantial Relationship.   It is understood and agreed that all of the Loan Documents were negotiated, executed and delivered in the State of Maryland.

16.6.2 Governing Law.   This Agreement and each of the other Loan Documents shall in all respects be governed, construed, applied and enforced in accordance with the internal laws of the State of Maryland without regard to principles of conflicts of law.

16.6.3 Consent to Jurisdiction. Borrower hereby consents to personal jurisdiction in any state or Federal court located within the State of Maryland.

16.6.4 JURY TRIAL WAIVER. BORROWER AND LENDER MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS LOAN AGREEMENT, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR

RFCCM00071

WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR BORROWER LENDER TO ENTER INTO THE TRANSACTIONS CONTEMPLATED HEREBY.

16.7   Survival

All representations, warranties, covenants and agreements of Borrower, or a Guarantor, herein or in any other Loan Document, or in any notice, certificate, or other paper delivered by or on behalf of Borrower or a Guarantor pursuant hereto are significant and shall be deemed to have been relied upon by Lender notwithstanding any investigation made by Lender or any of the Lender or on its behalf and shall survive the delivery of the Loan Documents and the making of the Loan and each advance pursuant thereto. No review or approval by Lender or by Lender's Consultants or any of their representatives, of any plans and specifications, opinion letters, certificates by professionals or other item of any nature shall relieve Borrower or anyone else of any of the obligations, warranties or representations made by or on behalf of Borrower or a Guarantor, or any one or more of them, under any one or more of the Loan Documents.

16.8   Cumulative Rights

All of the rights of Lender hereunder and under each of the other Loan Documents and any other agreement now or hereafter executed in connection herewith or therewith, shall be cumulative and may be exercised singly, together, or in such combination as Lender may determine in its sole good faith judgment.

16.9   Claims Against Lender.

16.9.1 Borrower Must Notify. The Lender shall not be in default under this Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower first had actual knowledge or actual notice of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, with reasonable promptness thereafter. Such actual knowledge or actual notice shall refer to what was actually known by, or expressed in a written notification

-32-

RFCCM00072

furnished to, any of the persons or officials referred to in <u>Exhibit C</u> as Authorized Representatives or of the Property manager.

16.9.2 <u>Remedies</u>.   If it is determined by the final order of a court of competent jurisdiction, which is not subject to further appeal, that Lender has breached any of its obligations under the Loan Documents and has not remedied or cured the same with reasonable promptness following notice thereof, Lender's responsibilities shall be limited to: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of a Loan Document, the obligation to grant such consent or give such approval and to pay Borrower's reasonable costs and expenses including, without limitation, reasonable attorneys' fees and disbursements in connection with such court proceedings; and (ii) the case of any such failure to grant such consent or give such approval, or in the case of any other such default by Lender, where it is also so determined that Lender acted in bad faith, the payment of any actual, direct, compensatory damages sustained by Borrower as a result thereof plus Borrower's reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements in connection with such court proceedings.

16.9.3 <u>Limitations</u>.   In no event, however, shall Lender be liable to Borrower or to Guarantor or anyone else for other damages such as, but not limited to, indirect, speculative or punitive damages whatever the nature of the breach by Lender of its obligations under this Loan Agreement or under any of the other Loan Documents. In no event shall Lender be liable to Borrower or to Guarantor or anyone else unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within the time period specified above.

16.10   <u>Obligations Absolute</u>

Except to the extent prohibited by applicable law which cannot be waived, the Obligations of Borrower and the obligations of the Guarantor under the Loan Documents shall be joint and several, absolute, unconditional and irrevocable and shall be paid strictly in accordance with the terms of the Loan Documents under all circumstances whatsoever, including, without limitation, the existence of any claim, set off, defense or other right which Borrower or any Guarantor may have at any time against Lender whether in connection with the Loan or any unrelated transaction.

16.11   <u>Table of Contents, Title and Headings</u>

Any Table of Contents, the titles and the headings of sections are not parts of this Loan Agreement or any other Loan Document and shall not be deemed to affect the meaning or construction of any of its or their provisions.

16.12   <u>Counterparts</u>

This Loan Agreement and each other Loan Document may be executed in several counterparts, each of which when executed and delivered is an original, but all of which together shall constitute one instrument. In making proof of this agreement, it shall not be necessary to

RFCCM00073

produce or account for more than one such counterpart which is executed by the party against whom enforcement of such loan agreement is sought.

16.13   Time Of the Essence

Time is of the essence of each provision of this Agreement and each other Loan Document.

16.14   Integration/No Oral Change

This Loan Agreement and each of the other Loan Documents is intended by the parties as the final, complete and exclusive statement of the transactions evidenced by this Loan Agreement and the other Loan Documents. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Loan Agreement and each of the Loan Documents, and no party is relying on any promise, agreement or understanding not set forth in this Loan Agreement or any of the other Loan Documents. Further, this Loan Agreement and each of the other Loan Documents may only be amended, terminated, extended or otherwise modified by a writing signed by the party against which enforcement is sought (except no such writing shall be required for any party which, pursuant to a specific provision of any Loan Document, is required to be bound by changes without such party's assent). In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealings or the like be effective to amend, terminate, extend or otherwise modify this Loan Agreement or any of the other Loan Documents.

16.15   Monthly Statements

While Lender may issue invoices or other statements on a monthly or periodic basis (a "Statement"), it is expressly acknowledged and agreed that: (i) the failure of Lender to issue any Statement on one or more occasions shall not affect Borrower's obligations to make payments under the Loan Documents as and when due; (ii) the inaccuracy of any Statement shall not be binding upon Lender and so Borrower shall always remain obligated to pay the full amount(s) required under the Loan Documents as and when due notwithstanding any provision to the contrary contained in any Statement; (iii) all Statements are issued for information purposes only and shall never constitute any type of offer, acceptance, modification, or waiver of the Loan Documents or any of Lender's rights or remedies thereunder; and (iv) in no event shall any Statement serve as the basis for, or a component of, any course of dealing, course of conduct, or trade practice which would modify, alter, or otherwise affect the express written terms of the Loan Documents.

16.16   Relationship

The relationship between the Lender and the Borrower is solely that of a lender and borrower, and nothing contained herein or in any of the other Loan Documents shall in any manner be construed as making the parties hereto partners, joint venturers or any other relationship other than lender and borrower.

16.17   Disclosure of Information

RFCCM00074

Lender may in connection with any sale, transfer or assignment of the Loan, the Loan Documents, and any or all servicing rights with respect thereto, or the granting of any participations therein or issue, or the issuance of mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement, as any such Lender determines necessary or desirable, forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such participations and/or securities or any rating agency rating such securities, and each of the foregoing's respective counsel, copies of all documents and information which Lender now has or may hereafter acquire relating to the debt evidenced by the Loan Documents, to the Borrower, to the Guarantors, or to any Person who may hereafter become a guarantor, any Indemnitor and the Property, which shall have been furnished to the Lender. Without limiting the foregoing, such Lender may from time to time, or if required pursuant to the request of any Governmental Authority, provide copies of the foregoing information to the Borrower's stockholders, Affiliates, officers, employees, auditors, counsel or other professional advisors and any such Governmental Authority.

### 16.18   Confidentiality

The Loan and the Loan Documents have been entered with the Borrower by the Lender, upon the condition that, without the prior written consent of the Lender, the Borrower shall not disclose the terms and conditions of this Agreement to any Person (other than to its employees, auditors, counsel or other professional advisors, or to affiliates, provided such Person agrees to be bound by the confidentiality provisions hereof). The Lender shall have the right to review and approve all public announcements and filings relating to the Loan that refer to the Lender before they are made.

### 16.19   No Novation

Nothing contained herein is intended or shall be construed to constitute a novation or substitution of the Original Loan or the indebtedness evidence thereby, all of which shall remain outstanding without interruption.

-35-

RFCCM00075

IN WITNESS WHEREOF this Agreement has been duly executed and delivered as a sealed instrument as of the _14_ day of ~~March,~~ 2006.

*April*

BORROWER:

                       **TRITON RODGERS FORGE, LLC**
                       A Delaware Limited Liability Company

                       By:    Bellona Holdings, LLC
                               A Delaware Limited Liability Company,
                               Managing Member

                       By:_____(SEAL)
                               Brian A. McCormick
                               Managing Member

RFCCM00076

LENDER:                          **CBRE REALTY FINANCE TRS, LLC**

_____        By: _Andrew A. Manders_
                                 Name: ANDREW A. MANDER
                                 Title: SR. VICE PRESIDENT

-37-

**RFCCM00077**

## EXHIBIT A TO LOAN AGREEMENT

### DEFINITIONS

<u>Acquisition Costs</u> as defined in Section 5 hereof.

<u>Agreement</u> as defined in the Preamble.

<u>Authorized Representatives</u> as defined in Section 4, and listed on <u>Exhibit C</u>.

<u>Borrower</u> as defined in the Preamble.

<u>Borrower Affiliates</u> means any of the following: (a) any subsidiary of Borrower; and (b) any Person in which any Person named in subsection (a) above owns a controlling interest or has the power to direct its board of directors or other managing body.

<u>Business Day</u> shall mean: any day of the year on which offices of Lender are not required or authorized by law to be closed for business in Washington, DC. If any day on which a payment is due is not a Business Day, then the payment shall be due on the next day following which is a Business Day, and such extension of time shall be included in computing interest and fees in connection with such payment. Further, if there is no corresponding day for a payment in the given calendar month (i.e., there is no "February 30th"), the payment shall be due on the last Business Day of the calendar month.

<u>Casualty</u> as defined in Section 14.1.

<u>Closing Date</u> means the date of this Agreement.

<u>Collateral</u> as defined in Section 7.8.

<u>Commitment Fee</u> as defined in Section 2.4.1.

<u>Cost To Repair</u> as defined in Section 14.3.

<u>Costs</u> as defined in Section 9.13.

<u>Creation</u> as defined in Section 1.3.

<u>Default</u> as defined in Section 11.1.

<u>Default Rate</u> as defined in Section 2.3.8.

<u>Dollars</u> shall mean lawful money of the United States.

<u>Effective Rate</u> shall mean the per annum rate of interest of twenty percent (20%) compounded on a monthly basis to the extent not paid hereunder (irrespective of whether accrual of such amount is permitted as of right)

<u>Environmental Indemnity</u> as defined in Section 9.15.1.



-38-

RFCCM00078

Environmental Legal Requirements as defined in the Environmental Indemnity.

ERISA and ERISA Plan each as defined in Section 8.9.

ERISA Affiliate means each Person (as defined in Section 3(9) of ERISA) which together with Borrower or any Subsidiary (as defined under ERISA) thereof, would be deemed to be a member of the same "controlled group" within the meaning of Section 414(b), (c), (m) and (o) of the Internal Revenue Code of 1986, as amended.

Event of Default as defined in Section 11.1.

Guaranty as defined in Section 3.1.2.

Guarantor as defined in Section 1.5.

Hazardous Materials shall mean and include asbestos, flammable materials, mold, explosives, radioactive substances, polychlorinated biphenyls, radioactive substances, other carcinogens, oil and other petroleum products, pollutants or contaminants that could be a detriment to the environment, and any other hazardous or toxic materials, wastes, or substances which are defined, determined or identified as such in any past, present or future federal, state or local laws, rules, codes or regulations, or any judicial or administrative interpretation of such laws, rules, codes or regulations.

Improvements as defined in Section 1.3.

Indemnified Party as defined in Section 9.15.

Indemnitors as defined in Section 3.1.8.

Independent shall mean, when used with respect to any Person, a Person who (i) is in fact independent, (ii) does not have any direct financial or indirect financial interest (other than amounts payable to such Person for serving as a director) in the Borrower or in any Affiliate of any thereof or in any constituent partner or member of the Borrower or any Affiliate of any thereof and (iii) is not connected with the Borrower or any Affiliate thereof or any constituent partner of the Borrower or any Affiliate of any thereof as an officer, employee, promoter, underwriter, trustee, partner, director, or person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning hereof.

Interest Period shall mean a period of one (1) calendar month, except that the first Interest Period shall mean that period from the date of this Agreement to the last day of March, 2006; Provided, however: (i) if the last day of any Interest Period would otherwise occur on a day which is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day; but (iii) if such extension would otherwise cause such last day to occur in a new calendar month, then such last day shall occur on the next preceding Business Day.

RFCCM00079



Investment shall mean the acquisition of any real or tangible personal property or of any stock or other security, any loan, advance, bank deposit, money market fund, contribution to capital, extension of credit (except for accounts receivable arising in the ordinary course of business and payable in accordance with customary terms), or purchase or commitment or option to purchase or otherwise acquire real estate or tangible personal property or stock or other securities of any party or any part of the business or assets comprising such business, or any part thereof.

Land as defined in Section 1.3.

Late Charge as defined in Section 2.3.9.

Legal Requirements shall mean all applicable federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, and the requirements of any governmental agency or authority having or claiming jurisdiction with respect thereto, including, but not limited to, those applicable to zoning, subdivision, building, health, fire, safety, sanitation, the protection of the handicapped, and environmental matters and shall also include all orders and directives of any court, governmental agency or authority having or claiming jurisdiction with respect thereto.

Licenses and Permits shall mean all licenses, permits, authorizations and agreements issued by or agreed to by any governmental authority, or by a private party pursuant to a Permitted Title Exception, and including, but not limited to, building permits, occupancy permits and such special permits, variances and other relief as may be required pursuant to Legal Requirements which may be applicable to the Property.

Liquidation Proceeds shall mean amounts received by the Lender in the exercise of the rights and remedies under the Loan Documents (including, but not limited to, all rents, profits, and other proceeds received by the Lender from the operation of the Property or the liquidation of any Collateral, but not including any amount bid at a foreclosure sale or on behalf of the Lender or otherwise credited to the Borrower in any deed in lieu of foreclosure or similar transaction).

Loan as defined in Section 1.4.

Loan Agreement as defined in the Preamble.

Loan Amount as defined in Section 1.4.

Loan Documents as defined in Section 3.2.

Loan To Cost Ratio as defined in Section 9.16.1.

Maturity shall mean the Maturity Date, or in any instance, upon acceleration of the Loan, if the Loan has been accelerated by the Lender upon an Event of Default.

Net Proceeds means the net sale proceeds to be received by Owner from the sale of any remaining Unit subsequent to the payment of actual costs and expenses incurred in connection with such sale, which costs and expenses shall mean (i) not more than one-half of applicable transfer and recordation tax applicable to the recordation of the deed evidencing such transfer, (ii) normal and customary real estate tax prorations, (iii) a third party sales brokerage fee in an



-40-

amount not in excess of the amount set forth in the Sales Pricing Plan, and (iv) other customary closing costs actually incurred and paid by Owner; but excluding any deduction for repayment of debt, return of or on equity and payment of any fee or expense to any Affiliate of Borrower.

<u>Note</u>.  The Amended and Restated Note payable to Lender in the aggregate principal amount of $22,073,200.00.

<u>Obligations</u> as defined in Section 3.1.

<u>Original Appraisal</u> as defined in Section 9.16.1.

<u>Owner</u>  means of  Rodgers Forge Apartments Realty Company Limited Partnership, a Maryland limited partnership.

<u>Ownership Interest Pledge Agreement</u> as defined in Section 3.1.1.

<u>Participation</u>  as defined in Section 2.3.10

<u>Payment Date</u> as defined in Section 2.3.2.

<u>Pay Rate</u>  shall mean the per annum rate of interest of eight percent (8%).

<u>Permitted Additional Debt</u> as defined in Section 9.6.4.

<u>Permitted Title Exceptions</u> shall mean those exceptions set forth on Schedule B of the Borrower's owner's policy of Title Insurance with respect to the Land.

<u>Permitted Transactions</u> as defined in Section 9.6.2.

<u>Permitted Transfers</u> as defined in Section 9.6.3.

<u>Person</u>  means individual, partnership, joint venture, firm, fund, corporation, limited liability company, association, trust or other enterprise (whether or not incorporated), or any Governmental Authority.

<u>Prepayment Fee</u> shall mean, upon final repayment of the Loan,  an amount equal to the positive difference, if any, between the amount of interest which would accrue on the entire Principal Amount of the Loan at the Effective Rate for a period of eighteen (18) full calendar months, and the amount of all interest that the Borrower has then actually previously paid to the Lender, up to and including the date of any such repayment.

<u>Property</u> as defined in Section 1.3.

<u>Remaining Units</u> means all Units remaining immediately after full repayment of the Senior Loan and the Loan (excluding repayment of the Participation).

<u>Reportable Event</u> as defined in Section 8.9.1.



RFCCM00081



Required Equity Contribution as defined in Section 6.2.

Rodgers Forge Apartments means Rodgers Forge Apartments GP, LLC, a Maryland limited liability company.

Sales Pricing Plan means that pricing plan for the sales of individual condominium units comprising the Property, which is attached to this Agreement as **Exhibit F**.

Security as defined in Section 3.1.

Security Documents as defined in Section 3.2.

Senior Lender means Ohio Savings Bank

Senior Loan shall mean collectively, the acquisition loan of even date with the Original Note between Borrower and the Senior Lender in the original principal amount not to exceed $34,000,000.00, and the revolving line of credit construction loan of even date herewith between Borrower and the Senior Lender in the principal amount of $6,000,000.00.

Senior Loan Documents shall mean the documents, instruments and agreements evidencing the Senior Loan.

Statement as defined in Section 16.15.

UCC means the Uniform Commercial Code in effect in the State of Maryland.

Units means all residential condominium units comprising or to comprise one hundred percent of the existing rental units located within the Improvements.

Updated Appraisal as defined in Section 9.16.2.

Value of the Property as defined in Section 9.16.1.



**RFCCM00082**

EXHIBIT B TO LOAN AGREEMENT

OWNERSHIP INTERESTS AND TAXPAYER IDENTIFICATION NUMBERS

| NAME | MEMBERSHIP INTEREST | SS# |
|------|---------------------|-----|
| Brian A. McCormick | 50% | |
| Charles W. Moore | 50% | |

RFCCM00083

EXHIBIT C TO LOAN AGREEMENT

AUTHORIZED REPRESENTATIVES


BRIAN A McCORMICK


-44-

RFCCM00084

## EXHIBIT D TO LOAN AGREEMENT

## REQUIRED PROPERTY, HAZARD AND OTHER INSURANCE

Borrower shall at all times provide and maintain the following insurance coverages with respect to the Property and the Collateral issued by companies qualified to do business in the State of Maryland, having a Best's Rating of not less than A-/VIII and otherwise acceptable to Lender in its sole discretion:

      (i)    physical insurance on an all-risk basis without exception (including, without limitation, flood required if property is in a "Special Flood Hazard Area" A or V), vandalism and malicious mischief, earthquake, collapse, boiler explosion, sprinkler coverage, cost of demolition, increased costs of construction and the value of the undamaged portion of the building and soft costs coverage) covering all the real estate, fixtures and personal property to the extent of the full insurable value thereof, on a builder's risk non-reporting form prior to completion and occupancy to Occupy Endorsement, having replacement cost and agreed amount endorsements (with deductibles not in excess of it of insurable value);

      (ii)    rent loss or business interruption insurance in an amount equal to one year's projected rentals or gross revenues;

      (iii)    public liability insurance, with underlying and umbrella coverages totaling not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate or such other amounts as may be determined by Lender from time to time;

      (iv)    automobile liability insurance (including non-owned automobile) with a coverage of $1,000, 000 per occurrence during construction;

      (v)    worker's compensation, employer's liability and other insurance required by law;

      (vi)    such other insurance coverages in such amounts as Lender may request consistent with the customary practices of prudent developers and owners of similar properties.

An actual insurance policy or certified copy thereof, or a binder, certificate of insurance, or other evidence of property coverage in the form of Acord 27 (Evidence of Property Coverage), Acord 25 (Certificate of Insurance), or a 30-day binder in form acceptable to Lender with an unconditional undertaking to deliver the policy or a certified copy within thirty (30) days, shall be delivered at closing of the Loan.

Flood insurance shall be provided if the property or the collateral is located in a flood prone, flood risk or flood hazard area as designated pursuant to the Federal Flood Disaster Protection Act of 1973, as amended, and the Regulations thereunder, or if otherwise reasonably required by Lender.

RFCCM00085

EXHIBIT E TO LOAN AGREEMENT

PROJECT BUDGET

RFCCM00086



***TRITON RODGERS FORGE, LLC***
**Rodgers Forge Condominium Conversion -- Financial Model**
**Construction Breakdown**

## Unit Improvements

|       | Units | $/Unit   | Total        |
|-------|-------|----------|--------------|
| 1BR   | 234   | $45,921  | $10,745,514  |
| 2BR   | 266   | $52,516  | $13,969,256  |
| 3BR   | 8     | $54,697  | $437,576     |
|       | 508   | $49,512  | $25,152,346  |

**Exterior & Sitework**

| | |
|---|---|
| Sitework | $2,200,000 |
| Pool/Clubhouse | $1,500,000 |
| Exterior Concrete | $20,000 |
| Masonry | $50,000 |
| Metals | $10,000 |
| Gutters, Fascia, soffitt | $403,200 |
| Roofing | $900,000 |
| Entry Portico | $360,000 |
| Exterior Caprentry | $60,000 |
| Exterior Painting | $120,000 |
| | $5,623,200 |

**Interior Common Space**

| | |
|---|---|
| Interior Signs | $10,000.00 |
| Asbestos Abatement | $100,000 |
| Interior Entry Upgrades | $480,000.00 |
| | $590,000.00 |

| | |
|---|---|
| **Subtotal** | $31,365,546.00 |
| **Contingency** | $3,136,554.60 |
| | $34,502,100.60 |



***TRITON RODGERS FORGE, LLC***
Rodgers Forge Condominium Conversion -- Financial Model
Summary of Soft Costs

<u>*Professional Fees*</u>

| | | |
|---|---|---|
| Banking & Service Charges | Bank Charges | $1,000 |
| Beers & Cutler | Accounting | $100,000 |
| Chesapeake Energy | Baltimore Gas & Electric Consultant | $158,000 |
| CSC | Miscellaneous | $2,060 |
| Daft-McCune-Walker, Inc. | Site Plan/Landscape Architects | $10,000 |
| Delta Associates | Demand Study | $19,000 |
| ECS Mid-Atlantic | Roofing Consultant | $10,000 |
| Eisner Petrou & Associates | Public Relations | $10,640 |
| Greenhorne & O'Mara, Inc | Site Plan Fees & Surveying | $25,000 |
| Koffel Associates | Fire Protection Engineers | $20,000 |
| Madison Mechanical, Inc. | Plumbing Consultant | $1,100 |
| Marks, Thomas and Associates | Design Consulting | $25,000 |
| MECX | Environmental | $20,000 |
| Ryan Construction Management | Owner's Rep. -- Construction | $630,000 |
| STV Incorporated | Architectural Consultant | $700,000 |
| Soft Cost Contingency | Contingency | $147,000 |
| **Professional Fees Sub-Total** | | **$1,878,800** |

<u>*Legal Fees*</u>

| | | |
|---|---|---|
| Cowie & Mott | Legal Fees - Local Counsel | $125,000 |
| Michael Mannes, P.A. | Legal Fees - Condo Conversion | $40,000 |
| Stevens & Lee | Legal Fees - Transaction | $200,000 |
| Other - (incl. Gildea Schmidt) | Legal | $50,000 |
| **Legal Fees Subtotal** | | **$415,000** |

<u>*Other Closing Costs*</u>

| | | |
|---|---|---|
| Bank Closing Costs: | Closing/Legal Costs | $65,000 |
| Equity/Mezzanine Closing Costs: | Closing/Legal Costs | $50,000 |
| Title Expenses: | Closing Costs | $150,208 |
| Pro-Rated Settlement with Seller @ Closing: | Closing Costs | $315,031 |
| **Subtotal Other Closing Costs** | | **$580,239** |

<u>*Other Soft Costs*</u>

| | |
|---|---|
| Marketing Expense | $400,000 |
| Project Administration | $0 |
| Development Fee | $1,255,000 |
| Working Capital | $0 |
| Bank Commitment Fee | $608,835 |
| Investment Banking Fees | $910,000 |
| **Subtotal Other Soft Costs** | **$3,173,835** |

| | |
|---|---|
| **TOTAL SOFT COSTS** | **$6,047,874** |



**RFCCM00088**



***TRITON RODGERS FORGE, LLC***
Rodgers Forge Condominium Conversion -- Financial Model
Sources & Uses of Financing

| SOURCES | Total Costs | % Cost | Per/Unit*<br>508 | Per/Saleable SF<br>411,980 |
|---|---|---|---|---|
| Sponsor Equity | $3,100,000 | 3.17% | $6,102 | $7.52 |
| Mezzanine Loan | $17,800,921 | 18.21% | $35,041 | $43.21 |
| Construction Loan | $76,871,063 | 78.62% | $151,321 | $186.59 |
| **Total Sources** | **$97,771,984** | **100%** | **$192,465** | **$237.32** |
| | | | | |
| USES | | | | |
| Acquisition Cost: | $51,682,000 | 52.86% | $101,736 | $125.45 |
| Interior Common Space: | $25,152,346 | 25.73% | $49,512 | $61.05 |
| Entry Vestibules: | $590,000 | 0.60% | $1,161 | $1.43 |
| Exterior and Sitework: | $5,623,200 | 5.75% | $11,069 | $13.65 |
| Fire and Safety: | $0 | 0.00% | $0 | $0.00 |
| Professional Fees: | $1,878,800 | 1.92% | $3,698 | $4.56 |
| General Building Permits: | $200,000 | 0.20% | $394 | $0.49 |
| Legal Fees: | $415,000 | 0.42% | $817 | $1.01 |
| Bank Closing Costs: | $65,000 | 0.07% | $128 | $0.16 |
| Equity/Mezzanine Closing Costs: | $50,000 | 0.05% | $98 | $0.12 |
| Title Expenses: | $150,208 | 0.15% | $296 | $0.36 |
| Project Administration Fee: | $0 | 0.00% | $0 | $0.00 |
| Development Fee: | $1,255,000 | 1.28% | $2,470 | $3.05 |
| Investment Banking Fees: | $910,000 | 0.93% | $1,791 | $2.21 |
| Bank Commitment Fees: | $608,835 | 0.62% | $1,198 | $1.48 |
| Mezz. Commitment Fees: | $178,009 | 0.18% | $350 | $0.43 |
| Marketing Expense: | $400,000 | 0.41% | $787 | $0.97 |
| Pro-Rated Settlement with Seller @ Closing: | $315,031 | 0.32% | $620 | $0.76 |
| Third Party Administration & Review: | $162,000 | 0.17% | $319 | $0.39 |
| Working Capital: | $0 | 0.00% | $0 | $0.00 |
| Interest Reserve: | $5,000,000 | 5.11% | $9,843 | $12.14 |
| **Total Cost (excl. contingency)** | **$94,635,429** | **96.79%** | **$186,290** | **$229.71** |
| Construction Contingency @ 10% | $3,136,555 | 3.21% | $6,174 | $7.61 |
| **Total Cost** | **$97,771,984** | **100%** | **$192,465** | **$237.32** |

RFCCM00089



*TRITON RODGERS FORGE, LLC*
Rodgers Forge Condominium Conversion – Financial Model
Inputs

**General Condominium Information**

Start Date:         11/1/05
Purchase Price:   $51,682,000 *(includes $182K interest on the deferred portion of the purchase price)*

| Apartment Type | # of Units | # of Renovated Units | Avg. Sq Ft | Base Monthly Rent Per Unit | Sales Price PSF | Base Sales Price Per Unit |
|---|---|---|---|---|---|---|
| 1BR | 234 | 234 | 677 | $695 | $303 | $205,000 |
| 2BR | 266 | 266 | 916 | $770 | $289 | $265,000 |
| 3BR | 8 | 8 | 1,223 | $925 | $266 | $325,000 |
| 4BR | 0 | 0 | 0 | 0 | $266 | $0 |
| 5BR | 0 | 0 | 0 | 0 | $266 | $0 |
|  | 508 | 508 | 411,980 | $374,850 |  |  |

**Base Sales Prices**

| 1BR | $303 | *(new sales prices for the 1BR's added on 1/13/06)* |
|---|---|---|
| 2BR | $289 | |
| 3BR | $266 | |
| 4BR | $266 | |
| 5BR | $266 | |

**Sales Price Sensitivity Analysis:**
Reduction to Base Sale Prices:    0.0%

**Capital Structure**

| Debt/Equity Ratio: | 78.6% | |
|---|---|---|
| OSB Loan Amount: | $76,871,063 | |
| Triton Initial Investment: | $3,100,000 | 3.2% (of total capital requirement) |
| CBRE Investment | $17,800,921 | |

**Debt Assumptions**

| Interest Rate: | | 7.5% | |
|---|---|---|---|
| Debt Service Reserve: | $500,000 | $5,000,000  | |
| Debt Repayment Percentage: | | 85.0% | (% of sales proceeds that go to repay debt) |
| Loan Period in Years | | 3 | |
| Number of Payments Per Year | | 12 | |

**Construction**

| Description | | Per Unit | Closing #1 | Total @ Close 2 | Total | |
|---|---|---|---|---|---|---|
| Interior Construction: | | | | | | |
| 1BR | | $45,921 | $0 | $0 | $10,745,514 | |
| 2BR | | $52,516 | $0 | $0 | $13,969,256 | |
| 3BR | | $54,697 | $0 | $0 | $437,576 | |
| 4BR | | $0 | $0 | $0 | $0 | |
| 5BR | | $0 | $0 | $0 | $0 | |
| Interior Common Space: | | | $0 | $0 | $590,000 | |
| Exterior and Sitework: | | | $0 | $0 | $5,623,200 | |
| Fire and Safety: | PSF | $0.00 | $0 | $0 | $0 | *(included above)* |
| Fire and Safety: | (Pump) | | $0 | $0 | $0 | *(included above)* |
| Professional Fees: | | | $0 | $245,312 | $1,878,800 | |
| Building/Demo Permits & Consultants: | | | $0 | $28,000 | $200,000 | |
| Contingency (%): | | 10.0% | $0 | $0 | $3,136,555 | |



RFCCM00090



| | | | | | |
|---|---|---|---|---|---|
| Construction Start Date: | 5 | (months from start of project) | | | |
| Construction Stages | 6 | | | | |
| Construction Timeline | 4.5 | (months to complete phase) | | | |

**Other Project Related Fees and Expenses**

| | Debt | Equity | @ Close #1 | @ Close #2 | Total |
|---|---|---|---|---|---|
| Bank Commitment Fees: | 1.0% | | $428,835 | $60,000 | $608,835 |
| Investment Banking Fees: | 1.0% | 2.0% | $660,000 | $250,000 | $910,000 |
| Mezz. Commitment Fees: | | 1.0% | $160,000 | $18,009 | $178,009 |

| | Closing #1 | Total @ Close 2 | Total | | |
|---|---|---|---|---|---|
| Bank Closing Costs: | $40,000 | $25,000 | $65,000 | | |
| Equity/Mezzanine Closing Costs: | $0 | $50,000 | $50,000 | | |
| Legal Fees | $108,101 | $144,211 | $415,000 | | |
| Title Expenses: | $125,208 | $25,000 | $150,208 | | |
| Pro-Rated Settlement with Seller @ Closing: | $315,031 | $0 | $315,031 | (Includes Insurance downpa | |
| Marketing Expense: | $0 | $42,214 | $400,000 | | |
| Working Capital: | $0 | $0 | $0 | | |
| Third Party Administration & Review: | $0 | $0 | $162,000 | | |
| Project Administration: | $0 | $0 | $0 | $0 (annualized) | |
| Development Fee: | $0 | $0 | $1,255,000 | 4.0% (on eligible pr | |

**Rental Assumptions**

| | | |
|---|---|---|
| Initial Vacancy Rate: | 8.0% | |
| Vacancy Escalator: | 2.5% | (increases every 6 months) |
| Additional Vacancy During Construction: | 5.0% | |

**Operating Expenses**

*(see Operating Summary worksheet)*

**Sales Inputs**

| | | |
|---|---|---|
| Number of Sales Per Month: | 16 | |
| Sales Begin in Month #: | 8 | (months from start of project) |

**Cost of Sales Expenses**

| | | |
|---|---|---|
| Monthly Sales Price Escalator: | 0.41% | 5.0% (annualized) |
| Sales Commisions & Marketing: | 4.0% | |
| Closing Fees: | 1.0% | |
| Transfer Taxes: | 0.0% | |

**Equity Distribution**

| | | | |
|---|---|---|---|
| Preferred Return: | 20.0% | | |
| Excess Return Split 1 (Third Party): | 12.5% | | |
| Excess Return Split 1 (Triton): | 87.5% | | |
| Return Threshold 2 | 100.0% | | |
| Excess Return Split 2 (Third Party): | 0.0% | | |
| Excess Return Split 2 (Triton): | 100.0% | | |
| Minimum Threshold Equity Return | 1.65X | 2 | (1=min. threshold on; 2=min. threshold off) |

**Unit Summary**

| Unit Type | # of Units | Sq. Ft. | Total SF Per Unit Type | Mkt Rent | Total Rent Per Unit Type | Per SF |
|---|---|---|---|---|---|---|
| 1BR/1BA | 220 | 677 | 148,940 | $670 | $147,400 | $0.99 |
| 1BR/1BA* | 14 | 677 | 9,478 | $645 | $9,030 | $0.95 |



Rodgers Forge Conversion Financial Model 3 28 06 Closing Version.xls - Inputs

RFCCM00091

| | | | | | | |
|---|---|---|---|---|---|---|
| 2BR/1BA | 212 | 907 | 192,284 | $756 | $160,272 | $0.83 |
| 2BR/1BA* | 17 | 907 | 15,419 | $720 | $12,240 | $0.79 |
| 2BR/1BA DR | 36 | 975 | 35,100 | $775 | $27,900 | $0.79 |
| 2BR/1BA* DR | 1 | 975 | 975 | $748 | $748 | $0.77 |
| 3BR/1BA | 8 | 1,223 | 9,784 | $926 | $7,410 | $0.76 |
| Total | 508 | 811 | 411,980 | $719 | $365,000 | $0.89 |

* - Terrace level apartments

| | | |
|---|---|---|
| Average 1BR | 677 | $669 |
| Average 2BR | 916 | $756 |
| Average 3BR | 1,223 | $926 |

RFCCM00092



**Rodgers Forge Condominiums**
Sources & Uses
*March 29, 2006*

| | Total Through Acquisition Financing | Interim Period | Construction Financing | Total Through Closing | Total Budget |
|---|---|---|---|---|---|
| **Sources of Funds** | | | | | |
| Ohio Savings Bank - Acquisition | $33,846,000 | $0 | $0 | $33,846,000 | $34,000,000 |
| Ohio Savings Bank - Construction | $0 | $0 | $160,000 | $160,000 | $42,871,062 |
| Total OSB | $33,846,000 | $0 | $160,000 | $34,006,000 | $76,871,062 |
| | | | | | |
| CBRE Realty Finance | $16,000,000 | $0 | $1,801,000 | $17,801,000 | $17,801,000 |
| CBRE Realty Finance - IR | $2,280,000 | $0 | $1,992,200 | $4,272,200 | $4,272,200 |
| Total CBRE | $18,280,000 | $0 | $3,793,200 | $22,073,200 | $22,073,200 |
| | | | | | |
| Triton Real Estate Partners | $4,173,175 | $444,737 | -$1,517,990 | $3,099,922 | $3,099,922 |
| Total Sources | $56,299,175 | $444,737 | $2,435,210 | $59,179,122 | $102,044,184 |
| | | | | | |
| **Uses of Funds** | | | | | |
| **Acquisition:** | | | | | |
| Property Purchase Price | $51,500,000 | $0 | $0 | $51,500,000 | $51,500,000 |
| Interest on Deferred Purchase Price | $182,000 | $0 | $0 | $182,000 | $182,000 |
| Total Acquisition Costs: | $51,682,000 | $0 | $0 | $51,682,000 | $51,682,000 |
| | | | | | |
| **Hard Costs:** | | | | | |
| General Conditions | $0 | $0 | $0 | $0 | $821,600 |
| Selective Demolition | $0 | $0 | $0 | $0 | $332,532 |
| Asbestos Abatement | $0 | $0 | $0 | $0 | $100,000 |
| Sitework | $0 | $0 | $0 | $0 | $2,200,000 |
| Exterior Concrete | $0 | $0 | $0 | $0 | $20,000 |
| Masonry | $0 | $0 | $0 | $0 | $50,000 |
| Metals | $0 | $0 | $0 | $0 | $10,000 |
| Exterior Carpentry | $0 | $0 | $0 | $0 | $60,000 |
| Cabinets | $0 | $0 | $0 | $0 | $1,524,000 |
| Granite Tops | $0 | $0 | $0 | $0 | $508,000 |
| Insulation | $0 | $0 | $0 | $0 | $127,000 |
| New Soffits,fascia gutters | $0 | $0 | $0 | $0 | $403,200 |
| Roofing | $0 | $0 | $0 | $0 | $900,000 |
| Sealants | $0 | $0 | $0 | $0 | $33,020 |
| Ext. Metal Doors & Frames | $0 | $0 | $0 | $0 | $203,200 |
| Int. Wood Doors & Frames | $0 | $0 | $0 | $0 | $508,000 |
| New Entry features | $0 | $0 | $0 | $0 | $360,000 |
| Aluminum windows | $0 | $0 | $0 | $0 | $1,915,000 |
| Gypsum Board | $0 | $0 | $0 | $0 | $3,163,316 |
| Ceramic Tile | $0 | $0 | $0 | $0 | $655,320 |
| Hardwood Flooring | $0 | $0 | $0 | $0 | $1,635,760 |
| Carpet | $0 | $0 | $0 | $0 | $366,000 |
| Interior Painting | $0 | $0 | $0 | $0 | $1,293,426 |
| Exterior Painting | $0 | $0 | $0 | $0 | $120,000 |
| Interior Signs | $0 | $0 | $0 | $0 | $10,000 |
| Fire Extinguishers | $0 | $0 | $0 | $0 | $25,400 |
| Bath Accessories | $0 | $0 | $0 | $0 | $50,800 |
| Appliances | $0 | $0 | $0 | $0 | $1,934,972 |
| Shades & Blinds | $0 | $0 | $0 | $0 | $180,500 |
| Plumbing | $0 | $0 | $0 | $0 | $4,779,160 |
| HVAC | $0 | $0 | $0 | $0 | $3,022,600 |
| Electrical | $0 | $0 | $0 | $0 | $2,072,640 |
| Interior Entry Upgrades | $0 | $0 | $0 | $0 | $480,000 |
| Pool & Clubhouse | $0 | $0 | $0 | $0 | $1,500,000 |
| Subtotal: | $0 | $0 | $0 | $0 | $31,365,546 |
| Contingency | $0 | $0 | $0 | $0 | $3,136,555 |
| Total Hard Costs: | $0 | $0 | $0 | $0 | $34,502,101 |
| | | | | | |
| **Soft Costs:** | | | | | |
| Professional Fees: | | | | | |



RFCCM00093

**Rodgers Forge Condominiums**
Sources & Uses
*March 29, 2006*

| | Total Through Acquisition Financing | Interim Period | Construction Financing | Total Through Closing | Total Budget |
|---|---|---|---|---|---|
| Banking & Service Charges | $0 | $110 | $0 | $110 | $1,000 |
| Beers & Cutler | $0 | $1,347 | $0 | $1,347 | $100,000 |
| Chesapeake Energy | $0 | $18,600 | $0 | $18,600 | $158,000 |
| CSC | $0 | $455 | $0 | $455 | $2,050 |
| Daft-McCune-Walker, Inc. | $0 | $5,391 | $0 | $5,391 | $10,000 |
| Delta Associates | $0 | $25,941 | $0 | $25,941 | $19,000 |
| ECS Mid-Atlantic | $0 | $2,000 | $0 | $2,000 | $10,000 |
| Elsner Petrou & Associates | $0 | $640 | $0 | $640 | $640 |
| EPA | $0 | $1,615 | $0 | $1,615 | $10,000 |
| Greenhome & O'Mara, Inc | $0 | $15,898 | $0 | $15,898 | $25,000 |
| Koffel Associates | $0 | $7,235 | $0 | $7,235 | $20,000 |
| Madison Mechanical, Inc. | $0 | $1,100 | $0 | $1,100 | $1,100 |
| Marks, Thomas and Associates | $0 | $8,151 | $0 | $8,151 | $25,000 |
| MECX | $0 | $19,500 | $0 | $19,500 | $20,000 |
| Ryan Construction Management | $0 | $58,521 | $0 | $58,521 | $630,000 |
| STV Incorporated | $0 | $78,809 | $0 | $78,809 | $700,000 |
| Soft Cost Contingency | $0 | $0 | $0 | $0 | $147,000 |
| **Total Professional Fees** | **$0** | **$245,312** | **$0** | **$245,312** | **$1,878,800** |
| | | | | | |
| Building Permits/POS Fees/Zoning | $0 | $28,000 | $0 | $28,000 | $200,000 |
| | | | | | |
| Legal Fees: | | | | | |
| Cowie & Mott | $0 | $67,338 | $0 | $67,338 | $125,000 |
| Michael Mannes, P.A. | $0 | $19,654 | $0 | $19,654 | $40,000 |
| Stevens & Lee | $108,101 | $0 | $25,000 | $133,101 | $200,000 |
| Other - (Gildea & Schmidt, etc.) | $0 | $32,219 | $0 | $32,219 | $50,000 |
| **Total Legal Fees** | **$108,101** | **$119,211** | **$25,000** | **$252,313** | **$415,000** |
| | | | | | |
| Project Administration Fees | $0 | $0 | $0 | $0 | $1,255,000 |
| | | | | | |
| Marketing: | | | | | |
| Borzz.Dixon & Other Mktg. | $0 | $42,214 | $0 | $42,214 | $400,000 |
| **Total Marketing** | **$0** | **$42,214** | **$0** | **$42,214** | **$400,000** |
| | | | | | |
| Third Party Administration & Review Fees | $0 | $0 | $0 | $0 | $162,000 |
| **Total Soft Costs** | **$108,101** | **$434,737** | **$25,000** | **$567,839** | **$4,310,800** |
| | | | | | |
| OSB Interest Reserve | $500,000 | $0 | $0 | $500,000 | $5,000,000 |
| CBRE Interest Reserve | $2,280,000 | $0 | $1,992,200 | $4,272,200 | $4,272,200 |
| | | | | | |
| Closing Costs: | | | | | |
| OSB - Commitment Fee & LC Fee | $428,835 | $0 | $0 | $428,835 | $428,835 |
| OSB - Annual Revolving Loan Fees | $0 | $0 | $60,000 | $60,000 | $180,000 |
| OSB - Legal Fees & Other Closing Fees | $40,000 | $10,000 | $15,000 | $65,000 | $65,000 |
| CBRE - Legal Fees | $0 | $0 | $50,000 | $50,000 | $50,000 |
| CBRE Mezz. Commit. Fee | $160,000 | $0 | $18,010 | $178,010 | $178,010 |
| CBRE - LJ Melody | $660,000 | $0 | $250,000 | $910,000 | $910,000 |
| Canton Title | $125,208 | $0 | $25,000 | $150,208 | $150,208 |
| Lockton Companies | $49,316 | $0 | $0 | $49,316 | $49,316 |
| Pro-Rated Settlement with Seller | $265,715 | $0 | $0 | $265,715 | $265,715 |
| **Total Closing Costs:** | **$1,729,074** | **$10,000** | **$418,010** | **$2,157,084** | **$2,277,084** |
| | | | | | |
| **Total Uses** | **$56,299,175** | **$444,737** | **$2,435,210** | **$59,179,122** | **$102,044,184** |
| | | | | | |
| | $0 | $0 | $0 | $0 | $0 |

RFCCM00094



**Rodgers Forge Condominiums**
Construction Loan Closing Reconciliation

<u>**Summary of Acquisition Financing - 10/31/05**</u>



*Sources of Funds*

| | |
|---|---|
| Ohio Savings Bank | $33,846,000 |
| CBRE | $18,280,000 |
| Triton Real Estate Partners | $4,173,175 |
| **Total Sources of Funds Through Acquisition Closing 10/31/05** | **$56,299,175** |

*Uses of Funds*

| Payee | Description | Amount |
|---|---|---|
| Chicago Deferred Exchange Corp. | Acquisition | $51,500,000 |
| Chicago Deferred Exchange Corp. | Interest on deferred purchase price | $182,000 |
| Ohio Savings Bank | Commitment fee & LC fee | $428,835 |
| Ohio Savings Bank | Interest reserve | $500,000 |
| CBRE | Commitment fee | $160,000 [1] |
| CBRE | Interest reserve | $2,280,000 |
| CBRE - LJ Melody | Investment banking fees | $660,000 |
| Canton Title | Title fees | $121,808 |
| Anchor Title | Title fees | $3,400 |
| Settlement with Seller | Taxes, interest on security deposits, etc. | $265,715 |
| Naka Huttar & Oldhouser, LLP | OSB legal fees | $40,000 |
| Stevens & Lee | Triton legal fees | $108,101 |
| Lockton | Insurance downpayment | $49,316 |
| **Total Through Acquisition Closing 10/31/05** | | **$56,299,175** |
| **Total Through Acquisition Closing 10/31/05 (less interest reserves)** | | **$53,519,175** |

**Construction Loan Closing - Funding Reconciliation**

*Triton Funding*

| | |
|---|---|
| Triton Deposit | $3,000,000 |
| Additional Triton Funding at Acquisition Closing | $1,173,175 |
| Additional Invoices Paid by Triton Prior to Construction Closing (see attached) | $444,737 |
| CBRE - L.J. Melody Fee @ Construction Closing | $190,000 |
| CBRE Legal Fees | $50,000 |
| Stevens & Lee (Triton Legal Fees) | $25,000 |
| **Total Triton Funding (prior to reconciliation)** | **$4,882,912** |
| **Additional CBRE Funding to Triton:** | **$1,782,912** |
| **Triton Equity after Construction Loan Closing** | **$3,100,000** |

*CBRE Funding*

| | |
|---|---|
| CBRE Loan - Acquisition Loan Closing | $16,000,000 |
| CBRE Loan - Construction Loan Closing | $1,782,912 |
| CBRE Loan - Interest Reserve | $2,280,000 |
| **Total CBRE Funding after Construction Loan Closing** | **$20,062,912** |

[1] The CBRE commitment fee was overfunded at closing by $20,280, which was then returned to Triton.

4/14/2006
11:33 AM
Rodgers Forge - Sources  Uses Breakdown 3 29 06.xls


RFCCM00095

Closing Costs
Closing Costs
Closing Costs

$1,517,912

RFCCM00096



**Triton Rodgers Forge**
**Account Summary**
*3/1/2006*

| Date | Description | Amount | G/L Account # |
|------|-------------|-------:|---------------|
| 6/17/2005 | Opening Balance | 100.00 | |
| 7/6/2005 | Wire transfer from Garrison Capital | 16,875.00 | |
| 7/15/2005 | Wire transfer from Garrison Capital | 15,000.00 | |
| 8/1/2005 | Wire transfer from Garrison Capital | 5,000.00 | |
| 8/19/2005 | Wire Transfer from Escrow Account (via Canton Title) | 70,000.00 | |
| 8/29/2005 | Deposit | 50.00 | |
| 9/9/2005 | Wire Transfer from Escrow Account (via Canton Title) | 25,000.00 | |
| 10/1/2005 | Wire Transfer from Escrow Account (via Canton Title) | 50,000.00 | |
| 11/14/2005 | Wire Transfer from Escrow Account (via Canton Title) | 80,000.00 | |
| 11/21/2005 | Wire from TREP | 10,000.00 | |
| 12/15/2005 | Additional Capital Contribution | 35,000.00 | |
| 12/23/2005 | Wire from the Escrow Account | 26,500.00 | |
| 1/24/2006 | Wire transfer from Triton Real Estate Partners | 65,000.00 | |
| 1/27/2006 | Wire transfer from Triton Real Estate Partners | 5,000.00 | |
| 2/17/2006 | Triton Real Estate Partners | 33,000.00 | |
| 3/3/2006 | Triton Real Estate Partners | 10,000.00 | |

**Building Permits/POS Fees/Zoning**

| Date | Description | Amount | G/L Account # |
|------|-------------|-------:|---------------|
| 11/30/2005 | Baltimore County | (4,186.00) | 15211-01 |
| 2/22/2006 | CadRender | (9,892.45) | |
| 9/27/2005 | Maryland Secretary of State | (2,545.00) | Need G/L |
| 1/3/2006 | Postal Express | (310.50) | 1535-02 |
| 12/22/2005 | Postal Express | (323.24) | 1535-02 |
| 11/23/2005 | Postal Express | (680.52) | 1535-02 |
| 1/3/2006 | Postal Express | (1,887.48) | 1535-02 |
| 1/24/2006 | Postal Express | (51.36) | 1535-02 |
| 10/27/2005 | Project Support Services | (2,500.00) | 1521-11 |
| 12/30/2005 | Sir Speedy | (928.20) | |
| 1/26/2006 | Sir Speedy | (4,694.84) | |

**Marketing**

| Date | Description | Amount | G/L Account # |
|------|-------------|-------:|---------------|
| 1/31/2006 | The Baltimore Sun | (5,104.00) | |
| 2/1/2006 | Bobby's Potties | (200.00) | |
| 10/26/2005 | Borcz: Dixon | (5,000.00) | 1524-02 |
| 11/16/2005 | Borcz: Dixon | (150.00) | 1524-39 |
| 12/30/2005 | Borcz:Dixon | (5,000.00) | 1524-02 |
| 1/30/2006 | Borcz:Dixon | (16,430.94) | 1524-02 |
| 2/24/2006 | Borcz:Dixon | (6,436.50) | 1524-02 |
| 1/30/2006 | Allied Trailers | (1,842.75) | |
| 2/27/2006 | U-Follow Up | (2,050.00) | |

**Legal Fees**

| Date | Description | Amount | G/L Account # |
|------|-------------|-------:|---------------|
| 7/8/2005 | Cowie & Mott | (13,763.72) | 1523-01 |

RFCCM00097

| Date | Payee | Amount | Code |
|---|---|---|---|
| 8/24/2005 | Cowie & Mott | (7,876.07) | 1523-01 |
| 10/25/2005 | Cowie & Mott | (6,061.81) | 1523-01 |
| 12/15/2005 | Cowie & Mott | (35,000.00) | 1523-01 |
| 2/22/2006 | Cowie & Mott | (4,636.06) | 1523-01 |
| 10/27/2005 | Gildea & Schmidt | (1,256.70) | 1523-04 |
| 8/30/2005 | Gildea & Schmidt | (2,500.00) | 1523-04 |
| 12/29/2005 | Gildea & Schmidt | (4,045.99) | 1523-04 |
| 11/16/2005 | Gildea & Schmidt | (12,998.78) | 1523-04 |
| 1/30/2006 | Gildea & Schmidt | (9,343.38) | 1523-04 |
| 2/24/2006 | Gildea & Schmidt | (2,074.63) | 1523-04 |
| 8/2/2005 | Michael H. Mannes | (3,000.00) | 1523-02 |
| 12/1/2005 | Michael Mannes | (2,500.00) | |
| 1/26/2006 | Michael Mannes | (14,154.00) | 1523-02 |

**Professional Fees:**

| Date | Payee | Amount | Code |
|---|---|---|---|
| 8/25/2005 | Beers & Cutler | (151.00) | 1521-12 |
| 11/17/2005 | Beers & Cutler | (541.00) | 1521-12 |
| 1/30/2006 | Beers & Cutler | (655.00) | 1521-12 |
| 10/27/2005 | Chesapeake Energy Services | (600.00) | 1537-00 |
| 9/20/2005 | Chesapeake Energy Services | (9,000.00) | Need G/L |
| 1/30/2006 | Chesapeake Energy Service | (9,000.00) | 1537-00 |
| 8/30/2005 | CSC | (454.72) | Need G/L |
| 11/17/2005 | Daft-McCune-Walker, Inc. | (3,150.00) | 1521-03 |
| 2/22/2006 | Daft-McCune-Walker, Inc. | (2,240.92) | 1521-03 |
| 10/31/2005 | Delta Associates | (323.00) | 1521-01 |
| 11/15/2005 | Delta Associates | (2,200.00) | 1521-02 |
| 8/24/2005 | Delta Associates | (6,543.00) | 1521-01 |
| 7/8/2005 | Delta Associates | (16,875.00) | 1521-01 |
| 11/17/2005 | ECS Mid Atlantic | (400.00) | 1521-10 |
| 8/25/2005 | ECS Mid Atlantic | (600.00) | 1521-10 |
| 10/27/2005 | ECS Mid Atlantic | (1,000.00) | 1521-10 |
| 2/17/2006 | Eisner Petrou & Associates | (640.00) | 1521-11 |
| 11/9/2005 | EPA | (1,615.00) | 1541-00 |
| 8/29/2005 | Greenhorne & O'Mara, Inc | (3,130.00) | 1521-13 |
| 10/26/2005 | Greenhorne & O'Mara, Inc | (4,695.00) | 1521-03 |
| 11/15/2005 | Greenhorne & O'Mara, Inc | (7,520.00) | 1521-03 |
| 2/22/2006 | Greenhorne & O'Mara, Inc | (552.50) | 1521-13 |
| 8/23/2005 | Koffel Associates, Inc | (495.00) | 1521-02 |
| 11/16/2005 | Koffel Associates, Inc | (4,740.00) | 1521-02 |
| 1/26/2006 | Koffel Associates | (2,000.00) | 1521-02 |
| 9/22/2005 | Madison Mechanical, Inc. | (1,100.00) | 1511-35 |
| 8/23/2005 | Marks Thomas Architects | (1,006.50) | 1521-05 |
| 12/28/2005 | Marks Thomas Architects | (1,090.50) | 1521-05 |
| 10/25/2005 | Marks Thomas Architects | (1,105.00) | 1521-05 |
| 8/23/2005 | Marks Thomas Architects | (4,948.50) | 1521-05 |
| 1/4/2006 | MECx | (1,280.00) | 1521-06 |
| 10/28/2005 | MECx | (5,120.00) | 1521-06 |
| 8/25/2005 | MECx | (13,100.00) | 1521-06 |
| 8/24/2005 | Ryan Construction Management | (8,303.03) | 1521-09 |
| 9/9/2005 | Ryan Construction Management | (8,383.03) | 1521-09 |
| 10/14/2005 | Ryan Construction Management | (8,383.03) | 1521-09 |

| | | | |
|---|---|---:|---|
| 11/23/2005 | Ryan Construction Management | (8,383.03) | 1521-09 |
| 12/29/2005 | Ryan Construction Management | (8,383.03) | 1521-09 |
| 1/27/2006 | Ryan Construction Management | (8,383.03) | 1521-09 |
| 2/27/2006 | Ryan Construction Management | (8,303.03) | 1521-09 |
| 8/30/2005 | STV - Retainer | (20,000.00) | 1521-07 |
| 11/21/2005 | STV - Retainer | (58,809.41) | 1521-07 |
| 1/9/2006 | OLBS Monthly Fee | (15.00) | |
| 2/7/2006 | OLBS Monthly Fee | (15.00) | |
| 7/6/2005 | Wire Transfer Fee | (10.00) | |
| 7/15/2005 | Wire Transfer Fee | (10.00) | |
| 8/1/2005 | Wire Transfer Fee | (10.00) | |
| 8/19/2005 | Wire Transfer Fee | (10.00) | |
| 9/9/2005 | Wire Transfer Fee | (10.00) | |
| 10/1/2005 | Wire Transfer Fee | (10.00) | |
| 11/14/2005 | Wire Transfer Fee | (10.00) | |
| 12/23/2005 | Wire Transfer Fee | (10.00) | |

**Closing Fees:**

| | | |
|---|---|---:|
| 3/3/2006 | Ohio Savings Bank | (10,000.00) |

| G/L Account Name | Check # | Check Date | Notes |
|---|---|---|---|
| Capital Contribution | | | Cleared |
| Capital Contribution | | 7/16/2005 | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | 9/9/2005 | Cleared |
| Capital Contribution | | 10/11/2005 | Cleared |
| Capital Contribution | | 11/14/2005 | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | Cleared |
| Capital Contribution | | | |
| | | | |
| Building Permit - Phase I | 1020 | 11/22/2005 | Cleared |
| | 1092 | 2/14/2006 | #VALUE! |
| POS Filing Fee | 1016 | 9/22/2005 | Cleared |
| POS - Mailing | 1029 | 12/21/2005 | Cleared |
| POS - Mailing | 1022 | 12/16/2005 | Cleared |
| Tenant Notice Requirements Mail/Post | 1018 | 11/21/2005 | Cleared |
| POS - Mailing | 1025 | 12/29/2005 | Cleared |
| POS - Mailing | 1052 | 1/17/2006 | Cleared |
| Other Professional Fees | 1036 | 10/19/2005 | Cleared |
| Printing of POS | 1024 | 12/29/2005 | Cleared |
| Printing of POS | 1090 | | Cleared |
| | | | |
| | 1053 | | |
| | 1055 | | |
| Advertising Agency Fees | 1026 | 10/19/2005 | Cleared |
| Pre-Sale Website | 1038 | 11/4/2005 | Cleared |
| Advertising Agency fees | 1047 | 11/23/2005 | Cleared |
| Advertising Agency fees | 1084 | | |
| Advertising Agency fees | 1091 | | -6,436.50 |
| | 1054 | | |
| | 1098 | | -2,050.00 |
| | | | |
| Local Counsel | 992 | 7/15/2005 | Cleared |

| | | | |
|---|---|---|---|
| Local Counsel | 1002 | 8/19/2005 | Cleared |
| Local Counsel | 1028 | 10/19/2005 | Cleared |
| Local Counsel | 992 | 7/15/2005 | Cleared |
| Local Counsel | 1093 | | #VALUE! |
| Zoning & Development Legal | 1032 | 10/19/2005 | Cleared |
| Zoning and Development Legal Counsel | 1011 | 8/24/2005 | Cleared |
| Zoning & Development Legal | 1051 | 12/15/2005 | Cleared |
| Zoning & Development Legal | 1042 | 11/4/2005 | Cleared |
| Zoning & Development Legal | 1086 | | |
| Zoning & Development Legal | 1095 | | -2,074.63 |
| Condo Conversion Counsel | 993 | 7/15/2005 | Cleared |
| Local Counsel | 1021 | 11/30/2005 | Cleared |
| Condo Conversion Counsel | 1088 | | Cleared |
| | | | |
| Accounting Fees | 1001 | 8/19/2005 | Cleared |
| Accounting Fees | 1037 | 11/4/2005 | Cleared |
| Accounting Fees | 1083 | | |
| Utility Consulting | 1027 | 10/19/2005 | Cleared |
| Utility Consulting | 1015 | | Cleared |
| Utility Consulting | 1085 | | |
| Registered Agent Fees | 1003 | 8/19/2005 | Cleared |
| Site Plan Fees | 1039 | 11/4/2005 | Cleared |
| Site Plan Fees | 1094 | | #VALUE! |
| Market Study Fees | 1029 | 10/19/2005 | Cleared |
| Market Study Fees | 1040 | 11/4/2005 | Cleared |
| Market Study Fees | 1004 | 8/19/2005 | Cleared |
| Market Study Fees | 991 | 7/15/2005 | Cleared |
| Roof Consulting Fees | 1041 | 11/4/2005 | Cleared |
| Roof Consulting Fees | 1005 | 8/19/2005 | Cleared |
| Roof Consulting Fees | 1030 | 10/19/2005 | Cleared |
| Other Professional Fees | 1048 | 11/23/2005 | |
| Public Relations | 1031 | 10/19/2005 | Cleared |
| Land Title Survey Fees | 1012 | 8/24/2005 | Cleared |
| Site Plan Fees | 1033 | 10/19/2005 | Cleared |
| Site Plan Fees | 1043 | 11/4/2005 | Cleared |
| Land Title Survey Fees | 1096 | | #VALUE! |
| Fire and Life Safety Engineers | 1006 | 8/19/2005 | Cleared |
| Fire & Life Safety Engineering | 1044 | 11/4/2005 | Cleared |
| Fire and Life Safety Engineers | 1087 | | Cleared |
| Plumbing | 1014 | 9/12/2005 | Cleared |
| Design Consulting Fees | 1007 | 8/19/2005 | Cleared |
| Design Consulting Fees | 1049 | 11/23/2005 | Cleared |
| Design Consulting Fees | 1034 | 10/19/2005 | Cleared |
| Design Consulting Fees | 1007 | 8/19/2005 | Cleared |
| Environmental Consulting Fees | 1050 | 11/23/2005 | Cleared |
| Environmental Consulting Fees | 1035 | 10/19/2005 | Cleared |
| Environmental Consulting Fees | 1008 | 8/19/2005 | Cleared |
| Construction Management Fees | 1009 | 8/19/2005 | Cleared |
| Construction Management Fees | 1013 | 9/8/2005 | Cleared |
| Construction Management Fee | 1017 | 10/6/2005 | Cleared |

RFCCM00101



| Construction Mgmt Fee | 1019 | 11/21/2005 | Cleared |
| Construction Management Fees | 1082 | 12/22/2005 | Cleared |
| Construction Management Fees | 1089 | | |
| Construction Management Fees | 1097 | | -8,303.03 |
| Architectural Consulting Fees | 1010 | 8/19/2005 | Cleared |
| Architectural Consulting Fees | 1046 | 11/4/2005 | Cleared |
| | | | Cleared |
| | | | |
| | | | Cleared |
| | | | Cleared |
| | | | Cleared |
| | | | Cleared |
| | | | Cleared |
| | | 10/11/2005 | Cleared |
| | | 11/14/2005 | Cleared |
| | | | Cleared |

Bank Deposit - Closing Costs

RFCCM00102

EXHIBIT F TO LOAN AGREEMENT

SALES PRICING PLAN

UNIT TYPE          MINIMUM SALES PRICE          MAXIMUM % OF GSP AS COSTS

-47-

RFCCM00103



**TRITON RODGERS FORGE, LLC**
Rodgers Forge Condominium Conversion -- Financial Model
Sales Proforma

| Unit Type | # of Units | Net SF/Unit | Total SF/Unit Type | Avg. $/Per SF | Sales Per Unit | Total Sales |
|---|---|---|---|---|---|---|
| 1BR/1BA | 220 | 677 | 148,940 | $313 | $211,838 | $46,604,454 |
| 1BR/1BA* | 14 | 677 | 9,478 | $313 | $211,838 | $2,965,738 |
| 2BR/1BA | 212 | 907 | 192,284 | $313 | $283,807 | $60,167,120 |
| 2BR/1BA* | 17 | 907 | 15,419 | $313 | $283,807 | $4,824,722 |
| 2BR/1BA DR | 36 | 975 | 35,100 | $313 | $305,085 | $10,983,056 |
| 2BR/1BA* DR | 1 | 975 | 975 | $313 | $305,085 | $305,085 |
| 3BR/1BA | 8 | 1,223 | 9,784 | $313 | $382,686 | $3,061,488 |
| Totals | 508 | 811 | 411,980 | $313 | $253,763 | $128,911,663 |
| less Sales Commissions | 4.0% | | | | | ($5,156,467) |
| less Closing Costs | 1.0% | | | | | ($1,289,117) |
| less Development Costs | | | | | | ($97,771,984) |
| Profit | | | | | | $24,694,096 |
| Profit Margin | | | | | | 25.3% |
| Loan to Gross Sellout | | | | | | 59.6% |
| | | | | | | |
| Total Net Operating Income | | | | | | $1,343,202 |
| less cash Interest Expense | | | | | | ($1,131,421) |
| Total Profitability | | | | | | $24,905,877 |
| plus Equity Investment | | | | | | $20,900,921 |
| plus Unused Debt Service Reserve | | | | | | ($228,525) |
| Total Distributions to Equity | | | | | | $45,578,273 |



SCHEDULE 8.3

Litigation Schedule

Complaint filed by Rodgers Forge Apartments Tenants Association, Inc. ("RFA") against the Grantor and Rodgers Forge Condominium, Inc. ("RFC") in the Circuit Court for Baltimore County, Maryland, which has not yet been served upon either RFC or the Grantor.  In this complaint RFA alleges, among other things, that the Grantor and RFC improperly increased rentals due from tenants of the last three (3) phases of the condominium project who have not yet received official conversion notices and is seeking monetary damages from both the Grantor and RFC attributable thereto.  The Grantor and RFC is represented by Michael H. Mannes, Esquire, special condominium counsel, in connection with this matter.  The Grantor and RFC have reviewed this complaint with special condominium counsel and do not believe that any of the allegations contained therein have any merit or will materially and adversely impact the Grantor, RFC, or the Project.  Both the Grantor and RFC intend to vigorously defend the allegations contained in this complaint.

RFCCM00105

EXHIBIT 7

**PROMISSORY NOTE**

**$18,280,000.00**                                                              October 31, 2005

1.     <u>Promise To Pay.</u>

FOR VALUE RECEIVED, **TRITON RODGERS FORGE, LLC**, a Delaware limited liability company having an address at c/o Triton Real Estate Partners, LLC, 410 Severn Avenue, Suite B-412, Annapolis, Maryland 21403 (hereinafter, the "Borrower"), promises to pay to the order of **CBRE REALTY FINANCE HOLDINGS, LLC**, a Delaware limited liability company having an address at 185 Asylum Street, 37th Floor, Hartford, Connecticut 06103 (hereinafter, the "Lender"), the principal sum of EIGHTEEN MILLION TWO HUNDRED EIGHTY THOUSAND DOLLARS ($18,280,000.00), with interest thereon, or on the amount thereof from time to time outstanding, to be computed, as hereinafter provided, from the date of its disbursement until such principal sum shall be fully paid (the amount hereunder outstanding from time to time, the "Principal Amount"). Interest shall be payable in installments as set forth herein. The total Principal Amount, together with any accrued but unpaid interest, shall be due and payable in full on November 1, 2006, subject to acceleration in accordance with the terms hereof (the "Maturity Date"). The credit accommodation evidenced hereby is referred to herein as the "Loan."

2.     <u>Interest.</u>

Commencing as of the date hereof and continuing through April 30, 2006, the unpaid Principal Amount shall bear interest at the fixed rate of twelve percent (12%) per annum, compounded on a monthly basis. Commencing on May 1, 2006 and continuing through July 31, 2006 the unpaid Principal Amount shall bear interest at the fixed rate of fifteen percent (15%) per annum, compounded on a monthly basis. Commencing on August 1, 2006 and continuing through the full repayment of all sums due hereunder, the unpaid Principal Amount shall bear interest at the fixed rate of eighteen percent (18%) per annum, compounded on a monthly basis. Interest as set forth above shall be computed from and including the first day of each month. Interest shall be due and payable in arrears on the first day of December, 2005, and on the first day of each month thereafter until all amounts due hereunder have been repaid in full. In the event there remain unfunded proceeds of the Loan hereunder, provided there does not exist any Event of Default hereunder or under any other Loan Documents, and further provided that no condition exists which with the giving of notice or the passage of time or both could constitute an Event of Default hereunder or under any Loan Documents, Lender shall advance such unfunded Loan proceeds and apply same toward the payment of interest due hereunder. The foregoing is not intended and shall not be construed to limit, obviate or excuse Borrower's obligation to pay interest and all other amounts hereunder when and as the same become due and payable.

As of the Maturity Date all accrued interest, principal and other charges due with respect to this Note shall be due and payable in full and the principal balance and such other charges, but not unpaid interest, shall continue to bear interest at the Default Rate until so paid.

Lender shall have the option of imposing, and Borrower shall pay upon billing therefor, an interest rate which is five percent (5%) per annum above the interest rate otherwise payable

1

Exhibit _5_
_6 - 19_ -09   pmc
ID

**RFCCM00106**



(hereinafter, the "Default Rate"): (a) while any monetary default exists and is continuing, during that period between the due date and the date of payment; (b) following and during the continuation of any Event of Default under or pursuant to any document or instrument evidencing or securing the Loan (the "Loan Documents"), unless and until the event of default is waived by Lender; and (c) after the Maturity Date.

Borrower shall pay, upon billing therefor, a late charge (hereinafter, a "Late Charge") equal to five percent (5%) of the amount of any payment of principal, interest, or both, which is not paid within ten (10) days of the due date thereof.  Late Charges are: (a) payable in addition to, and not in limitation of, the Default Rate, (b) intended to compensate Lender for administrative and processing costs incident to late payments, (c) are not interest, and (d) shall not be subject to refund or rebate or credited against any other amount due.

In addition to the interest as set forth above, upon the Maturity Date, or any earlier repayment hereof in whole or in part, whether upon a sale, refinance or upon the acceleration hereof as a result of an uncured Event of Default, Borrower shall pay to Lender (i) an exit fee in the amount of three percent (3%) of the Principal Amount, which amount is in addition to all other interest and other payments due hereunder (the "Exit Fee"), and (ii) an amount equal to the difference between (a) the amount of interest previously actually paid to Lender hereunder, and (b) the amount of interest which would have been payable hereunder in the event that the entire Principal Amount were outstanding for a period of twelve (12) full calendar months, at the full contract rate of interest as set forth herein (the "Minimum Interest Make-Up Payment"). The foregoing notwithstanding, the Exit Fee and the Minimum Interest Make-Up Payment shall each be deemed non-applicable in the event that the Loan is refinanced with a substitute facility provided by Lender.

3.    Acceleration; Event of Default.

The principal of, and interest on, this Note shall be payable as provided above and shall be subject to acceleration as provided therein. Upon the occurrence and during the continuance of an Event of Default hereunder or under any Loan Document, Lender shall have, in addition to any rights and remedies contained herein, any and all rights and remedies set forth in the Loan Documents.

4.    Certain Waivers, Consents and Agreements.

Each and every party liable hereon or for the indebtedness evidenced hereby whether as maker, endorser, guarantor, surety or otherwise hereby: (a) waives presentment, demand, protest, suretyship defenses and defenses in the nature thereof; (b) waives any defenses based upon and specifically assents to any and all extensions and postponements of the time for payment, changes in terms and conditions and all other indulgences and forbearances which may be granted by the holder to any party now or hereafter liable hereunder or for the indebtedness evidenced hereby; (c) agrees to any substitution, exchange, release, surrender or other delivery of any security or collateral now or hereafter held hereunder or in connection with the Loan Documents, and to the addition or release of any other party or person primarily or secondarily liable; (d) agrees that if any security or collateral given to secure this Note or the indebtedness evidenced hereby or to secure any of the obligations set forth or referred to in the Loan Documents shall be found to be

2

RFCCM00107



unenforceable in full or to any extent, or if Lender or any other party shall fail to duly perfect or protect such collateral, the same shall not relieve or release any party liable hereon or thereon nor vitiate any other security or collateral given for any obligations evidenced hereby or thereby; (e) agrees to pay all costs and expenses reasonably incurred by Lender or any other holder of this Note in connection with the indebtedness evidenced hereby pursuant to the Loan Documents, including, without limitation, all reasonable attorneys' fees and costs, incurred in connection therewith, the collection of the indebtedness evidenced hereby and the enforcement of rights and remedies hereunder or under the other Loan Documents, whether or not suit is instituted; and (f) consents to all of the terms and conditions contained in this Note and all other instruments now or hereafter executed evidencing or governing all or any portion of the security or collateral for this Note or any one or more of the other Loan Documents.

5.      Delay Not A Bar.

        No delay or omission on the part of the holder of this Note in exercising any right hereunder or any right under any instrument or agreement now or hereafter executed in connection herewith, or any agreement or instrument which is given or may be given to secure the indebtedness evidenced hereby or by the Loan Documents, or any other agreement now or hereafter executed in connection herewith or therewith shall operate as a waiver of any such right or of any other right of such holder or Lender, nor shall any delay, omission or waiver on any one occasion be deemed to be a bar to or waiver of the same or of any other right on any future occasion.

6.      Partial Invalidity.

        The invalidity or unenforceability of any provision hereof, of the other Loan Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the Loan made pursuant hereto and thereto shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

7.      Compliance With Usury Laws.

        All agreements among Borrower and Lender are hereby expressly limited so that in no event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof, provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Note shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of Borrower, and Lender in the execution, delivery and acceptance of this Note to contract in strict compliance with the laws of the State of Maryland from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limit of such validity, and if under or from any circumstances whatsoever Lender should ever

3

RFCCM00108

receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements among Borrower and Lender.

8.    Security.

This Note is secured by, amongst other collateral, the Membership Interests Pledge and Security Agreement.

9.    Notices.

Any notice or other communication in connection with this Note, or any of the other Loan Documents, shall be in writing, and (i) deposited in the United States Mail, postage prepaid, by registered or certified mail, or (ii) hand delivered by any commercially recognized courier service or overnight delivery service such as Federal Express, addressed to Borrower, or Lender, at the address for each set forth in the introductory paragraph hereof.

10.    Governing Law and Consent to Jurisdiction.

a.    Substantial Relationship.  It is understood and agreed that all of the Loan Documents were negotiated, executed and delivered in the State of Maryland, which State the parties agree has a substantial relationship to the parties and to the underlying transactions embodied by the Loan Documents.

b.    Place of Delivery.  Borrower agrees that the Loan Documents and this Note have been delivered to Lender in the State of Maryland.

c.    Governing Law.  This Note, and each of the other Loan Documents shall in all respects be governed, construed, applied and enforced in accordance with the internal laws of the State of Maryland without regard to principles of conflicts of law.

d.    Consent to Jurisdiction.  Borrower irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action or proceeding arising out of or relating to this Note or any other Loan Document.  The Borrower waives, to the fullest extent permitted by law, any objection that the Borrower may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court and any claims that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this Section shall limit the right of the Lender to bring proceedings against the Borrower in the courts of any other jurisdiction. The Borrower agrees that any forum other than the State of Maryland is an inconvenient forum and that a suit brought by the Lender by Borrower in a court of any state other than the State of Maryland should be forthwith dismissed or transferred to a court located in the State of Maryland by that court.

11.    Waiver of Jury Trial.

4

RFCCM00109

BORROWER AND LENDER (BY ACCEPTANCE OF THIS NOTE) MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.  THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.

12.     No Oral Change.

This Note and the other Loan Documents may only be amended, terminated, extended or otherwise modified by a writing signed by the party against which enforcement is sought.  In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend or otherwise modify this Note or any of the other Loan Documents.

13.     Rights of the Holder.

This Note and the rights and remedies provided for herein may be enforced only by Lender and any subsequent holder of this Note, and in all events pursuant to the terms, provisions and conditions of the Loan Agreement.  Wherever the context permits each reference to the term "holder" herein shall mean and refer to Lender or the then holder or holders of this Note.

14.     Right to Pledge.

Lender may at any time pledge all or any portion of its rights hereunder and under the Loan Documents.  No such pledge or enforcement thereof shall release Lender from its obligations under any of the Loan Documents.

15.     Time.

Time is of the essence with respect to each and every payment to be made and condition or obligation to be performed or observed hereunder.

5

16.   Commercial Loan.

Borrower represents and warrants that the Loan evidenced hereby is a loan made to an entity for business and investment purposes.

17.   Absolute Obligation.

Borrower is and shall be obligated to pay all amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.  In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then, the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

RFCCM00111

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed as an instrument under seal as of the date set forth above as a sealed instrument.

WITNESS:                                    BORROWER:

**TRITON RODGERS FORGE, LLC**
A Delaware Limited Liability Company

By:    Bellona Holdings, LLC
       A Delaware Limited Liability Company
       Managing Member

By:_____(SEAL)
   Brian A. McCormick
   Managing Member

STATE OF MARYLAND, ~~CITY~~/COUNTY OF _Baltimore_, TO WIT:

I HEREBY CERTIFY that on this _31st_ day of October, 2005, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Brian A. McCormick, and acknowledged himself to be the duly authorized managing member of Bellona Holdings, LLC, a Delaware limited liability company, which is a managing member of Triton Rodgers Forge, LLC, a Delaware limited liability company, the Borrower herein, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal

_____
NOTARY PUBLIC

My Commission Expires: _9/1/08_

7

EXHIBIT 8



## AMENDED AND RESTATED PROMISSORY NOTE

$22,073,200.00

April 14, 2006

### EXPLANATORY STATEMENT

Pursuant to a Promissory Note dated October 31, 2005 (the "**Original Note**") by **TRITON RODGERS FORGE, LLC**, a Delaware limited liability company (hereinafter, the "Borrower"), in favor of **CBRE REALTY FINANCE HOLDINGS, LLC**, a Delaware limited liability company, predecessor in interest to **CBRE REALTY FINANCE TRS, LLC** (hereinafter, the "Lender") Lender previously extended to Borrower a loan in the principal amount of up to $18,280,000 (the "**Original Loan**").

Borrower has requested, and Lender has agreed, to amend the Original Loan to, *inter alia*, increase the principal amount to be advanced under the Original Note and to extend the original Maturity Date as set forth and defined in the Original Note.

As a condition of entering into the modification of the Loan as set forth above, Lender has required that Borrower execute and deliver this Amended and Restated Promissory Note, amending and restating the Original Note in its entirety.

NOW, THEREFORE, Borrower and Lender agree that, effective as of the date hereof, the Original Note is amended and restated as follows:

1.   Promise To Pay.

FOR VALUE RECEIVED, **TRITON RODGERS FORGE, LLC**, a Delaware limited liability company having an address at c/o Triton Real Estate Partners, LLC, 410 Severn Avenue, Suite B-412, Annapolis, Maryland 21403 (hereinafter, the "Borrower"), promises to pay to the order of **CBRE REALTY FINANCE TRS, LLC**, a Delaware limited liability company having an address at 185 Asylum Street, 37th Floor, Hartford, Connecticut 06103 (hereinafter, the "Lender"), the principal sum of Twenty Two Million Seventy Three Thousand Two Hundred Dollars ($22,073,200.00), with interest thereon, or on the amount thereof from time to time outstanding, to be computed, as hereinafter provided, from the date of its disbursement until such principal sum shall be fully paid. Interest and principal shall be payable in installments as set forth in the Loan Agreement (as defined below). The total principal sum, or the amount thereof outstanding, together with any accrued but unpaid interest, shall be due and payable in full on April 1, 2009 (the "Maturity Date"), subject to acceleration in accordance with the Loan Agreement pursuant to which this Promissory Note (hereinafter, this "Note") has been issued.

2.   Loan Agreement.

This Note is issued pursuant to, and the principal amount from time to time outstanding hereunder shall be advanced pursuant to, the terms, provisions and conditions of an agreement captioned "Loan Agreement" (hereinafter, the "Loan Agreement") of even date herewith by and among the Borrower and the Lender, and evidences the Loan made pursuant thereto. Capitalized terms used herein which are not otherwise specifically defined shall have the same meaning herein as in the Loan Agreement.



Exhibit  *6*

*6* -*19* -09    pmc

RFCCM00120

3.     Acceleration; Event of Default.

The principal of, and interest on, this Note shall be payable as provided in the Loan Agreement and shall be subject to acceleration as provided therein. Upon the occurrence and during the continuance of an Event of Default, Lender shall have, in addition to any rights and remedies contained herein, any and all rights and remedies set forth in the Loan Agreement or in any other Loan Document.

4.     Certain Waivers, Consents and Agreements.

Each and every party liable hereon or for the indebtedness evidenced hereby whether as maker, endorser, guarantor, surety or otherwise hereby: (a) waives presentment, demand, protest, suretyship defenses and defenses in the nature thereof; (b) waives any defenses based upon and specifically assents to any and all extensions and postponements of the time for payment, changes in terms and conditions and all other indulgences and forbearances which may be granted by the holder to any party now or hereafter liable hereunder or for the indebtedness evidenced hereby; (c) agrees to any substitution, exchange, release, surrender or other delivery of any security or collateral now or hereafter held hereunder or in connection with the Loan Agreement, or any of the other Loan Documents, and to the addition or release of any other party or person primarily or secondarily liable; (d) agrees that if any security or collateral given to secure this Note or the indebtedness evidenced hereby or to secure any of the obligations set forth or referred to in the Loan Agreement, or any of the other Loan Documents, shall be found to be unenforceable in full or to any extent, or if Lender or any other party shall fail to duly perfect or protect such collateral, the same shall not relieve or release any party liable hereon or thereon nor vitiate any other security or collateral given for any obligations evidenced hereby or thereby; (e) agrees to pay all costs and expenses reasonably incurred by Lender or any other holder of this Note in connection with the indebtedness evidenced hereby pursuant to the Loan Agreement, including, without limitation, all reasonable attorneys' fees and costs, incurred in connection therewith, the collection of the indebtedness evidenced hereby and the enforcement of rights and remedies hereunder or under the other Loan Documents, whether or not suit is instituted; and (f) consents to all of the terms and conditions contained in this Note, the Loan Agreement, and all other instruments now or hereafter executed evidencing or governing all or any portion of the security or collateral for this Note and for such Loan Agreement, or any one or more of the other Loan Documents.

5.     Delay Not A Bar.

No delay or omission on the part of the holder of this Note in exercising any right hereunder or any right under any instrument or agreement now or hereafter executed in connection herewith, or any agreement or instrument which is given or may be given to secure the indebtedness evidenced hereby or by the Loan Agreement, or any other agreement now or hereafter executed in connection herewith or therewith shall operate as a waiver of any such right or of any other right of such holder or Lender, nor shall any delay, omission or waiver on any one occasion be deemed to be a bar to or waiver of the same or of any other right on any future occasion.

2

RFCCM00121

6.    Partial Invalidity.

The invalidity or unenforceability of any provision hereof, of the Loan Agreement, of the other Loan Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the Loan made pursuant hereto and thereto shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

7.    Compliance With Usury Laws.

All agreements among Borrower, Guarantor, and Lender are hereby expressly limited so that in no event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof, provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Note shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of Borrower, and Lender in the execution, delivery and acceptance of this Note to contract in strict compliance with the laws of the State of Maryland from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limit of such validity, and if under or from any circumstances whatsoever Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements among Borrower, Guarantor and Lender.

8.    Use of Proceeds.

All proceeds of the Loan shall be used solely for the purposes more particularly provided for and limited by the Loan Agreement.

9.    Security.

This Note is secured by amongst, other collateral, the Membership Interests Pledge and Security Agreement, and is further secured by other collateral as set forth in the Loan Agreement.

10.    Notices.

Any notices given with respect to this Note shall be given in the manner provided for in the Loan Agreement.

11.    Governing Law and Consent to Jurisdiction.

a.    Substantial Relationship. It is understood and agreed that all of the Loan Documents were negotiated, executed and delivered in the State of Maryland, which State the

3

parties agree has a substantial relationship to the parties and to the underlying transactions embodied by the Loan Documents.

b.   Place of Delivery.  Borrower agrees that the Loan Documents and this Note have been delivered to Lender in the State of Maryland.

c.   Governing Law.  This Note, and each of the other Loan Documents shall in all respects be governed, construed, applied and enforced in accordance with the internal laws of the State of Maryland without regard to principles of conflicts of law.

d.   Consent to Jurisdiction.  Borrower irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action or proceeding arising out of or relating to this Note or any other Loan Document.  The Borrower waives, to the fullest extent permitted by law, any objection that the Borrower may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court and any claims that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this Section shall limit the right of the Lender to bring proceedings against the Borrower in the courts of any other jurisdiction. The Borrower agrees that any forum other than the State of Maryland is an inconvenient forum and that a suit brought by the Lender by Borrower in a court of any state other than the State of Maryland should be forthwith dismissed or transferred to a court located in the State of Maryland by that court.

12.   Waiver of Jury Trial.

BORROWER AND LENDER (BY ACCEPTANCE OF THIS NOTE) MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.  THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.

RFCCM00123

13.   No Oral Change.

This Note and the other Loan Documents may only be amended, terminated, extended or otherwise modified by a writing signed by the party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend or otherwise modify this Note or any of the other Loan Documents.

14.   Rights of the Holder.

This Note and the rights and remedies provided for herein may be enforced only by Lender and any subsequent holder of this Note, and in all events pursuant to the terms, provisions and conditions of the Loan Agreement. Wherever the context permits each reference to the term "holder" herein shall mean and refer to Lender or the then holder or holders of this Note.

15.   Right to Pledge.

Lender may at any time pledge all or any portion of its rights hereunder and under the Loan Documents. No such pledge or enforcement thereof shall release Lender from its obligations under any of the Loan Documents.

16.   Setoff.

The setoff provisions set forth in Article 13 of the Loan Agreement are incorporated by reference herein.

17.   Time.

Time is of the essence with respect to each and every payment to be made and condition or obligation to be performed or observed hereunder.

18.   Commercial Loan.

Borrower represents and warrants that the Loan evidenced hereby is a loan made to an entity for business and investment purposes.

19.   Absolute Obligation.

Borrower is and shall be obligated to pay all amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff. In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then, the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall

5

RFCCM00124

remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed as of the date set forth above as a sealed instrument.

WITNESS:                                    BORROWER:

                                            **TRITON RODGERS FORGE, LLC**
                                            A Delaware Limited Liability Company

                                            By:     Bellona Holdings, LLC
                                                    A Delaware Limited Liability Company,
                                                    Managing Member

_____                     By:_____(SEAL)
                                                    Brian A. McCormick
                                                    Managing Member

STATE OF MARYLAND, CITY/COUNTY OF _Anne Arundel_, TO WIT:

    I HEREBY CERTIFY that on this _30_ day of March, 2006, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Brian A. McCormick, and acknowledged himself to be the duly authorized managing member of Bellona Holdings, LLC, a Delaware limited liability company, which is a managing member of Triton Rodgers Forge, LLC, a Delaware limited liability company, the Borrower herein, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal                        Tina Shotland
                                                            NOTARY PUBLIC
                                                    Anne Arundel County, Maryland
                                                    My Commission Expires 10/6/0?

                                            _____
                                            NOTARY PUBLIC

My Commission Expires:   _10/6/09_

6

RFCCM00125

EXHIBIT 9

## AMENDED AND RESTATED GUARANTY

This unconditional guaranty (hereinafter, the "Guaranty") is given pursuant to the terms and conditions of that certain Loan Agreement of even date herewith (hereinafter, the "Loan Agreement") by and among **TRITON RODGERS FORGE, LLC, LLC**, a Delaware limited liability company having an address at c/o Triton Real Estate Partners, LLC, 410 Severn Avenue, Suite B-412, Annapolis, Maryland 21403 (hereinafter, the "Borrower"), and **CBRE REALTY FINANCE TRS, LLC**, a Delaware limited liability company having an address at 185 Asylum Street, 37th Floor,  Hartford, Connecticut 06103, as lender (hereinafter, the "Lender"). *Capitalized terms used herein and not otherwise specifically defined shall have the same meaning herein as in the Loan Agreement.*

### EXPLANATORY STATEMENT

Pursuant to a Promissory Note dated October 31, 2005 (the "Original Note") by Borrower in favor of CBRE REALTY FINANCE HOLDINGS, LLC, predecessor in interest to Lender, Lender previously extended to Borrower a loan in the principal amount of up to $18,280,000 (the "Original Loan").

Borrower has requested, and Lender has agreed, to amend the Original Loan to, *inter alia*, increase the principal amount to be advanced under the Original Note and to extend the original Maturity Date as set forth and defined in the Original Note.

As a condition of entering into the modification of the Loan as set forth above, Lender has required that the undersigned guarantors execute and deliver this Amended and Restated Guaranty, amending and restating the original Guaranty given by guarantors in connection with the Original Loan in its entirety.

NOW. THEREFORE, FOR VALUE RECEIVED, and to induce Lender to extend credit to the Borrower as provided for in the Loan Agreement and the other Loan Documents, Brian A. McCormick, a resident of the State of Maryland, and Charles W. Moore a resident of the State of New York, each having an address at c/o Triton Real Estate Partners, LLC, 410 Severn Avenue, Suite B-412, Annapolis, Maryland 21403 (hereinafter, singly and collectively, the "Guarantor"), hereby unconditionally agrees as follows:

1.    <u>Guaranty</u>.    Guarantor, as a primary party and not merely as a surety, unconditionally and irrevocably guarantees to Lender the following "Guaranteed Obligations":

A.    <u>Specific Obligations</u>.  Any loss, damage or liability suffered by Lender, to the extent the same arises out of any of the following (hereinafter, a "Guaranty Event"):

(i)    The Borrower's failure to cause taxes, assessments and any other charges which could result in prior liens against any portion of the Property to be timely paid;

-1-



Exhibit  7

6 -19 -09    pmc

RFCCM00163

(ii)     Fraud by the Borrower or the Guarantor in connection with the development or operation of the Property, the making of the Loan, or any certificates or documents provided in connection therewith;

(iii)    A material misrepresentation or breach of warranty by the Borrower or Guarantor in connection with the development or operation of the Property, the making of the Loan, or any certificates or documents provided in connection therewith;

(iv)    A material misrepresentation or breach of warranty by the Borrower, which was known by the Guarantor to be false when made, in connection with the development or operation of the Property, the making of the Loan, or any certificates or documents provided in connection therewith;

(v)     Following an Event of Default, retention by the Borrower, Guarantor, Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership of any income arising with respect to the Property which, under the terms of the Loan Agreement, this Guaranty or any of the other Loan Documents, should have been applied against costs and expenses associated with the Property or paid to the Lender;

(vi)    The misapplication by the Borrower, the Guarantor, Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership of any insurance proceeds or condemnation awards attributable to the Property;

(vii)   The breach by the Guarantor or Borrower of the provisions limiting payments or distributions as set forth the Loan Agreement;

(viii)  The Borrower's failure to cause the insurance coverage required by the Loan Documents to be maintained;

(ix)    The amendment of any of the organizational documents of Borrower, Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership without the prior written consent of Lender in each case.

B.     _Additional Obligations_.  Upon the occurrence of a Trigger Event (as defined hereunder), and notwithstanding the provisions set forth above, the Guarantor guarantees to the Lender the prompt and full payment (and not merely the collectibility), performance and observance of all of the obligations, terms and conditions to be paid, performed or observed by Borrower under the Loan Agreement, the Note, and each other Loan Document, each as the same may be hereafter amended, modified, extended, renewed or recast, including, but not limited to the payment of the entire amount of all then outstanding principal balance of the Loan, together with interest and other charges thereon as provided for in the Loan Agreement or Note.  As used herein, the term

-2-

RFCCM00164

"Trigger Event" shall mean and refer to the occurrence of any of the following events:

(i)       Any filing by Borrower, any constituent entity owning Borrower or any member of Borrower or such constituent entity, or the Guarantor (or either of them), or Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership of a petition or application for relief, extension, moratorium or reorganization under any bankruptcy, insolvency or debtor's relief law, or the making of an assignment for the benefit of creditors, or the appointment of a receiver of (i) any property of the Borrower, any Guarantor, Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership, or (ii) with respect to Rodgers Forge Apartments Realty Company Limited Partnership, the Property, in any action initiated by, or consented to, by the Borrower, Guarantor, Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership; or

(ii)       The contesting or opposition by the Borrower, any Guarantor, Rodgers Forge Apartments GP, LLC or Rodgers Forge Apartments Realty Company Limited Partnership of any motion for relief from the automatic stay filed by the Lender in any involuntary bankruptcy proceeding of the Borrower.

C.     <u>Substantial Completion</u>. the substantial completion of each portion of the construction of the Project (as defined in the Loan Agreement) undertaken by Rodgers Forge Apartments Realty Company Limited Partnership pursuant to the Loan Documents (exclusive of finishes, options and materials to be chosen by purchasers of individual condominium units within the Property) to attain timely substantial completion free and clear of all mechanics' and materialmen's liens and claims therefore in the manner and within the time specified by the Loan Agreement, for a sum not to exceed the sum of the Loan and the Senior Loan, all in accordance with the terms of the Loan Agreement; and

D.     <u>Environmental Conditions.</u>  The indemnification of Lender, and its directors, officers, employees, shareholders, and agents, and each of their respective successors, affiliates, trustees and assigns, in each case acting in their capacities as such (collectively for the purposes of this subsection "D", the "Indemnified Parties") and shall hold the Indemnified Parties harmless from, and shall reimburse the Indemnified Parties for, any and all claims, demands, suits, causes of action, judgments, penalties, liabilities, losses, costs, damages (including those resulting from diminution of the value of the Property) and expenses incurred by any of the Indemnified Parties, including investigatory costs, court costs and reasonable attorneys' fees actually incurred (prior to trial, at trial and on appeal) resulting from or incurred in connection with: (i) the existence of any Hazardous Substance or Environmental Condition in, upon, under or over, or emanating from or otherwise affecting, the Property; (ii) any damage or injury to human health, the Environment or natural resources resulting from any such Hazardous Substance or Environmental Condition, or (iii) any abatement, clean-up, removal or

-3-

disposal of, any other action concerning, and any liability to any third party (including, but not limited to any governmental authority) as a result of any such Hazardous Substance or Environmental Condition, including any such abatement, clean-up, removal, disposal or other action required by: (a) any Governmental Authority having jurisdiction over the Property, the Borrower or Lender, (b) any prospective purchaser of or lender to the Property, or (c) virtue of or as the result of the Lender exercising any of its rights or remedies under any Loan Document, including becoming the owner of the Property by foreclosure or conveyance in lieu of foreclosure. At and as of such time as Lender has been repaid the entirety of all amounts due under and pursuant to the Note and other Loan Documents.

As used in this Subsection 1.D the terms:

(i)     "Environmental Condition" shall mean any condition, whether or not yet discovered or disclosed in any environmental report, which requires any investigation, sampling, testing, monitoring, remediation or reporting under or pursuant to any Environmental Laws in connection with any Hazardous Substances at, on, under or emanating to or from, the Property, including, but not limited to any condition resulting from a previous owner or operator of the Property or from any activity or operation now or formerly conducted by any person or entity on the Property or any property adjoining or in close proximity to the Property.

(ii)     "Environmental Laws" shall mean all existing or future federal, state and local statutes, ordinances, regulations, rules, executive orders, standards, requirements, including the requirements imposed by common law, and judicial orders and rulings concerning or relating to industrial hygiene and the protection of health and the Environment including:  (i) those relating to the generation, manufacture, storage, transportation, disposal, release, emission or discharge of Hazardous Substances; (ii) those in connection with the construction, fuel supply, power generation and transmission, waste disposal or any other operations or processes relating to the Property; and (iii) those relating to the atmosphere, soil, surface and ground water, wetlands, stream sediments and vegetation on, under, in or about the Property.  Any terms mentioned herein which are defined in any Environmental Law shall have the meanings ascribed to such terms in said laws; provided, however, that if any of such laws are amended so as to broaden any term defined therein, such broader meaning shall apply subsequent to the effective date of such amendment.

(iii)     "Hazardous Substances" shall mean (i) any "hazardous waste", "hazardous material" or "hazardous substance" under any present or future Environmental Law, which are in the nature of gasoline, fuel oil, or any other petroleum products, hydrocarbons or volatile organic compounds, or (ii) any other "hazardous waste", "hazardous material" or "hazardous substance" under any present or future Environmental Laws to the extent the existence thereof is the result of, or is or at any

-4-

RFCCM00166

time was emanating to or from, any currently or previously existing underground storage tank located on, under or about the Property, any past, present or future removal or repair thereof, and/or any remediation undertaken or to be undertaken in connection therewith.

Upon the occurrence of any Guaranty Event or Trigger Event, Lender may at its option proceed directly and at once, without further notice, against Guarantor hereunder, without proceeding against the Borrower or any other person or other Collateral for the obligations secured by this Guaranty that relate to the Guaranty Event or the Trigger Event, as applicable. Any sums payable by Guarantor hereunder shall bear interest at the Default Rate from the date of demand until the date paid.

This Guaranty shall survive and continue in full force and effect beyond and after the payment and satisfaction of the Guaranteed Obligations and the Obligations of Borrower in the event Lender is required to disgorge or return any payment or property received as a result of any laws pertaining to preferences, fraudulent transfers or fraudulent conveyances.

    2.    <u>Waivers</u>. Guarantor hereby waives and relinquishes to the fullest extent now or hereafter not prohibited by applicable law:

    (i)    all suretyship defenses and defenses in the nature thereof;

    (ii)    any right or claim of right to cause a marshalling of the assets of Borrower or of any Collateral, or to cause Lender to proceed against any of the other security for the Guaranteed Obligations or the obligations of Borrower before proceeding under this Guaranty against Guarantor, or, if there shall be more than one Guarantor, to require Lender to proceed against any other Guarantor or any of Guarantors in any particular order;

    (iii)    all rights and remedies, including, but not limited to, any rights of subrogation, contribution, reimbursement, exoneration or indemnification pursuant to any agreement, express or implied, or now or hereafter accorded by applicable law to indemnitors, guarantors, sureties or accommodation parties. <u>Provided</u>, <u>however</u>, unless Lender otherwise expressly agrees in writing, such waiver by any particular Guarantor shall not be effective to the extent that by virtue thereof such Guarantor's liability under this Guaranty or under any other Loan Document is rendered invalid, voidable, or unenforceable under any applicable state or federal law dealing with the recovery or avoidance of so-called preferences or fraudulent transfers or conveyances or otherwise;

    (iv)    notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of nonpayment, nonperformance, nonobservance or default, or other proof or notice of demand whereby to charge Guarantor therefor;

-5-

RFCCM00167

(v)      the pleading of any Statute of Limitations as a defense to Guarantor's obligations hereunder; and

(vi)      the right to a trial by jury in any matter related to this Guaranty.

GUARANTOR AND LENDER MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS GUARANTY, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS WAIVER IS GIVEN AS A MATERIAL INDUCEMENT TO LENDER TO ACCEPT THIS GUARANTY AND TO MAKE THE LOAN.

3.      <u>Cumulative Rights</u>. Lender's rights under this Guaranty shall be in addition to and not in limitation of all of the rights and remedies of Lender under the Loan Documents. All rights and remedies of Lender shall be cumulative and may be exercised in such manner and combination as Lender may determine.

4.      <u>No Impairment</u>. The liability of Guarantor hereunder shall in no way be limited or impaired by, and Guarantor hereby assents to and agrees to be bound by, any amendment or modification of the provisions of the Loan Documents to or with Lender by Borrower or any other Guarantor or any person who succeeds Borrower as owner of the Property. In addition, the liability of Guarantor under this Guaranty and the other Loan Documents shall in no way be limited or impaired by:

(i)      any extensions of time for performance required by any of the Loan Documents;

(ii)      any amendment to or modification of any of the Loan Documents;

(iii)      any sale or assignment of the Loan, or any sale, assignment or foreclosure of all or part of the Property;

(iv)      any exculpatory, or nonrecourse, or limited recourse, provision in any of the Loan Documents limiting Lender's rights to a deficiency judgment against Borrower or any other person or entity;

(v)      the accuracy or inaccuracy of any of the representations or warranties made by or on behalf of Borrower, any partner of Borrower, or Guarantor, under any Loan Document or otherwise;

(vi)      the release of Borrower, any partner of Borrower, or any other person or entity, from performance or observance of any of the agreements, covenants, terms or

-6-

RFCCM00168

conditions contained in any of the Loan Documents by operation of law,   Lender's voluntary act, or otherwise;

   (vii)  the filing of any bankruptcy or reorganization proceeding by or against Borrower, any partner of Borrower, or any subsequent owner of the Property;

   (viii)  the release or substitution in whole or part of any collateral or security for the obligations or the Guaranteed Obligations;

   (ix)  Lender's failure to file any UCC financing statements, or   Lender's improper recording or filing of any thereof, or   Lender's failure to otherwise perfect, protect, secure, or insure any security interest or lien given as security for the Obligations;

   (x)  the release of any other party now or hereafter liable upon or in respect of this Guaranty or any of the other Loan Documents; or

   (xi)  the invalidity or unenforceability of all or any portion of any of the Loan Documents as to Borrower or any other person or entity.

Any of the foregoing may be accomplished with or without notice to Borrower, any partner of Borrower or any Guarantor and with or without consideration.

   5.  <u>Delay Not Waiver</u>.  No delay on Lender's part in exercising any right, power or privilege hereunder or under any of the Loan Documents shall operate as a waiver of any such privilege, power or right.  No waiver by Lender in any instance shall constitute a waiver in any other instance.

   6.  <u>Warranties and Representations</u>.  Guarantor warrants and represents to Lender for the express purpose of inducing Lender to enter into the Loan Agreement, to disburse the proceeds of the Loan, to accept this Guaranty, and to otherwise complete the transactions contemplated by the Loan Agreement, that as of the date of this Guaranty, upon the date of the disbursement of the Loan proceeds and at all times thereafter until the Loan is repaid and all Guaranteed Obligations to Lender have been satisfied in full, as follows:

   (i)  <u>Incorporation by Reference</u>.  Each warranty and representation made by Guarantor or Borrower in the Loan Agreement is true, accurate and complete and is incorporated herein by reference.

   (ii)  <u>Financial Information</u>.  True and complete copies of the financial statements of Guarantor have been delivered to Lender and each of the same are true, accurate and complete and fairly present Guarantor's financial condition as of the dates thereof and no material and adverse change has occurred in Guarantor's financial condition or business since the respective dates thereof; and each financial statement of

RFCCM00169

Guarantor submitted in the future shall be true, accurate and complete and shall fairly present Guarantor's financial condition as of the dates thereof;

(iii)    No Violation.   The payment and performance by Guarantor of Guarantor's obligations under this Guaranty and the Environmental Indemnity do not and shall not constitute a violation of any law, order, regulation, contract or agreement to which Guarantor is a party or by which Guarantor or Guarantor's property may be bound;

(iv)    No Litigation.  There is no material litigation now pending or, to the best of Guarantor's knowledge threatened in writing, against Guarantor which, if adversely decided would materially impair the ability of Guarantor to pay and perform Guarantor's obligations under the Loan Agreement, this Guaranty or the Environmental Indemnity.   There is no litigation (whether or not material) pending, or threatened in writing, against Guarantor in which the amount in controversy exceeds $25,000.00 which is not either: (i) covered by adequate insurance, or (ii) previously disclosed in writing to Lender together with a written explanation of why such litigation is not material.

(v)    Valid and Binding.  Each of the Loan Documents to which Guarantor is a party, constitutes such Guarantor's legal, valid and binding obligation in accordance with the respective terms thereof, subject to bankruptcy, insolvency and similar laws of general application affecting the rights and remedies of creditors and with respect to the availability of remedies of specific enforcement subject to the discretion of the court before which proceedings therefor may be brought.

(vi)    Solvency.  Guarantor is solvent and is not rendered insolvent by the obligations undertaken in this Guaranty. No Guarantor is contemplating either the filing of a petition or proceeding under any state or federal bankruptcy or insolvency or reorganization laws or the liquidating of all or a major portion of such Guarantor's property, and no Guarantor has any knowledge of any such petition or proceeding being filed against such Guarantor.

(vii)    Material Economic Benefit.  The granting of the Loan to Borrower will constitute a material economic benefit to Guarantor.

7.    Notices.  Any notice or other communication in connection with this Guaranty shall be in writing and (i) deposited in the United States mail, postage prepaid by registered or certified mail, or (ii) hand delivered by any commercially recognized courier service or overnight delivery service such as Federal Express, or (ii) sent by facsimile transmission if a FAX number is designated below addressed to the parties at the address set forth for each in the Loan Agreement (provided that the address for Guarantors shall be as set forth above). Any such addressee may change its address for such notices to any other address in the United States as such addressee shall have specified by written notice given as set forth above.

-8-

RFCCM00170

All periods of notice shall be measured from the deemed date of delivery. A notice shall be deemed to have been given, delivered and received upon the earliest of: (i) if sent by such certified or registered mail, on the third Business Day following the date of post-mark, or (ii) if hand delivered by such courier or overnight delivery service, when so delivered or tendered for delivery during customary business hours on a Business Day at the specified address, or (iii) if so mailed, on the date of actual receipt (or tender of delivery) as evidenced by the return receipt, or (iv) if so delivered, upon actual receipt, or (v) if facsimile transmission is a permitted means of giving notice, upon receipt an evidenced by confirmation.

8.     No Oral Change.   No provision of this Guaranty may be changed, waived, discharged, or terminated orally (in person or by telephone) or by any other means except by an instrument in writing signed by the party against whom enforcement of the change, waiver or discharge or termination is sought.

9.     Parties Bound; Benefit.   This Guaranty shall be binding upon Guarantor and Guarantor' s respective assigns, heirs and personal representatives and shall be for the benefit of Lender and each Lender, and of any subsequent holder of Lender's interest or a Lender's interest in the Loan and of any owner of a participation interest therein.   In the event the interest of Lender the Loan Documents is sold or transferred, then the liability of the Guarantor to Lender and each Lender shall then be in favor of both Lender originally named herein and each subsequent holder of Lender's interest therein, to the extent of their respective interests.

10.     Joint and Several.   If there is more than one (1) Guarantor, the obligations of each Guarantor and such Guarantor's respective assigns, heirs and personal representatives shall be and remain joint and several.   Each reference to Guarantor shall include each Guarantor separately as well as all Guarantors collectively.

11.     Partial Invalidity.   Each of the provisions hereof shall be enforceable against Guarantor to the fullest extent now or hereafter not prohibited by applicable law. The invalidity or unenforceability of any provision hereof shall not limit the validity or enforceability of each other provision hereof.

12.     Governing Law.   This Guaranty and the rights and obligations of the parties hereunder shall in all respects be governed by and construed and enforced in accordance with the internal laws of the State of Maryland, without giving effect to principles of conflicts of law. It is understood and agreed that this Guaranty and all of the other Loan Documents were negotiated, executed and delivered in the State of Maryland which State the parties agree has a substantial relationship to the parties and to the underlying transactions embodied by the Loan Documents.

13.     Consent to Jurisdiction.   Guarantor hereby irrevocably submits to the nonexclusive personal jurisdiction of any Maryland State Court or any Federal Court sitting in the State of Maryland over any suit, action or proceeding arising out of or relating to this

-9-

RFCCM00171

Guaranty. Guarantor hereby agrees and consents that in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any Maryland State or Federal Court sitting in Maryland may be made by certified or registered mail, return receipt requested, directed to Guarantor at the address indicated in Section 7 above and service so made shall be deemed completed five (5) days after the same shall have been so mailed.

14.   Financial Statements and Reports.   Guarantor shall furnish or cause to be furnished to Lender from time to time the financial statements, data and other information required pursuant to Section 9.2 of the Loan Agreement.

15.   Additional Covenants of the Guarantors.   Guarantor shall pay, perform, observe and comply with all of the obligations, terms, covenants and conditions set forth in this Guaranty, the Environmental Indemnity, and the other Loan Documents to which Guarantor is a party and by any provisions of the Loan Agreement specifically applicable to Guarantor.

15.1.   Prohibited Transfers.   Without Lender's prior written consent after full disclosure, Guarantor shall not transfer any material portion of Guarantor's property, real or personal, or release any contract right or claim which constitutes a material portion of Guarantor's net worth, either voluntarily or involuntarily, absolutely or collaterally, without receiving full fair market value therefor. Guarantor agrees that any transfer or release in violation of the foregoing provision shall be deemed to have occurred with an intent to defraud creditors. For purposes of the foregoing, the term "material" shall be defined as any transfer or release involving more than ten percent (10%) of Guarantor's net worth in any calendar year.

16.   Subordination.

16.1.   Except as may be otherwise specifically provided for in the Loan Agreement with respect to Permitted Distributions, any indebtedness of Borrower to Guarantor, or to any affiliated entity, with respect to the Property now or hereafter existing together with any interest thereon shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior, full and Non-Contestable Payment and satisfaction of all Obligations of Borrower to the Lender. Payment and satisfaction of obligations shall be deemed "Non-Contestable Payment" only upon such payment and satisfaction and the expiration of all periods of time within which a claim for the recovery of a preferential payment, or fraudulent conveyance, or fraudulent transfer in respect of payments received by Lender as to the Obligations could be filed or asserted with: (A) no such claim having been filed or asserted, or (B) if so filed or asserted, the final, non-appealable decision of a court of competent jurisdiction denying the claim or assertion.

16.2.   Except as may be otherwise specifically provided for in the Loan Agreement with respect to Permitted Distributions, at all times until the full and Non-Contestable Payment and satisfaction of the Obligations of Borrower to Lender with respect to the Loan (and including interest accruing on the Note after the commencement of a case by or against Borrower

-10-

RFCCM00172

under the Bankruptcy Code now or hereafter in effect, which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor or any affiliated entity notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code, as now or hereafter in effect, generally), Guarantor, and each affiliated entity, agrees not to accept any payment or satisfaction for any kind of indebtedness of Borrower to Guarantor, or any affiliated entity, and hereby assigns such indebtedness to Lender including, but not limited to, the right to file proofs of claim and to vote thereon in connection with any such case under the Bankruptcy Code, as now or hereafter in effect, and the right to vote on any plan of reorganization.

16.3.    Any mortgage, security interest, lien or charge on the Collateral, all rights therein and thereto, and on the revenue and income to be realized therefrom, which Guarantor, or any affiliated entity, may have or obtain as security for any loans, advances, indebtedness or costs in connection with the construction and completion of the, Improvements or in connection with the Project, or otherwise, shall be, and such mortgage, security interest, lien or charge hereby is, subordinated to the mortgage and to the full and Non-Contestable Payment and satisfaction of all Obligations of Borrower to the Lender.

16.4.    In addition to the foregoing, and not in limitation thereof, any claims of Guarantor, or any affiliated entity, of subrogation, contribution, reimbursement, exoneration, indemnification, or reimbursement arising out of any payment made on this Guaranty, whether such claim is based upon an express or implied contract, or operation of law, are hereby waived during the term hereof.

17.    Legal Fees, Costs and Expenses.  Guarantor further agrees to pay upon demand all costs and expenses reasonably incurred by  Lender or any Lender or their respective successors or assigns in connection with enforcing any of the rights or remedies of Lender or any Lender, or such successors or assigns, under or with respect to this Guaranty including, but not limited to, attorneys, fees and the out-of-pocket expenses and disbursements of such attorneys. Any such amounts which are not paid within thirty (30) days of demand therefor shall bear interest at the Default Rate from the date of demand until paid.

[The balance of this page is intentionally left blank]

-11-

RFCCM00173

Witness the execution and delivery hereof as an instrument under seal as of the 14th day of March, 2006.

GUARANTOR:

_____        _____
Witness                                                    Brian A. McCormick, individually


_____        _____
Witness                                                    Charles W. Moore, individually

-12-

RFCCM00174

Witness the execution and delivery hereof as an instrument under seal as of the 14th day of ~~March~~, 2006. April

GUARANTOR:

_____        _____
Witness                          Brian A. McCormick, individually


_____        _____
Witness                          Charles W. Moore, individually

-12-

RFCCM00175

EXHIBIT 10



# FIRST AMENDMENT TO INDEMNITY DEED OF TRUST AND SECURITY AGREEMENT

THIS FIRST AMENDMENT TO INDEMNITY DEED OF TRUST AND SECURITY AGREEMENT (this "Deed of Trust") is made as of April 14, 2006, by RODGERS FORGE APARTMENTS REALTY COMPANY LIMITED PARTNERSHIP, a Maryland limited partnership (the "Grantor"), in favor of J. RICHARD SAAS (the "Trustee") (the Trustee, together with any other trustee now or hereafter added, collectively called the "Trustees"), for the benefit of CBRE REALTY FINANCE TRS, LLC, a Delaware limited liability company, as assignee of CBRE REAL ESTATE HOLDINGS, LLC (the "Beneficiary").

## RECITALS

R.1.   Pursuant to a Promissory Note dated October 31, 2005 by TRITON RODGERS FORGE, LLC, a Delaware limited liability company (the "Borrower"), in favor of Beneficiary, the Beneficiary previously extended to Borrower a loan in the principal amount of up to $18,280,000 (the "Original Loan").

R.2.   Pursuant to a Guaranty from Grantor to and for the benefit of the Beneficiary dated as of October 31, 2005 (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "Original IDOT Guaranty"), Grantor previously guaranteed the prompt and punctual payment and performance of the obligations as set forth in the Original Note.

R.3.   By Indemnity Deed of Trust and Security Agreement dated October 31, 2005 and recorded among the Land Records of Baltimore County, Maryland in Liber 22831, folio178 (the "Original Indemnity Deed of Trust"), Grantor previously agreed to secure the full and punctual payment of the Original Note and the full performance of all the provisions, conditions, covenants and agreements contained therein; and also to secure the reimbursement to the holder or holders of the Original Note and to the Trustees acting thereunder for the time being, and any purchaser or purchasers, grantee or grantees under any sale or sales under the provisions of the Original Indemnity Deed of Trust, for all money which may be advanced as therein provided for, and for any and all costs and expenses (including attorneys' fees) incurred or paid on account of any litigation at law or in equity which may arise in respect to the Original Indemnity Deed of Trust or to the indebtedness thereby secured or the property therein mentioned or in obtaining possession of the Premises (as therein defined) after any sale which may be made as hereinafter provided for.

R.4.   Borrower has requested, and Beneficiary has agreed, to amend the Original Loan to, inter alia, increase the principal amount to be advanced under the Original Note and to extend the original Maturity Date as set forth and defined in the Original Note.

1

RFCCM00126

**R.5.**    Pursuant to an Amended and Restated Promissory Note of even date herewith (the "**Note**") Borrower and Beneficiary have, on even date herewith, amended and restated the Original Note to increase the principal amount available to be advanced by Beneficiary to or for the use of Borrower to the aggregate amount of $22,073,200.00 (the "**Loan**"), to extend the Maturity Date thereof (and as defined therein) and to otherwise amend and modify the Original Note as more particularly set forth in the Note.

**R.6.**    By Amended and Restated Guaranty dated of even date herewith (together with the Original IDOT Guaranty, the "**IDOT Guaranty**"), Grantor has modified its obligations under the Original IDOT Guaranty such that Grantor has guaranteed and does guaranty the prompt and punctual payment and performance of the obligations as set forth in the Note.

**R.7.**    As a condition precedent to modifying the Loan with and for the Borrower as contemplated by the Note, the Beneficiary has required that the Grantor, by the execution and delivery of this Amendment, and the Grantor does hereby, secure the full and punctual payment of the following (collectively the "**Obligations**"): (a) the unpaid principal balance of the Loan as evidenced by the Note, interest thereon, late charges (if any), and prepayment fees or premiums (if any), at the time or times, in the manner and at the rate or rates set forth in the Note, and (b) all other present and future indebtedness, liabilities and obligations of the Borrower, the Grantor, or any other person or persons to the Trustees and/or the Beneficiary, the IDOT Guaranty, the Note or any of the other Loan Documents (as defined in the Original Indemnity Deed of Trust); and (c) any and all Expenses (as defined in the Original Indemnity Deed of Trust), indemnifications and other amounts due at any time under the provisions of the Original Indemnity Deed of Trust, as amended and modified by this Amendment (collectively, the "**Deed of Trust**") (whether or not expressly included as a part of the Obligations pursuant to the provisions of the Deed of Trust), together with interest thereon; and (d) the full and punctual payment when due (whether at stated maturity, upon acceleration or otherwise) of any and all present and future indebtedness, liabilities and obligations of every kind and nature whatsoever of the Borrower to the Beneficiary, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, joint or several, both now and hereafter existing, or due or to become due, arising under, out of, as a result of, or in connection with, the IDOT Guaranty, the Deed of Trust and the other Loan Documents, and (e) the due and punctual performance of all of the other terms and provisions of the IDOT Guaranty, the Deed of Trust and the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    The Recitals set forth above are incorporated herein as a substantive part of this Amendment.

2.    All capitalized terms used herein and not otherwise defined herein shall have the meanings given them in the Original Indemnity Deed of Trust.

2

RFCCM00127

3.    The Original Indemnity Deed of Trust shall be, and hereby is, amended such that the Obligations secured thereby are hereby increased to the aggregate principal sum of Twenty Two Million Seventy Three Thousand Two Hundred Dollars ($22,073,200.00), plus interest and other costs as set forth in the Deed of Trust.

4.    In connection with the foregoing, Grantor hereby confirms and ratifies the grant, conveyance and transfer of the Premises  and does hereby further **GRANT AND CONVEY** unto the Trustees, in fee simple, certain land situate, lying and being in the County of Baltimore, State of Maryland, that is particularly and legally described in **Exhibit "A"** attached hereto and incorporated by reference herein (hereinafter referred to as the "**Land**") and does further GRANT AND CONVEY unto the Trustees, the entirety of the Premises.

5.    Grantor hereby represents and warrants to Beneficiary and Trustees that all representations and warranties set forth in the Original Indemnity Deed of Trust are true, correct and complete as of the date hereof as though fully set forth and restated herein in their entirety.

6.    Except as specifically amended and modified as hereby, all other terms and provisions of the Original Indemnity Deed of Trust shall remain unmodified and shall continue, as of the date hereof, in full force and effect.

7.    Nothing contained herein is intended or shall be construed to constitute a substitution or novation of the original indebtedness evidenced by the Note, guaranteed by the Guaranty or secured by the Original Indemnity Deed of Trust, all of which remains outstanding without interruption.

3

**RFCCM00128**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the date first above written.

WITNESS/ATTEST:                    GRANTOR:

                                   **RODGERS FORGE APARTMENTS REALTY
                                       COMPANY LIMITED
                                       PARTNERSHIP**

                                   By:   Rodgers Forge Apartments GP, LLC
                                         A Maryland Limited Liability Company
                                         General Partner

                                         By: Triton Rodgers Forge, LLC, a Delaware
                                             limited liability company, its managing
                                             member

                                             By: Bellona Holdings, LLC, its
                                                 managing member

                                             By: _____(SEAL)
                                             By:   Brian A. McCormick
                                             Title   Managing Member


STATE OF MARYLAND, CITY/COUNTY OF _Anne Arundel_, TO WIT:

    I HEREBY CERTIFY that on this _30_ day of March, 2006, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Brian A. McCormick, and acknowledged himself to be the duly authorized managing member of Bellona Holdings, LLC, a Delaware limited liability company, which is a managing member of Triton Rodgers Forge, LLC, a Delaware limited liability company, the managing member of the Grantor herein, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal

                                         Tina Shotland
                                         NOTARY PUBLIC
                        _____  Anne Arundel County, Maryland
                        NOTARY PUBLIC    My Commission Expires 10/6/0⁹

4

RFCCM00129

## JOINDER BY BORROWER

The undersigned Borrower hereby joins in the foregoing and in each and every representation, warranty, certification, covenant, promise, agreement and undertaking therein as primary obligations of the Borrower directly with the Beneficiary, and agrees to comply or cause compliance with all provisions thereof, regardless of whether or to what extent the Grantor complies or causes compliance.

Borrower:

**TRITON RODGERS FORGE, LLC**
A Delaware Limited Liability Company

By:   Bellona Holdings, LLC
A Delaware Limited Liability
company,
Managing Member

By: _____ (SEAL)
Brian A. McCormick
Managing Member

STATE OF MARYLAND, CITY/COUNTY OF _Anne Arundel_ TO WIT:

I HEREBY CERTIFY that on this _30_ day of March, 2006, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Brian A. McCormick, and acknowledged himself to be the duly authorized managing member of Bellona Holdings, LLC, a Delaware limited liability company, which is a managing member of Triton Rodgers Forge, LLC, a Delaware limited liability company, the Borrower herein, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal

_____
NOTARY PUBLIC

Tina Shotland
NOTARY PUBLIC
Anne Arundel County, Maryla-
My Commission Expires 10-

My Commission Expires: _10/6/09_

5

## PREPARATION CERTIFICATE

I HEREBY CERTIFY that I am an attorney duly authorized to practice before the Court of Appeals for the State of Maryland and that the foregoing Indemnity Deed of Trust and Security Agreement was prepared under my supervision.

6

RFCCM00131

EXHIBIT A

Description of Land

7

RFCCM00132

EXHIBIT 11

LOAN AGREEMENT

Dated: As of November 8, 2005

Among

**MONTROSE INVESTMENT HOLDINGS, LLC**, a Delaware limited liability company

as "Borrower"

and

**CBRE REALTY FINANCE TRS, LLC,** a Delaware limited liability company

as "Lender"

-1-



Exhibit _33_

6 -19 -09   pmc

**RFCCM00228**

<u>LOAN AGREEMENT</u>

This Loan Agreement (hereinafter, this "Agreement") is made and entered into as of the 8th day of November, 2005, by and between **MONTROSE INVESTMENT HOLDINGS, LLC**, a Delaware limited liability company having an address at c/o Triton Real Estate Partners, LLC, 410 Severn Avenue, Suite B-412, Annapolis, Maryland 21403 (hereinafter, the "Borrower"), and **CBRE REALTY FINANCE TRS, LLC**, a Delaware limited liability company having an address at 185 Asylum Street, 37th Floor, Hartford, Connecticut 06103 (the "Lender.

WITNESSETH:

1.   <u>BACKGROUND.</u>

1.1   <u>Defined Terms</u>

Capitalized terms used in this Agreement are defined either in <u>Exhibit A,</u> or in specific sections of this Agreement, or in another Loan Document, as referenced in <u>Exhibit A</u>.

1.2   <u>Borrower</u>

Borrower is a limited liability company organized under the laws of the State of Delaware. The managing member of the Borrower is Brian A. McCormick, a Maryland resident (hereinafter, the "Managing Member").

1.3   <u>Land and Improvements; Property</u>

Borrower is the sole member and sole managing member of Triton Pavilion, LLC, a Delaware limited liability company ("Triton Pavilion"). Triton Pavilion will become the sole member of and the sole managing member of Pavilion LLC ("Pavilion"), a Maryland limited liability company, pursuant to a transaction which, using proceeds of the Loan advanced to it by Borrower and other credit facilities, Triton Pavilion will acquire all of the membership interests of Pavilion. Pavilion is the fee owner of a certain parcel of land located in Montgomery County, Maryland, bearing a street address of 5901 Montrose Road, Rockville, Montgomery County, Maryland 20852 (hereinafter, the "Land"). The Land is currently improved by a 432-unit multi-family rental project and each and every appurtenance and other improvement related thereto (the "Improvements"). The Land and Improvements are collectively called the "Property". The Improvements are contemplated to be converted to a residential for sale condominium project, and the Units therein to be sold in accordance with the Budget and the Sales Pricing Plan.

1.4   <u>Use of Loan Proceeds</u>

Borrower has applied to the Lender for a loan (hereinafter, the "Loan") in the amount of Thirty One Million Nine Hundred Forty Six Thousand Six Hundred Fifty Dollars ($31,946,650.00) (hereinafter, the "Loan Amount"). The Borrower shall (x) use a portion of the proceeds of the Loan to pay for the costs and expenses incident to the closing of the Loan, and (y) advance the remaining proceeds of the Loan to to acquire all of the membership interests of Pavilion as set forth above.

-2-

RFCCM00229

1.5   <u>Guaranties and Indemnities</u>

As an inducement to the Lender to make the Loan, the Managing Member, an individual resident of the State of Maryland, and Mr. Charles W. Moore, an individual resident of the State of New York (hereinafter, singly and collectively, the "Guarantor"), have agreed to furnish certain guaranties and indemnities to the extent provided for in such of the Loan Documents to which each such Guarantor is a party.

1.6   <u>Loan</u>

Subject to all of the terms, conditions and provisions of this Agreement, and of the agreements and instruments referred to herein, Lender agrees to make the Loan to the Borrower.

2.   <u>LOAN PROVISIONS</u>.

2.1   <u>Amount of Loan</u>

In no event shall the amount of the Loan exceed the lesser of: (i) Thirty One Million Nine Hundred Forty Six Thousand Six Hundred Fifty Dollars ($31,946,650.00), or (ii) ninety-seven percent (97%) of the actual Project Costs (when the Loan is aggregated with the original principal amount of the Senior Loan).

2.2   <u>Term of Loan</u>

Unless sooner accelerated pursuant to the terms and conditions hereof, the Loan shall be for a term of thirty six (36) months (hereinafter, the "Term") commencing on the date hereof and ending on October 1, 2008 (hereinafter, "Maturity Date") subject to extension pursuant to the terms of the Note.

2.3   <u>Interest Rate and Payment Terms</u>

The Loan shall be payable as to interest and principal in accordance with the provisions of this Agreement and the Note. This Agreement also provides for interest at a Default Rate, Late Charges and prepayment rights and fees.

2.3.1 <u>Interest Rate</u>. The principal amount outstanding under the Loan shall bear interest at the rate of twenty percent (20%) per annum (the "Effective Rate"), compounded on a monthly basis; subject to the conditions and limitations provided for in this Agreement.

2.3.2 <u>Payment, Pay Rate, Accrual, and Calculation of Interest</u>. That portion of the interest accruing at the Pay Rate shall be: (a) payable in arrears commencing on December 1, 2005 (which shall include all interest accrued from the date hereof to and through such date) and on the last day of each calendar month thereafter (hereinafter, a "Payment Date") until the principal together with all interest and other charges payable with respect to the Loan shall be fully paid; and (b) calculated on the basis of a 360 day year and the actual number of days elapsed. Interest at the Effective Rate shall be computed from and including the first day of the applicable Interest Period to, but excluding, the last day thereof. All interest accrued at the Effective Rate and not paid on a current basis as a part

-3-

RFCCM00230

of the Pay Rate, shall, as of the end of each Interest Period, accrue, and interest thereon at the Effective Rate shall accrue until paid in full in the same manner, with all amounts so accrued, and all interest thereon, to be due and payable in full at Maturity.

2.3.3 Principal.   The entire principal balance of the Loan shall be due and payable in full upon Maturity.

2.3.4 Prepayment

(a)     The Borrower may prepay all or any portion of the outstanding balance of the Loan, provided that (x) the Borrower has given the Lender not less than fifteen (15) days prior written notice of its intention to prepay all or any portion of the Loan, and (y) the Borrower pays to the Lender the applicable Prepayment Fee.  Any partial prepayment of principal shall first be applied to any installment of principal then due and then be applied to the principal due in the reverse order of maturity, and no such partial prepayment shall relieve Borrower of the obligation to pay each subsequent installment of principal when due. Notwithstanding such prepayment, the Participation ~ontinue to remain outstanding until paid in full upon the sale of all residential ~~~ inium units comprising the Property have been consummated in third party arms .ength transactions consistent with the Budget and the Sales Pricing Plan.

~ ~ ~ ~ ~rity.  At Maturity all accrued unpaid interest, principal and other charges due ~ ~~ :o the Loan shall be due and payable in full and the principal balance and ~~~~ ~~~er charges, but not unpaid interest, shall continue to bear interest at the Default Rate until so paid.

~.~.0 ~~~~~ ~~~ ~~~ment; Date of Credit.  All payments of interest, principal and fees shall be made in lawful money of the United States in immediately available funds. P~~~~~~~ ~~ ~~~ ~~ credited on the Business Day on which immediately available funds ~~~~~~~~~ ~~~~ one o'clock P.M. Eastern Time; payments received after one o'clock ~~~ :all be credited to the Loan on the next Business Day.

2.3.7 Billings.   Lender may submit monthly billings reflecting payments due; however, any changes in the interest rate which occur between the date of billing and the due date may be reflected in the billing for a subsequent month.  Neither the failure of Lender to submit a billing nor any error in any such billing shall excuse Borrower from the obligation to make full payment of all Borrower's payment obligations when due.

2.3.8 Default Rate.   Lender shall have the option of imposing, and Borrower shall pay upon billing therefor, an interest rate which is five percent (5%) per annum above the interest rate otherwise payable (hereinafter, the "Default Rate"): (a) while any monetary Default exists and is continuing, during that period between the due date and the date of payment; (b) following any Event of Default, unless and until the Event of Default is waived by Lender; and (c) after Maturity.

2.3.9 Late Charges. Borrower shall pay, upon billing therefor, a late charge (hereinafter, a "Late Charge") equal to five percent (5%) of the amount of any payment of principal, other than principal due at Maturity, interest, or both, which is not paid within ten (10)

-4-

RFCCM00231

days of the due date thereof. Late charges are: (a) payable in addition to, and not in limitation of, the Default Rate, (b) intended to compensate Lender for administrative and processing costs incident to late payments, (c) are not interest, and (d) shall not be subject to refund or rebate or credited against any other amount due.

2.3.10 Participation In addition to the interest to be paid hereunder at the Effective Rate, upon (i) repayment of the Senior Loan, (ii) repayment of the Loan and all interest at the Effective Rate due hereunder, and (iii) repayment to Borrower of Borrower's Required Equity Contribution as set forth in Section 6.2 hereof, plus interest thereon at (and calculated in the same manner as) the Effective Rate, Borrower shall thereafter, upon the consummation of closing by Pavilion of each Remaining Unit, cause to be paid to Lender an amount equal to twelve and one half percent (12.5%) of the Net Proceeds received by Pavilion from the sale of each Remaining Unit (the "Participation"), which payment shall be made at the time of and from the proceeds of such closing. The Participation shall remain outstanding and shall be paid by Borrower to Lender notwithstanding the full repayment of the remaining portion of the Loan, and shall continue to be evidenced hereby and by the Loan Documents until each Remaining Unit has been sold by Pavilion in an arms' length third party sale permitted in accordance with the Sales Pricing Plan or otherwise approved by Lender. The foregoing notwithstanding, the Participation is not intended and shall not be construed to be applicable to the Excluded Units.

2.4    Loan Fees; Lender's Fees.

2.4.1 Commitment Fee. Borrower shall pay a Loan fee in the amount of Three Hundred Thirty One Thousand Five Hundred Fourteen and 00/100 Dollars ($331,514.00) (hereinafter, the "Commitment Fee"). The Commitment Fee shall be deemed fully earned as of the date hereof, and shall not be subject to refund or rebate under any circumstances. The Commitment Fee shall not be considered a prepayment towards the Effective Rate of interest hereunder, nor a prepayment of the Principal Amount.

2.5    Acceleration

The Loan may be accelerated, at the option of Lender, following an Event of Default, except that upon the occurrence of an Event of Default described in Section 11.1.6 hereof, the Loan shall be accelerated automatically without notice or demand by the Lender. Unless the Lender has already instituted the Default Rate in accordance with the terms and conditions of the Note, upon any such acceleration, all principal, accrued interest and costs and expenses shall be due and payable together with interest on such principal at the Default Rate after acceleration, and any applicable Prepayment Fee.

3.    SECURITY FOR THE LOAN; LOAN AND SECURITY DOCUMENTS.

3.1    Security

The Loan together with interest thereon and all other charges and amounts payable by, and all other obligations of, Borrower and Guarantor to Lender with respect to the Loan, whenever incurred, direct or indirect, absolute or contingent (hereinafter, the "Obligations") shall

-5-

RFCCM00232

be secured by the following "Security" which Borrower, and the Guarantor where applicable, agree to provide and maintain:

3.1.1 <u>Pledge of Ownership Interests</u>.   A first priority limited recourse pledge of and security interest in all membership interests in the Borrower by the Guarantor in favor of the Lender (hereinafter, the "Ownership Interest Pledge Agreement").

3.1.2 <u>Guaranty</u>. A guaranty (hereinafter, collectively, the "Guaranty") from each Guarantor guaranteeing certain obligations of the Borrower to the Lender to the extent provided for in such Guaranty.

3.2     Loan Documents and Security Documents

The Loan shall be made, evidenced, administered, secured and governed by all of the terms, conditions and provisions of the "Loan Documents", each as the same may be hereafter modified or amended, consisting of: (i) this Agreement; (ii) the Note; (iii) the Ownership Interest Pledge Agreement; (iv) the Guaranty; (v) the UCC financing statements; and (vi) any other documents, instruments, or agreements executed to further evidence or secure the Loan.

The Ownership Interest Pledge Agreement and Guaranty are sometimes collectively referred to as the "Security Documents".

4.     <u>CONTINUING  AUTHORITY  OF  AUTHORIZED  REPRESENTATIVES</u>. Lender is authorized to rely upon the continuing authority of the persons, officers, signatories or agents hereafter designated (hereinafter, the "Authorized Representatives") to bind Borrower with respect to all matters pertaining to the Loan and the Loan Documents. Such authorization may be changed only upon written notice to Lender accompanied by evidence, reasonably satisfactory to Lender, of the authority of the person giving such notice and such notice shall be ·effective not sooner than five (5) Business Days following receipt thereof by Lender.   The present Authorized Representatives are listed on <u>Exhibit C</u>.  The Lender shall have a right of approval, not to be unreasonably withheld or delayed, over the identity of the Authorized Representatives so as to assure the Lender that each Authorized Representative is a responsible and senior official of Borrower.

5.     OPERATING BUDGET.

Borrower has submitted to Lender an operating budget (hereinafter, the "Budget") which is annexed hereto as <u>Exhibit B</u> for all costs of Triton Pavilion in acquiring Pavilion (hereinafter, the "Acquisition Costs"), Pavilion owning the Property and all other costs, including contingencies and carrying costs, for the Property through the Maturity Date.

6.·    <u>LOAN  DISBURSEMENT  AND  BORROWER'S  REQUIRED  EQUITY  CONTRIBUTIONS</u>.

6.1     <u>Procedures and Limits</u>

RFCCM00233



The Lender shall, subject to compliance with all of the other terms, conditions and provisions of this Agreement, make disbursement of the entirety of the Loan proceeds at closing, with the exception of the Interest Reserve.

### 6.2   Required Equity Contribution

The Budget contemplates total funding from the combination of the Loan, the Senior Loan and $5,500,000.00 to be contributed by Borrower to Triton Pavilion prior to the disbursement of the Loan proceeds (hereinafter, the "Required Equity Contribution"). Borrower agrees to make, or to cause Triton Pavilion to make (as appropriate), Borrower's Required Equity Contribution which shall consist of cash in the amount of $5,500,000.00 as reflected in the Budget. All of Borrower's Required Equity Contribution shall be made by way of capital contribution and not loan.

### 6.3   Interest Reserve

Lender shall retain the Interest Reserve and the same shall not be advanced at closing. Provided no Event of Default then exists hereunder, Lender shall advance, on the first day of December, 2005 and on Payment Date thereafter in payment of the accrued Pay Rate of interest, funds from the Interest Reserve for the payment of such accrued interest, which amount shall be added to the outstanding principal amount and shall thereafter accrue interest at the Effective Rate. In the event of the existence of an Event of Default, or in the event there exist insufficient funds in the Interest Reserve from which to pay accrued and unpaid interest at the Pay Rate, Borrower shall be and remain obligated for the payment of such Pay Rate of interest in accordance with the terms hereof, and nothing in this Section 6.3 is intended or shall be construed to excuse Borrower from making any such payment.

### 7.   CONDITIONS PRECEDENT.

It shall be a condition precedent of Lender's obligation to close and fund the Loan that each of the following conditions precedent be satisfied in full, unless specifically waived in writing by Lender at or prior to closing and funding of the Loan:

### 7.1   Satisfactory Loan Documents

Each of the Loan Documents and Security Documents shall be satisfactory in form, content and manner of execution and delivery to Lender and Lender's counsel.

### 7.2   Satisfactory Senior Loan Documents

Lender shall have received and approved certified copies of the Senior Loan Documents.

### 7.3   Intercreditor Agreement

The Lender shall have entered into an acceptable intercreditor or similar agreement with the Senior Lender.

### 7.4   Required Equity Contribution

-7-

RFCCM00234

The Borrower shall have provided the Lender with evidence of the Borrower's Required Equity Contribution.

7.5     No Material Change

No material adverse change shall have occurred in the financial condition, business, affairs, operations or control of Borrower, Triton Pavilion, Pavilion or any Guarantor, since the date of their respective financial statements most recently delivered to Lender.

7.6     Warranties and Representations Accurate

All warranties and representations made by or on behalf of Borrower, Triton Pavilion, Pavilion or any Guarantor to Lender shall be true, accurate and complete in all material respects and shall not omit any material fact necessary to make the same not misleading in any material respect.

7.7     Financials and Appraisals

Lender shall have received and approved: (i) financial statements from the Borrower, Triton Pavilion, Pavilion and each Guarantor complying with the standards set forth in Section 9.2; and (ii) an appraisal of the Property from an appraiser acceptable to Lender setting forth an appraised Value of the Property which results in a Loan to Project Cost ratio of not in excess of 97%.

7.8     Validity and Sufficiency of Security Documents

The Security Documents shall create a valid and perfected lien on the property described therein (hereinafter, the "Collateral") and each of the Security Documents and related UCC filings shall have been duly recorded and filed to the satisfaction of Lender and Lender's counsel.

7.9     No Other Liens; Taxes and Municipal Charges Current

The Collateral shall not be subject to any liens or encumbrances, whether inferior or superior to the Loan Documents or the Security Documents, except in respect of personal property taxes not yet due and payable. All real estate taxes, personal property taxes and other municipal charges relating to the Property shall be current.

7.10    Compliance With Law

Lender shall have received and approved evidence that:

7.10.1 Present Compliance. All real estate and tangible personal property constituting or intended to constitute Collateral, in all material respects, (to the extent of its present construction or existence), and the Property, each complies with all Legal Requirements including, without limitation, Environmental Legal Requirements, and the provisions of all Licenses and Permits.

RFCCM00235

7.10.2 <u>No Prohibitions or Violations</u>. There are no Legal Requirements which prohibit or adversely limit the use of the Property for the purposes the same are intended for, nor is there any outstanding and uncured violation of any Legal Requirements including, without limitation, any Environmental Legal Requirements, except as disclosed herein under Section 7.15.

7.11    <u>Evidence of Perfection</u>

Lender shall have received such other evidence of the perfection of its security interests as Lender and Lender's counsel may reasonably require.

7.12    <u>Condition of Property</u>

There shall have been no material damage or destruction by fire or otherwise to any of the Property.

7.13    <u>No Takings</u>

Neither the Property nor any material portion thereof shall have been taken by eminent domain nor shall there be any threat of such a taking.

7.14    <u>Insurance</u>

Borrower shall have provided to Lender with respect to the Property evidence of insurance coverages which meet the property, hazard and other insurance requirements set forth on <u>Exhibit D</u> of this Loan Agreement to the satisfaction of Lender and Lender's Consultants.

7.15    <u>Hazardous Waste, Hazardous Materials and Toxic Substances</u>

Lender shall have received, and in its sole discretion approved, satisfactory reports from acceptable, qualified professionals prepared in accordance with Lender's protocols indicating the acceptability of the environmental risk associated with the Property, addressing the existence of any Hazardous Materials at, or which may affect, the Property and the Property's compliance with Environmental Legal Requirements.

7.16    <u>Organizational Documents</u>

Lender shall have received and approved the organizational and authorizing documents of the Borrower, Triton Pavilion and Pavilion.

7.17    <u>Legal and other Opinions</u>

Lender shall have received and approved legal opinion letters from counsel representing Borrower and Guarantor which meet Lender's legal opinion requirements.

8.       <u>WARRANTIES AND REPRESENTATIONS</u>. Borrower warrants and represents to Lender for the express purpose of inducing the Lender to enter into this Agreement, to make the Loan, and to otherwise complete all of the transactions contemplated hereby that as of the

-9-

RFCCM00236

date of this Agreement, upon the date the Loan is funded and at all times thereafter until the Loan has been repaid and all obligations to Lender has been satisfied as follows:

### 8.1    Financial Information

True, accurate and complete financial statements of Borrower, Triton Pavilion, Pavilion and each Guarantor have been delivered to Lender and the same fairly present the financial condition of each such Person as of the date thereof and no material and adverse change has occurred in such financial condition since the date thereof.  All financial statements of such parties hereafter furnished to Lender shall be true, accurate and complete, in all material respects, and shall fairly present the financial condition of such party as of the date thereof.

### 8.2    No Violations

The consummation of the Loan and the subsequent payment and performance of the Obligations evidenced and secured by the Loan Documents shall not constitute a violation of, or conflict with, any law, order, regulation, contract, agreement or organizational document to which Borrower is a party or by which it or its property is or may be bound.

### 8.3    No Litigation

There is no material litigation now pending, or to the best of Borrower's knowledge threatened, against Borrower, Triton Pavilion, Pavilion or any Guarantor which if adversely decided could materially impair the ability of such party to pay and perform its obligations. There is no litigation, whether or not material, pending, or to the best of Borrower's knowledge threatened, against Borrower, Triton Pavilion, Pavilion or any Guarantor which is not covered by insurance.

### 8.4    Required Licenses and Permits

All Licenses and Permits which are reasonably required in order to operate the Improvements and to operate the Property as contemplated hereby, have been duly and properly obtained. All such Licenses and Permits once obtained shall remain in full force and effect and shall be complied with in all material respects.

### 8.5    Good Title and No Liens

Pavilion is the lawful owner of the Land and of areas over, under or on which utility or passage easements are required to make use of the Improvements and parking as contemplated hereby and by the documents referred to herein, and is the lawful owner of the Improvements, free and clear of all liens and encumbrances of any nature whatsoever, except for the matters, if any, which are listed as Permitted Title Exceptions.  Upon the closing hereunder and closing of the Senior Loan, Triton Pavilion will be the sole owner of 100% of the legal and beneficial rights in Pavilion. Borrower is currently the owner of 100% of the legal and beneficial rights in and to Triton Pavilion.

### 8.6    Use of Proceeds

RFCCM00237

The proceeds of the Loan shall be used solely and exclusively for the purposes set forth in Section 1.4 hereof. No portion of the proceeds of the Loan shall be used directly or indirectly, and whether immediately, incidentally or ultimately (x) to purchase or carry any margin stock or to extend credit to others for the purpose thereof or to repay or refund indebtedness previously incurred for such purpose, or (y) for any purpose which would violate or in inconsistent with the provisions of regulations of the Board of Governors of the Federal Reserve System including, without limitation, Regulations G, T, U and X thereof.

8.7    Entity Matters.

8.7.1 Organization.

(i)    Borrower is a single purpose bankruptcy-remote limited liability company which is a duly organized and validly existing limited partnership in good standing under the laws of the State of Delaware, and is duly qualified in each jurisdiction where the nature of its business is such that qualification is required, and has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Loan Agreement and the other Loan Documents to which it is party.

(ii)    Triton Pavilion is a single purpose bankruptcy-remote limited liability company which is a duly organized and validly existing limited partnership in good standing under the laws of the State of Delaware, and is duly qualified in each jurisdiction where the nature of its business is such that qualification is required, and has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Loan Agreement and the other Loan Documents to which it is party.

(iii)    Pavilion is a single purpose bankruptcy-remote limited liability company which is a duly organized and validly existing limited partnership in good standing under the laws of the State of Maryland, and is duly qualified in each jurisdiction where the nature of its business is such that qualification is required, and has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Loan Agreement and the other Loan Documents to which it is party.

(iv)    The Managing Member is an individual resident in the State of Maryland.

8.7.2 Ownership and Taxpayer Identification Numbers. All of the members of Borrower, and a description of the interests of Borrower held by the same, are listed in Exhibit B and no additional interests, or rights or instruments convertible into such interests, shall be issued, nor shall any ownership change. The taxpayer identification number(s) of Borrower, Managing Member and each Guarantor are accurately stated in Exhibit B.

8.7.3 Authorization. All required membership actions and proceedings have been duly taken so as to authorize the execution and delivery by Borrower of the Loan Documents.

-11-

8.8   <u>Valid and Binding</u>

Each of the Loan Documents constitute legal, valid and binding obligations of Borrower and, where applicable, Guarantor; subject to bankruptcy, insolvency and similar laws of general application affecting the rights and remedies of creditors and, with respect to the availability of the remedies of specific enforcement, subject to the discretion of the court before which any proceeding therefor may be brought.

8.9   <u>Deferred Compensation and ERISA</u>

8.9.1 Borrower does not have any pension, profit sharing, stock option, insurance or other arrangement or plan for employees covered by Title IV of the Employment Retirement Income Security Act of 1974, as now or hereafter amended (hereinafter, "ERISA") (hereinafter, the "ERISA Plan") and no "Reportable Event" as defined in ERISA has occurred and is now continuing with respect to any such ERISA Plan. The granting of the Loan, the performance by Borrower of its obligations under the Loan Documents and Borrower's conducting of its operations do not and will not violate any provisions of ERISA.

8.9.2 Neither Borrower, any principal of Borrower, nor any ERISA Affiliate of the foregoing is an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower, any principal of Borrower or any ERISA Affiliate constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3 101. The consummation of the transaction contemplated hereby will not constitute or result in any transaction prohibited by Section 406 of ERISA or Section 4975 of the Code.

8.10   <u>No Material Change; No Default</u>

Except for the acquisition by Triton Pavilion of all membership interests in Pavilion, there has been no material adverse change in the financial condition, business, affairs or control of Borrower, Triton Pavilion, Pavilion or any Guarantor since the date of their respective last financial statement most recently delivered to the Lender in accordance with the requirements of Section 9.2. hereof. No Default exists under any of the Loan Documents. There is no Default on the part of Borrower or Guarantor under this Agreement or any of the other Loan Documents and no event has occurred and is continuing which could reasonably be expected to constitute a Default under any Loan Document. Borrower has filed all required federal, state and local tax returns and has paid all taxes due pursuant to such returns or any assessments against Borrower or the Property.

8.11   <u>No Broker or Finder</u>

Neither Borrower, nor Guarantor, nor anyone on behalf thereof, has dealt with any broker, finder or other person or entity who or which may be entitled to a broker's or finder's fee, or other compensation, payable by Lender in connection with this Loan, except as otherwise disclosed to Lender and reflected on the closing statement prepared in connection with this transaction.

8.12   <u>Background Information and Certificates</u>

-12-

RFCCM00239

All of the factual information contained or referred to in Section 1 of this Agreement and in the Exhibits to this Agreement, and in the certificates and opinions furnished to Lender by or on behalf of Borrower in connection with the Property, is true, accurate and complete in all material respects, and omits no material fact necessary to make the same not misleading in any material respect.

### 8.13   Guarantor's Warranties and Representations

Borrower has no reason to believe that any warranties or representations made in writing by Guarantor to Lender are untrue, incomplete or misleading in any material respect.

### 9.   COVENANTS.

Borrower covenants and agrees that from the date hereof and so long as the Lender has any obligation to make the Loan, or any indebtedness is outstanding hereunder, or any of the Loan or other obligations remains outstanding, as follows:

### 9.1   Notices

Borrower shall, with reasonable promptness, but in all events within ten (10) days after it has actual knowledge thereof, notify Lender in writing of the occurrence of any act, event or condition which (x) constitutes a Default under any of the Loan Documents, or the Senior Loan, and/or (y) has had or may have a material adverse affect on the Property, or the financial condition of the Borrower, Triton Pavilion, Pavilion or any Guarantor, as reflected on the most recent financial statements delivered to the Lender in accordance with the terms and conditions of this Agreement. Such notification shall, in the case of clause (x), include a written statement of any remedial or curative actions which Borrower proposes to undertake to cure or remedy such Default.

### 9.2   Financial Statements and Reports

. Borrower shall furnish or cause to be furnished to Lender from time to time, the following financial statements and reports and other information, all in form, manner of presentation and substance acceptable to Lender:

### 9.2.1 Financial Statements and Reports.

(i)   So long as any portion of the Senior Loan remains outstanding, the Borrower shall furnish or cause to be furnished to the Lender duplicate copies of all of the financial statements, reports and other information delivered by the Borrower, Triton Pavilion, Pavilion or any Guarantor to the Senior Lender pursuant to the requirements of the Senior Loan Agreement and the other Senior Loan Documents at such times, and in such form and manner of presentation, as such financial statements, reports and other information are delivered to the Senior Lender pursuant to the terms and conditions of the Senior Loan Agreement and the other Senior Loan Documents.

(ii)   To the extent Triton Pavilion's and Pavilion's obligations to the Senior Lender under the Senior Loan Agreement and the other Senior Loan Documents are satisfied in full, the Borrower hereby agrees to continue to

-13-

RFCCM00240

provide the Lender with the financial statements, reports and other information referred to in Section 9.2.1(i) above at such times, and in such form and manner of presentation, as referred to in Section 9.2.1(i) above.

(iii)   In addition to the financial statements, reports and other information referred to in Sections 9.2.1(i) and 9.2.1(ii) above, the Borrower hereby agrees to provide, from time to time during the term hereof, such other information and reports, financial and otherwise, concerning the Borrower, Triton Pavilion, Pavilion and the operation of the Property as Lender may reasonably request; including, but not limited to a monthly rent roll and arrearage report, monthly sales activity reports, and copies of each executed sale contract for the sale of any unit(s) (which shall be delivered to Lender within ten days of the execution thereof).

9.2.2 Entity Notices. Concurrently with the issuance thereof, copies of all written notices with respect to defaults or capital contributions given or received by any member of Borrower, of Triton Pavilion and/or of Pavilion.

9.3      Payment of Taxes and other Obligations .

Subject to the right to contest as set forth in Section 10.1 Borrower shall duly pay and discharge, or cause Triton Pavilion or Pavilion to pay and discharge, before the same shall become overdue, all taxes, assessments and other governmental charges payable by it or with respect to the Property, as well as all claims or obligations for labor, materials, supplies or services (involving an amount in excess of $25,000.00 in any instance or $100,000.00 in the aggregate) or for borrowed funds in any amount.

9.4      Conduct of Business; Compliance With Law

As an express inducement to the Lender to make and maintain the Loan, the Borrower shall not (and as applicable shall not permit others to):

9.4.1 engage in any business or activity other than the ownership of 100% of the membership interests in Triton Pavilion; permit Triton Pavilion to engage in any business or activity other than the ownership of 100% of the membership interests in Pavilion; or permit Pavilion to engage in any business or activity other than the ownership, operation, improvement, development, sale, marketing, construction and maintenance of the Property;

9.4.2 acquire or own any material assets other than as described in Section 9.4.1 above;

9.4.3 merge into or consolidate, or permit Triton Pavilion or Pavilion to merge into or consolidate, with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's prior written consent;

9.4.4 fail, or permit Triton Pavilion or Pavilion to fail to observe its respective organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, and

-14-

RFCCM00241



qualification to do business in the State of Maryland, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its organizational documents;

9.4.5 own, or permit Triton Pavilion or Pavilion to own, any subsidiary or make any investment in, any person or entity without the prior written consent of Lender;

9.4.6 incur, or permit Triton Pavilion or Pavilion to incur, any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (with respect to Triton Pavilion only) the Senior Loan, suppliers and other trade payables in the ordinary course of its business of owning and operating the Property, provided that such trade payables debt is not evidenced by a note, is unsecured and is paid when due;

9.4.7 become, or permit Triton Pavilion or Pavilion to become, insolvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

9.4.8 fail, or permit Triton Pavilion or Pavilion to fail, to maintain its records, books of account and bank accounts separate and apart from those of its members, partners, principals and affiliates, the affiliates of its members, partners or principals, and any other person or entity;

9.4.9 enter into or permit Triton Pavilion or Pavilion to enter into any contract or agreement with any partner, principal or affiliate, or any member, general partner, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or affiliate, or any partner, principal or affiliate thereof;

9.4.10 seek or permit the dissolution or winding up in whole, or in part, of Borrower, Triton Pavilion or Pavilion;

9.4.11 fail to correct any known misunderstandings regarding its separate identity;

9.4.12 guarantee or become obligated for (or permit Triton Pavilion or Pavilion to guarantee or become obligated for) the debts of any other entity or person or hold itself out to be responsible for the debts of another Person other than with respect to the Loan and the Senior Loan, as applicable;

9.4.13 make any loans or advances (or permit Triton Pavilion or Pavilion to make any loans or advances) to any third party, including any partner, principal or affiliate, or any member, partner, principal or affiliate thereof, or acquire obligations or securities of any member, partner, principal or affiliate, or any member, general partner, or affiliate thereof, except for the capital contribution from Borrower to Triton Pavilion contemplated hereby;

9.4.14 fail to file its own tax returns;

9.4.15 fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to

-15-

RFCCM00242

suggest that Borrower is responsible for the debts of any third party (including any member, partner, principal or affiliate of Borrower, or any member, partner, principal or affiliate thereof);

9.4.16 fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

9.4.17 file or consent to the filing, or permit Triton Pavilion or Pavilion to file or consent to the filing, of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors;

9.4.18 share any common logo or hold itself out as or be considered as a department or division of (i) any partner, principal, member or affiliate of Borrower, (ii) any affiliate of a partner, principal or member of Borrower, or (iii) any other person or entity;

9.4.19 fail to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

9.4.20 pledge (or permit Triton Pavilion or Pavilion to pledge) its assets for the benefit of any other person or entity, other than, with respect to the Loan and (with respect to Triton Pavilion and Pavilion) the Senior Loan;

9.4.21 fail to maintain a sufficient number of employees in light of its contemplated business operations;

9.4.22 modify, amend or alter in any way, or permit Triton Pavilion or Pavilion to modify, amend or alter in any way, the organizational document of any of Borrower, Triton Pavilion or Pavilion;

9.4.23 allow any new member to be admitted into the entity comprising Borrower, Triton Pavilion or Pavilion;

9.4.24 permit or allow any Person other than (i) Managing Member to have responsibility for the management of Borrower as manager or managing member, (ii) Borrower to have responsibility for the management of Triton Pavilion as manager or managing member, or (iii) Triton Pavilion to have responsibility for the management of Pavilion as manager or managing member.

9.5   Insurance

Borrower shall at all times maintain or cause to be maintained (or cause Triton Pavilion or Pavilion to maintain): (a) those policies of insurance required pursuant to Exhibit D attached hereto and incorporated herein by reference; and (b) such other policies as reasonably required by Lender and which are customarily obtained for other property and buildings similar to the premises in nature, use, location, height, and type of construction; with all of the foregoing including types of insurance, insureds, named insureds, additional insureds, amounts of coverages and insurance carriers approved by the Lender, in Lender's reasonable discretion.

-16-

All policies of insurance shall be in amounts no less than the amounts set forth on <u>Exhibit D</u> and shall be maintained with the companies identified on <u>Exhibit D</u> (if any) or such other companies as shall be approved by Lender, in Lender's reasonable discretion..

9.6      <u>Restrictions on Liens, Transfers and Additional Debt.</u>

9.6.1 <u>Prohibited Transactions</u>.  Except for Permitted Transactions, Borrower shall not, and shall not permit Triton Pavilion or Pavilion to:

(i)      create or incur, or suffer to be created or incurred, or to exist, any encumbrance, mortgage, pledge, lien, charge or other security interest of any kind upon any of its assets of any character whether or not related to the Property or the Property, or any portion thereof, whether now owned or hereafter acquired or upon the proceeds or products thereof, except the security interests granted in favor of the Senior Lender pursuant to the Senior Loan Documents;

(ii)      create or incur any indebtedness for borrowed funds with respect to the Property whether secured or unsecured either directly or as a guarantor except for the Loan and the Senior Loan;

(iii)      directly or indirectly permit any sale, transfer, exchange, assignment or pledge of or grant of any security interest in any ownership interests in Borrower (except pursuant to the Ownership Interest Pledge Agreement), Triton Pavilion or Pavilion; or

(iv)      sell, convey, transfer or exchange any of its assets of any character whether or not related to the Property, or any portion thereof, whether now owned or hereafter acquired, other than Pavilion's sale of individual Units in the ordinary course of business to the extent consistent with the then applicable Sales Pricing Plan and  Project Budget, or otherwise as approved by Lender.

9.6.2 <u>Permitted Transactions</u>.  The term "Permitted Transactions" shall mean Permitted Transfers, Permitted Additional Debt and Permitted Title Exceptions.

9.6.3 <u>Permitted Transfers</u>.  The term "Permitted Transfers" shall mean:

(i)      the Security Documents and other agreements in favor of Lender;

(ii)      the Senior Loan Documents in favor of the Senior Lender;

(iii)      the distribution of the Loan proceeds to the Borrower, solely for the purposes set forth in this Agreement;

(iv)      transactions, whether outright or as security, for which Lender's prior written consent has been obtained, which consent may be withheld, granted or granted conditionally, subject to such protective and other conditions as Lender may require in its sole and absolute discretion.

-17-

9.6.4 <u>Permitted Additional Debt.</u>  The term "Permitted Additional Debt" shall mean:

(i)     transactions, whether secured or unsecured, for which Lender's prior written consent has been obtained, which consent may be withheld, granted or granted conditionally subject to such protective and other conditions as Lender may require in its sole and absolute discretion;

(ii)    indebtedness incurred by Pavilion in the ordinary course of business for the purchase of goods or services which are payable, without interest, within thirty (30) days of billing; and

(iii)   indebtedness incurred by Triton Pavilion and Pavilion pursuant to the Senior Loan.

9.6.5 <u>Additional Funds.</u>  All funds required for the Property in excess of those available from the Loan and the Senior Loan shall be provided by Borrower, Triton Pavilion, Pavilion and/or Guarantor, as additional equity contributions.

9.6.6 <u>Right To Accelerate Loan.</u>  The Loan shall become due and payable in full, and the Lender shall have the right to accelerate the Loan and declare an Event of Default, at the option of Lender, upon any breach or violation of the provisions of Section 9.6; provided, however upon the occurrence of an Event of Default described in Section 11.1.6 below, the Loan shall be accelerated without notice or demand.

9.7     <u>Limits on Guaranties.</u>

Borrower shall not guarantee to anyone other than Lender the obligations of any person or entity.

9.8     <u>Restrictions on Investments</u>

.  Borrower will not make or permit to exist or to remain outstanding any Investment out of proceeds of the Loan, the Property or the Senior Loan.

9.9     <u>Indemnification Against Payment of Brokers' Fees</u>

Borrower agrees to defend, indemnify and save harmless Lender from and against any and all liabilities, damages, penalties, costs, and expenses, relating in any manner to any brokerage or finder's fees in respect of the Loan.

9.10    <u>Limitations On Certain Transactions</u>

Borrower shall not, and shall not permit Triton Pavilion or Pavilion to, dissolve or liquidate, nor merge or consolidate with or otherwise acquire all or substantially all of the assets of any other entity.

9.11    <u>Place for Records; Inspection</u>

-18-

RFCCM00245

Borrower shall maintain all of its business records at the address specified at the beginning of this Agreement.  Upon reasonable notice and at reasonable times during normal business hours Lender shall have the right to examine Borrower's business records. Lender shall use reasonable efforts to not divulge information obtained from such examination to others except in connection with Legal Requirements and in connection with administering the Loan, enforcing its rights and remedies under the Loan Documents and in the conduct, operation and regulation of its banking and lending business (which may include, without limitation, the transfer of the Loan or of participation interests therein).  Any assignee or transferee of the Loan, co-lender, or any holder of a participation interest in the Loan shall be entitled to deal with such information in the same manner and in connection with any subsequent transfer of its interest in the Loan or of further participation interests therein.

9.12    Intentionally Deleted

9.13    Costs and Expenses

Borrower shall pay all costs and expenses reasonably incurred by Lender in connection with the implementation of the Loan, the administration of the Loan, the enforcement of the Lender's rights under the Loan Documents, including, without limitation, legal fees and disbursements, appraisal fees, inspection fees, plan review fees, travel costs, fees and out-of-pocket costs of independent engineers and consultants (hereinafter, collectively, the "Costs"). Borrower's obligations to pay such Costs shall include, without limitation, all attorneys' fees and other costs and expenses for preparing and conducting litigation or dispute resolution arising from any breach by Borrower or any Guarantor of any covenant, warranty, representation or agreement under any one or more of the Loan Documents.

9.14    Compliance with Legal Requirements

Borrower shall comply, or cause Triton Pavilion and/or Pavilion to comply, with all Legal Requirements with respect to the Property.

9.15    Indemnification

Borrower shall at all times, both before and after repayment of the Loan, at its sole cost and expense defend, indemnify, exonerate and save harmless Lender and all those claiming by, through or under Lender (hereinafter, each an "Indemnified Party") against and from all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind whatsoever, including, without limitation, attorneys, fees and experts' fees and disbursements, which may at any time be imposed upon, incurred by or asserted or awarded against the Indemnified Party and arising from or out of:

9.15.1 any Hazardous Materials or any violation of, or failure to comply with, any Environmental Legal Requirements all as more particularly provided for in the Environmental Indemnity;

9.15.2 any liability for damage to person or property arising out of any violation of any Legal Requirement, or

-19-

RFCCM00246

9.15.3 any act, omission, negligence or conduct at the Property, or arising or claimed to have arisen, out of any act, omission, negligence or conduct of Borrower, Triton Pavilion or Pavilion, or any contractor, sub-contractor, tenant, occupant or invitee thereof which is in any way related to the Property.

Notwithstanding the foregoing, an Indemnified Party shall not be entitled to indemnification in respect of claims arising from acts of its own gross negligence or willful misconduct to the extent that such gross negligence or willful misconduct is determined by the final judgment of a court of competent jurisdiction, not subject to further appeal, in proceedings to which such Indemnified Party is a proper party.

9.16    Loan To Cost Covenant.

9.16.1 Loan To Cost.   At all times the ratio (hereinafter, the "Loan To Cost Ratio") obtained by dividing: (i) as of the date of calculation, the aggregate of the outstanding balance of (x) the Loan, and (y) the Senior Loan (plus any unadvanced portion of the Senior Loan), by (ii) the then aggregate Project Budget (both expended and not expended), expressed as a percentage, shall not be greater than 97%.

9.16.2 Updated Appraisals.   Lender shall have the right at its option, from time to time, to order an update to the Original Appraisal or a new appraisal (hereinafter, collectively, an "Updated Appraisal"). Each Updated Appraisal shall be prepared by the original or more recent appraiser unless Lender makes a good faith determination not to have such appraiser prepare the same in which event the Updated Appraisal shall be prepared at Lender's direction by an appraiser selected by Lender. Any appraiser selected by Lender shall be: (i) an MAI member with not less than ten (10) years experience appraising properties of a similar type to the Property in the general area, (ii) otherwise qualified pursuant to provisions of applicable laws and regulations under and pursuant to which Lender operates, and (iii) each Updated Appraisal shall be in form and substance satisfactory to the Lender, which approval shall not be unreasonably withheld.

9.16.3 Costs of Appraisal.   Borrower shall pay for the costs of the Original Appraisal and each Updated Appraisal; provided that Borrower shall not be required to pay for more than one (1) Updated Appraisal in any twelve (12) month period unless a Default has occurred.

9.16.4 Principal Reduction.   If at any time the Loan To Cost Ratio is not satisfied, Borrower shall within thirty (30) days following Lender's notice thereof make a principal payment in an amount sufficient to reduce the Loan To Cost Ratio to not more than 97%. It shall be an Event of Default if such payment is not so made.

9.17    Replacement Documentation

Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon surrender and cancellation of such Note or other security document, Borrower will issue, in lieu thereof, a replacement Note or other security document in the same principal amount thereof and otherwise of like tenor.

-20-

9.18   ERISA Compliance.

9.18.1 No Prohibited Transaction. Borrower shall not engage in any transaction, nor will it permit or cause any Borrower Affiliate to engage in any transaction, which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

9.18.2 Deliveries. Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as required by Lender in its reasonable discretion, that: (a) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (b) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (c) one or more of the following circumstances is true with respect to Borrower: (i) equity interests in such Person are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101 (b)(2); (ii) less than twenty-five percent (25%) of each outstanding class of equity interests in such Person are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); and (iii) such Person qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (iv) an investment company registered under The Investment Company Act of 1940.

9.18.3 Operating Company Status. Until the Loan is paid in full, Borrower will remain at all times an "operating company" as defined in the regulation issued by the U.S. Department of Labor known as the "plan assets regulation," 29 C.F.R. §2510.3-101.

9.19   Senior Loan Documents.

The Borrower shall not permit Pavilion or Triton Pavilion to breach the provisions of the Senior Loan Documents, and the Borrower shall not modify or amend, or permit Triton Pavilion or Pavilion to modify or amend any of the Senior Loan Documents without the prior written consent of the Lender.

10.   SPECIAL PROVISIONS.

10.1   Right to Contest.

10.1.1 Taxes and Claims by Third Parties. Notwithstanding the provisions of Section 9.3 which obligate Borrower to pay taxes and other obligations to third parties when due, it is agreed that any tax, assessment, charge, levy, claim or obligation to a third party (expressly excluding an obligation created under the Loan Documents) need not be paid if the validity or amount thereof shall be contested currently, diligently and in good faith by appropriate proceedings and if Borrower shall have adequate unencumbered (except in favor of Lender) cash reserves with respect thereto, and further provided that such contest does not create a default by landlord under any lease assigned to Lender; and provided, further, that Borrower shall pay all taxes, assessments, charges, levies or obligations: (i) immediately upon the commencement of proceedings to enforce any lien which may have

-21-

RFCCM00248

attached as security therefor, unless such proceeding is stayed by proper court order pending the outcome of such contest; and (ii) as to claims for labor, materials or supplies, prior to the imposition of any lien on the Property unless the lien is discharged or bonded as set forth in Section 11.1.7.

10.1.2 <u>Legal Requirements</u>. Borrower may contest in good faith any claim, demand, levy or assessment under any Legal Requirements by any person or entity if: (i) the contest is based upon a material question of law or fact raised by Borrower in good faith; (ii) Borrower properly commences and thereafter diligently pursues the contest; (iii) Borrower demonstrates to Lender's reasonable satisfaction that Borrower has the financial capability to undertake and pay for such contest and any corrective or remedial action then or thereafter reasonably likely to be necessary; (iv) if the likely cost of complying with the Legal Requirement in the event the contest is not successfully resolved, as determined reasonably by Lender, is more than $25,000.00, there is no reason to believe that the contest will not be resolved prior to the Maturity Date; (v) no Event of Default exists; and (vi) if the contest relates to an Environmental Legal Requirement, the conditions set forth in the Environmental Indemnity relating to such contests shall be satisfied.

10.2    <u>Borrower Fully Liable</u>

The Borrower shall be fully liable for the Loan and the Obligations of the Borrower to the Lender.

10.3    <u>Lender's Consultation Rights</u>

Except with respect to compliance with Environmental Legal Requirements and the handling and disposal of Hazardous Materials, Lender shall have the right from time to time (a) to consult with Borrower regarding the business operation of Triton Pavilion, Pavilion and the Property, and the financial and other condition thereof, with Borrower's officers, employees, directors and managers, (b) to discuss with Borrower any significant business issues involved in negotiating a plan of reorganization for Borrower, including Borrower's proposed reorganization plans and operating plans for proceeding following such plan of reorganization coming into effect, and (c) to request from Borrower such forecasts, projections and other financial and business data as Lender may deem reasonably appropriate.

11.    <u>EVENTS OF DEFAULT</u>. The following provisions deal with Default, Events of Default, notice, grace and cure periods, and certain rights of Lender following an Event of Default.

11.1    <u>Default and Events of Default</u>

The term "Default" as used herein or in any of the other Loan Documents shall mean an Event of Default, or any fact or circumstance which constitutes, or upon the lapse of time, or giving of notice, or both, could constitute, an Event of Default. Each of the following events, unless cured within any applicable grace period set forth or referred to below in this Section 11.1., or in Section 11.2., shall constitute an "Event of Default".

-22-

RFCCM00249

11.1.1 <u>Generally</u>.  A default by Borrower in the performance of any term, provision or condition of this Agreement to be performed by Borrower, or a breach, or other failure to satisfy, any other term provision, condition, covenant or warranty under this Agreement and such default remains uncured beyond any applicable specific grace period provided for in this Agreement, or as set forth in Section 11.2. below;

11.1.2 <u>Note and Other Loan Documents</u>.  A default by Borrower in the performance of any term or provision of the Note, or of any of the other Loan Documents or a breach, or other failure to satisfy, any other term, provision, condition or warranty under the Note, or any other Loan Document,  and the specific grace period, if any, allowed for the default in question shall have expired without such default having been cured;

11.1.3 <u>Financial Status and Insolvency.</u>

Any of Borrower, Triton Pavilion, Pavilion or any Guarantor shall: (i) admit in writing its inability to pay its debts generally as they become due; (ii) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (iii) make an assignment for the benefit of creditors; (iv) consent to, or acquiesce in, the appointment of a receiver, liquidator or trustee of itself or of the whole or any substantial part of its properties or assets; (v) file a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law; (vi) have a court of competent jurisdiction enter an order, judgment or decree appointing a receiver, liquidator or trustee, or of the whole or any substantial part of the property or assets of such entity, and such order, judgment or decree shall remain unvacated or not set aside or unstayed for sixty (60) days; (vii) have a petition filed against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law and such petition shall remain undismissed for sixty (60) days; (viii) have, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assume custody or control of such entity or Person or of the whole or any substantial part of its property or assets and such custody or control shall remain unterminated or unstayed for sixty (60) days; (ix) have an attachment or execution levied against any substantial portion of the its property or against any portion of the Collateral which is not discharged or dissolved by a bond within thirty (30) days; or (x) have any material adverse change in its financial condition since the date of this Agreement; or

11.1.4 <u>Liens</u>.  A lien for the performance of work, or the supply of materials, or a notice of contract, or an attachment, judgment, execution or levy is filed against the Land or the Improvements and remains unsatisfied or is not discharged or dissolved by a bond (or by cash collateral acceptable to Lender) for a period of thirty (30) days after the Borrower receives written notice of the filing thereof;

11.1.5 <u>Breach of Representation or Warranty</u>.  Any material representation or warranty made by Borrower or Guarantor herein or in any other instrument or document relating to

-23-

RFCCM00250

the Loan or the Property shall at any time be materially false or misleading, or any warranty shall be materially breached;

11.1.6 Guarantor Default.   A default by Guarantor in the performance of any term or provision of any Loan Document to which Guarantor is a party, or the breach, or any other failure to satisfy any other term, provision, condition or warranty imposed upon the Guarantor in any other Loan Document to which it is a party or by which Guarantor is bound which is not cured in accordance with the cure periods under Section 11.2;

11.1.7 Plan Assets.   If any of Borrower or any Principal is deemed to hold "plan assets" within the meaning of ERISA or any regulations promulgated thereunder of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Tide I of ERISA or any plan (within the meaning of Section 4975 of the Code);

11.1.8 Judgments.   There shall occur any uninsured final judgment in excess of $100,000.00 against Borrower, Triton Pavilion, Pavilion or Guarantor and shall remain in force, undischarged, unsatisfied and unstayed, for more than thirty (30) days, whether or not consecutive, unless such party is diligently pursuing an appeal of such judgment after posting a bond acceptable to the lender, acting reasonably;

11.1.9 Senior Loan.   The occurrence of an event of default under the Senior Loan, as evidenced under the Senior Loan Documents

11.2    Grace Periods and Notice

As to each of the foregoing events the following provisions relating to grace periods and notice shall apply:

11.2.1 No Notice or Grace Period.   There shall be no grace period and no notice provision with respect to the nonpayment of interest and principal at Maturity as and when required by the terms and conditions of this Agreement and no grace period and no notice provision with respect to defaults related to the voluntary filing of bankruptcy or reorganization proceedings or an assignment for the benefit of creditors, or with respect to nonmonetary defaults which are not reasonably capable of being cured, or with respect to a breach of warranty or representation under Sections 8.1. (regarding Financial Information), or with respect to breaches under Sections 9.6 (Restrictions on Liens, Transfers and Additional Debt), and 9.7 (Limits on Guaranties), or with respect to the occurrence of an event of default under the Senior Loan.

11.2.2 Other Monetary Defaults.   All other monetary defaults (including, without limitation, the elimination of any Equity Deficiency) shall have a five (5) day grace period following written notice from Lender, or, if shorter, a grace period without notice until five (5) Business Days before the last day on which payment is required to be made in order to avoid: (i) the cancellation or lapse of required insurance, (ii) a tax sale or the imposition of late charges or penalties in respect of taxes or other municipal charges; and

11.2.3 Nonmonetary Defaults Capable of Cure.   As to non-monetary defaults which are reasonably capable of being cured or remedied, unless there is a specific shorter or longer

-24-

grace period provided for in this Loan Agreement or in another Loan Document, there shall be a thirty (30) day grace period following written notice from Lender or, if such default would reasonably require more than thirty (30) days to cure or remedy, such longer period of time not to exceed a total of ninety (90) days from Lender's notice as may be reasonably required so long as Borrower shall commence reasonable actions to remedy or cure the default within thirty (30) days following such notice and shall diligently prosecute such curative action to completion within such ninety (90) day period. However, where there is an emergency situation in which there is danger to person or property such curative action shall be commenced as promptly as possible. As to breaches of warranties and representations (other than those related to financial information or construction documents) there shall be a thirty (30) day grace period following notice from Lender.

11.3   <u>Certain Remedies</u>

If an Event of Default shall occur:

11.3.1 <u>Accelerate Debt</u>.   Lender may declare the indebtedness evidenced by the Note and secured by the Security Documents immediately due and payable (provided that in the case of a voluntary petition in bankruptcy filed by Borrower or an involuntary petition in bankruptcy filed against Borrower (after expiration of the grace period, if any, set forth in Section 11.1), such acceleration shall be automatic); and

11.3.2 <u>Pursue Remedies</u>.   Lender may pursue any and all remedies provided for hereunder, or under any one or more of the other Loan Documents.

12.   <u>ADDITIONAL REMEDIES.</u>

12.1   <u>Interest and other Charges</u>

Borrower shall be liable to Lender for all sums paid or incurred to lease, operate, or market and sell the Property whether so paid or incurred pursuant to the provisions of this Section or otherwise, and all payments made or liabilities incurred by Lender hereunder of any kind whatsoever shall be paid by Borrower to Lender upon demand with interest at the Default Rate as provided in this Agreement from the date of payment by Lender to the date of payment to Lender and repayment of such sums with such interest shall be secured by the Security Documents.

12.2   <u>Power of Attorney</u>

For the purpose of exercising the rights granted by this Section 12, as well as any and all other rights and remedies of Lender, Borrower hereby irrevocably constitutes and appoints Lender (or any agent designated by Lender) its true and lawful attorney-in-fact, exercisable upon and following any Event of Default, to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of Borrower.

13.   <u>SECURITY INTEREST AND SET-OFF.</u>

-25-

### 13.1   Security Interest

Borrower and Guarantor hereby grant to the Lender, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender or any affiliate.

### 13.2   Set-Off

If any payment is not made when due under any of the Loan Documents, after giving regard to applicable grace periods, if any, or if any Event of Default or other event which would entitle Lender to accelerate the Loan occurs, any such deposits, balances or other sums credited by or ⁀ke from Lender in connection with the Loan, or from any such affiliate of Lender in connection with the Loan, to Borrower may to the fullest extent not prohibited by applicable law at ᵃⁿʸ time or from time to time, without regard to the existence, sufficiency or adequacy of any other collateral, and without notice or compliance with any other condition precedent now or hereafter imposed by statute, rule of law or otherwise, all of which are hereby waived, be set off, apᵖ ⁀d applied by Lender against any or all of Borrower's Obligations irrespective of ᵃ ⁀d shall have been made and although such obligations may be unmatured, in such maⁿⁿer as Leⁿder in its sole and absolute discretion may determine.  Within five (5) Business Days of makiⁿg any such set off, appropriation or application, Lender agrees to notify Borrower ⁀ided the failure to give such notice shall not affect the validity of such set off or appropᵣ ⁀ application.  ANY AND ALL RIGHTS TO REQUIRE LENDER TO ᴱˣERCISE RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETᴼ ⁀ RᴱˢᴾECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF ⁀ OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

### ⁀ ⁀o Freeze

Inᵤ ⁀ll also have the right, at its option, upon the occurrence of any event which would ⁀ ⁀le the Lender to set off or debit as set forth in Section 13.2, to freeze, block or segregate any such deposits, balances and other sums held by Lender in connection with the Loan ⁀o that Borrower may not access, control or draw upon the same.

### 13.4   Additional Rights

The rights of Lender under this Section 13 are in addition to, and not in limitation of, other rights and remedies, including other rights of set off, which Lender may have.

## 14.   CASUALTY AND TAKING.

### 14.1   Casualty and Obligation To Repair

In the event of any damage or destruction to the Property or the other Collateral by reason of fire or other hazard or casualty (collectively, a "Casualty"), Borrower shall give immediate written notice thereof to Lender and cause Pavilion to proceed with reasonable diligence (or, as

-26-

RFCCM00253

applicable, cause Triton Pavilion and/or Pavilion to proceed), in full compliance with all Legal Requirements and the other requirements of the Loan Documents, to repair, restore, rebuild or replace the affected property (collectively, the "Repair Work").

### 14.2   Adjustment of Claims

All insurance claims shall be adjusted by Borrower, at Borrower's sole cost and expense, but subject to Lender's prior written approval which approval shall not be unreasonably withheld; provided that if any Default exists under any of the Loan Documents, subject to the rights of the Senior Lender, Lender shall have the right to adjust and compromise such claims without the approval of Borrower.

### 14.3   Payment and Application of Insurance Proceeds

So long as the Senior Loan remains outstanding, the provisions of the Senior Loan Documents concerning insurance proceeds shall control. Thereafter the following provisions shall control. All proceeds of insurance shall be paid to Lender and, at Lender's option, be applied to Borrower's Obligations or released, in whole or in part, to pay for the actual cost of repair, restoration, rebuilding or replacement (collectively, "Cost To Repair"). If the Cost To Repair does not exceed $250,000.00, Lender shall release so much of the insurance proceeds as may be required to pay for the actual Cost to Repair in accordance with the provisions of Section 14.4. Notwithstanding the foregoing, Lender shall also release so much of the insurance proceeds as may be required to pay for the actual Cost To Repair if:

(i)      in Lender's good faith judgment such proceeds together with any additional funds as may be deposited with and pledged to Lender, on behalf of the Lender, are sufficient to pay for the Cost To Repair;

(ii)     in Lender's good faith judgment the Repair Work is likely to be completed prior to the Maturity Date; and

(iii)    no Default exists under the Loan Documents.

### 14.4   Conditions To Release of Insurance Proceeds

If Lender elects or is required to release insurance proceeds, Lender may impose reasonable conditions on such release which shall include, but not be limited to, the following:

(i)      Prior written approval by Lender, which approval shall not be unreasonably withheld or delayed of plans, specifications, cost estimates, contracts and bonds for the restoration or repair of the loss or damage;

(ii)     Waivers of lien, architect's certificates, contractor's sworn statements and other evidence of costs, payments and completion as Lender may reasonably require;

(iii)    If the Cost To Repair does not exceed $250,000.00, the funds to pay therefor shall be released to Borrower otherwise, funds shall be released

-27-

RFCCM00254

upon final completion of the Repair Work, unless Borrower requests earlier funding, in which event partial monthly disbursements equal to 90% of the value of the work completed shall be made prior to final completion of the repair, restoration or replacement and the balance of the disbursements shall be made upon full completion and the receipt by Lender of satisfactory evidence of payment and release of all liens;

(iv)   Determination by Lender that the undisbursed balance of such proceeds on deposit with Lender, together with additional funds deposited for the purpose, shall be at least sufficient to pay for the remaining Cost To Repair, free and clear of all liens and claims for lien;

(v)   All work to comply with the standards, quality of construction and Legal Requirements applicable to the construction of the Improvements; and

(vi)   the absence of any Default under any Loan Documents.

### 14.5   Taking

So long as the Senior Loan remains outstanding, the provisions of the Senior Loan Documents concerning condemnation shall control. Thereafter, the following provisions shall control. If there is any condemnation for public use of the Property or of any Collateral, the awards on account thereof shall be paid to Lender and shall be applied to Borrower's obligations, or at Lender's discretion released to Borrower. If, in the case of a partial taking or a temporary taking, in the sole judgment of Lender the effect of such taking is such that there has not been a material and adverse impairment of the viability of the Property or the value of the Collateral, so long as no Default exists Lender shall release awards on account of such taking to Borrower if such awards are sufficient (or amounts sufficient are otherwise made available) to repair or restore the Property to a condition reasonably satisfactory to Lender and such partial or temporary taking shall not be deemed to violate the provisions of Section 9.6.

### 15.   ADDITIONAL RIGHTS OF THE LENDER

15.1.1 Participations.   Lender may sell participations to one or more banks or other financial institutions in all or a portion of such Lender's rights and obligations under this Loan Agreement and the other Loan Documents.

15.1.2 Disclosure.   The Borrower agrees that in addition to disclosures made in accordance with standard and customary banking practices Lender may disclose information obtained by pursuant to this Loan Agreement to assignees or participants and potential assignees or participants hereunder. Miscellaneous Assignment Provisions.

### 16.   GENERAL PROVISIONS.

### 16.1   Notices

. Any notice or other communication in connection with this Loan Agreement, the Note, or any of the other Loan Documents, shall be in writing, and (i) deposited in the United States

-28-

RFCCM00255

Mail, postage prepaid, by registered or certified mail, or (ii) hand delivered by any commercially recognized courier service or overnight delivery service such as Federal Express, addressed:

-29-

RFCCM00256

If to Borrower:

> c/o Triton Real Estate Partners, LLC
> 410 Severn Avenue
> Suite B-412
> Annapolis, Maryland 21403
> Attention: Mr. Brian A. McCormick

With a copy to:

> Steven M. Tyminski, Esq.
> Stevens & Lee
> 620 Freedom Business Center
> Suite 200
> P.O. Box 62330
> King of Prussia, PA 19406

If to Lender:

> CBRE Realty Finance TRS, LLC
> 185 Asylum Street
> 37th Floor
> Hartford, Connecticut 06103
> Attention: Mr. Andrew Manley

With c copy to:

> J. Richard Saas, Esq.
> Tenenbaum & Saas, P.C.
> 4504 Walsh Street
> Suite 200
> Chevy Chase, Maryland 20815

Any such addressee may change its address for such notices to such other address in the United States as such addressee shall have specified by written notice given as set forth above. All periods of notice shall be measured from the deemed date of delivery.

A notice shall be deemed to have been given, delivered and received for the purposes of all Loan Documents upon the earliest of: (i) if sent by such certified or registered mail, on the third Business Day following the date of postmark, or (ii) if hand delivered at the specified address by such courier or overnight delivery service, when so delivered or tendered for delivery during customary business hours on a Business Day, or (iii) if so mailed, on the date of actual receipt as evidenced by the return receipt, or (iv) if so delivered, upon actual receipt, or (v) if facsimile transmission is a permitted means of giving notice, upon receipt as evidenced by confirmation.

16.2    <u>Limitations on Assignment</u>

-30-

Borrower may not assign this Agreement or the monies due hereunder or convey or encumber the mortgaged premises or any interest therein without the prior written consent of the Lender in each instance.

### 16.3   Further Assurances

Borrower shall upon request from Lender from time to time execute, seal, acknowledge and deliver such further instruments or documents which Lender may reasonably require to better perfect and confirm its rights and remedies hereunder, under the Note, and under each of the other Loan Documents.

### 16.4   Payments

All payments shall be applied first to the payment of all fees, expenses and other amounts due to the Lender (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after an Event of Default, payments will be applied to the Obligations of Borrower to Lender as Lender determines in its sole discretion.

### 16.5   Parties Bound

The provisions of this Agreement and of each of the other Loan Documents shall be binding upon and inure to the benefit of Borrower and the Lender and its successors and assigns, except as otherwise prohibited by this Agreement or any of the other Loan Documents.

This Agreement is a contract by and among Borrower, the Lender for their mutual benefit, and no third person shall have any right, claim or interest against either Lender, or Borrower by virtue of any provision hereof.

### 16.6   Governing Law; Consent to Jurisdiction; Mutual Waiver of Jury Trial.

16.6.1 Substantial Relationship.   It is understood and agreed that all of the Loan Documents were negotiated, executed and delivered in the State of Maryland.

16.6.2 Governing Law.   This Agreement and each of the other Loan Documents shall in all respects be governed, construed, applied and enforced in accordance with the internal laws of the State of Maryland without regard to principles of conflicts of law.

16.6.3 Consent to Jurisdiction. Borrower hereby consents to personal jurisdiction in any state or Federal court located within the State of Maryland.

16.6.4 JURY TRIAL WAIVER. BORROWER AND LENDER MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS LOAN AGREEMENT, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR

RFCCM00258

WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR BORROWER LENDER TO ENTER INTO THE TRANSACTIONS CONTEMPLATED HEREBY.

16.7   Survival

All representations, warranties, covenants and agreements of Borrower, or a Guarantor, herein or in any other Loan Document, or in any notice, certificate, or other paper delivered by or on behalf of Borrower or a Guarantor pursuant hereto are significant and shall be deemed to have been relied upon by Lender notwithstanding any investigation made by Lender or any of the Lender or on its behalf and shall survive the delivery of the Loan Documents and the making of the Loan and each advance pursuant thereto. No review or approval by Lender or by Lender's Consultants or any of their representatives, of any plans and specifications, opinion letters, certificates by professionals or other item of any nature shall relieve Borrower or anyone else of any of the obligations, warranties or representations made by or on behalf of Borrower or a Guarantor, or any one or more of them, under any one or more of the Loan Documents.

16.8   Cumulative Rights

All of the rights of Lender hereunder and under each of the other Loan Documents and any other agreement now or hereafter executed in connection herewith or therewith, shall be cumulative and may be exercised singly, together, or in such combination as Lender may determine in its sole good faith judgment.

16.9   Claims Against Lender.

16.9.1 Borrower Must Notify. The Lender shall not be in default under this Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower first had actual knowledge or actual notice of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, with reasonable promptness thereafter. Such actual knowledge or actual notice shall refer to what was actually known by, or expressed in a written notification

-32-

RFCCM00259

furnished to, any of the persons or officials referred to in <u>Exhibit C</u> as Authorized Representatives or of the Property manager.

16.9.2 <u>Remedies</u>.   If it is determined by the final order of a court of competent jurisdiction, which is not subject to further appeal, that Lender has breached any of its obligations under the Loan Documents and has not remedied or cured the same with reasonable promptness following notice thereof,  Lender's responsibilities shall be limited to: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of a Loan Document, the obligation to grant such consent or give such approval and to pay Borrower's reasonable costs and expenses including, without limitation, reasonable attorneys' fees and disbursements in connection with such court proceedings; and (ii) the case of any such failure to grant such consent or give such approval, or in the case of any other such default by Lender, where it is also so determined that  Lender acted in bad faith, the payment of any actual, direct, compensatory damages sustained by Borrower as a result thereof plus Borrower's reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements in connection with such court proceedings.

16.9.3 <u>Limitations</u>.  In no event, however, shall  Lender be liable to Borrower or to Guarantor or anyone else for other damages such as, but not limited to, indirect, speculative or punitive damages whatever the nature of the breach by  Lender of its obligations under this Loan Agreement or under any of the other Loan Documents.  In no event shall  Lender be liable to Borrower or to Guarantor or anyone else unless a written notice specifically setting forth the claim of Borrower shall have been given to  Lender within the time period specified above.

16.10   <u>Obligations Absolute</u>

Except to the extent prohibited by applicable law which cannot be waived, the Obligations of Borrower and the obligations of the Guarantor under the Loan Documents shall be joint and several, absolute, unconditional and irrevocable and shall be paid strictly in accordance with the terms of the Loan Documents under all circumstances whatsoever, including, without limitation, the existence of any claim, set off, defense or other right which Borrower or any Guarantor may have at any time against  Lender whether in connection with the Loan or any unrelated transaction.

16.11   <u>Table of Contents, Title and Headings</u>

Any Table of Contents, the titles and the headings of sections are not parts of this Loan Agreement or any other Loan Document and shall not be deemed to affect the meaning or construction of any of its or their provisions.

16.12   <u>Counterparts</u>

This Loan Agreement and each other Loan Document may be executed in several counterparts, each of which when executed and delivered is an original, but all of which together shall constitute one instrument.  In making proof of this agreement, it shall not be necessary to

-33-

RFCCM00260



produce or account for more than one such counterpart which is executed by the party against whom enforcement of such loan agreement is sought.

16.13   Time Of the Essence

Time is of the essence of each provision of this Agreement and each other Loan Document.

16.14   Integration/No Oral Change

This Loan Agreement and each of the other Loan Documents is intended by the parties as the final, complete and exclusive statement of the transactions evidenced by this Loan Agreement and the other Loan Documents. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Loan Agreement and each of the Loan Documents, and no party is relying on any promise, agreement or understanding not set forth in this Loan Agreement or any of the other Loan Documents. Further, this Loan Agreement and each of the other Loan Documents may only be amended, terminated, extended or otherwise modified by a writing signed by the party against which enforcement is sought (except no such writing shall be required for any party which, pursuant to a specific provision of any Loan Document, is required to be bound by changes without such party's assent). In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealings or the like be effective to amend, terminate, extend or otherwise modify this Loan Agreement or any of the other Loan Documents.

16.15   Monthly Statements

While Lender may issue invoices or other statements on a monthly or periodic basis (a "Statement"), it is expressly acknowledged and agreed that: (i) the failure of Lender to issue any Statement on one or more occasions shall not affect Borrower's obligations to make payments under the Loan Documents as and when due; (ii) the inaccuracy of any Statement shall not be binding upon Lender and so Borrower shall always remain obligated to pay the full amount(s) required under the Loan Documents as and when due notwithstanding any provision to the contrary contained in any Statement; (iii) all Statements are issued for information purposes only and shall never constitute any type of offer, acceptance, modification, or waiver of the Loan Documents or any of Lender's rights or remedies thereunder; and (iv) in no event shall any Statement serve as the basis for, or a component of, any course of dealing, course of conduct, or trade practice which would modify, alter, or otherwise affect the express written terms of the Loan Documents.

16.16   Relationship

The relationship between the Lender and the Borrower is solely that of a lender and borrower, and nothing contained herein or in any of the other Loan Documents shall in any manner be construed as making the parties hereto partners, joint venturers or any other relationship other than lender and borrower.

16.17   Disclosure of Information

-34-

RFCCM00261

Lender may in connection with any sale, transfer or assignment of the Loan, the Loan Documents, and any or all servicing rights with respect thereto, or the granting of any participations therein or issue, or the issuance of mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement, as any such Lender determines necessary or desirable, forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such participations and/or securities or any rating agency rating such securities, and each of the foregoing's respective counsel, copies of all documents and information which Lender now has or may hereafter acquire relating to the debt evidenced by the Loan Documents, to the Borrower, to the Guarantors, or to any Person who may hereafter become a guarantor, any Indemnitor and the Property, which shall have been furnished to the Lender. Without limiting the foregoing, such Lender may from time to time, or if required pursuant to the request of any Governmental Authority, provide copies of the foregoing information to the Borrower's stockholders, Affiliates, officers, employees, auditors, counsel or other professional advisors and any such Governmental Authority.

### 16.18   Confidentiality

The Loan and the Loan Documents have been entered with the Borrower by the Lender, upon the condition that, without the prior written consent of the Lender, the Borrower shall not disclose the terms and conditions of this Agreement to any Person (other than to its employees, auditors, counsel or other professional advisors, or to affiliates, provided such Person agrees to be bound by the confidentiality provisions hereof). The Lender shall have the right to review and approve all public announcements and filings relating to the Loan that refer to the Lender before they are made.

IN WITNESS WHEREOF this Agreement has been duly executed and delivered as a sealed instrument as of the 8th day of November, 2005.

BORROWER:

MONTROSE INVESTMENT HOLDINGS, LLC, a
Delaware limited liability company

By: _____ (SEAL)
Name:   Brian A. McCormick
Title:    Managing Member

-35-

RFCCM00262

LENDER:                          CBRE REALTY FINANCE TRS, LLC

_____          By: _____
                                 Name: ANDREW A. MANLEY
                                 Title: SR. VICE PRESIDENT

-36-

RFCCM00263



EXHIBIT A TO LOAN AGREEMENT

DEFINITIONS

Acquisition Costs as defined in Section 5 hereof.

Agreement as defined in the Preamble.

Authorized Representatives as defined in Section 4, and listed on Exhibit C.

Borrower as defined in the Preamble.

Borrower Affiliates means any of the following: (a) any subsidiary of Borrower; and (b) any Person in which any Person named in subsection (a) above owns a controlling interest or has the power to direct its board of directors or other managing body.

Business Day shall mean: any day of the year on which offices of Lender are not required or authorized by law to be closed for business in Washington, DC. If any day on which a payment is due is not a Business Day, then the payment shall be due on the next day following which is a Business Day, and such extension of time shall be included in computing interest and fees in connection with such payment. Further, if there is no corresponding day for a payment in the given calendar month (i.e., there is no "February 30th"), the payment shall be due on the last Business Day of the calendar month.

Casualty as defined in Section 14.1.

Closing Date means the date of this Agreement.

Collateral as defined in Section 7.8.

Commitment Fee as defined in Section 2.4.1.

Cost To Repair as defined in Section 14.3.

Costs as defined in Section 9.13.

Creation as defined in Section 1.3.

Default as defined in Section 11.1.

Default Rate as defined in Section 2.3.8.

Dollars shall mean lawful money of the United States.

Effective Rate shall mean the per annum rate of interest of twenty percent (20%) compounded on a monthly basis to the extent not paid hereunder (irrespective of whether accrual of such amount is permitted as of right)



Environmental Indemnity as defined in Section.

-37-

RFCCM00264

**Environmental Legal Requirements** as defined in the Environmental Indemnity.

**ERISA** and **ERISA Plan** each as defined in Section 8.9.

**ERISA Affiliate** means each Person (as defined in Section 3(9) of ERISA) which together with Borrower or any Subsidiary (as defined under ERISA) thereof, would be deemed to be a member of the same "controlled group" within the meaning of Section 414(b), (c), (m) and (o) of the Internal Revenue Code of 1986, as amended.

**Event of Default** as defined in Section 11.1.

**Excluded Units** those Units within the Improvements identified on **Exhibit G** attached hereto

**Guaranty** as defined in Section 3.1.2.

**Guarantor** as defined in Section 1.5.

**Hazardous Materials** shall mean and include asbestos, flammable materials, mold, explosives, radioactive substances, polychlorinated biphenyls, radioactive substances, other carcinogens, oil and other petroleum products, pollutants or contaminants that could be a detriment to the environment, and any other hazardous or toxic materials, wastes, or substances which are defined, determined or identified as such in any past, present or future federal, state or local laws, rules, codes or regulations, or any judicial or administrative interpretation of such laws, rules, codes or regulations.

**Improvements** as defined in Section 1.3.

**Indemnified Party** as defined in Section 9.15.

**Indemnitors** as defined in Section 3.1.8.

**Independent** shall mean, when used with respect to any Person, a Person who (i) is in fact independent, (ii) does not have any direct financial or indirect financial interest (other than amounts payable to such Person for serving as a director) in the Borrower or in any Affiliate of any thereof or in any constituent partner or member of the Borrower or any Affiliate of any thereof and (iii) is not connected with the Borrower or any Affiliate thereof or any constituent partner of the Borrower or any Affiliate of any thereof as an officer, employee, promoter, underwriter, trustee, partner, director, or person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning hereof.

**Interest Period** shall mean a period of one (1) calendar month, except that the first Interest Period shall mean that period from the date of this Agreement to the last day of November, 2005; Provided, however: (i) if the last day of any Interest Period would otherwise occur on a day which is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day; but (iii) if such extension would otherwise cause such last day to occur in a new calendar month, then such last day shall occur on the next preceding Business Day.

RFCCM00265



<u>Investment</u> shall mean the acquisition of any real or tangible personal property or of any stock or other security, any loan, advance, bank deposit, money market fund, contribution to capital, extension of credit (except for accounts receivable arising in the ordinary course of business and payable in accordance with customary terms), or purchase or commitment or option to purchase or otherwise acquire real estate or tangible personal property or stock or other securities of any party or any part of the business or assets comprising such business, or any part thereof.

<u>Land</u> as defined in Section 1.3.

<u>Late Charge</u> as defined in Section 2.3.9.

<u>Legal Requirements</u> shall mean all applicable federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, and the requirements of any governmental agency or authority having or claiming jurisdiction with respect thereto, including, but not limited to, those applicable to zoning, subdivision, building, health, fire, safety, sanitation, the protection of the handicapped, and environmental matters and shall also include all orders and directives of any court, governmental agency or authority having or claiming jurisdiction with respect thereto.

<u>Licenses and Permits</u> shall mean all licenses, permits, authorizations and agreements issued by or agreed to by any governmental authority, or by a private party pursuant to a Permitted Title Exception, and including, but not limited to, building permits, occupancy permits and such special permits, variances and other relief as may be required pursuant to Legal Requirements which may be applicable to the Property.



<u>Liquidation Proceeds</u> shall mean amounts received by the Lender in the exercise of the rights and remedies under the Loan Documents (including, but not limited to, all rents, profits, and other proceeds received by the Lender from the operation of the Property or the liquidation of any Collateral, but not including any amount bid at a foreclosure sale or on behalf of the Lender or otherwise credited to the Borrower in any deed in lieu of foreclosure or similar transaction).

<u>Loan</u> as defined in Section 1.4.

<u>Loan Agreement</u> as defined in the Preamble.

<u>Loan Amount</u> as defined in Section 1.4.

<u>Loan Documents</u> as defined in Section 3.2.

<u>Loan To Cost Ratio</u> as defined in Section 9.16.1.

<u>Maturity</u> shall mean the Maturity Date, or in any instance, upon acceleration of the Loan, if the Loan has been accelerated by the Lender upon an Event of Default.

<u>Net Proceeds</u> means the net sale proceeds to be received by Pavilion from the sale of any remaining Unit subsequent to the payment of actual costs and expenses incurred in connection with such sale, which costs and expenses shall mean (i) not more than one-half of applicable transfer and recordation tax applicable to the recordation of the deed evidencing such transfer, (ii) normal and customary real estate tax prorations, (iii) a third party sales brokerage fee in an

-39-

RFCCM00266



amount not in excess of the amount set forth in the Sales Pricing Plan, and (iv) other customary closing costs actually incurred and paid by Pavilion; but excluding any deduction for repayment of debt, return of or on equity and payment of any fee or expense to any Affiliate of Borrower.

Note. The Note payable to Lender in the aggregate principal amount of $31,946,650.00.

Obligations as defined in Section 3.1.

Original Appraisal as defined in Section 9.16.1.

Ownership Interest Pledge Agreement as defined in Section 3.1.1.

Pavilion means Pavilion LLC, a Maryland limited liability company.

Participation as defined in Section 2.3.10

Payment Date as defined in Section 2.3.2.

Pay Rate shall mean the per annum rate of interest of eight percent (8%).

Permitted Additional Debt as defined in Section 9.6.4.

Permitted Title Exceptions shall mean those exceptions set forth on Schedule B of the Borrower's owner's policy of Title Insurance with respect to the Land.

Permitted Transactions as defined in Section 9.6.2.

Permitted Transfers as defined in Section 9.6.3.

Person means individual, partnership, joint venture, firm, fund, corporation, limited liability company, association, trust or other enterprise (whether or not incorporated), or any Governmental Authority.

Prepayment Fee shall mean, upon final repayment of the Loan, an amount equal to the positive difference, if any, between the amount of interest which would accrue on the entire Principal Amount of the Loan at the Effective Rate for a period of eighteen (18) full calendar months, and the amount of all interest that the Borrower has then actually previously paid to the Lender, up to and including the date of any such repayment.

Property as defined in Section 1.3.

Remaining Units means all Units remaining immediately after full repayment of the Senior Loan and the Loan (excluding repayment of the Participation) other than the Excluded Units.

Reportable Event as defined in Section 8.9.1.

Required Equity Contribution as defined in Section 6.2.



-40-

RFCCM00267

<u>Sales Pricing Plan</u> means that pricing plan for the sales of individual condominium units comprising the Property, which is attached to this Agreement as **Exhibit F**.

<u>Security</u> as defined in Section 3.1.

<u>Security Documents</u> as defined in Section 3.2.

<u>Senior Lender</u> means Fremont Investment and Loan

<u>Senior Loan</u> shall mean the senior loan of even date between Pavilion and the Senior Lender in the original principal amount not to exceed $_____.

<u>Senior Loan Documents</u> shall mean the documents, instruments and agreements evidencing the Senior Loan.

<u>Statement</u> as defined in Section 16.15.

<u>Triton Pavilion</u> means Triton Pavilion, LLC, a Delaware limited liability company.

<u>UCC</u> means the Uniform Commercial Code in effect in the State of Maryland.

<u>Units</u> means all residential condominium units comprising or to comprise one hundred percent of the existing rental units located within the Improvements.

<u>Updated Appraisal</u> as defined in Section 9.16.2.

<u>Value of the Property</u> as defined in Section 9.16.1.



-41-

RFCCM00268



## EXHIBIT B TO LOAN AGREEMENT

## OWNERSHIP INTERESTS AND TAXPAYER IDENTIFICATION NUMBERS

| NAME | MEMBERSHIP INTEREST | SS# |
|------|---------------------|-----|
| Brian A. McCormick | 50% | |
| Charles W. Moore | 50% | |

-42-

RFCCM00269

EXHIBIT C TO LOAN AGREEMENT

AUTHORIZED REPRESENTATIVES

**BRIAN A McCORMICK**

-43-

RFCCM00270

## EXHIBIT D TO LOAN AGREEMENT

## REQUIRED PROPERTY, HAZARD AND OTHER INSURANCE

Borrower shall at all times provide and maintain the following insurance coverages with respect to the Property and the Collateral issued by companies qualified to do business in the State of Maryland, having a Best's Rating of not less than A-/VIII and otherwise acceptable to Lender in its sole discretion:

(i)     physical insurance on an all-risk basis without exception (including, without limitation, flood required if property is in a "Special Flood Hazard Area" A or V), vandalism and malicious mischief, earthquake, collapse, boiler explosion, sprinkler coverage, cost of demolition, increased costs of construction and the value of the undamaged portion of the building and soft costs coverage) covering all the real estate, fixtures and personal property to the extent of the full insurable value thereof, on a builder's risk non-reporting form prior to completion and occupancy to Occupy Endorsement, having replacement cost and agreed amount endorsements (with deductibles not in excess of it of insurable value);

(ii)     rent loss or business interruption insurance in an amount equal to one year's projected rentals or gross revenues;

(iii)     public liability insurance, with underlying and umbrella coverages totaling not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate or such other amounts as may be determined by Lender from time to time;

(iv)     automobile liability insurance (including non-owned automobile) with a coverage of $1,000, 000 per occurrence during construction;

(v)     worker's compensation, employer's liability and other insurance required by law;

(vi)     such other insurance coverages in such amounts as Lender may request consistent with the customary practices of prudent developers and owners of similar properties.

An actual insurance policy or certified copy thereof, or a binder, certificate of insurance, or other evidence of property coverage in the form of Acord 27 (Evidence of Property Coverage), Acord 25 (Certificate of Insurance), or a 30-day binder in form acceptable to Lender with an unconditional undertaking to deliver the policy or a certified copy within thirty (30) days, shall be delivered at closing of the Loan.

Flood insurance shall be provided if the property or the collateral is located in a flood prone, flood risk or flood hazard area as designated pursuant to the Federal Flood Disaster Protection Act of 1973, as amended, and the Regulations thereunder, or if otherwise reasonably required by Lender.

RFCCM00271

EXHIBIT E TO LOAN AGREEMENT

PROJECT BUDGET

RFCCM00272



The Pavilion Condominiums Conversion
Sources and Uses
November 8, 2005

| | Description | Total Budget | To-Date | At-Close | Through Closing | Post Closing |
|---|---|---|---|---|---|---|
| **SOURCES OF FUNDS** | | | | | | |
| Fremont Investment & Loan | 1st Mortgage Lender | $130,000,000 | $0 | $87,162,904 | $87,162,904 | $42,837,096 |
| CBRE Mezzanine | Mezzanine Debt | $29,700,000 | $0 | $29,700,000 | $29,700,000 | $0 |
| Triton Equity | Sponsor Equity | $5,200,000 | $4,725,381 | $774,619 | $5,500,000 | $0 |
| Continental Deferred Revenue | Deferred Revenue | $950,000 | $0 | $0 | $0 | $950,000 |
| Total Sources of Funds | | $166,150,000 | $4,725,381 | $117,637,523 | $122,362,904 | $43,787,096 |
| **USES** | | $0 | $0 | $0 | $0 | $0 |
| **Acquisition Costs** | | | | | | |
| Home Properties, LP | Property Acquisition | $117,453,000 | $4,203,000 | $113,250,000 | $117,453,000 | $0 |
| **Construction Cost:** | | | | | | |
| Unit Interiors | Construction | $9,259,533 | $0 | $0 | $0 | $9,259,533 |
| Interior Common Space | Construction | $6,038,775 | $0 | $0 | $0 | $6,038,775 |
| Demo/Structure/Garage | Construction | $1,201,739 | $0 | $0 | $0 | $1,201,739 |
| Exterior and Sitework | Construction | $6,828,922 | $0 | $0 | $0 | $6,828,922 |
| General Conditions | Construction | $400,000 | $0 | $0 | $0 | $400,000 |
| Fire and Safety | Construction | $0 | $0 | $0 | $0 | $0 |
| Contractor Fee | Construction | $1,608,950 | $0 | $0 | $0 | $1,608,950 |
| Construction Contingency | Construction Contingency | $3,800,688 | $42,508 | $0 | $42,508 | $3,758,180 |
| Construction Cost Sub-Total | | $4,263,861 | $0 | $0 | $0 | $4,263,861 |
| | | $33,402,468 | $42,508 | $0 | $42,508 | $33,359,960 |
| **Soft Costs** | | | | | | |
| **Professional Fees** | | | | | | |
| ECS | Roof Consulting | $2,500 | $2,500 | $0 | $2,500 | $0 |
| Eisner Petrou & Associates | Public Relations | $15,000 | $13,216 | $0 | $13,216 | $1,784 |
| Koffel Associates | Fire Protection Engineers | $20,000 | $10,019 | $0 | $10,019 | $9,981 |
| Mahan Rykiel Associates Inc. | Site Plan/Landscape Architects | $25,000 | $0 | $0 | $0 | $25,000 |
| Marks, Thomas and Associates | Design Consulting | $25,000 | $14,669 | $0 | $14,669 | $10,331 |
| MECX | Environmental | $20,000 | $9,300 | $0 | $9,300 | $10,700 |
| Project Support Services | Professional Fees | $2,500 | $2,500 | $0 | $2,500 | $0 |
| STV Incorporated | Architectural & Engineering | $700,000 | $64,235 | $0 | $64,235 | $635,765 |
| Ryan Construction Management | Owner's Rep. - Construction | $540,000 | $24,930 | $0 | $24,930 | $515,070 |
| Village Solutions Company | Retail Development Strategy | $25,000 | $12,500 | $0 | $12,500 | $12,500 |
| Other | Contingency | $22,000 | $193 | $0 | $193 | $21,807 |
| Professional Fees Sub-Total | | $1,397,000 | $154,063 | $0 | $154,063 | $1,242,937 |
| **Legal Fees** | | | | | | |
| **Triton Pavilion:** | | | | | | |
| Cowie & Mott | Legal Fees | $125,000 | $45,742 | $15,000 | $60,742 | $64,258 |
| Michael Mannes, P.A. | Legal Fees | $40,000 | $22,000 | $0 | $22,000 | $18,000 |
| Linowes & Blocher | Legal Fees | $9,122 | $9,122 | $0 | $9,122 | $0 |
| Stevens & Lee | Legal Fees | $160,000 | $0 | $160,000 | $160,000 | $0 |
| DLA Piper | Legal Fees | $77,000 | $77,000 | $0 | $77,000 | $0 |
| Other | Legal Fees | $40,878 | $0 | $0 | $0 | $40,878 |
| | | $452,000 | $153,864 | $175,000 | $328,864 | $123,136 |
| **Other Closing Costs** | | | | | | |
| ~~Fremont Investment & Loan~~ | | $75,000 | $150,000 | ($75,000) | $75,000 | $0 |
| Fremont Investment & Loan | Bank Commitment Fee | $1,300,000 | $0 | $1,300,000 | $1,300,000 | $0 |
| Saac and Tenenbaum | CBRE Legal Costs | $34,500 | $0 | $34,500 | $34,500 | $0 |
| CBRE Realty Finance | Mezz. Commitment Fee | $297,000 | $0 | $297,000 | $297,000 | $0 |
| LJ Melody | Investment Banking | $1,894,000 | $0 | $1,894,000 | $1,894,000 | $0 |
| Canton Title Company | Title/Closing Fees | $308,742 | $0 | $308,742 | $308,742 | $0 |
| Home Properties - Settlement with Seller | Closing Costs | $283,406 | $0 | $283,406 | $283,406 | $0 |
| Lackton Companies | Insurance Downpayment | $34,533 | $0 | $34,533 | $34,533 | $0 |
| Tenant Security Deposits | Security Deposits | $135,342 | $0 | $135,342 | $135,342 | $0 |
| Building Permits | Permits | $200,000 | $8,946 | $0 | $8,946 | $191,054 |
| Third Party Administrative & Review Fees | Administrative | $96,000 | $0 | $0 | $0 | $96,000 |
| Project Administration Fee | Administrative | $750,000 | $0 | $0 | $0 | $750,000 |
| Marketing Expense | Marketing | $400,000 | $13,000 | $0 | $13,000 | $387,000 |
| Miscellaneous Closing Fees | Closing Fees | $137,009 | $0 | $0 | $0 | $137,009 |
| Other Fees & Expenses Sub-Total | | $5,945,532 | $171,946 | $4,212,523 | $4,384,469 | $1,561,063 |
| | | $158,650,000 | $4,725,381 | $117,637,523 | $122,362,904 | $36,287,096 |
| Mezz. Interest Reserve | | $0 | $0 | $0 | $0 | $0 |
| Interest Reserve | | $7,500,000 | $0 | $0 | $0 | $7,500,000 |



RFCCM00273

Total Project Cost

| $166,150,000 | $4,725,381 | $117,637,523 | $122,362,904 | $43,787,096 |

RFCCM00274

| Closing + 90 Days | After 90 Days | Notes: |
|---|---|---|
| $6,107,043 | $36,730,053 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $950,000 | |
| $6,107,043 | $37,680,053 | |
| $0 | $0 | |
| | | |
| $0 | $0 | |
| | | |
| $617,302 | $8,642,231 | |
| $402,585 | $5,636,190 | |
| $76,783 | $1,124,956 | |
| $2,599,395 | $4,229,527 | |
| $26,667 | $373,333 | |
| $107,263 | $1,501,687 | |
| $562,668 | $3,195,511 | |
| $645,469 | $3,618,392 | |
| $5,038,132 | $28,321,828 | |
| | | |
| $0 | $0 | |
| $1,784 | ($0) | |
| $4,000 | $5,981 | |
| $12,500 | $12,500 | |
| $10,331 | ($0) | |
| $10,700 | $0 | |
| $0 | $0 | |
| $500,000 | $135,765 | |
| $24,930 | $490,140 | |
| $0 | $12,500 | |
| $11,000 | $10,807 | |
| $575,245 | $667,692 | |
| | | |
| $25,000 | $39,258 | |
| $9,000 | $9,000 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $40,878 | |
| $34,000 | $89,136 | |
| | | |
| $0 | $0 | (need to get final estimates from Fremont, who are their attorneys, etc.) |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $0 | $0 | |
| $150,000 | $41,054 | |
| $18,000 | $78,000 | |
| $41,667 | $708,333 | |
| $250,000 | $137,000 | |
| $0 | $137,009 | |
| $459,667 | $1,101,397 | |
| | | |
| $6,107,043 | $30,180,053 | |
| | | |
| $0 | $0 | |
| $0 | $7,500,000 | |

RFCCM00275



| $6,107,043 | $37,680,053 |

RFCCM00276

-46-

RFCCM00277

EXHIBIT F TO LOAN AGREEMENT

SALES PRICING PLAN

| UNIT TYPE | MINIMUM SALES PRICE | MAXIMUM % OF GSP AS COSTS |
|-----------|---------------------|---------------------------|

RFCCM00278



Exhibit

| Unit # | Apt.# | Sales $ | Sq. Ft. | Unit Type |
|---|---|---|---|---|
| C100 | APT. C100 | $409,900 | 748 | 1A/0C |
| C101 | APT. C101 | $409,900 | 748 | 1A/0C |
| C102 | APT. C102 | $409,900 | 748 | 1A/0C |
| C103 | APT. C103 | $409,900 | 748 | 1A/0C |
| C104 | APT. C104 | $409,900 | 748 | 1A/0C |
| C105 | APT. C105 | $409,900 | 748 | 1A/0C |
| C106 | APT. C106 | $409,900 | 748 | 1A/0C |
| C107 | APT. C107 | $409,900 | 748 | 1A/0C |
| C200 | APT. C200 | $409,900 | 748 | 1A/0C |
| C201 | APT. C201 | $412,900 | 748 | 1A/0C |
| C202 | APT. C202 | $412,900 | 748 | 1A/0C |
| C203 | APT. C203 | $412,900 | 748 | 1A/0C |
| C204 | APT. C204 | $412,900 | 748 | 1A/0C |
| C205 | APT. C205 | $412,900 | 748 | 1A/0C |
| C206 | APT. C206 | $412,900 | 748 | 1A/0C |
| C207 | APT. C207 | $412,900 | 748 | 1A/0C |
| C208 | APT. C208 | $412,900 | 748 | 1A/0C |
| C300 | APT. C300 | $415,900 | 748 | 1A/0C |
| C301 | APT. C301 | $415,900 | 748 | 1A/0C |
| C302 | APT. C302 | $415,900 | 748 | 1A/0C |
| C303 | APT. C303 | $415,900 | 748 | 1A/0C |
| C304 | APT. C304 | $415,900 | 748 | 1A/0C |
| C305 | APT. C305 | $415,900 | 748 | 1A/0C |
| C306 | APT. C306 | $415,900 | 748 | 1A/0C |
| C307 | APT. C307 | $415,900 | 748 | 1A/0C |
| C400 | APT. C400 | $418,900 | 748 | 1A/0C |
| C401 | APT. C401 | $418,900 | 748 | 1A/0C |
| C402 | APT. C402 | $418,900 | 748 | 1A/0C |
| C403 | APT. C403 | $418,900 | 748 | 1A/0C |
| C404 | APT. C404 | $418,900 | 748 | 1A/0C |
| C405 | APT. C405 | $418,900 | 748 | 1A/0C |
| C406 | APT. C406 | $418,900 | 748 | 1A/0C |
| C407 | APT. C407 | $418,900 | 748 | 1A/0C |
| C500 | APT. C500 | $421,900 | 748 | 1A/0C |
| C501 | APT. C501 | $421,900 | 748 | 1A/0C |
| C502 | APT. C502 | $421,900 | 748 | 1A/0C |
| C503 | APT. C503 | $421,900 | 748 | 1A/0C |
| C504 | APT. C504 | $421,900 | 748 | 1A/0C |
| C505 | APT. C505 | $421,900 | 748 | 1A/0C |
| C506 | APT. C506 | $421,900 | 748 | 1A/0C |
| C507 | APT. C507 | $421,900 | 748 | 1A/0C |
| C600 | APT. C600 | $424,900 | 748 | 1A/0C |
| C601 | APT. C601 | $424,900 | 748 | 1A/0C |
| C602 | APT. C602 | $424,900 | 748 | 1A/0C |
| C603 | APT. C603 | $424,900 | 748 | 1A/0C |
| C604 | APT. C604 | $424,900 | 748 | 1A/0C |
| C605 | APT. C605 | $424,900 | 748 | 1A/0C |
| C606 | APT. C606 | $424,900 | 748 | 1A/0C |
| C607 | APT. C607 | $424,900 | 748 | 1A/0C |
| C700 | APT. C700 | $427,900 | 748 | 1A/0C |
| C701 | APT. C701 | $427,900 | 748 | 1A/0C |
| C702 | APT. C702 | $427,900 | 748 | 1A/0C |
| C703 | APT. C703 | $427,900 | 748 | 1A/0C |
| C704 | APT. C704 | $427,900 | 748 | 1A/0C |
| C705 | APT. C705 | $427,900 | 748 | 1A/0C |
| C706 | APT. C706 | $427,900 | 748 | 1A/0C |
| C708 | APT. C708 | $427,900 | 748 | 1A/0C |

RFCCM00279

| C707 | APT. C707 | $427,900 | 748 | 1A10C |
|---|---|---|---|---|
| C800 | APT. C800 | $430,900 | 748 | 1A10C |
| C801 | APT. C801 | $430,900 | 748 | 1A10C |
| C802 | APT. C802 | $430,900 | 748 | 1A10C |
| C803 | APT. C803 | $430,900 | 748 | 1A10C |
| C804 | APT. C804 | $430,900 | 748 | 1A10C |
| C805 | APT. C805 | $430,900 | 748 | 1A10C |
| C806 | APT. C806 | $430,900 | 748 | 1A10C |
| C807 | APT. C807 | $430,900 | 748 | 1A10C |
| C900 | APT. C900 | $433,900 | 748 | 1A10C |
| C901 | APT. C901 | $433,900 | 748 | 1A10C |
| C902 | APT. C902 | $433,900 | 748 | 1A10C |
| C903 | APT. C903 | $433,900 | 748 | 1A10C |
| C904 | APT. C904 | $433,900 | 748 | 1A10C |
| C905 | APT. C905 | $433,900 | 748 | 1A10C |
| C906 | APT. C906 | $433,900 | 748 | 1A10C |
| C907 | APT. C907 | $433,900 | 748 | 1A10C |
| C1000 | APT. C1000 | $436,900 | 748 | 1A10C |
| C1001 | APT. C1001 | $436,900 | 748 | 1A10C |
| C1002 | APT. C1002 | $436,900 | 748 | 1A10C |
| C1003 | APT. C1003 | $436,900 | 748 | 1A10C |
| C1004 | APT. C1004 | $436,900 | 748 | 1A10C |
| C1005 | APT. C1005 | $436,900 | 748 | 1A10C |
| C1006 | APT. C1006 | $436,900 | 748 | 1A10C |
| C1007 | APT. C1007 | $436,900 | 748 | 1A10C |
| C1100 | APT. C1100 | $439,900 | 748 | 1A10C |
| C1101 | APT. C1101 | $439,900 | 748 | 1A10C |
| C1102 | APT. C1102 | $439,900 | 748 | 1A10C |
| C1103 | APT. C1103 | $439,900 | 748 | 1A10C |
| C1104 | APT. C1104 | $439,900 | 748 | 1A10C |
| C1105 | APT. C1105 | $439,900 | 748 | 1A10C |
| C1106 | APT. C1106 | $439,900 | 748 | 1A10C |
| C1107 | APT. C1107 | $439,900 | 748 | 1A10C |
| C1200 | APT. C1200 | $442,900 | 748 | 1A10C |
| C1201 | APT. C1201 | $442,900 | 748 | 1A10C |
| C1202 | APT. C1202 | $442,900 | 748 | 1A10C |
| C1203 | APT. C1203 | $442,900 | 748 | 1A10C |
| C1204 | APT. C1204 | $442,900 | 748 | 1A10C |
| C1205 | APT. C1205 | $442,900 | 748 | 1A10C |
| C1206 | APT. C1206 | $442,900 | 748 | 1A10C |
| C1207 | APT. C1207 | $442,900 | 748 | 1A10C |
| C1300 | APT. C1300 | $445,900 | 748 | 1A10C |
| C1301 | APT. C1301 | $445,900 | 748 | 1A10C |
| C1302 | APT. C1302 | $445,900 | 748 | 1A10C |
| C1303 | APT. C1303 | $445,900 | 748 | 1A10C |
| C1304 | APT. C1304 | $445,900 | 748 | 1A10C |
| C1305 | APT. C1305 | $445,900 | 748 | 1A10C |
| C1306 | APT. C1306 | $445,900 | 748 | 1A10C |
| C1307 | APT. 1Q | $445,900 | 748 | 1A10C |
| C1400 | APT. C1400 | $448,900 | 748 | 1A10C |
| C1401 | APT. C1401 | $448,900 | 748 | 1A10C |
| C1402 | APT. C1402 | $448,900 | 748 | 1A10C |
| C1403 | APT. C1403 | $448,900 | 748 | 1A10C |
| C1404 | APT. C1404 | $448,900 | 748 | 1A10C |
| C1405 | APT. C1405 | $448,900 | 748 | 1A10C |

RFCCM00280

| Unit | APT. | Price | | |
|---|---|---|---|---|
| C1406 | APT. C1406 | $448,900 | 748 | 1A10C |
| C1407 | APT. C1407 | $448,900 | 748 | 1A10C |
| C1500 | APT. C1500 | $451,900 | 748 | 1A10C |
| C1501 | APT. C1501 | $451,900 | 748 | 1A10C |
| C1502 | APT. C1502 | $451,900 | 748 | 1A10C |
| C1503 | APT. C1503 | $451,900 | 748 | 1A10C |
| C1504 | APT. C1504 | $451,900 | 748 | 1A10C |
| C1505 | APT. C1505 | $451,900 | 748 | 1A10C |
| C1506 | APT. C1506 | $451,900 | 748 | 1A10C |
| C1507 | APT. C1507 | $451,900 | 748 | 1A10C |
| C1600 | APT. C1600 | $460,900 | 748 | 1A10C |
| C1601 | APT. C1601 | $460,900 | 748 | 1A10C |
| C1602 | APT. C1602 | $460,900 | 748 | 1A10C |
| C1603 | APT. C1603 | $460,900 | 748 | 1A10C |
| C1604 | APT. C1604 | $460,900 | 748 | 1A10C |
| C1605 | APT. C1605 | $460,900 | 748 | 1A10C |
| C1606 | APT. C1606 | $460,900 | 748 | 1A10C |
| C1607 | APT. C1607 | $460,900 | 743 | 1A10B |
| N100 | APT. N100 | $391,900 | 743 | 1A10B |
| N101 | APT. N101 | $539,900 | 1076 | 2A20G |
| N102 | APT. N102 | $491,900 | 1001 | 2A20F |
| N103 | APT. N103 | $321,900 | 673 | 1A10K |
| N104 | APT. N104 | $491,900 | 1001 | 2A20F |
| N105 | APT. N105 | $491,900 | 949 | 2A10D |
| N106 | APT. N106 | $491,900 | 949 | 2A10D |
| N107 | APT. N107 | $491,900 | 1001 | 2A10D |
| N108 | APT. N108 | $701,900 | 1521 | 3A20I |
| N109 | APT. N109 | $701,900 | 1521 | 3A20I |
| N200 | APT. N200 | $394,900 | 743 | 1A10B |
| N201 | APT. N201 | $544,900 | 1076 | 2A20G |
| N202 | APT. N202 | $495,900 | 1001 | 2A20F |
| N203 | APT. N203 | $324,900 | 673 | 0A10A |
| N204 | APT. N204 | $495,900 | 1001 | 2A20F |
| N205 | APT. N205 | $495,900 | 949 | 2A20F |
| N206 | APT. N206 | $495,900 | 949 | 2A20F |
| N207 | APT. N207 | $495,900 | 1001 | 2A10D |
| N208 | APT. N208 | $708,900 | 1521 | 3A20I |
| N209 | APT. N209 | $708,900 | 1521 | 3A20I |
| N300 | APT. N300 | $397,900 | 743 | 1A10B |
| N301 | APT. N301 | $499,900 | 1076 | 2A20G |
| N302 | APT. N302 | $499,900 | 1001 | 2A20F |
| N303 | APT. N303 | $327,900 | 673 | 2A10K |
| N304 | APT. N304 | $499,900 | 673 | 1A10K |
| N305 | APT. N305 | $499,900 | 1001 | 2A20F |
| N306 | APT. N306 | $499,900 | 949 | 2A20F |
| N307 | APT. N307 | $499,900 | 949 | 2A10D |
| N308 | APT. N308 | $715,900 | 1521 | 3A20I |
| N309 | APT. N309 | $715,900 | 1521 | 3A20I |
| N400 | APT. N400 | $400,900 | 743 | 1A10B |
| N401 | APT. N401 | $554,900 | 1076 | 2A20G |
| N402 | APT. N402 | $503,900 | 1001 | 2A20F |
| N403 | APT. N403 | $330,900 | 673 | 1A10K |

RFCCM00281

| | APT. | Price | | |
|---|---|---|---|---|
| N404 | APT. N404 | $503,900 | 1001 | 2A20F |
| N404 | APT. N405 | $503,900 | 1001 | 2A20F |
| N405 | APT. N406 | $503,900 | 1001 | 2A20F |
| N405 | APT. N407 | $503,900 | 1001 | 2A20F |
| N406 | APT. N408 | $503,900 | 949 | 2A10D |
| N407 | APT. N409 | $503,900 | 949 | 3A20I |
| N408 | APT. N500 | $722,900 | 1521 | 3A20I |
| N409 | APT. N501 | $722,900 | 1521 | 2A10B |
| N500 | APT. 831 | $403,900 | 743 | 2A20G |
| N501 | APT. N502 | $559,900 | 1078 | 2A20G |
| N501 | APT. N503 | $559,900 | 1078 | 2A20F |
| N501 | APT. N504 | $533,900 | 1001 | 1A10K |
| N502 | APT. N505 | $507,900 | 873 | 2A20F |
| N503 | APT. N506 | $507,900 | 1001 | 2A10D |
| N503 | APT. N507 | $507,900 | 949 | 3A20I |
| N504 | APT. N508 | $722,900 | 949 | 3A20I |
| N505 | APT. N509 | $722,900 | 1521 | 3A20I |
| N506 | APT. N600 | $722,900 | 1521 | 1A10B |
| N507 | APT. N601 | $722,900 | 1521 | 2A20G |
| N508 | APT. N602 | $405,900 | 1521 | 2A20F |
| N508 | APT. N603 | $564,900 | 1078 | 2A10D |
| N509 | APT. N604 | $515,900 | 743 | 1A10K |
| N509 | APT. N605 | $336,900 | 673 | 2A20F |
| N600 | APT. N606 | $511,900 | 1001 | 2A10D |
| N601 | APT. N607 | $511,900 | 1001 | 2A10D |
| N602 | APT. N608 | $511,900 | 949 | 3A20I |
| N603 | APT. N609 | $729,900 | 949 | 3A20I |
| N604 | APT. N700 | $729,900 | 1521 | 3A20I |
| N605 | APT. N701 | $409,900 | 1521 | 2A20G |
| N606 | APT. N702 | $559,900 | 1078 | 2A20F |
| N607 | APT. N703 | $515,900 | 673 | 2A20F |
| N608 | APT. N704 | $339,900 | 1001 | 2A10D |
| N609 | APT. N705 | $515,900 | 949 | 3A20I |
| N700 | APT. N707 | $515,900 | 949 | 1A10B |
| N701 | APT. N708 | $515,900 | 1521 | 2A10D |
| N702 | APT. N709 | $736,900 | 1521 | 3A20I |
| N703 | APT. N800 | $736,900 | 743 | 2A20G |
| N704 | APT. N801 | $413,900 | 1076 | 2A20F |
| N705 | APT. N802 | $574,900 | 1001 | 2A10D |
| N707 | APT. N803 | $519,900 | 673 | 2A20F |
| N708 | APT. N804 | $342,900 | 1001 | 0A10A |
| N709 | APT. N805 | $515,900 | 1001 | 2A20G |
| N800 | APT. N806 | $519,900 | 949 | 2A10D |
| N801 | APT. N807 | $519,900 | 949 | 3A20I |
| N802 | APT. N808 | $743,900 | 1521 | 3A20I |
| N803 | APT. N809 | $743,900 | 1521 | 1A10B |
| N804 | APT. N900 | $415,900 | 1078 | 2A20G |
| N805 | APT. N901 | $523,900 | 1001 | 2A20F |

RFCCM00282

| Unit | APT | Price | SqFt | Plan |
|---|---|---|---|---|
| N903 | APT. N903 | $345,900 | 673 | 0A10A |
| N904 | APT. N904 | $523,900 | 1001 | 2A20F |
| N905 | APT. N905 | $523,900 | 949 | 2A10D |
| N906 | APT. N906 | $523,900 | 949 | 2A10I |
| N907 | APT. N907 | $750,900 | 1521 | 3A20I |
| N908 | APT. N908 | $750,900 | 743 | 1A10B |
| N909 | APT. N909 | $418,900 | 1078 | 2A20G |
| N1001 | APT. N1001 | $584,900 | 673 | 2A20F |
| N1002 | APT. N1002 | $527,900 | 673 | 0A10A |
| N1003 | APT. N1003 | $348,900 | 1001 | 2A20F |
| N1004 | APT. N1004 | $527,900 | 949 | 2A10D |
| N1005 | APT. N1005 | $527,900 | 949 | 2A10D |
| N1006 | APT. N1006 | $527,900 | 1521 | 3A20I |
| N1007 | APT. N1007 | $757,900 | 743 | 1A10B |
| N1008 | APT. N1008 | $757,900 | 1076 | 2A20G |
| N1009 | APT. N1009 | $421,900 | 1001 | 2A20F |
| N1100 | APT. N1100 | $568,900 | 1001 | 2A20F |
| N1101 | APT. N1101 | $531,900 | 949 | 2A10D |
| N1102 | APT. N1102 | $531,900 | 949 | 2A10K |
| N1103 | APT. N1103 | $531,900 | 1521 | 2A20F |
| N1104 | APT. N1104 | $351,900 | 1521 | 2A10D |
| N1105 | APT. N1105 | $531,900 | 743 | 3A20I |
| N1106 | APT. N1106 | $531,900 | 1076 | 3A20I |
| N1107 | APT. N1107 | $531,900 | 1001 | 1A10B |
| N1108 | APT. N1108 | $531,900 | 673 | 1A10B |
| N1109 | APT. N1109 | $764,900 | 1001 | 2A20F |
| N1200 | APT. N1200 | $764,900 | 949 | 2A20G |
| N1201 | APT. N1201 | $424,900 | 949 | 2A20F |
| N1202 | APT. N1202 | $594,900 | 1521 | 2A10K |
| N1203 | APT. N1203 | $535,900 | 1521 | 2A20F |
| N1204 | APT. N1204 | $535,900 | 743 | 2A10D |
| N1205 | APT. N1205 | $535,900 | 1076 | 2A10D |
| N1206 | APT. N1206 | $535,900 | 1001 | 3A20I |
| N1207 | APT. N1207 | $535,900 | 673 | 3A20I |
| N1208 | APT. N1208 | $535,900 | 743 | 1A10B |
| N1209 | APT. N1209 | $771,900 | 1521 | 1A10B |
| N1300 | APT. N1300 | $427,900 | 1521 | 2A20F |
| N1301 | 7th Flr. | $596,900 | 743 | 2A20G |
| N1302 | APT. N1301 | $539,900 | 1078 | 1A10K |
| N1303 | APT. N1302 | $539,900 | 673 | 2A20F |
| N1304 | APT. N1303 | $357,900 | 1001 | 2A20F |
| N1305 | APT. N1304 | $539,900 | 949 | 2A10D |
| N1306 | APT. N1305 | $539,900 | 949 | 2A10D |
| N1307 | APT. N1306 | $539,900 | 1001 | 1A10B |
| N1308 | APT. N1307 | $539,900 | 1521 | 2A20F |
| N1309 | APT. N1308 | $778,900 | 1521 | 2A20F |
| N1400 | APT. N1309 | $778,900 | 743 | 1A10K |
| N1401 | APT. N1400 | $430,900 | 1078 | 2A20F |
| N1402 | APT. N1401 | $604,900 | 1001 | 2A20F |
| N1402 | APT. N1402 | $543,900 | 673 | 1A10K |
| N1403 | APT. N1403 | $360,900 | 1001 | 2A20F |
| N1404 | APT. N1404 | $543,900 | 1001 | 2A20F |
| N1405 | APT. N1405 | $543,900 | 1001 | |

| | | | | |
|---|---|---|---|---|
| N1406 | APT. N1406 | $543,900 | 949 | 2A10D |
| N1407 | APT. N1407 | $543,900 | 949 | 2A10D |
| N1408 | APT. N1408 | $785,900 | 1521 | 3A20I |
| N1408 | | $785,900 | 1521 | 3A20I |
| N1408 | | $785,900 | 1521 | 3A20I |
| N1409 | APT. N1409 | $785,900 | 1521 | 3A20H |
| N1409 | | $785,900 | 1521 | 3A20H |
| N1500 | APT. N1500 | $433,900 | 743 | 1A10B |
| N1501 | APT. N1501 | $609,900 | 1076 | 2A20J |
| N1502 | APT. N1502 | $547,900 | 1001 | 2A20F |
| N1503 | APT. N1503 | $383,900 | 673 | 0A10A |
| N1504 | APT. N1504 | $547,900 | 1001 | 0A10A |
| N1505 | APT. N1505 | $547,900 | 949 | 2A20F |
| N1506 | APT. N1506 | $547,900 | 949 | 2A10D |
| N1507 | APT. N1507 | $547,900 | 949 | 3A20I |
| N1508 | APT. N1508 | $792,900 | 1521 | 3A20I |
| N1509 | APT. N1509 | $792,900 | 1521 | 1A10B |
| N1600 | APT. N1600 | $442,900 | 743 | 2A20G |
| N1601 | APT. N1601 | $624,900 | 1076 | 2A20F |
| N1602 | APT. N1602 | $559,900 | 1001 | 1A10K |
| N1603 | APT. N1603 | $372,900 | 673 | 2A20F |
| N1604 | APT. N1604 | $559,900 | 1001 | 2A20F |
| N1605 | APT. N1605 | $559,900 | 1001 | 2A10D |
| N1606 | APT. N1606 | $559,900 | 949 | 2A10D |
| N1607 | APT. N1607 | $559,900 | 1521 | 3A20I |
| N1608 | APT. N1608 | $513,900 | 1521 | 3A20I |
| N1609 | APT. N1609 | $513,900 | 1349 | 3A20H |
| S100 | APT. S100 | $609,900 | 1349 | 1A10K |
| S101 | APT. S101 | $401,900 | 673 | 2A20F |
| S102 | APT. S102 | $321,900 | 673 | 2A20F |
| S103 | APT. S103 | $491,900 | 1001 | 2A20F |
| S104 | APT. S104 | $491,900 | 1001 | 2A20E |
| S105 | APT. S105 | $491,900 | 1001 | 2A20F |
| S106 | APT. S106 | $491,900 | 1001 | 2A20F |
| S107 | APT. S107 | $534,900 | 1064 | 2A20H |
| S108 | APT. S108 | $534,900 | 1064 | 2A20F |
| S200 | APT. S200 | $615,900 | 1349 | 2A20F |
| S201 | APT. S201 | $495,900 | 1001 | 1A10K |
| S202 | APT. S202 | $324,900 | 673 | 2A20F |
| S203 | APT. S203 | $495,900 | 1001 | 2A20F |
| S204 | APT. S204 | $495,900 | 1001 | 2A20F |
| S205 | APT. S205 | $495,900 | 1001 | 2A20F |
| S205 | | $495,900 | 1001 | 2A20F |
| S205 | | $495,900 | 1001 | 2A20F |
| S206 | APT. S206 | $495,900 | 1349 | 3A20H |
| S207 | APT. S207 | $539,900 | 1064 | 2A20F |
| S208 | APT. S208 | $539,900 | 1064 | 2A20E |
| S300 | APT. S300 | $623,000 | 1349 | 2A20F |
| S301 | APT. S301 | $499,900 | 1001 | 2A20F |
| S302 | APT. S302 | $327,900 | 673 | 1A10K |
| S303 | APT. S303 | $499,900 | 1001 | 2A20F |
| S304 | APT. S304 | $499,900 | 1001 | 2A20F |
| S305 | APT. S305 | $499,900 | 1001 | 2A20H |
| S306 | APT. S306 | $499,900 | 1001 | 2A20F |
| S307 | APT. S307 | $544,900 | 1064 | 2A20E |
| S308 | APT. S308 | $544,900 | 1064 | 2A20E |

| Unit | APT. | Price | Code | Type |
|------|------|-------|------|------|
| S400 | APT. S400 | $630,900 | 1349 | 3A20H |
| S400 | APT. S401 | $630,900 | 1349 | 3A20H |
| S401 | APT. S402 | $503,900 | 1001 | 2A20F |
| S402 | APT. S403 | $330,900 | 673 | 2A20F |
| S403 | APT. S404 | $503,900 | 1001 | 2A20F |
| S404 | APT. S405 | $503,900 | 1001 | 2A20F |
| S405 | APT. S406 | $503,900 | 1001 | 2A20E |
| S406 | APT. S407 | $503,900 | 1064 | 2A20E |
| S407 | APT. S408 | $549,900 | 1064 | 2A20E |
| S408 | APT. S500 | $549,900 | 1349 | 3A20H |
| S500 | APT. S501 | $637,900 | 1349 | 2A20F |
| S501 | APT. S502 | $507,900 | 1001 | 1A10K |
| S502 | APT. S503 | $333,900 | 673 | 2A20F |
| S503 | APT. S504 | $507,900 | 1001 | 2A20F |
| S504 | APT. S505 | $507,900 | 1001 | 2A20F |
| S505 | APT. S506 | $507,900 | 1001 | 2A20F |
| S506 | APT. S507 | $554,900 | 1064 | 2A20E |
| S507 | APT. S508 | $544,900 | 1349 | 3A20H |
| S508 | APT. S600 | $511,900 | 1001 | 2A20F |
| S600 | APT. S601 | $338,900 | 673 | 1A10K |
| S601 | APT. S602 | $511,900 | 1001 | 2A20F |
| S602 | APT. S603 | $511,900 | 1001 | 2A20F |
| S603 | APT. S604 | $511,900 | 1001 | 2A20E |
| S604 | APT. S605 | $559,900 | 1064 | 2A20E |
| S605 | APT. S606 | $559,900 | 1064 | 2A20E |
| S606 | APT. S607 | $651,900 | 1349 | 3A20H |
| S607 | APT. S608 | $515,900 | 673 | 2A20F |
| S608 | APT. S700 | $515,900 | 1001 | 2A20F |
| S700 | APT. S701 | $515,900 | 1001 | 2A20F |
| S701 | APT. S702 | $515,900 | 1001 | 2A20F |
| S702 | APT. S703 | $515,900 | 1064 | 2A20E |
| S703 | APT. S704 | $515,900 | 1064 | 2A20E |
| S704 | APT. S705 | $564,900 | 1064 | 2A20E |
| S705 | APT. S706 | $564,900 | 1349 | 2A20E |
| S706 | APT. S707 | $564,900 | 1349 | 2A20E |
| S707 | APT. S708 | $808,900 | 673 | 2A20F |
| S708 | APT. S708 | $519,900 | 1001 | 1A10K |
| S800 | APT. S800 | $342,900 | 1001 | 2A20F |
| S801 | APT. S801 | $519,900 | 1001 | 2A20F |
| S802 | APT. S802 | $519,900 | 1064 | 2A20F |
| S803 | APT. S803 | $519,900 | 673 | 2A20E |
| S804 | APT. S804 | $569,900 | 1001 | 2A20E |
| S805 | APT. S805 | $569,900 | 1001 | 2A20F |
| S806 | APT. S806 | $668,900 | 1349 | 2A20H |
| S807 | APT. S807 | $523,900 | 1001 | 2A20F |
| S808 | APT. S808 | $345,900 | 673 | 1A10K |
| S900 | APT. S900 | $523,900 | 1001 | 2A20F |
| S901 | APT. S901 | $523,900 | 1001 | 2A20F |
| S902 | APT. S902 | $523,900 | 1001 | 2A20F |
| S903 | APT. S903 | $523,900 | 1001 | 2A20F |
| S903 | APT. 823 | $523,900 | | |
| S904 | APT. S904 | | | |
| S905 | APT. S905 | | | |
| S906 | APT. S906 | | | |

RFCCM00285

| Unit | Apartment | Price | Sq Ft | Plan |
|------|-----------|-------|-------|------|
| S907 | APT. S907 | $574,900 | 1064 | 2A20E |
| S908 | APT. S908 | $574,900 | 1064 | 2A20E |
| S1000 | APT. S1000 | $672,900 | 1349 | 3A20H |
| S1000 | APT. S1000 | $672,900 | 1349 | 3A20H |
| S1001 | APT. S1001 | $672,900 | 1349 | 3A20H |
| S1002 | APT. S1002 | $527,900 | 1001 | 2A20F |
| S1003 | APT. S1003 | $346,900 | 673 | 1A10K |
| S1004 | APT. S1004 | $527,900 | 1001 | 2A20F |
| S1005 | APT. S1005 | $527,900 | 1001 | 2A20F |
| S1006 | APT. S1006 | $527,900 | 1001 | 2A20F |
| S1007 | APT. S1007 | $527,900 | 1064 | 2A20E |
| S1008 | APT. S1008 | $578,900 | 1064 | 2A20E |
| S1100 | APT. S1100 | $578,900 | 1349 | 3A20H |
| S1101 | APT. S1101 | $676,900 | 673 | 1A10K |
| S1102 | APT. S1102 | $531,900 | 1001 | 2A20F |
| S1103 | APT. S1103 | $531,900 | 1001 | 2A20F |
| S1103 | APT. S1103 | $531,900 | 1001 | 2A20F |
| S1104 | APT. S1104 | $531,900 | 1001 | 2A20F |
| S1105 | APT. S1105 | $531,900 | 1064 | 2A20E |
| S1106 | APT. S1106 | $531,900 | 1349 | 3A20H |
| S1107 | APT. S1107 | $584,900 | 1349 | 3A20H |
| S1108 | APT. S1108 | $584,900 | 1001 | 2A20F |
| S1200 | APT. S1200 | $686,900 | 673 | 1A10K |
| S1200 | APT. S1200 | $686,900 | 1001 | 2A20F |
| S1201 | APT. S1201 | $535,900 | 1001 | 2A20E |
| S1202 | APT. S1202 | $354,900 | 673 | 2A20E |
| S1203 | APT. S1203 | $535,900 | 1001 | 2A20F |
| S1204 | APT. S1204 | $535,900 | 1001 | 2A20F |
| S1205 | APT. S1205 | $535,900 | 1001 | 2A20F |
| S1206 | APT. S1206 | $535,900 | 1064 | 2A20E |
| S1207 | APT. S1207 | $588,900 | 1064 | 2A20E |
| S1208 | APT. S1208 | $588,900 | 1349 | 3A20H |
| S1300 | APT. S1300 | $693,900 | 1001 | 2A20F |
| S1301 | APT. S1301 | $539,900 | 673 | 1A10K |
| S1302 | APT. S1302 | $539,900 | 1001 | 2A20F |
| S1303 | APT. S1303 | $539,900 | 1001 | 2A20F |
| S1304 | APT. S1304 | $539,900 | 1001 | 2A20F |
| S1305 | APT. S1305 | $539,900 | 1001 | 2A20F |
| S1306 | APT. S1306 | $594,900 | 1064 | 2A20E |
| S1307 | APT. S1307 | $594,900 | 1349 | 3A20H |
| S1308 | APT. S1308 | $700,900 | 1001 | 2A20F |
| S1400 | APT. S1400 | $543,900 | 1001 | 2A20F |
| S1401 | APT. S1401 | $357,900 | 1001 | 2A20E |
| S1402 | APT. S1402 | $543,900 | 673 | 2A20F |
| S1403 | APT. S1403 | $543,900 | 1001 | 2A20F |
| S1404 | APT. S1404 | $543,900 | 1001 | 2A20F |
| S1405 | APT. S1405 | $543,900 | 1001 | 2A20E |
| S1406 | APT. S1406 | $598,900 | 1001 | 2A20E |
| S1407 | APT. S1407 | $598,900 | 1064 | 2A20E |
| S1408 | APT. S1408 | $598,900 | 1064 | 3A20H |
| S1500 | APT. S1500 | $707,900 | 1349 | 2A20F |
| S1501 | APT. S1501 | $547,900 | 1001 | 1A10K |
| S1502 | APT. S1502 | $380,900 | 673 | |

RFCCM00286



| | | | | |
|---|---|---|---|---|
| S1503 | APT. S1503 | $547,900 | 1001 | 2A20F |
| S1504 | APT. S1504 | $547,900 | 1001 | 2A20F |
| S1505 | APT. S1505 | $547,900 | 1001 | 2A20F |
| S1506 | APT. S1506 | $547,900 | 1001 | 2A20F |
| S1507 | APT. S1507 | $604,900 | 1064 | 2A20E |
| S1508 | APT. S1508 | $604,900 | 1064 | 2A20E |
| S1550 | APT. S1600 | $728,900 | 1349 | 3A20H |
| S1601 | APT. S1601 | $559,900 | 1001 | 2A20F |
| S1602 | APT. S1602 | $369,900 | 673 | 1A10K |
| S1603 | APT. S1603 | $559,900 | 1001 | 2A20F |
| S1604 | APT. S1604 | $559,900 | 1001 | 2A20F |
| S1605 | APT. S1605 | $559,900 | 1001 | 2A20F |
| S1606 | APT. S1606 | $618,900 | 1021 | 2A20F |
| S1607 | APT. S1607 | $618,900 | 1064 | 2A20E |
| S1608 | APT. S1608 | | | |
| | | $240,704,100 | | |

RFCCM00287

EXHIBIT G TO LOAN AGREEMENT

EXCLUDED UNITS

-48-

RFCCM00288

# EXHIBIT 12

EXHIBIT 13

# EXHIBIT 14

EXHIBIT 15

Loan No. #950114914

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**"), dated as of November 16, 2005, is entered into by and between **FREMONT INVESTMENT & LOAN**, a California industrial bank ("**Fremont**"), and **CBRE REALTY FINANCE TRS, LLC**, a Delaware limited liability company ("**Mezzanine Lender**").

## RECITALS

A.    Pavilion LLC, a Maryland limited liability company ("**IDOT Guarantor**") is the owner of that certain real property located in the City of Rockville, County of Montgomery, State of Maryland, more fully described in Exhibit A attached hereto and made a part hereof (the "**Land**"). The Land and the improvements now or hereafter located on the Land (the "**Improvements**") are collectively referred to herein as the "**Project**."

B.    Fremont has made or has agreed to make a loan to Triton Pavilion, LLC, a Delaware limited liability company ("**Primary Borrower**") in an amount of up to One Hundred Thirty Million Dollars ($130,000,000) (the "**Primary Loan**") pursuant to that certain Loan and Security Agreement (the "**Primary Loan Agreement**"), dated as of the date hereof, between Fremont, IDOT Guarantor and Primary Borrower. IDOT Guarantor is an affiliate of Primary Borrower and will benefit from the making of the Primary Loan to Primary Borrower, and the term "Primary Borrower" shall also include a reference to IDOT Guarantor wherever necessary to give effect to the indemnity deed of trust structure of the Primary Loan Documents. The Primary Loan is evidenced by that certain Secured Promissory Note dated as of the date hereof, made by Primary Borrower, payable to Fremont in the face principal amount of the Primary Loan (the "**Primary Note**"). The Primary Note is secured by, among other documents, an Indemnity Deed of Trust and Fixture Filing dated as of the date hereof, made by IDOT Guarantor for the benefit of Fremont and encumbering the Project (the "**Primary Security Instrument**"). Certain obligations under the Primary Loan Documents have been guaranteed by IDOT Guarantor, Brian A. McCormick, an individual, and Charles W. Moore, an individual (each, a "**Primary Guarantor**" and collectively, the "**Primary Guarantors**") pursuant to those certain Guaranty agreements dated as of the date hereof from Primary Guarantors to Fremont (the "**Primary Guaranties**"). Primary Borrower and Primary Guarantors have also entered into that certain Environmental Indemnity dated as of the date hereof in favor of Fremont (the "**Primary Indemnity**"). The Primary Loan Agreement, the Primary Note, the Primary Security Instrument, the Primary Guaranties, the Primary Indemnity, and the other documents and instruments evidencing, governing or securing the Primary Loan, together with all amendments, modifications, renewals, extensions and substitutions thereof, are hereinafter collectively referred to as the "**Primary Loan Documents**".

C.    Mezzanine Lender has agreed to make a loan in the amount of $31,946,650 (the "**Mezzanine Loan**") to Montrose Investment Holdings, LLC, a Delaware limited liability company ("**Mezzanine Borrower**"), pursuant to that certain Loan Agreement dated as of the date hereof between Mezzanine Borrower and Mezzanine Lender (the "**Mezzanine Loan Agreement**"). The Mezzanine Loan is evidenced by that certain Promissory Note dated as of the date hereof, made by Mezzanine Borrower, payable to Mezzanine Lender in the face principal amount of the Mezzanine Loan (the "**Mezzanine Note**"). Certain obligations under the Mezzanine Loan Documents will be guaranteed by that certain Guaranty Agreement dated as of the date hereof made by Brian A. McCormick, a Maryland resident, and Charles W. Moore, a resident of the State of New York (each, a "**Mezzanine Guarantor**" and collectively, "**Mezzanine Guarantors**") from Mezzanine Guarantors to Mezzanine Lender, (the "**Mezzanine Guaranty**"). The Mezzanine Loan is secured by, among other documents, that certain Membership Interest Pledge and Security Agreement dated as of the date hereof made by Mezzanine Guarantors for the benefit of Mezzanine Lender (the "**Mezzanine Pledge Agreement**"), granting Mezzanine Lender a security interest in the Ownership Interests (as hereinafter defined). The Mezzanine Loan Agreement, the Mezzanine Note, the Mezzanine Guaranty, the Mezzanine Pledge Agreement and the other

20772859.3 05139533

RFC007553

documents and instruments evidencing, governing or securing the Mezzanine Loan, together with all amendments, modifications, renewals, extensions and substitutions thereof, are hereinafter collectively referred to as the "**Mezzanine Loan Documents.**"

D.   Fremont, as a condition to its consent to the Mezzanine Loan, has required that Mezzanine Lender enter into this Agreement.

E.   Mezzanine Lender, as a condition to providing the Mezzanine Loan to Mezzanine Borrower, has required that Fremont enter into this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained and to induce Fremont to consent to the Mezzanine Loan, and to induce Mezzanine Lender to provide the Mezzanine Loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   <u>Certain Definitions</u>.  As used in this Agreement, the following initially-capitalized terms shall have the following meanings:

"**Affiliate**" means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with the Person or Persons in question.

"**Agreement**" means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

"**Anti-Terrorism Laws**" means Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), and the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies and any other requirements of any Governmental Agency (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other States or localities.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. Sec. 101 *et seq.*).

"**Borrower Group**" means Primary Borrower, Primary Guarantors, Mezzanine Borrower, Mezzanine Guarantors and each of such party's partners, members, shareholders, other owners and Affiliates.

"**Business Day**" means any day other than a Saturday, a Sunday, a legal holiday under the laws of the State of California or the State of Maryland, or a day on which commercial banks in the State of California or the State of Maryland are authorized or required by law or other governmental action to be closed.

"**Cash Collateral**" has the meaning provided in <u>Section 20</u> hereof.

"**Common Claim**" has the meaning provided in <u>Section 12</u> hereof.

"**Condemnation Awards**" has the meaning provided in <u>Section 7(A)</u> hereof.

20772859.3 05139533                                    2

RFC007554

"**Condominium Documents**" means all documents required by applicable law and regulations relating to the submission of the condominium units constructed or to be constructed on the Project to a condominium regime, including, without limitation, the declaration of condominium, offering circular, bylaws and rules and regulations of the condominium association.

"**Continuing Primary Loan Event of Default**" means an Event of Default under the Primary Loan for which (i) Fremont has provided notice of such Event of Default to Mezzanine Lender, and (ii) the cure period, if applicable, provided to Mezzanine Lender in <u>Section 16 (A), (B), (C)</u> or <u>(D)</u> hereof has expired without such Event of Default having been cured.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlled by," "Controlling" and "under common Control with" shall have the respective correlative meanings thereto.

"**Deed in Lieu**" has the meaning provided in <u>Section 22</u> hereof.

"**Disapproved Entity**" means any Person to which Fremont is or has been adverse in litigation, arbitration or other adversary proceeding (and all Affiliates of such Person).

"**Event of Default**" as used herein means (i) with respect to the Primary Loan and the Primary Loan Documents, any default thereunder which has occurred and has not been cured by Primary Borrower or Mezzanine Lender in accordance with the Primary Loan Documents prior to the expiration of the applicable cure period, if any, set forth in the Primary Loan Documents, and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any default thereunder which has occurred and has not been cured by Mezzanine Borrower prior to the expiration of the applicable cure period, if any, set forth in the Mezzanine Loan Documents.

"**Excess Payments**" has the meaning provided in <u>Section 25(B)</u> hereof.

"**Incurable Defaults**" has the meaning provided in <u>Section 16(E)</u> hereof.

"**Insolvency Proceeding**" means any proceeding under the Bankruptcy Code or any other insolvency, liquidation, reorganization or other similar proceeding concerning Primary Borrower, any Primary Guarantor, Mezzanine Borrower or any Mezzanine Guarantor, any action for the dissolution of Primary Borrower, any Primary Guarantor, Mezzanine Borrower or any Mezzanine Guarantor, any proceeding (judicial or otherwise) concerning the assignment of the assets of Primary Borrower, any Primary Guarantor, Mezzanine Borrower or any Mezzanine Guarantor, for the benefit of its creditors, the appointment of or any proceeding seeking the appointment of a trustee, receiver or other similar custodian for all or any substantial part of the assets of Primary Borrower, any Primary Guarantor, Mezzanine Borrower or any Mezzanine Guarantor or any other action concerning the adjustment of the debts of Primary Borrower, any Primary Guarantor, Mezzanine Borrower or any Mezzanine Guarantor.

"**Insurance Default**" means a default under the Primary Loan Documents resulting from Primary Borrower's failure to maintain or cause to be maintained any insurance required by the Primary Loan Documents.

"**Insurance Proceeds**" has the meaning provided in <u>Section 7(A)</u> hereof.

"**Loan Purchase Price**" means the outstanding principal balance of the Primary Loan, plus all accrued but unpaid interest and other fees, expenses and amounts due or payable thereon or due or payable to Fremont pursuant to the Primary Loan Documents, plus all unpaid exit fees under the Primary Loan Documents (whether or not such exit fees are then due from Primary Borrower under the Primary Loan Documents). The Loan Purchase Price shall include, without limitation, all unpaid late charges, default interest, advances, post-petition interest, Protective Advances previously made by Fremont and

RFC007555

any interest due on such Protective Advances, and all costs and expenses (including, without limitation, legal fees and expenses) actually incurred by Fremont in enforcing the terms of the Primary Loan Documents, but the Loan Purchase Price shall exclude any prepayment charges and prepayment fees.

"**Mezzanine Expense Reimbursements**" means the reimbursement of reasonable, out-of-pocket, third party expenses incurred by Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"**Mezzanine Lender**" has the meaning provided in the Recitals hereto, and includes any Qualified Transferee following the transfer of the Mezzanine Loan to such Qualified Transferee.

"**Mezzanine Loan Enforcement Action**" means the commencement of the exercise or the attempted exercise of any remedies against Primary Borrower, any Primary Guarantor, the Project, any other Primary Loan Collateral or the Ownership Interests, including, without limitation, the commencement of any litigation or proceeding, the commencement of any foreclosure proceeding, the exercise of any power of sale, the sale by advertisement, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against, or the taking of possession or control of, any or all of the Project, any other Primary Loan Collateral or the Ownership Interests, but specifically excludes (a) requests and demands made upon Mezzanine Borrower by delivery of notices to Mezzanine Borrower, (b) accrual of default interest and late charges, (c) foreclosure of the Ownership Interests in accordance with Section 17 of this Agreement or acceptance of transfers of the Ownership Interests in accordance with Section 17 of this Agreement, and (d) the filing of claims in any Insolvency Proceeding concerning Primary Borrower and/or any Primary Guarantor as may be required to protect and preserve the right of Mezzanine Lender to participate in such Insolvency Proceeding as a creditor of Mezzanine Borrower and to participate in distributions of assets of Primary Borrower and/or any Primary Guarantor in said Insolvency Proceeding with respect to Mezzanine Borrower after payment and satisfaction in full of the Primary Loan, but subject in all respects to the rights of Fremont under and as provided in this Agreement and without in any way impairing or affecting the right of Fremont to require performance and observance by Mezzanine Lender of its covenants, undertakings and agreements under this Agreement.

"**Mezzanine Loan Modification**" means any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver of the Mezzanine Loan or the Mezzanine Loan Documents.

"**Mezzanine Successor**" means a wholly-owned subsidiary of Mezzanine Lender for the purpose of taking title to the Ownership Interests.

"**Mezzanine Transfer Default**" means a default under the Primary Loan Documents resulting from any Transfer of the Ownership Interests to or at the direction of Mezzanine Lender or any of its Affiliates or any Transfer of the Ownership Interests as a result of the exercise of any rights or remedies under the Mezzanine Loan Documents or any assignment or Transfer in lieu or in aid thereof, except in each case in compliance with the provisions of Section 17 of this Agreement.

"**Net Cash Flow**" or "**net cash flow**" means the net cash flow from the Project determined in accordance with the Primary Loan Documents.

"**Non-Monetary Default**" means a default under the Primary Loan Documents which is of a non-monetary nature and which cannot be cured by the payment of money; provided that "Non-Monetary Default" shall not include an Insurance Default or a Mezzanine Transfer Default.

"**Ownership Interests**" means all of the direct or indirect membership interests in Primary Borrower which are collateral for the Mezzanine Loan pursuant to the Mezzanine Pledge Agreement, but Ownership Interests shall not include (a) any property or assets owned or leased by Primary Borrower or in which Primary Borrower has an interest, or (b) without limiting the terms of this Agreement, any of the

RFC007556

Primary Loan Collateral which is paid, disbursed or distributed to any member of the Borrower Group in violation of the Primary Loan Documents.

"**Permitted Mezzanine Payments**" means (a) to the extent the same can be paid from net cash flow not required to be paid or deposited with Fremont pursuant to the Primary Loan Documents, current payments under the Mezzanine Loan Documents, (b) to the extent the same are not required to be paid to Fremont under the Primary Loan Documents, excess net sales proceeds from the sale of condominium units, and (c) to the extent the same can be paid from net cash flow, the Mezzanine Expense Reimbursements.

"**Person**" means any individual, sole proprietorship, corporation, trustee, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), governmental agency, or court or other authority, endowment fund or any other form of entity, including, without limitation, any officer appointed by any court or other authority.

"**Post-Control Default**" means a Non-Monetary Default (a) for which Primary Borrower has a cure period under the express terms of the Primary Loan Documents, and (b) which cannot reasonably be cured by Mezzanine Lender except after an exercise by Mezzanine Lender of its remedies under the Mezzanine Pledge Agreement and Mezzanine Lender or a Mezzanine Successor Taking Control of Primary Borrower.

"**Pre-Control Default**" means a Non-Monetary Default (a) for which Primary Borrower has a cure period under the express terms of the Primary Loan Documents, and (b) which can reasonably be cured by Mezzanine Lender without Mezzanine Lender or a Mezzanine Successor Taking Control of Primary Borrower.

"**Primary Default**" has the meaning provided in Section 16(F) hereof.

"**Primary Loan Collateral**" means the collateral now or hereafter pledged to Fremont under the Primary Loan Documents, including, without limitation, the Project.

"**Primary Loan Default Notice**" has the meaning provided in Section 16(A) hereof.

"**Primary Loan Enforcement Action**" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, UCC sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Project or Primary Borrower, including, without limitation, the taking of possession or control of the Project, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness evidenced by the Primary Loan Documents secured by the Project (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Fremont under the Primary Loan Documents, at law, in equity or otherwise with respect to Primary Borrower and/or the Project, but specifically excludes (a) requests and demands made upon Primary Borrower by delivery of notices to Primary Borrower, (b) the charging of default interest and late charges in accordance with the Primary Loan Documents, (c) refusing to fund any advances if all of the conditions thereto set forth in the Primary Loan Documents have not been satisfied in full, and (d) the filing of claims in any Insolvency Proceeding concerning Primary Borrower.

"**Primary Loan Modification**" means any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver of the Primary Loan or the Primary Loan Documents.

"**Primary Loan Satisfaction Date**" means the date of the indefeasible payment and satisfaction in full of the Primary Loan and all obligations of Primary Borrower under the Primary Loan Documents.

20772859.3 05139533                                   5

RFC007557

"**Prohibited Person**" means any Person (a) listed in any annex to, or who is otherwise subject to the provisions of, any of the Anti-Terrorism Laws; (b) that is owned or controlled by, or acting for or on behalf of, any Person that is listed in any annex to, or is otherwise subject to the provisions of, any of the Anti-Terrorism Laws; (c) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including any of the Anti-Terrorism Laws; (d) who commits, threatens or conspires to commit or supports "terrorism" as defined in any of the Anti-Terrorism Laws; (e) that is named on the "Specially Designated Nationals and Blocked Persons" list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or (f) who is an Affiliate of any Person listed in clauses (a) through (e).

"**Protective Advances**" means all sums advanced for the purpose of payment of real estate taxes (including, without limitation, special payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including, without limitation, capital items) reasonably necessary to protect the Project or the Ownership Interests, respectively, from forfeiture, casualty, loss or waste, including, without limitation, with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 16 hereof.

"**Purchase Exercise Period**" has the meaning provided in Section 18(A) hereof.

"**Purchase Notice**" has the meaning provided in Section 18(A) hereof.

"**Qualified Affiliate Transferee**" shall mean (a) Mezzanine Lender; (b) an Affiliate of Mezzanine Lender which has a net worth in excess of Three Hundred Million Dollars ($300,000,000) at the time of Transfer and which is not a Prohibited Person; or (c) an entity wholly owned by, and whose obligations under this Agreement are guarantied by, any of the entities described in clauses (a) or (b) above and which is not a Prohibited Person. Notwithstanding the foregoing, in no event shall Primary Borrower, Primary Guarantors, Mezzanine Borrower, Mezzanine Guarantors or any member of the Borrower Group be a Qualified Affiliate Transferee.

"**Qualified Third Party Transferee**" shall mean (a) any of the following entities which (1) has a net worth in excess of Three Hundred Million Dollars ($300,000,000) at the time of Transfer, and (2) is not a Disapproved Entity or Prohibited Person or under common Control with a Disapproved Entity or Prohibited Person at the time of the Transfer: (A) a federal or state chartered commercial bank or trust company or federal or state chartered savings and loan association or insurance company organized and existing under the laws of the United States, or any state thereof, (B) a foreign bank or a branch office of a foreign bank, (C) a foreign or domestic pension fund, (D) a foundation, college or university, (E) a nationally recognized commercial credit corporation, (F) a domestic real estate investment trust having an investment grade senior debt rating from a nationally recognized rating agency, (G) an investment bank having an investment grade senior debt rating from a nationally recognized rating agency, or (H) an opportunity fund or investment partnership organized and existing under the laws of the United States, or any state thereof; or (b) an entity wholly owned by, and whose obligations under this Agreement are guarantied by, any of the entities described in clause (a) above. Notwithstanding the foregoing, in no event shall Primary Borrower, Primary Guarantors, Mezzanine Borrower, Mezzanine Guarantors or any member of the Borrower Group be a Qualified Third Party Transferee.

"**Qualified Transferee**" shall mean a Qualified Third Party Transferee or a Qualified Affiliate Transferee.

"**Replacement Guarantor**" means Mezzanine Lender, the Mezzanine Successor Taking Control of Primary Borrower, an Affiliate of Mezzanine Lender or such Mezzanine Successor, or another Person, which is not a Disapproved Entity or a Prohibited Person, reasonably acceptable to Fremont, in each case: (a) which has a net worth, calculated excluding the positive value, if any, of the Ownership Interests, of not less than Fifty Million Dollars ($50,000,000), and (b) as to which the guaranty and indemnity is separately enforceable as an obligation separate and distinct from Primary Borrower's

RFC007558

obligations under the Primary Loan Documents under the applicable law governing the Primary Loan Documents. Nothing contained in this definition shall modify the above definition of "Qualified Affiliate Transferee" or "Qualified Third Party Transferee."

"**Rescinded Payments**" has the meaning provided in Section 25(B) hereof.

"**Secondary Default**" has the meaning provided in Section 16(F) hereof.

"**Subsequent Obligations**" has the meaning provided in Section 25(C) hereof.

"**Taking Control of Primary Borrower**" means the acquisition by Mezzanine Lender or a Mezzanine Successor of beneficial, economic, record or other ownership of any or all of the Ownership Interests and Control of Primary Borrower. "**Takes Control of Primary Borrower**" and "**Take Control of Primary Borrower**" shall have the respective correlative meanings thereto.

"**Timing Default**" has the meaning provided in Section 16(E) hereof.

"**Transfer**" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, hypothecation, or other disposition, either directly or indirectly, by operation of law or otherwise.

   2.   **Subordination; Separate Loans and Collateral.** Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan (and any further extensions of credit by Mezzanine Lender to Mezzanine Borrower) is not and will not be a direct or indirect obligation of Primary Borrower and is not and will not be secured by a lien on the Project or any of the other Primary Loan Collateral. Without limiting the foregoing, Mezzanine Lender hereby intentionally and unconditionally subordinates the lien, security interests or charge, now or hereafter created (including, without limitation, any judgment which may be obtained on any of the indebtedness or obligations described in the Mezzanine Loan Documents), of the Mezzanine Loan Documents (and any amendments, modifications, renewals, extensions or substitutions relating thereto), in favor of the lien, security interests or charge upon the Project and such other Primary Loan Collateral described in and created by the Primary Loan Documents and any permitted amendments, modifications, renewals or extensions thereof and any additional advances made by Fremont pursuant to the Primary Loan Documents. Fremont may, without affecting the senior priority of the Primary Loan Documents or other rights and benefits afforded to Fremont herein, in its good faith sole discretion, and without the approval of Mezzanine Lender and without regard to any effect upon the Mezzanine Loan or the collateral for the Mezzanine Loan: (i) release or compromise any obligation under the Primary Loan Documents, (ii) release its liens in, or surrender, release or permit any substitution or exchange of all or any part of any Primary Loan Collateral, or (iii) retain or obtain a lien in any property to further secure payment of the Primary Loan. In the event Fremont receives a lien or charge upon the Ownership Interests, Fremont agrees that the foregoing subordination shall not apply to such lien or charge. Fremont acknowledges that Fremont does not have and will not acquire any security interest in the Ownership Interests as collateral for the Primary Loan.

   3.   **Mezzanine Lender Representations and Covenants.**

   A.   Mezzanine Lender hereby represents, warrants and certifies to Fremont that, as of the date of this Agreement: (i) the documents described on Exhibit B attached hereto are all of the Mezzanine Loan Documents, true, correct and complete copies of which have been delivered to Fremont, (ii) the Mezzanine Loan Documents have not been modified, amended or terminated except as indicated on Exhibit B, (iii) to Mezzanine Lender's actual knowledge, there is no default or other event or circumstance which permits, or with the giving of notice or passage of time, or both, would permit, the Mezzanine Lender to accelerate repayment of the Mezzanine Loan or to refuse to make additional advances as contemplated by the Mezzanine Loan Documents; and (iv) Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan, free and clear of any lien, security interest, option or other charge or encumbrance.

20772859.3 05139533                                7

RFC007559

B.      Mezzanine Lender shall have the right, without any need for the consent of Fremont in each instance, to enter into any Mezzanine Loan Modification, but only so long as such Mezzanine Loan Modification does not (i) increase the interest rate or principal amount of the Mezzanine Loan (in each case other than in connection with an increase of the Mezzanine Loan to fund Project budget deficiencies) or recharacterize principal payments as interest, fees or other amounts, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) accelerate the scheduled maturity date of the Mezzanine Loan, (iv) convert the Mezzanine Loan into or exchange the Mezzanine Loan for any other indebtedness or subordinate all or any portion of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, whether such indebtedness is owed to Mezzanine Lender or to any other Person, (v) provide for any additional contingent interest, any additional interest or any so-called "kicker" measured on the basis of the cash flow or appreciation of the Project (or other similar equity participation) other than in connection with an increase of the Mezzanine Loan to fund Project budget deficiencies, (vi) cross-default the Mezzanine Loan with any other indebtedness other than the Primary Loan, whether such indebtedness is owed to Mezzanine Lender or any other Person, or (vii) grant any lien, security interest or encumbrance on the Project or any other Primary Loan Collateral, or grant any lien, security interest or encumbrance on any property or assets owned or leased by any Primary Guarantor.  Any Mezzanine Loan Modification which results in any of the modifications described in clauses (i) through (vii) above shall require Fremont's express written consent, which consent may be withheld in Fremont's good faith sole discretion.  In addition to and notwithstanding the foregoing provisions of this Section 3(B), any amounts funded by Mezzanine Lender under the Mezzanine Loan Documents without Fremont's consent as a result of (A) the making of any Protective Advances or other advances by Mezzanine Lender, or (B) interest accruals or accretions and any compounding thereof (including, without limitation, default interest), or (C) increases in the amount of the Mezzanine Loan not to exceed One Million Dollars ($1,000,000), provided that such additional amount is contributed by Mezzanine Borrower to Primary Borrower and applied to payment of Project-related costs and expenses, shall be deemed not to contravene this Section 3(B).  The restrictions in this Section 3 apply to amendments of the documents and not to the exercise of any rights or remedies (e.g. making Protective Advances) or the taking effect of any provisions (e.g., imposition of default rates of interest or the acceleration of the maturity date upon an Event of Default) set forth in the Mezzanine Loan Documents.  Mezzanine Lender hereby specifically acknowledges and agrees that Mezzanine Lender's failure to get Fremont's prior written consent to any Mezzanine Loan Modification, to the extent required by this Section 3, shall, at Fremont's election, constitute an Event of Default under the Primary Loan Documents.  Mezzanine Lender shall deliver to Fremont copies of any and all Mezzanine Loan Modifications, whether or not Fremont's consent thereto is required hereunder, within a reasonable time after the execution thereof by Mezzanine Lender.

4.      Fremont Representations and Covenants.

A.      Fremont hereby represents, warrants and certifies to Mezzanine Lender that, as of the date of this Agreement: (i) the documents described on Exhibit C attached hereto are all of the Primary Loan Documents, true, correct and complete copies of which have been delivered to Mezzanine Lender, (ii) the Primary Loan Documents have not been modified, amended or terminated except as indicated on Exhibit C, and (iii) to Fremont's actual knowledge, there is no default or other event or circumstance which permits, or with the giving of notice or passage of time, or both, would permit, Fremont to accelerate repayment of the Primary Loan or to refuse to make additional advances as contemplated by the Primary Loan Documents.

B.      Fremont shall have the right, without any need for the consent of Mezzanine Lender in each instance, to enter into any Primary Loan Modification, but only so long as such Primary Loan Modification does not (i) increase the interest rate or principal amount of the Primary Loan or recharacterize principal payments as interest, fees or other amounts, (ii) increase in any other material respect any monetary obligations of Primary Borrower under the Primary Loan Documents, (iii) accelerate the scheduled maturity date of the Primary Loan, (iv) convert the Primary Loan into or exchange the Primary Loan for any other indebtedness or subordinate all or any portion of the Primary Loan to any other indebtedness of Primary Borrower, whether such indebtedness is owed to Fremont or to any other

20772859.3  05139533                          8

RFC007560

Person, (v) amend or modify the provisions limiting Transfers of interests in Primary Borrower or the Project, (vi) cross-default the Primary Loan with any other indebtedness, whether such indebtedness is owed to Fremont or to any other Person, (vii) obtain any contingent interest, any additional interest or any so-called "kicker" measured on the basis of the cash flow or appreciation of the Project (or other similar equity participation), (viii) if any portion of the Project is contemplated to be sold and release prices therefor are set forth in the Primary Loan Agreement, modify the release price provisions in the Primary Loan Agreement, or (ix) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge.  Any Primary Loan Modification which results in any of the modifications described in clauses (i) through (ix) above shall require Mezzanine Lender's express written consent, which consent may be withheld in Mezzanine Lender's good faith sole discretion; provided, however, in no event shall Fremont be obligated to obtain Mezzanine Lender's consent to any Primary Loan Modification in the case of a work-out or other surrender, compromise, release, renewal or indulgence relating to the Primary Loan during the existence of a Continuing Primary Loan Event of Default, unless such Primary Loan Modification would result in an increase in the principal amount of the Primary Loan described in clause (i) above (expressly excluding an increase in the interest rate on the Primary Loan), in which case the written consent of Mezzanine Lender shall nevertheless be required, which consent shall not be unreasonably withheld, conditioned or delayed.  In addition to and notwithstanding the foregoing provisions of this <u>Section 4(B)</u>, any amounts funded by Fremont under the Primary Loan Documents without Mezzanine Lender's consent as a result of (A) the making of any Protective Advances or other advances by Fremont, or (B) interest accruals or accretions and any compounding thereof (including, without limitation, interest at the default interest rate set forth in the Primary Loan Documents) shall be deemed not to contravene this <u>Section 4(B)</u>.  The restrictions in this <u>Section 4</u> apply to amendments of the documents and not to the exercise of any rights or remedies (e.g. making Protective Advances) or taking effect of any provisions (e.g., imposition of default rates of interest or the acceleration of the maturity date upon an Event of Default) set forth in the Primary Loan Documents.  Fremont hereby specifically acknowledges and agrees that Fremont's failure to get Mezzanine Lender's prior written consent to any Primary Loan Modification, to the extent required by this <u>Section 4</u>, shall, at Mezzanine Lender's election, constitute an Event of Default under the Mezzanine Loan Documents.  Fremont shall deliver to Mezzanine Lender copies of any and all Primary Loan Modifications, whether or not Mezzanine Lender's consent thereto is required hereunder, within a reasonable time after the execution thereof by Fremont.

5.      <u>Primary Loan Documents</u>.  Mezzanine Lender has reviewed the Primary Loan Documents identified on <u>Exhibit C</u> attached hereto and hereby approves of and consents to the Primary Loan and such Primary Loan Documents.

6.      <u>Mezzanine Loan Documents and Limited Waiver of Event of Default</u>:

A.      Fremont has reviewed the Mezzanine Loan Documents identified on <u>Exhibit B</u> attached hereto and hereby approves of and consents to the Mezzanine Loan and such Mezzanine Loan Documents, but, without limiting the terms and provisions of this Agreement, only to the extent that the terms and provisions of the Mezzanine Loan Documents can be performed and observed in a manner which does not result in an Event of Default or an Event of Default under the Primary Loan and/or this Agreement..  If and to the extent that the performance or observance of any of the terms or provisions of the Mezzanine Loan Documents would result in a default or an Event of Default under the Primary Loan Documents and/or this Agreement, then such terms and provisions of the Mezzanine Loan Documents shall not be performed or observed unless and until the Primary Loan and the Primary Loan Documents have been paid and satisfied in full (and to the extent the terms and provisions of the Mezzanine Loan Documents may be performed and observed without creating a default or an Event of Default under the Primary Loan Documents and/or this Agreement, this <u>Section 6(A)</u> shall not restrict the performance and observance of such terms and provisions of the Mezzanine Loan Documents).  Neither the review of nor the consent to any of the Mezzanine Loan Documents by Fremont shall be deemed Fremont's approval or authorization of the performance or observance of any term or provision of the Mezzanine Loan Documents that is contrary to or inconsistent with the Primary Loan Documents or this Agreement.

RFC007561

Notwithstanding the foregoing, the mere existence of any such term or provision in the Mezzanine Loan Documents shall not in and of itself constitute a default or Event of Default under the Primary Loan Documents so long as, prior to the payment and satisfaction in full of the Primary Loan and the Primary Loan Documents, such term or provision of the Mezzanine Loan Documents is not performed or observed.

B.      The execution and delivery of the Mezzanine Loan Documents, including the Mezzanine Pledge Agreement, shall not constitute a default or Event of Default under the Primary Loan Documents or result in the acceleration of the Primary Loan; provided, however, that the waiver hereunder of the default or Event of Default or right of acceleration that would otherwise exist under the Primary Loan Documents as a result of the pledge of the Ownership Interests in Primary Borrower extends solely to the pledge of such Ownership Interests to Mezzanine Lender and shall in no event constitute a waiver of any other default under the Primary Loan Documents or a waiver of any other right to accelerate the Primary Loan in accordance with the Primary Loan Documents (subject to the provisions of this Agreement), and further provided, however, that any event under or in connection with the Mezzanine Loan or the exercise of any remedy by Mezzanine Lender which results in Mezzanine Lender or a Mezzanine Successor Taking Control of Primary Borrower and/or any Mezzanine Loan Enforcement Action, shall constitute a default or Event of Default under the Primary Loan Documents unless otherwise expressly permitted under this Agreement or the Primary Loan Documents.

7.      Insurance Proceeds and Condemnation Awards.

A.      For so long as the Primary Loan or any obligations under the Primary Loan Documents remain unsatisfied or outstanding, Mezzanine Lender hereby assigns, transfers and releases to Fremont all of Mezzanine Lender's right, title, interest and claim, if any, in and to (a) the proceeds of all policies of insurance covering the Project, or any part thereof (collectively, "Insurance Proceeds"), for application to the Primary Loan or for other disposition in accordance with the terms of the Primary Loan Documents, and (b) all awards or other compensation made for any taking or condemnation of the Project, or any part thereof (collectively, "Condemnation Awards"), for application to the Primary Loan or for other disposition in accordance with the terms of the Primary Loan Documents. Unless Fremont shall agree in writing to the contrary, Mezzanine Lender shall not have any right to adjust or settle, or to participate in any adjustment or settlement of, any loss or taking of the Project or any part thereof and Mezzanine Lender hereby assigns to Fremont any right to adjust, settle or participate in any adjustment or settlement of any such loss or taking.

B.      Notwithstanding the provisions of Section 7(A) above, in the event of a casualty or condemnation affecting the Project, Fremont shall make the Insurance Proceeds or Condemnation Awards from any such event available to the Primary Borrower in order to repair and restore the Project to the extent Fremont is required to do so in accordance with the provisions of the Primary Loan Documents and applicable law. To the extent that the Primary Loan Documents or applicable law require Fremont to make such Insurance Proceeds or any Condemnation Awards available to Primary Borrower to repair and restore the Project, or Fremont otherwise agrees to permit Primary Borrower to use Insurance Proceeds or Condemnation Awards to repair and restore the Project, Mezzanine Lender shall be deemed to have agreed thereto and Mezzanine Lender shall execute any and all documents as may be reasonably necessary to evidence that consent and agreement and to comply with the other provisions of this Section 7. Mezzanine Lender further agrees that, if and to the extent that Fremont releases or consents to the release of Insurance Proceeds or Condemnation Awards pursuant to the Primary Loan Documents for the purpose of restoring the Project, Mezzanine Lender shall permit such funds to be utilized solely for the purpose of such restoration in accordance with the terms of the Primary Loan Documents.

8.      Impounds and Escrow Accounts. So long as the Primary Loan or any of the Primary Loan Documents remain outstanding, Mezzanine Lender shall not, without Fremont's prior written consent, which may be withheld in Fremont's good faith sole discretion, collect payments from Primary Borrower for the purpose of escrowing taxes, assessments or other charges imposed on the Project or for creating, funding or maintaining any reserves with respect to the Project or the operation thereof or for

RFC007562

insurance policies required under the Primary Loan Documents or the Mezzanine Loan Documents. The foregoing is not intended to prevent Mezzanine Lender from advancing or reserving the proceeds of the Mezzanine Loan for such purposes to the extent such advances or reserves are contemplated by the Mezzanine Loan Documents.

9.   **Mezzanine Loan Payments.**

A.      Except as specifically provided in Sections 10 and 12 hereof, and notwithstanding anything to the contrary set forth in the Mezzanine Loan Documents, no payment shall be made by or on behalf of Mezzanine Borrower for or on account of the Mezzanine Loan, and Mezzanine Lender shall not take or receive from Mezzanine Borrower, any Mezzanine Guarantor, Primary Borrower, any Primary Guarantor or any other party, directly or indirectly, in cash or other property or by setoff or in any other manner, including, without limitation, as payment of all or any portion of the Mezzanine Loan, unless and until the Primary Loan has been indefeasibly paid and satisfied in full. Without limiting the foregoing, Mezzanine Lender shall not hereafter acquire, by subrogation, contract or otherwise, any lien upon or other estate, right or interest in any of the Primary Loan Collateral or any other property or assets of Primary Borrower or any rents, revenues or proceeds thereof. In the event Mezzanine Lender receives a lien, security interest or charge upon the Project or any of the other Primary Loan Collateral or receives any payments prohibited by this Agreement, Mezzanine Lender shall hold such lien, security interest or charge or payments in trust for the benefit of Fremont until the Primary Loan is indefeasibly paid and satisfied in full. Mezzanine Lender shall also notify Fremont in writing of any such lien, security interest, charge or payments within five (5) Business Days of Mezzanine Lender's receipt thereof and shall transfer, assign and/or pay over to Fremont the lien, security interest and charge so held in trust, and/or the funds so held in trust (up to the amount of the unpaid balance of the Primary Loan and all other amounts payable under the Primary Loan Documents), within ten (10) Business Days of Mezzanine Lender's receipt from Fremont of a written demand therefor.

B.      In the event of a foreclosure sale held under the Primary Security Instrument in which neither Fremont nor any Affiliate of Fremont is the successful bidder, any proceeds from such foreclosure sale in excess of the amount necessary to indefeasibly pay and satisfy the Primary Loan in full (including, without limitation, all sums owing to Fremont in connection with the Primary Loan) may be paid to Mezzanine Lender and applied in accordance with the provisions of the Mezzanine Loan Documents.

10.   **Permitted Payments on Mezzanine Loan.** Notwithstanding any provision contained herein or in the Mezzanine Loan Documents to the contrary, as long as no Event of Default has occurred under the Primary Security Instrument or other Primary Loan Documents and no uncured Potential Default (as defined in the Primary Loan Documents) exists under the Primary Loan Documents and as long as Mezzanine Lender has fully complied with its obligations under this Agreement, Mezzanine Borrower may make, and Mezzanine Lender may receive and retain from Mezzanine Borrower, Permitted Mezzanine Payments; provided, however, that the amount of such Permitted Mezzanine Payments shall not exceed the amounts payable to Mezzanine Lender in accordance with the Mezzanine Loan Documents. Notwithstanding anything to the contrary set forth in the Mezzanine Loan Documents, so long as Mezzanine Borrower timely makes payments on the Mezzanine Loan as provided in this Section 10, Mezzanine Lender's failure to receive any other amounts provided under the Mezzanine Loan Documents, including, without limitation, fees, costs, expenses or principal and interest, shall not constitute a default under the Mezzanine Loan Documents and shall not entitle Mezzanine Lender to exercise any of its rights and remedies under the Mezzanine Loan Documents. To the extent that the Permitted Mezzanine Payments are determined by reference to net cash flow, (a) if Fremont is not then requiring the collection of escrow deposits for taxes, assessments, insurance premiums or other charges imposed on the Project, then the amount of the monthly deposit that Fremont would be entitled to collect for such purpose under the applicable provisions of the Primary Loan Documents (if they were in effect) shall be treated as a monthly operating expense of the Project for the purposes of determining such net cash flow, and (b) without duplication of amounts in clause (a), reasonable operating reserves for the Project shall be treated as a monthly operating expense of the Project for the purposes of determining such net cash flow, whether or not Primary Borrower is maintaining such reserves. The foregoing shall in

20772859.3 05139533                    11

RFC007563

no event prohibit Mezzanine Lender from advancing, on account of any interest accruing on the Mezzanine Loan, amounts from the interest reserve described in the Mezzanine Loan Documents and held by Mezzanine Lender; provided, however, that such advances shall not cause the principal amount of the Mezzanine Loan to exceed $31,946,650.

11.     **Mezzanine Loan Enforcement Action.**  If an Event of Default occurs under the Mezzanine Loan Documents, Mezzanine Lender may exercise certain remedies against Mezzanine Guarantors in accordance with <u>Section 12</u> below and may exercise certain rights under the Mezzanine Pledge Agreement and cause Mezzanine Lender or a Mezzanine Successor to Take Control of Primary Borrower in accordance with <u>Section 17</u> below.  Except as permitted in the preceding sentence, and notwithstanding Mezzanine Lender's rights under applicable law or any provision of the Mezzanine Loan Documents to the contrary, Mezzanine Lender shall not commence any Mezzanine Loan Enforcement Action until the Primary Loan Satisfaction Date.  Further, except to the extent specifically permitted by <u>Section 12</u> hereof, until the Primary Loan Satisfaction Date, Mezzanine Lender shall not institute or exercise any remedies (including, without limitation, any judicial or administrative proceeding) against Primary Borrower, any Primary Guarantor or Fremont which directly or indirectly would interfere with or delay the exercise by Fremont of any of its rights and remedies with respect to the Project or any part thereof or under the Primary Loan Documents or this Agreement (other than a proceeding concerning a dispute under this Agreement).

12.     **Exercise of Certain Remedies Against Mezzanine Guarantors.**  Notwithstanding anything to the contrary in this Agreement, Mezzanine Lender shall have and hereby expressly retains the right to (i) enforce the Mezzanine Guaranty and commence and prosecute to completion litigation against Mezzanine Guarantors pursuant thereto in order to cause Mezzanine Guarantors to complete construction of the Project, subject to Fremont's rights to enforce compliance with any completion guaranties benefiting Fremont by any Primary Guarantors, and (ii) enforce the Mezzanine Guaranty and commence and prosecute to completion litigation against the Mezzanine Guarantors pursuant thereto in order to cause Mezzanine Guarantors to perform obligations with respect to hazardous materials or toxic substances, subject to Fremont's rights to enforce compliance with the Primary Guaranty and/or Primary Indemnity, provided that if any such action under clause (i) or (ii) is for a matter for which Fremont would be entitled to bring an action against a Mezzanine Guarantor pursuant to the Primary Guaranty or Primary Indemnity (a "**Common Claim**"), then, if Mezzanine Lender collects on any such action relating to a Common Claim, Mezzanine Lender shall hold any such amounts collected (less the reasonable costs of collection by Mezzanine Lender) in trust for the benefit of Fremont until the Primary Loan Satisfaction Date.  Mezzanine Lender shall also notify Fremont in writing of the amount of funds so recovered and held in trust within five (5) Business Days of Mezzanine Lender's receipt thereof and shall assign and/or pay over to Fremont the funds so held in trust (up to the amount of the unpaid balance of the Primary Loan and all other amounts payable under the Primary Loan Documents) within ten (10) Business Days of Mezzanine Lender's receipt from Fremont of a written demand for such funds.  In the event any such proceeds are paid by Mezzanine Lender to Fremont following demand by Fremont, Mezzanine Lender shall be subrogated to Fremont's rights against Primary Borrower and each Primary Guarantor to the extent of the proceeds so paid to Fremont, provided that Mezzanine Lender shall have no right to bring a Mezzanine Loan Enforcement Action on account thereof until the Primary Loan Satisfaction Date.

13.     **Cross-Default with Other Indebtedness.**  Mezzanine Lender represents to Fremont that the Mezzanine Loan is not now, and covenants and agrees that the Mezzanine Loan shall not subsequently be, cross-defaulted with any loan or indebtedness other than the Primary Loan.  Fremont represents to Mezzanine Lender that the Primary Loan is not now, and covenants and agrees that the Primary Loan shall not subsequently be, cross-defaulted with any other loan or indebtedness.

14.     **Primary Loan Not Cross-Defaulted with Mezzanine Loan.**  A default under the Mezzanine Loan Documents shall not in and of itself constitute a default under the Primary Loan Documents; provided, however, that the foregoing shall not affect Fremont's right to declare a default or Event or Default under the Primary Loan Documents or pursue any remedies under the Primary Loan Documents or otherwise as the result of the occurrence of any event (other than a default or Event of

20772859.3 05139533                                   12

RFC007564

Default under the Mezzanine Loan Documents) which is expressly a default under the Primary Loan Documents even though such event is also, or is not, a default under the Mezzanine Loan Documents, subject to Mezzanine Lender's right to cure such defaults to the extent set forth in Section 16 hereof.

15.    **Notice of Default.**  At the time Mezzanine Lender gives written notice to Mezzanine Borrower of (a) any breach or default by Mezzanine Borrower under the Mezzanine Loan Documents, or (b) the declaration or occurrence of an Event of Default under the Mezzanine Loan Documents, or (c) any election by Mezzanine Lender to accelerate the Mezzanine Loan or (d) any election by Mezzanine Lender to avail itself of any remedy under the Mezzanine Loan Documents, Mezzanine Lender shall simultaneously send a copy of such notice to Fremont. At the time Fremont gives written notice to Primary Borrower of (x) any breach or default by Primary Borrower under the Primary Loan Documents, or (y) the declaration or occurrence of an Event of Default under the Primary Loan Documents, or (z) any election by Fremont to accelerate the Primary Loan or to avail itself of any remedy under the Primary Loan Documents, Fremont shall simultaneously send a copy of such notice to Mezzanine Lender.

16.    **Primary Loan Defaults.**

A.    Prior to Fremont commencing any Primary Loan Enforcement Action, Fremont shall provide to Mezzanine Lender written notice of the default under the Primary Loan Documents which would permit Fremont to commence such Primary Loan Enforcement Action, whether or not Fremont is obligated to give notice thereof to Primary Borrower (each, a "**Primary Loan Default Notice**"), and Mezzanine Lender shall have the right to cure such default in accordance with the provisions of this Section 16. If the default under the Primary Loan Documents disclosed by such Primary Loan Default Notice is a monetary default which can be cured by the payment of money, Mezzanine Lender shall have until five (5) Business Days after the date which is the later of (1) delivery to Mezzanine Lender of the Primary Loan Default Notice relating to such monetary default; or (2) the expiration of any applicable cure period provided Primary Borrower under the Primary Loan Documents, to cure such monetary default.

B.    If the default under the Primary Loan Documents disclosed by such Primary Loan Default Notice is an Insurance Default, then Mezzanine Lender shall have until three (3) Business Days after delivery to Mezzanine Lender of such Primary Loan Default Notice to cure such Insurance Default. If the default under the Primary Loan Documents disclosed by such Primary Loan Default Notice is a Non-Monetary Default as to which Primary Borrower does not have a cure period under the express terms of the Primary Loan Documents, then Mezzanine Lender shall have until ten (10) Business Days after delivery to Mezzanine Lender of such Primary Loan Default Notice to cure such Non-Monetary Default.

C.    Subject to the provisions of Section 16(D) below with respect to Post-Control Defaults, and subject to the provisions of Section 16(E) below with respect to Incurable Defaults, if the default under the Primary Loan Documents disclosed by such Primary Loan Default Notice is a Pre-Control Default, Mezzanine Lender shall have until fifteen (15) days after the date which is the later of (1) delivery to Mezzanine Lender of the Primary Loan Default Notice relating to such Pre-Control Default, or (2) the expiration of the applicable cure period provided to the Primary Borrower under the Primary Loan Documents, to cure such Pre-Control Default.

D.    Notwithstanding the provisions of Section 16(C) above, if the default under the Primary Loan Documents disclosed by such Primary Loan Default Notice is a Post-Control Default, such Post-Control Default may be cured by (i) Mezzanine Lender commencing to exercise such remedies to Take Control of Primary Borrower within thirty (30) days after Mezzanine Lender receives the Primary Loan Default Notice with respect to such Post-Control Default, (ii) Mezzanine Lender thereafter diligently pursuing such proceedings to Take Control of Primary Borrower in accordance with Section 17 hereof to conclusion, (iii) Mezzanine Lender curing all monetary defaults under the Primary Loan Documents within the time period provided in Section 16(A) above and thereafter making or causing to be made timely payment of all amounts owing to Fremont under the Primary Loan Documents, (iv) Mezzanine Lender curing all other Non-Monetary Defaults under the Primary Loan Documents, other than the Post-Control Default and any Incurable Defaults, within the time period provided in Sections 16(B) or 16(C) above, as

RFC007565

applicable, and (v) Mezzanine Lender commencing (or causing to be commenced) the cure of such Post-Control Default as soon as reasonably practicable after Mezzanine Lender or a Mezzanine Successor Takes Control of Primary Borrower, diligently pursuing such cure to completion and curing such Post-Control Default as soon as reasonably practicable, in no event to exceed one hundred eighty (180) days after delivery to Mezzanine Lender of the Primary Loan Default Notice with respect to such Post-Control Default.

       E.     If a Non-Monetary Default under the Primary Loan Documents is not susceptible of cure by Mezzanine Lender either before or after Mezzanine Lender or a Mezzanine Successor Takes Control of Primary Borrower (any such defaults, "**Incurable Defaults**"), for example, because (i) it was due to an Insolvency Proceeding (other than an Insolvency Proceeding involving Primary Borrower), or (ii) of the identities of the parties who were responsible for the default, or (iii) it was due to the failure of Primary Borrower to meet a specified timing requirement under the Primary Loan Documents, including, without limitation, the timely completion of any contemplated construction or repairs on or at the Project (a "**Timing Default**"), and provided that any such Incurable Default does not, in Fremont's reasonable determination, impair Fremont's security interest in the Project or any of the other Primary Loan Collateral or the value, use, operation or completion of the Project or any of the other Primary Loan Collateral, such Incurable Default shall be waived by Fremont upon Mezzanine Lender's or a Mezzanine Successor's Taking Control of Primary Borrower in compliance with Section 17 hereof. Without limiting the foregoing, Incurable Defaults shall not include any Event of Default under the Primary Loan Documents which (1) could be cured by the payment of money, or (2) could be cured if an extension of time was granted, or (3) could be cured if Mezzanine Lender or a Mezzanine Successor had control over the Primary Borrower, or (4) arises out of Primary Borrower's failure to maintain or obtain any insurance required by the Primary Loan Documents, or (5) is a Mezzanine Transfer Default, or (6) is an Insolvency Proceeding involving Primary Borrower. Notwithstanding anything to the contrary set forth in this Section 16(E), if the Incurable Default is a Timing Default, then the waiver by Fremont of such Incurable Default under this Section 16(E) shall extend solely to Primary Borrower's failure to meet the specified timing requirement under the Primary Loan Documents (and not to the underlying covenant or obligation required to be performed by Primary Borrower), and such underlying covenant or obligation shall constitute a Pre-Control Default or Post-Control Default, as applicable, required to be cured by Mezzanine Lender as provided in Section 16(C) or 16(D).

       F.     Notwithstanding anything to the contrary set forth in this Section 16, in no event shall (i) any cure period granted to Mezzanine Lender in this Section 16 extend beyond, and any such cure period granted to Mezzanine Lender shall terminate on the earlier of, (1) the date which is one hundred ninety-five (195) days after delivery to Mezzanine Lender of the Primary Loan Default Notice with respect to such default, and/or (2) the maturity date under the Primary Loan Documents, and (ii) Mezzanine Lender be entitled to any cure period with respect to any Mezzanine Transfer Default. Further, notwithstanding anything to the contrary set forth in this Section 16, in the event of a default under one of the Primary Loan Documents (the "**Secondary Default**") which arises as a result of a cross-default with another of the Primary Loan Documents (the "**Primary Default**"), Mezzanine Lender's cure period under this Section 16 shall be determined only with respect to the Primary Default, and Mezzanine Lender shall not be entitled to any cure period under this Agreement with respect to the Secondary Default. Nothing contained in this Section 16 shall limit or modify the provisions of Section 17 below.

       G.     To the extent that this Section 16 and Section 15 hereof contemplate the delivery by Fremont of notices to Mezzanine Lender, Fremont need only send a single notice and such single notice shall satisfy the requirements of both this Section 16 and Section 15 hereof. With respect to any default which requires the giving of notice by Fremont to Primary Borrower before becoming an Event of Default under the Primary Loan Documents, if Fremont is prevented or prohibited under applicable law from giving such notice, then for the purposes of determining Mezzanine Lender's cure period under this Agreement, such notice to Primary Borrower as may be required under the Primary Loan Documents shall be deemed to have been given when notice of such default is given by Fremont to Mezzanine Lender, and Mezzanine Lender's cure period under this Agreement shall be determined accordingly.

RFC007566

H.     Except to the extent provided in Sections 16(D) and 16(E), the cure periods and rights granted to Mezzanine Lender under this Section 16 shall terminate on Mezzanine Lender's or a Mezzanine Successor's Taking Control of Primary Borrower.

17.     Acquisition of Ownership Interest by Mezzanine Lender.  So long as no Event of Default has occurred under the Primary Loan Documents, or Mezzanine Lender has cured or is diligently curing all defaults under the Primary Loan Documents, other than Incurable Defaults, within the time periods permitted in this Agreement, upon the occurrence of an Event of Default under the Mezzanine Loan Documents, Mezzanine Lender shall have the right, at Mezzanine Lender's option, so long as Mezzanine Lender fully complies with this Section 17, to accelerate payment of the Mezzanine Loan and exercise its rights under the Mezzanine Pledge Agreement and cause Mezzanine Lender or a Mezzanine Successor to Take Control of Primary Borrower through the exercise of UCC sale rights or the acceptance of an assignment in lieu thereof.  Any event under or in connection with the Mezzanine Loan or the exercise of any remedy by Mezzanine Lender which results in Mezzanine Lender or a Mezzanine Successor Taking Control of Primary Borrower shall not constitute a default as a result of the limitations on transfers set forth in Section 1.10 of the Primary Security Instrument, or any other provisions of the Primary Loan Documents (and Fremont shall not require an assumption of the Primary Loan or the Primary Guaranty in connection with Mezzanine Lender's exercise of its remedies under the Mezzanine Loan Documents), so long as all of the following conditions are satisfied:

(i)     Mezzanine Lender shall have theretofore provided to Fremont all of the notices required by Section 15 hereof and complied with all of its other obligations under this Agreement.

(ii)     Mezzanine Lender or such Mezzanine Successor, as applicable, shall have retained, upon Taking Control of Primary Borrower, third party professional property management and leasing management of the Project by a property manager and, if applicable, leasing manager, each of which: (a) is a reputable management company having at least five (5) years' experience in the management and, if applicable, leasing of properties with similar uses as the Project and in the jurisdiction in which the Project is located, (b) has, for at least five (5) years prior to its engagement as manager, managed at least five (5) properties of substantially the same property type as the Project, (c) has sufficient financial resources to carry out all of the obligations for which it would be responsible in connection with the Project, (d) has not been a party to any litigation or other disputes with Fremont over the prior ten (10) years, (e) at the time of its engagement as property manager or leasing manager has under management square footage of substantially the same property type as the Project equal to the lesser of (1) one million (1,000,000) square feet or (2) five (5) times the square footage of the Project, and (f) is not the subject of a bankruptcy or similar insolvency proceeding.

(iii)     Mezzanine Lender or such Mezzanine Successor, as applicable, shall have retained, upon Taking Control of Primary Borrower, a third party professional brokerage company reasonably acceptable to Fremont which (a) is a reputable professional brokerage company having at least five (5) years' experience in the sale of properties substantially similar to the portion of the Project contemplated to be sold and in the jurisdiction in which the Project is located, (b) has, during the five (5) years prior to its engagement as broker, sold at least five (5) developments of substantially similar size and type as the Project, (c) has sufficient financial resources to carry out all of the obligations for which it would be responsible in connection with the Project, (d) has not been a party to any litigation or other dispute with Fremont over the prior ten (10) years, (e) at the time of its engagement as broker has properties under listing agreements of the same property type as the Project and of at least the same scope and size as the scope and size of the Project, and (f) is not the subject of a bankruptcy or similar insolvency proceeding.

(iv)     Mezzanine Lender or such Mezzanine Successor, as applicable, shall have retained, upon Taking Control of Primary Borrower, a third party construction manager and general contractor reasonably acceptable to Fremont each of which (a) is a reputable

RFC007567

construction manager and general contractor having at least five (5) years' experience in the construction of projects substantially similar to the Project and in the jurisdiction in which the Project is located, (b) has, during the five (5) years prior to its engagement as construction manager or general contractor, managed at least five (5) construction projects substantially . similar to the Project, (c) has sufficient financial resources to carry out all of the obligations for which it would be responsible in connection with the Project, (d) has not been a party to any litigation or other dispute with Fremont over the prior ten (10) years, (e) at the time of its engagement as construction manager or general contractor has construction projects under management of the same type of development as the Project and of at least the same scope and size as the scope and size of the Project, and (f) is not the subject of a bankruptcy or similar insolvency proceeding.

(v)     On or before Mezzanine Lender's or such Mezzanine Successor's Taking Control of Primary Borrower Fremont shall have determined, in its good faith sole discretion, that Mezzanine Lender's or such Mezzanine Successor's acquisition of the Ownership Interest(s) shall not materially and adversely affect any agreement for the sale of any or all of the Project or Primary Borrower's ability to perform its obligations under any such agreement.

(vi)     On or before Mezzanine Lender's or such Mezzanine Successor's Taking Control of Primary Borrower Fremont shall have determined, in its good faith sole discretion, that Mezzanine Lender's or such Mezzanine Successor's acquisition of the Ownership Interest(s) shall not materially and adversely affect (a) any agreement, instrument or document relating to the development of the Project or the construction or renovation of improvements thereon or Primary Borrower's ability to timely perform its obligations thereunder, (b) the timing of the construction or renovation of any improvements on the Project or any offsite improvements required in connection with the development of the Project, or (c) the performance of any obligation or the satisfaction of any other condition required in connection with the development of the Project.

(vii)     Within thirty (30) days following Mezzanine Lender's or such Mezzanine Successor's Taking Control of Primary Borrower, Fremont shall have reviewed and approved each written property management, leasing management agreement and, if applicable, sales listing agreement, construction management agreement and general contract into which Mezzanine Lender or such Mezzanine Successor, as applicable, proposes to enter, such approval not to be unreasonably withheld.

(viii)     Concurrently with Taking Control of Primary Borrower (the effective date thereof being referred to herein as the "Taking Date"), (i) Mezzanine Lender or Mezzanine Successor, as applicable, shall have delivered to Fremont a Replacement Guaranty from Replacement Guarantor, and (ii) the Project shall be covered by an environmental insurance policy for the maximum term of the Primary Loan having limits of $1,000,000 per occurrence and $2,000,000 in the aggregate, which policy shall otherwise be acceptable to Fremont in its good faith sole discretion. As used herein, "Replacement Guaranty" shall mean a guaranty agreement in substantially the same form as the Primary Guaranty but limited to Recourse Obligations as set forth in Section 2.B.(i) of the Primary Guaranty (the "Recourse Section") and provided further that (a) subsection (1) of the Recourse Section shall be omitted, (b) Replacement Guarantor shall only be liable for the delivery of Lease Deposits under subsection (4) and Condominium Deposits under subsection (17) to the extent the same have been actually delivered to Mezzanine Lender or Mezzanine Successor, (c) clause (ii) of subsection (11) shall be omitted, and (d) Replacement Guarantor shall only be liable for violations of the Recourse Obligations arising from the voluntary affirmative acts after the Taking Date of Mezzanine Lender or Mezzanine Successor, as applicable, such Replacement Guarantor, and their general partners, managers, managing members, major shareholders, and/or Affiliates.

RFC007568

(ix)   On or before the date on which Mezzanine Lender's or such Mezzanine Successor's Taking Control of Primary Borrower occurs, Mezzanine Lender or such Mezzanine Successor shall have cured all defaults under the Primary Loan which remain uncured as of such date other than Post-Control Defaults, which shall be cured by Mezzanine Lender or such Mezzanine Successor, as applicable, as provided in Section 16(D) hereof, and Incurable Defaults, which are to be waived by Fremont in accordance with Section 16(E) hereof.

(x)   Mezzanine Lender or such Mezzanine Successor, as applicable, shall have complied with all of the terms and requirements of the Condominium Documents in connection with Mezzanine Lender's or such Mezzanine Successor's Taking Control of Primary Borrower as provided herein,

(xi)   [If the Project is a condominium conversion project:] Mezzanine Lender or such Mezzanine Successor, as applicable, shall have retained, upon Taking Control of Primary Borrower, a third party professional experienced in the conversion of apartments into condominiums reasonably acceptable to Fremont which (a) is a reputable professional company having at least five (5) years' experience in the conversion into condominiums of properties substantially similar to the Project and in the jurisdiction in which the Project is located, (b) has, during the five (5) years prior to its engagement, converted into condominiums at least five (5) developments of substantially similar size and type as the Project, (c) has sufficient financial resources to carry out all of the obligations for which it would be responsible in connection with the Project, (d) has not been a party to any litigation or other dispute with Fremont over the prior ten (10) years, (e) at the time of its engagement, is engaged in the conversion into condominiums for properties of at least the same scope and size as the scope and size of the Project, and (f) is not the subject of a bankruptcy or similar insolvency proceeding.

(xii)   Fremont, Primary Borrower and Primary Guarantors shall have entered into such amendments of the Primary Loan Documents as are reasonably necessary to reflect that Mezzanine Lender or such Mezzanine Successor, as applicable, has Taken Control of Primary Borrower, all of which amendments shall be in form reasonably acceptable to Fremont and Primary Borrower.

Mezzanine Lender acknowledges and agrees that, in the event that Mezzanine Lender or a Mezzanine Successor Takes Control of Primary Borrower, the Primary Loan shall continue to be an obligation of Primary Borrower pursuant to the terms of the Primary Loan Documents.

18.   **Option to Purchase Primary Loan.**

A.   **Purchase Price; Loan Purchase Price.**  Upon acceleration by Fremont of the Primary Loan in accordance with the Primary Loan Documents and notice thereof to Mezzanine Lender (whether pursuant to Section 15 or 16(A) hereof or otherwise), Mezzanine Lender shall have the right (but not the obligation), exercisable by written notice to Fremont (the "**Purchase Notice**") given within thirty (30) days after Mezzanine Lender receives notice of such acceleration (the "**Purchase Exercise Period**"), to purchase, in whole but not in part, the Primary Loan for a price equal to the Loan Purchase Price. Concurrently with payment to Fremont of the Loan Purchase Price, which must occur within fifteen (15) days after delivery of the Purchase Notice, Fremont shall deliver or cause to be delivered to Mezzanine Lender the executed and, where applicable, as-recorded originals of all Primary Loan Documents held by or on behalf of Fremont and Fremont shall execute in favor of Mezzanine Lender or its designee assignment documents, in form and substance reasonably acceptable to Mezzanine Lender, at the sole cost and expense of Mezzanine Lender, assigning to Mezzanine Lender or its designee the Primary Loan and all of Fremont's rights under the Primary Loan Documents, including, without limitation, the remaining balance in any pledge or escrow accounts held by Fremont unless the same were previously applied on account of the Primary Loan (without recourse, representations or warranties of any kind, express or implied, except for representations as to the outstanding balance of the Primary Loan and reasonable representations as to Fremont's power and authority to sell the Primary Loan).  The right of Mezzanine

RFC007569

Lender to purchase the Primary Loan shall automatically terminate upon the earlier of (i) Mezzanine Lender's or a Mezzanine Successor's Taking Control of Primary Loan or (ii) a transfer of the Project by foreclosure sale, sale by power of sale or delivery of a Deed in Lieu; provided, however, that Fremont shall not proceed with a Deed in Lieu during the Purchase Exercise Period and, if Mezzanine Lender timely delivers a Purchase Notice, during the fifteen (15) day period following Fremont's receipt of the Purchase Notice. Except as expressly provided in the immediately preceding sentence with respect to a Deed in Lieu during the Purchase Exercise Period, the rights granted to Mezzanine Lender in this <u>Section 18(A)</u> shall not limit, delay or in any way affect Fremont's right to exercise any or all of its rights and remedies under the Primary Loan Documents, including, without limitation, through a foreclosure sale, sale by power of sale or Deed in Lieu. Upon Mezzanine Lender's purchase of the Primary Loan, Fremont shall have no further obligations or liability under this Agreement. The rights granted to Mezzanine Lender in this <u>Section 18A</u> shall not affect or prejudice Primary Borrower's or any Primary Guarantor's right to repay any or all of the Primary Loan at any time, and nothing contained herein shall limit or affect Fremont's right to accept at any time any payment of any amounts owing under the Primary Loan Documents from Primary Borrower, any Primary Guarantor or any other party.

      **B.**    <u>No Avoidance of Prepayment Fee or Charge</u>. Mezzanine Lender shall not enter any agreement with Primary Borrower or any Affiliate thereof to purchase the Primary Loan pursuant to <u>Section 18(A)</u> hereof or in connection with any refinancing of the Primary Loan in any manner designed to avoid or circumvent the provisions of the Primary Loan Documents which require the payment of a prepayment fee or yield maintenance charge in connection with a prepayment of the Primary Loan by Primary Borrower.

      **19.**    <u>Initiation of Insolvency Proceedings by Mezzanine Lender</u>. Until the Primary Loan Satisfaction Date, Mezzanine Lender shall not acquiesce, petition or otherwise invoke or cause any other Person to invoke the process of the United States of America, any state or other political subdivision thereof or any other jurisdiction or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government for the purpose of (a) commencing or sustaining a case against Primary Borrower, Mezzanine Borrower or any Primary Guarantor under a Federal or state bankruptcy, insolvency or similar law, (b) appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Primary Borrower, Mezzanine Borrower or any Primary Guarantor or all or any part of their respective property or assets, or (c) ordering the winding-up or liquidation of the affairs of Primary Borrower, Mezzanine Borrower or any Primary Guarantor.

      **20.**    <u>Restriction on Mezzanine Lender in Insolvency Proceeding</u>. In the event Primary Borrower becomes the subject of an Insolvency Proceeding, (a) all claims of Mezzanine Lender shall be subordinate to payment in full of the Primary Loan and all claims and amounts owed Fremont under the Primary Loan Documents, including, without limitation, post-petition interest, whether such amounts and claims are secured or unsecured and whether any such amount or claim is created solely as a result of any provision of the Bankruptcy Code, (b) Mezzanine Lender shall not propose or vote in favor of a plan of reorganization unless either such plan provides for full satisfaction of the Primary Loan or Fremont consents to such plan, and (c) Mezzanine Lender shall not seek or propose or cause any other Person to seek or propose any "cram down" of Fremont in such Insolvency Proceeding or any restructuring of the scheduled payments under the Primary Loan or any plan or course of action which would have the effect of (i) impairing the priority or lien of the Primary Loan or Primary Loan Documents, (ii) denying, impeding or delaying Fremont's efforts to collect the Primary Loan or any amounts owed to Fremont under the Primary Loan Documents, or (iii) delaying, preventing, limiting, requiring a reduction in the amount of, or impairing Fremont's collection of, all or any portion of the Primary Loan. In addition, Mezzanine Lender shall not object to or oppose (a) any efforts by Fremont to obtain relief from the automatic stay under <u>Section 362</u> of the Bankruptcy Code or to seek to cause such entity's bankruptcy estate to abandon the Project (or any portion thereof) that is subject to the Primary Security Instrument, unless concurrently therewith Mezzanine Lender has exercised its rights under <u>Section 18</u> hereof to purchase the Primary Loan, or (b) any request or motion by Fremont for an order establishing that proceeds, product, offspring, rents and profits of the Project constitute cash collateral for purposes of <u>Section 363</u> of the Bankruptcy Code ("**Cash Collateral**") and for the application of such Cash Collateral to payment of the Primary Loan

RFC007570

prior to any application of such Cash Collateral to the Mezzanine Loan until the Primary Loan is indefeasibly paid and satisfied in full.

21.    Estoppel Certificates.

A.    Mezzanine Lender shall, within ten (10) days following a written request from Fremont, provide Fremont with a written estoppel certificate setting forth (i) the then current outstanding principal balance of the Mezzanine Loan, (ii) the aggregate accrued and unpaid interest under the Mezzanine Loan, (iii) a statement to the current actual conscious knowledge of the Mezzanine Lender officer responsible for the administration of the Mezzanine Loan and to whom any notices from Mezzanine Borrower to Mezzanine Lender should be directed, and without any duty of inquiry or investigation, as to whether there then exists any uncured Event of Default under the Mezzanine Loan Documents, (iv) whether Mezzanine Lender has delivered written notice to Mezzanine Borrower of an event, which if it remains uncured, would constitute an Event of Default under the Mezzanine Loan Documents, and (v) such other information, customary in such estoppel certificates, as Fremont may reasonably request.

B.    Fremont shall, within ten (10) days following a written request from Mezzanine Lender, provide Mezzanine Lender with a written estoppel certificate setting forth (i) the then current outstanding principal balance of the Primary Loan, (ii) the aggregate accrued and unpaid interest under the Primary Loan, (iii) a statement to the current actual conscious knowledge of the Fremont asset manager responsible for the administration of the Primary Loan and to whom any notices from Primary Borrower to Fremont should be directed, and without any duty of inquiry or investigation, as to whether there then exists any uncured Event of Default under the Primary Loan Documents, (iv) whether Fremont has delivered written notice to Primary Borrower of an event, which if it remains uncured, would constitute an Event of Default under the Primary Loan Documents, and (v) such other information, customary in such estoppel certificates, as Mezzanine Lender may reasonably request.

22.    No Merger.  If Fremont, or Fremont's assignee or designee, accepts a deed in lieu or in aid of foreclosure (a "Deed In Lieu"), there shall be no merger of the liens arising under the Primary Loan Documents into the estate conveyed or assigned by such Deed in Lieu. The interests of Fremont (or its assignee or designee) as holder of the Primary Loan Documents and holder of the estate transferred by the Deed in Lieu shall remain forever separate and distinct except to the extent that Fremont (or its assignee or designee) expressly agrees in writing to the contrary.

23.    Waiver of Marshaling.  Mezzanine Lender hereby waives any right it may have to require that Fremont marshal any assets of Primary Borrower in favor of Mezzanine Lender.

24.    Notice and Opportunity to Cure Defaults Under Intercreditor Agreement.  Fremont and Mezzanine Lender shall each give the other written notice of any claim that the other is in default of its obligations under this Agreement and ten (10) days following the delivery of such notice in which to cure such default.  Any such notice shall specify in reasonable detail the nature of the claimed default.

25.    Continuing Agreement; Rescinded Payments and Subsequent Obligations.

A.    This Agreement is a continuing agreement and, subject to the provisions of Sections 25(B) and 25(C) below, shall remain in full force and effect until the earliest of (i) the Primary Loan Satisfaction Date, or (ii) indefeasible payment and satisfaction in full of the Mezzanine Loan, and shall thereafter terminate. Any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.  For purposes of this Agreement and without limitation, (1) the Primary Loan and the Primary Loan Documents shall not be deemed satisfied in full, and shall be deemed to be outstanding, until Fremont has received full payment of all amounts due under the Primary Loan Documents and Fremont has no further obligation to make any disbursements under the Primary Loan Documents, and (2) the Mezzanine Loan and the Mezzanine Loan Documents shall not be deemed satisfied in full, and shall be deemed to be outstanding, until Mezzanine Lender has received full payment of all amounts due under the Mezzanine Loan

20772859.3 05139533                              19

Documents and Mezzanine Lender has no further obligation to make any disbursement under the Mezzanine Loan Documents.

**B.** Notwithstanding the provisions of Section 25(A) above, if and to the extent that Fremont receives payments on, or proceeds of the collateral for, the Primary Loan which are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other Person under any bankruptcy law, state or federal law, common law, in equity or otherwise ("**Rescinded Payments**"), then the Primary Loan, the Primary Loan Documents and this Agreement shall be deemed revived with respect to the Rescinded Payments with the same force and effect as if such Rescinded Payments had never been made to Fremont, whereupon any amounts (up to the total amount of the Rescinded Payments) theretofore received by Mezzanine Lender on account of the Mezzanine Loan which are in excess of the amounts to which Mezzanine Lender would be entitled under the provisions of Section 10 of this Agreement (assuming this Agreement had not terminated) (the "**Excess Payments**") shall be deemed to have been received by Mezzanine Lender in trust for the benefit of Fremont and, if such Rescinded Payments have not been repaid to Fremont by Primary Borrower or any Primary Guarantor, Mezzanine Lender shall immediately deliver to Fremont all Excess Payments for application against the Rescinded Payments and/or any other amounts owed to Fremont under the Primary Loan Documents.

**C.** Notwithstanding the provisions of Section 25(A) above, if after the termination of this Agreement pursuant to Section 25(A) above, Primary Borrower or any Primary Guarantor becomes obligated to pay to Fremont any amount due under the Primary Loan Documents for any reason, including, without limitation, as a result of an indemnity or other obligation which survives the repayment of the Primary Loan (the "**Subsequent Obligations**"), then the provisions of Section 2 of this Agreement shall be deemed revived with respect to the Subsequent Obligations and the Primary Loan Documents with respect thereto.

**26.** **Notices.** Any notice or other communication required or permitted to be given pursuant to this Agreement shall be in writing addressed to the respective party as set forth below and may be personally served or sent by overnight courier or U.S. Mail, postage prepaid, return receipt requested, and shall be deemed given, if served in person, when served, and otherwise, when actually received or delivery is refused.

| | |
|---|---|
| Notices to Fremont: | Fremont Investment & Loan<br>2727 E. Imperial Highway<br>Brea, California  92821-6713<br>Attention:  Commercial Real Estate Division<br>Loan No. #950114914<br>Telephone:     (714) 961-4700 |
| With a copy to: | Fremont Investment & Loan<br>2425 Olympic Boulevard<br>Third Floor – East<br>Santa Monica, California  90404<br>Attention: Alec G. Nedelman, Esq.<br>Loan No. #950114914<br>Telephone:     (310) 315-5578 |
| Notices to Mezzanine<br>Lender: | CBRE Realty Finance TRS, LLC<br>185 Asylum Street, 37th Floor<br>Hartford, Connecticut 06103<br>Attention: Andrew Manley<br>Telephone: (____) _____ |

RFC007572

27.   **Assignment by Mezzanine Lender.**

A.      Mezzanine Lender shall not Transfer the Mezzanine Loan or any of its rights under this Agreement or the Mezzanine Loan Documents without Fremont's prior written consent, which consent may be withheld in Fremont's good faith sole discretion; provided, however, Fremont's consent shall not be required for a Transfer to a Qualified Transferee so long as advance written notice thereof is provided to Fremont prior to such Transfer.  In the event of a proposed Transfer of the Mezzanine Loan or the Mezzanine Loan Documents, promptly after Fremont's receipt of written notice of the proposed transferee, Fremont will notify Mezzanine Lender as to whether or not such proposed transferee is a Disapproved Entity.

B.      In the event Fremont consents to the Transfer of the Mezzanine Loan or any Mezzanine Loan Documents or such Transfer is otherwise permitted hereunder without such consent, such Transfer shall be subject to all of the terms and conditions of this Agreement and such transferee of the Mezzanine Loan shall assume in writing the obligations of Mezzanine Lender under this Agreement.  No Transfer of this Agreement or the Mezzanine Loan Documents shall release Mezzanine Lender from any of its obligations under this Agreement.  Nothing herein shall prohibit Mezzanine Lender from transferring participations in the Mezzanine Loan so long as (a) it remains in control of all decisions with respect to the Mezzanine Loan, (b) its obligations under this Agreement and under the Mezzanine Loan Documents remain unchanged and Mezzanine Lender shall continue to have the duty to make disbursements under the Mezzanine Loan Documents notwithstanding any participant's failure to fund its participation interest in such disbursement, (c) Fremont shall be entitled to deal solely and directly with Mezzanine Lender in connection with Mezzanine Lender's rights and obligations under this Agreement, and (d) Mezzanine Lender shall at all times own and retain not less than fifty-one percent (51%) of the Mezzanine Loan.

28.      **Successors and Assigns.**  Without limitation upon Section 27 above, the terms, covenants and conditions contained herein shall bind and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that this Section 28 shall not be deemed to permit any unpermitted assignee to acquire any benefits hereunder (but such unpermitted assignee shall be nonetheless bound by the assignor's obligations and restrictions hereunder).  Any transferee of the Primary Loan by Fremont shall be subject to all of the terms and conditions of this Agreement from and after the date of such transfer and Fremont shall provide Mezzanine Lender written notice of such transfer prior to the effective date of such transfer.

29.      **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

30.      **Governing Law and Construction of Agreement.**  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Maryland.  The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.  The exhibits attached hereto form a part of this Agreement.  This Agreement shall not be construed against either Fremont or Mezzanine Lender, but shall be construed as a whole, in accordance with its fair meaning, and as if prepared by Fremont and Mezzanine Lender jointly.

31.      **Attorneys' Fees.**  If any lawsuit or other proceeding is commenced which arises out of, under or in connection with, or which relates to, this Agreement, including, without limitation, any alleged tort action, the prevailing party shall be entitled to recover from each other party to such lawsuit or proceeding such sums as the court or other party presiding over such lawsuit or proceeding may adjudge to be reasonable attorneys' fees and costs in the lawsuit or proceeding, in addition to costs and expenses otherwise allowed by law.  As used herein, "attorneys' fees and costs" means the reasonable fees and expenses of counsel, including without limitation, attorneys who are employees acting as counsel to the

RFC007573

applicable party, which may include, without limitation, printing, photostating, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The terms "attorneys' fees" or "attorneys' fees and costs" shall also include, without limitation, all such reasonable fees and expenses incurred with respect to appeals, arbitrations, bankruptcy proceedings and any post-judgment proceedings to collect any judgment, and whether or not any action or proceeding is brought with respect to the matter for which such fees and expenses were incurred. The provisions allowing for the recovery of post-judgment fees, costs and expenses are separate and several and shall survive the merger of this Agreement into any judgment.

32.     <u>WAIVER OF JURY TRIAL</u>. EACH OF FREMONT AND MEZZANINE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY CONTROVERSY OR CLAIM, WHETHER ARISING IN TORT OR CONTRACT OR BY STATUTE OR LAW, BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, THE VALIDITY, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF), OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. EACH OF FREMONT AND MEZZANINE LENDER HEREBY ACKNOWLEDGES AND AGREES THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR FREMONT'S AND MEZZANINE LENDER'S ENTERING INTO THIS AGREEMENT AND THE PARTIES WOULD NOT HAVE ENTERED INTO THIS AGREEMENT WITHOUT THIS WAIVER. EACH OF FREMONT AND MEZZANINE LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS <u>SECTION 32</u> IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL.

33.     <u>Consent to Jurisdiction</u>. Fremont and Mezzanine Lender hereby consent to the jurisdiction of any state or federal court located within the State of Maryland in any suit, action or proceeding based hereon or arising out of, under or in connection with this Agreement (and further agree not to assert or claim that such venue is inconvenient or otherwise inappropriate or unsuitable) and hereby waive personal service of any and all process upon them and consent that all service of process be made by certified mail directed to the parties at the addresses set forth above.

34.     <u>No Modification of Borrower's Obligations</u>. This Agreement is for the sole benefit of Fremont and Mezzanine Lender and their respective successors and assigns and no third party, including, without limitation, Primary Borrower and Mezzanine Borrower, shall be a third party beneficiary hereof. Nothing herein shall be deemed to modify, limit or in any way affect the rights and obligations of Primary Borrower to Fremont under the Primary Loan Documents or the rights and obligations of the Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents, except as expressly set forth herein.

35.     <u>Entire Agreement</u>. This Agreement shall be the whole and only agreement among the parties hereto with regard to the matters set forth herein, and shall supersede and cancel any prior agreements with respect thereto, including, without limitation, any provisions contained in the Mezzanine Loan Documents relating thereto.

RFC007574

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement, on the date and year first above written.

FREMONT:

FREMONT INVESTMENT & LOAN,
a California industrial bank

By: _____

Name: _____

Title: _____

MEZZANINE LENDER:

CBRE REALTY FINANCE TRS, LLC,
a Delaware limited liability company

By: _____

Name: _Michael A. Angeshal_____

Title: _Chief Financial Officer___

31.8.

20772859.3 05139533                         S-1

RFC007575

EXHIBIT A

## LEGAL DESCRIPTION OF LAND

That certain real property in the City of Rockville, County of Montgomery, State of Maryland, having a street address of 5901 Montrose Road, more particularly described as follows:

Parcel lettered "F" in a subdivision known as "Montrose" as per plat thereof recorded as Plat No. 21858 among the land records of Montgomery County, Maryland.

20772859.3 05139533                          A-1

RFC007576

**EXHIBIT B**

**DESCRIPTION OF MEZZANINE LOAN DOCUMENTS**

(All documents dated as of November 8, 2005, unless otherwise indicated)

1.    Loan Agreement between Mezzanine Borrower and Mezzanine Lender;

2.    Membership Interests Pledge and Security Agreement from Brian A. McCormick and Charles W. Moore to Mezzanine Lender;

3.    Guaranty from Brian A. McCormick and Charles W. Moore; and

4.    Promissory Note from Mezzanine Borrower in favor of Mezzanine Lender.

RFC007577

EXHIBIT C

## DESCRIPTION OF PRIMARY LOAN DOCUMENTS

(All documents dated as of November 10, 2005, unless otherwise indicated)

1. Loan and Security Agreement between Primary Borrower, Pavilion LLC and Fremont (including Maryland Condominium Loan and Security Agreement Rider);
2. Secured Promissory Note from Primary Borrower to Fremont;
3. Indemnity Deed of Trust and Fixture Filing from Pavilion LLC to Fremont;
4. Indemnity Assignment of Rents (and Leases) from Pavilion LLC to Fremont;
5. Environmental Indemnity executed by Primary Borrower, Pavilion LLC, Brian A. McCormick and Charles W. Moore in favor of Fremont;
6. Guaranty executed by Pavilion LLC in favor of Fremont;
7. Guaranty executed by Brian A. McCormick and Charles W. Moore in favor of Fremont;
8. Assignment of Project Agreements from Primary Borrower and Pavilion LLC to Fremont;
9. Collateral Assignment of Purchase Agreements and Deposits with an Irrevocable Power of Attorney from Primary Borrower and Pavilion LLC in favor of Fremont;
10. Insurance Agreement between Primary Borrower, Pavilion LLC and Fremont;
11. Formation Document Certificate from Montrose Investment Holdings, LLC to Fremont;
12. Formation Document Certificate from Pavilion LLC to Fremont;
13. Formation Document Certificate from Triton Pavillion, LLC to Fremont;
14. UCC-1 Financing Statements naming IDOT Guarantor as debtor;
15. Waiver of Rights Under Servicemembers Civil Relief Act from Primary Borrower, Brian McCormick and Charles W. Moore; and
16. Escrow Account Control Agreement to Fremont.

RFC007578

# EXHIBIT 16

# EXHIBIT 17

SALE-PURCHASE AGREEMENT

between

PAVILION LLC,
a Maryland limited liability company,

as "Seller",

and

ANGELO GORDON REAL ESTATE INC.,
a Delaware corporation,

as "Purchaser".

Premises:

Real Property and Improvements thereon
commonly known as The Monterey;
located at Rockville Pike and Montrose Road,
Rockville , Maryland.

N:\2009\112R\PSA\PSA v14ck.doc
1/14/2008 1:05:36 PM

CONFIDENTIAL

RFC045046

# TABLE OF CONTENTS

PAGES

1.   Sale-Purchase..........................................................................................1
2.   Purchase Price.........................................................................................2
3.   Escrow.....................................................................................................3
4.   Permitted Exceptions; Violations of Law.............................................5
5.   Closing Date.............................................................................................6
6.   Apportionments.......................................................................................6
7.   Title Insurance and Survey.....................................................................8
8.   Closing Deliveries...................................................................................9
9.   Representations and Warranties............................................................12
10.  Seller's and Purchaser's Covenants.....................................................15
11.  Broker.....................................................................................................18
12.  Condemnation and Destruction.............................................................18
13.  Conditions Precedent.............................................................................19
14.  Termination of Agreement; Default......................................................21
15.  Indemnification by AG Indemnitor.......................................................22
16.  Reserved.................................................................................................23
17.  Expenses.................................................................................................23
18.  Reserved.................................................................................................23
19.  Access To Property................................................................................23
20.  Notices....................................................................................................24
21.  Entire Agreement...................................................................................25
22.  Amendments...........................................................................................25
23.  Waiver.....................................................................................................25
24.  Successors and Assigns.........................................................................25
25.  Section Headings....................................................................................25
26.  Governing Law.......................................................................................25
27.  Submission To Jurisdiction....................................................................25
28.  Waiver Of Jury Trial..............................................................................26
29.  Enforceability.........................................................................................26
30.  Attorneys' Fees......................................................................................26
31.  Assignment.............................................................................................26
32.  Counterparts...........................................................................................26
33.  Further Assurances.................................................................................27
34.  Certain Definitions.................................................................................27
35.  Reserved.................................................................................................27
36.  Publicity and Confidentiality.................................................................27
37.  Calculation of Time Periods; Time of the Essence...............................27
38.  Acquisition and Assumption of the Existing Loan................................27
39.  Reserved.................................................................................................27
40.  Seller Indemnity.....................................................................................27
41.  Montgomery County's Rights................................................................30
42.  Arbitration..............................................................................................31
43.  Seller Estoppel Certificate.....................................................................32
44.  Consent to Relief from Automatic Stay.................................................32

i

CONFIDENTIAL

RFC045047

EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description |
| Exhibit B | Schedule of Personal Property |
| Exhibit C | Form of Seller Estoppel Certificate and Agreement |
| Exhibit D | Form of Assumption and Release Agreement |
| Exhibit E | Rent Roll |
| Exhibit F | Form of Deed |
| Exhibit G | Form of Bill of Sale |
| Exhibit H | Form Assignment and Assumption of Leases |
| Exhibit I | Form of Tenant Notification Letter |
| Exhibit J | Form Assignment and Assumption of Contracts |
| Exhibit K | Form of Assigned Contract Notification Letters |
| Exhibit L | Form of FIRPTA Certification |
| Exhibit M | Reserved |
| Exhibit N | Form of Assignment of Rights Under Public Offering Statement for The Monterey Condominium |
| Exhibit O | Form of Owner's Affidavit |
| Exhibit P | Schedule of Environmental Reports |
| Exhibit Q | The Existing Loan Purchase Agreement |
| Exhibit R | 2005 Certificate of Compliance |
| Exhibit S | Approved Trade Agreements |
| Exhibit T | Outstanding Trade Payables |
| Exhibit U | Assignment and Assumption of Intangible Property |
| Exhibit V | List of Existing Loan Documents |
| Exhibit W | Schedule of Litigation |

CONFIDENTIAL

RFC045048

## SALE-PURCHASE AGREEMENT

THIS SALE-PURCHASE AGREEMENT (this "Agreement"), made as of the 14th day of January, 2008 (the "Effective Date"), between PAVILION LLC, a Maryland limited liability company, having an office at c/o CBRE Realty Finance TRS, LLC, 185 Asylum Street, City Place, 31st Floor, Hartford, Connecticut 06103 ("Seller"), and ANGELO GORDON REAL ESTATE INC., a Delaware corporation, having an office at c/o Angelo, Gordon & Co., L.P., 245 Park Avenue, 26th Floor, New York, New York 10167 ("Purchaser").

### W I T N E S S E T H :

WHEREAS, Seller is the owner of the Property (as hereinafter defined) and desires to sell the Property to Purchaser;

WHEREAS, Purchaser desires to purchase the Property from Seller on the terms and conditions hereinafter set forth; and

WHEREAS, concurrently with the consummation of the transactions contemplated herein, an affiliate of Purchaser (such affiliate, the "Existing Loan Purchaser") intends to purchase the lender's interest in the Existing Loan (as hereinafter defined) pursuant to a separate agreement being entered into concurrently herewith by the Existing Loan Purchaser and the Existing Lender (as hereinafter defined) (as such agreement may hereafter be amended or otherwise modified from time to time, the "Existing Loan Purchase Agreement"). A copy of the Existing Loan Purchase Agreement is attached hereto as Exhibit Q.

NOW, THEREFORE, in consideration of the foregoing recitals, One Hundred and 00/100 Dollars ($100.00) (the "Independent Contract Consideration") and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      Sale-Purchase.

Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions herein set forth, the following (collectively, the "Property"):

(a)      all that certain plot, piece and parcel of land located in the City of Rockville, County of Montgomery and the State of Maryland, (the "Land"), which Land contains approximately 3.2701 acres of land and is commonly known as "The Monterey" located at Rockville Pike and Montrose Road, as such land is further described in Exhibit A attached hereto and made a part hereof, including, without limitation, (i) all easements, rights of way, privileges, appurtenances and other rights, if any, pertaining thereto, (ii) all right, title and interest of Seller, if any, in and to any land lying in the bed of any street, road or avenue opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, and (iii) all right, title and interest of Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street, and the buildings and improvements located thereon and Seller shall execute and deliver to Purchaser at the Closing (as hereinafter defined) all proper instruments for the conveyance of such title and the assignment and collection of any such award;

(b)      all buildings and improvements located on the Land, the foregoing to include, without limitation, the building commonly known as "The Monterey" and known by the street address of 5901 Montrose Road, Rockville, Maryland, containing 432 rental apartment units (collectively, the "Improvements"; together with the Land, the "Real Estate");

CONFIDENTIAL

RFC045049

(c)     all of Seller's right, title and interest in and to any and all tangible personal property, including, without limitation, all furniture, fixtures, fittings, apparatus, appliances, vehicles, equipment and machinery and other articles of personal property located on, attached to, appurtenant to or used or usable in connection with any part of the Real Estate, including, without limitation, the personal property listed in the inventory attached hereto as Exhibit B (collectively, the "Personal Property");

(d)     to the extent assignable, all of Seller's right, title and interest in and to any and all intangible property relating to the Real Estate and the Personal Property, including, without limitation, all warranties and guaranties pertaining to the Real Estate, or any Personal Property or any fixture attached to the Real Estate, all tradenames (including, without limitation, the name "The Monterey"), and trademarks, service marks, copyrights, and goodwill relating to the ownership and operation of the Real Estate (collectively, the "Intangible Property");

(e)     subject to the terms hereof, all of (i) Seller's right, title and interest in and to the contracts and agreements pertaining to the Real Estate, including all leases in which Seller is the lessee of equipment used in the operation or maintenance of the Real Estate, all concession agreements, service contracts and construction contracts pertaining to the Real Estate, and all agreements of any kind or nature pertaining to the Real Estate (the "Contracts"), which Purchaser opts to assume (it being acknowledged, for the avoidance of doubt, that Purchaser shall have the right to assume or not assume any of the Contracts at Closing for any reason or no reason, in Purchaser's sole discretion) and (ii) CBF's (as hereinafter defined) rights in and to that certain Intercreditor Agreement, dated as of November 10, 2005, by and between Fremont (as hereinafter defined) and CBF, but only to the extent described in Exhibit J;

(f)     subject to the terms hereof, all of Seller's right, title and interest in and to any and all existing licenses, franchises, permits, certificates of occupancy, authorizations and approvals used in or relating to the ownership, occupancy or operation of any part of the Real Estate (the "Permits"); and

(g)     subject to the terms hereof, all of Seller's right, title and interest in and to all leases, licenses and other agreements (written or oral) for the occupancy of the retail or any other space within the Improvements (the "Leases"), including, without limitation, the Leases described in the rent roll (the "Rent Roll") attached hereto as Exhibit E.

2.     Purchase Price.

2.1.     The purchase price for the Property (the "Purchase Price") is One and 00/100 dollar ($1.00), plus Three Hundred and Fifty Thousand and 00/100 Dollars ($350,000.00), which is payable as reimbursement to Seller of certain expenses it has heretofore incurred, plus assumption of the matters described in Section 2.4, in each case, payable as follows:

(a)     Three Hundred and Fifty Thousand and 00/100 Dollars ($350,000) (the "Deposit"), at the option of Purchaser, either by (i) check payable to the order of Linowes and Blocher LLP, as agent for Lawyers Title Insurance Corporation (the "Title Company"), having an office at 7200 Wisconsin Avenue, Suite 800, Bethesda, Maryland 20814-4842, as escrow agent (in such capacity, "Escrow Agent"), or (ii) current or federal funds wire transferred to a bank account designated by Escrow Agent not later than one (1) Business Day (as hereinafter defined) after the execution and acceptance of this Agreement by Seller and Purchaser; and

(b)     The remainder, if any, of the Purchase Price, as adjusted for prorations and apportionments as herein provided (such funds, the "Closing Funds"), upon the delivery of the Deed (as hereinafter defined) in accordance with the terms hereof, at the option of Purchaser, either by (i) a

2

CONFIDENTIAL

RFC045050

certified or official bank check payable to the order of Seller, (ii) current or federal funds transferred to a bank account of Seller (to be designated by Seller in writing not less than three (3) Business Days prior to the Closing Date (as hereinafter defined)), or (iii) by wire transfer of funds to Escrow Agent at the Closing (as hereinafter defined) with instructions to Escrow Agent to release the Closing Funds so transferred to or as directed by Seller upon the consummation of the Closing.

2.2.    The Deposit shall be held and disbursed by Escrow Agent in accordance with the provisions of Section 3 of this Agreement.  For purposes hereof, the Deposit, together with all interest earned thereon, shall be collectively referred to herein as the "Downpayment".

2.3.    Notwithstanding anything to the contrary herein, the parties acknowledge and agree that the Independent Contract Consideration (receipt of which is hereby acknowledged by Seller) (a) is not deemed a portion of the Purchase Price, (b) constitutes separate and independent consideration from Purchaser to Seller for the execution of this Agreement by Seller and delivery thereof to Purchaser, and (c) shall not be refundable by Seller to Purchaser notwithstanding any termination of this Agreement by Purchaser or Seller.

2.4.    In addition to the foregoing and as an integral part of the total consideration given by Purchaser for the transactions contemplated by this Agreement, at Closing, Purchaser shall assume (a) liability for the trade payables listed on Exhibit T attached hereto and made a part hereof (collectively, the "Outstanding Trade Payables"), but only to the extent that the amount of any such individual Outstanding Trade Payable does not exceed the line item amount therefor set forth on Exhibit T (each, a "Maximum Line Item Amount") and only to the extent that the aggregate amount of such Outstanding Trade Payables does not exceed Four Million Nine Hundred Ninety Three Thousand Eight Hundred Ninety and 00/100 Dollars ($4,993,890) (the "Maximum Trade Payables Exposure") (it being agreed, for the avoidance of doubt, that (x) under no circumstances shall Purchaser be responsible for payment of the Outstanding Trade Payables beyond the Maximum Line Item Amount, for any individual Outstanding Trade Payable, or the Maximum Trade Payables Exposure, with respect to the aggregate Outstanding Trade Payables, (y) Seller is retaining liability for the Outstanding Trade Payables, to the extent that the amount thereof exceeds (I) the  Maximum Line Item Amount, for any individual Outstanding Trade Payable, or (II) the Maximum Trade Payables Exposure, with respect to all Outstanding Trade Payables) and (z) Purchaser's assumption of such Outstanding Trade Payables shall include assumption by Purchaser of the benefit (if any) of any reduced costs or credits for purchased materials which are located at the Property, or are otherwise in the possession of Seller or any trade creditor), and (b) both Seller's and Existing Loan Borrower's (as hereinafter defined) rights and obligations as IDOT guarantor and borrower, as applicable, under the Existing Loan (the outstanding principal balance of which is $103,571,973.51), to the extent arising from and after the Closing Date, in accordance with an Assumption and Release Agreement (the "Assumption and Release Agreement") to be executed and delivered by Purchaser and  the Existing Loan Purchaser, in the form of Exhibit D attached hereto and made a part hereof.

2.5.    The Seller acknowledges that the Purchase Price stated herein represents at least reasonably equivalent value and fair consideration for the Property.

3.    Escrow.

The Downpayment shall be held by Escrow Agent, in trust, on the terms hereinafter set forth:

3.1.    Escrow Agent shall deposit the Deposit in an interest bearing day of deposit-day of withdrawal bank account, with a Federally insured financial institution.

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045051

3.2.    Escrow Agent shall not commingle the Downpayment with any other funds of Escrow Agent or others and shall promptly advise Purchaser and Seller of the number of any bank account in which the Deposit has been deposited.

3.3.    If the Closing takes place under this Agreement, then Escrow Agent shall disburse the Downpayment on the Closing Date to Seller and Purchaser shall receive a credit against the Purchase Price in an amount equal to the Downpayment.

3.4.    If this Agreement is terminated in accordance with the terms hereof or if the Closing does not take place under this Agreement by reason of the failure of Purchaser or Seller to comply with its obligations hereunder, then Escrow Agent shall pay the Downpayment as required by the terms of this Agreement, provided, however, that notwithstanding the foregoing, Escrow Agent shall not pay over the Downpayment to any party hereunder unless and until the following procedure is complied with:  The party requesting disbursement of the Downpayment (the "Requesting Party") shall deliver notice to Escrow Agent and all other parties hereto requesting such disbursement.  Within five (5) days after receipt of such notice of request, Escrow Agent shall deliver notice to all other parties hereto stating that the Requesting Party has requested such disbursement (and including a copy of the Requesting Party's notice).  Within ten (10) days after receipt of Escrow Agent's notice, the non-requesting party shall either: (a) agree to permit such disbursement by Escrow Agent or (b) inform Escrow Agent that the non-requesting party does not agree to permit such disbursement.  If the non-requesting party acts under clause (a), then Escrow Agent shall make the disbursement as requested by the Requesting Party.  If the non-requesting party acts under clause (b), then Escrow Agent shall not make any disbursement except as provided in Section 3.6 below.  If the non-requesting party fails to respond during the foregoing ten (10) day period, same shall be deemed to be the response of the non-requesting party under clause (a) on the last day of such ten (10) day period.

3.5.    It is agreed that the duties of Escrow Agent are only as herein specifically provided, and, subject to the provisions of Section 3.6 hereof, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatever except for willful misconduct or gross negligence, as long as Escrow Agent has acted in good faith.  Seller and Purchaser each release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder.

3.6.    Escrow Agent is acting as a stakeholder only with respect to the Downpayment. If there is any dispute as to whether Escrow Agent is obligated to deliver the Downpayment as to whom the Downpayment is to be delivered, Escrow Agent shall not make any delivery, but in such event Escrow Agent shall hold same until receipt by Escrow Agent of an authorization in writing, signed by all the parties having an interest in such dispute, directing the disposition of same, or, in the absence of such authorization, Escrow Agent shall hold the Downpayment until the final determination of the rights of the parties in an appropriate proceeding.  If such written authorization is not given, or proceedings for such determination are not begun within thirty (30) days after the Closing Date and diligently continued, Escrow Agent may bring an appropriate action or proceeding for leave to deposit the Downpayment in court pending such determination.  Escrow Agent shall be reimbursed for all costs and expenses of such action or proceeding including, without limitation, reasonable attorneys' fees and disbursements, by the party determined not to be entitled to the Downpayment.  Upon making delivery of the Downpayment in the manner herein provided, Escrow Agent shall have no further liability hereunder.

3.7.    Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received the Deposit, and that Escrow Agent will hold the Downpayment in escrow, pursuant to the provisions hereof.

4

CONFIDENTIAL

RFC045052

3.8.      Purchaser shall pay any and all costs and expenses incurred by Escrow Agent as a result of this transaction.

4.      Permitted Exceptions; Violations of Law.

4.1.      At Closing, the Property shall be sold, and good and marketable title thereto is to be conveyed, subject only to (a) the Leases with the tenants, subtenants, licenses and other parties having rights of occupancy in any portion of the Property (collectively, the "Tenants") reflected on the Rent Roll, (b) the Permitted Title Exceptions (as hereinafter defined), and (c) the Permitted Survey Conditions (as hereinafter defined) (such Leases, the Permitted Title Exceptions, and the Permitted Survey Conditions being hereinafter collectively referred to as the "Permitted Exceptions").

4.2.      Title to the Property shall be good and marketable and shall be insurable by the Title Company, at its regular rates, without exceptions or reservations of any type or kind, except the Permitted Exceptions.

4.3.      Purchaser shall accept title to the Premises subject to all violations of law or municipal ordinances, orders or requirements issued by the departments of buildings, fire, labor, health or other federal, state, county, municipal or other departments and governmental agencies having jurisdiction against or affecting the Premises (collectively, the "Governmental Authorities"), and any outstanding work orders, noticed and outstanding on the Effective Date (each, an "Existing Violation"). Any violation that is noticed (i.e., issued by the applicable Governmental Authority) after the Effective Date and which will cost, as determined by Purchaser, in excess of $250,000 to cure is referred to herein as a "New Violation". The Existing Violations and the New Violations are referred to herein, collectively, as the "Violations". Purchaser and Seller agree that the following shall apply in respect of any Violation:

(a)      In respect of Existing Violations and other violations which do not meet the threshold of $250,000 for cure as set forth in this Section 4.3 above, Seller shall have no restoration, repair or other obligation or liability of any kind or nature with respect thereto.

(b)      In respect of New Violations:

(i)      Purchaser shall deliver notice to Seller ("Purchaser's New Violations Notice") on or before the earlier of one (1) day prior to the Closing Date or five (5) days after it becomes aware of the existence of any New Violation (it being acknowledged and agreed by Purchaser that Purchaser's failure to deliver Purchaser's New Violations Notice within such time period shall be deemed to be Purchaser's waiver of any rights under this Section 4.3(b)).

(ii)      Within five (5) Business Days after Seller receives Purchaser's New Violations Notice (and if the expiration of such five (5) Business Day period is after the Closing Date, then the Closing shall be adjourned to the date three (3) Business Days after the expiration of such five (5) Business Day period), Seller shall deliver notice to Purchaser ("Seller's New Violations Response Notice") stating either (x) that Seller agrees to cure such New Violation prior to the Closing or (y) that Seller does not elect to cure such New Violation. Seller's failure to deliver Seller's New Violations Response Notice within such five (5) Business Day period shall be deemed to be Seller's election under clause (y) at 5:00 p.m. (New York time) on the last day of such five (5) Business Day period.

(iii)      If, in Seller's New Violations Response Notice, Seller makes the election under clause (x) of Section 4.3(b)(ii) above, then Seller shall cause the applicable New Violation to be reasonably cured prior to the Closing. If Seller agrees to cure a New Violation as aforesaid and thereafter

5

CONFIDENTIAL

RFC045053

fails so to do within the above time period, then the Closing shall take place and Seller shall grant Purchaser a credit against the Purchase Price in the amount required to complete such cure (it being agreed that disputes regarding the amount of such credit shall be resolved in accordance with Section 42). If, in Seller's New Violations Response Notice, Seller makes the election under clause (y) of Section 4.3(b)(ii) above, then by the earlier of one (1) day prior to the Closing Date, or five (5) days after Purchaser receives Seller's New Violations Response Notice making such election, Purchaser shall deliver notice to Seller ("Purchaser's New Violations Response Notice") stating either (x) that Purchaser elects to accept title to the Premises subject to the applicable New Violation, in which event the Closing hereunder shall occur without any further obligation of Seller under this Section 4.3, or (y) that Purchaser elects to terminate this Agreement, in which event this Agreement shall terminate and no party hereto shall have any further rights or obligations under this Agreement, except for the Surviving Obligations, which shall survive such termination (and if Purchaser fails to deliver any such notice on or before the expiration of such five (5) days period, Purchaser shall be deemed to have elected to proceed under clause (x) above).

5.      Closing Date.

        The closing for the transactions under this Agreement (the "Closing") shall take place in escrow at 11:00 A.M. (New York time) at the offices of the Title Company, on the date that is 10 days following the later to occur of the date upon which (a) each of the Financing Conditions (as hereinafter defined) are satisfied and (b) such time periods following the Effective Date have elapsed as are necessary in order to for Purchaser and Seller to have complied with (x) any procedures related to any applicable right of first refusal in favor of Montgomery County, Maryland, the Housing Opportunities Commission of Montgomery County or any tenants' association now or hereafter formed at the Property and (y) without duplication of the matters described in clause (x), the terms of Section 41. The date upon which the Closing is to occur is referred to herein as the "Closing Date". Notwithstanding the foregoing, in the event that the Closing Date does not occur within 140 days after the Effective Date (such date, the "Outside Closing Date"), then either Purchaser or Seller may terminate this Agreement, by written notice to the other, and in such event, the Downpayment shall be returned to Purchaser, and upon such return, no party shall have any further obligation under this Agreement, except for the Surviving Obligations (as hereinafter defined), which shall survive such termination. The respective attorneys for the parties hereto are hereby authorized to agree (on behalf of their respective clients) in writing to adjournments and relocations of the Closing. Upon satisfaction of the conditions described in clauses (a) and (b) above, Purchaser shall deliver notice thereof to Seller. The parties acknowledge, for the avoidance of doubt, that notwithstanding the foregoing, it is the intent of the parties that the transactions contemplated by the Existing Loan Purchase Agreement close simultaneously with the transactions contemplated by this Agreement and accordingly, so long as the Closing is not scheduled after the Outside Closing Date, agree to schedule the date and location of the Closing so as to coincide with the closing under the Existing Loan Purchase Agreement.

6.      Apportionments.

        6.1.    The following are to be apportioned as of the Closing Date:

                (a)     All real and personal property taxes and other taxes and charges, including, without limitation, sewer taxes and rents, Washington Suburban Sanitary Commission front foot benefit charges, annual assessments shown on the real property tax bill for the Property, and common areas charges, imposed on the owner of the Property and not paid by others. Apportionments of real property taxes, water rates and charges and sewer taxes and rents shall be made on the basis of the fiscal year for which assessed. If the Closing Date shall occur before the real property tax rate is fixed, the apportionment of taxes shall be made on the basis of the tax rate for the preceding year applied to the

6

CONFIDENTIAL

RFC045054

latest assessed valuation. After the real property taxes, water rates and charges are finally fixed, Seller and Purchaser shall make a recalculation of the apportionment of same, and Seller or Purchaser, as the case may be, shall promptly make an appropriate payment to the other based on such recalculation.

        (b)     Utility charges payable by the owner of the Property.

        (c)     All rents and any other similar payment, with respect to any and all leases, subleases, licenses, and other occupancy agreements, if, as and when collected.

        (d)     Annual license, permit and inspection fees provided that same are transferable to Purchaser.

        (e)     Charges under the Assigned Contracts (as hereinafter defined).

        (f)     Deposits, if any, on account with utility companies servicing the Property (and Seller and Purchaser each agrees to cooperate to effectuate the transfer of any such deposits), provided that at Purchaser's option Seller will obtain a refund of any such utility deposits in effect and Purchaser shall provide its own utility deposits directly to the applicable utility companies. The parties acknowledge that as of the Effective Date, Seller has no deposits on account with any such utility companies.

        (g)     Such other items as are customarily prorated in transactions similar to the transaction contemplated by this Agreement.

    6.2.    <u>Documentation Regarding Rents and Expenses</u>. Periodically upon Purchaser's request following the Effective Date and on the Closing Date, Seller shall furnish Purchaser with a comprehensive and complete statement of prepaid rents and uncollected rents on the form provided by Seller's property manager.

    6.3.    <u>Assessments</u>. If on the Closing Date all or any portion of the Property shall be or shall have been affected by assessments, other than those to be apportioned pursuant to <u>Section 6.1(a)</u>, which are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then for purposes of this Agreement all of the unpaid installments of any such assessments, including those which are to become due and payable after the Closing Date, shall be deemed to be due and payable and to be liens upon the Property affected thereby and Seller shall pay and discharge such assessments on the Closing Date.

    6.4.    <u>Rents Paid After Closing</u>. To the extent that Purchaser receives any late rent or other similar payments under any Lease or other occupancy arrangements after the Closing Date, Purchaser shall render an accounting to Seller with respect to such late payments, and such rents or payments shall be applied in the following order of priority, to the extent such calendar months have not been paid: (i) first to any calendar month or months following the calendar month in which the Closing occurred until the Tenant under such Lease is current with respect to all rents payable after the Closing Date, (ii) then to the calendar month in which the Closing occurred, and (iii) then to calendar months prior to the month in which the Closing occurred.

    6.5.    <u>Books and Records Available</u>. To the extent within Seller's reasonable possession or control, Seller agrees to make available for Purchaser's examination, promptly after the Effective Date, and thereafter from time to time, all records, statements and accounts bearing on or

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045055

relating to (a) rents and revenues and the collection thereof, and (b) the operation of the Property and expenditures made in connection therewith.

6.6.   Security Deposits.  At Closing, Seller will transfer to Purchaser all accounts in which are held the security deposits under the Leases or other occupancy arrangements.

6.7.   Operating Expenses and Trade Accounts.  Subject to Purchaser's obligations set forth in Section 2.4, Seller shall be responsible for all operating expenses and trade accounts of the Property (including charges and fees under the Contracts) up to and including 11:59 P.M. on the night preceding the Closing Date (the "Cut-Off Time").   Seller agrees to indemnify and hold harmless Purchaser from and against any claim, loss, damage or liability (including, without limitation, reasonable attorneys' fees and costs of enforcement of the foregoing indemnification obligation) arising out of Seller's failure to pay such amounts.

6.8.   Reconciliation of Apportionments.  In the event the Closing occurs, either party shall have the right, during the 30-day period following the Closing to require that errors related to computations and calculations under this Section 6 be corrected and the parties agree that any errors not raised prior to the expiration of such 30 day period shall be deemed to be waived.

6.9.   The provisions of this Section 6 shall survive the Closing.

7.   Title Insurance and Survey.

7.1.   Purchaser acknowledges that prior to the Effective Date, Purchaser has obtained (x) a title commitment (the "Title Commitment") for the Property from the Title Company bearing an effective date of November 30, 2007, last updated January 10, 2008, and commitment number CTIC-07158 and (y) a pro forma title insurance policy having case number 07158 (the "Pro Forma").  The exceptions to title shown in the Pro Forma shall be hereinafter referred to as "Permitted Title Exceptions". Without limiting the terms of Sections 8.1, 10.1 and 13.1, Seller shall take all commercially reasonable actions necessary (other than the payment of Purchaser's title insurance premium) to cause the Title Company to issue to Purchaser at Closing a title insurance policy in respect of the Property, in an amount equal to $108,915,864.51.

7.2.   Purchaser acknowledges that prior to the Effective Date, Purchaser has obtained an ALTA survey (the "Survey"), prepared by Greenhorne & O'Mara, dated October 21, 2005, and last revised January 11, 2008.  The matters shown on the Survey shall be hereinafter referred to as "Permitted Survey Conditions".

7.3.   If any subsequent update of the Title Commitment, the Pro Forma or the Survey prior to the Closing Date discloses new exceptions, matters or conditions which are not acceptable to Purchaser in Purchaser's sole discretion, then Purchaser shall give Seller notice thereof.  Seller shall have the earlier of five (5) Business Days following the receipt of any such notice or the Closing Date in which to give Purchaser notice that Seller will either (a) cause such new exception, matter or condition to be deleted as an exception from the Title Commitment and Pro Forma or deleted from the Survey or otherwise cured in the manner requested by Purchaser or (b) refuse to cause such new exception, matter or condition to be deleted as an exception from the Title Commitment and Pro Forma or deleted from the Survey or otherwise cured in the manner requested by Purchaser, provided that Seller shall be required to cause such new exception, matter or condition to be deleted as an exception from the Title Commitment and Pro Forma or deleted from the Survey or otherwise cured in the manner requested by Purchaser to the extent required by Section 7.4 (and in the event Seller fails to deliver such notice within such five (5) Business Day (or earlier) period, Seller shall be deemed to have elected under clause (a)).  With respect to

8

N:\2009\1128\PSA\PSA v14ck.doc

any such notice, (i) if Seller gives (or is deemed to have given) notice that it will cause any or all of the new exceptions, matters or conditions referenced in such notice to be deleted from the Title Commitment and Pro Forma or deleted from the Survey or otherwise cured in the manner requested by Purchaser, then Seller shall cause the Title Company to delete all such new exceptions, matters or conditions from the Title Commitment and Pro Forma or deleted from the Survey or otherwise cured in the manner requested by Purchaser, and (ii) if Seller gives notice that it will not cause any or all of the new exceptions, matters or conditions to be deleted from the Title Commitment and Pro Forma or deleted from the Survey or otherwise cured in the manner requested by Purchaser, then Purchaser will thereafter have the right, as its sole remedy, to either (x) terminate this Agreement as a result of any such new exceptions, matters or conditions (in which event the Downpayment shall be returned to Purchaser, and upon such return no party shall have any further obligation under this Agreement, except for the Surviving Obligations, which shall survive such termination) or (y) waive the right to terminate this Agreement on account of such new exceptions, matters or conditions and proceed to Closing without abatement of the Purchase Price (in which event, for purposes hereof, any such waived new exceptions, matters or conditions previously objected to by Purchaser shall become "<u>Permitted Title Exceptions</u>" or "<u>Permitted Survey Conditions</u>", as applicable).  Notwithstanding the foregoing, in the event any such update of the Title Commitment or Survey is obtained on or after the date five (5) Business Days prior to the Closing Date, Purchaser shall have the right, at its option, on or prior to the Closing Date, to extend the Closing Date to the third (3rd) Business Day after such original Closing Date (even if such date is beyond the Outside Closing Date). Seller acknowledges that Purchaser shall have the right to elect under either of the foregoing <u>clauses (x)</u> or <u>(y)</u> in its sole and absolute discretion.

7.4.    Notwithstanding the foregoing, if at the Closing there shall be any liens, encumbrances or charges affecting the Property, other than those which Purchaser is required by the terms hereof to accept or which Purchaser chooses to accept, Seller shall have no obligation to cure same, provided, that Seller shall be obligated to (a) cause any mortgage, deed of trust or other encumbrance evidencing outstanding indebtedness (other than the Existing Loan Documents (as hereinafter defined)) to be satisfied of record (or, at Purchaser's option and without making of any payment by Seller, assigned to Purchaser's lender), (b) cause any judgments, mechanic's, materialman's or supplier's liens to be satisfied of record (to the extent that the aggregate amount of such mechanics' liens exceeds the Maximum Trade Payables Exposure, with respect to all Outstanding Trade Payables, or to the extent that the amount of any individual mechanic's lien exceeds the Maximum Line Item Amount, with respect to such individual Outstanding Trade Payable), (c) cause to be removed of record any lien or encumbrance placed upon the Property subsequent to the Effective Date with Seller's consent or as a result of Seller's action or omission, and (d) cause to be removed of record any lien or encumbrance placed upon the Property subsequent to the Effective Date without Seller's consent and not as a result of Seller's action or omission (other than with respect to the matters described on Exhibit T, and only to the extent in an amount (x) less than the Maximum Line Item Amount, with respect to any individual Outstanding Trade Payable or (y) less than the Maximum Trade Payables Exposure, with respect to all Outstanding Trade Payables), provided, however, the total amount required to be expended by Seller in respect of this <u>Section 7.4(d)</u> shall not exceed $50,000.

8.    <u>Closing Deliveries</u>.

8.1.    At the Closing, Seller, at its sole cost and expense, shall deliver to Purchaser the following items and documents (which documents shall be in form and substance reasonably satisfactory to Purchaser's attorneys):

(a)    a Special Warranty Deed in the form attached hereto as <u>Exhibit F</u> (the "<u>Deed</u>"), duly executed by Seller and acknowledged on behalf of Seller;

N:\2009\1128\PSA\PSA.v14ck.doc

CONFIDENTIAL

RFC045057

(b)     a Bill of Sale in the form attached hereto as Exhibit G (the "Bill of Sale") conveying, transferring and selling to Purchaser all right, title and interest of Seller in and to all of the Personal Property, executed by Seller;

(c)     an Assignment and Assumption of Leases, in the form attached hereto as Exhibit H (the "Assignment and Assumption of Leases"), executed by Seller;

(d)     a signed notice to each Tenant advising it of the within sale and directing it to pay rent to Purchaser or, at Purchaser's option, to Purchaser's designee in the form attached hereto as Exhibit I (the "Tenant Notification Letters"), executed by Seller;

(e)     subject to the terms of Section 2.4, evidence of the termination of each Contract which Purchaser notifies Seller it does not desire to assume (any such Contract being referred to as a "Terminated Contract" and all other Contracts being referred to as the "Assigned Contracts");

(f)     to the extent within Seller's possession or control, all (i) original licenses and permits pertaining to the Property and which may be required for the use or occupancy thereof (the "Licenses and Permits"), (ii) required permanent certificates of occupancy for the Improvements relating to such Property ("Certificates of Occupancy"), to the extent existing, and (iii) records and other documents pertaining to the ownership, operation and maintenance of the Property (the "Property Documents");

(g)     to the extent within Seller's possession or control, all assignable guaranties and warranties which Seller has received in connection with any work or services performed, or to be performed with respect to, or equipment installed in the Property, and Seller shall cooperate with Purchaser at Purchaser's expense in enforcing any such guaranties and warranties not assignable, which obligation shall survive the Closing (the "Guaranties and Warranties");

(h)     an Assignment and Assumption of the Assigned Contracts, Licenses and Permits, Certificates of Occupancy, Property Documents and Guaranties and Warranties in the form attached hereto as Exhibit J (the "Assignment and Assumption of Contracts"), executed by Seller;

(i)     an Assignment and Assumption of Intangible Property, in the form attached hereto as Exhibit U (the "Assignment and Assumption of Intangible Property"), executed by Seller;

(j)     a signed notice to each contract party (other than Seller), or service or materials provider or supplier under the Assigned Contracts advising it of the within sale and directing it to address all correspondence and bills to Purchaser or, at Purchaser's option, to Purchaser's designee in the form attached hereto as Exhibit K (the "Assigned Contract Notification Letters"), executed by Seller;

(k)     an executed Affidavit of Non-Foreign Status, in the form attached hereto as Exhibit L, executed by Seller, certifying that Seller is not a "foreign person" pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder;

(l)     an executed IRS Form 1099;

(m)     copies of such organizational documents and consents of Seller and its managing member, including, without limitation, good standing certificates, as Purchaser or the Title Company shall reasonably require;

10

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045058

(n)    to the extent within Seller's possession or control, all keys to entrance doors to, and equipment and utility rooms located in, the Property, which keys shall be properly tagged for identification;

(o)    any and all documents, affidavits and/or instruments required to be filed by Seller in connection with the imposition and/or payment of any and all applicable federal, state, county, municipal or other transfer taxes with respect to the transactions set forth herein (collectively, "Transfer Tax Documentation"), in proper form for submission, prepared, executed and acknowledged by Seller;

(p)    such reasonable and customary affidavits, indemnities and other deliveries as are required by the Title Insurance Company to deliver so-called "extended coverage", executed by Seller (or such other persons as may be required by the Title Company), it being agreed that the affidavit attached as Exhibit O is deemed reasonable and customary;

(q)    to the extent within Seller's possession or control, all books, records, property maintenance and other files (on computer disc, if available) maintained by Seller, or by Seller's agents, with respect to the Property;

(r)    to the extent within Seller's possession or control, any and all plans and specifications pertaining to the Property;

(s)    all deliveries required to be made pursuant to the provisions of Section 6.6 of this Agreement;

(t)    a certification updating the representations and warranties given by Seller pursuant to Section 9.1 hereof, executed by Seller;

(u)    to the extent within Seller's possession or control, the lessor's original executed counterparts of all Leases and Assigned Contracts, together with all lease files maintained in connection therewith and all books, records, property maintenance and other files (on computer disc, if available) maintained by Seller, or by Seller's agents, with respect to the Property, including, without limitation, originals of all amendments and modifications of the Leases and original counterparts of all guarantees thereunder, and copies of all correspondence and other contents of Seller's Lease files for all Tenants;

(v)    evidence of termination of any and all leases, or other occupancy, operational, or other arrangements in effect between Seller and any affiliate of or party related to Seller;

(w)    the Seller Estoppel Certificate (as hereinafter defined);

(x)    such other documents as may be reasonably required to effectuate the transactions contemplated by this Agreement, the transactions contemplated by the Existing Loan Purchase Agreement (it being agreed that documents required to be executed and delivered by Seller, Existing Loan Borrower, CBF or their respective affiliates in accordance with the terms of the Existing Loan Purchase Agreement (as it exists on the Effective Date) shall be deemed reasonably required), and/or to effectuate the closing of the transaction contemplated hereunder (including, without limitation, the documentation described in Section 13.1); and

11

CONFIDENTIAL

RFC045059

(y) if requested by Purchaser, an assignment of Seller's right to pursue to conclusion the condominium conversion process triggered by filing of the Public Offering Statement, in the form attached hereto as Exhibit N (the "Assignment of Rights Under Public Offering Statement").

8.2. At the Closing, Purchaser, at its sole cost and expense, shall deliver to Seller the following, each document hereafter mentioned to be in form and substance reasonably satisfactory to Seller's attorneys:

(a) the balance of the Purchase Price;

(b) the Assignment and Assumption of Leases, executed by Purchaser;

(c) the Assignment and Assumption of Contracts, executed by Purchaser;

(d) the Assignment and Assumption of Intangible Property, executed by Purchaser;

(e) a certification updating the representations and warranties given by Purchaser pursuant to Section 9.2 of this Agreement, executed by Purchaser;

(f) the Tenant Notification Letters, executed by Purchaser;

(g) the Assumed Contract Notification Letters, executed by Purchaser;

(h) the Transfer Tax Documentation, if applicable, executed by Purchaser (if required by law);

(i) such other documents as may be reasonably required to effectuate the transaction contemplated by the Agreement and/or to effectuate the closing of the transaction contemplated hereunder; and

(j) the Assumption and Release Agreement, executed by Purchaser and the Existing Loan Purchaser.

9. Representations and Warranties.

9.1. Representations and Warranties of Seller. Seller represents and warrants to Purchaser that:

(a) Leases, Rents, Tenant Matters, etc. To Seller's knowledge: (i) All of the Tenants are listed on the Rent Roll, which includes a description of the space leased to each Tenant, the Lease expiration dates, the security and other deposits, any prepaid rents, the rental (whether fixed, minimum, escalation, percentage or additional) for leased space, and a complete index of all Leases and all amendments thereto. The data set forth on the Rent Roll is true and correct. All Tenants are in possession of the premises leased by them unless otherwise noted on the Rent Roll. Each of the Leases is valid and enforceable in accordance with its terms, is in full force and effect, and neither the lessor under the Leases nor any of the Tenants is in default of any of its obligations under any of the Leases. No notice of any default of the lessor under the Leases has been given or, to the best of Seller's knowledge, is pending.

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045060

(ii)     To the extent within Seller's possession or control, Seller has made available a true, correct and complete copy of each Lease (including, without limitation, any and all modifications, extensions and amendments thereto) to Purchaser.

(iii)     Except pursuant to the Existing Loan, Seller has not assigned, mortgaged, pledged, hypothecated or otherwise encumbered any of Seller's rights or interests under any of the Leases.

(b)     No Litigation.   To Seller's knowledge, except as set forth on Exhibit W, there is no action or proceeding or governmental investigation pending, or threatened in writing, against or relating to (A) the Property, (B) this transaction or (C) Seller.

(c)     Authorization of Agreement, etc.; Prior Business Name.   Seller (a) is a limited liability company duly organized, validly existing and in good standing in the State of Maryland, and (b) is entitled to own its property and to carry on its business in the State of Maryland. The execution and performance of this Agreement have been duly authorized by all necessary corporate and/or limited liability company action, and the execution and performance of this Agreement will not violate any term of Seller's certificate of formation, operating agreement, or any other agreement, judicial decree, statute or regulation to which Seller is a party or by which Seller or the Property may be bound or affected. Seller has not been registered under, been known by, or conducted business under any name other than the name of Seller as same appears in the preamble to this Agreement.

(d)     No Foreign Status.   Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

(e)     No Options to Purchase.   To Seller's knowledge, Seller has not granted to any person or entity any option or other right to purchase to the Property and no person or entity has any option or other right to purchase the Property, other than the ROFR Parties, in accordance with the rights described in Section 41.

(f)     Consents and Approvals.   Other than as set forth in Section 41, there are no consents or approvals of any third persons, or any federal, state or local governmental authorities, including, without limitation, any internal board of directors or other approval process, that are required in connection with the performance by Seller of its obligations under this Agreement, other than such of the foregoing as have been obtained or will be obtained by the Closing Date.

(g)     Environmental Reports.   To Seller's knowledge, Exhibit P attached hereto and made a part hereof sets forth all environmental reports (the "Environmental Reports") obtained by or in the possession or control of Seller with respect to the Property, and Seller has delivered a true, correct and complete copy of each Environmental Report to Purchaser on or prior to the Effective Date.

(h)     ERISA.   The Property is not a "plan asset" as defined in the Employment Retirement Income Security Act of 1974, as amended ("ERISA") and the sale of the Property by Seller is not a "prohibited transaction" under ERISA.

(i)     Financial Obligations.   Neither Seller nor Existing Loan Borrower has (i) made a general assignment for the benefit of its creditors; (ii) admitted in writing its inability to pay its debts as they mature; (iii) other than as expressly set forth on Exhibit T, had an attachment, execution or other judicial seizure of any property interest which remains in effect; or (iv) other than with respect to its obligations under the Existing Loan, become generally unable to meet its financial obligations as they mature.

13

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045061

(j)    <u>Bankruptcy Matters</u>. There is not pending any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or recomposition of Seller or Existing Loan Borrower, or the debts of Seller or Existing Loan Borrower, under any law relating to bankruptcy, insolvency, reorganization or the relief of debtors, or seeking the appointment of a receiver, trustee, custodian or other similar official for Seller or the Property.

9.2.    <u>Representations and Warranties of Purchaser</u>. Purchaser represents and warrants to Seller that (a) Purchaser is a corporation duly formed, validly existing and in good standing in the State of Delaware, entitled to own its property and to carry on its business in the State of Delaware, (b) Purchaser has duly authorized the execution and performance of this Agreement, and (c) the execution and performance of this Agreement will not violate any term of Purchaser's certificate of incorporation or bylaws, or any other agreement, judicial decree, statute or regulation to which Purchaser is a party or by which Purchaser may be bound or affected.

9.3.    <u>Materiality</u>. Seller acknowledges that each of the representations, warranties and agreements made by it in <u>Section 9.1</u> above and elsewhere in this Agreement is material to Purchaser. Purchaser acknowledges that each of the representations, warranties and agreements made by it in <u>Section 9.2</u> above and elsewhere in this Agreement is material to Seller.

9.4.    <u>Survival</u> All of the representations and warranties of Seller set forth herein and elsewhere in this Agreement shall be true upon the execution of this Agreement, shall be deemed to be repeated at and as of the Closing Date (it being understood that Seller may, prior to Closing, update its representations set forth in (i) <u>Section 9.1(a)</u>, to reflect (a) defaults under any of the Leases due to matters not within Seller's control, and (b) new Leases executed in accordance with <u>Section 10.1(b)</u>, and (ii) <u>Section 9.1(b)</u>, to reflect new litigations first arising after the Effective Date, which would not adversely affect either (x) the transactions contemplated by this Agreement, (y) Purchaser's title to the Property, or (z) Purchaser or any of its affiliates, except, in each case, to the extent fully covered by insurance) and shall survive the Closing for a period of time ending on December 31, 2008. All of the representations and warranties of Purchaser set forth herein and elsewhere in this Agreement shall be true upon the execution of this Agreement, shall be deemed to be repeated at and as of the Closing Date and shall survive the Closing for a period of time ending on December 31, 2008.

9.5.    <u>Accuracy of Representations is a Condition to Purchaser's Obligation to Close</u>. Without limiting any of the rights of Purchaser elsewhere provided for in this Agreement, it is agreed that the obligation of Purchaser to close title under this Agreement is conditioned upon the accuracy in all material respects of all of Seller's warranties and representations and the due compliance by Seller of all of its agreements set forth herein and elsewhere in this Agreement. If, on or before the Closing Date, Purchaser determines that any of Seller's representations or warranties are untrue or Seller has not complied with any of the said agreements, then, in addition to any other legal remedies available to Purchaser, Purchaser shall have the right to either (a) exercise its rights granted to it in <u>Section 14.2</u> or (b) to proceed to consummate the Closing hereunder and receive an abatement of the Purchase Price in an amount equal to the diminution of value of the Property caused by such untrue representation or warranty. For purposes of this Agreement, the terms "Seller's knowledge", "Seller's best knowledge" and other statements of similar import shall mean (i) the actual knowledge of Mary Alice Haft, after having made reasonable inquiry, to the extent such statement is made regarding the Property, and (ii) the actual knowledge of both Seller and Mary Alice Haft, in each case, after having made reasonable inquiry, to the extent such statement is made regarding matters other than the Property.

9.6.    <u>Accuracy of Representations is a Condition to Seller's Obligation to Close</u>. Without limiting any of the rights of Seller elsewhere provided for in this Agreement, it is agreed that the

14

N:\2009\1128\PSA\PSA.v14ck.doc

CONFIDENTIAL

RFC045062

obligation of Seller to close title under this Agreement is conditioned upon the accuracy in all material respects of all of Purchaser's warranties and representations and the due compliance by Purchaser of all of its agreements set forth herein and elsewhere in this Agreement. If, on or before the Closing Date, Seller determines that any of Purchaser's representations or warranties are untrue or Purchaser has not complied with any of the said agreements, then Seller shall be entitled to terminate this Agreement by notice given to Purchaser, whereupon the provisions of Section 14.1 hereof shall apply.

    10.    <u>Seller's and Purchaser's Covenants.</u>

        10.1.    Seller covenants that, between the Effective Date and the Closing Date:

        (a)    <u>Performance Under Leases.</u> Seller shall perform all of Seller's obligations as landlord under the Leases and will enforce all of the obligations of the Tenants under the Leases.

        (b)    <u>No Modification to Leases; Leasing Guidelines.</u> Subject to any applicable law, Seller shall not modify, cancel, extend, renew or otherwise change in any manner any of the terms, covenants or conditions of any of the Leases or enter into any new leases of space in the Property or any other occupancy agreements affecting the Property, or grant any consent to any matter requiring the consent of Seller under any Lease, each without the prior written consent of Purchaser. Notwithstanding the foregoing, Seller may enter into new leases of residential apartment units at the Property, so long as such leases are (i) entered into in compliance with applicable law (including, without limitation, all applicable Montgomery County rules and regulations), (ii) are for a term of no more than 1 year, (iii) require market rate rental payments, (iv) do not have non-market concessions (it being agreed that Seller will use commercially reasonable efforts to only enter into leases which are on month to month terms), and (v) are written on a form of lease reasonably approved by Purchaser, and to the extent permitted by law, containing such waivers (by such tenants) of their respective rights to purchase condominium units at the Property, as shall be reasonably acceptable to Purchaser.

        (c)    <u>No Modification to Contracts.</u> Seller shall not modify, cancel, extend, renew or otherwise change in any manner any of the terms, covenants or conditions of any of the Contracts affecting the Property or enter into any new agreement affecting the Property, or grant any consent to any matter requiring the consent of Seller under any Contract, each without the prior written consent of Purchaser, provided that subject to the terms of clause (q) Seller shall be permitted to terminate (and shall terminate at Seller's sole cost and expense) all of the Contracts other than the Assigned Contracts. Seller shall provide Purchaser with evidence of termination of any Contracts Purchaser has elected not to assume at Closing. Notwithstanding the foregoing, Seller shall not terminate any Contract prior to Closing, if doing so would, in Purchaser's sole discretion, adversely affect any ongoing Trade Negotiations or any Trade Agreement (as such terms are hereinafter defined).

        (d)    <u>No Employment Contracts.</u> Seller will not enter into any employment contract, service contract or any other agreement in respect of the Property without the prior written consent of Purchaser.

        (e)    <u>Reserved.</u>

        (f)    <u>Operation of Property.</u> Seller will maintain and operate the Property substantially in the same manner as same has been maintained and operated prior to the Effective Date, and will make such repairs and replacements as may be necessary to continue such standard of operation and maintenance through Closing, ordinary wear and tear and casualty damage excepted (it being agreed that the foregoing shall not obligate Seller to perform capital expenditures or perform repairs to the

15

CONFIDENTIAL

RFC045063

Property, so long as Seller continues to perform such maintenance and repairs to the Property as are sufficient to address life safety issues and ordinary course Property operations). From and after the Effective Date, through Closing, Seller shall grant Purchaser and/or Purchaser's designees (i) reasonable access to the Property, subject, in each case, to the qualifications and conditions established in Section 19, and (ii) the right (but not the obligation) to consult with and advise Seller on the construction, maintenance and operation thereof.

(g)     Maintain Insurance.  Seller shall keep the Property insured in accordance with Seller's existing insurance program.

(h)     Make Records Available.  To the extent within Seller's possession and control, Seller shall make available to Purchaser all records, statements and accounts bearing on or relating to the Property, including, without limitation, the operation thereof.

(i)     Cooperation with Purchaser's Due Diligence.  Without limiting the terms of clause (f), Seller shall cooperate with Purchaser in connection with Purchaser's due diligence, such cooperation to include such due diligence conducted by Purchaser pursuant to the terms of this Agreement, including, without limitation, the terms of Section 19 hereof.

(j)     No Marketing of Property; No Encumbrances; No Zoning Changes.  (i) Seller shall terminate all negotiations with any other parties concerning the sale of the Property, any interest therein or any interest in Seller, and shall deal exclusively with Purchaser with respect thereto, (ii) Seller shall not show or otherwise offer for sale the Property, or, subject to clause (b), any interest therein or any interest in Seller, (iii) Seller shall not commit, agree to, or acquiesce in, any act which could, in any way, affect or impair Purchaser's intended use and occupancy of the Property, including, but not limited to, but subject to clause (b), leasing space or contracting for service or property improvements or encumbering the Property or any interest therein, (iv) Seller will not take any action which would encumber or affect the marketability of title to the Property or any interest therein, including, without limitation, leasing space or contracting for services or property improvements (other than as provided in clause (b)) and (v) Seller shall not initiate, consent to, approve or otherwise take any action with respect to the zoning, or any other governmental rule or regulation, currently applicable to all or any part of the Property.

(k)     Reserved.

(l)     The Existing Loan.  Except as expressly set forth in its acknowledgment to the Existing Loan Purchase Agreement, Seller shall not (and shall not permit its affiliates to) take any action with respect to the Existing Loan which would result in the termination of the Existing Lender's forbearance from enforcing its remedies set forth in the Existing Loan Purchase Agreement, provided, however, that nothing herein provided shall be deemed to require Seller to make any payments or accommodations to the Existing Lender, other than any as may be expressly set forth in the Existing Loan Purchase Agreement on the Effective Date.  Seller shall deliver to Purchaser notice of any receipt or delivery of any notice thereunder (including, without limitation, any notice of default thereunder).  Seller shall not modify, amend, renew, extend or otherwise alter the Existing Loan, the Existing Loan Documents or any other documents or instruments relating to the Existing Loan.

(m)     Violation Notices.  Seller shall immediately provide Purchaser with a copy of any Violation issued by any Governmental Authorities having jurisdiction over or affecting the business of Seller or the Property and received by Seller.

16

CONFIDENTIAL

RFC045064

(n)    Financial Statements.  From time to time as reasonably requested by Purchaser, Seller shall deliver to Purchaser updated balance sheets, income statements and other financial statements with respect to the Property, to the extent prepared by Seller's property manager in the ordinary course.

(o)    Personal Property.  Without Purchaser's prior written consent, which consent may be granted or withheld in Purchaser's sole and absolute discretion, Seller shall not remove from the Real Estate any article of Personal Property, except as may be necessary for repairs, or the discarding of worn out or useless items by (and at the expense of) Seller pursuant to the terms of this Agreement.

(p)    Bankruptcy.  So long as (x) Purchaser is not in default of this Agreement beyond any applicable notice or cure period and (y) this Agreement otherwise remains in full force and effect then Seller shall not permit Existing Borrower to file a voluntary bankruptcy, or take any similar local law action, challenge (or permit the challenge by anyone under its direction or control) any foreclosure instituted by Purchaser or its affiliates, or otherwise collude in or cooperate with an involuntary bankruptcy (collectively, a "Bankruptcy Event"), in each case, from and after the Effective Date, and continuing for a period of ninety one (91) days after the Closing.  In the event that an involuntary bankruptcy (or similar proceeding or action) is filed against or with respect to Seller or Existing Loan Borrower, then Seller and Existing Loan Borrower shall take all commercially reasonable actions required to contest, oppose and seek dismissal of such involuntary bankruptcy (or similar proceeding or action); provided, however, that Seller shall not be under any obligation to contest, oppose, or seek dismissal of any involuntary bankruptcy proceeding or other similar action in which neither Seller nor its affiliates has colluded or cooperated, although Seller and Existing Loan Borrower shall reasonably cooperate with Purchaser in seeking a dismissal of any such involuntary bankruptcy proceeding or similar action.  This Section 10.1(p) shall survive the Closing.

(q)    Outstanding Trade Payables.  From and after the Effective Date, Seller will reasonably cooperate with and assist Purchaser and its affiliates in negotiations with the creditors under and other parties in interest with respect to the Outstanding Trade Payables (such parties, the "Trade Creditors").  Without limiting the foregoing, Seller hereby acknowledges, consents to and approves Purchaser and its agents, from and after the Effective Date, (i) contacting and holding meetings, discussions and other negotiations from time to time ("Trade Negotiations") with one or more of the Trade Creditors and (ii) entering into such agreements, arrangements, settlements or other transactions (each, a "Trade Agreement") as Purchaser or its representatives may determine, but subject to reasonable review and approval of Seller and upon the express conditions that (A) Seller shall have the right to attend, in person or by conference call (in its sole discretion) any such Trade Negotiations and (B) any such Trade Agreement is not made binding upon, or creates obligations or liability on, Seller or its affiliates, without Seller's consent.  In connection therewith, Purchaser (I) shall diligently pursue resolution of the Outstanding Trade Payables and (II) shall not settle or compromise any Outstanding Trade Payable for less than the face amount thereof, unless in connection with such settlement or compromise, Seller, the Existing Loan Borrower and CBRE Realty Finance TRS, LLC ("CBF") shall be released by the applicable Trade Creditor from any liability in respect of such Outstanding Trade Payable.  Seller hereby (1) acknowledges that prior to the Effective Date, Purchaser has engaged in Trade Negotiations and entered into Trade Agreements with certain of the Trade Creditors and (2) confirms that Seller has heretofore approved all of such Trade Negotiations and Trade Agreements (per the list of approved Trade Agreements and copies thereof, attached hereto as Exhibit S).  This Section 10.1(q) shall survive the Closing.

(r)    The 2005 Certificate of Compliance.  Seller acknowledges and agrees that at any time after the Effective Date, Purchaser may cause to be recorded in the land records of

17

CONFIDENTIAL

Montgomery County, Maryland, that certain Certificate of Compliance, dated August 16, 2005, made by Montgomery County, Maryland, a copy of which is attached hereto as <u>Exhibit R</u>.

11.   <u>Broker</u>.

Purchaser represents and warrants that Purchaser has not dealt with any broker, agent, finder or similar party in connection with the transaction contemplated hereby and Purchaser hereby indemnifies and holds harmless Seller and Seller's affiliates, members, managers, partners, shareholders, officers, directors and agents from any liability, cost or expense (including, without limitation, reasonable attorneys' fees and costs of enforcement of the foregoing indemnity) arising out of the falsity of the foregoing representation. Seller represents and warrants that Seller has not dealt with any broker, agent, finder or similar party in connection with the transaction contemplated hereby. Seller hereby indemnifies and holds harmless Purchaser and Purchaser's affiliates, members, managers, partners, shareholders, officers, directors and agents from any liability, cost or expense (including, without limitation, reasonable attorneys' fees and costs of enforcement of the foregoing indemnity) arising out of the falsity of the foregoing representation. Seller shall pay any brokerage commission due in connection with the transactions contemplated by this Agreement to the extent that a broker makes a claim for compensation as a result of its dealings with Seller, and Purchaser shall pay any brokerage commission due in connection with the transactions contemplated by this Agreement to the extent that a broker makes a claim for compensation as a result of its dealings with Purchaser. The provisions of this <u>Section 11</u> shall survive the Closing or any earlier termination of this Agreement.

12.   <u>Condemnation and Destruction</u>.

12.1.   <u>Takings</u>. If, prior to the Closing Date, a Non-Material Taking (as hereinafter defined) occurs, then (a) Seller shall notify Purchaser of such fact, (b) Purchaser shall not have any right or option to terminate this Agreement and this Agreement shall continue in effect, (c) at the Closing, Purchaser shall accept the Property subject to such Non-Material Taking or so much of the Property as remains after such Non-Material Taking, as the case may be, with no abatement of the Purchase Price, and (d) at the Closing, Seller shall assign and turn over to Purchaser, and Purchaser shall be entitled to receive and keep, all of Seller's interest in and to all awards for such Non-Material Taking (and Seller shall execute and deliver to Purchaser any and all instruments or documentation required by Purchaser to effectuate such assignment). If, prior to the Closing Date, a Material Taking (as hereinafter defined) occurs, then (i) Seller shall notify Purchaser of such fact and (ii) Purchaser shall have the right to terminate this Agreement by delivering notice of such termination to Seller within ten (10) days after it receives such notice from Seller. In the event that Purchaser fails to exercise such termination right due to such Material Taking within such ten (10) day period, Purchaser shall be deemed to have waived such termination right, in which event the provisions of the first sentence of this <u>Section 12.1</u> shall apply to such Material Taking. In the event that Purchaser delivers a notice of termination within such ten (10) day period, Escrow Agent shall refund the Downpayment to Purchaser, whereupon this Agreement shall terminate and neither party shall have any further rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination.

12.2.   <u>Casualties</u>. If, prior to the Closing Date a Non-Material Casualty (as hereinafter defined) occurs, then (a) Seller shall notify Purchaser of such fact, (b) Purchaser shall not have any right or option to terminate this Agreement and this Agreement shall continue in effect, (c) at the Closing Purchaser shall accept the Premises subject to such Non-Material Casualty, with no abatement of the Purchase Price, and (d) at the Closing, Seller shall assign and turn over to Purchaser, and Purchaser shall be entitled to receive and keep, all of Seller's interest in and to all insurance proceeds payable in connection with such Casualty, and Purchaser shall receive a credit against the Purchase Price at the Closing in the amount of any loss deductible payable in connection with such insurance proceeds (and

18

CONFIDENTIAL

RFC045066

Seller shall execute and deliver to Purchaser any and all instruments or documentation required by Purchaser to effectuate such assignment). If, prior to the Closing Date, a Material Casualty (as hereinafter defined) occurs, then (i) Seller shall notify Purchaser of such fact and (ii) Purchaser shall have the right, within ten (10) days after it receives such notice from Seller to terminate this Agreement by delivering notice of such termination to Seller. In the event that Purchaser fails to exercise such termination right within such ten (10) day period, Purchaser shall be deemed to have waived such termination right, in which event the provisions of the first sentence of this Section 12.2 shall apply to such Material Casualty. In the event that Purchaser delivers a notice of termination within such ten (10) day period, Escrow Agent shall refund the Downpayment to Purchaser, whereupon this Agreement shall terminate and no party shall have any further rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination.

12.3.   Certain Definitions.   As used herein, the following terms shall have the following meanings:

"Casualty" means the destruction of all or a portion of the Improvements by fire or other casualty.

"Material Casualty" means a Casualty that, in Purchaser's reasonable judgment, would cost more than $500,000 to repair.

"Material Taking" means a Taking (a) affecting more than two percent (2%) percent of the Land or affecting any portion of the Improvements, (b) affecting the parking areas or driveways thereon, or (c) affecting any means of ingress thereto or egress therefrom.

"Non-Material Casualty" means any Casualty, other than a Material Casualty.

"Non-Material Taking" means any Taking, other than a Material Taking.

"Taking" means any taking of any portion of the Land or the Improvements by condemnation or eminent domain.

13.   Conditions Precedent.

13.1.   Conditions to Obligations of Purchaser.   The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions precedent, as determined by Purchaser:

(a)   Seller shall have performed or otherwise complied with all of its obligations under this Agreement;

(b)   the representations and warranties of Seller contained in this Agreement shall be true, correct and accurate on the Closing Date in all material respects, as if first made on the Closing Date;

(c)   Seller shall have delivered all documents and instruments required to be delivered by Seller pursuant to the provisions of this Agreement;

(d)   Purchaser shall have received the Title Commitment and the Pro Forma (appropriately executed) from the Title Company in compliance with the requirements of Section 7

19

CONFIDENTIAL

RFC045067

hereof, which shall (i) show no exceptions other than the Permitted Title Exceptions and (ii) contain such endorsements or affirmative coverages as are requested by Purchaser;

(e)     Purchaser shall have received the Survey in compliance with the requirements of Section 7 hereof, which shall (i) show no exceptions other than the Permitted Survey Conditions and (ii) contain such certifications as are requested by Purchaser;

(f)     Seller shall have obtained fully-executed and effective releases from all contract purchasers of condominium units at the Property, terminating their respective purchase contracts and otherwise waiving any rights with respect thereto (including, without limitation, rights to purchase such units) (Purchaser hereby acknowledges receipt of fully-executed and effective releases from all contract purchasers of condominium units at the Property other than the contracts relating to Unit 327 and Unit 502 (the "Outstanding Unit Purchase Contracts"));

(g)     Purchaser shall have received the Seller Estoppel Certificate, as required by Section 43 of this Agreement, with the Seller Estoppel Certificate down-dated to the Closing Date;

(h)     Purchaser shall have confirmed that no person has any written or oral right to remain in possession of any portion of the Property after the Closing Date other than Tenants under Leases identified on the Rent Roll;

(i)     the Financing Conditions shall have been satisfied;

(j)     each of the conditions set forth in Section 41 shall have been satisfied;

(k)     Purchaser shall have received from Seller the following documentation, in each case, in form acceptable to Purchaser:

(i)     a new Certificate of Compliance in accordance with Chapters 11A/53A of the Montgomery County Code (the "County Code"), in connection with the transactions contemplated by this Agreement as more fully described in Section 41, which Certificate of Compliance shall not be based upon a rental agreement; and

(ii)     the Assignment of Rights Under Public Offering Statement;

(l)     no litigation, investigation, contest or other proceeding (including, without limitation, foreclosure proceedings in respect of the Existing Loan) shall have been commenced or imminent which, in any case, could restrain, delay, enjoin or otherwise prohibit or make illegal the consummation of any of the transactions contemplated by this Agreement; and

(m)     Purchaser shall have received an original title policy of title insurance with respect to the Property, in form and with endorsements reasonably acceptable to Purchaser, and otherwise identical to the Pro Forma and showing only the Permitted Title Exceptions and the Permitted Survey Conditions.

If any of the foregoing conditions are not satisfied on the Closing Date, Purchaser shall have the right (in addition to any right Purchaser may have under Section 14 in the event that the non-satisfaction of a condition is as a result of a breach or default by Seller), to (x) terminate this Agreement by notice given to Seller, whereupon the entire Downpayment shall be refunded to Purchaser and upon such refund, no party hereto shall have any rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination, or (y) at Purchaser's sole option, to waive any unsatisfied condition and

20

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045068

consummate the transactions contemplated hereby. Notwithstanding the foregoing, if the condition described in Section 13.1(f) is not satisfied on the Closing Date, Purchaser's sole options shall be to either (A) waive the condition and consummate the transactions contemplated hereby, or (B) to accept the agreement of the Seller Indemnitors, which agreement is set forth in this clause (B), to indemnify, defend and hold Purchaser and its affiliates harmless from and against any and all loss, cost and expense (including, without limitation, attorneys' fees and disbursements) arising out of Seller's failure to satisfy such condition (including, without limitation, any claims made by the prospective purchasers of Units 327 and 502 at the Property), which indemnity shall survive the Closing.

13.2.    Conditions to Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions precedent:

(a)    Purchaser shall have performed or observed all of its obligations under this Agreement;

(b)    Purchaser shall have delivered all documents and instruments required to be delivered by Purchaser pursuant to the provisions of this Agreement;

(c)    Purchaser shall have paid to Seller the full Purchase Price, subject to proration and adjustment in accordance with the provisions hereof; and

(d)    Existing Lender shall have executed and delivered to Seller the release and indemnity agreement attached to the Existing Loan Purchase Agreement as Exhibit 5 thereto.

If any of the foregoing conditions are not satisfied on the Closing Date, Seller shall have the right (in addition to any right Seller may have under Section 14 in the event that the non-satisfaction of a condition is as a result of a breach or default by Purchaser) to (x) terminate this Agreement by notice given to Purchaser, whereupon, if Purchaser is not then in default under this Agreement, the entire Downpayment shall be refunded to Purchaser and upon such refund, no party hereto shall have any rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination, or (y) at Seller's sole option, to waive any unsatisfied condition and consummate the transactions contemplated hereby.

14.    Termination of Agreement; Default.

14.1.    By Purchaser. If Purchaser shall default hereunder (including, without limitation, a default hereunder based on breach by Purchaser of any of its representations and warranties contained herein that is discovered prior to the Closing) or shall fail or refuse to perform its obligation to purchase the Property in accordance with this Agreement, Seller, as its sole and exclusive remedy, shall have the right to cause Escrow Agent to deliver to Seller the Downpayment as is then maintained in escrow by Escrow Agent, as and for its liquidated damages (the parties hereto acknowledging that it would be difficult or impossible to accurately ascertain the amount of Seller's damages). THE PARTIES AGREE THAT SELLER'S DAMAGES IN THE EVENT OF PURCHASER'S DEFAULT HEREUNDER WOULD BE DIFFICULT AND IMPRACTICAL TO CALCULATE AND THAT THE FOREGOING PAYMENT (A) HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES REASONABLE ESTIMATE OF SELLER'S DAMAGES, (B) REPRESENTS A FAIR AND ADEQUATE MEASURE OF DAMAGES, AND (C) REPRESENTS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST PURCHASER, AT LAW OR IN EQUITY, IN THE EVENT OF A DEFAULT UNDER THIS AGREEMENT ON THE PART OF PURCHASER.

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045069

14.2.   <u>By Seller</u>.  If Seller shall default hereunder (including, without limitation, a default hereunder based on breach by Seller of any of its representations and warranties contained herein that is discovered prior to the Closing), then, subject to any indemnity obligations of Seller or its affiliates set forth in <u>Section 40</u>, Purchaser, as its sole and exclusive remedy against Seller, may either:

(a)     terminate this Agreement by notice given to Seller, whereupon the entire Downpayment shall be refunded to Purchaser and upon such refund, no party hereto shall have any rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination; or

(b)     bring an action against Seller to seek specific performance of Seller's obligations hereunder.

14.3.   <u>Subsequent to Closing</u>.  If Seller or Purchaser fails to comply with any obligation hereunder that survives the Closing (including, without limitation, any representation or warranty contained herein), then the parties shall have all rights available to them at law or in equity without limitation.

15.     <u>Indemnification by AG Indemnitor</u>.

At Closing, Purchaser and AG Core Plus II Corp., a Delaware corporation ("<u>Core Plus II</u>") and AG Core Plus II (AU) Holdings Corp., a Delaware corporation ("<u>Core Plus II (AU)</u>", together with Core Plus II, the "<u>AG Indemnitor</u>") shall each severally (and not jointly and severally) indemnify, defend and hold Seller and CBF harmless from and against trade creditors' claims arising out of the non-payment by Purchaser of the Outstanding Trade Payables (the "<u>AG Indemnity</u>"); provided, that (a) the AG Indemnitor's and Purchaser's aggregate liability in respect of the AG Indemnity shall under no circumstances exceed the Maximum Line Item Amount, with respect to any individual Outstanding Trade Payable, and the Maximum Trade Payables Exposure, with respect to the aggregate of all Outstanding Trade Payables (the "<u>Indemnity Cap</u>"), (b) Seller and CBF shall forbear from asserting any claims in respect of the AG Indemnity for a period of eighteen (18) months following the Closing (the "<u>Forbearance Period</u>"), so that Purchaser will have the full benefit of the Forbearance Period in which to resolve remaining claims in respect of the Outstanding Trade Payables that would otherwise be covered by the AG Indemnity, (c) the amount of the Indemnity Cap shall decrease, on a dollar for dollar basis, as Purchaser resolves claims relating to the Outstanding Trade Payables (by entering into Trade Agreements, or otherwise) (for example, if (x) Purchaser resolves aggregate claims in respect of the Outstanding Trade Payables in an amount equal to $1,000,000, then the Indemnity Cap shall automatically decrease by $1,000,000 or, (y) Purchaser resolves an individual claim in respect of an individual Outstanding Trade Payable in an amount equal to $1,000,000, then the Indemnity Cap shall automatically decrease by $1,000,000), and (d) the AG Indemnity shall automatically terminate on the date which is eighteen (18) months following the expiration of the Forbearance Period.   Notwithstanding the foregoing, the AG Indemnity shall be inapplicable with respect to claims in respect of or otherwise arising from (i) any individual or aggregate Outstanding Trade Payables in excess of the applicable Indemnity Cap (as same may be reduced from time to time, in accordance with the terms of this <u>Section 15</u>), (ii) any written Trade Agreement which has been executed or otherwise approved by Seller or CBF, (iii) the outcome of any Trade Negotiation, to the extent that Seller or CBF has approved the actions taken by or on behalf of Purchaser in connection with such Trade Negotiation, (iv) any actions taken by Seller, CBF, or any affiliate of either of them with respect to any Outstanding Trade Payables, in violation of this Agreement or (v) any actions taken by Seller, CBF, or any affiliate of either of them with respect to any Outstanding Trade Payables, to the extent such actions are contrary to or in conflict with actions taken by Purchaser in connection with its Trade Negotiations (to the extent that Purchaser is conducting such Trade Negotiations on a commercially reasonably basis, and otherwise in compliance with the terms of this Agreement, it being agreed that such commercially reasonable efforts shall not require Purchaser to reveal

22

CONFIDENTIAL

RFC045070

the existence of the AG Indemnity to any Person). Without limiting the foregoing, the parties agree that any liability of the AG Indemnitor under the AG Indemnity shall be allocated (x) 93.6245% to Core Plus II and (y) 6.3755% to Core Plus II (AU). Neither Seller nor any of its affiliates shall disclose the existence of the AG Indemnity to any third party, except (a) for the purposes of enforcement of the indemnification obligations hereunder; (b) to the ROFR Parties, as described in <u>Section 41</u> of this Agreement; and (c) for disclosures mandated by law.

      16.    <u>Reserved</u>.

      17.    <u>Expenses</u>.

      (a)    Seller shall be obligated to pay (i) one hundred percent (100%) of the cost of satisfying Seller's obligations under <u>Section 7</u>, and (ii) one hundred percent (100%) of any other costs or expenses stated in this Agreement to be the obligation of Seller.

      (b)    Purchaser shall be obligated to pay (i) one hundred percent (100%) of the cost of the Survey, (ii) one hundred percent (100%) of all Transfer Taxes (including any sales tax arising out of any transfer of any personal property hereunder), (iii) one hundred percent (100%) of the cost of its title insurance policy, (iv) one hundred percent (100%) of all recording fees, (v) one hundred percent (100%) of any escrow fees, and (vi) one hundred percent (100%) of any other costs or expenses stated in this Agreement to be the obligation of Purchaser.

      (c)    Purchaser and Seller shall each be obligated to pay their own respective legal fees.

      (d)    Except as otherwise provided in this <u>Section 17</u> and elsewhere in this Agreement, Purchaser and Seller shall allocate all other expenses in connection with this Agreement in accordance with the custom and practices of the jurisdiction in which the Property is located.

      18.    <u>Reserved</u>.

      19.    <u>Access to Property</u>.    Purchaser acknowledges that it is acquiring the Property "AS IS and WHERE IS" with all faults, based upon its inspection of the Property prior to the Effective Date. Purchaser and its designated agent and representatives shall have a reasonable right of entry upon the Property from and after the Effective Date, through the Closing Date, subject to the rights of Tenants under their existing Leases, and subject to all applicable laws and reasonable advance notice to Seller's property manager and/or construction consultant, as appropriate. In furtherance of the foregoing, Purchaser shall have the right to review all of the materials provided by Seller, and to conduct such further due diligence as is deemed necessary or appropriate by Purchaser in connection with the transactions contemplated by this Agreement, including, without limitation, non-invasive or invasive environmental testing or engineering surveys of the Real Estate (provided that Phase II environmental testing shall be subject to Seller's prior consent), interviews with the lessees under the Leases, and such other due diligence as is customarily conducted by purchasers of real property. Purchaser and/or the persons or entities conducting any testing and investigations shall not commit waste at the Property, and Purchaser shall restore the Property to its condition existing immediately prior to Purchaser's inspection thereof, and Purchaser shall be liable for all damage or injury to any person or property resulting from, relating to or arising out of any inspection, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and hold harmless Seller and its agents, employees, officers, directors, affiliates and asset managers from any liability resulting therefrom. This indemnification by Purchaser shall survive the Closing or the termination of this Agreement, as applicable. In connection with the foregoing, Seller acknowledges that Purchaser has

23

CONFIDENTIAL

RFC045071

heretofore provided Seller and CBF with a certificate of insurance, naming Seller and CBF as additional insureds on its property damage and liability insurance policies.

20. Notices.

All notices, demands or requests made pursuant to, under or by virtue of this Agreement must be in writing and sent to the party to which the notice, demand or request is being made by (i) certified or registered mail, return receipt requested, (ii) by nationally recognized overnight courier delivery, (iii) by hand delivery, or (iv) by facsimile transmission as follows:

To Seller:

c/o CBRE Realty Finance
185 Asylum Street
City Place I, 31st Floor
Hartford, Connecticut 06103
Attention: Paul Martin
Facsimile Number: (860) 275-6225

with copy to:

Ballard Spahr Andrews & Ingersoll, LLP
4800 Montgomery Lane, 7th Floor
Bethesda, Maryland 20814-3401
Attention: Roger D. Winston
Facsimile Number: (866) 415-6014

To Purchaser:

c/o Angelo, Gordon & Co., L.P.
245 Park Avenue, 26th Floor
New York, New York 10167
Attention: Dana Roffman
Facsimile Number:  (212) 867-5436

with a copy to:

Federal Capital Partners
1000 Potomac Street, NW, Suite 120
Washington, D.C. 20007
Attention: Lacy I. Rice III
Facsimile Number: (202) 333-6098

and an additional copy to:

Duval & Stachenfeld LLP
300 East 42nd Street, 3rd Floor
New York, New York  10017
Attention:  Terri L. Adler, Esq.
Facsimile Number:  (212) 883-8883

24

N:\2009\1128\PSA\PSA.v14ck.doc

CONFIDENTIAL

RFC045072

To Escrow Agent:

c/o Linowes and Blocher, LLP
7200 Wisconsin Avenue, Suite 800
Bethesda, Maryland 20814-4842
Attention: William M. Hoffman, Esq.
Facsimile Number: (301) 654-2801

or to such other address as is specified by a party by notice to the other party given in accordance with the provisions of this <u>Section 20</u>.   Any notice given in accordance with the provisions of this <u>Section 20</u> shall be deemed given (i) three (3) Business Days after mailing (if sent by certified mail), (ii) one (1) Business Day after deposit of same with a nationally recognized overnight courier service (if delivered by nationally recognized overnight courier service), (iii) on the date delivery is made (if delivered by hand), or (iv) on the date delivery is made as confirmed by telephonic answerback (if delivered by facsimile transmission).

21.    <u>Entire Agreement</u>.

This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement.

22.    <u>Amendments</u>.

This Agreement may not be changed, modified or terminated, except by an instrument executed by the parties hereto who are or will be affected by the terms of such instrument.

23.    <u>Waiver</u>.

No waiver by either party of any failure or refusal to comply with its obligations shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

24.    <u>Successors and Assigns</u>.

The stipulations aforesaid shall inure to the benefit of, and shall bind, the heirs, executors, administrators, successors and assigns of the respective parties.

25.    <u>Section Headings</u>.

The headings of the various paragraphs of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.

26.    <u>Governing Law</u>.

This Agreement shall be governed by the laws of the State of Maryland.

27.    <u>Submission To Jurisdiction</u>.

PURCHASER AND SELLER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY MARYLAND STATE COURT OR FEDERAL COURT SITTING IN THE DISTRICT OF

25

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045073

MARYLAND, SOUTHERN DIVISION, OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREE THAT VENUE FOR ANY SUCH ACTION OR PROCEEDING SHALL BE IN MONTGOMERY COUNTY, MARYLAND. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO SUCH VENUE AS BEING AN INCONVENIENT FORUM.

28.   Waiver Of Jury Trial.

PURCHASER AND SELLER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PURCHASER AND SELLER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. SELLER OR PURCHASER, AS APPLICABLE, IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PURCHASER OR SELLER, AS APPLICABLE.

29.   Enforceability.

In the event that any portion of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

30.   Attorneys' Fees.

In the event of any litigation arising out of this Agreement, and notwithstanding any other limitations on liability set forth in this Agreement, the prevailing party shall be entitled to receive from the losing party an amount equal to the prevailing party's costs incurred in such litigation, including, without limitation, the prevailing party's attorneys' fees, costs and disbursements. The provisions of this Section 30 shall survive the Closing or termination of this Agreement.

31.   Assignment.

Purchaser may not assign this Agreement without the consent of Seller, provided, however, Purchaser may assign this Agreement without the consent of Seller to one or more corporations, partnerships, limited liability companies or other entities, provided that such entities are controlled by principals or affiliates of, or funds invested with or managed by (A) Angelo, Gordon & Co., L.P. (or affiliates thereof), (B) R&K Partners, LLC, d/b/a Federal Capital Partners (or affiliates thereof), or (C) a combination of the entities referenced in clauses (A) and (B). Upon any assignment that does not require the consent of Seller as provided in this Section 31, the party named as Purchaser herein shall be released from further liability under this Agreement. Purchaser shall provide Seller with a copy of any assignment of this Agreement prior to Closing.

32.   Counterparts.

This Agreement may be executed in two or more counterparts, each of which, when taken together, shall constitute the same instrument and one original. Executed counterpart signatures may be

26

CONFIDENTIAL

RFC045074

delivered by either party to the other by facsimile or e-mail with "PDF" attachment, and signatures delivered by either such method shall be deemed enforceable as original signatures (it being agreed that if signatures to this Agreement are delivered by either such method, then upon request, each party shall submit to the other party original signatures, provided that the failure by any party to deliver such original signatures shall not affect the effectiveness or enforceability of this Agreement).

33.    Further Assurances.

Subsequent to the Closing Date, each party shall execute and deliver to the other such further documents and instruments as either party may request of the other in order to confirm or implement the terms of this Agreement.

34.    Certain Definitions.

As used herein the following terms shall have the following definitions:

"Business Day" shall mean a day on which banks are required to be open for business within the State of Maryland and the State of New York, and shall not include (i) any Saturday or Sunday, (ii) any national holiday, or (iii) any holiday within the State of Maryland or the State of New York.

"Surviving Obligations" shall mean the obligations of Purchaser and/or Seller set forth in this Agreement that are expressly stated to survive the termination of this Agreement, including, without limitation, such obligations as are set forth in Sections 6, 8.1(g), 9, 10.1(p), 10.1(q), 11, 19, 30 and 40 of this Agreement.

35.    Reserved.

36.    Publicity and Confidentiality.

36.1.    Unless and until the Closing occurs hereunder, neither Purchaser nor Seller will make, or permit anyone to make on their behalf, any public statement or public comment with respect to this Agreement, the transactions contemplated hereby, that is intended for public distribution or made to any newspaper, trade publication, or other print or other media, without the approval by the other party as to such disclosure and the information to be disclosed, which approval shall not be unreasonably withheld or delayed.

36.2.    Unless and until the Closing occurs hereunder, Purchaser and its agents shall maintain the confidentiality of all documents, instruments and information obtained by Purchaser or such agents hereunder or otherwise in connection with the proposed acquisition of the Property and shall not, without Seller's prior written consent, which consent shall not be unreasonably withheld or delayed, disclose any of such information to any other person or use any of such information for any purpose other than as contemplated herein.    Notwithstanding the foregoing, Purchaser may disclose any of such information to its proposed investors and lenders and its officers, directors, employees, agents, attorneys, accountants, consultants and other professionals to whom such disclosure is reasonably necessary for the consummation of the transactions contemplated hereby, provided that each such person maintains such information in a confidential manner.

37.    Calculation of Time Periods; Time of the Essence.

In the event any time for performance of any obligation under this Agreement expires or the expiration or termination of any time period provided in this Agreement for any consent, response or

27

CONFIDENTIAL

RFC045075

notice occurs, on a day other than a Business Day, the time for performance shall be extended to the next succeeding day which is a Business Day. Time is of the essence of Seller's and Purchaser's obligations under this Agreement.

38.    Acquisition and Assumption of the Existing Loan.

38.1.    Seller and Existing Loan Borrower are parties to that certain mortgage loan in the original principal amount of $130,000,000 (as assigned, the "Existing Loan"), made by Fremont Investment & Loan, a California industrial bank ("Fremont"), predecessor in interest to iStar FM Loans LLC (the "Existing Lender"), as lender, to Triton Pavilion, LLC (the "Existing Loan Borrower"), as borrower, and evidenced by the documents set forth on Exhibit V (the "Existing Loan Documents"). Concurrently with the Closing, Seller acknowledges that Existing Loan Purchaser intends to acquire Existing Lender's right, title and interest in, to and under the Existing Loan, pursuant to the Existing Loan Purchase Agreement (such transaction, the "Existing Loan Acquisition Transaction"), and concurrently therewith, Purchaser shall assume Seller's and the Existing Loan Borrower's respective positions under the Existing Loan.

38.2.    The obligations of Purchaser to close the transactions contemplated by this Agreement shall be conditioned upon (i) the Existing Lender, prior to the Outside Closing Date (x) agreeing to sell to Existing Loan Purchaser the Existing Loan pursuant to the Existing Loan Purchase Agreement and (y) consummating the transactions contemplated thereby simultaneously with the Closing, and, in each case, in accordance with the terms of the Existing Loan Purchase Agreement, and (ii) concurrently with the Existing Loan Purchaser's acquisition of the Existing Loan, Existing Loan Purchaser approving Purchaser's assumption of Seller's and the Existing Loan Borrower's respective positions as IDOT guarantor and borrower, as applicable, under the Existing Loan, simultaneously with the Closing, in each case, on terms acceptable to Purchaser in its sole discretion and without condition or qualification or modification to the Existing Loan Documents (except for such modifications to the Existing Loan Documents as are approved by Purchaser and the Existing Loan Purchaser) (collectively, the "Financing Conditions"). In the event that the Financing Conditions, or any of them, have not been satisfied prior to the Outside Closing Date, then Purchaser may elect to terminate this Agreement. In the event that Purchaser elects to terminate this Agreement in accordance with the preceding sentence, then the Downpayment shall be released to Purchaser and no party shall have any further liability or obligation to the other, except for the Surviving Obligations, which shall survive such termination. In connection with Purchaser's assumption of, and Existing Loan Purchaser's acquisition of, the Existing Loan, Purchaser and Seller each agree to use commercially reasonable efforts to cooperate with each other and with Existing Lender in connection with the satisfaction of the Financing Conditions and to furnish to the Existing Lender such information as may be reasonably required by the Existing Lender in order to approve such assumption and acquisition of the Existing Loan on the terms set forth herein. It is acknowledged and agreed that the Financing Conditions have been included for the sole benefit of Purchaser who shall have the right to waive same, at its sole option, by written notice at any time up to and including the Outside Closing Date.

38.3.    If (a) the Existing Loan Acquisition Transaction is consummated simultaneously with the consummation of the transactions contemplated by this Agreement, and (b) there exists no default by any of Seller, CBF, or Pavilion Indemnitor (as hereinafter defined) under this Agreement, then from and after the Closing Date, Purchaser shall cause the Existing Loan Purchaser to waive all claims relating to the Existing Loan which it may then have against Seller, Existing Loan Borrower, or CBF, solely in their capacity as borrower (or affiliates of borrower, as applicable) or as owner of the Property in respect of the Existing Loan (it being understood that the foregoing forbearance shall exclude, and be inapplicable to, any claims which Purchaser or its affiliates may have against Seller, CBF, Existing Loan Borrower or their respective affiliates which arise out of or otherwise relate to (x) the Property, this

28

CONFIDENTIAL

RFC045076

Agreement, the Closing, or matters related to any of the foregoing items or (y) any claims made against Purchaser, Existing Loan Purchaser or their respective affiliates by the Existing Lender or is affiliates, arising out of the acts or omissions of Seller, Existing Loan Borrower or CBF). Seller acknowledges that it has determined that the Existing Loan Purchase Agreement fully satisfies Purchaser's obligations under this Section 38.3.

39.   Reserved.

40.   Seller Indemnity.

40.1   (a)   For a period commencing on the Effective Date and following the Closing for a period of time ending on December 31, 2008, Seller and CBRE Realty Finance, Inc., a Delaware corporation ("Pavilion Indemnitor", and together with Seller, the "Seller Indemnitors") shall jointly and severally indemnify, defend (with counsel acceptable to Purchaser) and hold Purchaser and its respective direct and indirect members, managers, partners, officers, directors, shareholders, employees, affiliates and their respective successors and assigns, including, without limitation, the Existing Loan Purchaser (collectively, the "Purchaser Indemnified Parties"), harmless from and against any and all liquidated liabilities (including, without limitation, attorneys' fees and litigation costs) (collectively "Losses") which any Purchaser Indemnified Party incurs arising out of or resulting from: (i) any matter or thing pertaining to the ownership or operation of the Property prior to the Closing Date; (ii) any liabilities and any litigation, action or proceeding pertaining to the ownership or operation of the Property or otherwise relating to the Existing Loan (to the extent not covered by the release by Purchaser of Seller pursuant to the Assumption and Release Agreement) or the mezzanine financing provided by Seller's affiliates in respect of the Property, in each case relating to actions or events occurring prior to the Closing Date; (iii) Seller's violation of Section 10.1(p) hereof; (iv) Seller's default under this Agreement beyond any applicable notice and grace periods, due to matters solely within Seller's control; or (v) Seller's failure to consummate the Closing and/or any Seller Indemnitor's hindrance of the Closing or the consummation of the Existing Loan Acquisition Transaction, in each case, due to matters solely within Seller's control; provided, however, the foregoing indemnity shall not be applicable to (x) Losses incurred as a result of the exercise by a party entitled to exercise a right of first refusal to purchase the Property under Chapters 11 or 53A of the County Code, (y) Losses resulting from the failure of the Closing to occur because Purchaser is in default under this Agreement beyond any applicable notice or grace periods; or (z) Losses related to the Outstanding Trade Payables, to the extent that such Losses are less than the Maximum Trade Payables Exposure.

(b)   The Seller Indemnitors' indemnity obligations under this Section 40, under any other applicable provision of this Agreement, and under any other instrument delivered by the Seller Indemnitors pursuant to this Agreement, are sometimes collectively referred to herein as the "Indemnity".

(c)   Without limiting the foregoing, Purchaser shall have the right to require Pavilion Indemnitor to pay, comply with and satisfy its obligations and liabilities under this Agreement, and shall have the right to proceed immediately against Pavilion Indemnitor with respect thereto, in each case, without being required to attempt recovery first from Seller or any other party.

40.2   In connection with the foregoing Indemnity, for the avoidance of doubt, the Seller Indemnitors' liability shall include the amount of any deposit made by the Existing Loan Purchaser under the Existing Loan Purchase Agreement, in the event that the Existing Loan Purchaser defaults or elects to terminate the transactions contemplated by the Existing Loan Purchase Agreement because of the matters described in Section 40.1(a) (iii), (iv) or (v), and as a result, forfeits such deposit to the Existing Lender and (b) Seller's liability shall include all other Losses incurred by Purchaser and the Existing Loan Purchaser resulting from the matters described in Section 40.1.

29

CONFIDENTIAL

RFC045077

40.3.    The Existing Loan Purchaser and the Title Company shall each be deemed a third party beneficiary of this Section 40, and shall be entitled to separately enforce same, on its own behalf; provided, that the Title Company shall only be deemed a third party beneficiary of this Section 40 as it relates to Losses incurred by the Title Company in connection with the Outstanding Unit Purchase Contracts.

40.4.    This Section 40 shall survive the Closing.

41.    Montgomery County's Rights.

(a)    The parties acknowledge that the Property is subject to the terms of the County Code. Accordingly, it shall be a condition precedent to Purchaser's obligation to close the transactions contemplated by this Agreement that on or prior to the ROFR Out Date (as hereinafter defined) (i) Purchaser shall have obtained a Certificate of Compliance (as hereinafter defined) and (ii) Seller shall have (x) complied with the terms of clause (b) below and (y) delivered to Purchaser evidence acceptable to Purchaser, and in recordable form, that each governmental or tenant entity (each, a "ROFR Party") having a right to purchase the Property under the County Code shall have either (A) waived its right to purchase the Property under the County Code or (B) been deemed to have waived its right to purchase the Property under the County Code, by the passage of time, or otherwise.  Such evidence shall be satisfied by a "Certificate of Compliance", issued in Purchaser's name (and, at Purchaser's option, in the name of Purchaser's assignee, as permitted in accordance with the terms of Section 31), in accordance with the County Code, and in form reasonably acceptable to Purchaser and Purchaser's title insurer and suitable for recording in the Montgomery County land records (it being understood that such Certificate of Compliance shall be deemed reasonably acceptable to Purchaser if same (w) correctly reflects all applicable names and other facts related to the ROFR Process, as applied to the Property, this Agreement and the parties hereto (taking into account any permitted assignment of Purchaser's interest in this Agreement, prior to Closing), (x) is in suitable form for recording in the Montgomery County land records, (y) is deemed acceptable by the Title Company to delete any exception in the Title Commitment regarding the ROFR Process and (z) otherwise complies with the County Code).  The matters described in clauses (i) and (ii) above are hereinafter referred to as the "ROFR Process".  The ROFR Process shall be deemed to have been completed when and if the matters described above have been completed.

(b)    In connection with the ROFR Process, Seller shall promptly take all actions necessary timely to comply with provisions of the County Code relating to the right of first refusal granted to each of the ROFR Parties.  Seller's actions shall include, without limitation, serving such notices, executing such documents (including, without limitation, affidavits) and taking such actions as shall be required under the County Code, or otherwise advisable to prove compliance by Seller with the County Code (it being agreed that Seller shall deliver to all required recipients thereto, on or prior January 16, 2008, all applicable notices and offers, including, without limitation all (x) notices of sale under Section 53A-3 of the County Code and (y) right of first refusal offers under Section 53A-4 of the County Code, in each case, in the manner required by the County Code and containing all documentation required to be delivered in connection therewith).  Seller shall provide to Purchaser copies of any proposed notices to be delivered, or other submittals to made under, the ROFR Process for Purchaser's review and reasonable approval, prior to delivery of such notices or other submittals (which approval shall not be withheld if such notices or other submittals are (x) factually accurate, as applied to the Property, this Agreement and the parties hereto (taking into account any permitted assignment of Purchaser's interest in this Agreement, prior to Closing) and (y) otherwise in compliance with the County Code).  Purchaser shall cooperate with Seller, in all commercially reasonable respects, in connection with Seller's actions under this clause (b); provided, however, that, any provision of this Agreement to the contrary notwithstanding, Seller shall not enter into or agree to any rental covenants or other terms, conditions or agreements of any type or nature

30

CONFIDENTIAL

RFC045078

whatsoever that would bind the Property or Purchaser after Closing in connection with Seller's obligation to obtain a Certificate of Compliance pursuant to the ROFR Process without the prior written consent of Purchaser, which consent may be withheld by Purchaser in its sole and absolute discretion, even if Purchaser's failure to consent should preclude the issuance of a Certificate of Compliance. If, prior to the ROFR Out Date, one or more ROFR Parties lawfully gives notice that it is or intends to exercise its right to purchase the Property under the County Code, or if a tenants' association shall be formed and registered with respect to the Property, then, at Purchaser's option, upon notice to Seller (which notice shall be given by Purchaser to Seller within 10 Business Days after Purchaser receives notice of the formation and registration of such tenants' association), this Agreement shall terminate and be of no further force or effect (other than those provisions expressly stated to survive) and the Downpayment (together with any interest accrued thereon) shall be refunded to Purchaser. If, prior to the ROFR Out Date, all rights to purchase the Property held by all ROFR Parties shall have elapsed, then the parties shall proceed to Closing in accordance with the terms of this Agreement, and Seller shall obtain and deliver to Purchaser, at Closing, a Certificate of Compliance. For purposes of this Section 41, "ROFR Out Date" shall mean the Outside Closing Date.

42.    Arbitration.

42.1.    In the event that there is a disagreement between Purchaser and Seller as to any matter arising out of this Agreement for which arbitration is expressly stated to be the sole procedure or mechanism for the resolution of such disagreement (the "Matter in Dispute"), then the Matter in Dispute shall be submitted to arbitration pursuant to the rules of the JAMS within the District of Columbia. The arbitrators will be entitled to award monetary damages, declaratory relief and injunctive relief interpreting the provisions of this Agreement, however the arbitrators will not be entitled to award punitive or consequential damages or to act inconsistently with the terms of this Agreement. The arbitrators will be entitled, but not required, to provide that the losing party in any arbitration will pay all or a portion of the prevailing party's costs incurred in connection therewith, including, without limitation, the costs and fees of the arbitrators, provided, however, if the arbitrators decline to make such a provision, then the costs of the arbitration will be split equally between the parties (except that each party will bear such party's own attorneys' fees). The determination of the arbitrators in the foregoing proceeding shall be binding upon the parties, subject only to the provision of Section 42.3 below.

42.2.    In the event that the arbitrators make a determination in favor of a party (the "Prevailing Party") and the Matter in Dispute is monetary in nature, then the other party (the "Non-Prevailing Party") shall pay to the Prevailing Party the amount determined by the arbitrators to be necessary to make the Prevailing Party whole (the "Arbitrated Amount") within ten (10) days after the determination is made in such arbitration proceeding, provided, however, in the event this Agreement expressly provides that an escrow of funds (each, a "Funds Escrow") be established (and such Funds Escrow is established) by the Non-Prevailing Party with respect to a monetary Matter in Dispute and the amount in the Funds Escrow is greater than the Arbitrated Amount, then the Non-Prevailing Party shall, within such ten (10) day period, instruct the escrow agent for the Funds Escrow to disburse an amount equal to the Arbitrated Amount from the Funds Escrow to the Prevailing Party and, unless otherwise provided in this Agreement, the Non-Prevailing Party shall be entitled to a return of the remaining funds in the Funds Escrow. In the event that the arbitrators make a determination in favor of the Prevailing Party and the Matter in Dispute is non-monetary in nature, then the Non-Prevailing Party shall take such action as is required by the arbitrators in connection therewith within ten (10) days after the determination is made in such arbitration proceeding.

42.3.    The parties agree that the arbitration proceeding described in this Section 42 is the sole and exclusive manner in which the parties may resolve Matters in Dispute and the parties fully waive any right to commence any action or proceeding in any court arising out of any Matter in Dispute,

31

CONFIDENTIAL

RFC045079

subject only to the right of a party hereto to bring an action in court to enforce the determination made in an arbitration proceeding.  For the avoidance of doubt the parties hereto acknowledge and agree that any dispute arising out of this Agreement that is not a Matter in Dispute shall not be required to be submitted to arbitration as hereinabove provided.

43.   Seller Estoppel Certificate.   Concurrently with the execution and delivery of this Agreement, and again at Closing, Seller and Existing Loan Borrower shall deliver to Purchaser an estoppel certificate with respect to the Existing Loan (the "Seller Estoppel Certificate"), in form attached hereto as Exhibit C, and otherwise in form acceptable to Purchaser in Purchaser's sole and absolute discretion, stating, among other things, that Seller has no defenses to the repayment, in full, of the Existing Loan, in accordance with the terms of the Existing Loan Documents.

44.   Consent to Relief from Automatic Stay.   Seller hereby consents to relief from the automatic stay in bankruptcy, in the event that a Bankruptcy Event occurs.  In connection with the foregoing consent, Seller hereby acknowledges that (a) the debts secured by liens on the Property exceed the value of the Property; (b) if a Bankruptcy Event occurs, then, absent Purchaser's consent, there is no reasonable possibility that Seller could achieve a successful reorganization within a reasonable length of time; and (c) the Seller's business and Property constitute "single asset real estate" within the meaning of Section 101(51B) of the United States Bankruptcy Code, because the Property is real property consisting of a single property or project which generates substantially all of the gross income of Seller, on which no substantial business is being operated, other than operating such real property (and the Property is not residential property with fewer than four units).

[Signatures on Following Page]

N:\2009\1128\PSA\PSA v14ck.doc

CONFIDENTIAL

RFC045080

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.

Seller:

PAVILION LLC, a Maryland limited liability company

By:     Triton Pavilion, LLC, a Delaware limited
        liability company, its managing member

        By:     Montrose Investment Holdings, LLC, a
                Delaware limited liability company,
                its managing member

                By:     CBRE Realty Finance TRS,
                        LLC, a Delaware limited
                        liability company, its managing
                        member

                        By:     _____
                                Name:
                                Title:          Paul Martin
                                                Managing Director

Federal Employer Identification No.:     20-3942281

Purchaser:

ANGELO GORDON REAL ESTATE INC., a Delaware
corporation

By:     _____
        Name:
        Title:

Federal Employer Identification No.:     20-4522205

Sale - Purchase Agreement

CONFIDENTIAL

RFC045081

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.

Seller:

PAVILION LLC, a Maryland limited liability company

By:    Triton Pavilion, LLC, a Delaware limited
liability company, its managing member

        By:    Montrose Investment Holdings, LLC, a
Delaware limited liability company,
its managing member

                By:    CBRE Realty Finance TRS,
LLC, a Delaware limited
liability company, its managing
member

                        By:   _____
                               Name:
                               Title:

Federal Employer Identification No.:   20-3942281

Purchaser:

ANGELO GORDON REAL ESTATE INC., a Delaware
corporation

By:   _____
    Name:  Joseph R. Wekselblatt
    Title:   Vice President

Federal Employer Identification No.:   20-4522205

CONFIDENTIAL

RFC045082

The escrow provisions in the foregoing contract are agreed to by the undersigned, who acknowledges receipt of the Deposit.

LAWYERS TITLE INSURANCE CORPORATION

By:   Linowes and Blocher, LLP, its authorized agent

By: _____

Name:

Title:   William Hoffman

CONFIDENTIAL

RFC045083

The indemnification provisions in <u>Section 40</u> of the foregoing Agreement are each agreed to by the undersigned.

<u>Pavilion Indemnitor</u>:

CBRE REALTY FINANCE, INC., a Delaware corporation

By: _Paul Martin_

Name: Paul Martin

Title: Executive Vice President

CONFIDENTIAL

RFC045084

The provisions in Sections 1(e), 13.1, 15 and 19 of the foregoing Agreement are each agreed to by the undersigned.

CBF:

CBRE REALTY FINANCE TRS, LLC,
a Delaware limited liability company

By: _Paul Martin_

Name: Paul Martin
Title: Managing Director

CONFIDENTIAL

RFC045085

AG Indemnitor is executing this Agreement, solely to evidence its agreement to the terms of the indemnification provisions set forth in Section 15 above.

AG Indemnitor:

AG CORE PLUS II CORP., a Delaware corporation

By: _____
Name: JOSEPH R. WEKSELBLATT
Title: CHIEF FINANCIAL OFFICER

AG CORE PLUS II (AU) HOLDINGS CORP., a Delaware corporation

By: _____
Name: JOSEPH R. WEKSELBLATT
Title: CHIEF FINANCIAL OFFICER

CONFIDENTIAL

EXHIBIT A
Legal Description

(See Attached)

A-1

CONFIDENTIAL

RFC045087

## DESCRIPTION

BEING PARCEL LETTERED 'F' IN A SUBDIVISION KNOWN AS "MONTROSE" PER PLAT RECORDED AT PLAT No. 21858 AMONG THE LAND RECORDS OF MONTGOMERY COUNTY, MARYLAND AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIPE FOUND AT THE BEGINNING OF THE NORTH 04°07'33" WEST, 327.55 FEET LINE AS SHOWN ON THE AFORESAID PLAT NO. 21858, SAID PIPE ALSO BEING ON THE NORTHERLY MARGIN OF MONTROSE ROAD; THENCE LEAVING MONTROSE ROAD AND RUNNING WITH THE OUTLINES OF PLAT NO. 21858 THE FOLLOWING SEVEN (7) COURSES:

1) NORTH 04°07'33" WEST, 327.55 FEET, TO AN IRON BAR SET; THENCE,

2) NORTH 82°34'09" EAST, 442.81 FEET TO AN IRON PIPE AND CAP FOUND ON THE WESTERLY MARGIN OF OLD GEORGETOWN ROAD; THENCE RUNNING WITH SAID MARGIN THE FOLLOWING THREE COURSES;

3) SOUTH 09°12'09" WEST, 9.03 FEET TO AN IRON PIPE FOUND; THENCE,

4) SOUTH 80°49'12" EAST, 19.98 FEET TO AN IRON BAR SET; THENCE,

5) SOUTH 09°12'38" WEST, 329.00 FEET TO THE CORNER OF AN EXISTING BUILDING, THENCE RUNNING ALONG THE FACE OF SAID BUILDING

6) SOUTH 52°39'36" WEST, 35.72 FEET TO A CORNER OF THE AFORESAID BUILDING, SAID POINT ALSO BEING ON THE AFORESAID MARGIN OF MONTROSE ROAD; AND RUNNING WITH SAID MARGIN

7) SOUTH 85°52'27" WEST, 353.67 FEET TO THE PLACE OF BEGINNING.

THE AREA OF LAND CONTAINED BY THE FOREGOING AMOUNTS TO 142,445 SQUARE FEET OR 3.2701 ACRES OF LAND, MORE OR LESS.

EXHIBIT "A"

CONFIDENTIAL

RFC045088

EXHIBIT B
Schedule of Personal Property

(See Attached)

B-1

CONFIDENTIAL

RFC045089

## Pavilion Inventory, 12/20/07
### Location:  Maintenance

| # of/Serial Number | Description or Specifications | Purchase Date | Cost(if available) |
|---|---|---|---|
| 1 | Savair Freeze collar repair kit | 1996 | 1200.00 |
| 1 | Kollman D75 Rod machine | 1995 | 2000.00 |
| 1 | Ridgid compound miter saw 10" | 2001 | 199.00 |
| 2 | Rdgid wet /dry vacuum | 1998 | 2998.00 |
| 2 | Justrite 60gal storage cabinets | 1999 | 1200.00 |
| 1 | Porter cable power washer (gasoline) | 2003 | 775.00 |
| 1 | Porta Pro power washer (electric) | 1997 | 229.00 |
| 1 | Kollman K-50 rod machine (drain cleaning) | 1998 | 1500.00 |
| 8 | Rod cables for K-50 rod machine (drain cleaning) | 2006 | 240.00 |
| 2 | Heavy Duty Appliance dolly | 2000 | 800.00 |
| 2 | Key cutting machines | 1997 | 990.00 |
| 1 | Snow thrower 18.5 HP (yard machine) | 2003 | 850.00 |
| 1 | Ridgid free standing drill press | 1999 | 339.00 |
| 1 | Ryobl cut of saw 10" | 2000 | 259.00 |
| 1 | 24" Ridgid pipe wrench | 2001 | 55.97 |
| 1 | 18" Ridgid pipe wrench | 2001 | 35.97 |
| 2 | Hoover vacuums small | 2002 | 260.00 |
| 2 | 8ft fiberglass ladders | 1998 | 200.00 |
| 2 | 6ft fiberglass ladders | 2001 | 160.00 |
| 1 | 10ft aluminum step ladder Werner | 2003 | 125.00 |
| 1 | 4ft aluminum step ladder | 2004 | 40.00 |
| 1 | 16ft alum extension ladder | 2003 | 120.00 |
| 1 | Portable generator (5000 watts) | 2000 | 529.00 |
| 1 | 12 ft Aluminum step ladder | 2004 | 155.00 |
| 1 | Saws-All Milwaukee | 2003 | 149.95 |
| 1 | Hilti hammerdrill | 1997 | 489.00 |
| 11 | Two-way radios | 2000 | 1199.00 |
| 9 | Radio charges | 2000 | 504.00 |
| 1 | GE two way radio base | 1996 | 389.00 |

CONFIDENTIAL

**Location:  Business Office, Employee Break Room & Leasing Area**

| # of/Serial Number | Description or Specifications | Purchase Date | Cost(if available) |
|---|---|---|---|
| 2 | Work Stations w/2 dr. files &overhead file closet | 2002 | 998.00 |
| 6 | Desk Chairs-3 Blue 3 Beige | 2/2002 | 435.00 |
| 3 | Wooden desks with returns | 2/2002 | 774.00 |
| 2 | 6ft high Hutch w/doors & 2 drawer file | 2/2002 | 680.00 |
| 2 | 6ft Wood credenza | 2/2002 | 680.00 |
| 6 | Wood & cloth visitor chairs | 2/2002 | 590.00 |
| 8 | Chairs | 2/2002 | 1220.00 |
| 1 | Microwave-GE | 2/2002 | 555.00 |
| 1 | Dishwasher GE | 2/2002 | 285.00 |
| 1 | Refrigerator Side by Side GE | 2/2002 | 698.00 |
| 1 | Ricoh copy machine | 2/2002 | n/a |
| 2154/52232/5 | Keytrak system | 9/26/1995 | $8,400.00 |
| 2153/5 | Keytrak 3rd drawer | 10/31/1996 | $1,585.00 |
| 2 | Wood desks | 2/2002 | 774.00 |
| 1 | Brown leather desk chairs | 2/2002 | 235.00 |
| 2 | Cloth chairs Res. Services | 2/2002 | 160.00 |
| 1 | 24" Round end table | 2/2002 | 135.00 |
| 4 | 5 Drawer lateral file cabinet | 2/2002 | 1380.00 |
| 2 | 4 Drawer lateral file cabinet | 2/2002 | 677.00 |
| 1 | Supply cabinet 2dr 2 drwr | 2/2002 | 230.00 |
| 6 | Cloth arm chairs - Green | 2/2002 | 850.00 |
| 5 | Computers - complete | (see Jeremy) 11/2005 | |
| 5 | Laser Printers | (see Jeremy)11/2005 | |
| 1 | 34 x 44 Mirror | 2/2002 | 180.00 |

CONFIDENTIAL

RFC045091



**The Monterey- Condo Building**
Sales Agreement # 47223
Sales Order # 20-000301

| Furniture | Quanity | Room | Date Ordered | Status | Scheduled |
|---|---|---|---|---|---|
| Executive Chair | 1 | Main Lobby | 2.13.06 | L | |
| Arm Chair | 1 | Main Lobby | 2.13.06 | L | |
| Chair | 1 | Main Lobby | 2.13.06 | O | 4.18.06 |
| End table | 1 | Main Lobby | 2.13.06 | L | |
| Table | 1 | Main Lobby | 2.13.06 | L | |
| Sofa | 1 | Main Lobby | 2.13.06 | O | 6.17.06 |
| Ottoman | 2 | Main Lobby | 2.13.06 | L | |
| Fountain | 1 | Main Lobby | 3.31.06 | O | 5.30.06 |
| Ottoman | 4 | Lobby Hallways | 2.13.06 | L | |
| Chairs | 2 | Elevator Lobbies | 2.13.06 | L | |
| Tables | 2 | Coffee Lounge | 2.13.06 | L | |
| Stools | 8 | Coffee Lounge | 2.13.06 | O | 4.14.06 |
| Table | 1 | Coffee Lounge | 2.13.06 | L | |
| Chairs | 2 | Coffee Lounge | 2.13.06 | O | 5.17.06 |
| Chairs | 2 | Coffee Lounge | 2.13.06 | O | 5.17.06 |
| Executive Chairs | 8 | Conference Room | 2.13.06 | L | |
| Dining Table (Base) | 1 | Conference Room | 2.13.06 | L | |
| Dining Table (Top) | 1 | Conference Room | 2.13.06 | L | |
| Sofa Table | 2 | Conference Room/Lounge | 2.13.06 | L | |
| Ottoman | 2 | Library | 2.13.06 | L | |
| Chairs | 2 | Library | 2.13.06 | L | |
| Chairs | 2 | Library | 2.13.06 | L | |
| End Tables | 2 | Library | 2.13.06 | O | 6.14.06 |
| Table | 1 | Business Center | 2.13.06 | L | |
| Chairs | 3 | Business Center | 2.13.06 | L | |
| Chairs | 3 | Business Center | 2.13.06 | L | |
| Cubes | 4 | Social Room | 2.13.06 | L | |
| Lamp Table | 1 | Social Room | 2.13.06 | L | |
| Tables | 3 | Social Room | 2.13.06 | L | |
| Chairs | 3 | Social Room | 2.13.06 | L | |
| Chairs | 12 | Social Room | 2.13.06 | 11L/1 O | 4.15.06 |
| Sofa | 1 | Social Room | 1.23.06 | O | 6.17.06 |
| Credenza | 1 | Social Room | 2.13.06 | L | |
| Pool Table | 1 | Social Room | 2.23.06 | O | 4.42.06 |
| Cocktail Table | 1 | Social Room | 3.01.06 | L | |
| Consols | 32 | Hallway Lobbies | 2.13.06 | L | |
| POOL BALL TABLE | 1 | SOCIAL ROOM | 3.01.06 | O | 5.15.06 |

L = Received, located, & put into a/t/c location.
O = On Order

RFC045092

EXHIBIT C

Form of Seller Estoppel Certificate and Agreement

To:     Angelo Gordon Real Estate Inc.,
        and its successors and assigns
        c/o Angelo, Gordon & Co., L.P.
        245 Park Avenue, 26th Floor
        New York, New York 10167

Re:     Mortgage Loan (as assigned, the "Existing Loan") in the principal amount of
        $130,000,000, made by iStar FM Loans LLC ("Lender"), as lender, to Triton Pavilion,
        LLC ("Existing Loan Borrower"), as borrower

Ladies and Gentlemen:

Reference is hereby made to the Existing Loan.  Pursuant to that certain Sale-Purchase Agreement, between Pavilion LLC ("Seller"), an affiliate of Existing Loan Borrower, as seller, and Angelo Gordon Real Estate Inc. ("Purchaser"), as purchaser, dated as of January 14, 2008 (the "Purchase Agreement"), and knowing that Purchaser and Purchaser's lenders are relying upon the accuracy of the information contained herein, Seller and Existing Loan Borrower certify, represent, warrant and covenant as follows:

1.      Neither Seller, Existing Loan Borrower, nor their respective affiliates have any defenses to the repayment, in full, of the Existing Loan, in accordance with the terms of the Existing Loan Documents (as defined in the Purchase Agreement) and that such Existing Loan Documents are each enforceable in accordance with their respective terms, in each case, subject to no present or incipient defaults, offsets, claims or counterclaims by Seller or Existing Borrower, other than as set forth on Schedule 1 hereto.

2.      Seller and Existing Loan Borrower, on behalf of themselves and their respective affiliates, successors and assigns, hereby release, relinquish and forever discharge Purchaser and each of its present and former direct and indirect agents, representatives, attorneys, directors, officers, employees, members, shareholders and affiliates (collectively, the "Released Parties") from any and all claims, actions, causes of action, liabilities, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, obligations, variances, trespasses, damages, judgments, extents, executions and demands whatsoever, in law, admiralty or equity, and whether known or unknown, fixed or contingent, which against the Released Parties, any Releasor or its successors or assigns ever had, now has or hereafter can, shall or may have, for, upon or by reason of any matter arising from or relating to the Existing Loan from the beginning of the world through the date hereof.

[Signatures on following page]

CONFIDENTIAL

RFC045093

In Witness whereof, the undersigned has executed this Seller's Estoppel Certificate and Agreement as of this ___ day of January, 2008.

Very truly yours,

**PAVILION LLC,** a Maryland limited liability company

By: Triton Pavilion, LLC, a Delaware limited liability company, its managing member

    By: Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

        By: CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

            By: _____
                Name:
                Title:

**TRITON PAVILION, LLC,** a Delaware limited liability company

By: Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

    By: CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

        By: _____
            Name:
            Title:

DMEAST #9957649 v1

3

CONFIDENTIAL

RFC045094

Schedule 1

4

DMEAST #9957649 v1

CONFIDENTIAL

RFC045095

EXHIBIT D

Form of Assumption and Release Agreement

THIS ASSUMPTION AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the ___ day of _____, 2008 (the "Effective Date"), by _____, a _____ [fill in successor to Angelo Gordon Real Estate Inc.] ("Assignee") and _____, a _____ [fill in Existing Loan Purchaser] ("Lender"), for the benefit of Pavilion LLC, a Maryland limited liability company ("Pavilion"), Triton Pavilion, LLC, a Delaware limited liability company ("Triton Pavilion"), Montrose Investment Holdings, LLC, a Delaware limited liability company ("Montrose"), and CBRE Realty Finance TRS, LLC, a Delaware limited liability company (the "CBF", and collectively with Pavilion, Triton Pavilion, and Montrose, the "Released Parties").

RECITALS

R-1.   Fremont Investment & Loan, a California industrial bank ("Fremont"), predecessor in interest to Lender, made a mortgage loan (the "Existing Loan") to Triton Pavilion in the original principal amount of $130,000,000.00, which Existing Loan is evidenced by a Secured Promissory Note dated November 10, 2005 made by Existing Loan Borrower to the order of Fremont (the "Note"), a Loan and Security Agreement dated as of November 10, 2005 by and among Triton Pavilion, Pavilion and Fremont (the "Loan Agreement"), a Guaranty by Pavilion dated as of November 10, 2005 (the "IDOT Guaranty") and certain other Loan Documents (as defined in the Loan Agreement). The IDOT Guaranty is secured by an Indemnity Deed of Trust and Fixture Filing made by Pavilion for the benefit of Fremont, recorded on November 15, 2005 among the Land Records of Montgomery County at Liber 31233, folio 613 (the "Indemnity Deed of Trust") with respect to certain real property located in the City of Rockville, County of Montgomery, Maryland described on Exhibit A hereto (the "Property");

R-2.   CBF provided certain financing for Pavilion's initial acquisition of the Property, pursuant to a mezzanine loan funded contemporaneously with the Existing Loan, and in connection therewith CBF and Fremont entered into a certain Intercreditor Agreement ("Intercreditor Agreement") dated as of November 10, 2005;

R-3.   Pavilion and Angelo Gordon Real Estate Inc., a Delaware corporation ("Initial Purchaser") are parties to that certain Sale-Purchase Agreement, dated as of January 14, 2008 (as amended, the "Purchase Agreement"), by and between Pavilion, as seller, and Initial Purchaser, as purchaser, pursuant to which Pavilion has agreed to sell the Property to Initial Purchaser, and Initial Purchaser has agreed to purchase the Property from Pavilion, in accordance with the terms thereof;

R-3.   Initial Purchaser and Assignee are parties to that certain [Assignment and Assumption Agreement], dated as of [_____] (the "Purchase Agreement Assignment"), by and between Initial Purchaser, as assignor, and Assignee, as assignee, pursuant to which Initial Purchaser has assigned to Assignee, and Assignee has assumed from Initial Purchaser, all of Initial Purchaser's right, title and interest in, to and under the Purchase Agreement;

R-4   Lender has agreed to consent to the sale and transfer of the Property from Pavilion to Assignee, in accordance with Section 1.10 of the Indemnity Deed of Trust, and permit Assignee to assume the obligations of Assignor and Existing Loan Borrower under the Existing Loan; and

R-5.   Pursuant to the terms of the Purchase Agreement, upon the Closing under the Purchase Agreement, the purchaser thereunder is required to assume all rights and obligations of Pavilion and

5

CONFIDENTIAL

RFC045096

Triton Pavilion as IDOT guarantor and borrower, as applicable, under the Existing Loan, and to deliver this Agreement for the benefit of the Released Parties.

AGREEMENT

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows, for the benefit of the Released Parties:

1.    Assumption.  Assignee hereby assumes and agrees to perform all of the obligations of Pavilion and Triton Pavilion under the Note, the Loan Agreement, the Indemnity Deed of Trust and other Loan Documents from and after the Effective Date (as any of such documents may have been heretofore, and may be hereafter, amended or otherwise modified by Assignee and Lender), and agrees to be bound by each and every covenant, condition, agreement, representation, warranty, waiver, consent, acknowledgment, and obligation of Pavilion and Triton Pavilion under all of the Loan Documents from and after the Effective Date. Assignee shall henceforth be deemed to be the "Grantor" and/or "Borrower" and/or "IDOT Guarantor" under each of the Loan Documents.  Without limiting the generality of the foregoing, Assignee's assumption expressly includes the assumption of all obligations, liabilities, and waivers of Triton Pavilion set forth in the Note, and all obligations, liabilities and waivers of Pavilion under the IDOT Guaranty and the Indemnity Deed of Trust.

2.    Consent; Extinguishment of One-Time Transfer Right.  Lender hereby consents to the conveyance by Pavilion to Assignee of all of its rights, title, and interest in and to the Property, and to the assumption by Assignee of all of the obligations and liabilities of Pavilion and Triton Pavilion under the Loan Documents upon the terms and conditions set forth herein.  Assignee and Lender hereby acknowledge and agree that Lender's consent herein is a one-time right of transfer, which shall not apply to any subsequent transfer by Assignee or any other subsequent owner of the Property without Lender's express consent, and such right of transfer shall be extinguished upon the conveyance of the Property to Assignee.

3.    Release.  From and after the Effective Date, each of Lender and Assignee, on Lender's behalf and on Assignee's behalf, and on behalf of all past, present and future representatives, partners, managers, members, shareholders, affiliates and related companies, successors and assigns of any of them, hereby waives, releases and forever discharges the Released Parties and all past, present and future representatives, partners, managers, members, shareholders, affiliates and related companies, successors and assigns of any of them, from and against all obligations, liabilities, losses, damages, claims and demands of whatever kind and nature, whether known or unknown, whether accrued or which may subsequently accrue, arising out of or relating to the Note, the IDOT Guaranty, the Indemnity Deed of Trust and all other Loan Documents, and the Intercreditor Agreement. Notwithstanding the foregoing, the foregoing release shall be deemed inapplicable with respect to any obligations, liabilities, losses, damages, claims or demands of Assignee, Lender or their respective affiliates successors or assigns (collectively, the "Purchaser Parties") which arise out of or otherwise relate to (a) claims made against any Purchaser Party by iStar FM Loans LLC (or any affiliate thereof) under or with respect to the Existing Loan Purchase Agreement (as defined in the Purchase Agreement); (b) claims made against any Purchaser Party in respect of matters arising or accruing prior to the Effective Date; (c) breaches by any Released Party or any of their respective affiliates of the terms of the Purchase Agreement; or (d) claims relating to matters as to which a Released Party has retained liability or has responsibility, in each case, as more particularly described in the Purchase Agreement.

4.    Ratification.  Except as expressly provided herein as may be necessary to implement the terms and provisions hereof,  the Loan Documents and the Intercreditor Agreement shall remain

6

DMEAST #9957649 v1

CONFIDENTIAL

RFC045097

unmodified and in full force and effect and are hereby ratified and reaffirmed by Assignee.  Nothing in this Agreement shall be deemed to or shall in any manner prejudice or impair any of the Loan Documents or the Intercreditor Agreement, or any security granted or held by Lender for the Existing Loan or the original priority of the Indemnity Deed of Trust or any of the other Loan Documents.  This Agreement shall not be deemed to be nor shall it constitute, any alteration, waiver, annulment or variation of the lien and encumbrance of the Indemnity Deed of Trust or any of the other Loan Documents or the terms and conditions of or any rights, powers or remedies under the Loan Documents or the Intercreditor Agreement, except as expressly set forth herein.

5.      Lien Priority.  All of the Property described in the Indemnity Deed of Trust and the other Loan Documents shall remain in all respects subject to the lien, charge and encumbrance of the Indemnity Deed of Trust and other Loan Documents, and nothing herein contained and nothing done pursuant hereto shall affect, or be construed to affect the lien, charge or encumbrance of the Indemnity Deed of Trust or other Loan Documents or the priority thereof over all liens, charges or encumbrances.

6.      Further Documents.  Assignee hereby agrees to execute and deliver to Lender any and all further documents and instruments reasonably required by Lender to effectuate the transaction contemplated by this Agreement, to create and/or perfect the liens and security interests granted to Lender under the Loan Documents and/or to give effect to the terms and provisions hereof, including, without limitation, appropriate UCC financing statements.

7.      Governing Law; Binding Effect.  This Agreement shall be governed by the law of the State of Maryland without regard to its conflicts of law provisions.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns

8.      Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

9.      Notice.  Any notice required or permitted to be given hereunder or under any of the Loan Documents must be in writing and given (a) by depositing same in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested; (b) by delivering the same in person to such party; (c) by transmitting a facsimile copy to the correct facsimile phone number of the intended recipient; or (d) by depositing the same into the custody of a nationally recognized overnight delivery service addressed to the party to be notified.  In the event of mailing, notices shall be deemed effective three (3) business days after posting; in the event of overnight delivery, notices shall be deemed effective on the next business day following deposit with the delivery service; in the event of personal service or facsimile transmissions, notices shall be deemed effective when delivered.  For purposes of notice, the address of the parties hereto shall be as follows:

10.     WAIVER OF TRIAL BY JURY.  ASSIGNEE AND LENDER EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT,

7

DMEAST #9957649 v1

CONFIDENTIAL

RFC045098

THE INDEMNITY DEED OF TRUST, THE NOTE OR THE OTHER LOAN DOCUMENTS, OR THE INTERCREDITOR AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY ASSIGNEE AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. ASSIGNEE AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER.

(THE REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

DMEAST #9957649 v1

8

CONFIDENTIAL

RFC045099

IN WITNESS WHEREOF, Assignee and Lender have caused this Agreement to be executed as of the ____ day of _____, 2008.

WITNESS/ATTEST:

CONFIDENTIAL

RFC045100

EXHIBIT A

Legal Description

D-1

CONFIDENTIAL

RFC045101

EXHIBIT E
Rent Roll

(See Attached)

E-1

CONFIDENTIAL

RFC045102

Rent Roll Repo<sub></sub>

Community=Pavilion Apartments (65)
Effective Date = 1/11/2008
Sort By = Bld. Ast

Printed on: 1/11/08  3:01 pm

Pavilion Apartments (65)

| Person Name | Apt Nbr | # BR | Month Date | Lease Exp | Recert Date | Rent | Subsidy | Vacancy | Total | Gross Potential | Variance | Rent 1 | Rent 2 | Util Allow | Rent Class | Overage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VACANT | C-100 | 0 | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Conventional | |
| VACANT | C-102 | 0 | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Conventional | |
| VACANT | C-104 | 1 | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Conventional | |

CONFIDENTIAL

RFC045103

CONFIDENTIAL

RFC045104

CONFIDENTIAL

RFC045105

CONFIDENTIAL

RFC045106

CONFIDENTIAL

RFC045107

CONFIDENTIAL

RFC045108

CONFIDENTIAL

RFC045109

RFC045110

EXHIBIT F
Form of Deed

## <u>SPECIAL WARRANTY DEED</u>

THIS DEED is made this [__] day of [_____], 200[__], by and between **PAVILION LLC**, a Maryland limited liability company, ("Grantor"), and [_____], a Delaware limited liability company ("<u>Grantee</u>").

WITNESSETH, that for good and valuable consideration in the sum of $[_____] in hand paid by Grantee, the receipt and sufficiency of which are acknowledged by Grantor, Grantor does hereby grant and convey in fee simple unto Grantee, its successors and assigns, all that piece of land situate, lying, and being in Montgomery County, Maryland, and being more particularly described on "<u>Exhibit A</u>" attached hereto and made a part hereof.

TOGETHER WITH all the buildings and improvements on the such land, erected, made or being; and all and every rights-of-way, alleys, ways, waters, easements, privileges, appurtenances, and advantages, to the same belonging or in anywise appertaining and all the estate, title, right, interest and claim, either at law or in equity, or otherwise, however, of the Grantor of, in, to or out of the said land and premises, and all right, title and interest of the Grantor in and to the land lying in the bed of any street, road or highway (open or proposed) in front of, adjoining or servicing the above-described real property, including condemnation awards or payments in lieu thereof as a result of a change of grade, alignment or access rights.

TO HAVE AND TO HOLD the land and premises above described and hereby intended to be conveyed, together with the building and improvements erected thereon and all rights, privileges, appurtenances, easements and advantages belonging and pertaining to the use and benefit of the Grantee, in fee simple, forever.

AND the Grantor covenants and warrants specially the property hereby conveyed and covenants to execute such further assurances as may be requisite.

[SIGNATURE PAGE FOLLOWS]

F-1

CONFIDENTIAL

RFC045111

IN WITNESS WHEREOF, Grantor has duly executed this Deed under seal as of the date set forth above.

**GRANTOR:**

**PAVILION LLC**, a Maryland limited liability company

By:  Triton Pavilion, LLC, a Delaware limited liability company, its managing member

> By:  Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member
>
> > By:  CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member
> >
> > > By:  _____
> > > Name:
> > > Title:

STATE OF _____     &gt;
                             &gt;  to wit:

COUNTY OF _____     &gt;

    I HEREBY CERTIFY that on this _____ day of _____, 200[__], before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, known to me (or satisfactorily proven) to be the _____ of Pavilion LLC, and that such _____, being authorized to do so, executed the foregoing and annexed instrument for the purposes therein contained by signing the name of Pavilion LLC.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires:_____

[SEAL]

F-2

CONFIDENTIAL

RFC045112

## ATTORNEY'S CERTIFICATION

THE UNDERSIGNED, a member in good standing of the Bar of the Court of Appeals of Maryland, hereby certifies that the foregoing deed was prepared by me or under my supervision.

Name: _____

F-3

CONFIDENTIAL

RFC045113

EXHIBIT A

Real Property Description

F-4

CONFIDENTIAL

RFC045114

EXHIBIT G
Form of Bill of Sale

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, PAVILION LLC, a limited liability company organized under the laws of the State of Maryland (the "Seller"), does hereby quitclaim unto [_____], a [limited liability company] organized under the laws of the State of [Delaware] (the "Purchaser"), all of Seller's right, title and interest in and to all equipment, appliances, tools, machinery, supplies, building materials and other personal property of every kind and character located on and used in connection with the Premises and to all intangible personal property associated with the Premises described in Schedule 1 attached hereto (the "Personalty") relating to the real property described in Schedule 2 hereto. The conveyance contained in this Quitclaim Bill of Sale is made without representation or warranty by the Seller of any kind or nature and is expressly without recourse to the Seller of any kind or nature whatsoever.

This Bill of Sale is subject to the express provisions of that certain Sale-Purchase Agreement, dated as of January 14, 2008, by and between Seller and Purchaser (as assignee of Angelo Gordon Real Estate Inc., a Delaware corporation), including, without limitation, the provisions of Sections 26, 27, 28, and 30 thereof.

[Signatures on following page]

G-1

CONFIDENTIAL

RFC045115

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this instrument as of this [_____] day of [_____], [_____].

<u>SELLER</u>:

PAVILION LLC, a Maryland limited liability company

By: Triton Pavilion, LLC, a Delaware limited liability company, its managing member

  By: Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

    By: CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

      By: _____
        Name:
        Title:

<u>PURCHASER</u>:

[_____]

By: [_____]

  By: _____
    Name:
    Title:

G-2

CONFIDENTIAL

RFC045116

<u>Schedule 1</u>
<u>Schedule of Personalty</u>

All equipment, appliances, tools, machinery, supplies, building materials and other personal property of every kind and character owned by Seller and located on and used in connection with that certain land (the "<u>Land</u>") and the improvements located thereon located in Montgomery County, State of Maryland, which Land is more particularly described in <u>Schedule 2</u> attached to the Bill of Sale to which this <u>Schedule 1</u> is attached.

All licenses, permits and other intangible property pertaining to the Land and the improvements located thereon.

G-3

CONFIDENTIAL

RFC045117

<u>Schedule 2</u>
<u>Legal Description of the Land</u>

G-4

CONFIDENTIAL

RFC045118

EXHIBIT H

Form of Assignment and Assumption of Leases

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "Assignment"), made as of the [____] day of [_____], [____], by and between PAVILION LLC, a limited liability company organized under the laws of the State of Maryland, having an office at c/o CBRE Realty Finance TRS, LLC, 185 Asylum Street, City Place, 31ˢᵗ Floor, Hartford, Connecticut 06103, as assignor ("Assignor"), and [_____], a [limited liability company] organized under the laws of the State of [Delaware], having an office [c/o Angelo, Gordon & Co., L.P., 245 Park Avenue, 26ᵗʰ Floor, New York, New York 10167], as assignee ("Assignee").

W I T N E S S E T H:

WHEREAS, Assignor is the landlord under the leases set forth on Schedule A attached hereto and made a part hereof (the "Leases"), pursuant to which Leases, Assignor has demised to the tenants thereunder certain premises located at Rockville Pike and Montrose Road, Rockville, Maryland, and more particularly described in Schedule B attached hereto (the "Premises");

WHEREAS, Assignor and Angelo Gordon Real Estate Inc., a Delaware corporation ("Contract Vendee") are parties to that certain Sale-Purchase Agreement, dated as of January 14, 2008 (as amended, the "Purchase Agreement"), by and between Assignor, as seller, and Contract Vendee, as purchaser, pursuant to which Purchase Agreement, Assignor has agreed to sell to Contract Vendee, and Contract Vendee has agreed to purchase from Assignor, the Premises;

WHEREAS, Contract Vendee and Assignee are parties to that certain [Assignment and Assumption Agreement], dated as of [_____] (the "Purchase Agreement Assignment"), by and between Contract Vendee, as assignor, and Assignee, as assignee, pursuant to which Purchase Agreement Assignment, Contract Vendee has assigned to Assignee, and Assignee has assumed from Contract Vendee, all of Contract Vendee's right, title and interest in, to and under the Purchase Agreement;

WHEREAS, in connection with the Purchase Agreement (a) Assignor is required to assign, transfer and convey to the purchaser thereunder all of Assignor's right, title and interest in, to and under the Leases, together with any and all right, title, estate and interest of Assignor in and to such security deposits and prepaid rents, if any, as have been paid to Assignor pursuant to such Leases (collectively, the "Security Deposits"), and (b) such purchaser is required to accept such assignment and to assume Assignor's obligations under the Leases and the Security Deposits from and after the Effective Date; and

WHEREAS, Assignee and Assignor are consummating the transactions set forth in the Purchase Agreement on the Effective Date.

NOW, THEREFORE, in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto to hereby agree as follows:

1.      Unless otherwise stated herein, all capitalized terms used in this Assignment shall have the meanings specified in the Purchase Agreement.

2.      Subject to the terms of the Purchase Agreement, Assignor hereby assigns, transfers, releases and sets over unto Assignee all of the right, title and interest of Assignor in, to and under (a) the Leases, and (b) the Security Deposits.

H-1

CONFIDENTIAL

RFC045119

3.      Assignee hereby accepts the foregoing assignment and hereby assumes all of the obligations of Assignor under the Leases from and after the Closing Date.

4.      Assignor and Assignee shall cooperate to notify any third party institutions holding the Security Deposit Accounts of the transfer of title thereto from Assignor to Assignee.

5.      This Assignment may not be amended, modified or terminated except by an instrument in writing executed by the parties hereto.

6.      This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

7.      This Assignment may be executed in counterparts, each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

8.      The provisions hereof are subject to the provisions of the Purchase Agreement, including, without limitation, the provisions of Sections 26, 27, 28, and 30 thereof.

[Signatures on following page]

H-2

CONFIDENTIAL

IN WITNESS WHEREOF, intending to be legally bound the parties hereto have executed this Assignment as of the day and year first above written.

ASSIGNOR:

PAVILION LLC, a Maryland limited liability company

By:   Triton Pavilion, LLC, a Delaware limited liability company, its managing member

    By:   Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

        By:   CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

           By:   _____

              Name:

              Title:

ASSIGNEE:

[_____], a [_____]

By:   [_____], a [_____], its [_____]

    By:   _____

        Name:

        Title:

H-3

CONFIDENTIAL

RFC045121

<u>Schedule A</u>
<u>Leases</u>

H-4

CONFIDENTIAL

RFC045122

Schedule B
Legal Description of the Premises

H-5

CONFIDENTIAL

RFC045123

EXHIBIT I
Form of Tenant Notification Letter

[_____], [____]

<u>VIA [Insert Form of Delivery under the Lease]</u>

[Name of Tenant]
[Address of Tenant]
[Address of Tenant]

Re:    [Description of Lease], dated as of [Date of Lease] (as amended, the "<u>Lease</u>"), by and between [Name of Seller], as landlord ("<u>Landlord</u>"), and [Name of Tenant], as tenant ("<u>Tenant</u>")

Ladies & Gentlemen:

Reference is made to the Lease.  Pursuant to the Lease, Tenant has leased from Landlord certain premises located in that certain property known as The Monterey, located at Rockville Pike and Montrose Road, Rockville, Maryland (the "<u>Property</u>").

Landlord hereby notifies Tenant that Landlord is, on the date hereof, conveying and otherwise transferring its interest in the Property to [_____] ("<u>Purchaser</u>"), including, without limitation, Landlord's interest in the Lease.

Please be advised that all future rentals and payments under the Lease should be delivered to Purchaser (as the new landlord under the Lease) as follows:

c/o [_____]
[_____]
[_____]
Attention: [_____]

Please be further advised that all future notices and correspondence under the Lease should be delivered to Purchaser (as the new landlord under the Lease) as follows:

c/o [_____]
[_____]
[_____]
Attention: [_____]

I-1

CONFIDENTIAL

RFC045124

with a copy to:

c/o [_____]
[_____]
[_____]
Attention: [_____]

Please call Purchaser's representative [_____], at [_____], if you have any questions regarding the Lease after the date hereof.

Very truly yours,

Seller:

PAVILION LLC, a Maryland limited liability company

By:     Triton Pavilion, LLC, a Delaware limited liability company, its managing member

      By:     Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

            By:     CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

                  By: _____
                        Name:
                        Title:

Purchaser:

[_____]

By:     [_____], its [_____]

      By: _____
          Name:
          Title:

cc:     [Required Notice Parties Under the Lease]

I-2

CONFIDENTIAL

RFC045125

EXHIBIT J

Form of Assignment and Assumption of Contracts

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND TELECOM AGREEMENTS (this "Assignment"), made as of the [____] day of [_____], [____], by and between PAVILION LLC, a limited liability company organized under the laws of the State of Maryland and CBRE REALTY FINANCE TRS, LLC, a Delaware limited liability company ("CBF"), each having an office at 185 Asylum Street, City Place, 31st Floor, Hartford, Connecticut 06103, as assignor (collectively "Assignor"), and [_____], a [limited liability company] organized under the laws of the State of [Delaware], having an office at c/o Angelo, Gordon & Co., L.P., 245 Park Avenue, 26th Floor, New York, New York 10167, as assignee ("Assignee").

W I T N E S S E T H:

WHEREAS, (a) Assignor is party to certain (the "Contracts") contracts set forth on Schedule A-1 attached hereto and made a part hereof, pursuant to which Contracts Assignor has entered into certain agreements regarding the provision of certain services and the supply of certain goods to or for certain premises located at Rockville Pike and Montrose Road, Rockville, Maryland, and more particularly described in Schedule B attached hereto (the "Premises"), as further described therein, (b) Assignor is party to certain original licenses and permits pertaining to the Premises (the "Licenses and Permits"), required permanent certificates of occupancy (the "Certificates of Occupancy"), records and other documents pertaining to the ownership, operation and maintenance of the Premises (the "Property Documents" and guaranties and warranties received in connection with work performed on the Premises (the "Guaranties and Warranties") set forth on Schedule A-2 attached hereto and (c) CBF is party to that certain Intercreditor Agreement, dated as of November 10, 2005, by and between Fremont Investment & Loan and CBF (the "Intercreditor Agreement", together with the Licenses and Permits, Certificates of Occupancy, Property Documents and the Guaranties and Warranties, the "Assigned Documents"), pursuant to which Assigned Documents Assignor holds certain rights and required documentation related to the Premises;

WHEREAS, Assignor and Angelo Gordon Real Estate Inc., a Delaware corporation ("Contract Vendee") are parties to that certain Sale-Purchase Agreement, dated as of January 14, 2008 (as amended, the "Purchase Agreement"), by and between Assignor, as seller, and Contract Vendee, as purchaser, pursuant to which Purchase Agreement, Assignor has agreed to sell to Contract Vendee, and Contract Vendee has agreed to purchase from Assignor, the Premises;

WHEREAS, Contract Vendee and Assignee are parties to that certain [Assignment and Assumption Agreement], dated as of [_____] (the "Purchase Agreement Assignment"), by and between Contract Vendee, as assignor, and Assignee, as assignee, pursuant to which Purchase Agreement Assignment, Contract Vendee has assigned to Assignee, and Assignee has assumed from Contract Vendee, all of Contract Vendee's right, title and interest in, to and under the Purchase Agreement;

WHEREAS, in connection with the Purchase Agreement (a) Assignor is required to assign, transfer and convey to the purchaser thereunder all of Assignor's right, title and interest in, to and under the Contracts and the Assigned Documents, and (b) such purchaser is required to accept such assignment and to assume Assignor's obligations under the Contracts and the Assigned Documents from and after the Effective Date; and

WHEREAS, Assignee and Assignor are consummating the transactions set forth in the Purchase Agreement on the Effective Date.

J-1

CONFIDENTIAL

RFC045126

NOW, THEREFORE, in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto to hereby agree as follows:

1. Unless otherwise stated herein, all capitalized terms used in this Assignment shall have the meanings specified in the Purchase Agreement.

2. Subject to the terms of the Purchase Agreement, Assignor hereby assigns, transfers, releases and sets over unto Assignee all of the right, title and interest of Assignor in, to and under (a) the Contracts, and (b) the Assigned Documents; provided, that the assignment set forth in this Section 2 shall not be deemed to include CBF's rights under Section 12 of the Intercreditor Agreement, such rights to be retained by CBF.

3. Assignee hereby accepts the foregoing assignment and hereby assumes (a) all of the obligations of Assignor under the Contracts from and after the Closing Date, and (b) all of the obligations of Assignor under the Assigned Documents from and after the Closing Date; provided, that the assumption set forth in this Section 3 shall not include the assumption of any obligations of CBF under Section 12 of the Intercreditor Agreement.

4. Existing Loan Purchaser hereby irrevocably waives any rights of Existing Loan Purchaser to receive payments from Assignor under Section 12 of the Intercreditor Agreement, and hereby irrevocably releases CBF from any obligation to forbear from receiving or recovering funds from any Mezzanine Guarantor (as defined in the Intercreditor Agreement), or to hold any funds so received or recovered by CBF in trust for Existing Loan Purchaser.

5. This Assignment may not be amended, modified or terminated except by an instrument in writing executed by the parties hereto.

6. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

7. This Assignment may be executed in counterparts, each of which shall constitute an original, and all of which taken together hall constitute one and the same instrument.

8. The provisions hereof are subject to the provisions of the Purchase Agreement, including, without limitation, the provisions of Sections 26, 27, 28, and 30 thereof.

[Signatures on following page]

J-2

CONFIDENTIAL

RFC045127

IN WITNESS WHEREOF, intending to be legally bound, the parties hereto have executed this Assignment as of the day and year first above written.

ASSIGNOR:

PAVILION LLC, a Maryland limited liability company

By:    Triton Pavilion, LLC, a Delaware limited liability company, its managing member

        By:    Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

                By:    CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

                    By:  _____
                            Name:
                            Title:

CBRE REALTY FINANCE TRS, LLC, a Delaware limited liability company

        By:  _____
             Name:
             Title:

ASSIGNEE:

[_____], a [_____]

By:    [_____], a [_____], its [_____]

        By:  _____
             Name:
             Title:

J-3

RFC045128

Existing Loan Purchaser is executing this Assignment to indicate its agreement to the terms of <u>Section 4</u> above:

AG/FCP MONTEREY FINANCE, L.L.C., a Delaware limited liability company

By:    AG Real Estate Manager, Inc., a Delaware corporation, its manager

By:    _____
        Name:
        Title:

J-4

CONFIDENTIAL

RFC045129

Schedule A-1
List of Contracts

CONFIDENTIAL

RFC045130

Schedule A-2
List of Assigned Documents

CONFIDENTIAL

RFC045131

Schedule B
Legal Description of the Premises

J-7

CONFIDENTIAL

RFC045132

EXHIBIT K
Form of Assigned Contract Notification Letters

[_____], [____]

VIA [Insert Form of Delivery under the Service Contract]

[Name of Service Contractor]
[Address of Service Contractor]
[Address of Service Contractor]

Re:   The Montgomery, Rockville, Maryland (the "Property")

Ladies & Gentlemen:

You have a contract (the "Service Contract") for the supply of services or the furnishing of goods to the owner of the Property.

Please be advised that the current owner of the Property, Pavilion LLC ("Seller"), is, on the date hereof, conveying and otherwise transferring its interest in the Property to [_____] ("Purchaser"), and in connection with such transfer, Seller is also assigning its interest in the Service Contract to Purchaser.

Please be advised that all demands for payment, correspondence and notices under the Service Contract should be delivered to Purchaser (as the new owner of the Property) as follows:

c/o [_____]
[_____]
[_____]
Attention: [_____]

Please call Purchaser's representative [_____], at [_____], if you have any questions regarding the Service Contract after the date hereof.

K-1

CONFIDENTIAL

RFC045133

Very truly yours,

Seller:

PAVILION LLC, a Maryland limited liability company

By:     Triton Pavilion, LLC, a Delaware limited liability company, its managing member

        By:     Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

               By:     CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

                     By:     _____
                                Name:
                                Title:

Purchaser:

[_____]

By:     [_____], its [_____]

        By:     _____
               Name:
               Title:

K-2

CONFIDENTIAL

RFC045134

EXHIBIT L
Form of FIRPTA Certification

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform [_____], a [_____] ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by PAVILION LLC, a Maryland limited liability company ("Transferor"), Transferor hereby certifies the following:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Transferor is not a disregarded entity, as such term is defined in Internal Revenue Code Income Tax Regulation § 1.1445–2(b)(2)(iii);

3. Transferor's U.S. employer identification number is [_____]; and

4. Transferor's office address is [_____].

Transferor understands that this certificate (this "Certificate") may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, Transferor declares that Transferor has examined this Certificate and to the best of Transferor's knowledge and belief this Certificate is true, correct and complete, and Transferor further declares that Transferor has authority to sign this Certificate.

IN WITNESS WHEREOF, this Certificate has been executed as of this [_____] day of [_____], [____].

PAVILION LLC, a Maryland limited liability company

By:  Triton Pavilion, LLC, a Delaware limited liability company, its managing member

By:  Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

By:  CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

By: _____
Name:
Title:

L-1

CONFIDENTIAL

EXHIBIT M
Reserved

M-1

CONFIDENTIAL

RFC045136

EXHIBIT N
Form of Assignment of Rights Under Public Offering Statement
for The Monterey Condominium

THIS ASSIGNMENT OF RIGHTS UNDER PUBLIC OFFERING STATEMENT (this "Assignment"), made as of the [____] day of [_____], [____], by and between PAVILION LLC, a limited liability company organized under the laws of the State of Maryland, having an office at c/o CBRE Realty Finance TRS, LLC, 185 Asylum Street, City Place, 31st Floor, Hartford, Connecticut 06103, as assignor ("Assignor"), and [_____], a limited liability company organized under the laws of the State of Delaware, having an office at c/o Angelo, Gordon & Co., L.P., 245 Park Avenue, 26th Floor, New York, New York 10167, as assignee ("Assignee").

W I T N E S S E T H:

WHEREAS, Assignor and Angelo Gordon Real Estate Inc., a Delaware corporation ("Contract Vendee") are parties to that certain Sale-Purchase Agreement, dated as of January 14, 2008 (as amended, the "Purchase Agreement"), by and between Assignor, as seller, and Contract Vendee, as purchaser, pursuant to which Purchase Agreement, Assignor has agreed to sell to Contract Vendee, and Contract Vendee has agreed to purchase from Assignor, the real property described therein (the "Property").

WHEREAS, Contract Vendee and Assignee are parties to that certain [Assignment and Assumption Agreement], dated as of [_____] (the "Purchase Agreement Assignment"), by and between Contract Vendee, as assignor, and Assignee, as assignee, pursuant to which Purchase Agreement Assignment, Contract Vendee has assigned to Assignee, and Assignee has assumed from Contract Vendee, all of Contract Vendee's right, title and interest in, to and under the Purchase Agreement.

WHEREAS, Assignor is the original "Developer" and/or "Declarant" under that certain Public Offering Statement and Consumer Guide for "The Monterey Condominium (including all exhibits and amendments thereto, the "POS") for which an Order of Registration was issued by the Maryland Secretary of State on October 3, 2005 pursuant to Section 11-127 of Title 11, Real Property Article, Annotated Code of Maryland (together with the 2003 Replacement Volume, the "Maryland Condominium Act").

WHEREAS, in connection with the Purchase Agreement, Assignor is required to assign, transfer and convey to the purchaser thereunder all of Assignor's right, title and interest in, to and under the POS; excluding, however, any obligations of Assignor under the POS.

WHEREAS, Assignee and Assignor are consummating the transactions set forth in the Purchase Agreement on the Effective Date.

WHEREAS, Assignor desires to make and Assignee desires to accept, the assignment of Assignor's rights, interests, exemptions, privileges and/or powers under the POS, as more fully set forth herein.

NOW, THEREFORE, in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto to hereby agree as follows:

1.      Unless otherwise stated herein, all capitalized terms used in this Assignment shall have the meanings specified in the Purchase Agreement.

N-1

CONFIDENTIAL

RFC045137

2.    Assignor hereby grants, transfers and assigns and Assignee assumes and accepts from Assignor all rights of the "Developer" and "Declarant" under the POS, including without limitation, the right, but not the obligation to amend the POS, and the right, but not the obligation, to proceed with and fully implement the conversion of the Property from a residential rental facility to a condominium regime pursuant to the Maryland Condominium Act, the Montgomery County Code, and any other applicable law and/or the requirements of any governmental or quasi-governmental agency or authority having jurisdiction over the Property.

3.    Assignee shall not be responsible for and does not assume any warranties, liabilities, or obligations of any kind whatsoever which accrued or may accrue to Assignor under the POS or pursuant to law, including, but not limited to, any warranties, liabilities or obligations to any contract purchasers in connection with Assignor's sales of condominium units within the Property or in connection with Assignor's marketing, leasing and sales activities regarding the Property.

4.    Except to the extent expressly stated in this Assignment, Assignee shall not otherwise be deemed to be the Declarant or the Developer under the POS for any other purpose. Exercise by Assignee of the rights assigned to Assignee hereunder shall be at Assignee's sole and absolute discretion, shall be exclusively by Assignee, and shall not require or be subject to the consent or approval of any other individual or entity. All or any portion of the rights assigned to assignee hereunder may be further assigned by Assignee without notice to or the consent of Assignor or any other Party.

5.    Assignee hereby indemnifies and holds Assignor harmless from and against any and all claims, expenses, costs, obligations or other liabilities whatsoever in connection with, arising out of or associated with Assignee's obligations under the POS, arising after the date hereof, including but not limited to, Assignee's marketing, sales, leasing and conversion activities in connection with the Property.

6.    This Assignment shall bind and inure to the benefit of Assignor, Assignee, and their respective successors and assigns. This Assignment is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity not a party to this Assignment as a third party beneficiary.

7.    The provisions of this Assignment are not intended to create, nor shall they in any way be interpreted to create, a joint venture, partnership, or other similar relationship between the parties hereto. Assignor shall execute such further assurances of this Assignment as may be reasonably requested by Assignee.

8.    This Assignment may not be amended, modified or terminated except by an instrument in writing executed by the parties hereto.

9.    All questions with respect to construction of this Assignment shall be determined in accordance with the laws of the State of Maryland.

10.    Each provision of this Assignment is intended to be severable. If any term or provision of this Assignment shall be determined to be illegal or invalid for any reason whatsoever, such provision shall be severed from this Assignment and shall not affect the validity of the remainder of this Assignment.

11.    This Assignment may be executed in counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

N-2

CONFIDENTIAL

RFC045138

12.     The provisions hereof are subject to the provisions of the Purchase Agreement, including, without limitation, the provisions of Sections 26, 27, 28 and 30 thereof.

[Signatures on following page]

N-3

CONFIDENTIAL

RFC045139

IN WITNESS WHEREOF, intending to be legally bound the parties hereto have executed this Assignment as of the day and year first above written.

ASSIGNOR:

PAVILION LLC, a Maryland limited liability company

By:   Triton Pavilion, LLC, a Delaware limited liability company, its managing member

     By:   Montrose Investment Holdings, LLC, a Delaware limited liability company, its managing member

          By:   CBRE Realty Finance TRS, LLC, a Delaware limited liability company, its managing member

              By: _____
                      Name:
                      Title:

ASSIGNEE:

[_____], a [_____]

By:   [_____], a [_____], its [_____]

          By: _____
             Name:
             Title:

N-4

CONFIDENTIAL

RFC045140

EXHIBIT O
Form of Owner's Affidavit

(See Attached)

O-1

CONFIDENTIAL

RFC045141

## <u>OWNER/SELLER AFFIDAVIT</u>

Date:                    _____, 2008

Case No.:          07158

Re:                    Real Property (the "Property") Described in Commitment for Title Insurance
No. LTIC-07158 (the "Commitment"), issued on behalf of the title insurance
company identified at the end of this Affidavit

THE UNDERSIGNED, BEING DULY SWORN, DOES HEREBY DEPOSE AND AFFIRM
THAT THE UNDERSIGNED HAS PERSONAL KNOWLEDGE OF THE FACTS AND
CIRCUMSTANCES INVOLVING THE PROPERTY, AND THAT TO THE BEST OF THE
UNDERSIGNED'S KNOWLEDGE, INFORMATION AND BELIEF:

A.    **Owner.**  The undersigned is _____ of PAVILION, LLC, a Maryland
limited liability company, formally known as Home Properties Pavilion, LLC, formerly
known as Bernmil Associates L.L.P., formerly known as Bernmil Associates, owner
("Owner") of the Property.  Owner is in good standing with the Maryland State Department
of Assessments and Taxation.

B.    **No Other Contracts.**  Owner has not entered into any contracts of sale that would prohibit
Owner from transferring title or encumbering title to the Property, other than the pending
contract with Angelo Gordon/Federal Capital Partners, as assigned to and as refer- enced in
Paragraph C, below.

C.    **Condominium Contract Purchasers.**  In connection with Owner's plans to establish a
condominium regime on the Property, Owner entered into contracts of sale for
condominium units to be established with 42 contract buyers, as set forth on the attached
<u>Exhibit "A"</u>.  Certain of those contract buyers have executed full releases of their contract
rights, copies of which are set forth in attached <u>Exhibit "B"</u>.

D.    **Leases.**  Set forth on attached <u>Exhibit "C"</u> is a rent roll listing all persons with a right or
claim to possession of any part of the Property as tenant under an unrecorded lease (oral or
written).

E.    **Bankruptcy.**  The Owner (i) is not in receivership or dissolution, (ii) has not made an
assignment for the benefit of creditors or admitted in writing its inability to pay its debts as
they mature, (iii) has not been adjudicated a bankrupt, or (iv) has not filed a petition in
voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with
creditors under the Federal Bankruptcy Law or any other similar law or statute of the united
States.  No such petition, of which the Owner is aware, has been filed against the Owner.

F.    **Unrecorded Easements.**  Owner has not entered into any unrecorded easements or
rights-of-way servicing, crossing or affecting the Property.

CONFIDENTIAL

G.   **Recent Financing.** There are no deeds of trust, mortgages or other liens against the Property, other than as set forth in this Affidavit or the Commitment. Owner has not executed any deed, deed of trust, mortgage, financing statement or other instrument of conveyance or encumbrance affecting the Property since the Effective Date of the Commitment.

H.   **FIRPTA.** For purposes of complying with the Federal law (26 U.S.C. 1445(b)(2)) concerning the possible withholding of tax upon the disposition of real property, Owner (as seller) hereby deposes and says, under penalty of perjury, that Owner is not a foreign person as defined in 26 U.S.C. 1455(f)(3); and is not a disregarded entity, as such term is defined in Internal Revenue Code and Income Tax Regulation Sec. 1.1445-2(b)(2)(iii); and that the EIN of Owner (as seller) is _____; and that Owner's address is _____.

I.   **TIN Solicitation.** For purposes of 1099 annual reporting, Owner (as seller) hereby certifies, under penalty of perjury, that the EIN listed above is its current taxpayer identification number.

THIS AFFIDAVIT is given to induce Lawyer's Title Insurance Corporation (the "Company") to make settlement and issue its title insurance policies insuring the interest in the Property created by this transaction.

_____
_____
_____ of Owner

Owner hereby indemnifies and holds harmless the Company, and its agent conducting closing, from all loss or damage that it may sustain by reliance on this Affidavit.

PAVILION, LLC

By:_____

\* \* \*

SUBSCRIBED AND SWORN TO before me this _____ day of _____, 2008.

_____
Notary Public

My Commission Expires: _____

[NOTARIAL SEAL]

L&B 923157v1

2

CONFIDENTIAL

RFC045143

EXHIBIT P
Schedule of Environmental Reports

Phase I Environmental Site Assessment dated July 11, 2005, titled "The Pavilion, 5901 Montrose Road, North Bethesda, Maryland 20852", prepared by MEC*, LLC for Pavilion, LLC, 410 Severn Avenue, Suite B412, Annapolis, Maryland 21403.

R-1

CONFIDENTIAL

RFC045144

EXHIBIT Q
The Existing Loan Purchase Agreement

(See Attached)

R-2

CONFIDENTIAL

RFC045145

LOAN PURCHASE AGREEMENT

Dated as of January 14, 2008

Between

iSTAR FM LOANS LLC

and

AG/FCP MONTEREY FINANCE, L.L.C.

CONFIDENTIAL

RFC045146

## LOAN PURCHASE AGREEMENT

This LOAN PURCHASE AGREEMENT ("**Agreement**"), dated as of January 14, 2008, by and between iSTAR FM LOANS LLC, a Delaware limited liability company ("**Seller**"), and AG/FCP MONTEREY FINANCE, L.L.C., a Delaware limited liability company, or its permitted assigns ("**Purchaser**").

### RECITAL:

A.   Seller is the owner of the Mortgage Loan as defined herein.

B.   Seller desires to sell to Purchaser, and Purchaser desires to buy from Seller, Seller's right, title and interest in the Mortgage Loan.

C.   Seller and Purchaser desire to enter into this Agreement to set forth the terms and conditions of the sale and purchase of the Mortgage Loan.

### AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

1.   <u>Definitions</u>.  For purposes of this Agreement, capitalized terms have the meanings set forth in **Exhibit 1** unless the context otherwise requires.

2.   <u>Agreement to Purchase</u>.

2.1   <u>Sale and Purchase.</u>  Seller agrees to sell, convey and assign to Purchaser without recourse or warranty (except as expressly set forth in this Agreement) and Purchaser agrees to purchase, accept and assume from Seller, for the Purchase Price (as defined in Section 2.2(a) below), on the terms and conditions set forth in this Agreement, all of Seller's right, title and interest in and to the Mortgage Loan and the Related Property, on a servicing released basis.

2.2   <u>Purchase Price</u>.

a.   The purchase price ("**Purchase Price**") to be paid by Purchaser to Seller for the Mortgage Loan shall be an amount equal to Ninety-Seven Million and No/100 Dollars ($97,000,000.00).

b.   Purchaser shall pay the Purchase Price to Seller at the Closing by wire transfer of good immediately available federal funds pursuant to the following wiring instructions (it being agreed that the Deposit has been posted pursuant to Section 2.3(a) and, pursuant to Section 2.3(c), will be applied to the Purchaser's obligation to pay the Purchase Price at the Closing):

Bank: JP Morgan Chase Bank
ABA Number: 021-000-021
Beneficiary: iStar FM Loans LLC

CONFIDENTIAL

RFC045147

Account Number: 708-315825
Reference: iStar FM Loans LLC/AG/FCP Monterey Finance, L.L.C.)

2.3   Deposit.

a.   Simultaneously with the execution and delivery hereof, Purchaser shall deposit with Linowes and Blocher LLP, as agent for Lawyers Title Insurance Corporation, having an office at 7200 Wisconsin Avenue, Suite 800, Bethesda, Maryland 20814-4842, as escrow agent (the "Escrow Agent"), good immediately available funds as an earnest money deposit in an amount equal to Five Million and No/100 Dollars ($5,000,000.00) (the "Deposit"). All earnings on the Deposit shall be earned for the benefit of Seller and paid to the Seller concurrently with the release of the Deposit.

b.   The Deposit shall be non-refundable to Purchaser and shall be retained by Seller notwithstanding the failure of the Closing to occur hereunder, unless this Agreement is terminated by Purchaser pursuant to Section 7.3 of this Agreement.

c.   If the Closing shall occur, the Deposit shall, upon payment to the Seller pursuant to Section 2.3(b), be credited against the Purchase Price due from Purchaser at the Closing.  All earnings with respect to the Deposit, which shall not be credited against the Purchase Price, shall be paid to Seller at the Closing by wire transfer pursuant to the wiring instructions set forth in Section 2.2(b) of this Agreement.

d.   The Deposit shall be wire transferred to Escrow Agent on the date hereof pursuant to the following wiring instructions:

| | |
|---|---|
| Bank: | Suntrust Bank |
| ABA Number: | 061000104 |
| Account Number: | 018-3836 |
| Reference: | Linowes and Blocher LLP |
| Attention: | William M. Hoffman, Jr. |

2.4   Intentionally Omitted.

2.5   Forbearance.  Seller agrees that Seller has not commenced and will not commence foreclosure proceedings against the collateral for, or exercise its other remedies with respect to, the Mortgage Loan prior to the earlier to occur of the following (the "Forbearance Period") (a) termination of this Agreement pursuant to Section 7.3 or otherwise, (b) Purchaser's default under this Agreement, after the expiration of any applicable notice or cure period expressly provided hereunder, (c) March 24, 2008 (unless Closing has occurred prior to such date), (d) the commencement of any litigation by the Mortgage Borrower, the Purchaser, the IDOT Guarantor, the Mezzanine Lender, or any of their respective Affiliates against the Seller or any Affiliate thereof in connection with the Mortgaged Property, the Mortgage Loan or the loan made by the Mezzanine Lender to the Mezzanine Borrower, (e) termination or cancellation of the Purchase Contract, or (f) the occurrence of an "Event of Default" (as defined in the Loan Agreement) under Section 8.1(B)(but excluding Section 8.1(B)(ii)(b)) of the Loan Agreement.

CONFIDENTIAL

Notwithstanding any of the forgoing to the contrary, it is agreed that the Seller may proceed in accordance with Section 3.2(b).

2.6   Escrow.   The Deposit shall be held by Escrow Agent, in trust, on the terms hereinafter set forth:

a.   Escrow Agent shall deposit the Deposit in an interest bearing day of deposit-day of withdrawal bank account, with a Federally insured financial institution.

b.   Escrow Agent shall not commingle the Deposit with any other funds of Escrow Agent or others and shall promptly advise Purchaser and Seller of the number of any bank account in which the Deposit has been deposited.

c.   If the Closing takes place under this Agreement, then Escrow Agent shall disburse the Deposit and all earnings thereon on the Closing Date in accordance with Section 2.3 of this Agreement.

d.   If this Agreement is terminated in accordance with the terms hereof or if the Closing does not take place under this Agreement by reason of the failure of Purchaser or Seller to comply with its obligations hereunder, then Escrow Agent shall pay the Deposit as required by the terms of this Agreement, provided, however, that notwithstanding the foregoing, Escrow Agent shall not pay over the Deposit to any party hereunder unless and until the following procedure is complied with:  The party requesting disbursement of the Deposit (the "Requesting Party") shall deliver notice to Escrow Agent and all other parties hereto requesting such disbursement.  Within five (5) days after receipt of such notice of request, Escrow Agent shall deliver notice to all other parties hereto stating that the Requesting Party has requested such disbursement (and including a copy of the Requesting Party's notice).  Within ten (10) days after receipt of Escrow Agent's notice, the non-requesting party shall either: (a) agree to permit such disbursement by Escrow Agent or (b) inform Escrow Agent that the non-requesting party does not agree to permit such disbursement.  If the non-requesting party acts under clause (a), then Escrow Agent shall make the disbursement as requested by the Requesting Party.  If the non-requesting party acts under clause (b), then Escrow Agent shall not make any disbursement except as provided in Section 2.6(f) below.  If the non-requesting party fails to respond during the foregoing ten (10) day period, same shall be deemed to be the response of the non-requesting party under clause (a) on the last day of such ten (10) day period.

e.   It is agreed that the duties of Escrow Agent are only as herein specifically provided, and, subject to the provisions of Section 2.6(f) hereof, are purely minis-terial in nature, and that Escrow Agent shall incur no liability whatever except for willful misconduct or gross negligence, as long as Escrow Agent has acted in good faith.  Seller and Purchaser each release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder.

f.   Escrow Agent is acting as a stakeholder only with respect to the Deposit.  If there is any dispute as to whether Escrow Agent is obligated to deliver the Deposit as to whom the Deposit is to be delivered, Escrow Agent shall not make any delivery, but in such event Escrow Agent shall hold same until receipt by Escrow Agent of an authorization in

CONFIDENTIAL

RFC045149

writing, signed by all the parties having an interest in such dispute, directing the disposition of same, or, in the absence of such authorization, Escrow Agent shall hold the Deposit until the final determination of the rights of the parties in an appropriate proceeding. If such written authorization is not given, or proceedings for such determination are not begun within thirty (30) days after the Closing Date and diligently continued, Escrow Agent may bring an appropriate action or proceeding for leave to deposit the Deposit in court pending such determination. Escrow Agent shall be reimbursed for all costs and expenses of such action or proceeding including, without limitation, reasonable attorneys' fees and disbursements, by the party determined not to be entitled to the Deposit. Upon making delivery of the Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder.

g.      Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received the Deposit, and that Escrow Agent will hold the Deposit in escrow, pursuant to the provisions hereof.

h.      Purchaser shall pay any and all costs and expenses incurred by Escrow Agent as a result of this transaction

3.   Transfer of Mortgage Loan.

3.1      [Intentionally Omitted].

3.2      Transfer; Retention of Guaranty.

a.      Ownership.  On the Closing Date, the ownership of Seller's interest in the Mortgage Loan and Related Property will be transferred, without recourse or warranty (except as provided in this Agreement), to Purchaser as provided in the Closing Documents.

b.      Guaranty.  Notwithstanding anything in this Agreement to the contrary, Seller's interest in the Guaranty shall not be transferred to Purchaser and Seller shall retain legal and equitable title to the Guaranty prior to and after the Closing, to the extent permitted by law.  In the event that Seller's interest in the Guaranty shall be deemed to have transferred to Purchaser, by operation of law or otherwise, Purchaser and Seller shall cooperate to enforce the Guaranty and any amount ("Seller's Guaranty Amount") collected thereunder shall be held in trust for the benefit of Seller.  Purchaser shall remit, or cause to be remitted, to Seller within five (5) Business Days of its receipt, any portion of the Seller's Guaranty Amount received by Purchaser or any affiliate thereof.

3.3      Certain Pre-Closing Covenants During Forbearance Period.  From the date hereof until the expiration of the Forbearance Period, without the prior consent of the Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, Seller shall not, in any material respect, (i) except as required by law or the terms of any Loan Document, take any affirmative action to release (A) any collateral from the lien of or (B) any party from any liability on or with respect to, the Mortgage Loan; (ii) compromise or settle any claims of any kind or character with respect to the Mortgage Loan; (iii) sell or encumber, or contract to sell or encumber, the Mortgage Loan, or any portion thereof or any interest therein or agree to subordinate the Mortgage Loan; or (iv) modify or amend any Loan Document.

CONFIDENTIAL

3.4   Intentionally Omitted.

4.   Examination of Mortgage File and Due Diligence Review.

4.1   Availability of Materials.

a.   Deliveries and Cooperation. Seller will cooperate with Purchaser, in its examination of the Mortgage File and Servicing File for the Mortgage Loan and its due diligence review of the Mortgage Loan.

b.   Access. Subject to the confidentiality requirements set forth in Section 4.2, upon two (2) Business days notice from Purchaser, Seller shall allow Purchaser's designated representatives reasonable access to examine, audit, inspect, copy, duplicate or abstract the Mortgage File, the Servicing File or any other books and records in the possession of Seller related to the Mortgage Loan or the Related Property.

4.2   Confidentiality. Purchaser will keep confidential any information regarding Seller, the Mortgage Loan, the Related Property, any obligor or guarantor of the Mortgage Loan or any collateral for the Mortgage Loan that has been, or may be, delivered or disclosed to Purchaser by Seller that is not otherwise available to Purchaser from other sources that, to the Purchaser's knowledge, are not bound by obligations of confidentiality with respect to such information; provided, however, that such information need not be kept confidential to the extent Purchaser is required by law or court order to disclose such information.

5.   Representations and Warranties of Seller and Purchaser.

5.1   Representations and Warranties of Seller. To induce Purchaser to enter into this Agreement, Seller represents and warrants to Purchaser that:

a.   Seller is a limited liability company created by and existing under the laws of the State of Delaware. Seller has the requisite power and authority and legal right to own the Mortgage Loan, to transfer and convey the Mortgage Loan to Purchaser, and to execute and deliver, engage in the transactions contemplated by, and perform and observe the terms and conditions of this Agreement.

b.   This Agreement has been duly and validly authorized, executed and delivered by Seller, all requisite action by Seller has been taken in connection therewith, and (assuming the due authorization, execution and delivery hereof by Purchaser) this Agreement constitutes the valid, legal and binding agreement of Seller, enforceable in accordance with its terms, except as such enforcement may be limited by laws relating to bankruptcy, insolvency, reorganization, receivership or moratorium, other laws relating to or affecting the rights of creditors generally and general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

c.   To Seller's knowledge, Seller is the owner of the Mortgage Loan.

CONFIDENTIAL

d.    Seller has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loan or the consummation of any other actions contemplated hereby.

e.    To Seller's knowledge, based solely on the representations and warranties of Fremont, Seller has provided to Purchaser correct and complete copies of each of the Loan Documents delivered to Seller by Fremont pursuant to the Fremont Assignment.

f.    Seller has not pledged or granted any security interest upon Seller's interest in the Mortgage Loan.

g.    To Seller's knowledge, the outstanding principal balance owing of the Mortgage Loan as of January 14, 2008 is $103,571,973.51.

5.2    <u>Representations and Warranties of Purchaser</u>.  To induce Seller to enter into this Agreement, Purchaser hereby represents and warrants to Seller that:

a.    Purchaser is a limited liability company, validly existing, and in good standing under the laws of the State of Delaware.

b.    Purchaser has the requisite power and authority to acquire the Mortgage Loan, to execute and deliver this Agreement and to enter into and consummate all transactions contemplated by this Agreement.  Purchaser has duly authorized the execution, delivery and performance of this Agreement and has duly executed and delivered this Agreement.  This Agreement, assuming due authorization, execution and delivery by Seller, constitutes the valid legal and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

c.    Purchaser has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loan or the consummation of any other actions contemplated hereby.

d.    Purchaser is an "accredited" investor as that term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, or is a "qualified purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended.

e.    Purchaser has delivered to Seller a true, correct and complete copy of the Purchase Contract.

f.    On or before January 21, 2008, Purchaser shall cause to be sent such notice or notices as may be required to initiate the time period within which any applicable tenant, the Montgomery County Department of Housing and Community Affairs or the Maryland Housing Opportunities Commission is required to exercise a Right of First Refusal.

CONFIDENTIAL

RFC045152

5.3   Как-Is.   Except as expressly set forth in this Agreement, Purchaser acknowledges it has been given an opportunity to review all information that it deems material to its decision to purchase the Mortgage Loan and has made its decision to purchase the Mortgage Loan based on its independent review of this information and is not relying on any representation or warranty, either express or implied, made by Seller or any affiliate thereof, other than as otherwise set forth in Section 5.1 of this Agreement.  Purchaser further acknowledges that in acquiring the Mortgage Loan, Purchaser is, except as expressly set forth in this Agreement, assuming the risk of full or partial loss which is inherent with the credit, collateral and collectibility risks associated with the quality and character of the Mortgage Loan.  Except as expressly set forth in this Agreement, Purchaser is assuming all risks with respect to the completeness, accuracy or sufficiency of the Mortgage Loan and any information pertaining thereto.  The Mortgage Loan and Related Property will be acquired by Purchaser "AS-IS, WHERE-IS" with all faults.

6.   Indemnification Obligations.

6.1   Seller's Indemnification Obligations.   Seller shall defend, indemnify and hold Purchaser, its Affiliates and their respective members, managers, officers, directors and shareholders harmless from and against any claim, demand or cause of action, or any action or other proceeding arising out damages, losses or fees incurred or suffered by Purchaser as a result of the loss or destruction of the Mortgage Note, or as a result of a claim by a third party, not affiliated with the Purchaser, Borrower, IDOT Guarantor or the Mezzanine Lender (or any of their respective successors or assigns) based on any willful misconduct on the part of Seller in violation of the Loan Documents or applicable law with respect to the Mortgage Loan, occurring during the period commencing at the date and time that the Mortgage Loan was acquired by the Seller and ending immediately prior to the Closing; provided, however, in no event shall the foregoing obligation to defend, indemnify and hold harmless apply to any liability relating to any unpaid state or county transfer or recordation tax payable by the IDOT Guarantor or in respect of the Mortgage.

6.2   Purchaser's Indemnification Obligations.   From and after the Closing, Purchaser shall have assumed all of the Seller's obligations with respect to the Mortgage Loan (except for the obligations under the Guaranty) and shall defend, indemnify and hold Seller, its Affiliates and their respective members, managers, officers, directors and shareholders harmless from and against any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against Seller, or any Affiliate members, managers, officers, directors and shareholders harmless thereof, by Borrower, Mezzanine Borrower, IDOT Guarantor, Mezzanine Lender or any Affiliate of any of the foregoing, which directly or indirectly relates to, arises from or is based on the Mortgage Loan, the Related Property, the Mortgaged Property, this Agreement or any of the transactions contemplated hereunder; provided, however, that in no event shall the foregoing indemnity be construed to apply to any liability arising from (a) any act or omission of Seller or Fremont or (b) the Guaranty.

7.   Closing.

7.1   Timetable.

RFC045153

a.   Closing Date. The closing of the sale of the Mortgage Loan (the "Closing") shall take place in escrow at 11:00 A.M. (New York time) at the offices of the Escrow Agent on the Closing Date or at such other place, date and time as the Parties hereto may mutually agree in writing.

7.2   Conditions to Closing.

a.   Conditions to Purchaser's Obligations.   The obligations of Purchaser under this Agreement to be performed on the Closing Date are subject to satisfaction of each of the following conditions (or waiver by Purchaser):

i.   All of the representations and warranties of Seller specified in Section 5.1 of this Agreement will be true and correct in all material respects as of the Closing Date, as if first made on the Closing Date.

ii.   All Closing Documents set forth in Section 8.1 shall be duly executed (as applicable) and delivered by Seller.

iii.   Seller shall, in all material respects, have performed or otherwise complied with all of its obligations under this Agreement.

iv.   No tenant association with respect to the Mortgaged Property shall have been formed on or prior to March 6, 2008.

v.   No Right of First Refusal shall have been timely and properly exercised by a ROFR Party.

vi.   Seller shall not have executed and delivered a release of the lien with respect to all or any portion of the Mortgaged Property under the Mortgage Loan Documents.

vii.   The Mortgage Loan shall not have been repaid in full.

viii.   No suit, investigation, action or other proceeding will be threatened or pending against Seller before any court or governmental agency that could reasonably be expected, in any material respect, to result in any restraint, prohibition or the obtaining of damages or other relief against Seller or in connection with this Agreement or the consummation of the transactions contemplated hereby.

b.   Conditions to Seller's Obligations. The obligations of Seller under this Agreement to be performed on the Closing Date are subject to satisfaction of each of the following conditions (or waiver by Seller):

i.   All of the representations and warranties of Purchaser specified in Section 5 of this Agreement will be true and correct in all material respects as of the Closing Date, as if first made on the Closing Date.

RFC045154

ii.   All Closing Documents will be duly executed and delivered by all signatories (other than Seller).

iii.   Purchaser shall, in all material respects, have performed or otherwise complied with all of its obligations under this Agreement.

iv.   No suit, investigation, action or other proceeding will be threatened or pending against Seller or Purchaser before any court or governmental agency that could reasonably be expected to result in any restraint, prohibition or the obtaining of damages or other relief against Seller or Purchaser in connection with this Agreement or the consummation of the transactions contemplated hereby.

v.   The Mortgage Loan shall not have been repaid in full.

7.3   Termination.  All Parties agree to use reasonable good faith efforts to perform their respective obligations hereunder in a manner that will enable the sale and purchase of the Mortgage Loan to occur on the Closing Date.  If any of the foregoing conditions set forth in Section 7.2(a) above is not satisfied, other than as a result of a default on the part of Purchaser, Purchaser will be entitled to terminate this Agreement and receive a refund of the Deposit.  If any of the foregoing conditions set forth in Section 7.2(b) above is not satisfied, other than as a result of a default on the part of Seller, Seller will be entitled to terminate this Agreement and the Deposit shall be retained by Seller in accordance with Section 2.2.  In the event that (i) Purchaser is entitled to terminate this Agreement and receive a refund of the Deposit pursuant to Section 7.2(a) and (ii) Seller is also entitled to terminate this Agreement pursuant to Section 7.2(b), then if either party terminates this Agreement, and regardless of which party first attempts to terminate this Agreement, Purchaser shall be entitled to a refund of the Deposit.  Seller's sole and exclusive remedy for a default by Purchaser hereunder shall be to retain the Deposit, together with accrued interest thereon, as liquidated damages.  THE PARTIES AGREE THAT SELLER'S DAMAGES IN THE EVENT OF PURCHASER'S DEFAULT HEREUNDER WOULD BE DIFFICULT AND IMPRACTICAL TO CALCULATE AND THAT THE FOREGOING PAYMENT (A) HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES REASONABLE ESTIMATE OF SELLER'S DAMAGES, (B) REPRESENTS A FAIR AND ADEQUATE MEASURE OF DAMAGES, AND (C) REPRESENTS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST PURCHASER, AT LAW OR IN EQUITY, IN THE EVENT OF A DEFAULT UNDER THIS AGREEMENT ON THE PART OF PURCHASER.  Purchaser's sole and exclusive remedy for a default by Seller hereunder shall be either to (a) terminate this Agreement and receive a refund of the Deposit or (b) demand specific performance of this Agreement.

8.   Closing Documents.

8.1   Deliveries by Seller.  At the Closing, Seller will deliver to Purchaser:

a.   The Bill of Sale, executed by Seller.

b.   The Assignment and Assumption Agreement, executed by Seller.

c.    The UCC Financing Statement Amendments.

d.    A closing statement prepared and executed by Seller.

e.    The Mortgage File including, the original Mortgage Note, together with an allonge to such original Mortgage Note (which allonge shall be in the form attached hereto as **Exhibit 6**) or a lost note affidavit and indemnity or similar evidence as to the lost instrument (in the event that Seller is unable to locate the original Mortgage Note).

f.    The Servicing File.

g.    A certificate signed by Seller stating that each of Seller's representations and warranties in this Agreement are true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on the Closing Date and that Seller has complied with all of the covenants of Seller in this Agreement to be performed by Seller on or prior to the Closing Date.

h.    A release, substantially in the form attached hereto as **Exhibit 5**, duly executed by Seller releasing the Mezzanine Lender and its Affiliates from all claims relating to the Mortgage Loan, the Property and the Related Property.

i.    A written direction executed by the Seller to the Escrow Agent directing the Escrow Agent to disburse the Deposit to the Seller by wire transfer to the account specified in Section 2.2(b).

8.2    <u>Deliveries by Purchaser</u>.    At the Closing, Purchaser will deliver to Seller:

a.    A wire transfer of good immediately available federal funds in the amount of the Purchase Price (less any portion of the Deposit to be credited against the Purchase Price in accordance with Section 2.3(c)).

b.    A receipt pertaining to the Mortgage File and the Servicing File.

c.    A certificate signed by Purchaser stating that each of Purchaser's representations and warranties in this Agreement are true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on the Closing Date and that Purchaser has complied with all covenants of Purchaser in this Agreement to be performed by Purchaser on or prior to the Closing Date.

d.    The closing statement prepared by Seller described in Section 8.1 executed by Purchaser.

e.    The Assignment and Assumption Agreement, executed by Purchaser.

f.    A release, substantially in the form attached hereto as **Exhibit 5**, duly executed by Borrower, the IDOT Guarantor, the Mezzanine Borrower and Mezzanine

CONFIDENTIAL

Lender releasing the Seller and its Affiliates and predecessors from all claims relating to the Mortgage Loan, the Property and the Related Property.

       i.    A written direction executed by the Purchaser addressed to the Escrow Agent directing the Escrow Agent to disburse the Deposit to the Seller by wire transfer to the account specified in Section 2.2(b).

    8.3   <u>Post-Closing Matters.</u>

       a.    <u>Servicing.</u>   Purchaser is responsible for making its own arrangements as to servicing of the Mortgage Loan after the Closing. Seller shall not have any obligation to Purchaser with respect to servicing of the Mortgage Loan after the Closing.

       b.    <u>Notices to Insurers.</u> As to each title, hazard and other insurance policy assigned to Purchaser, Purchaser is responsible for notifying the insurer or other appropriate person after the Closing regarding the assignment of Seller's interest to Purchaser. Seller will have no obligation to Purchaser with respect to the giving of such notice, however, Seller shall cooperate with Purchaser in all reasonable respects in order to effectuate such notice.

       c.    <u>No Suit.</u> Seller agrees that, following the Closing, it will not sue the Mezzanine Lender in connection with the Mortgage Loan, the Property or the Related Property.

    9.  <u>Costs.</u> Except as otherwise set forth in this Agreement, all costs and expenses in connection with the transactions contemplated hereunder will be borne by the Party that incurred such costs. Notwithstanding the foregoing, Purchaser shall bear and be responsible for all costs and expenses relating to the filing or recording of any of the Closing Documents and any transfer or other taxes imposed on the sale of the Mortgage Loan.

    10. <u>Notices.</u> All communications provided for or permitted hereunder will be in writing and will be deemed to have been duly given if (a) personally delivered, (b) mailed by registered or certified mail, postage prepaid and received by the addressee, (c) sent by express courier delivery service and received by the addressee, or (d) transmitted by telex or facsimile transmission (or any other type of electronic transmission agreed upon by the Parties) and confirmed by a writing delivered by any of the means described in (a), (b) or (c), in each case at the following addresses:

| | |
|---|---|
| If to Purchaser: | c/o Angelo, Gordon & Co., L.P. |
| | 245 Park Avenue, 26th Floor |
| | New York, New York 10167 |
| | Attention:   Dana Roffman |
| | Phone:       212-692-2000 |
| | |
| | Fax:          212-867-5436 |
| | |
| With a copy to: | Duval & Stachenfeld LLP |
| | 300 East 42nd Street, 3rd Floor |
| | New York, New York 10017 |

CONFIDENTIAL

RFC045157

|  | Attention: | Terri L. Adler, Esq. |
|---|---|---|
|  | Phone: | 212-883-1700 |
|  | Fax: | 212-883-8883 |

If to Escrow Agent:  c/o Linowes and Blocher, LLP
7200 Wisconsin Avenue, Suite 800
Bethesda, Maryland 20814-4842
Attention:   William M. Hoffman, Esq.
Phone:       301-961-5212
Fax:          (301) 654-2801

If to Seller:  iStar FM Loans LLC
c/o iStar Financial Inc.
1114 Avenue of the Americas
New York, New York 10036
Attention:   Chief Operating Officer
Phone:       212-930-9400
Fax:          212-930-9494

With a copy to:  iStar Financial Inc.
1114 Avenue of the Americas
New York, New York 10036
Attention:   General Counsel
Phone:       212-930-9406
Fax:          212-930-9492

With a copy to:  iStar Asset Services Inc.
180 Glastonbury Boulevard, Suite 201
Glastonbury, Connecticut 06033
Attention:   President
Phone:       860-815-5910
Fax:          860-815-5901

With a copy to:  Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Attention:   Kenneth M. Jacobson, Esq.
Phone:       312-902-5445
Fax:          312-577-8646

With a copy to:  Katten Muchin Rosenman LLP
401 S. Tryon Street
Suite 2600
Charlotte, North Carolina 28202-1935
Attention:   David M. Wilkinson, Esq.
Phone:       704-344-3044
Fax:          704-344-2279

CONFIDENTIAL

RFC045158

The designation of such person and/or address may be changed at any time by either Party upon written notice given under this Section. All notices, demands, requests or other communications sent pursuant to this Section will be deemed received (i) if personally delivered, on the business day of delivery, (ii) if sent by telecopy or electronic mail before 5:00 P.M. of the locality of the address of the notice on the day sent if a business day or, if such day is not a business day or if sent after 5:00 P.M. of the locality of the address of the notice on the next business day, (iii) if sent by overnight express carrier, on the business day immediately following the day sent, or (iv) if sent by registered or certified mail, on the earlier of the third business day after the day sent or when actually received.

11. Severability of Provisions. Any part, provision, representation, warranty or covenant of this Agreement that is held to be void or unenforceable by a court of competent jurisdiction will be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation, warranty or covenant of this Agreement that is unenforceable or is held to be void or unenforceable by a court of competent jurisdiction will, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof, and any such unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the Parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

12. Further Assurances. Seller and Purchaser each agree to execute and deliver such instruments and take such actions as the other may, from time to time, reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement.

13. Survival. The representations, warranties and agreements made by a Party herein and in any certificate or other instrument delivered pursuant hereto will not survive the Closing, except the provisions of Sections 3.2(b), 5, 8.3 and 12 shall survive the Closing for a period of one (1) year and the provisions of Section 6 shall survive the Closing forever; provided, however, the provisions of Sections 5.1(c), 5.1(e), 5.1(f), 5.1(g), 5.2(e) and 5.2(f) shall terminate simultaneously with the closing under the Purchase Contract.

14. Governing Law. The laws of the State of New York govern the interpretation and performance of this Agreement.

15. Entire Agreement; Binding Effect. This Agreement (including all exhibits and any other attachments) constitutes the entire understanding between the Parties regarding the subject matter of this Agreement, supersedes any and all previous communications and understandings between the Parties (including any bid, indication of interest, commitment letter or letter of interest) regarding the subject matter of this Agreement, and binds and inures to the benefit of the Parties, their successors and permitted assigns. Neither Party has entered into this Agreement in reliance upon any oral or written representation or information provided by the other Party other than the representations and information expressly set forth in this Agreement.

CONFIDENTIAL

RFC045159

16. No Third Party Beneficiaries. Nothing expressed or mentioned in this Agreement is intended or will be construed to give any other person any legal or equitable right, remedy or claim under or in respect of this Agreement, or any provisions herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of Seller and Purchaser and for the benefit of no other person; provided, however, that Borrower and the IDOT Guarantor are intended third-party beneficiaries of Seller's covenants under Section 2.5 of this Agreement.

17. Counterparts. This Agreement may be executed in two or more counterpart originals, which may be delivered by facsimile copy or .pdf copy, each of which when so executed and delivered shall be deemed to be an original, but all of which together will constitute one and the same instrument.

18. Amendments. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the Party against whom enforcement of the change, waiver, discharge or termination is sought.

19. Headings. The headings in this Agreement are for purposes of reference only and will not limit or otherwise affect the meaning hereof.

20. Assignment. This Agreement (including Purchaser's rights under this Agreement) is not assignable by Purchaser without the consent in advance of the Seller. For purposes of this Section, "assignment" includes (a) any transfer or delegation by a Party of any right or obligation of such Party arising under this Agreement, (b) any sale of substantially all of the assets of a Party, (c) any merger of a Party with another person, and (d) any change in control of a Party. For purposes of this Section, "change in control" means a transaction or series of transactions, such that any person (as that term is used in Sections 13 and 14(d)(2) of the Securities Exchange Act of 1934), excluding Affiliates of the Party as of the date of this Agreement, is or becomes the beneficial owner (as that term is used in Section 13(d) of such Act) directly or indirectly, of securities of the Party representing 51% or more of the combined voting power of the Party's then outstanding securities. Notwithstanding the foregoing, Purchaser shall have a one-time right to assign this Agreement, without Seller's consent, to any one or more of its parents, Affiliates, or subsidiaries, so long as such assignee is controlled, directly or indirectly, by Angelo, Gordon & Co. L.P., or Affiliates thereof, or funds invested therewith, or managed thereby, provided Purchaser provides a copy of any such assignment document to Seller at least five (5) Business Days day prior to the Closing Date and provides evidence reasonably satisfactory to the Seller that the assignee is a parent company, subsidiary or Affiliate of the Purchaser.

21. No Party the Drafter. This Agreement is the product of negotiation between Seller and Purchaser. No Party is deemed the drafter of this Agreement.

22. Jurisdiction; Venue; Consent to Service of Process.

a. Each of the Parties hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in the Supreme Court of the State of New York, New York County court or, to the extent

CONFIDENTIAL

permitted by law, the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to or connected with this Agreement, or for recognition or enforcement of any judgment. Each of the Parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such courts. Each of the Parties agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

  b.   Each of the Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in the above-identified courts. Each of the Parties hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

  23. Attorneys' Fees.  The prevailing Party in any action or proceeding relating to this Agreement will be entitled to recover its reasonable attorneys' fees and other costs from the non-prevailing Parties, in addition to any other relief to which such prevailing Party may be entitled.

  24. Affiliates of Seller. Whenever the term "Seller" is used throughout this Agreement, the term shall mean iStar FM Loans LLC and its Affiliates.

  25.   Administrative Agent.  The Purchaser shall cause Borrower and IDOT Guarantor to consent to the resignation of the Seller as administrative agent for the Mortgage Loan pursuant to the joinder attached hereto. Seller shall have no obligation under this Agreement unless and until each of Borrower and IDOT Guarantor has executed a counterpart original of such joinder, which may be delivered to Seller by facsimile or .pdf copy.

  [Remainder of this Page Intentionally Left Blank]

CONFIDENTIAL

RFC045161

IN WITNESS WHEREOF, Purchaser and Seller have caused their names to be signed by their respective duly authorized officers as of the date first above written.

"SELLER":

iSTAR FM LOANS LLC, a Delaware limited liability company

By: _____
      Name: _____
      Title: _____

"PURCHASER":

AG/FCP MONTEREY FINANCE, L.L.C., a Delaware limited liability company

By: Angelo Gordon Real Estate Inc., a Delaware corporation, its sole member

    By: _____
       Name: _____
       Title: _____

CONFIDENTIAL

RFC045162

## BORROWER AND IDOT GUARANTOR ACKNOWLEDGMENT:

Reference is made to that certain Loan Purchase Agreement, dated as of January 14, 2008 (the "**Loan Purchase Agreement**"), between iStar FM Loans LLC, a Delaware limited liability company ("**Seller**") and AG/FCP Monterey Finance, L.L.C., a Delaware limited liability company ("**Purchaser**").

By its signature below, each of Triton Pavilion, LLC ("**Borrower**") and Pavilion LLC ("**IDOT Guarantor**") hereby consents to, acknowledges and agrees that, notwithstanding anything to the contrary set forth in Section 9.2(C) of that certain Loan and Security Agreement dated November 10, 2005 by and among Borrower, IDOT Guarantor and Seller (as successor in interest in Fremont Investment & Loan)(the "**Loan Agreement**"), upon the transfer of the Loan Agreement and loan governed by the Loan Agreement to the Purchaser (or its permitted assigns), Seller shall have no further obligation under the Loan Agreement to act as administrative or lead lender thereunder; and Purchaser, as Loan Transferee under the Loan Agreement, shall have sole responsibility for servicing and administration of the Loan in accordance with the Loan Agreement.

Each of the undersigned (i) consents to the form and substance of the Loan Purchase Agreement and the transactions contemplated thereunder and (ii) acknowledges and agrees that if Closing (as defined in the Loan Purchase Agreement) does not occur on or prior to February 29, 2008, commencing March 1, 2008, all amounts owing under the Loan Documents (as defined in the Loan Agreement) shall accrue interest at the Default Interest Rate (as defined in the Loan Agreement).

**BORROWER:**

**TRITON PAVILION, LLC,**
a Delaware limited liability company
By: Montrose Investment Holdings, LLC,
    a Delaware limited liability company
    By:    CBRE Realty Finance TRS, LLC, a
        Delaware limited liability company

        By: _____
        Name: _____
        Title: _____

**IDOT GUARANTOR:**

**PAVILION LLC,**
a Maryland limited liability company
By:    Triton Pavilion, LLC, a Delaware limited
    liability company
    By:    Montrose Investment Holdings, LLC, a
        Delaware limited liability company
        By:    CBRE Realty Finance TRS,
            LLC, a Delaware limited
            liability company

            By: _____
            Name: _____
            Title: _____

CONFIDENTIAL

The escrow provisions in the foregoing Agreement are agreed to by the undersigned, who acknowledges receipt of the Deposit.

**LAWYERS TITLE INSURANCE CORPORATION**

By:    Linowes and Blocher, LLP, its authorized agent

       By:   _____

            Name:

            Title:

CONFIDENTIAL

RFC045164

# EXHIBIT 1

## DEFINITIONS

"**Affiliate**": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise. The terms "controlling" and "controlled" have meanings correlative to the foregoing definition of "control."

"**Agreement**": This Loan Purchase Agreement, including all amendments hereof and supplements hereto.

"**Assignment and Assumption Agreement**": The Assignment and Assumption of Note & Indemnity Deed of Trust and Other Loan Documents, substantially in the form attached hereto as **Exhibit 4**.

"**Bill of Sale**": The Bill of Sale, substantially in the form attached as **Exhibit 3**, transferring Seller's interest in the Mortgage Loan and Related Property to Purchaser.

"**Borrower**": Triton Pavilion, LLC, a Delaware limited liability company.

"**Business Day**": Any day other than a Saturday, Sunday, a legal holiday under the laws of the States of New York or Maryland or a day on which national banks in the States of New York or Maryland are authorized or required by law or other governmental act to be closed.

"**Closing**": As defined in Section 7.

"**Closing Date**": March 24, 2008, or upon not less than five (5) Business Days notice from Purchaser to Seller, such earlier date as required in order to cause Closing hereunder to occur simultaneously with the closing of the sale of the Mortgaged Property under the Purchase Contract.

"**Closing Documents**": The documents listed in Sections 8.1 through 8.2 (i.e., the conveyance documents and the other documents listed in those Sections).

"**Deposit**": As defined in Section 2.3(a).

"**Escrow Agent**": As defined in Section 2.3(a).

"**Forbearance Period**": As defined in Section 2.5.

"**Fremont**": Fremont Investment & Loan, a California industrial bank.

"**Fremont Assignment**": Assignment and Assumption of Notes, Mortgages and Other Loan Documents dated June 29, 2007 by Fremont Investment & Loan, a California industrial

CONFIDENTIAL

RFC045165

bank in favor of Seller recorded September 6, 2007 among the Land Records of Montgomery County at Liber 34805, folio 653.

"**Guaranty**": That certain Guaranty dated November 10, 2005 by Brian A McCormick and Charles W. Moore in favor of Seller (as successor in interest to Fremont Investment & Loan, a California industrial bank).

"**IDOT Guarantor**": Pavilion LLC, a Maryland limited liability company.

"**Loan Documents**": As defined in the Loan Agreement.

"**Loan Agreement**": Loan and Security Agreement dated as of November 10, 2005 pertaining to the Mortgage Loan

"**Mezzanine Borrower**": Montrose Investment Holdings, LLC, a Delaware limited liability company.

"**Mezzanine Lender**": CBRE Realty Finance TRS, LLC, a Delaware limited liability company.

"**Mortgage**": The mortgage, deed of trust or other instrument securing the Mortgage Note.

"**Mortgage File**": Originals or copies of the Loan Documents and all modifications thereto, and, to the extent in the possession of the Seller, originals or copies of plats of survey, Title Policies, real estate tax statements, letters of credit, material, correspondence with the Borrowers, leases, insurance information, engineering reports and environmental site assessment reports, but excluding Seller's internal memoranda and reports, correspondence and other documents.

"**Mortgage Loan**": The mortgage loan identified on the Mortgage Loan Schedule.

"**Mortgage Loan Schedule**": The schedule attached hereto as **Exhibit 2**, which identifies the Mortgage Loan to be purchased by Purchaser on the Closing Date, as amended from time to time.

"**Mortgaged Property or "Property**": The real property, together with improvements thereto, securing the guaranty of the IDOT Guarantor under the related Mortgage Loan.

"**Mortgage Note**": The original executed promissory note evidencing the indebtedness of the Borrower under the Mortgage Loan, together with any riders, addenda or amendments thereto.

"**Parties**": Seller and Purchaser.

"**Person**": Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

CONFIDENTIAL

"**Purchase Contract**": The Sale Purchase Agreement, dated as of the date hereof, between IDOT Guarantor, or an affiliate thereof, and Angelo Gordon Real Estate Inc., a Delaware corporation, providing for the sale of the Mortgaged Property to an affiliate of Purchaser.

"**Purchase Price**": As defined in Section 2.

"**Purchaser**": AG/FCP Monterey Finance, L.L.C., a Delaware limited liability company.

"**Related Property**": As defined in the Bill of Sale.

"**Right of First Refusal**": the right of first refusal of any applicable tenant, the Montgomery County Department of Housing and Community Affairs and the Maryland Housing Opportunities Commission in connection with the sale of the Mortgaged Property in accordance with Chapters 11A/53A of the Montgomery County Code.

"**ROFR Party**": any holder of a Right of First Refusal.

"**Seller**": iStar FM Loans LLC, a Delaware limited liability company.

"**Servicing File**": As to the Mortgage Loan, to the extent in the possession of the Seller, any material documents, other than documents required to be part of the Mortgage File, relating to the servicing of the Mortgage Loan (but excluding any internal correspondence, communications or memoranda)

"**Title Policy**": Copies (or originals) of the Mortgage title insurance policies for a Mortgage Loan.

"**UCC Financing Statement Amendments**": Assignments of Seller's interest as a secured party in the UCC-1 financing statements filed with respect to the Loan.

CONFIDENTIAL

RFC045167

**EXHIBIT 2**

**MORTGAGE LOAN SCHEDULE**

| Loan No. | Address | Stated Principal Amount of Mortgage Loan in Mortgage Note |
|---|---|---|
| 950114914 | 5901 Montrose Road, Rockville, Maryland 20852 (Montgomery County) | $130,000,000 |

CONFIDENTIAL

RFC045168

**EXHIBIT 3**

**BILL OF SALE**

1.  <u>Parties</u>. The Parties to this Bill of Sale are the following:

> Seller:    iStar FM Loans, LLC
> Purchaser:    AG/FCP Monterey Finance, L.L.C.

2.  <u>Sale</u>. For value received, Seller hereby conveys to Purchaser, without recourse or warranty, except as set forth in the Agreement (as hereinafter defined) all right, title and interest of Seller in and to the Mortgage Loan identified on <u>Exhibit 2</u> (the "**Mortgage Loan Schedule**") to the Loan Purchase Agreement, dated as of January 14, 2008 (the "**Agreement**"), between Seller and Purchaser (a copy of which exhibit is attached as Exhibit A to this Bill of Sale) and all of the following property (the "**Related Property**"), subject to Section 3.2(b) of the Agreement:

> (a)    All accounts, general intangibles, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and investment property consisting of, arising from or relating to any of the following property: the Mortgage Loan and the Mortgage File; and

> (b)    All cash and non-cash proceeds of the collateral described in clauses (a) and (b) above (but excluding the Purchase Price paid by Purchaser to Seller).

Notwithstanding the foregoing, Seller shall continue to have the benefit of all environmental indemnification agreements constituting part of the Mortgage File, and shall be fully entitled to such indemnification as an indemnified party under the Mortgage Loan; it being agreed that none of the foregoing shall preclude Purchaser from exercising any of its rights (other than terminating the benefit of such agreements in respect of the Seller), whether to indemnification or otherwise, with respect to the Mortgage Loan.

3.  <u>Purchase Price</u>. See <u>Section 2</u> of the Agreement.

4.  <u>Definitions</u>. Terms used but not defined herein will have the meanings assigned to them in the Agreement.

CONFIDENTIAL

RFC045169

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered on this _____ day of _____, 200_.

Seller:

By: _____
Name: _____
Title: _____

CONFIDENTIAL

## EXHIBIT 4

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION OF NOTE & INDEMNITY
DEED OF TRUST AND OTHER LOAN DOCUMENTS
(Montgomery County, Maryland)

THIS ASSIGNMENT AND ASSUMPTION OF NOTE, INDEMNITY DEED OF TRUST, AND OTHER LOAN DOCUMENTS ("Assignment") dated for reference purposes only as of [Insert Closing Date under Loan Purchase Agreement] (the "Effective Date", is made by iSTAR FM LOANS LLC, a Delaware limited liability company ("Assignor"), in favor of AG/FCP MONTEREY FINANCE, L.L.C., a Delaware limited liability company ("Assignee"),

BACKGROUND FACTS

A.    Pursuant to that certain Assignment and Assumption of Notes, Mortgages and Other Loan Documents dated June 29, 2007 by Fremont Investment & Loan, a California industrial bank ("Fremont") in favor of Assignor recorded September 6, 2007 among the Land Records of Montgomery County at Liber 34805, folio 653 (the "Fremont Assignment"), Assignor is the holder of a mortgage loan (as such loan has been amended, modified, extended, renewed, consolidated, spread or recast from time to time, collectively, the "Loan") relating to certain real property located in the County of Montgomery, State of Maryland, as more particularly described on **Exhibit B** hereto (the "Property").

B.    The Loan is evidenced, governed, insured and secured by various loan agreements, assignments, pledges, guaranties, financing statements, instruments and other documents (collectively, as modified, amended, assigned, consolidated, spread, recast, endorsed, continued, renewed, extended, superseded, exchanged, supplemented or restated from time to time, and together with all opinion letters issued in connection with the Loan, the "Loan Documents"), including, without limitation, the Loan Documents more particularly described in **Exhibit A** hereto.

C.    As used herein, "Loan Purchase Agreement" means that certain Loan Purchase Agreement dated January 14, 2008 between Assignor and Assignee.

NOW, THEREFORE, for good and valuable consideration paid by Assignee at the time of execution hereof, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment.  Assignor does hereby grant, bargain, sell, assign, transfer and set over unto Assignee, effective as of the Effective Date, without recourse, or, except as expressly provided in the Loan Purchase Agreement, representation or warranty, all of Assignor's right, title, interest, claim and demand in and to the Loan and the Loan Documents, together with, except as provided in the Loan Purchase Agreement, all monies, principal and interest, due and

CONFIDENTIAL

RFC045171

to become due thereon, all rights to act as agent, servicer or lead lender in connection therewith or thereunder, and all rights, remedies and incidents thereunto belonging arising from and after the Effective Date.

2.     Assumption.   Assignee does hereby accept the foregoing assignment and assumes all of Assignor's obligations, right, title, interest, claim and demand in and to the Loan and the Loan Documents, effective as of the Effective Date, together with all monies, principal and interest, due and to become due thereon, all rights to act as agent, servicer or lead lender in connection therewith or thereunder, and all rights, remedies and incidents thereunto belonging arising from and after the Effective Date.

3.     Retention of Guaranty.   Notwithstanding anything in this Assignment to the contrary, Assignor's right, title and interest in the Guaranty (as defined on Exhibit A hereto) shall not be transferred to Assignee and Assignor shall retain legal and equitable title to the Guaranty.

4.     Retention of Indemnification Rights.   Notwithstanding anything in this Assignment to the contrary, Assignor shall continue to have the benefit of all indemnification agreements (including without limitation, environmental indemnification) under the Loan, and shall be fully entitled to indemnification as an indemnified party under the Loan Documents; it being agreed that none of the foregoing shall preclude Assignee from exercising any of its rights (other than terminating the benefit of such agreements in respect of the Assignor), whether to indemnification or otherwise, with respect to the Loan.

5.     Successors and Assigns.   This Assignment shall be binding upon and shall inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns.

6.     Severability.   In the event any provision of this Assignment is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision hereof.

7.     Further Assurances.   Assignor and Assignee hereby agree that they will execute such further documents and perform such further acts as may be necessary to properly consummate the transactions contemplated hereunder. Assignor agrees that at any time and from time to time, at the expense of Assignee, Assignor will promptly execute and deliver all further instruments, documents, releases or agreements, and take all further action that Assignee may reasonably request, in order to assign the Loan and all Loan Documents to Assignee and/or give direction to any bank or other person to evidence the assignment of the Loan by Assignor or to otherwise effectuate the assignment of the Loan to Assignee.

8.     Governing Law.   This Assignment shall be governed by the laws of the State of New York.

9.     Counterparts.   This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this Assignment to physically form one document, which may be recorded.

CONFIDENTIAL

RFC045172

[EXECUTION PAGES FOLLOW]

CONFIDENTIAL

**ASSIGNOR:**

**iSTAR FM LOANS LLC**, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

STATE OF _____ )
                           )   SS:
COUNTY OF _____ )

On _____, 2008, before me, the undersigned, a notary public in and for state, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC                              (SEAL)

My Commission expires:

RFC045174

ASSIGNEE:

**AG/FCP MONTEREY FINANCE, L.L.C.,** a
Delaware limited liability company

By:   Angelo Gordon Real Estate Inc., a Delaware
      corporation, its sole member

By: _____
Name: _____
Title: _____

STATE OF _____   )
                          )   SS:
COUNTY OF _____     )

On _____, 2008, before me, the undersigned, a notary public in and for state, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC                              (SEAL)

My Commission expires:

CONFIDENTIAL

RFC045175

**CERTIFICATION:**
This is to certify that this instrument was prepared under my supervision and that I am a member in good standing of the Bar of the Court of Appeals of the State of Maryland.

Name: _____

CONFIDENTIAL

RFC045176

**Exhibit A**
**LOAN DOCUMENTS**

(All documents dated as of November 10, 2005, unless otherwise indicated)

1.  Allonge dated June 29, 2007 by Fremont to the order of Assignor.

2.  Secured Promissory Note executed by Borrower in favor of Fremont (the "Note").

3.  Loan and Security Agreement between Fremont and Triton Pavilion, LLC, a Delaware limited liability company ("Borrower") and Pavilion LLC, a Maryland limited liability company ("IDOT Guarantor").

4.  Indemnity Deed of Trust and Fixture Filing made by IDOT Guarantor for the benefit of Fremont, recorded on November 15, 2005 among the Land Records of Montgomery County at Liber 31233, folio 613 (the "Indemnity Deed of Trust").

5.  Indemnity Assignment of Rents (and Leases) made by IDOT Guarantor to Fremont, recorded on November 15, 2005 among the Land Records of Montgomery County at Liber 31233, folio 639 (the "Indemnity Assignment of Rents").

6.  Guaranty made by IDOT Guarantor in favor of Fremont.

7.  Guaranty made by Brian A. McCormick and Charles W. Moore (the "Guarantors") in favor of Fremont (the "Guaranty")

8.  Environmental Indemnity (the "Environmental Indemnity") made by Borrower and Guarantors for the benefit of Fremont.

9.  Insurance Agreement made by Borrower and IDOT Guarantor in favor of Fremont.

10. Waiver of Rights Under Servicemembers Civil Relief Act executed by Borrower, Guarantors, Brian A. McCormick and Charles W. Moore.

11. Formation Documents Certificate (Triton Pavilion, LLC) executed by Borrower.

12. Formation Documents Certificate (Pavilion LLC) executed by Borrower and IDOT Guarantor.

13. Formation Documents Certificate (Montrose Investment Holdings, LLC).

14. UCC-1 Financing Statement naming IDOT Guarantor, as debtor, filed November 14, 2005 as Instrument Number 181249403 with the Maryland Department of Assessments and Taxation ("State UCC-1").

15. UCC-3 Assignment of State UCC-1 to Assignor filed on or about July 6, 2007 with the Maryland Department of Assessments and Taxation.

CONFIDENTIAL

RFC045177

16. UCC-1 Financing Statement naming IDOT Guarantor, as debtor, filed among the Land Records of Montgomery County at Liber 31233, folio 654 ("Fixture Filing").

17. UCC-3 Assignment of Fixture Filing to Assignor filed on our about December 20, 2007 among the Land Records of Montgomery County.

18. Assignment of Project Agreements executed by Borrower and IDOT Guarantor in favor of Fremont.

19. Consent to Assignment of Project Agreements dated December 12, 2005 executed by STV Incorporated.

20. Assignment of Condominium Documents executed by Borrower and IDOT Guarantor in favor of Fremont.

21. Collateral Assignment of Purchase Agreements and Deposits with an Irrevocable Power of Attorney executed by Borrower and IDOT Guarantor in favor of Fremont.

22. Maryland Condominium Loan and Security Agreement Rider executed by Borrower, IDOT Guarantor and Fremont.

23. Intercreditor Agreement between Fremont and CBRE Realty Finance TRS, LLC, a Delaware limited liability company.

24. Escrow Account Control Agreement executed by Borrower, IDOT Guarantor, Canton Title Company and Fremont.

25. Side letter agreement dated April 20, 2006, among Fremont, Borrower and Guarantors.

26. Pledge Agreement (Balancing Deposit) dated May 24, 2006, executed by Borrower in favor of Fremont.

27. Pledge Account Agreement executed by Borrower.

28. Side letter agreement dated August 25, 2006, among Fremont, Borrower, Guarantors and CBRE Realty Finance TRS, LLC, a Delaware limited liability company.

29. Event of Default Notice dated January 24. 2007, from Fremont to Borrower and Guarantors.

30. Agreement Regarding Mezzanine Lender's Cure Rights, dated April 27, 2007, between Fremont and CBRE Realty Finance TRS, LLC, a Delaware limited liability company.

31. Opinion letter of Stevens & Lee to Fremont.

32. Opinion letter of Cowie & Mott, P.A. to Fremont.

CONFIDENTIAL

RFC045178

33. The Fremont Assignment, but only to the extent required to transfer Assignor's right, title and interest in the Loan and the Loan Documents referenced on Exhibit A-1 to the Fremont Assignment as "Loan Number 950114914; Borrower Name: TRITON PAVILION, LLC) and **specifically excluding** any right, title or interest related the Loan or Loan Documents referenced on Exhibit A-2 to the Fremont Assignment as Loan Number 950114914 (and without transferring any other rights, titles or interests in any other assets)(it is agreed that no original counterpart of the Fremont Assignment is to be delivered to Assignee).

CONFIDENTIAL

**Exhibit B**
**PROPERTY DESCRIPTION**

That certain real property located in the City of Rockville, County of Montgomery, State of Maryland, having a street address of 5901 Montrose Road, more particularly described as follows:

Parcel lettered "F" in a subdivision known as "Montrose" as per plat thereof recorded as Plat No. 21858 among the land records of Montgomery County, Maryland.

CONFIDENTIAL

RFC045180

**EXHIBIT 5**

FORM OF RELEASE

RELEASE AND INDEMNITY AGREEMENT

THIS RELEASE AND INDEMNITY AGREEMENT (this "Agreement") dated as of [Insert Closing Date under Loan Purchase Agreement](the "Effective Date"), is executed by Triton Pavilion, LLC, a Delaware limited liability company (the "Borrower"), Pavilion LLC, a Maryland limited liability company (the "IDOT Guarantor"), Montrose Investment Holdings, LLC, a Delaware limited liability company (the "Mezzanine Borrower") and CBRE Realty Finance TRS, LLC, a Delaware limited liability company (the "Mezzanine Lender" and collectively with Borrower, IDOT Guarantor and Mezzanine Borrower, the "Releasor") and iSTAR FM LOANS LLC, a Delaware limited liability company (the "Assignor").

RECITALS

A.     Fremont Investment & Loan, a California industrial bank, as predecessor in interest to Assignor ("Fremont"), made a mortgage loan (the "Mortgage Loan") to Borrower in an amount of up to One Hundred Thirty Million and No/100 Dollars ($130,000,000.00), which Mortgage Loan is evidenced by a Secured Promissory Note dated November 10, 2005 made by Borrower to the order of Fremont (the "Note"), a Loan and Security Agreement dated as of November 10, 2005 by and among Borrower, IDOT Guarantor and Fremont (the "Loan Agreement"), a Guaranty by IDOT Guarantor dated as of November 10, 2005 (the "IDOT Guaranty") and certain other Loan Documents (as defined in the Loan Agreement).

B.     The IDOT Guaranty is secured by an Indemnity Deed of Trust and Fixture Filing made by IDOT Guarantor for the benefit of Fremont, recorded on November 15, 2005 among the Land Records of Montgomery County at Liber 31233, folio 613 (the "Indemnity Deed of Trust") with respect to certain real property located in the City of Rockville, County of Montgomery, Maryland (the "Property").

C.     On the date hereof, Assignor has assigned all of its right, title and interest in the Mortgage Loan, the IDOT Guaranty, the Indemnity Deed of Trust, the Loan Agreement, the Note, the other Loan Documents (collectively, the "Assigned Documents") to AG/FCP Monterey Finance, L.L.C., a Delaware limited liability company (the "Assignee") pursuant to the terms of that certain Loan Purchase Agreement dated as of January 14, 2008 (the "Purchase Agreement"), by and between Assignor and Assignee.  Assignee has agreed to assume the obligations of Assignor under the Assigned Documents.

D.     Mezzanine Lender and Assignor (by virtue of an assignment from Fremont) are parties to a certain Intercreditor Agreement dated November 10, 2005 (the "Intercreditor Agreement") pertaining, among other things, to the Mortgage Loan and to that certain loan from Mezzanine Lender to Mezzanine Borrower of even date with the Mortgage Loan in the amount of $31,946,650.00 (the "Mezzanine Loan").

CONFIDENTIAL

RFC045181

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Releasor and Assignor hereby agree as follows-:

1.   Release.  Releasor, on Releasor's behalf and on behalf of its respective past, present and future representatives, partners, managers, members, shareholders, officers, directors, agents, employees, servants, affiliates and related companies, successors and assigns (the "Releasor Group"), hereby waives, releases and forever discharges Assignor and its past, present and future officers, directors, subsidiary and affiliated entities or companies, agents, servants, employees, shareholders, partners, members, managers, representatives, successors, predecessors, assigns, attorneys, accountants, assets and properties, as the case may be (the "Assignor Group") from and against all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands, of whatever kinds and nature, in law or in equity, whether known or unknown, whether or not concealed or hidden, arising out of or relating to any matter, cause or thing whatsoever, that any of the Releasor Group may have had, or now have or that may subsequently accrue against the Assignor Group by reason of any matter or thing whatsoever through the Effective Date arising out of or in any way connected to the Mortgage Loan, the Mezzanine Loan, the Assigned Documents or the Property.

2.   Assignor Release.  Assignor, on Assignor's behalf and on behalf of its respective past, present and future representatives, partners, managers, members, shareholders, officers, directors, agents, employees, servants, affiliates and related companies, successors and assigns (the "Assignor Group"), hereby waives, releases and forever discharges Mezzanine Lender and its past, present and future officers, parent entities or companies, agents, servants, employees, members, managers, representatives, successors, predecessors, assigns, attorneys, accountants, assets and properties, as the case may be (the "Mezzanine Lender Group") from and against all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands, of whatever kinds and nature, in law or in equity, whether known or unknown, whether or not concealed or hidden, arising out of or relating to any matter, cause or thing whatsoever, that any of the Assignor Group may have had, or now have or that may subsequently accrue against the Mezzanine Lender Group by reason of any matter or thing whatsoever through the Effective Date arising out of or in any way connected to the Mortgage Loan, the Mezzanine Loan, the Assigned Documents (including without limitation the Intercreditor Agreement) or the Property. The foregoing release shall not be deemed to release the obligations of Borrower's and IDOT Guarantor's successors in interest under the Mortgage Loan, including, without limitation, with respect to the obligations of such successors in interest to repay the Mortgage Loan to Assignor's successors in interest.

RFC045182

3.    <u>Indemnification Survival</u>.  Borrower and IDOT Guarantor hereby agree that Assignor shall continue to have the benefit of all indemnification provisions in the Assigned Documents as they relate to the period prior to the Effective Date to the extent such indemnification rights would have survived the payment in full of the Note on the date hereof. Such indemnification provisions are incorporated herein by reference as if fully set forth herein.

4.    <u>Modifications</u>.  This Agreement may not be changed, terminated or modified orally or in any manner other than by an agreement in writing signed by Releasor and Assignor.

5.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts. All such counterparts shall constitute one and the same instrument.

6.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

[Signature page follows]

CONFIDENTIAL

IN WITNESS WHEREOF, Borrower, IDOT Guarantor, Mezzanine Lender, Mezzanine Borrower and Assignor have executed this Release and Indemnity Agreement as of the date first above written.

**BORROWER:**

TRITON PAVILION, LLC,
a Delaware limited liability company
By: Montrose Investment Holdings, LLC,
    a Delaware limited liability company

    By: _____
    Name: _____
    Title: _____

**IDOT GUARANTOR:**

PAVILION, LLC,
a Maryland limited liability company

By: Triton Pavilion, LLC,
    a Delaware limited liability company

    By: Montrose Investment Holdings, LLC,
      a Delaware limited liability company

    By: _____
    Name: _____
    Title: _____

**MEZZANINE LENDER:**
CBRE REALTY FINANCE TRS, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**MEZZANINE BORROWER:**

MONTROSE INVESTMENT HOLDINGS, LLC,
a Delaware limited liability company
By: _____
Name: _____
Title: _____

CONFIDENTIAL

RFC045184

**ASSIGNOR:**

**iSTAR FM LOANS LLC**, a Delaware limited
liability company

By:       _____
Name:   _____
Title:    _____

CONFIDENTIAL

RFC045185

EXHIBIT 6

FORM OF ALLONGE

ALLONGE

Loan No.: 950114914
Borrower Name: Triton Pavilion, LLC

This Allonge is attached to and made part of that certain Secured Promissory Note dated November 10, 2005, in the stated original principal amount of $130,000,000.00 executed by Triton Pavilion, LLC, a Delaware limited liability company, and made payable to the order of Fremont Investment & Loan, a California industrial bank ("Fremont"), as assigned by Fremont to iStar FM Loans LLC, a Delaware limited liability company ("Seller"), pursuant to that certain Allonge dated June 29, 2007.

**PAY TO THE ORDER** of AG/FCP Monterey Finance, L.L.C., a Delaware limited liability company ("Purchaser"), without recourse (except as set forth in that certain related Loan Purchase Agreement dated as of January 14, 2008 by and between Seller and Purchaser), representation or warranty, express or implied.

iSTAR FM LOANS LLC, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

RFC045186

EXHIBIT R
2005 Certificate of Compliance

(See Attached)

R-3

CONFIDENTIAL

RFC045187



### DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS

Douglas M. Duncan
*County Executive*

Elizabeth B. Davison
*Director*

August 16, 2005

Kathleen K. Suher
Vice President and Assistant Counsel
Home Properties
850 Clinton Square
Rochester, New York 14604

BY FAX/FIRST CLASS MAIL

            Re:  The Pavilion Apartments
                Certificate of Compliance

Dear Ms. Suher:

    Enclosed is the above referenced Certificate of Compliance.  If you have any questions, give me a call at: 240-777-3654.

             Sincerely,

             Joseph T. Giloley
             Chief

JTG:ek
Enclosure:  Certificate of Compliance/The Pavilion Apartments

S:\Files\recurring\Housing\Chief\suher.doc



**Division of Housing and Code Enforcement**

| | Moderately Priced Dwelling Unit | Housing Development and Loan Programs | |
| --- | --- | --- | --- |
| Code Enforcement FAX 240/777-3701 | 240/777-3709 | 240/777-3691 | Landlord-Tenant Affairs 240/777-3691 |

100 Maryland Avenue, 4th Floor • Rockville, Maryland 20850 • 240/777-3600, TDD  240/777-3679
http://hca.emontgomery.org

CONFIDENTIAL

RFC045188

## CERTIFICATION OF COMPLIANCE

This Certification of Compliance is made this 16th day of August, 2005 by MONTGOMERY COUNTY, MARYLAND, a public body, corporate and politic, with a charter home rule form of local municipal government organized under the provisions of Article XI-A of the Maryland Constitution (hereinafter referred to as the "County").

PAVILION LLC, a Maryland limited liability company formerly known as Home Properties Pavilion, LLC (the "Pavilion") is the owner of real property commonly known as, Pavilion Apartments, 5901 Montrose Road, Rockville, Maryland 20852, as more particularly described on the legal description attached hereto as Exhibit "A" and incorporated by reference herein (the "Property"). Home Properties Pavilion now known as Pavilion LLC entered into a Purchase and Sale Contract with TRITON PAVILION, LLC (the "Purchaser") a Delaware limited liability company for the sale of the Property. The County, acting through the Montgomery County Department of Housing and Community Affairs, on behalf of itself and its designated housing agency, the Montgomery County Housing Opportunities Commission, hereby certifies that the requirements of Chapters 11A and 53A, of the Montgomery County Code (the "Code") regarding the transfer of membership interests in the Pavilion to Purchaser have been satisfied. In addition, the County further certifies that no tenant organizations have been certified by the Department of Housing and Community Affairs with respect to the Property.

This certification, along with Exhibit A is to be recorded among the Land Records of Montgomery County, Maryland together with any instrument evidencing the sale of the Property to TRITION PAVILION LLC, the Deed is incorporated herein by this reference. Notice as to the recordation date, liber and folio numbers, will be provided to the Department of Housing and Community Affairs.

MONTGOMERY COUNTY, MARYLAND
Department of Housing and Community Affairs

By: _Jay T. Clark_

Title: Chief, Division of Housing and Code Enforcement
Date: August 16, 2005

CONFIDENTIAL

RFC045189

COUNTY OF MONTGOMERY/STATE OF MARYLAND

On this 16th day of August, 2005, before me personally appeared Joe Giloley, known to me to be the person whose name is subscribed to the foregoing and annexed Certification instrument as Chief, Division of Housing and Code Enforcement, Montgomery County, Maryland, Department of Housing and Community Affairs, did duly acknowledge that he executed the same on behalf of Montgomery County as his voluntary act.

Subscribed and sworn to before me this 16th t day of August, 2005.

[NOTARY SEAL]

_____
Notary Public

My Commission Expires: _02/04/08_

S:\Files\recurring\Housing\Chapter 53A\Certificate of Compliance - Pavilion.doc

CONFIDENTIAL

RFC045190

EXHIBIT S
Approved Trade Agreements

(See Attached)

S-1

CONFIDENTIAL

RFC045191

## CONTRACTOR / VENDOR

| SUPPLIER / VENDOR | AMOUNT ($) |
|---|---:|
| A&R ENTERPRISES, INC., TRADING AS SIGNS BY TOMORROW | $ 6,901.00 |
| ARCHITECTURAL WALL SYSTEMS INC. | $ 16,169.00 |
| ASIAN FORTUNE | $ 2,150.00 |
| BAUSUM & DUCKETT | $ 30,170.00 |
| BMW CONSTRUCTION SPECIALTIES | $ 62,627.00 |
| CAFFES-STEELE, INC. | $ 571,543.00 |
| CARPENTRY & HARDWARE SERVICES, INC. | $ 36,978.80 |
| CRYSTAL METALWORKS, INC. | $ 25,064.00 |
| DELANEY CONCRETE CONSTRUCTION, INC. | $ 342.00 |
| FLOORS ETC., INC.[1] | $ 66,426.52 |
| FOXMARK MEDIA, LLC | $ 1,502.34 |
| G & I CONTRACTING INC. | $ 65,420.00 |
| GE APPLIANCES | $ 54,639.00 |
| HOMESTYLES MEDIA, INC. T/A | $ 2,700.00 |
| INDUSTRIAL LIGHTING | $ 38,613.00 |
| INTERIOR CONCEPTS, INC. | $ 20,732.87 |
| KITCHEN & BATH CREATIONS, INC. | $ 31,111.00 |
| LIVINGSTON FIRE PROTECTION | $ 14,519.00 |
| MA BUILDERS, INC. | $ 71,110.00 |
| MAHAN RYKIEL ASSOCIATES, INC. | $ 4,056.35 |
| MELTZER KARLIN PROPERTY & CASUALTY, INC. | $ 16,639.12 |
| MICHAEL H. MANNES, P.A. | $ 6,339.89 |
| MILLER PURDY ARCHITECTS | $ 19,669.99 |
| MILLSTONE CORP | $ 61,051.00 |
| NLP ENTERPRISES, INC. | $ 4,241.00 |
| PCM CONSTRUCTION, INC. | $ 3,027.00 |
| QUIET FLOOR SYSTEMS, LLC. | $ 1,049.00 |
| RE ROBERTSON PLUMBING & HEATING | $ 203,805.93 |
| ROLL OFF EXPRESS, INC. | $ 8,486.00 |
| SCREENVISION DIRECT | $ 3,745.54 |
| SERVPRO | $ 4,975.92 |
| TACC, INC. | $ 122,650.00 |
| TADJER-COHEN-EDELSON ASSOCIATES, INC. | $ 2,829.10 |
| TOP UNLIMITED LLC. | $ 16,731.00 |
| UNITED SIGNS CO. INC. | $ 6,300.00 |
| VALENTINO JOSEPH TOCCI, JR. | $ 110.00 |
| WJLA / NEWS CHANNEL 8, A DIVISION OF ALBRITTON COMMUNICATIONS COMPANY | $ 8,925.00 |

## TOTAL $ 1,615,350.37

[1] Includes Addendum specifying Settlement Amount shall be reduced by 72% of whatever credit Contractor receives from Masland carpeting.

In no event will Settlement Amount be less than $6,847.51

CONFIDENTIAL

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Signs By Tomorrow ("Contractor"). - A&R Enterprises, Inc., trading as: Signs By Tomorrow

### Recitals

A.      Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.      Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated ___02-05-2007_____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ _17,914.76_____.

C.      Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $8,901.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.      Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.      Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.      Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

CONFIDENTIAL

RFC045193

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.   Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.   Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.   Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.   Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045194

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:
A&R Enterprises, Inc. t/a SIGNS BY TOMORROW
~~SIGNS BY TOMORROW~~

By: _____
      Richard W. Kraft, Sr.
Title: President _____
Tax ID:  52-1372465

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913494v1/05159.0186

3

CONFIDENTIAL

RFC045195

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Architectural Wall Systems, Inc. ("Contractor").

### Recitals

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _8/31/2007_ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ _30,206.17_ .

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $16,169.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.     Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.     Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

RFC045196

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045197

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

ARCHITECTURAL WALL SYSTEMS, INC.

By: _____ 1/3/2008

Title: _President_____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 913469v1/05159.0186

3

CONFIDENTIAL

RFC045198

<u>Conditional Settlement Agreement</u>

This Conditional Settlement Agreement (this "Agreement") is made as of December 21, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Asian Fortune ("Creditor").

*Recitals*

A.      Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.      Creditor has provided goods and/or services to the owner of The Monterey. Creditor asserts a claim for unpaid amounts due. Creditor represents and warrants that the total amount due in connection with The Monterey as of the date hereof is $ 2,600.00                .

C.      Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Creditor in the amount of $2,150.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with goods or services provided with respect to The Monterey, and all other claims of Creditor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.      Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Creditor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due with respect to The Monterey, and all other claims of Creditor, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.      Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Creditor.

2.      Upon payment to Creditor of the Settlement Amount, Creditor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions,

CONFIDENTIAL

RFC045199

predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with goods or services provided with respect to The Monterey (collectively, the "Released Claims").

3.      Upon payment to Creditor of the Settlement Amount, Creditor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior to the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Creditor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Creditor on or before March 31, 2008, Creditor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Creditor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Creditor shall reserve and retain any and all of its rights and claims against the CB Released Parties, but in no event shall Creditor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Creditor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Creditor.

6.      Creditor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.      This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Creditor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party,

2

CONFIDENTIAL

RFC045200

on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CREDITOR:

ASIAN FORTUNE

By: _____  Jizzzing CHEN

Title: _President_____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 916252v1/05159.0186

3

CONFIDENTIAL

RFC045201

Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 22nd, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Bausum & Duckett ("Contractor").

Recitals

A.   Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.   Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated 2-15-2006 (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ 166,011.00.

C.   Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $30,170.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.   Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

Agreement

1.   Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.   Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. ~~Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.~~ *NWH* *New Scope of Work + Pricing to be determined. Completion of Project subject to negotiations acceptance by both parties*

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045203

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

BAUSUM & DUCKETT

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913470v1/05159.0186

3

CONFIDENTIAL

RFC045204

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December _24_, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and BMW Construction Specialties ("Contractor").

### Recitals

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _15 February 2006_ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ _313,134.35_ .

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $62,627.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.    Upon payment to Contractor of the Settlement Amount, Contractor ~~is hereby~~ _SHALL BE_ deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

CONFIDENTIAL

RFC045205

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims"). *THE FOREGOING RELEASE SHALL HAVE NO EFFECT UNLESS AND UNTIL PURCHASER HAS PAID TO CONTRACTOR THE FULL SETTLEMENT AMOUNT.*

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

CONFIDENTIAL

RFC045206

*UPON PAYMENT TO CONTRACTOR OF THE SETTLEMENT AMOUNT*

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

        IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

*NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, PURCHASER SHALL HAVE NO RIGHT TO ASSIGN THIS AGREEMENT TO ANY OF THE CB RELEASED PARTIES, AND CONTRACTOR SHALL HAVE EVEN RIGHT TO PURSUE PROSECUTE AND ENFORCE LIENS AND CLAIMS AGAINST CB RELEASED PARTIES UNTIL AND UNLESS (1) Purchaser has paid the full settlement amount AND (2) Purchaser has acquired the Monterey*

CONTRACTOR:

BMW CONSTRUCTION SPECIALTIES

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913471v1/05159.0186

3

CONFIDENTIAL

RFC045207

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 27th, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Caffes-Steele, Inc. ("Contractor").

*Recitals*

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _____2-15-06_____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ __1,342,604.52__.

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $571,543.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.    Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

RFC045208

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045209

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

CAFFES-STEELE, INC.

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913472v1/05159.0186

3

CONFIDENTIAL

RFC045210

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 27th, @ 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Carpentry & Hardware Services, Inc. ("Contractor").

### Recitals

A.   Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.   Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _10/06/2006_ @ _____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ _56,028.48 @_ .  . .

C.   Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $30,027.00 $36,978.90 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or @ in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.   Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.   Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.   Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees .

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.     Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.     Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

RFC045212

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

        IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

CARPENTRY & HARDWARE SERVICES, INC.

By: _____

Title: _Michael P. McDonald   Vice President_

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913479v1/05159.0186

3

CONFIDENTIAL

RFC045213

<u>Conditional Settlement Agreement</u>

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Crystal Metalworks, Inc. ("Contractor").

*Recitals*

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $_____.

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $25,064.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.    Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and

CONFIDENTIAL

RFC045214

(b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods JmS from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.      This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser

2

CONFIDENTIAL

RFC045215

may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

CRYSTAL METALWORKS, INC.

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913498v1/05159.0186

3

CONFIDENTIAL

RFC045216

Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Delaney Concrete Construction, Inc. ("Contractor").

*Recitals*

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $_____.

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $342.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.     Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.     Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

CONFIDENTIAL

RFC045217

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.     Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.     Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045218

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

DELANEY    CONCRETE    CONSTRUCTION, INC.

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 913487v1/05159.0186

3

CONFIDENTIAL

RFC045219

Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December ____, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Floors Etc., Inc. ("Contractor").

*Recitals*

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated ⟨JUNE 21, 2006⟩ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $⟨237,237.56⟩.

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $~~134,191.00~~ ⟨66,426.52⟩ (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.     . Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.     Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

RFC045220

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045221

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

        IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.


CONTRACTOR:

FLOORS ETC., INC.

By: _____

Title: _General Manager._____


PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____


L&B 913473v1/05159.0186

3

RFC045222

**Addendum (this "Addendum") to Conditional Settlement Agreement
dated December ___, 2007 between Angelo Gordon Real Estate, Inc.
and N. Ginsburg & Son, Inc. (aka Floors Etc.) (the "Agreement")**

This Addendum is incorporated into the Agreement, and all capitalized terms herein shall have the meaning given such terms in the Agreement.

1. The parties hereby acknowledge that, in order to mitigate its damage claims, Contractor has returned to manufacturers and/or distributors certain materials that Contractor previously had procured in connection with the Contract, and billed by Contractor pursuant to the Contract. The amount set forth in Recital B of the Agreement as due and owing under the Contract reflects credits based on Contractor's mitigation efforts. The Settlement Amount reflected in the Agreement consequently is based on the asserted claim, as mitigated. Notwithstanding anything in the Agreement to the contrary, the parties acknowledge and agree that the Agreement does not require Contractor to deliver any materials even if previously billed by Contractor under the Contract other than the Bizazza glass tile that Contractor is storing in its warehouse. Further, the Settlement Amount under Recital C shall be reduced by 60% of whatever credit Contractor receives from the manufacturer of the Masland carpeting. In no event will be Settlement Amount be less than $6,847.51.   ↑ 72½% ~

2. The parties agree that the Released Claims as defined under paragraph 2 of the Agreement and paragraph 3 of this Addendum is limited to claims arising in connection with the Monterey project.

3. Upon payment to Contractor of the Settlement Amount, the Purchaser, on its own behalf and on behalf of the AG/FCP Released Parties, and Triton Pavilion LLC, on its own behalf and on behalf of the CB Released Parties, are deemed to have released the Contractor, its past, present or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants and employees from the Released Claims. Notwithstanding the above, the Contractor is not released from warranty claims properly asserted under the Contract to the extent such claims total less than $10,000. Contractor has asserted that flooring and/or carpeting materials that Contractor supplied and/or installed pursuant to the Contract may have been damaged as a result of the failure by the owner of The Monterey (or owner's agents) to protect against weather damage. This will confirm that Purchaser shall not assert a claim for damages against Contractor on account of damages to the carpeting or flooring installed by Contractor that result from owner's (or owner's agents) failing to take action to protect against weather damage or for warranty claims totaling in excess of $10,000. The Purchaser hereby agrees to indemnify and hold harmless the Contractor from any and all Released Claims, together with Contractor's court costs and reasonable attorneys fees, arising as a result of the assertion by any party of a claim released under this paragraph.

   IN WITNESS WHEREOF, this Addendum has been executed this ___ day of January, 2008.

CONFIDENTIAL

CONTRACTOR:
N. GINSBURG & SON, INC. t/a FLOORS ETC.

By: _____

Title: General Manager

PURCHASER:
ANGELO GORDON REAL ESTATE, INC., a Delaware corporation

By: _____

Title: _____

Triton Pavilion LLC joins this Addendum to confirm the conditional release on its own behalf and on behalf of the CB Released Parties, as set forth in the first sentence of Section 3, above.

TRITON PAVILION LLC, a Delaware limited liability company

By: _____

Title: _____

L&B 922506v2/05159.0186

CONFIDENTIAL

RFC045224

<u>Conditional Settlement Agreement</u>

This Conditional Settlement Agreement (this "Agreement") is made as of December 21, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Foxmark Media, LLC ("Creditor").

*Recitals*

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Creditor has provided goods and/or services to the owner of The Monterey. Creditor asserts a claim for unpaid amounts due. Creditor represents and warrants that the total amount due in connection with The Monterey as of the date hereof is $_____.

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Creditor in the amount of $1,502.34 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with goods or services provided with respect to The Monterey, and all other claims of Creditor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Creditor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due with respect to The Monterey, and all other claims of Creditor, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.     Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Creditor.

2.     Upon payment to Creditor of the Settlement Amount, Creditor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners

CONFIDENTIAL

RFC045225

("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with goods or services provided with respect to The Monterey (collectively, the "Released Claims").

3.     Upon payment to Creditor of the Settlement Amount, Creditor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Creditor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Creditor on or before March 31, 2008, Creditor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Creditor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Creditor shall reserve and retain any and all of its rights and claims against the CB Released Parties, but in no event shall Creditor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Creditor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Creditor.

6.     Creditor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Creditor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a

2

CONFIDENTIAL

RFC045226

breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CREDITOR:

FOXMARK MEDIA, LLC

By: _____

Title: _Secretary_____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 916260v1/05159.0186

3

CONFIDENTIAL

RFC045227

<u>Conditional Settlement Agreement</u>

This Conditional Settlement Agreement (this "Agreement") is made as of December 28th, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and G & I Contracting, Inc. ("Contractor").

*Recitals*

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $_____.

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $65,420.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.    Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

CONFIDENTIAL

RFC045228

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.     Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.     Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045229

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

        IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.


CONTRACTOR:

G & I CONTRACTING, INC.

By: _Kenny Santos_

Title: _President_


PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913474v1/05159.0186

3

RFC045230

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and GE Appliances ("Contractor").

### Recitals

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated JUNE, 2006_____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ 89,344.25_____.

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $54,639.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.     Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.     Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal

CONFIDENTIAL

RFC045231

Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.     Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. ~~In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.~~

6.     Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the

2

CONFIDENTIAL

RFC045232

foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

GE APPLIANCES

By: _____

Title: _____

PETER R. DeHAAN
AUTHORIZED AGENT FOR
G.E. CONSUMER & INDUSTRIAL DIVISION
P.O. BOX 429321
CINCINNATI, OHIO 45242

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 913490v1/05159.0186

CONFIDENTIAL

RFC045233

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 21, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Home & Design ("Creditor").

*— Homestyles Media, Int. t/a*

### Recitals

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Creditor has provided goods and/or services to the owner of The Monterey. Creditor asserts a claim for unpaid amounts due. Creditor represents and warrants that the total amount due in connection with The Monterey as of the date hereof is $ _10,300.00_ , *exclusive of interest and attorneys' fees*.

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Creditor in the amount of $ 2,700.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with goods or services provided with respect to The Monterey, and all other claims of Creditor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Creditor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due with respect to The Monterey, and all other claims of Creditor, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Creditor, *sent to Home & Design, 12501 Prosperity Drive, Suite 150, Silver Spring, Md. 20904-9905, attn: Carrie Green.*

2.    Upon payment to Creditor of the Settlement Amount, Creditor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their

*※ but specifically excluding Triton Real Estate Partners, LLC, a Delaware limited liability company, which shall not constitute one of the ~~[illegible]~~ Released Parties*

CONFIDENTIAL

respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with goods or services provided with respect to The Monterey (collectively, the "Released Claims").

3.     Upon payment to Creditor of the Settlement Amount, Creditor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Creditor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Creditor on or before March 31, 2008, Creditor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Creditor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Creditor shall reserve and retain any and all of its rights and claims against the CB Released Parties, but in no event shall Creditor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Creditor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Creditor.

6.     Creditor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Creditor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the

2

CONFIDENTIAL

RFC045235

State of Maryland.  Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CREDITOR:

HOMESTYLES MEDIA, INC. T/A  HOME & DESIGN

By: _____

Title: _Thomas E. Hoff_
      _attorney and authorized signatory_

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 916261v1/05159.0186

3

CONFIDENTIAL

RFC045236

Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December *27*, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Industrial Lighting ("Contractor").

*Recitals*

A.   Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.   Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated ____*09/05/2006*____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $___*81,664.61*___.

C.   Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $38,613.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.   Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.   Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.   Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

CONFIDENTIAL

RFC045237

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045238

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

INDUSTRIAL LIGHTING

By: _____

Title: _Controller_____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913493v1/05159.0186

3

CONFIDENTIAL

RFC045239

Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 21, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Interior Concepts, Inc. ("Creditor").

*Recitals*

A.      Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.      Creditor has provided goods and/or services to the owner of The Monterey. Creditor asserts a claim for unpaid amounts due. Creditor represents and warrants that the total amount due in connection with The Monterey as of the date hereof is $ 82,931.50 .

C.      Subject to the completion of its due diligence and the consummation of its acquisition of $20,732.87
The Monterey, Purchaser is willing to make payment to Creditor in the amount of $ 10,917.12 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with goods or services provided with respect to The Monterey, and all other claims of Creditor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.      Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Creditor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due with respect to The Monterey, and all other claims of Creditor, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.      Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Creditor.

2.      Upon payment to Creditor of the Settlement Amount, Creditor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners

CONFIDENTIAL

RFC045240

("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with goods or services provided with respect to The Monterey (collectively, the "Released Claims").

3.     Upon payment to Creditor of the Settlement Amount, Creditor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Creditor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Creditor on or before March 31, 2008, Creditor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Creditor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Creditor shall reserve and retain any and all of its rights and claims against the CB Released Parties, but in no event shall Creditor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Creditor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Creditor.

6.     Creditor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Creditor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a

2

CONFIDENTIAL

RFC045241

breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CREDITOR:

INTERIOR CONCEPTS, INC.

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 916266v1/05159.0186

3

CONFIDENTIAL

RFC045242

Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 26, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Kitchen & Bath Creations, Inc. ("Contractor").

Recitals

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated Sept. 12, 2006 _____ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ 73,830.00 _____.

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $14,766.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

Agreement

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.    Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

NWD 12/26/07

CONFIDENTIAL

RFC045243

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

NWD 12|26|07

2

CONFIDENTIAL

RFC045244

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

KITCHEN & BATH CREATIONS, INC.

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 913475v1/05159.0186

NWD 12/24/07

3

CONFIDENTIAL

RFC045245

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December *26*, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Kitchen & Bath Creations, Inc. ("Contractor").

### Recitals

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated *Sept. 12, 2006*          (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ *81,725.00*          .

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $16,345.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.     Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.     Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

*NWD 12/26/07*

RFC045246

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

NWD 12/20/07

CONFIDENTIAL

RFC045247

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

KITCHEN & BATH CREATIONS, INC.

By: ~~Neil W Dalton~~

Title: ~~President~~

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 913491v1/05159.0186

NWD 12/26/07

3

CONFIDENTIAL

RFC045248

<u>Conditional Settlement Agreement</u>

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Livingston Fire Protection ("Contractor").

<em>Recitals</em>

A.      Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.      Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _January 4, 2008_ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ _72,592.50_ .

C.      Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $14,519.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.      Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

<em>Agreement</em>

1.      Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.      Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

CONFIDENTIAL

RFC045249

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.      Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.      Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.      Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor.  In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.      Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045250

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns. Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent. The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland. Neither the waiver by either party of a breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.*The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

*  COUNTERPART ATTACHED
   DATED 1/4/08.

CONTRACTOR:

LIVINGSTON FIRE PROTECTION

By: _____

Title: _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 913478v1/05159.0186

3

CONFIDENTIAL

RFC045251

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December ___, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and MA Builders, Inc. ("Contractor").

### Recitals

A.    Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.    Contractor has provided goods and/or services to the owner of The Monterey pursuant to a contract dated _12 - 17 - 2006_ (the "Contract"). Contractor asserts a claim for unpaid amounts due under the Contract. Contractor represents and warrants that the total amount due under the Contract as of the date hereof is $ _119,511 82_ .

C.    Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Contractor in the amount of $71,110.00 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.    Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Contractor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due under or in connection with the Contract, and all other claims of Contractor arising out of or under the Contract, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

### Agreement

1.    Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Contractor.

2.    Upon payment to Contractor of the Settlement Amount, Contractor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees

RFC045252

(collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners ("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with the Contract (collectively, the "Released Claims").

3.     Upon payment to Contractor of the Settlement Amount, Contractor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing. In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Contractor under this Agreement, or otherwise in connection with The Monterey. In the event that the Settlement Amount is not paid to Contractor on or before March 31, 2008, Contractor may terminate this Agreement. In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Contractor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Contractor shall reserve and retain any and all of its rights and claims under the Contract against the CB Released Parties, but in no event shall Contractor have any claims or rights with respect to the AG/FCP Released Parties. Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Contractor. Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Contractor. In the event that Purchaser elects to use services of, or acquire goods from, Contractor in connection with The Monterey, Contractor shall supply such goods or services to Purchaser or its affiliates or designees substantially in accordance with the terms of the Contract, and shall not raise its rates or prices, or impose conditions or penalties on Purchaser.

6.     Contractor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

2

CONFIDENTIAL

RFC045253

7.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Contractor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a breach or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder.  This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above).  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement.  The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

        IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CONTRACTOR:

MA BUILDERS, INC.

By: _____   _Marcelo Angoti_

Title: _President_____


PURCHASER:

ANGELO GORDON REAL ESTATE INC., a Delaware corporation

By: _____

Title: _____

L&B 913482v1/05159.0186

3

CONFIDENTIAL

RFC045254

## Conditional Settlement Agreement

This Conditional Settlement Agreement (this "Agreement") is made as of December 21, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Mahan Rykiel Associates, Inc. ("Creditor").

*Recitals*

A.     Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.     Creditor has provided goods and/or services to the owner of The Monterey. Creditor asserts a claim for unpaid amounts due. Creditor represents and warrants that the total amount due in connection with The Monterey as of the date hereof is $ *16,225.51*

C.     Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Creditor in the amount of $ 4,056.35 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with goods or services provided with respect to The Monterey, and all other claims of Creditor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

D.     Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Creditor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due with respect to The Monterey, and all other claims of Creditor, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.     Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Creditor.

2.     Upon payment to Creditor of the Settlement Amount, Creditor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and (b) Purchaser, R&K Partners, LLC d/b/a Federal Capital Partners

CONFIDENTIAL

RFC045255

("FCP"), and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (the "AG/FCP Released Parties", and together with the CB Released Parties, the "Released Parties"), from any and all complaints, claims, motions, demands, damages, lawsuits, actions, and causes of action (whether known or unknown, occurred or contingent, liquidated or unliquidated) which they now have or may have against them as of the date of this Agreement, for any reason whatsoever in law or in equity, under federal, state or other law, whether the same be upon statutory claim, contract, tort or other basis, including without limitation any and all claims arising under or in connection with goods or services provided with respect to The Monterey (collectively, the "Released Claims").

3.     Upon payment to Creditor of the Settlement Amount, Creditor shall: (a) dismiss any then-pending lawsuit, arbitration, action or other proceeding against any of the Released Parties with prejudice; (b) release any mechanics', materialman's, judgment or other lien against The Monterey; (b) file a satisfaction of any judgment obtained against any of the Released Parties; and (c) from time to time, execute and deliver such other and further documents and instruments as may be reasonably requested by any of the Released Parties or their respective lenders to effectuate and/or confirm the releases and satisfactions contemplated by this Agreement.

4.     Purchaser may terminate this Agreement at any time, for any reason or for no reason, prior the completion of the Closing.  In the event that Purchaser terminates this Agreement, Purchaser shall have no obligation or liability to Creditor under this Agreement, or otherwise in connection with The Monterey.  In the event that the Settlement Amount is not paid to Creditor on or before March 31, 2008, Creditor may terminate this Agreement.  In the event of termination of this Agreement pursuant to this paragraph, the release set forth in paragraph 2 and Creditor's covenants set forth in paragraph 3 above, shall be null and void and of no force or effect, and Creditor shall reserve and retain any and all of its rights and claims against the CB Released Parties, but in no event shall Creditor have any claims or rights with respect to the AG/FCP Released Parties.  Nothing in this Agreement is intended to create a binding obligation on Purchaser to purchase The Monterey.

5.     Nothing in this Agreement obligates Purchaser or its affiliates or designees to use the services of, or acquire goods from, Creditor.  Purchaser may, in its sole discretion, elect to use the services of, or acquire goods from, Creditor.

6.     Creditor represents and warrants that it has not assigned to any other person any Released Claim, and agrees that, prior to termination of this Agreement in accordance with paragraph 4, above, will not assign any Released Claim to any other person.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective representatives, successors in interests, affiliates, and assigns.  Without limiting the foregoing, Purchaser may assign this agreement to its designees in connection with its acquisition of The Monterey, without Creditor's consent.  The CB Released Parties shall be deemed to be third party beneficiaries of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland.  Neither the waiver by either party of a

CONFIDENTIAL

RFC045256

breach of or default under any of the provisions of the Agreement, nor the failure of such party, on one or more occasions, to enforce any of the provisions of the Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any provisions, rights or privileges hereunder. This Agreement, including exhibits, contains the entire agreement between the parties with respect to the subject matter hereof and may not be amended, modified or terminated except by a signed written agreement between the parties (or as provided in paragraph 4, above). This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original (including facsimiles), and all such counterparts together shall constitute one and the same agreement. The persons signing this Agreement represent and covenant that they have full legal authority to act on behalf of the respective parties and to bind the respective parties to the terms of this Agreement by affixing their signatures hereto.

IN WITNESS WHEREOF, the undersigned, having fully read and understood all of the above, and having full authority to sign this document, have voluntarily and knowingly executed and delivered this Agreement as of the date first set forth above.

CREDITOR:

MAHAN RYKIEL ASSOCIATES, INC.

By: _____

Title: PRESIDENT _____

PURCHASER:

ANGELO GORDON REAL ESTATE INC., a
Delaware corporation

By: _____

Title: _____

L&B 916269v1/05159.0186

3

CONFIDENTIAL

RFC045257

<u>Conditional Settlement Agreement</u>

This Conditional Settlement Agreement (this "Agreement") is made as of December 27, 2007, between Angelo Gordon Real Estate Inc., a Delaware corporation, as purchaser (together with its successors and assigns in such capacity, "Purchaser") and Meltzer Karlin Property & Casualty, Inc. ("Creditor").

*Recitals*

A.   Purchaser currently is conducting its due diligence review with respect to a possible acquisition of certain real property known as The Monterey, located at Rockville Pike and Montrose Road, North Bethesda, Maryland ("The Monterey").

B.   Creditor has provided goods and/or services to the owner of The Monterey. Creditor asserts a claim for unpaid amounts due. Creditor represents and warrants that the total amount due in connection with The Monterey as of the date hereof is $ _66,556.48_ .

C.   Subject to the completion of its due diligence and the consummation of its acquisition of The Monterey, Purchaser is willing to make payment to Creditor in the amount of $16,639.12 (the "Settlement Amount"), in full and final accord and satisfaction of all amounts due under or in connection with goods or services provided with respect to The Monterey, and all other claims of Creditor against the owner and its affiliates (including, without limitation, claims secured by liens on property, and claims evidenced by judgments).

Subject to the consummation of the acquisition of The Monterey by Purchaser (or one or more affiliates thereof), and to the timely payment of the Settlement Amount as set forth below, Creditor is willing to accept the Settlement Amount in full and final accord and satisfaction of all amounts due with respect to The Monterey, and all other claims of Creditor, as more fully detailed below (including without limitation claims secured by liens on property, and claims evidenced by judgments).

*Agreement*

1.   Unless this Agreement has been terminated pursuant to paragraph 4, below, within fifteen (15) business days following the completion of the closing of the acquisition of The Monterey by Purchaser or its designees (the "Closing"), Purchaser shall pay, or shall cause to be paid, the Settlement Amount to Creditor.

2.   Upon payment to Creditor of the Settlement Amount, Creditor is hereby deemed to have released each of (a) Pavilion LLC, a Maryland limited liability company, Triton Pavilion LLC, a Delaware limited liability company, CBRE Realty Finance TRS, LLC, a Delaware limited liability company, and each of their respective present, past or future affiliates, subsidiaries, divisions, predecessors, successors, heirs, legatees, and assigns, and any and all of their past or present officers, directors, agents, attorneys, accountants, and employees (collectively, the "CB Released Parties"), and

CONFIDENTIAL

RFC045258

EXHIBIT T
Outstanding Trade Payables

(See Attached)

T-1

CONFIDENTIAL

RFC045309

EXHIBIT W
Schedule of Litigation

(See attached)

W-1

CONFIDENTIAL

RFC045318