IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CBRE FINANCE TRS, LLC,                  *
                                        *
           v.                           *    Case No.: 1:08-cv-1964
                                        *
BRIAN A. MCCORMICK                      *
                                        *
           and                          *
                                        *
CHARLES W. MOORE                        *
                                      *****

MEMORANDUM

CBRE Finance ("Plaintiff") has filed a complaint in this Court for monetary damages

against Charles W. Moore ("Moore") and Brian A. McCormick ("McCormick") (collectively

"Defendants") based on their guaranty of two commercial real estate loans made by Plaintiff to

companies under Defendants' control.  Now pending before the Court are Plaintiff's Motion for

Summary Judgment and Defendants' Rule 56(f) Motion requesting leave to conduct further

discovery.  For the reasons that follow, I will grant the Plaintiff's Motion and deny the

Defendant's Motion.

**Factual Background[1]**

The dispute in the instant case arises from personal guaranties executed by Defendants on

two loans made by Plaintiff to companies under Defendants control.  Defendants' companies

required the loans for the purpose of purchasing, renovating and reselling condominiums.  (Mem.

in Supp. of Defs.' Opp. to Pl.'s Mot. for Summ. J. ("Defs.' Mem.") at 4-5.)  The first of the two

---

[1] The facts are presented in the light most favorable to the Defendant, the non-moving party.  *See Lee v. York County Sch. Div.*, 484 F.3d 687, 693 (4th Cir. 2007).

loans was for a project called "Rodgers Forge," a 508-unit apartment complex in the Rodgers

Forge subdivision of Baltimore, Maryland. The second loan was in connection with a 432-unit

property in Rockville, Maryland called "Montrose." (*Id*.)  In each case, the terms of the loan

were detailed in a written and signed loan agreement between the Plaintiff and the Defendants'

companies.  Each agreement provided Plaintiff with a security interest in the relevant property;

however, Plaintiff's interests were subordinate to senior lenders.

While the loans were made to the companies and not to Defendants in their individual

capacities, each Defendant executed personal, written guaranties with respect to each loan

("Rodgers Forge guaranty" and "Montrose guaranty").  The guaranties are not unlimited and do

not obligate the Defendants to be liable for every shortfall under the loan.  The guaranties

provide, in pertinent part:

> Guarantor, as a primary party and not merely as a surety, unconditionally and irrevocably guarantees to [Plaintiff] the following "Guaranteed Obligations":
>
>> A. <u>Specific Obligations</u>.  Any loss, damage or liability suffered by [Plaintiff] to the extent the same arises out of any of the following (hereinafter, a "Guaranty Event"):
>>
>>> (i) . . . [F]ailure to cause, taxes, assessments and any other charges which could result in prior lines against any portion of the property to be timely paid; . . .
>>
>> C.  <u>Substantial Completion</u>.  The substantial completion of each portion of the project (as defined in the loan agreement) undertaken by . . . [Defendants] . . . pursuant to the loan documents (exclusive of finishes, options and materials to be chosen by purchasers of individual condominium units with the Property) to attain timely substantial completion free and clear of all mechanics' and materialmen's liens and claims therefore in the manner and with the time specified by the Loan Agreement, for a sum not to exceed the sum of the Loan and the Senior Loan, all in accordance with the terms of the Loan Agreement.

(*Id*. at 10, 12.)

Solely with respect to the Montrose loan, Defendants contend that Plaintiff orally promised to waive current interest payments.  The written loan agreement between Plaintiff and Defendants' companies provided for an interest reserve (a portion of the loan principle that would be used to make current interests payments).  (*Id.* at 6.)  According to Defendants, Plaintiff orally promised that if the interest reserve was exhausted, Plaintiff would either replenish the reserve or waive the current interest payments prospectively.  (*Id.*)  According to Defendants, the motivation for excluding this agreement from the written contract was Plaintiff's need to "demonstrate the payment of current interest in order to . . . attract investors to a then-upcoming initial public offering." (*Id.*)  Defendants contend that they relied on these oral representations in executing the Montrose Guaranty.  (*Id.*)

Eventually, both the Rodgers Forge and Montrose projects fell into default and were foreclosed upon by Plaintiff.  (Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") at 1.) Plaintiff completed a foreclosure of each property at sales in which the Plaintiff was the only bidder.  Prior to foreclosure, Defendants' companies were in default under the senior loan obligations as well. [2]  (*Id.* at 5, 14.)  Because Defendants' companies had defaulted on senior loan obligations, Plaintiff made a series of expenditures to senior creditors to protect its security

---

[2] On January 17, 2007, the senior lender on the Rodgers Forge Project, Ohio Savings Bank, issued two notices of default to Rodgers Forge due to its failure to make interest payments from November 2006 to January 2007 on the senior loan. (*Id.* at 5.) At the same time, Rodgers Forge had not met its real estate tax obligations. (*Id.* at 6.) By falling into arrears on the senior loan obligation and failing to pay taxes, Rodgers Forge was in default under the Plaintiff's loan.  Plaintiff declared a default and accelerated the remaining balance of the Rodgers Forge loan, and also paid the real estate taxes and interest on the senior loan to avoid being foreclosed out of its junior position. (*Id.*) Ultimately, Plaintiff noticed and completed a foreclosure of the property at a sale in which Plaintiffs were the only bidder.

Under the Montrose Project, the senior lender, Freemont Investment and Loan ("Freemont"), required the project to remain on schedule and on budget to avoid default.  On January 24, 2007, Fremont declared a default on the senior loan because Defendants had failed to make November, December and January interest payments totaling over $2 million. (*Id.* at 13.)  Again, Plaintiff advanced the missed interest payments to the senior lender to avoid being foreclosed out of its junior position.  On January 31, 2007, Plaintiff declared a default and accelerated the remaining balance of the Montrose loan. (*Id.*)  In addition to defaulting on the senior loan, Defendants also had not made interests payments on Plaintiff's loan.  After declaring a default, Plaintiff paid real estate taxes, interest on the senior loan, and contractors and materialmen in order to clear lines, restart construction and sell the property. (*Id.* at 14.)  In April 2007, Plaintiff completed a foreclosure of the property at a sale at which it was the only bidder. (*Id.*)

interest in the properties.  Plaintiff made interest payments to senior lenders, paid overdue real

estate taxes, and paid contractors and materialmen in order to clear lines, restart construction and

sell the property.  (*Id.* at 14.)  These payments constitute Plaintiff's damage claims:

**Rodgers Forge Damages**

| | |
|---|---|
| Legal Fees and Costs: | $62,509.36 |
| Property Taxes advanced: | $352,612.03 |
| Interest Payments Paid to Senior Lender: | $3,963,582.54 |
| TOTAL: | $4,378,703.93 |

**Montrose Damages**

| | |
|---|---|
| Legal Fees and Costs: | $257,608.04 |
| Property Taxes advanced: | $562,155.86 |
| Mechanics Lien Payments: | $3,374,288.12 |
| Assumption of Trade Payable by Purchaser: | $4,993,890.00[3] |
| Interest Payment Paid to Senior Lender: | $9,054,768.39 |
| TOTAL: | $18,242,710.41 |

(Defs.' Mem. at 7.)

Plaintiff initiated this action by filing its complaint on July 29, 2008.  On December 9,

2009, the Honorable Judge Andre Davis issued a pretrial order setting the close of discovery for

April 23, 2009.  (Defs.' Mem. at 1.)  Judge Davis later extended this deadline by 75 days, to July

7, 2009.  (*Id*. at 2.)  The scheduling order also provided for a May 26, 2009 deadline by which

the Defendants were required to disclose expert witnesses.  (Mem in Supp. of Defs.' Mot. To

Clarify ("Defs.' Clarify) at 2.)  Defendants were then required to supplement any expert witness

reports by June 15, 2009.  (*Id.*)

After the entry of the scheduling order, production of documents proceeded slowly.  On

March 16, Plaintiff submitted its request for documents to Defendants.  McCormick produced his

first set of documents on July 2, 2009, and completed his production of documents on July 7,

---

[3] This claim for damages arises from the sale of the Montrose property.  Plaintiff contends that because the purchaser of the Montrose property at the foreclosure sale was required to assume the obligation to pay Montrose contractors and materialmen whose liens were outstanding, the sale price of the property was reduced by $4,993,890.00.  (Pl.'s Reply to Defs.'s Mem. ("Pl.'s Reply") at 2.)

2009, the morning of his deposition.  (Pl.'s Reply to Defs.' Mem. ("Pl.'s Reply") at 10.)  On

March 18, 2009, Defendants submitted their request for documents to Plaintiff.  In response to

Defendants' requests, Plaintiff produced discovery documents on the following dates:

| | |
|---|---|
| 5/27/2009 | 4,500 pages |
| 6/16/2009 | 64,000 pages |
| 7/2/2009 | 19,798 |

(Defs.' Reply to Pl.'s Reply "Defs.' Reply" at 3.)

By the close of discovery, the Defendants had not conducted a deposition of Plaintiff's

Rule 30(b)(6) corporate designee.  On June 16, 2009, the Defendants suggested dates for the

deposition.  (Defs.' Reply at 6-7.)   Plaintiff agreed to one of the proposed dates eight days later;

however, at that time, Defendants indicated that the date was no longer available.  (*Id.*)

Defendants then suggested a date after the close of discovery, which Plaintiff rejected.  (*Id.*)

The Defendants also did not designate an expert witness prior to the scheduling order

deadline of May 26, 2009.  ("Defs.' Clarify at 2.)   In a motion seeking clarification and

extension of the scheduling order, filed June 12, 2009, Defendants indicated that they had

"settled on an expert" by the May 26, 2009 deadline, but were unable to obtain the approval of

one of the Defendants because he was out of the country for multiple weeks.  (*Id.* at 3.)  In a

motion filed one week after the Motion to Clarify, Defendants sought an emergency extension of

the discovery deadline on the grounds that they needed additional time to review the documents

produced by Plaintiff prior to taking depositions and retaining an expert witness.  (Mem. in Supp.

of Defs.' Mot. to Ext. "Defs.' Ext." at 4.)  Both the Motion to Clarify and the Motion to Extend

were denied.


**Standard of Review**

Summary judgment is appropriate where there is no genuine issue as to any material fact so that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law of the cause of action determines which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A question of fact is genuine only where it "may reasonably be resolved in favor of either party."  *Id.* at 250.  In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party.  *Id.* at 255.  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Rule 56(f) protects a party opposing summary judgment who for valid reasons cannot present evidence essential to raise a genuine issue of material fact.  Generally, summary judgment is appropriate only after "adequate time for discovery," and Rule 56(f) permits a party to show through affidavit that without discovery it cannot properly present facts essential to its opposition.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); s*ee also Evans v. Technologies Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir.1996) (same).  However, a party must present valid reasons justifying their inability to present facts to oppose the motion.  *See, e.g*., *Rivera-Torres v. Rey-Hernandez*, 502 F.3d 7, 10 (1st Cir. 2007) (noting that Rule 56(f) requires a showing of good cause and concluding that the rule does not protect those who sleep on their rights).  Furthermore, a "Rule 56(f) motion for additional discovery is properly denied when the additional evidence sought to be discovered would not create a genuine issue of material fact

sufficient to defeat summary judgment." *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006) (citing *Strag v. Board of Trustees, Craven Comm. Coll*., 55 F.3d 943, 954 (4th Cir. 1995)).  The purpose of the rule is to ensure that a diligent party is given a reasonable opportunity to prepare the case.

## Plaintiff's Motion for Summary Judgment

Defendants deny liability under the guaranties for the damages alleged by Plaintiff.  First, Defendants contend that the obligations imposed by the guaranties do not cover all the damages suffered by Plaintiff.  While they appear to have conceded that the guaranties cover Plaintiff's claims for taxes and legal fees, they argue that they do not cover protective interest payments, payments to clear mechanics liens, or assumption of trade payables.  Second, Defendants argue that the guaranties are unenforceable as the product of fraud.  Contrary to Defendants arguments, the plain language of the guaranties covers the Plaintiff's damages, and the Defendants' fraud claim is without merit.

The language of the guaranties covers Plaintiff's payment of mechanics liens, protective interest payments, and assumption of trade payables.  Defendants guaranteed to indemnify Plaintiff against any "loss, damage or liability suffered by [Plaintiff]" to the extent such loss arises out of Defendants' failure to pay "taxes, assessments and any other charges which could result in prior liens against" any portion of the Rodgers Forge or Montrose properties.  (Defs.' Mem. at 9.)  Defendant also guaranteed "to attain substantial completion [of the projects] free and clear of all mechanics' and materialmen's liens and claims."  (*Id.* at 12.)  Defendants suggest that the Plaintiff's damages are "not traceable" to any of the guaranteed obligations listed above;

therefore, they contend that protective interest payments, payment of mechanics liens and

assumption of trade payables are not "damages" arising out of a failure to pay "charges" which

could result in prior liens against the properties.  (*Id.* at 11.)  And they contend that none of the

damages flow from the Defendants' failure to "attain substantial completion" of the projects.

Where, as here, a contract is plain and unambiguous, there is no room for construction.

The parties must be presumed to have intended what they expressed.  *See Board of Trustees of*

*State Colleges v. Sherman*, 373 A.2d 626, 629 (Md. 1977):

> We see this as a case of contract construction, the principles of which are well known and
> have been enunciated by this Court numerous times: the clear and unambiguous language
> of an agreement will not give way to what the parties thought the agreement meant or
> intended it to mean; where a contract is plain and unambiguous, there is no room for
> construction, and it must be presumed that the parties meant what they expressed; and
> when the language of a contract is clear, the true test of what is meant is not what the
> parties to the contract intended it to mean, but what a reasonable person in the position of
> the parties would have thought it meant.

Contrary to this well settled principle of contract interpretation, Defendants' interpretation of

their obligations under the guaranties would require this court to read the plain meaning out of

clear contractual terms.  Defendants guaranteed that payments would be made and the project

would be completed on time.  Payments were not made, and the projects were not finished.  As a

result, Plaintiff made payments and suffered damages.  The clear language of the Guaranties

covers Plaintiff's damages.

In addition to challenging the language of the guaranties, Defendants argue that they

cannot be held liable for the Plaintiff's "Assumption of Trade Payables" because they were not

disclosed during discovery.  (Defs.' Mem. at 15.)  Under Fed. R. Civ. Pro. 37(c)(1), if a party

fails to supplement information as required by Rule 26(e), "the party is not allowed to use that

information . . . on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or harmless." Here, Defendants have not suggested any prejudice arising from the Plaintiff's failure to supplement, nor can they. Indeed, the basis for liability for assumption of trade payables is identical to the basis for liability for the mechanics' liens paid by Plaintiff.

Finally, Defendants argue that they are not liable for any of the Plaintiff's damages because Plaintiff has not established that it was "actually harmed" by Defendants' breach. According to Defendants, the projects might have failed financially even in the absence of a breach. (Defs.' Mem. at 11, 13.) Defendants appear to suggest that the only appropriate measure of damages under the guaranties is the difference in value between the project completed without breach, and the project as foreclosed upon by Plaintiff. (*Id.* at 13.) Therefore, if the project was doomed to economic failure at inception, Plaintiff cannot recover any damages because there may not have been enough value in the completed property to repay its loans. Such a conclusion misreads the Restatement (Second) of Contracts § 347, relied on by Defendants:

> Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by:
> (a)   The loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b)   Any other loss, including incidental or consequential loss, caused by the breach, less
> (c)   Any cost or other loss that he has avoided by not having to perform.

(*Id.* at 13.) In a breach of contract action, any loss avoided is subtracted from damages only if the saving results from the injured party not having to perform, rather than some unrelated event. *See* Restatement (Second) of Contract § 347, Comment (d).[4] Therefore, Defendants do not escape from damages caused by their breach of contract because of an economic recession.

---

[4] Illustration 10 in the Restatement (Second) of Contracts § 347, explains: "A contracts to build a machine for B and deliver it to be installed in his factory by June 30. A breaks the contract and does not deliver the machine. B's factory is destroyed by fire on December 31 and the machine, if it had been installed there, would also have been destroyed. The fact that the factory was burned is not considered in determining B's damages."

In addition to challenging the scope of the guaranties, Defendants challenge the enforceability of the Montrose guaranty on the grounds that it was induced by Plaintiff's fraud.[5] Defendants claim that Plaintiff orally promised to either fund, or waive, all interest payments under the Montrose Loan.  In contradiction, the relevant provision of the written loan agreement provides:

> In the event there exist (sic) insufficient funds in the Interest Reserve from which to pay accrued and unpaid interest at the Pay Rate, Borrower shall be and remain obligated for the payment of such Pay Rate of interest in accordance with the terms hereof, and nothing in this Section 6.3 is intended or shall be construed to excuse Borrower from making any such payment.

(Pl.'s Mem. at 18.)  Despite the written contract language, Defendants claim that they relied on Plaintiff's oral promises when executing the guaranties; therefore, the guaranties should be unenforceable due to fraud.  This argument is without merit.

Assuming arguendo that the alleged oral promise was made and relied upon, there can be no fraud here because it would be unreasonable for the Defendants to have relied on the oral representation.  Under Maryland law, a party claiming fraud must show that they "not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had no such misrepresentation been made."  *See Martens Chevrolet, Inc. v. Seney,* 439 A.2d 534, 537 (Md. 1982).  A party has a "right to rely" on misrepresentations only where reliance is reasonable.  *See Sass v. Andrew*, 152 Md. App. 406, 441 (Md. Ct. Spec. App. 2003).  The terms of the written agreement itself,

---

[5] Defendants, in their complaint, and in their counterclaims (dismissed by Judge Davis, March 3, 2009), claimed that the Guaranties are also unenforceable due to duress and illegality.  However, Defendants have failed to raise these arguments as affirmative defenses in either their Response to Plaintiff's Motion for Summary Judgment, or in their Reply to Plaintiff's Opposition to Rule 56(f) Motion.  Because the Defendants have chosen not to raise these arguments in opposition to Plaintiff's Motion for Summary Judgment, they have no bearing on this Court's decision and are therefore not discussed.

the sophistication of the Defendants, and the course of negotiations preceding the Montrose Loan all indicate the unreasonableness of Defendants' reliance on the purported oral statement.

As discussed above, the alleged oral promise is directly contradicted by the plain terms of the written agreement.  In Maryland, courts generally conclude that reliance on oral representations is unreasonable when it is contradicted by the written agreement.  *See, e.g.*, *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 631 (4th Cir. 1977) ("[W]e do not think the plaintiffs could reasonably have relied upon the allegedly fraudulent statements made in the face of plainly contradictory contractual language."); *First Union Nat. Bank v. Steele Software Systems Corp.,* 154 Md. App. 97, 161 (Md. Ct. Spec. App. 2003) (misrepresentations "could not reasonably be relied on by a sophisticated business entity entering a negotiated contract because they were contradicted by the explicit terms of the [contract]" and thus there could be no fraud.)

The Defendants cite to *Goodman v. Winskowski*, 241 A.2d 407 (1968) as an example of when courts will consider oral representations notwithstanding contradictory written terms. While that case dealt with parol evidence and not fraud, the court credited oral representations over a written agreement on grounds not present in this case, namely that the parties' course of conduct comported with the oral representation, rather than the written agreement.  *Id.* at 410. Courts that do find fraud notwithstanding a contradictory written agreement, do so only when other relevant facts support the reasonableness of the oral representation.  *See, e.g.*, *Parker v. Columbia Bank*, 91 Md.App. 346, 361 (Md. Ct. Spec. Ap. 1992) ("In determining if reliance is reasonable, a court is required to view the act in its setting, which will include the implications and promptings of usage and fair dealing.")

While attendant circumstances in *Goodman* led a court to credit oral representations, the circumstances and facts surrounding the Montrose Loan Agreement undermine the

reasonableness of Defendants' purported reliance.  Moore and McCormick are sophisticated businessmen who had dealt in these types of loans before.[6]  The negotiations leading up to the execution of the Montrose Loan agreement are devoid of any mention of the oral promise and fully comport with the terms of the written contract.  Indeed, on November 7, 2005, the very day that this oral representation was supposedly made to McCormick, he asked his attorney "what happens if we exhaust the [interest] reserve?  Do we have a continuing obligation to fund current interest to CBRE?"  (Pl.'s Mem. Ex. 43 at 2.)  Later that day, McCormick was included in an email chain informing him: "the interest is not being waived in the event that the interest reserve is extinguished although I understand your client was advised that they would consider it at the time should that situation arise."  (Pl.'s Mem. Ex. 42 at 2.)  Then McCormick's investment banker responded "I just spoke with Andrew [at CBRE] and the interest is not being waived in the event that the interest reserve is exhausted."  (*Id.*)  And a year later in November 2006, after the interest reserve was exhausted, McCormick ordered at least one interest payment be made on the loan.  (Pl.'s Mem. Ex. 49 at 1.)  Against the background of the facts, no reasonable jury could conclude that professional real estate developers ignored a detailed, signed written document and information from their own investment banker and instead reasonably relied on a single, privately communicated oral representation, intended to defraud investors.  *See Gross v. Susse*, 630 A.2d 1156, 1167 (1993) (when "the facts should be apparent to one of his knowledge and intelligence from a cursory glance or he has discovered something which should serve as a warning that he is being deceived," reliance on the fraudulent statement will not be reasonable.)

**56(f) Motion for Continuance**

---

[6] McCormick is a lawyer and a certified public accountant; Moore has a Masters in Business Administration from the University of Chicago.  (Pl.'s Mem. at 3.)

In the alternative to contending that there are genuine issues of material fact in dispute, Defendants argue that the motion for summary judgment should be denied under Rule 56(f) because they have had an inadequate opportunity to conduct discovery.  Specifically, Defendants contend that the timetable established by the scheduling order and the production of the Plaintiff's discovery within the final six weeks of the discovery schedule precluded them from effectively reviewing the requested documents, conducting depositions, and designating an expert witness.

In determining whether to grant a continuance under Rule 56(f), a court must consider whether the moving party has been diligent, and if the information sought will likely lead to an issue of material fact such that summary judgment is premature.  *See Strag v. Board of Trustees*, 55 F.3d 943, 953-54 (4th Cir. 1995) (noting that a Rule 56(f) motion requires the movant to state what information is needed to prepare the party's case); *see also Superguide Corp. v. DirectTV Enterprises, Inc.*, 202 F.R.D. 460, 463 (W.D.N.C. 2001).  Contrary to Defendants' assertions, they have had adequate opportunity to pursue discovery and the additional information they seek is insufficient to oppose Plaintiff's motion for summary judgment.

Defendants have not diligently pursued discovery and therefore cannot now invoke Rule 56(f) to obtain materials in opposition.  In general, summary judgment should not be granted when the nonmoving party has not had the opportunity to discover information that is essential to her opposition.  *See* Fed.R.Civ.P. 56(f); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).  However, Rule 56(f) is not designed to protect "those who slumber upon perceptible rights." *Ayala-Gerena v. Bristol Myers-Squibb Company*, 95 F.3d 86, 92 (1st Cir. 1996) (quoting *Resolution Trust Corp. v. North Bridge Assoc., Inc.*, 22 F.3d 1198, 1203 (1st

Cir. 1994)).  Defendants seek discovery pertaining to the scope of the guaranties and Plaintiff's

theory, and mitigation, of damages.  (Defs.' Mem. at 26; Defs.' Reply at 9.)  However, they offer

no explanation as to why these materials could not have been requested before all of the

Plaintiff's initial production was reviewed.  For example, they do not point to any specific piece

of information in Plaintiff's production which triggered this need for further discovery.  Indeed,

Plaintiff's theory of damages is apparent from the face of its complaint.

      Defendants also argue for additional discovery on the grounds that they were precluded

an opportunity to take depositions and retain an expert witness.  Defendants never filed a formal

notice of a deposition.  (Pl.'s Reply at 8.)  And while they made informal requests to Plaintiff,

Defendants ultimately reneged on the very dates which they had suggested for a deposition.  (*Id.*

at 9.)  With respect to retaining an expert witness, Defendants argue that they should not have

been required to expend limited resources to hire one until review of all Plaintiff's discovery was

complete.  However, in their Emergency Motion for an Extension of Discovery, Defendants'

counsel initially indicated that they had selected an expert witness, but could not retain the expert

until their client returned from a multi-week trip abroad.  (Defs.' Clarify at 3.)[7]  It is clear that the

Defendants' failure to take depositions and retain an expert is attributable only to their

delinquency.

      Furthermore, Defendants' 56(f) arguments are grounded in general averments, rather than

specific indications of what they intend to discover.  Conjecture is insufficient to raise an issue of

material fact to warrant the grant of a rule 56(f) motion.  "The mere hope that something might

turn up in further discovery does not satisfy the standards of Rule 56(f)." *Goodell v. Rehrig Int'l,*

*Inc.*, 683 F. Supp. 1051, 1054 (E.D. Va. 1988), aff'd, 865 F.2d 1257 (4th Cir. 1989); *see also*

---

[7] In their memorandum, Defendants' stated: "By May 26, 2009, counsel for defendants had settled on an expert, but the retention required the approval of the defendants, one of whom was out of the country at the time (and had been for the previous two weeks) with limited access to email."

*Morrow v. Farrell*, 50 Fed. Appx. 179, 179 (4th Cir. 2002) (concluding that Rule 56(f) does not permit fishing expeditions); *Adams v. Giant Food, Inc.*, 225 F.Supp.2d 600, 607 (D. Md. 2002) (same).  Plaintiff has indicated that Defendants are already in possession of significant evidence regarding their expenditures.  Defendants took a deposition of the contractor who oversaw the properties following foreclosure, Plaintiff produced the appraisals it obtained at or shortly after the foreclosures, and produced the investment committee memoranda detailing the justifications for any funding provided to the projects.  (Pl.'s Reply at 11.)  Defendants fail to specifically indicate what additional information they require.  Instead, Defendants only speculatively list the "exercises that the Defendants would be able to perform with the benefit of further discovery" and which of Plaintiff's theories they would be able to "test."  (Defs.' Mem. at 26.)

Finally, much of the information sought by the Defendants is irrelevant to Plaintiff's Motion for Summary Judgment.  Defendants request additional time to engage the services of an expert witness to assess the economic viability of the projects had they been completed on time and within the terms of the contract.  (Defs.' Reply at 9.)  The Defendants contend that if the projects lacked economic viability even after substantial completion, the Plaintiffs cannot recover under the guaranties because the Defendants' breach of contract has made them no worse off.  (*Id*.)  As indicated above, Defendants' argument lacks merit as a matter of law.  Furthermore, Defendants claim that they need additional time for discovery to pursue Plaintiff's "new theory" of damages for assumption of trade account payables.  As discussed above, this figure is based on the same theory upon which all of the Plaintiff's other damage figures are based.

A separate order granting Plaintiff's motion for summary judgment is being entered herewith.  While the language of the Rodgers Forge and Montrose Guaranties appear to indicate

that Plaintiff is entitled to its request for attorney's fees and costs for this proceeding, the parties

have not briefed this issue.  Nor have the parties addressed the issue of pre and post judgment

interest.[8]  Plaintiff should file a request for attorney's fees, costs, and pre and post judgment

interest on or before December 22, 2009.  Defendants should file any opposition on or before

January 6, 2010.


DATE:  <u>12/8/2009</u>                    ___/s/_____
                                        J. Frederick Motz
                                        United States District Judge

---

[8] While the parties have not yet briefed the issue of interest, this Court believes an appropriate interest rate would be the three-month average Treasury bill rate of approximately 2.34 percent.  In determining pre-judgment interest where no contractual rate exists, "[t]he Second Circuit has suggested as a benchmark 'short-term, risk free obligations.'"  *Loginter S.A. Y Parque Industrial Agua Profunda S.A. v. M/V Nobility*, 177 F. Supp. 2d 411, 421 (D. Md. 2001) (quoting *Ingersoll Milling v. Bodena*, 829 F.2d 293 (2d Cir. 1987)).  Following that guidance, Judge Nickerson, in a case where no contractual interest rate existed, applied the three-month average Treasury bill rate to value an FMLA lien. *Id.* at 421–22; *see also Bruzzone Consol. Inc v. M/V Blue Eagle*, 713 F. Supp. 146, 153 (D. Md. 1989) (Niemeyer, J.)